**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CHAPARRAL ENERGY, INC., *et al.*,[1] | ) Case No. 20-11947 (MFW) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Hearing Date: October 1, 2020 at 10:30 a.m. (ET)** |
| | ) **Obj. Deadline: September 22, 2020 at 4:00 p.m. (ET)** |
| | ) |

**MOTION OF DEBTORS FOR ENTRY OF AN ORDER (A) AUTHORIZING THE DEBTORS TO ASSUME THE BACKSTOP PURCHASE AGREEMENT, (B) PAY THE BACKSTOP OBLIGATIONS, AND (C) GRANTING RELATED RELIEF**

Chaparral Energy, Inc. and its subsidiaries that are debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned cases (the "**Chapter 11 Cases**"), hereby move (this "**Motion**") for entry of an order, substantially in the forms attached hereto as **Exhibit A** (the "**Proposed Order**"), granting the relief described below. In support thereof, the Debtors refer to the *Declaration of Kevin Glodowski in Support of Motion for Entry of an Order (A) Authorizing the Debtors to Assume the Backstop Purchase Agreement, (B) Pay the Backstop Obligations, and (C) Granting Related Relief* (the "**Glodowski Declaration**"), attached as **Exhibit B** hereto and further represent as follows:

---

[1] The Debtors in these cases, along with the last four digits (or five digits, in cases in which multiple Debtors have the same last four digits) of each Debtor's federal tax identification number, are: CEI Acquisition, L.L.C. (1817); CEI Pipeline, L.L.C. (6877); Chaparral Biofuels, L.L.C. (1066); Chaparral $CO_2$, L.L.C. (1656); Chaparral Energy, Inc. (90941); Chaparral Energy, L.L.C. (20941); Chaparral Exploration, L.L.C. (1968); Chaparral Real Estate, L.L.C. (1655); Chaparral Resources, L.L.C. (1710); Charles Energy, L.L.C. (3750); Chestnut Energy, L.L.C. (9730); Green Country Supply, Inc. (2723); Roadrunner Drilling, L.L.C. (2399); and Trabajo Energy, L.L.C. (9753). The Debtors' address is 701 Cedar Lake Boulevard, Oklahoma City, OK 73114.

## JURISDICTION

1. The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

2. Venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief requested herein are sections 105, 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), Rule 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## BACKGROUND

4. On August 16, 2020 (the "**Petition Date**"), the Debtors filed voluntary petitions in this Court commencing the Chapter 11 Cases. The Debtors continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been requested in the Chapter 11 Cases and no committees have yet been appointed.

5. On August 15, 2020, the Debtors began the solicitation of votes on the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* [D.I. 16] (the "**Prepackaged Plan**") through their *Disclosure Statement for Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* [D.I. 17] (the "**Disclosure Statement**") pursuant to sections 1125 and 1126(b) of the Bankruptcy Code.

6. On August 18, 2020, the Court entered the *Order (I) Scheduling a Combined Hearing to Consider (A) Approval of Disclosure Statement and (B) Confirmation of Plan, (II) Establishing a Deadline to Object to Disclosure Statement and Plan, (III) Approving the Form and Manner of Notice of the Combined Hearing, Objection Deadline, and Notice of Commencement, (IV) Approving Solicitation Procedures and Forms of Ballots, (V) Approving Opt Out Procedures and Equity Holder Opt Out Form, (VI) Approving the Rights Offering and Related Materials, (VII) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases, and (VIII) Conditionally waiving Requirements to (A) File Statement of Financial Affairs and Schedules of Assets and Liabilities and (B) Convene Section 341 Meeting of Creditors* [D.I. 84] (the "**Scheduling and Solicitation Order**") and scheduled a combined hearing on October 1, 2020 to consider the adequacy of the Disclosure Statement and the confirmation of the Prepackaged Plan.

7. Additional information about the Debtors, including their business operations, their capital structure and prepetition indebtedness, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the *Declaration of Charles Duginski, Chief Executive Officer and President of Chaparral Energy, Inc. in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [D.I. 25], which is incorporated herein by reference.

**RELIEF REQUESTED**

8. By this Motion, pursuant to sections 105, 363, 365, 503, and 507 of the Bankruptcy Code and Rules 6004 and 6006 of the Bankruptcy Rules the Debtors seek entry of an order (i) authorizing the Debtors to assume the Backstop Purchase Agreement (as defined herein), a copy of which is attached as **Exhibit C** hereto and pay the Backstop Obligations (as defined herein) and (ii) granting related relief.

**THE PREPACKAGED PLAN**

9. The Backstop Purchase Agreement is a critical element of the restructuring transactions contemplated by the Prepackaged Plan, which is supported by more than 75% of holders of the Debtors' revolving loans and more than 75% of holders of the Debtors' outstanding $300 million in aggregate principal amount of unsecured notes (the "**Senior Notes**"), who have documented their support by executing a restructuring support agreement on August 15, 2020 (the "**Restructuring Support Agreement**").  Under the Plan, the Debtors will equitize all of their approximately $300 million of unsecured notes, eliminating a significant portion of their prepetition debt, and convert the revolving loans into an exit facility. Importantly, the Plan contemplates that allowed general unsecured claims will remain unimpaired and be paid in full or "ride through" the Chapter 11 Cases.

10. To successfully consummate the restructuring transactions contemplated under the Prepackaged Plan and emerge from the Chapter 11 Cases well-capitalized and competitive, on September 8, 2020, pursuant to the Scheduling and Solicitation Order, the Debtors launched a $35 million rights offering of second-lien senior notes convertible into new common stock of the reorganized Chaparral Energy, Inc. (such new common stock, the "**New Common Stock**" and such offering, the "**Rights Offering**").

11. The Rights Offering will be backstopped in full by certain holders of the Senior Notes (the **Backstop Parties**") pursuant to that certain Backstop Purchase Agreement, dated August 15, 2020, by and among the Debtors and the Backstop Parties (the "**Backstop Purchase Agreement**"). The Debtors entered into the Backstop Purchase Agreement to ensure that, in the event the Rights Offering is undersubscribed, the Debtors will nonetheless receive sufficient proceeds to meet their obligations under the Prepackaged Plan and Restructuring Support Agreement.

## THE BACKSTOP PURCHASE AGREEMENT[2]

12. As discussed above, the Rights Offering will be fully backstopped by the Backstop Parties pursuant to the Backstop Purchase Agreement. As consideration for their commitment under the Backstop Purchase Agreement, the Backstop Parties will receive either (i) a "**Put Option Premium**" constituting an aggregate number of shares of New Common Stock equal to 10% of the total shares of New Common Stock issued by the Company upon emergence from bankruptcy or (ii) a "**Put Option Premium Cash Amount**" of $2,625,000 in the event the Backstop Purchase Agreement is terminated under certain circumstances.

13. The Backstop Purchase Agreement also obligates the Debtors to indemnify the Backstop Parties for certain losses, claims, damages, liabilities, costs and expenses incurred in connection with, among other things, the Prepackaged Plan and the transactions contemplated thereby including the Backstop Purchase Agreement, the Rights Offering, the payment of the Put Option Premium, or others (the "**Indemnification Obligations**") and pay or reimburse the Backstop Parties for their reasonable professional fees incurred in connection with

---

[2] The following is intended to provide a summary of the Backstop Purchase Agreement. To the extent that the summary is inconsistent with the Backstop Purchase Agreement, the Backstop Purchase Agreement shall control.

RLF1 23974481v.1

the Backstop Purchase Agreement (the "**Expense Reimbursements**, and, together with the Put Option Premium, the Put Option Premium Cash Amount, and the Indemnification Obligations, the "**Backstop Obligations**"). The Backstop Purchase Agreement provides that the Backstop Obligations shall constitute allowed administrative expenses of the Debtors' estate under section 503(b) and 507(a)(1) of the Bankruptcy Code.

14. The following chart summarizes the key terms of the Backstop Agreement[3].

| **Backstop Commitment** §1.2(a) | The Backstop Parties commit to fully backstop the Rights Offering and to purchase from the Company, on the Effective Date, at a purchase price equal to the total principal amount of such Unsubscribed Securities, its Backstop Commitment Percentage of all Unsubscribed Securities. The Backstop Commitments of the Backstop Parties are several, not joint, obligations of the Backstop Parties, such that no Backstop Party shall be liable or otherwise responsible for the Backstop Commitment of any other Backstop Party. |
|---|---|
| **Put Option Premium, Put Option Premium Cash Amount, Expense Reimbursements, and Indemnification Obligations** § § 1.3, 2.2, 9 | In consideration for the Debtors' right to require the Backstop Parties to purchase the Backstop Commitment Securities pursuant to their Backstop Commitments on the terms and subject to the conditions set forth in the Backstop Purchase Agreement, the Debtors shall be required to pay to the Non-Defaulting Backstop Parties, as the Put Option Premium, an aggregate number of shares of New Common Stock equal to 10% of the Total New Equity Interests, which Put Option Premium shall be paid to the Non-Defaulting Backstop Parties on a *pro rata* basis (in each case rounded up or down to the nearest whole share of New Common Stock) based upon their respective Backstop Commitment Percentages. The Debtors shall pay the Put Option Premium on the Effective Date.<br><br>If the Closing does not occur and the Backstop Purchase Agreement is terminated, the Debtors shall be required to pay the Put Option Premium to the Non-Defaulting Backstop Parties in cash (in lieu of issuing Put Option Securities), in an amount equal to the Put Option Premium Cash Amount of $2,625,000.<br><br>Whether or not the transactions contemplated by the Backstop Purchase Agreement are consummated, the Debtors agree to reimburse in cash or pay in cash, as the case may be, the (a) all Consenting Creditor Fees and |

---

[3] Capitalized terms used in the chart but not otherwise defined shall have the meaning ascribed to them in the Backstop Purchase Agreement.

6

Expenses of each of the Backstop Parties payable pursuant to the terms of the RSA, (b) to the extent not included among such Consenting Creditor Fes and Expenses, all accrued but unpaid reasonable and documented fees and expenses (whether incurred prior to or after the commencement of the Chapter 11 Cases) related to the formulation, development, negotiation, documentation, and implementation of the Backstop Purchase Agreement and the transactions contemplated hereby, the Definitive Documents, and/or any amendments, waivers, consents, supplements, or other modifications to any of the foregoing, in each case, of: (i) Stroock & Stroock & Lavan LLP, as counsel to the Backstop Parties, (ii) Young Conaway Stargatt & Taylor, LLP, as local counsel to the Backstop Parties, (iii) Perella Weinberg Partners LP, as financial advisor to Stroock & Stroock & Lavan LLP and (iv) such other advisors retained by the Required Backstop Parties with the consent of the Company (such consent not to be unreasonably withheld) in connection with its representation of the Backstop Parties, in the case of a financial advisor, in accordance with the engagement letters and/or fee letters among such consultant or professional and any of the Debtors, including, without limitation, any success fees contemplated therein, and in each case, without further order of, or application to, the Bankruptcy Court by such consultant or professionals or the Debtors, and (c) all filing fees (if any) required by the HSR Act or any other competition Laws and any expenses related thereto.

Whether or not the transactions contemplated by the Backstop Purchase Agreement or any of the other Contemplated Transactions are consummated, the Debtors agree, jointly and severally, to indemnify and hold harmless (i) each of the Backstop Parties, (ii) each of the Affiliates of each of the Backstop Parties, and (iii) each of the stockholders, equity holders, members, partners, managers, officers, directors, employees, attorneys, accountants, financial advisors, consultants, agents, advisors and controlling persons of each of the Backstop Parties and each of the Affiliates of each of the Backstop Parties (each, in such capacity, an "Indemnified Party") from and against any and all losses, claims, damages, liabilities, costs and expenses (including reasonable attorneys' fees but excluding Taxes of the Backstop Parties, except to the extent otherwise expressly provided for in the Backstop Purchase Agreement), Taxes, interest, penalties, judgments and settlements, whether or not related to a third party claim, imposed on, sustained, incurred or suffered by, or asserted against, any Indemnified Party as a result of, arising out of, related to or in connection with, directly or indirectly, the Backstop Purchase Agreement, the Backstop Commitments, the Backstop Securities, the Rights Offering, any of the Definitive Documents, the Plan (or the solicitation thereof), the Chapter 11 Cases or the transactions contemplated hereby or thereby or any of the other Contemplated Transactions, or any breach by any Debtor of any of its representations, warranties and/or covenants set forth in the Backstop Purchase Agreement, or any claim, litigation, investigation or other Proceeding relating to or arising out of any of the foregoing, regardless of

| | |
|---|---|
| | whether any such Indemnified Party is a party thereto, and to pay and/or reimburse each such Indemnified Party for the reasonable and documented legal or other out-of-pocket costs and expenses as they are incurred in connection with investigating, monitoring, responding to or defending any of the foregoing. |
| **Representations and Warranties** §§ 3,4 | The Backstop Purchase Agreement will contain representations and warranties of the Debtors and the Backstop Parties customary for transactions of this type. |
| **Termination** § 8 | Unless earlier terminated in accordance with the terms of the Backstop Purchase Agreement, the Backstop Purchase Agreement (including the Backstop Commitments contemplated hereby) shall terminate automatically and immediately, without a need for any further action on the part of (or notice provided to) any Person, upon the earlier to occur of:<br>  i. the Bankruptcy Court's entry of an Order converting any of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, appointing a trustee or custodian for any of the Debtors or dismissing any of the Chapter 11 Cases; and<br>  ii. the date of any termination of the RSA with respect to the Consenting Noteholders or all parties thereto or the delivery of notice of termination by any of the parties to the RSA that would have the effect of terminating the RSA with respect to the Consenting Noteholders or all parties thereto if such notice of termination was effective.<br><br>The Backstop Purchase Agreement (including the Backstop Commitments contemplated hereby) may be terminated and the transactions contemplated hereby may be abandoned at any time by the Backstop Parties effective immediately upon the giving by the Required Backstop Parties of written notice of termination to the Debtors:<br>  i. if (A) any of the Debtors shall have breached or failed to perform any of their respective covenants or other obligations contained in the Backstop Purchase Agreement (including covenants incorporated into the Backstop Purchase Agreement by reference), and (B) any such breach or failure to perform (x) would result in a failure of a condition set forth in Section 7.1 and (y) is not curable by the Outside Date, or, if curable or able to be performed by the Outside Date, is not cured by the Outside Date;<br>  ii. if any of the conditions set forth in Section 7.1 of the Backstop Purchase Agreement become incapable of fulfillment prior to the Outside Date;<br>  iii. if any of the Debtors (including by or through any of their Representatives) (A) enters into, publicly announces its intention to enter into (including by means of any filings made with any Governmental Body), or announces to any of the Backstop Parties or holders of Company Claims/Interests its intention to enter into, an |

<table>
<tr><td></td><td>

agreement (including any agreement in principle, letter of intent, memorandum of understanding or definitive agreement), whether binding or non-binding, or whether subject to terms and conditions, with respect to any Alternative Transaction, (B) files any pleading or document with the Bankruptcy Court agreeing to, evidencing its intention to support, or otherwise supports, any Alternative Transaction or (C) consummates any Alternative Transaction;

iv. if a Consenting Creditor Termination Event shall occur, without giving effect to any waivers of a Consenting Creditor Termination Event provided under the RSA (for purposes of determining the occurrence of a Consenting Creditor Termination Event, the terms "Required Consenting Noteholders" and "Required Consenting Creditors" as used in any of clauses (a)-(m) of Section 10.01 of the RSA shall be replaced with "Required Backstop Parties")

v. if any Law or Order has been enacted or entered by any Governmental Body that operates to prevent, restrict or alter, in any material respect, the implementation of the Plan, the Rights Offering or any of the Contemplated Transactions;

vi. if the Backstop Order is not entered by the Bankruptcy Court on or before the date that is forty-five (45) days after the Petition Date; or

vii. at any time after the date that is one hundred (100) days after the Petition Date (the "Outside Date"), if the Closing shall not have occurred on or prior to the Outside Date.

The Backstop Purchase Agreement (including the Backstop Commitments contemplated hereby) may be terminated at any time by the Debtors effective immediately upon the Debtors' giving of written notice of termination to the Backstop Parties if (i) any of the Backstop Parties shall have breached or failed to perform any of their respective covenants or other obligations contained in the Backstop Purchase Agreement, or any representation or warranty of any of the Backstop Parties in Backstop Purchase Agreement shall have become untrue (determined as if the Backstop Parties made their respective representations and warranties at all times on and after the Execution Date and prior to the date the Backstop Purchase Agreement is terminated), and (ii) any such breach or failure to perform (A) would result in a failure of a condition set forth in Section 7.2 and (B) is not curable by the Outside Date, or, if curable or able to be performed by the Outside Date, is not cured by the Outside Date; provided, however, that if a Funding Default shall occur, the Debtors shall not be permitted to terminate the Backstop Purchase Agreement and the transactions contemplated hereby pursuant to this Section 8(c) unless Non-Defaulting Backstop Parties do not elect to commit to purchase all of the Default Securities pursuant to the process set forth in Section 1.2(c) or otherwise.

</td></tr>
</table>

RLF1 23974481v.1

**BASIS FOR RELIEF REQUESTED**

**A.    Assumption of the Backstop Purchase Agreement Is an Exercise of Sound Business Judgment.**

15.    The Debtors seek Court authorization to assume the prepetition Backstop Purchase Agreement so that the Debtors and Backstop Parties perform their obligations thereto. The Backstop Purchase Agreement is an integral component of the Prepackaged Plan. Moreover, assumption of the Backstop Purchase Agreement (including approval of the Backstop Obligations) is a key milestone in the Restructuring Support Agreement, and the failure to meet this milestone could result in the Debtors' creditors withdrawing their support for the Prepackaged Plan. Restructuring Support Agreement § 4(f). Furthermore, satisfaction of the conditions under the Backstop Purchase Agreement is a condition precedent to the effectiveness of the Prepackaged Plan. Prepackaged Plan § IX.A.6.

16.    This Court has authority to grant the relief requested in this Motion pursuant to sections 105(a), 363(b), 365(a) and 503(b) of the Bankruptcy Code. Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the Court's approval, may . . . assume any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The standard to be applied by a court in determining whether an executory contract or unexpired lease should be assumed or rejected is the "business judgment" test, which is premised upon the debtor's business judgment that assumption or rejection would be beneficial to its estate. *See, e.g.*, *Group of Inst. Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 318 U.S. 523, 550 (1943) ("[T]he question of whether a lease should be rejected and if not on what terms it should be assumed is one of business judgment."); *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (noting that the "resolution of [the] issue of assumption or rejection will be a

matter of business judgment by the bankruptcy court"); *Glenstone Lodge Inc. v. Buckhead Am. Corp. (In re Buckhead Am. Corp.)*, 180 B.R. 83, 88 (D. Del. 1995) (noting that the requirement for granting an assumption motion is the reasonable exercise of the debtor's business judgment); *In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003) ("The business judgment test dictates that a court should approve a debtor's decision to reject a contract unless that decision is the product of bad faith or a gross abuse of discretion."); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (D. Del. 2003) ("A debtor's determination to reject an executory contract can only be overturned if the decision was the product of bad faith, whim or caprice.").

17. Upon finding that a debtor has exercised its sound business judgment in determining that assumption of an agreement is in the best interests of its estate, the Court should approve the assumption under section 365(a) of the Bankruptcy Code. *See, e.g.*, *In re Bankvest Capital Corp.*, 360 F.3d 291 (1st Cir. 2004) ("If a debtor wants to assume a contract in its business judgment . . . the debtor should be allowed to do so."); *In re Child World, Inc.,* 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992); *In re TS Indus., Inc.*, 117 B.R. 682, 685 (Bankr. D. Utah 1990).

18. The Debtors submit that the Debtors' assumption of the Backstop Purchase Agreement for the purpose of consummating the transactions contemplated under the Prepackaged Plan is a sound exercise of business judgment. The Backstop Purchase Agreement requires a substantial investment by the Backstop Parties in the Debtors' reorganization. The committed investment of the Backstop Parties ensures that all of the convertible notes offered pursuant to the Rights Offering are purchased, and therefore ensures an infusion of the funds required for the Debtors to emerge from chapter 11.

## B. Payment of the Backstop Obligations Is Appropriate and Should Be Afforded Administrative Expense Status.

19. The Debtors have consulted their advisors and have determined, in the exercise of their reasonable business judgment, that the Backstop Obligations are reasonable under the circumstances, include customary terms for transactions of this type, and that the Put Option Premium is within the range of backstop fees that have been approved in connection with rights offerings in other chapter 11 cases. Moreover, the Put Option Premium is an essential feature of the Backstop Purchase Agreement, without which the Backstop Parties would not have agreed to sign the Backstop Purchase Agreement. Without the Backstop Purchase Agreement, the success of the Rights Offering, and, in turn, the Prepackaged Plan would be subject to substantial uncertainty. More specifically, the proceeds of the Rights Offering and the Backstop Purchase Agreement ensure that the Debtors will obtain the new money investment that the holders of the Debtors' revolving loans required in connection with the proposed exit facility. The Put Option Premium was negotiated extensively and at arm's length and is considered an essential feature of the bundle of rights and obligations set forth in the Restructuring Support Agreement that underpins the Prepackaged Plan. Given the Debtors' interest in pursuing a consensual restructuring process, particularly one in which trade and other creditors will be paid in full, the Debtors determined that agreeing to the terms of the Put Option Premium was appropriate and in the best interest of the estates and all of its stakeholders.

20. In addition to the Put Option Premium, the Backstop Purchase Agreement provides that a Put Option Premium Cash Amount of $2,625,000 is payable to the non-defaulting Backstop Parties in the event the Backstop Purchase Agreement is terminated under certain enumerated circumstances. Backstop Agreement § 8(e). The Put Option Premium Cash Amount, like the Put Option Premium, is a market-driven feature of the Backstop Purchase

12

Agreement that was negotiated at arms' length, and the Backstop Parties would not have agreed to sign the Backstop Purchase Agreement without the Put Option Premium Cash Amount.

21. Notably, the Put Option Premium and the Put Option Premium Cash Amount are, by their nature, mutually exclusive. The Put Option Premium will only be issued upon the issuance of the New Common Stock on the Effective Date of the Prepackaged Plan in connection with consummation of the Rights Offering. The Put Option Premium Cash Amount is only payable upon termination of the Backstop Purchase Agreement in certain circumstances, that would only apply prior to the Effective Date of the Prepackaged Plan (and where the Put Option Premium would not apply). Thus, under no circumstances would both amounts become payable.

22. Payment of the Expense Reimbursement and Indemnification Obligations is also warranted. The Backstop Parties already have invested significant time and effort in pursuing the transactions set forth in the Backstop Purchase Agreement, including conducting diligence on the Debtors' businesses and reviewing and negotiating the Prepackaged Plan, the Backstop Purchase Agreement, and various related documents and agreements. Reimbursing such fees and expenses is customary in other similar transactions, and the Debtors submit that such reimbursement is reasonable here.

23. Similar protections for backstop parties have been approved in other chapter 11 cases in this District. *See, e.g.*, *In re RentPath Holdings, Inc, et al.*, No. 20-10312 (BLS) (Bankr. D. Del. Mar. 10, 2020) (Dkt. No. 179) (approving backstop commitment letter and related obligations, including fee premium and indemnification provisions); *In re Hexion Holdings, LLC, et al.*, No. 19-10684 (KG) (Bankr. D. Del. May 15, 2019) (Dkt. Nos. 367 and 368) (approving backstop agreement, including commitment premiums, expense reimbursements

and indemnification obligations); *In re GulfMark Offshore, Inc.*, No. 17-11125 (KG) (Bankr. D. Del. June 15, 2017) (Dkt. No. 151) (approving backstop agreement, including commitment premium, termination fee and indemnification obligations); *See, e.g.*, *In re Aspect Software Parent, Inc., et al.*, No. 16-10497 (MFW) (Bankr. D. Del. Apr. 25, 2016) (Dkt. No. 238) (approving backstop agreement, including put premium, termination fee and indemnification obligations); *In re Offshore Group Inv. Ltd., et al.*, No. 15-12422 (BLS) (Bankr. D. Del. Dec. 4, 2015) (Dkt. No. 37) (approving backstop agreement and authorizing debtors pay backstop premium, reimburse backstop parties' expense, and incur indemnification obligations).

24. Lastly, the Debtors submit that the Backstop Obligations to the extent and in the form payable under the Backstop Purchase Agreement constitute "actual, necessary costs and expenses of preserving the estates." 11 U.S.C. § 503(b)1)(A). Without the ability to pay the Backstop Obligations, the Debtors would be unable to secure the Backstop Parties' commitments to ensure that the Rights Offering is backstopped up to the full amount.

25. Under similar circumstances, courts have recognized that obligations undertaken by debtors in backstop and other financing commitment agreements are entitled to administrative expense status. *See, e.g.*, *In re RentPath Holdings, Inc, et al.*, No. 20-10312 (BLS) (Bankr. D. Del. Mar. 10, 2020) (Dkt. No. 179); *In re Hexion Holdings, LLC, et al.*, No. 19-10684 (KG) (Bankr. D. Del. May 15, 2019); *In re GulfMark Offshore, Inc.*, No. 17-11125 (KG) (Bankr. D. Del. June 15, 2017) (Dkt. No. 151); *In re Aspect Software Parent, Inc.*, Case No. 16-10597 (Bankr. D. Del. Mar. 9, 2016) [Dkt. No. 238]; *In re Exide Tech.*, Case No. 13-11482 (KJC) (Bankr. D. Del. Feb. 4, 2015) [Dkt. No. 3087].

26. Because the Backstop Purchase Agreement confers substantial benefits on the Debtors' estates and because the Backstop Obligations were negotiated at arms' length, are a

key component of the consummation of the Backstop Purchase Agreement and the Prepackaged Plan, are customary in connection with rights offerings in chapter 11 cases, and represent the principal inducements for the Backstop Purchase Agreement, the Debtors hereby request authorization to assume the Backstop Purchase Agreement and perform their obligations thereunder, including the Backstop Obligations.

**BANKRUPTCY RULE 6004 SHOULD BE WAIVED**

27.  To the extent that any aspect of the relief sought herein constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay under Bankruptcy Rule 6004(h).  As described above, the relief that the Debtors request in this Motion is immediately necessary in order for the Debtors to be able to continue to operate their businesses and preserve the value of their estates.  The Debtors respectfully request that the Court waive the notice requirements imposed by Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

**NOTICE**

28.  Notice of this Motion will be given to: (a) the Office of the United States Trustee for the District of Delaware; (b) the administrative agent for the Debtors' prepetition revolving credit facility; (c) counsel to the administrative agent for the Debtors' prepetition revolving credit facility; (d) the indenture trustee under the Debtors' 8.750% senior notes due 2023; (e) Stroock & Stroock & Lavan LLP and Young, Conaway, Stargatt & Taylor, LLP as counsel to the ad hoc group of holders of the 8.750% senior notes due 2023; (f) the Internal Revenue Service; (g) the Environmental Protection Agency and similar state environmental

agencies for states in which the Debtors conduct business; (h) the United States Attorney for the District of Delaware; (i) the Attorneys General for the states of Oklahoma and Texas; (j) counsel to Naylor Farms, Inc. and Harrel's LLC, as lead plaintiffs in the action captioned *Naylor Farms, Inc., individually and as class representative on behalf of all similarly situated persons v. Chaparral Energy, L.L.C.*, Case No. 11-00634 (W.D. Ok. 2011); (k) the parties included on the Debtors' consolidated list of top (20) largest unsecured creditors; (l) the Backstop Parties; and (m) any party that is entitled to notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**").  The Debtors submit that, under the circumstances, no other or further notice is required.

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order respectively, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: September 8, 2020
      Wilmington, Delaware

/s/ *Amanda R. Steele*
John H. Knight (No. 3848)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King St.
Wilmington, Delaware 19801
Telephone: 302-651-7700
Fax: 302-651-7701
E-mail: knight@rlf.com
        steele@rlf.com
        schlauch@rlf.com

- and -

Damian S. Schaible (admitted *pro hac vice*)
Angela M. Libby (admitted *pro hac vice*)
Jacob S. Weiner (admitted *pro hac vice*)
Paavani Garg (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: 212-450-4000
Fax: 212-701-5800
Email: damian.schaible@davispolk.com
        angela.libby@davispolk.com
        jacob.weiner@davispolk.com
        paavani.garg@davispolk.com

*Proposed Counsel for Debtors and Debtors in Possession*