**IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CHAPARRAL ENERGY, INC., *et al.*,[1] | ) Case No. 20-11947 (MFW) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Hearing Date: Oct. 1 2020 at 10:30 a.m. (ET)** |
| | ) |
| | ) |
| | ) |

**NOTICE OF FILING PLAN SUPPLEMENT TO THE CHAPTER 11 JOINT
PREPACKAGED PLAN OF REORGANIZATION FOR
<u>CHAPARRAL ENERGY, INC. AND ITS AFFILIATED DEBTORS</u>**

**PLEASE TAKE NOTICE** that, on August 16, 2020, the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "**Court**").

**PLEASE TAKE FURTHER NOTICE** that, on August 16, 2020, the Debtors filed the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* [D.I. 16] (the "**Plan**").[2]

**PLEASE TAKE FURTHER NOTICE** that attached hereto are the forms of the documents set forth below, which form a supplemental appendix to the Plan (collectively, the "**Plan Supplement**"):

---

[1] The Debtors in these cases, along with the last four digits (or five digits, in cases in which multiple Debtors have the same last four digits) of each Debtor's federal tax identification number, are: CEI Acquisition, L.L.C. (1817); CEI Pipeline, L.L.C. (6877); Chaparral Biofuels, L.L.C. (1066); Chaparral CO2, L.L.C. (1656); Chaparral Energy, Inc. (90941); Chaparral Energy, L.L.C. (20941); Chaparral Exploration, L.L.C. (1968); Chaparral Real Estate, L.L.C. (1655); Chaparral Resources, L.L.C. (1710); Charles Energy, L.L.C. (3750); Chestnut Energy, L.L.C. (9730); Green Country Supply, Inc. (2723); Roadrunner Drilling, L.L.C. (2399); and Trabajo Energy, L.L.C. (9753). The Debtors' address is 701 Cedar Lake Boulevard, Oklahoma City, OK 73114.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

| Exhibit | Plan Supplement Document |
|---|---|
| **A** | New Corporate Governance Documents |
| **B** | New Stockholders Agreement |
| **C** | Restructuring Steps Memorandum |
| **D** | Rejected Executory Contract and Unexpired Lease List |
| **E** | Reorganized Chaparral Parent Board and the Officers of the Reorganized Chaparral Parent |
| **F** | Exit Facility Credit Agreement |
| **G** | New Convertible Notes Indenture |
| **H** | New Warrants Agreement and Certificate |
| **I** | Backstop Commitment Agreement |

**PLEASE TAKE FURTHER NOTICE** the documents annexed hereto are in draft form and remain subject to continuing review and negotiation among the Debtors and interested parties with respect thereto and therefore remain subject to material change. The Debtors reserve all rights to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, subject to the applicable consent rights under the Plan and the Restructuring Support Agreements, at anytime before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court, and all rights and remedies of any parties with respect thereto are expressly reserved.

**PLEASE TAKE FURTHER NOTICE** that the forms of the documents contained in the Plan Supplement are integral to, and are considered part of, the Plan. If the Plan is approved, the documents contained in the Plan Supplement will be approved by the Court pursuant to the Confirmation Order.

## Obtaining Additional Information

Copies of all documents referenced herein and filed with the Court are available free of charge on the Debtors' case information website, located at *http://www.kccllc.net/chaparral2020* or can be requested by email at chaparral2020info@kccllc.com.

## Important Dates and Deadlines[3]

1. **Plan Objection Deadline**. The deadline to object to the confirmation of the Plan is **4:00 p.m. on September 21, 2020 (prevailing Eastern Time)**.

2. **Confirmation Hearing**. A hearing to consider the confirmation of the Plan will be held before the Court on **October 1, 2020 at 10:30 a.m. (prevailing Eastern**

---

[3] The following dates and deadlines may be subject to amendment by the Debtors (in consultation with the RBL Agent and the Ad Hoc Group) or the Court.

**Time)** or such other date and time as determined by the Court, at 824 North Market Street, Wilmington, Delaware 19801.

*[Remainder of This Page Intentionally Left Blank]*

Dated: September 8, 2020
Wilmington, Delaware

/s/ *John H. Knight*

John H. Knight (No. 3848)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King St.
Wilmington, Delaware 19801
Telephone: 302-651-7700
Fax: 302-651-7701
E-mail: knight@rlf.com
steele@rlf.com
schlauch@rlf.com

- and -

Damian S. Schaible (Admitted *pro hac vice*)
Angela M. Libby (admitted *pro hac vice*)
Jacob S. Weiner (admitted *pro hac vice*)
Paavani Garg (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: 212-450-4000
Fax: 212-701-5800
Email: damian.schaible@davispolk.com
angela.libby@davispolk.com
jacob.weiner@davispolk.com
paavani.garg@davispolk.com

*Proposed Counsel for Debtors and
Debtors in Possession*

# Exhibit A

**New Corporate Governance Documents**

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

# THIRD AMENDED AND RESTATED BYLAWS

## OF

## CHAPARRAL ENERGY, INC.

(a Delaware corporation)

Effective as of [●], 2020

These Third Amended and Restated Bylaws (the "Bylaws") of CHAPARRAL ENERGY, INC., a Delaware corporation (the "Corporation"), are subject to, and governed by, the Delaware General Corporation Law (the "DGCL"), the Fourth Amended and Restated Certificate of Incorporation of the Corporation (as may be amended, restated or otherwise modified from time to time, the "Certificate of Incorporation"), and the Stockholders Agreement, dated as of [●], 2020, among the Corporation and its stockholders (as may be amended, supplemented or otherwise modified from time to time in accordance with the provisions thereof, the "Stockholders Agreement").

## ARTICLE I

## OFFICES

1.    REGISTERED OFFICE.

The registered office of the Corporation in the State of Delaware is [●].The name of the registered agent of the Corporation at such address is [●]. The registered office or registered agent of the Corporation may be changed from time to time by action of the board of directors of the Corporation (the "Board of Directors").

2.    OTHER OFFICES.

The Corporation may also have offices at such other places, within or without the State of Delaware, as the Board of Directors may from time to time designate or as the business of the Corporation may require.

## ARTICLE II

## STOCKHOLDERS

1.    CERTIFICATES REPRESENTING STOCK.

(a)    The shares of common stock of the Corporation, par value $0.01 per share, shall be uncertificated shares evidenced by a book-entry system maintained by a transfer agent retained by the Corporation for such stock.  Notwithstanding the foregoing, the Board of

NY 78181088

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Directors may provide by resolution or resolutions that some or all of any class or series of capital stock shall be represented by physical certificates.  If any shares of capital stock are represented by certificates, such certificates shall be in such form, other than bearer form, as is approved by the Board of Directors.  Any certificates representing shares of capital stock shall be signed by, or in the name of, the Corporation by the Chief Executive Officer of the Corporation (the "Chief Executive Officer") or by the President or any Senior Vice-President and by the Treasurer or an Assistant Treasurer or the Secretary or an Assistant Secretary of the Corporation.  If such certificate is countersigned by a transfer agent other than the Corporation or its employee or by a registrar other than the Corporation or its employee, any other signature on the certificate may be a facsimile.  In case any officer, transfer agent, or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar at the date of issue.

(b)    Whenever the Corporation shall be authorized to issue more than one class of stock or more than one series of any class of stock, and whenever the Corporation shall issue any shares of its stock as partly paid stock, the certificates representing shares of any such class or series or of any such partly paid stock shall set forth thereon the statements prescribed by the DGCL.  Any restrictions on the transfer or registration of transfer of any shares of stock of any class or series shall be noted conspicuously on the certificate representing such shares.

(c)    The Corporation may issue a new certificate of stock in place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Board of Directors may require the owner of any lost, stolen or destroyed certificate, or such person's legal representative, to give the Corporation a bond sufficient to indemnify the Corporation against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of any such new certificate.

2.    FRACTIONAL SHARES.

The Corporation may, but shall not be required to, issue fractions of a share.

3.    STOCK TRANSFERS.

Upon compliance with provisions restricting the transfer or registration of transfer of shares of stock, if any, set forth in the Certificate of Incorporation, the Stockholders Agreement or in these Bylaws, transfers or registration of transfer of shares of stock of the Corporation shall be made only on the stock ledger of the Corporation by the registered holder thereof, or by such person's attorney thereunto authorized by power of attorney duly executed and filed with the Secretary of the Corporation or with a transfer agent or a registrar, if any, and on surrender of the certificate or certificates for such shares of stock properly endorsed and the payment of all taxes due thereon.

NY 78181088

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

4.      RECORD DATE FOR STOCKHOLDERS.

(a)      In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting.  If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; *provided*, *however*, that the Board of Directors may fix a new record date for the adjourned meeting.

(b)      In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty (60) days prior to such action.  If no record date has been fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

5.      MEANING OF CERTAIN TERMS.

As used herein in respect of the right to notice of a meeting of stockholders or a waiver thereof or to participate or vote threat or to consent or dissent in writing in lieu of a meeting, as the case may be, the term "share" or "shares" or "share of stock" or "shares of stock" or "stockholder" or "stockholders" refers to an outstanding share or shares of stock and to a holder or holders of record of outstanding shares of stock when the Corporation is authorized to issue only one class of shares of stock, and said reference is also intended to include any outstanding share or shares of stock and any holder or holders of record of outstanding shares of stock of any class upon which or upon whom the Certificate of Incorporation confers such rights where there are two or more classes or series of shares of stock or upon which or upon whom the DGCL confers such rights notwithstanding that the Certificate of Incorporation may provide for more than one class or series of shares of stock, one or more of which are limited or denied such rights thereunder; *provided*, *however*, that no such right shall vest in the event of an increase or a decrease in the authorized number of shares of stock of any class or series which is otherwise denied voting rights under the provisions of the Certificate of Incorporation, including any preferred stock which is denied voting rights under the provisions of the resolution or resolutions adopted by the Board of Directors with respect to the issuance thereof.

-3-

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

6.      STOCKHOLDER MEETINGS.

(a)      ANNUAL MEETING.   Unless directors are elected by written consent of stockholders in lieu of an annual meeting in accordance with the provisions of these Bylaws, applicable law and the Stockholders Agreement, an annual meeting of the stockholders shall be held for the purpose of electing directors and conducting such other proper business as may properly be brought before the meeting.   The date, time and place, if any, either within or without the State of Delaware, and/or the means of remote communication, of the annual meeting shall be determined by the Board of Directors. Unless determined otherwise by the Board of Directors, the annual meeting shall be held at the principal executive office of the Corporation.

SPECIAL MEETINGS.   Except as otherwise required by applicable law or provided in the Certificate of Incorporation, special meetings of stockholders for any purpose or purposes (including, without limitation, the filling of board vacancies and newly created directorships) may be called only by the Chairman of the Board of Directors (the "Chairman"), by the Chief Executive Officer, by the Board of Directors, or by the Secretary at the request in writing of stockholders holding shares representing not less than 50% of the voting power of the outstanding shares entitled to vote on the matter for which such meeting is to be called.   The Secretary shall call such a meeting upon receiving such a written request.   The date, time and place, if any, either within or without the State of Delaware, and/or the means of remote communication, of any special meeting shall be determined by the Board of Directors or, if applicable, by such stockholders (to the extent set forth in the notice pursuant to which they requested such meeting), and shall be stated in the Corporation's notice of the meeting.   If no designation is made the place of meeting shall be the principal executive office of the Corporation.

(b)      NOTICE OR WAIVER OF NOTICE.   Whenever stockholders are required or permitted to take any action at a meeting, written notice stating the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and, in the case of special meetings, the purpose or purposes, of such meeting, shall be given to each stockholder entitled to vote at such meeting not less than ten (10) nor more than sixty (60) days before the date of the meeting.   All such notices shall be delivered, either personally, by mail, or by a form of electronic transmission consented to by the stockholder to whom the notice is given (including pursuant to the notice provisions of the Stockholders Agreement), by or at the direction of the Board of Directors, the Chief Executive Officer or the Secretary, and if mailed, such notice shall be deemed to be delivered when deposited in the United States mail, postage prepaid, addressed to the stockholder at his, her or its address as the same appears on the records of the Corporation or when delivered in accordance with the notice provisions of the Stockholders Agreement.   If given by electronic transmission, such notice shall be deemed to be delivered (i) if by facsimile telecommunication, when directed to a facsimile number at which the stockholder has consented to receive notice; (ii) if by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice; (iii) if by a posting on an electronic network (e.g., a secure website or electronic data room used for posting information to stockholders)

-4-

NY 78181088

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

together with separate notice to the stockholder of such posting, upon the later of such posting and the giving of such separate notice; and (iv) if by any other form of electronic transmission, when directed to the stockholder.  Any such consent to notice by facsimile or electronic mail shall be revocable (or the applicable facsimile number or electronic mail address may be changed) by the stockholder by written notice to the Secretary of the Corporation at the Corporation's principal executive office.  Notwithstanding anything to the contrary in these Bylaws, notice shall be deemed validly delivered to any stockholder that is party to the Stockholders Agreement if such notice is delivered to such stockholder in accordance with the Stockholders Agreement, and each such stockholder shall be deemed to have consented thereto, which consent shall be irrevocable except to the extent provided otherwise in the Stockholders Agreement.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.  Without limiting the manner by which notice otherwise may be given effectively by the Corporation to stockholders, any notice to stockholders given by the Corporation under any provision of the DGCL, the Certificate of Incorporation or these Bylaws shall be effective if given by a single written notice to stockholders who share an address and is consented to by the stockholders at that address to whom such notice is given; provided, any such stockholder may revoke such consent by delivering written notice of such revocation to the Secretary of the Corporation at the Corporation's principal executive office.

(c)    STOCKHOLDER LIST.  There shall be prepared and made, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten (10) days prior to the meeting either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or if not so specified, at the place where the meeting is to be held.  The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.  The stock ledger shall be the only evidence as to who are the stockholders entitled to examine the stock ledger, the list required by this section or the books of the Corporation, or to vote at any meeting of stockholders.

(d)    CONDUCT OF MEETING.  Meetings of the stockholders shall be presided over by one of the following officers in the order of seniority and if present and acting:  the Chairman, the Vice-Chairman of the Board of Directors (the "Vice Chairman"), if any, the Chief Executive Officer, a Senior Vice President, a chairman for the meeting chosen by the Board of Directors or, if none of the foregoing is in office and present and acting, by a chairman to be chosen by the stockholders.  The Secretary of the Corporation or, in such person's absence, an Assistant Secretary, shall act as secretary of every meeting, but if neither the Secretary nor an Assistant Secretary is present the chairman for the meeting shall appoint a secretary of the meeting.

(e)    PROXY REPRESENTATION.  Every stockholder may authorize another person or persons to act for such stockholder by proxy in all matters in which a stockholder is entitled to

NY 78181088

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

participate, whether by waiving notice of any meeting, voting or participating at a meeting, or expressing consent or dissent without a meeting. Every proxy must be signed by the stockholder or by such person's attorney-in-fact. No proxy shall be voted or acted upon after three years from its date unless such proxy provides for a longer period. A duly executed proxy shall be irrevocable if it states that it is irrevocable and, if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the Corporation generally.

(f)    INSPECTORS AND JUDGES. The Board of Directors, in advance of any meeting, may, but need not, appoint one or more inspectors of election or judges of the vote, as the case may be, to act at the meeting or any adjournment thereof. If an inspector or inspectors or judge or judges are not appointed by the Board of Directors, the person presiding at the meeting may, but need not, appoint one or more inspectors or judges. In case any person who may be appointed as an inspector or judge fails to appear or act, the vacancy may be filled by appointment made by the person presiding thereat. Each inspector or judge, if any, before entering upon the discharge of such person's duties, shall take and sign an oath faithfully to execute the duties of inspector or judge at such meeting with strict impartiality and according to the best of his ability. The inspectors or judges, if any, shall determine the number of shares of stock outstanding and the voting power of each, the shares of stock represented at the meeting, the existence of a quorum and the validity and effect of proxies, receive votes, ballots or consents, hear and determine all challenges and questions arising in connection with the right to vote, count and tabulate all votes, ballots or consents, determine the result, and do such other acts as are proper to conduct the election or vote with fairness to all stockholders. On request of the person presiding at the meeting, the inspector or inspectors or judge or judges, if any, shall make a report in writing of any challenge, question or matter determined by such person or persons and execute a certificate of any fact so found.

(g)    QUORUM. Except as the DGCL, these Bylaws or the Stockholders Agreement may otherwise provide, the holders of a majority of the outstanding shares of stock entitled to vote shall constitute a quorum at a meeting of stockholders for the transaction of any business. The stockholders present may adjourn the meeting despite the absence of a quorum. When a quorum is once present to organize a meeting, it is not broken by the subsequent withdrawal of any stockholders.

(h)    VOTING. Each holder of common stock ("Common Stock") of the Corporation shall be entitled to one (1) vote, in person or by proxy, for each share of Common Stock entitled to vote held by such stockholder. Any action shall be authorized by a majority of the votes cast except where the Stockholders Agreement, the Certificate of Incorporation or the DGCL prescribes a higher percentage of votes and/or a different exercise of voting power. When a quorum is present, the affirmative vote of the majority of the voting power of the shares cast by stockholders present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of the stockholders, unless the question is one upon which by express provisions of an applicable law, the Stockholders Agreement, these Bylaws or the Certificate of Incorporation a different vote is required, in which case such express provision

NY 78181088

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

shall govern and control the decision of such question.  The Corporation shall not directly or indirectly vote any shares of its own stock; *provided*, that the Corporation may vote shares that it holds in a fiduciary capacity to the extent permitted by law.  Voting by ballot shall not be required for corporate action except as otherwise provided by the DGCL.

7.       STOCKHOLDER ACTION WITHOUT MEETINGS.

Any action required to be taken, or any action which may be taken, at any annual or special meeting of stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of the outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing and shall be delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.

8.       FACSIMILE, EMAIL OR OTHER ELECTRONIC TRANSMISSION.

A facsimile, email or other electronic transmission by a stockholder or proxyholder (or by any person authorized to act on such person's behalf, including pursuant to the Stockholders Agreement) of a proxy or a written consent to an action to be taken (including the delivery of such a document in the .pdf, .tif, .gif, .peg or similar format attached to an email message) shall be deemed to be written, signed, dated and delivered to the Corporation for the purposes of this ARTICLE II; *provided* that any such facsimile, email or other electronic transmission sets forth or is delivered with information from which the Corporation can determine (or the Corporation is otherwise aware) (A) that the facsimile, email or other electronic transmission was transmitted by the stockholder or proxyholder or by a person authorized to act for the stockholder or proxyholder and (B) the date on which such stockholder or proxyholder or authorized person transmitted such facsimile, email or other electronic transmission.  The date on which such facsimile, email or other electronic transmission is transmitted shall be deemed to be the date on which such consent or proxy was signed.  Any such facsimile, email or other electronic transmission of a consent or proxy shall be treated in all respects as an original executed consent or proxy and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of the Board of Directors, the Chief Executive Officer or the Secretary of the Corporation, each stockholder, proxyholder or other authorized person who delivered a consent or proxy by facsimile, email or other electronic transmission shall re-execute the original form thereof and deliver such original to the Corporation at its registered office in the State of Delaware, its principal place of business or to an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded; *provided* that no such request shall invalidate, or affect the date of, the proxy or written consent as initially transmitted.

-7-

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

ARTICLE III

BOARD OF DIRECTORS

1.      GENERAL.

The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by applicable law, these Bylaws or the Certificate of Incorporation required to be exercised or done by the stockholders or are not otherwise restricted by the terms of the Certificate of Incorporation or the Stockholders Agreement.  Each member of the Board of Directors is referred to in this Article III as a "Director".  The use of the phrase "Whole Board" herein refers to, at the time of determination, the total number of Directors which the Corporation would have at such time if there were no vacancies.

2.      NUMBER AND ELECTION; TERM.

Subject to the Stockholders Agreement, the total number of Directors constituting the Whole Board shall be fixed by, or in the manner provided in, the Certificate of Incorporation. Directors need not be stockholders of the Corporation.  Subject to the Stockholders Agreement and the rights of any series of preferred stock, if applicable, Directors shall be elected, at each annual meeting of stockholders and at any special meeting of stockholders called for the purpose of electing Directors, by a plurality of the total voting power of the outstanding shares of Common Stock and any other class or series of capital stock entitled to vote together with the Common Stock present in person or represented by proxy at such meeting and entitled to vote on the election of Directors; *provided*, *however* that any election of Directors by written consent of the stockholders in lieu of a meeting shall require the written consent of stockholders holding a majority of the total voting power of the outstanding shares of Common Stock and any other class or series of capital stock entitled to vote together with the Common Stock.  The term of office of each Director shall expire at each annual meeting of the stockholders, and each Director shall hold office until such Director's successor has been elected and qualified or until such Director's earlier death, resignation or removal.

3.      VACANCIES; RESIGNATIONS.

Subject to the Stockholders Agreement, any vacancy on the Board of Directors (whether resulting from the death, resignation, removal of any Director, from an increase in the size of the Whole Board, or otherwise) may be filled at any time by the vote of a majority of the remaining Directors then in office, although less than a quorum, or (if applicable) by the sole remaining Director.  Any Director may resign at any time by giving written notice thereof to the Chairman, to the Chief Executive Officer, or to the Secretary of the Corporation. Any such resignation shall take effect at the date and time specified in such notice or, if not specified therein, then upon receipt of such notice by the Chairman, the Chief Executive Officer or the Secretary of the Corporation, as applicable. The acceptance of such resignation shall not be necessary to make it effective unless otherwise stated therein.

-8-

NY 78181088

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

4.   DIRECTOR NOMINATIONS.

Except for Directors nominated pursuant to the Stockholders Agreement and subject to the terms and provisions set forth therein, Directors may be nominated by action of the Board of Directors, or by the proposal of a stockholder that satisfies the following conditions:

(a)   The stockholder proposes the nomination for an election to be held at an annual meeting of stockholders or at a special meeting of stockholders called for such purpose;

(b)   The stockholder is a record holder on the record date for determining stockholders entitled to receive notice of and to vote at such annual meeting or special meeting (a "Proposing Stockholder");

(c)   The Proposing Stockholder delivers written notice identifying such nominees to the Corporation's Secretary at the Corporation's principal place of business at least seven (7) business days prior to the meeting by (i) personal delivery, (ii) facsimile transmission, (iii) registered or certified mail, postage prepaid, return receipt requested, (iv) nationally recognized overnight or other express courier service, or (v) by electronic transmission.  All notices shall be effective and shall be deemed delivered (a) if by personal delivery or electronic transmission, on the date of delivery if delivered during normal business hours of the Corporation, and if not delivered during such normal business hours, on the next business day following delivery, (b) if by facsimile transmission, on the next business day following dispatch of such facsimile, (c) if by courier service, on the second business day after dispatch of a notice addressed to the Corporation, and (d) if by mail, on the fifth day after deposit in the mail, addressed to the Corporation;

(d)   The Proposing Stockholder's notice includes: (i) the name and address of the Proposing Stockholder, as they appear on the Corporation's books, and the telephone number at which the Proposing Stockholder may be contacted during normal business hours through the time for which the meeting is scheduled and (ii) the names and qualifications of the Proposing Stockholder's nominees;

(e)   The Proposing Stockholder must also provide such other information as any officer of the Corporation shall reasonably deem relevant with respect to the nominees within such time limits as any officer of the Corporation shall reasonably impose for such information; and

(f)   If the chairman of such meeting of the stockholders determines that a nomination was not made in accordance with the foregoing procedures, the chairman of the meeting shall declare to the meeting that the nomination was defective and such defective nomination shall be disregarded.

Notwithstanding the foregoing, no such nomination may be made with respect to any Director seat that is subject to a "Designation Right" under the Stockholders Agreement except in accordance with the applicable provisions of the Stockholders Agreement, and nothing

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

contained herein shall be deemed to affect the rights, if applicable, of any series of preferred stock to elect Directors in accordance with the Certificate of Designation for such series.

5.    MEETINGS.

(a)    TIME.  The Board of Directors will meet at least once during each calendar quarter.  In addition, the Chairman, the Chief Executive Officer, or any two (2) Directors may call a special meeting of the Board of Directors at any time upon two (2) business days' written notice.

(b)    PLACE.  The Board of Directors may designate any place, either within or without the State of Delaware, and/or by means of remote communication, as the place of any meeting of the Board of Directors.  If no designation is made, or if a special meeting is otherwise called, the place of meeting shall be the principal executive office of the Corporation.

(c)    NOTICE OR ACTUAL OR CONSTRUCTIVE WAIVER.  No notice shall be required for regular meetings for which the time and place have been fixed.  Written, oral or any other mode of notice of the time and place shall be given for special meetings at least twenty-four hours prior to the meeting; notice may be given by telephone, facsimile or electronic transmission (in which case it is effective when given) or by mail (in which case it is effective seventy-two hours after mailing by prepaid first class mail).  The notice of any meeting need not specify the purpose of the meeting.  Any requirement of furnishing a notice shall be waived by any Director who signs a written waiver of such notice before or after the time stated therein.  Attendance of a Director at a meeting of the Board of Directors shall constitute a waiver of notice of such meeting, except when the Director attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

(d)    QUORUM AND ACTION.  A majority of the Whole Board shall constitute a quorum except when a vacancy or vacancies prevents such majority, whereupon a majority of the Directors in office shall constitute a quorum; *provided* that such majority shall constitute at least one-third (1/3) of the Whole Board.  Any Director may participate in a meeting of the Board of Directors by means of a conference telephone or similar communications equipment by means of which all Directors participating in the meeting can hear each other, and such participation in a meeting of the Board of Directors shall constitute presence in person at such meeting.  A majority of the Directors present, whether or not a quorum is present, may adjourn a meeting to another time and place.  Except as herein otherwise provided, and except as otherwise provided by the DGCL or the Stockholders Agreement, the act of the Board of Directors shall be the act by vote of a majority of the Directors present at a meeting, a quorum being present.  The quorum and voting provisions herein stated shall not be construed as conflicting with any provisions of the DGCL and these Bylaws which govern a meeting of Directors held to fill vacancies and newly created Directorships in the Board of Directors.

(e)    CHAIRMAN OF THE MEETING.  The Chairman, if present and acting, shall preside at all meetings.  Otherwise, the Vice-Chairman, if any and if present and acting, or the

NY 78181088

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Chief Executive Officer, if present and acting, or any other Director chosen by the Board of Directors, shall preside.

6.      REMOVAL OF DIRECTORS.

Directors may be removed in the manner provided in the Stockholders Agreement and the DGCL.

7.      COMMITTEES.

The Board of Directors shall establish an Audit Committee and a Compensation Committee which shall each have and may exercise the powers of the Board of Directors with respect to the powers delegated to it.[1]   The Board of Directors may also establish, by resolution passed by a majority of the Whole Board, one or more other Board committees, *provided* that such committees' authority will be limited to making recommendations to the full Board of Directors for their approval.  Each committee shall consist of one or more of the Directors of the Corporation.  The Board of Directors may designate one or more Directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.   In the absence or disqualification of any member of any such committee or committees, the members thereof present at any meeting and not disqualified from voting, whether or not they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.

8.      ACTION IN WRITING.

Any action required or permitted to be taken at any meeting of the Board of Directors or any committee thereof may be taken without a meeting if all members of the Board of Directors or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board of Directors or such committee.

9.      COMPENSATION.

Directors not employed by the Corporation or any of its direct or indirect subsidiaries may receive compensation determined by the Board of Directors.

ARTICLE IV

OFFICERS

1.      EXECUTIVE OFFICERS.

The Board of Directors shall appoint a Chief Executive Officer, a President, a Secretary and a Treasurer.  The Board of Directors in its discretion may also appoint, from time to time, one or more Senior Vice Presidents (which may be denominated with additional descriptive

---

[1] Note to Draft: Consider whether to provide for any other standing committees (e.g., Nominating & Governance, or Strategic Alternatives).

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

titles), one or more Vice Presidents (which may be denominated with additional descriptive titles), and such other or additional officers as in its opinion are desirable for the conduct of the business of the Corporation.  Any number of offices may be held by the same person. The Board of Directors shall also elect from among its members, subject to the applicable provisions of the Stockholders Agreement, the Chairman of the Board who may or may not also be an officer of the Corporation, and may at any time and from time to time also appoint a Vice Chairman.  For the avoidance of doubt, the Chief Executive Officer may designate one or more members of the Corporation's management as a "Vice President," provided that any such person shall not by such designation be considered an officer of the Corporation, except for purposes of insurance, indemnification and advancement of expenses.

2.      ELECTION; TERM OF OFFICE.

The officers of the Corporation shall be appointed by the Board of Directors from time to time in its discretion.  Subject to the provisions of the Stockholders Agreement, vacancies may be filled or new offices created and filled at any meeting of the Board of Directors.  Each officer shall hold office until a successor is duly appointed or until such officer's earlier death, resignation or removal as hereinafter provided.

3.      REMOVAL.

Any officer or agent may be removed with or without cause, at any time by the Board of Directors, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.

4.      COMPENSATION.

Compensation of all officers shall be fixed by the Board of Directors or a committee thereof, and no officer shall be prevented from receiving such compensation by virtue of his or her also being a director of the Corporation.

5.      AUTHORITY AND DUTIES.

All officers, as between themselves and the Corporation, shall have such power and perform such duties in the management of the Corporation as may be provided by applicable law, by these Bylaws or by the Board of Directors and, unless otherwise prescribed by these Bylaws or by the Board of Directors, each officer shall have such further powers and duties as ordinarily pertain to such office.

6.      CHAIRMAN.

The Chairman, if present and acting, shall preside at all meetings of the Board of Directors, otherwise, the Vice-Chairman, if any and if present and acting, otherwise, the Chief Executive Officer, if present, shall preside, or if the Chief Executive Officer does not so preside, any other Director chosen by the Board of Directors shall preside.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

7. CHIEF EXECUTIVE OFFICER.

The Chief Executive Officer shall be the senior officer of the Corporation, and shall preside at all meetings of the stockholders and all meetings of the Board of Directors at which he or she is present and at which the Chairman or Vice-Chairman (if any) is not present. The Chief Executive Officer shall have the general authority, subject to the powers of and supervision by the Board of Directors, to manage and control the business, affairs and properties of the Corporation and its controlled direct and indirect subsidiaries in the ordinary course, and general authority and control over the Corporation's officers, agents and employees, and shall see that all orders and resolutions of the Board of Directors are carried into effect. The Chief Executive Officer may sign, execute and deliver, in the name of the Corporation, powers of attorney, contracts, bonds and other obligations. The Chief Executive Officer shall have such other powers and perform such other duties as may be prescribed by the Board of Directors or as may be provided in these Bylaws.

8. PRESIDENT.

The President, subject to the powers of and supervision by the Board of Directors and the Chief Executive Officer, shall act in a general executive capacity and, in the absence or disability of the Chief Executive Officer, shall perform the duties and exercise the powers of the Chief Executive Officer. The President shall perform such other duties and exercise such powers as may be prescribed by the Board of Directors. The President may sign, execute and deliver, in the name of the Corporation, contracts and other obligations pertaining to the regular course of his or her duties, subject to such policies and limitations as may be established by the Board of Directors. The Chief Executive Officer shall also be the President, unless a separate President is appointed by the Board of Directors in its discretion.

9. SENIOR VICE PRESIDENTS.

Any Senior Vice President that may have been appointed, in the absence or disability of the Chief Executive Officer and the President, shall perform the duties and exercise the powers of the Chief Executive Officer, in the order of their seniority, and shall perform such other duties as may be prescribed by the Board of Directors. Senior Vice Presidents may sign, execute and deliver, in the name of the Corporation, contracts and other obligations pertaining to the regular course of his or her duties, subject to such policies and limitations as may be established by the Board of Directors

10. SECRETARY.

The Secretary shall keep in safe custody the seal of the Corporation and affix it to any instrument when authorized by the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors. The Secretary (or in such officer's absence, an Assistant Secretary, but if neither is present another person selected by the Chairman for the meeting) shall have the duty to record the proceedings of the meetings of the stockholders and Directors in a book to be kept for that purpose.

NY 78181088

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

11.     TREASURER.

The Treasurer shall have the care and custody of the corporate funds, and other valuable effects, including securities, and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors.  The Treasurer shall disburse the funds of the Corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the Chief Executive Officer and Board of Directors, at the regular meetings of the Board of Directors, or whenever they may require it, an account of all transactions as Treasurer and of the financial condition of the Corporation.  If required by the Board of Directors, the Treasurer shall give the Corporation a bond for such term, in such sum and with such surety or sureties as shall be satisfactory to the Board of Directors for the faithful performance of the duties of such office and for the restoration to the Corporation, in case of such person's death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in such person's possession or under such person's control belonging to the Corporation.  The Treasurer shall perform such other duties and exercise such powers as may be prescribed by the Board of Directors.

## ARTICLE V

### CORPORATE SEAL; CORPORATE BOOKS

The corporate seal shall be in such form as the Board of Directors shall prescribe.  The books of the Corporation may be kept within or without the State of Delaware, at such place or places as the Board of Directors may, from time to time, determine.

## ARTICLE VI

### FISCAL YEAR

The fiscal year of the Corporation shall be fixed, and shall be subject to change, by the Board of Directors.  Except as otherwise determined by the Board of Directors, the fiscal year of the Corporation shall end on December 31 of each year.

## ARTICLE VII

### INDEMNITY

1.     INDEMNITY.

(a)     Without limiting the provisions of Section 12 of the Certificate of Incorporation, any person who was or is a party or threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) with respect to any act or omission solely occurring by reason of the fact that he or she is or was a Director, officer, employee or

-14-

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

agent of the Corporation (at any time, including prior to the date hereof and including serving as a member of the board of directors of any predecessor to the Corporation), or is or was serving at the request of the Corporation (at any time, including prior to the date hereof and including at the request of any predecessor to the Corporation) as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise (including employee benefit plans) (hereinafter an "indemnitee"), shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the DGCL, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification than permitted prior thereto), against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such indemnitee in connection with such action, suit or proceeding, if the indemnitee acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Corporation, and with respect to any criminal action or proceeding, had no reasonable cause to believe such conduct was unlawful. The termination of the proceeding, whether by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interests of the Corporation and, with respect to any criminal action or proceeding, had reasonable cause to believe such conduct was unlawful.

(b)      Any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor with respect to any act or omission by reason of the fact that he or she is or was a Director, officer, employee or agent of the Corporation (at any time, including prior to the date hereof and including serving as a member of the board of directors of any predecessor to the Corporation), or is or was serving at the request of the Corporation (at any time, including prior to the date hereof and including serving as a member of the board of directors of any predecessor to the Corporation) as a director, officer, employee or agent of another Corporation, partnership, joint venture, trust or other enterprise (including employee benefit plans), shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the DGCL, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification than permitted prior thereto), against expenses (including attorneys' fees) actually and reasonably incurred by him or her in connection with the defense or settlement of such action or suit if he or she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court in which such suit or action was brought, shall determine, upon application, that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper.

(c)      All reasonable expenses incurred by or on behalf of the indemnitee in connection with any suit, action or proceeding, may be advanced to the indemnitee by the Corporation.

-15-

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(d)     The rights to indemnification and to advancement of expenses conferred in this article shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, the Certificate of Incorporation, a Bylaw of the Corporation, agreement, vote of stockholders or disinterested Directors or otherwise.

(e)     The indemnification and advancement of expenses provided by this article shall continue as to a person who has ceased to be a Director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

(f)     In addition to the indemnification rights of directors, officers, employees or agents of the Corporation, the Corporation shall have the power to, in the sole discretion of the Board of Directors, indemnify any other person made a party to any action, suit or proceeding who the Corporation may indemnify under Section 145 of the DGCL.

(g)     The provisions of this ARTICLE VII shall be deemed to be contract rights based upon good and valuable consideration between the Corporation and each director and officer or other person entitled to indemnification who serves in any such capacity at any time while this ARTICLE VII and the relevant provisions of the DGCL or other applicable law are in effect, and such person may bring suit as if the provisions of this ARTICLE VII were set forth in a separate written contract between such person and the Corporation. Such contract right shall vest for each director and officer or other person entitled to indemnification at the time such person is elected or appointed to such position or is requested to serve in the capacity that entitled such person to indemnification under this ARTICLE VII, and no repeal or modification of this ARTICLE VII or any such law shall affect any such vested rights or obligations of any current or former director or officer  or other person with respect to any state of facts or proceeding regardless of when occurring.

(h)     For purposes of this ARTICLE VII, references to "the Corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger that, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was or agreed to be a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, limited liability company, trust, association, employee benefit plan or other enterprise, shall stand in the same position under this ARTICLE VII with respect to the resulting or surviving corporation as he or she would have with respect to such constituent corporation if its separate existence had continued.

NY 78181088

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

## ARTICLE VIII

## GENERAL PROVISIONS

1.    DIVIDENDS.

Dividends upon the capital stock of the corporation, subject to the provisions of the Certificate of Incorporation, if any, may be declared by the Board at any regular or special meeting, pursuant to law and in accordance with the Stockholders Agreement.  Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the Certificate of Incorporation and the Stockholders Agreement.  Before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the directors from time to time, in their absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the corporation, or any other purpose and the Board of Directors may modify or abolish any such reserve in the manner in which it was created.

2.    CHECKS, DRAFTS AND ORDERS.

All checks, drafts, or other orders for the payment of money by or to the Corporation and all notes and other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers, agent or agents of the Corporation, and in such manner, as shall be determined by resolution of the Board of Directors or a duly authorized committee thereof.

3.    CONTRACTS.

Subject to the Stockholders Agreement, the Board of Directors may authorize any officer or officers, or any agent or agents, of the Corporation to enter into any contract or to execute and deliver any instrument in the name of and on behalf of the Corporation, and such authority may be general or confined to specific instances.

4.    LOANS.

Subject to the Stockholders Agreement, the Corporation may lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the Corporation or of its subsidiary, including any officer or employee who is a director of the Corporation or its subsidiary, whenever, in the judgment of the directors, such loan, guaranty or assistance may reasonably be expected to benefit the Corporation.  The loan, guaranty or other assistance may be with or without interest, and may be unsecured or secured in such manner as the Board of Directors shall approve, including, without limitation, a pledge of shares of stock of the Corporation.  Nothing in this Section 4 shall be deemed to deny, limit or restrict the powers of guaranty or warranty of the Corporation at common law or under any statute.

NY 78181088

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

5.      VOTING SECURITIES OWNED BY THE CORPORATION.

Voting securities in any other corporation or other entity held by the Corporation shall be voted as directed by the Chief Executive Officer, unless the Board of Directors specifically confers authority to vote with respect thereto, which authority may be general or confined to specific instances, upon some other person or officer.  Any person authorized to vote securities shall have the power to appoint proxies, with general power of substitution.

6.      INSPECTION OF BOOKS AND RECORDS.

Any stockholder of record, in person or by attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose the Corporation's stock ledger and a list of its stockholders.  A proper purpose shall mean any purpose reasonably related to such person's interest as a stockholder.  In every instance where an attorney or other agent shall be the person who seeks the right to inspection, the demand under oath shall be accompanied by a power of attorney or such other writing that authorizes the attorney or other agent to so act on behalf of the stockholder.  The demand under oath shall be directed to the Corporation at its registered office in the State of Delaware or at its principal place of business.

7.      EXCLUSIVE JURISDICTION.

Unless otherwise waived by resolution of the Board of Directors, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director or officer of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation arising pursuant to any provision of the DGCL or the Certificate of Incorporation or Bylaws or (iv) any action asserting a claim against the Corporation governed by the internal affairs doctrine, except, as to each of (i) through (iv), for any claim for which the Court of Chancery of the State of Delaware determines there is an indispensable party not subject to its jurisdiction (and such party does not consent to such jurisdiction within ten (10) days of such determination).

8.      SECTION HEADINGS.

Section headings in these Bylaws are for convenience of reference only and shall not be given any substantive effect in limiting or otherwise construing any provision herein.

9.      INCONSISTENT PROVISIONS.

In the event that any provision of these Bylaws is or becomes inconsistent with any provision of the Certificate of Incorporation, the DGCL or any other applicable law, the provision of these Bylaws shall not be given any effect to the extent of such inconsistency but shall otherwise be given full force and effect. If there is any conflict between the provisions of the Stockholders Agreement and these Bylaws, the provisions of the Stockholders Agreement will prevail unless for them to do so would be in contravention of the requirements of the DGCL.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

## ARTICLE IX

## AMENDMENTS

So long as the Stockholders Agreement and the Certificate of Incorporation are each in effect, these Bylaws may be amended in accordance with the provisions of the Stockholders Agreement and the Certificate of Incorporation, as applicable.  At any time the Stockholders Agreement and the Certificate of Incorporation are not in effect, these Bylaws may be amended by the vote of a majority of the voting power of the shares of stock of the Corporation then outstanding.

*[Remainder of Page Intentionally Left Blank]*

NY 78181088

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

# FOURTH AMENDED AND RESTATED

## CERTIFICATE OF INCORPORATION

### of

## CHAPARRAL ENERGY, INC.

CHAPARRAL ENERGY, INC., a corporation organized and existing under the laws of the State of Delaware, hereby certifies as follows:

A.      The name of the corporation is CHAPARRAL ENERGY, INC. (the "Corporation").  The Corporation was originally incorporated by the filing of a Certificate of Incorporation with the Secretary of State of the State of Delaware on September 14, 2005 (the "Incorporation Date"), which was amended and restated on September 26, 2006, again on April 12, 2010, and again on March 21, 2017 (as amended, the "Original Certificate of Incorporation").

B.      This Fourth Amended and Restated Certificate of Incorporation (this "Certificate of Incorporation") has been duly adopted in accordance with Sections 242, 245 and 303 of the Delaware General Corporation Law (the "DGCL"), pursuant to the authority granted to the Corporation under Section 303 of the DGCL and in accordance with the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization*, as confirmed by that certain order of the United States Bankruptcy Court for the District of Delaware entered on [●], 2020 (as confirmed, including any amendments and supplements thereto, the "Plan"), in *In re: Chaparral Energy, Inc., et al.*, No. 20-11947 (MFW) under Chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101-1330), as amended (the "Bankruptcy Code").

C.      The Original Certificate of Incorporation is hereby amended and restated to read in its entirety as follows:

1.      **Name.**  The name of the corporation is CHAPARRAL ENERGY, INC. (the "Corporation").  Capitalized terms used and not otherwise defined in this Certificate of Incorporation shall have the meanings given to them in Section 19 hereof.

2.      **Registered Office and Agent.**  The address of the registered office of the Corporation in the State of Delaware is [●]. The name of the registered agent of the Corporation at such address is [●].

3.      **Purpose.**  The nature of the business or purposes to be conducted or promoted by the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

4.    **Authorized Capital Stock; Number of Shares.**  The total number of shares of all classes of capital stock that the Corporation shall have the authority to issue is [●] ([●])] shares, of which (a) [●] million ([●])] shares shall be common stock, $0.01 par value per share ("Common Stock"); and (b) [●] ([●])] shares shall be preferred stock, $0.01 par value per share ("Preferred Stock"), which may be issued in one or more series as set forth below.

Notwithstanding anything herein to the contrary, the Corporation shall not issue any non-voting equity securities to the extent prohibited by Section 1123(a)(6) of the Bankruptcy Code; *provided*, *however*, that the foregoing restriction (i) shall have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) shall only have such force and effect to the extent and for so long as such Section 1123(a)(6) is in effect and applies to the Corporation and (iii) may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

5.    **Rights of Stockholders.**

5.1    ***Preferred Stock.***  Shares of Preferred Stock may be issued from time to time in one or more series.  The rights, restrictions and other terms applicable to the shares of Preferred Stock of any such series shall be set forth in a Certificate of Designation for such series filed by the Corporation with the Secretary of State of the State of Delaware (each, a "Certificate of Designation").  Subject to applicable law and to the terms of the Stockholders Agreement (as defined below) and the provisions of this Certificate of Incorporation, the Board of Directors is authorized to determine the designation of any series of Preferred Stock, to fix the number of shares of any series of the Preferred Stock, and to determine the rights, powers (including voting powers, if any), preferences, privileges, limitations and restrictions granted to or imposed upon any series of Preferred Stock and, within the limits and restrictions stated in any resolution or resolutions of the Board of Directors originally fixing the number of shares constituting any series of Preferred Stock, to increase or decrease (but not below the number of shares of such series then outstanding) the number of shares of such series at any time subsequent to the designation of such series by the Board of Directors.  If the number of shares of any series of Preferred Stock shall be so decreased, the shares constituting such decrease shall resume the status which they had prior to the adoption of the resolution(s) originally fixing the number of shares of such series.

5.2    ***Common Stock.***

5.2.1    *Relative Rights*. The Common Stock shall be limited by, and subject to, all of the rights, powers, preferences, privileges and priorities of any outstanding series of Preferred Stock.

5.2.2    *Dividends*.  Subject to the terms of the Stockholders Agreement and the rights of any outstanding series of Preferred Stock, the Board of Directors may cause dividends to be declared and paid on outstanding shares of Common Stock out of funds legally available for the payment of dividends.  When, as and if dividends on Common Stock are declared by the Board of Directors, whether payable in cash, in property, in stock or otherwise, in accordance with this Certificate of Incorporation and the Bylaws of the Corporation, as in effect from time to time (the "Bylaws"), out of the assets of the Corporation which are at law available therefor, the

2

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

holders of outstanding shares of Common Stock shall be entitled to share equally in, and to receive in accordance with the number of shares of Common Stock held by each such holder, all such dividends.

5.2.3   *Liquidation Rights*.  In the event of any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, and subject to the rights of any outstanding series of Preferred Stock, the holders of issued and outstanding shares of Common Stock shall be entitled to share, ratably according to the number of shares of Common Stock held by each such holder, in the remaining assets of the Corporation available for distribution to its stockholders after the payment, or provision for payment, of all debts and other liabilities of the Corporation.

5.2.4   *Stockholder Voting Rights*.  Subject to applicable law and except as otherwise expressly provided elsewhere in this Certificate of Incorporation or the Bylaws, and subject to the voting rights, if any, of any outstanding series of Preferred Stock, each holder of record of one or more issued and outstanding shares of Common Stock shall be entitled to one vote for each share of Common Stock standing in such holder's name on the books of the Corporation.

5.3   **Consideration**.  Subject to applicable law and except as otherwise provided in this Certificate of Incorporation and the Stockholders Agreement, the capital stock of the Corporation, regardless of class or series, may be issued for such consideration and for such corporate purposes as the Board of Directors may from time to time determine.

5.4   **Special Approval Requirements for Certain Actions**.  In addition to any other vote of stockholders or stockholder or Board of Directors approval that may be required by law or by the provisions of this Certificate of Incorporation, so long as the Stockholders Agreement is in effect, whether or not specifically provided for in this Certificate of Incorporation, neither the Corporation nor any of its subsidiaries nor their Board of Directors shall take any action that under the terms of the Stockholders Agreement first requires a vote, consent or approval from one or more holders of Common Stock and/or members of the Board of Directors to be obtained, without first obtaining such required vote, consent or approval.

**Stockholders Agreement**.  To the fullest extent permitted by law, every holder of shares of Common Stock shall be subject to, shall be required to enter into, and shall be deemed to have entered into and to be bound by, the Stockholders Agreement of the Corporation to be entered into pursuant to the Plan and dated as of the "Effective Date" under the Plan (such date, the "Plan Effective Date"), by and among the Corporation and its stockholders (as may be amended, supplemented or otherwise modified from time to time in accordance with the provisions thereof, the "Stockholders Agreement"), including without limitation the restrictions on transfer of Common Stock set forth therein, from and after such time as such holder receives any shares of Common Stock (whether by sale, gift, inheritance or other Transfer, as a distribution under the Plan, through the exercise or conversion of options, warrants, convertible notes or other convertible securities, by operation of law or otherwise), and the Stockholders Agreement shall be deemed to be a valid and binding obligation of such stockholder, enforceable against each such holder in accordance with its terms (including any provisions thereof that require the holder to waive or refrain from exercising any appraisal, dissenters or similar rights), in each case even if such holder has not actually executed a counterpart signature page or joinder (or other written

3

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

instrument pursuant to which such holder agrees to be bound thereby) to the Stockholders Agreement.  In the event the Stockholders Agreement is terminated at any time in accordance with its terms, all references to "Stockholders Agreement" contained in this Certificate of Incorporation shall, from and after the effective time of such termination, automatically cease to be of any further force or effect.  If any provisions of this Section 5.5 or the application thereof to any Person or circumstance are to any extent held by a court of competent jurisdiction to be invalid or unenforceable for any reason, the applicability of the remainder of this Section 5.5 to such Person or circumstance, and the application of such provision(s) to other Persons and circumstances, shall not be affected thereby and such provisions shall be enforced to the greatest extent permitted by law.  The Corporation shall furnish without charge to each holder of record of shares of Common Stock a copy of the Stockholders Agreement upon written request to the Secretary of the Corporation at the Corporation's principal executive office.

6.      **Transfers of Shares.**

6.1      *Restrictions on Transfer*.  Without limiting any other provisions or restrictions or conditions of this Section 6, unless otherwise waived by the Board of Directors in its sole discretion, no shares of Common Stock or Preferred Stock shall be Transferred by any stockholder (regardless of the manner in which the Transferor initially acquired such shares of Common Stock or Preferred Stock), if such Transfer (a) would, if consummated, result in any violation of the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder or any state securities laws or regulations, or any other applicable federal or state laws or order of any Governmental Authority having jurisdiction over the Corporation or (b) is not made in accordance with the applicable provisions of the Stockholders Agreement.

6.2      *Legends on Certificates*.  All certificates (if any) evidencing shares of Common Stock or Preferred Stock shall conspicuously bear, or shall be deemed to conspicuously bear (even if such certificate does not actually bear such legends), the legends required by the Stockholders Agreement (to the extent the Stockholders Agreement requires such certificates to bear such legends) and such other legends as the Board of Directors determines are necessary or appropriate.   Each stockholder shall be deemed to have actual knowledge of the terms, provisions, restrictions and conditions set forth in this Certificate of Incorporation and the Stockholders Agreement (including, without limitation, the restrictions on Transfer set forth in this Section 6 and the restrictions on Transfer set forth in the Stockholders Agreement) for all purposes of this Certificate of Incorporation, the Stockholders Agreement and applicable law (including, without limitation, the DGCL and the Uniform Commercial Code as adopted and in effect in any applicable jurisdiction), whether or not any certificate evidencing shares of Common Stock or Preferred Stock owned or held by such stockholder bear the legends required by the Stockholders Agreement or whether or not any such stockholder received a separate notice of such terms, provisions, restrictions and conditions.

6.3      *Prohibited Transfers Void*.  The Corporation shall not record upon its books any sale or other Transfer of securities except in accordance with the provisions of this Certificate of Incorporation and (to the extent applicable) the Stockholders Agreement.  Any purported sale or

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Transfer in violation of such provisions shall be void *ab initio* and shall not be recognized by the Corporation for any purpose.

7. **Board of Directors**.

7.1 *General*.  Except as may otherwise be provided in this Certificate of Incorporation, the Bylaws, the Stockholders Agreement or the DGCL, the business of the Corporation shall be managed by the Board of Directors.  This Section 7 is inserted for the management and conduct of the business and affairs of the Corporation and is intended to be in furtherance of and not in limitation or exclusion of the powers conferred on the Board of Directors by applicable law.

7.2 *Composition of the Board of Directors; Term; Removal*.

7.2.1 The number of directors constituting the whole Board of Directors shall be fixed from time to time by a vote of a majority of the directors then in office; provided, that upon the Plan Effective Date such number shall be fixed at seven (7) and shall not subsequently be fixed at fewer than five (5) directors nor more than seven (7) directors except with the prior approval by holders of a majority of the aggregate voting power of the shares of capital stock then outstanding. Except as otherwise provided in the Stockholders Agreement, each director shall hold office until the next annual meeting of stockholders and until his or her successor is duly elected and qualified in accordance with the terms of this Certificate of Incorporation, the Bylaws and the Stockholders Agreement, or his or her earlier death, resignation or removal.

7.2.2 Except as otherwise provided by the Stockholders Agreement, and subject to the voting rights, if any, of holders of any outstanding series of Preferred Stock, at each annual meeting of stockholders, directors shall be elected for a one-year term by affirmative vote of a majority (or such other threshold as may be specified in the Stockholders Agreement) of the aggregate combined voting power of the Corporation's then issued and outstanding shares of Common Stock, present in person or represented by proxy at a meeting called for the purpose of electing directors.  Directors may also be elected by written consent of the stockholders if and to the extent provided for in the Stockholders Agreement.  There shall not be cumulative voting for directors.

7.2.3 Any director may be removed at any time in accordance with the Stockholders Agreement. In the event the chief executive officer of the Corporation is serving as a director and his or her employment as chief executive officer is terminated for any reason, such Person shall automatically, upon such termination, cease to serve as a director and be deemed to have resigned from the Board of Directors.

7.2.4 Except as otherwise provided by the Stockholders Agreement, any vacancies in the Board of Directors resulting from any director's death, resignation, removal or other cause, shall be filled as provided in the Bylaws.

8. **Compromise, Arrangement or Reorganization.**  Whenever a compromise or arrangement is proposed between the Corporation and its creditors or any class of them and/or

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

between the Corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware may, on the application in a summary way of the Corporation or of any creditor or stockholder thereof or on the application of any receiver or receivers appointed for the Corporation under the provisions of Section 291 of the DGCL or on the application of trustees in dissolution or of any receiver or receivers appointed for the Corporation under the provisions of Section 279 of the DGCL, order a meeting of the creditors or class of creditors, and/or of the stockholders or class of stockholders of the Corporation, as the case may be, to be summoned in such manner as the said court directs. If a majority in number representing three-fourths in value of the creditors or class of creditors, and/or of the stockholders or class of stockholders of the Corporation, as the case may be, agree to any compromise or arrangement and to any reorganization of the Corporation as a consequence of such compromise or arrangement, the said compromise or arrangement and the said reorganization shall, if sanctioned by the court to which the said application has been made, be binding on all the creditors or class of creditors, and/or on all the stockholders or class of stockholders, of the Corporation, as the case may be, and also on the Corporation.

9. **Limitation of Liability.** To the fullest extent permitted by the DGCL, no director of the Corporation serving in such capacity (at any time, including prior to the date hereof) shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director arising from acts or omissions (at any time, including prior to the date hereof), including breaches resulting from such director's grossly negligent behavior, except for liability (a) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (c) under Section 174 of the DGCL or (d) for any transaction from which the director derived any improper personal benefits. If the DGCL is hereafter amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation arising from acts or omissions (at any time, including prior to the date hereof) shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended. Any amendment, repeal or modification of this Section 9 by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at or prior to the time of such amendment, repeal or modification.

10. **Corporate Opportunity.** The Corporation hereby renounces, to the fullest extent permitted by law, any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, business ventures or opportunities that are presented to any of its directors who are not employed by the Corporation or any of its subsidiaries ("Non-Employee Directors") or to any Affiliate of any such director; *provided*, *however*, that notwithstanding anything contained herein, this Section 10 shall not apply to business ventures or opportunities presented or offered to a Non-Employee Director solely in his or her capacity as a director of the Corporation (including as a member of any committee of the Board of Directors or any governing body of any subsidiary of the Corporation). Without limiting the generality of the foregoing, the Corporation specifically renounces any rights the Corporation might have in any business venture or business opportunity of any Non-Employee Director or Affiliate thereof, and no Non-Employee Director shall have any obligation to offer any interest in any such business venture or opportunity to the Corporation or otherwise account to the Corporation in respect of

6

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

any such business ventures or opportunities, even if the business venture or opportunity is one that the Corporation or its subsidiaries might reasonably be deemed to have pursued or had the ability or desire to pursue if granted the opportunity to do so. Furthermore, (a) it shall not be deemed a breach of any fiduciary or other duty, whether express or implied, for any Non-Employee Director or any of its Affiliates to engage in a business venture or opportunity in preference or to the exclusion of the Corporation and (b) a Non-Employee Director or Affiliate thereof shall have no obligation to (i) disclose to the Board of Directors or the Corporation any information in the possession of such Non-Employee Director or Affiliate thereof regarding any business ventures or opportunities even if it is material and relevant to the Corporation and/or the Board of Directors or (ii) refrain from engaging in any line of business or from investing in or doing business with any Person.  Any Person purchasing or otherwise acquiring any interest in capital stock of the Corporation shall be deemed to have notice of and to have consented to the provisions of this <u>Section 10</u>.

11.    **<u>DGCL Section 203</u>.**    The Company expressly elects not to be governed by Section 203 of the DGCL.

12.    **<u>Indemnification</u>.**

12.1    To the fullest extent permitted by law, the Corporation shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding ("<u>Proceeding</u>"), whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) with respect to any act or omission by reason of the fact that the Person is or was a director or officer of the Corporation (at any time, including prior to the date hereof), or is or was (at any time, including prior to the date hereof) serving at the request of the Corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise ("<u>Other Entity</u>"), against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the Person in connection with such Proceeding if the Person acted in good faith and in a manner the Person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe the Person's conduct was unlawful.  The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner which the Person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that the Person's conduct was unlawful.  To the fullest extent permitted by law, the Corporation shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor with respect to any act or omission by reason of the fact that the Person is or was a director, officer, employee or agent of the Corporation (at any time, including prior to the date hereof), or is or was (at any time, including prior to the date hereof) serving at the request of the Corporation as a director, officer, employee or agent of an Other Entity, against expenses (including attorneys' fees) actually and reasonably incurred by the Person in connection with the defense or settlement of such action or suit if the Person acted in good faith

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

and in a manner the Person reasonably believed to be in or not opposed to the best interests of the Corporation, except that no indemnification shall be made in respect of any claim, issue or matter as to which such Person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court of Chancery of the State of Delaware (the "Court of Chancery") or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such Person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

12.2    The Corporation shall, from time to time, reimburse or advance to any director or officer entitled to indemnification hereunder the funds necessary for payment of expenses, including reasonable attorneys' fees and disbursements, incurred in connection with any Proceeding, in advance of the final disposition of such Proceeding; *provided*, *however*, that, if required by the DGCL, such expenses incurred by or on behalf of any director or officer may be paid in advance of the final disposition of a Proceeding only upon receipt by the Corporation of an undertaking, by or on behalf of such director or officer, to repay any such amount so advanced if it shall ultimately be determined by final judicial decision from which there is no further right of appeal that such director or officer is not entitled to be indemnified for such expenses.

12.3    The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this Section 12 shall not be deemed exclusive of any other rights to which a Person seeking indemnification or reimbursement or advancement of expenses may have or hereafter be entitled under any statute, this Certificate of Incorporation, the Bylaws, any agreement (including any policy of insurance purchased or provided by the Corporation under which directors, officers, employees and other agents of the Corporation are covered), any vote of stockholders or disinterested directors or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding such office.

12.4    The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this Section 12 shall continue as to a Person who has ceased to be a director or officer and shall inure to the benefit of the executors, administrators, legatees and distributees of such Person.

12.5    The Corporation shall maintain insurance on behalf of any Person who is or was a director or officer of the Corporation (at any time, including prior to the date hereof), or is or was (at any time, including prior to the date hereof) serving at the request of the Corporation as a director or officer of an Other Entity, against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as such, whether or not the Corporation would have the power to indemnify such Person against such liability under the provisions of this Section 12, the Bylaws, the Stockholders Agreement or under Section 145 of the DGCL or any other provision of law.

12.6    The provisions of this Section 12 shall be a contract between the Corporation, on the one hand, and each director and officer who serves in such capacity at any time while this Section 12 is in effect, on the other hand, pursuant to which the Corporation and each such

8

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

director or officer intend to be legally bound.  Notwithstanding anything to the contrary contained in this Certificate of Incorporation, no amendment, repeal or modification of this Section 12 shall affect any rights or obligations with respect to any state of facts then or theretofore existing or any proceeding theretofore or thereafter brought or threatened based in whole or in part upon any such state of facts.

12.7    The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this Section 12 shall be enforceable by any Person entitled to such indemnification or reimbursement or advancement of expenses in any court of competent jurisdiction.  Neither the failure of the Corporation (including its Board of Directors, its independent legal counsel and its stockholders) to have made a determination prior to the commencement of such action that such indemnification or reimbursement or advancement of expenses is proper in the circumstances nor an actual determination by the Corporation (including its Board of Directors, its independent legal counsel and its stockholders) that such Person is not entitled to such indemnification or reimbursement or advancement of expenses shall constitute a defense to the action or create a presumption that such Person is not so entitled. Such a Person shall also be indemnified, to the fullest extent permitted by law, for any expenses incurred in connection with successfully establishing his or her right to such indemnification or reimbursement or advancement of expenses, in whole or in part, in any such action.

12.8    Any director or officer of the Corporation serving in any capacity in (i) another corporation of which a majority of the shares entitled to vote in the election of its directors is held, directly or indirectly, by the Corporation or (ii) any employee benefit plan of the Corporation or any corporation referred to in clause (i) shall be deemed to be doing so at the request of the Corporation.

12.9    Any Person entitled to be indemnified or to reimbursement or advancement of expenses as a matter of right pursuant to this Section 12 may elect to have the right to indemnification or reimbursement or advancement of expenses interpreted on the basis of the applicable law in effect at the time of the occurrence of the event or events giving rise to the applicable Proceeding, to the extent permitted by law, or on the basis of the applicable law in effect at the time such indemnification or reimbursement or advancement of expenses is sought. Such election shall be made, by a notice in writing to the Corporation, at the time indemnification or reimbursement or advancement of expenses is sought; *provided*, *however*, that if no such notice is given, the right to indemnification or reimbursement or advancement of expenses shall be determined by the law in effect at the time indemnification or reimbursement or advancement of expenses is sought.

12.10   It is the intent that with respect to all advancement, reimbursement and indemnification obligations under this Section 12, the Corporation shall be the indemnitor of first resort (*i.e.*, its obligations to indemnitees under this Certificate of Incorporation are primary and any obligation of any stockholder (or any of its Affiliates) to provide advancement or indemnification for the same losses incurred by indemnitees are secondary), and if a stockholder pays or causes to be paid, for any reason, any amounts otherwise indemnifiable hereunder or under any other indemnification agreement (whether pursuant to this Certificate of Incorporation,

9

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

the Bylaws, the Stockholders Agreement, contract, law or regulation), then (i) such stockholder (or such Affiliate, as the case may be) shall be fully subrogated to all rights hereunder of the indemnitee with respect to such payment and (ii) the Corporation shall reimburse such stockholder (or such Affiliate, as the case may be) for the payments actually made and waive any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of such stockholder (or such Affiliate, as the case may be).

13.    **Books and Records.**  The books and records of the Corporation may be kept (subject to any provision contained in the DGCL or other applicable law) at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws.

14.    **Notices.**  All notices, requests, waivers and other communications made pursuant to this Certificate of Incorporation shall be in writing and shall be deemed to have been effectively given or delivered (a) when personally delivered to the party to be notified; (b) if given by electronic transmission in the manner provided in Section 232 of the DGCL; (c) three (3) Business Days after deposit in the United States mail, postage prepaid, by certified or registered mail with return receipt requested, addressed to the party to be notified; or (d) one (1) Business Day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified with next-Business Day delivery guaranteed, in each case as follows: (i) in the case of any stockholder, to such stockholder at its address or facsimile number set forth in the stock records of the Corporation; and (ii) in the case of the Corporation, to the Secretary of the Corporation at the Corporation's principal executive office.  A party may change its address for purposes of notice hereunder by giving notice of such change in the manner provided in this Section 14.

15.    **Amendments.**  The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by the DGCL and in accordance with the terms of the Stockholders Agreement.

16.    **Forum**.  Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery shall, to the fullest extent permitted by law, be the sole and exclusive forum for (a) any derivative action or proceeding brought on behalf of the Corporation, (b) any action asserting a claim for breach of a fiduciary duty owed by any director, officer, employee or agent of the Corporation to the Corporation or the Corporation's stockholders, (c) any action asserting a claim arising pursuant to any provision of the DGCL, this Certificate of Incorporation or the Bylaws, or (d) any action asserting a claim governed by the internal affairs doctrine, in each case subject to said Court of Chancery having personal jurisdiction over the indispensable parties named as defendants therein.  Any Person purchasing or otherwise acquiring shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Section 16.

17.    **Enforceability; Severability**.  Each provision of this Certificate of Incorporation shall be enforceable in accordance with its terms to the fullest extent permitted by law, but in case any one or more of the provisions contained in this Certificate of Incorporation shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity,

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

illegality or unenforceability shall not affect any other provision of this Certificate of Incorporation, and this Certificate of Incorporation shall be construed as if such invalid, illegal or unenforceable provision or provisions had never been contained herein.

18.     **Bylaws; Inconsistent Provisions**.  In furtherance and not in limitation of the powers conferred by law and except as otherwise set forth in the Stockholders Agreement, the Board of Directors is expressly authorized and empowered to adopt, amend or repeal any or all of the Bylaws without any action on the part of the stockholders of the Corporation, subject to the power of the stockholders of the Corporation to amend or repeal any Bylaws adopted or amended by the Board of Directors.  If there is any conflict between the provisions of the Stockholders Agreement and this Certificate of Incorporation, the provisions of the Stockholders Agreement will prevail unless for them to do so would be in contravention of the requirements of the DGCL.

19.     **Certain Definitions.**  As used in this Certificate of Incorporation, the following terms shall have the following meanings:

(i)     "Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person, and shall also include (i) any Related Fund of such Person and (ii) in the case of a specified Person who is an individual, any Family Member of such Person; *provided*, *however*, that a Stockholder (or any Affiliate thereof) shall not be deemed an Affiliate of any another Person solely by reason of the Stockholder's being a party to the Stockholders Agreement.  For purposes hereof, the term "control" (including the terms "controlling", "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(ii)     "Business Day" means any day, other than a day which is a Saturday, Sunday or other day on which banks in New York City, New York are required or authorized to be closed.

(iii)     "Family Member" means, with respect to any individual, (i) any of such individual's parents, spouse, siblings, children and grandchildren or (ii) any trust the sole beneficiaries of which are such individual or one or more of such individual's parents, spouse, siblings, children and grandchildren.

(iv)     "Person" means an individual, partnership, corporation, unincorporated organization, joint stock company, limited liability company, association, trust or joint venture, or a governmental agency or political subdivision thereof.

(v)     "Related Fund" means, with respect to any Person, any fund, account or investment vehicle that is controlled or managed by (x) such Person or an Affiliate thereof, (y) the same investment manager or advisor as such Person or (z) an Affiliate of such investment manager or advisor.

11

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(vi)    "Transfer" means any direct or indirect sale, transfer, gift, hypothecation, pledge, assignment, devise or other disposition of Common Stock or Preferred Stock (including (x) the granting of any option or entering into any agreement for the future sale, transfer or other disposition of Common Stock or Preferred Stock, or (y) the sale, transfer, assignment or other disposition of any securities or rights convertible into, or exchangeable or exercisable for, Common Stock or Preferred Stock), whether voluntary or involuntary, whether of record, constructively or beneficially and whether by operation of law or otherwise, including by recapitalization, merger, consolidation, liquidation, dissolution, dividend, distribution or otherwise.  Notwithstanding the foregoing, any transaction in which a stockholder lends or borrows any shares of Common Stock or Preferred Stock to or from brokers, banks, or other financial institutions for the purpose of effecting margin transactions, or pledges or otherwise encumbers shares of Common Stock or Preferred Stock in connection with such stockholder's financing arrangements, in any case in the ordinary course of business, shall not constitute a Transfer of shares of Common Stock or Preferred Stock for purposes of this Certificate of Incorporation; provided, however, that any foreclosure (including the retention of shares of Common Stock in satisfaction of any obligations) on shares of Common Stock or Preferred Stock by any such broker, bank or other financial institution shall be deemed a Transfer of shares of Common Stock or Preferred Stock for purposes of this Certificate of Incorporation.  The terms "Transferee," "Transferor," "Transferred," and other forms of the word "Transfer" shall have the correlative meanings.

[*Remainder of Page Intentionally Left Blank*]

IN WITNESS WHEREOF, the undersigned has executed this Fourth Amended and Restated Certificate of Incorporation as of this [●] day of [●], 2020.

**CHAPARRAL ENERGY, INC.**


By: _____
     Name:
     Title:

# Exhibit B

**New Stockholders Agreement**

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

# CHAPARRAL ENERGY, INC.

## STOCKHOLDERS AGREEMENT

This STOCKHOLDERS AGREEMENT (this "Agreement"), dated as of [●], 2020, is made by and among CHAPARRAL ENERGY, INC., a Delaware corporation (the "Company"), each of the Initial Stockholders (as defined below) that has executed a counterpart signature page to this Agreement or is deemed to have entered into this Agreement pursuant to the Plan (as defined below) as described in Section 12.8 hereof, and each other Person (as defined below) that hereafter becomes a Stockholder (as defined below).  Capitalized terms used and not otherwise defined herein shall have the meanings set forth for such terms in Article I hereof.

### W I T N E S S E T H :

WHEREAS, (a) on August 16, 2020, the Company and certain of its Subsidiaries filed voluntary petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), commencing cases under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), (b) on [●], 2020, the Bankruptcy Court entered an order (*In re Chaparral Energy, Inc., et al.,* No. 20-11947 (MFW))  (the Confirmation Order") confirming the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (as confirmed, including any amendments and supplements thereto, the "Plan"), and (c) the "Effective Date" of the Plan (the "Effective Date") is occurring on the date of this Agreement;

WHEREAS, pursuant to the Plan and the Confirmation Order, on the Effective Date, (a) the holders of Senior Notes Claims (as defined in the Plan) received or became entitled to receive, in partial satisfaction of such claims, shares of the Company's newly issued Common Stock, par value $0.01 per share (the "Common Stock"), representing in the aggregate one hundred percent (100%) of the Company's outstanding capital stock as of the Effective Date, and (b) the Convertible Notes were issued to the Backstop Parties and the holders of Senior Notes Claims who subscribed for Convertible Notes in the Rights Offering (as defined in the Plan);

WHEREAS, as of the Effective Date, each of the Initial Stockholders has executed and delivered to the Company a counterpart signature page to this Agreement or, pursuant to the Plan and the Confirmation Order, is bound by and is deemed to have agreed to, this Agreement; and

NOW THEREFORE, in consideration of the premises and the mutual agreements, covenants and provisions contained herein, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

# ARTICLE I

# CERTAIN DEFINITIONS

Section 1.1    As used in this Agreement, the following terms shall have the definitions set forth below:

(a)    "Accredited Investor" has the meaning given to such term in Rule 501 under the Securities Act.

(b)    "Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person, and shall also include (i) any Related Fund of such Person and (ii) in the case of a specified Person who is an individual, any Family Member of such Person; *provided*, *however*, that a Stockholder (or any Affiliate thereof) shall not be deemed an Affiliate of any another Person solely by reason of the Stockholder's being a party to this Agreement.    For purposes hereof, the term "control" (including the terms "controlling", "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(c)    "Agreement" has the meaning specified in the preamble of this Agreement.

(d)    "Amzak Stockholders" has the meaning specified in Section 6.2(b).

(e)    "At-Large Director" means an independent Director who (i) is not a Designated Director, (ii) is nominated in accordance with the Bylaws and (iii) is elected by the Company's stockholders in accordance with the Bylaws.

(f)    "Avenue Stockholders" has the meaning specified in Section 6.2(b).

(g)    "Backstop Party" has the meaning given to such term in the Backstop Purchase Agreement.

(h)    "Backstop Purchase Agreement" means the Backstop Purchase Agreement, dated as of August 15, 2020, by and among the Company, its Subsidiaries, and the Backstop Parties party thereto.

(i)    "Bankruptcy Code" has the meaning specified in the recitals to this Agreement.

(j)    "Bankruptcy Court" has the meaning specified in the recitals to this Agreement.

2

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(a)     "beneficial owner" (and related terms such as "beneficial ownership") shall have the meaning given to such term in Rule 13d-3 under the Exchange Act, and any Person's beneficial ownership of securities shall be calculated in accordance with the provisions of such Rule.

(b)     "Board of Directors" means the Board of Directors of the Company.

(c)     "Business Day" means any day other than a day which is a Saturday, Sunday or other day on which banks in New York City, New York are required or authorized to be closed.

(d)     "Bylaws" means the Third Amended and Restated Bylaws of the Company in the form attached hereto as Exhibit A, as may be amended in accordance with the terms thereof and the terms of this Agreement and in effect from time to time.

(e)     "CEO" means the Chief Executive Officer of the Company.

(f)     "Certificate of Incorporation" means the Fourth Amended and Restated Certificate of Incorporation of the Company in the form attached hereto as Exhibit B, as filed by the Company with the Secretary of State of the State of Delaware on or prior to the date hereof, as may be amended in accordance with the terms thereof and the terms of this Agreement and in effect from time to time.

(g)     "Chairman of the Board" means the Chairman of the Board of Directors.

(h)     "Common Stock" has the meaning specified in the recitals to this Agreement.  For purposes of this Agreement, if the Common Stock has been reclassified or changed, or if the Company pays a dividend or makes a distribution on the Common Stock in shares of capital stock, or subdivides (or combines) the outstanding shares of Common Stock into a greater (or smaller) number of shares of Common Stock, a share of Common Stock shall be deemed to be such number of shares of stock and amount of other securities to which a holder of a share of Common Stock outstanding immediately prior to such change, reclassification, exchange, dividend, distribution, subdivision or combination would be entitled to hold as a result of such change, reclassification, exchange, dividend, distribution, subdivision or combination.

(i)     "Company Asset Sale" means the bona fide sale, lease, transfer, conveyance or other disposition to a Third Party Purchaser, in a single transaction or a series of related transactions, of all or substantially all of the consolidated assets of the Company and its Subsidiaries, taken as a whole, whether directly or indirectly.

(j)     "Company Entities" means, collectively, the Company and all of its wholly-owned Subsidiaries.

(k)     "Company ROFO Notice" has the meaning specified in Section 10.2(c).

(l)     "Company ROFO Period" has the meaning specified in Section 10.2(c).

3

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(m)    "Company ROFO Right" has the meaning specified in Section 10.2(d).

(n)    "Company Stock Sale" means the bona fide sale, transfer, conveyance or other disposition to a Third Party Purchaser, in a single transaction or a series of related transactions, of all of the outstanding shares of Common Stock and [, if applicable,] the Convertible Notes, whether directly or indirectly, or by way of any merger, consolidation, statutory share exchange, recapitalization, sale of equity, reclassification, consolidation or other business combination transaction or purchase of beneficial ownership.

(o)    "Competitor" means any Person identified on a list of competitors maintained by the Board of Directors, which list shall be made available to all Stockholders upon reasonable request, and which list may be updated from time to time by the Board of Directors. The determination of whether any particular Person is a Competitor shall be made by the Company in its good faith business judgment.

(p)    "Confirmation Order" has the meaning specified in the recitals to this Agreement.

(q)    "Company" has the meaning specified in the preamble of this Agreement.

(r)    "Convertible Notes" means the 9.0%/13.0% Second Lien Secured Convertible PIK Toggle Notes due 2025 issued pursuant to the New Convertible Notes Indenture (as defined in the Plan), in the initial aggregate principal amount as of the Effective Date of $35,000,000.

(s)    "Data Room" has the meaning specified in Section 7.1(a).

(t)    "Designated Director" means, with respect to any Designating Stockholder (x) any Director for whom the Designating Stockholder is identified as such in Schedule 6.2 and (y) any other Director who was elected as a result of being nominated or designated pursuant to such Designating Stockholder's exercise of its Designation Right, in each case for so long as such individual continues to serve as a Director.

(u)    "Designating Stockholders" means, collectively, the Millstreet Stockholders, the Avenue Stockholders, the Amzak Stockholders, and, if applicable, any other Stockholder to whom a Designation Right has been Transferred in accordance with this Agreement, in each case so long as it has a Designation Right. A Designating Stockholder shall automatically cease to be a Designating Stockholder if and when it ceases to have any Designation Rights.

(v)    "Designation Right" means any of the following: (i) the exclusive right of the Millstreet Stockholders to nominate one or more Directors pursuant to Section 6.2(b)(i), (ii) the exclusive right of the Avenue Stockholders to nominate a Director pursuant to Section 6.2(b)(ii), (iii) the exclusive right of the Amzak Stockholders to nominate a Director pursuant to Section 6.2(b)(iii), (iv) if applicable, the right of any Designating Stockholder to whom any of the foregoing rights have been Transferred in accordance with this Agreement and

4

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(v) the right of the Designating Stockholders to collectively nominate an independent Director pursuant to Section 6.2(b)(iv), in each case together with the exclusive right to remove, at any time, the Director serving in such Designated Director seat and to fill vacancies with respect to such Designated Director seat in accordance with Section 6.3.

(w)   "Director" means, at any time of determination, any director then serving on the Board of Directors .

(x)   "Disinterested Director Approval" means, with respect to any particular matter, the affirmative vote at a duly held meeting of the Board of Directors (at which a quorum is present) of a majority of the Directors then in office who are "disinterested" with respect to such matter, or the unanimous written consent of all Directors then in office so long as at least one of the Directors is "disinterested" with respect to such matter.

(y)   "DGCL" means the General Corporation Law of the State of Delaware.

(z)   "Drag-Along Documents" has the meaning specified in Section 3.1(i).

(aa)   "Drag-Along Notice" has the meaning specified in Section 3.1(a).

(bb)   "Drag-Along Purchaser" has the meaning specified in Section 3.1(a).

(cc)   "Drag-Along Sale" has the meaning specified in Section 3.1(b).

(dd)   "Dragged Holders" has the meaning specified in Section 3.1(a).

(ee)   "Effective Date" has the meaning specified in the recitals to this Agreement.

(ff)   "Equity Holder" means any Person who is a Stockholder and/or a holder of Convertible Notes.

(gg)   "Equity Securities" means any shares of Common Stock or Convertible Notes.

(hh)   "Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

(ii)   "Excluded Issuance" means (i) the issuance and distribution of shares of Common Stock pursuant to and in accordance with the Plan; (ii) any issuance of shares of Common Stock upon conversion of Convertible Notes or upon exercise of New Warrants (as defined in the Plan), (iii) any issuance of shares of Common Stock by means of a *pro rata* distribution to all Stockholders; (iv) any issuance of shares of Common Stock or other equity awards pursuant to the Management Incentive Plan or any future director or employee equity plan approved by the Board of Directors, including shares of Common Stock issued upon the vesting of awards issued pursuant thereto; (v) any issuance of shares of Common Stock as

5

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

purchase price consideration in a merger or acquisition transaction approved by the Board of Directors, or as an "equity kicker" to the lenders in a bona fide debt financing transaction approved by the Board of Directors and (vi) the issuance of shares of Common Stock in an initial Public Offering.

(jj)    "Family Member" means, with respect to any individual, (i) any of such individual's parents, spouse, siblings, children and grandchildren or (ii) any trust the sole beneficiaries of which are such individual or one or more of such individual's parents, spouse, siblings, children and grandchildren.

(kk)    "GAAP" means United States generally accepted accounting principles.

(ll)    "Holder ROFO Right" has the meaning specified in Section 10.2(d).

(mm)    "Information" has the meaning specified in Section 12.3(a).

(nn)    "Initial Board" has the meaning specified in Section 6.2(a).

(oo)    "Initial Stockholder" means any Person that has received or is entitled to receive a distribution of shares of Common Stock pursuant to the Plan and has duly executed and delivered to the Company a counterpart signature page to this Agreement, or is deemed to have entered into this Agreement pursuant to the Plan as further specified in Section 12.8 hereof and in Section IV.C(3) of the Plan and the Confirmation Order.

(pp)    "Initiating Drag-Along Holders" has the meaning specified in Section 3.1(a).

(qq)    "Initiating Holders" means (a) with respect to any Drag-Along Sale, the Initiating Drag-Along Holders and (b) with respect to any Tag-Along Sale, the Initiating Tag-Along Holders.

(rr)    "Initiating Tag-Along Holders" has the meaning specified in Section 4.1(a).

(ss)    "Joinder Agreement" means a Joinder Agreement in the form attached hereto as Exhibit C, or otherwise in form and substance acceptable to the Board of Directors in its discretion, pursuant to which a Person agrees to become bound as a Stockholder party to this Agreement.    (i)

(tt)    "Key Action" means any of the following:

any direct or indirect sale or other disposition (including by way of equity sale, asset sale, lease, merger, consolidation or similar transaction), in one transaction or a series of related transactions, of all or substantially all of the consolidated assets of the Company and its Subsidiaries, taken as a whole; *provided*, *however*, that any such transaction that is solely between two or more Company Entities (excluding any

6

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Company Entity that is not a wholly-owned Subsidiary) shall not constitute a Key Action;

the dissolution and/or winding up of the Company;

(ii) any material amendment or modification to the Certificate of Incorporation or the Bylaws;

(iii) any change to the size of the Board of Directors;

(iv) the incurrence of indebtedness, by the Company and its Subsidiaries on a consolidated basis, in an aggregate principal amount greater than fifty million dollars ($50,000,000), excluding any indebtedness incurred in an amount (v) necessary to refinance amounts outstanding (at the time of such refinancing) under the Exit Revolving Facility (as defined in the Plan), the Second Out Term Loan Facility (as defined in the Plan) and/or any other indebtedness previously approved as a Key Action;

(vi) hiring or terminating the CEO;

(vii) declaring or making dividends or distributions to, or redeeming or repurchasing shares from, the Company's stockholders, other than (A) repurchases or redemptions contemplated by the terms of this Agreement or the terms of any employment or similar agreement entered into with the Company or any of its Subsidiaries (including the Management Incentive Plan) or (B) dividends or other distributions by a wholly owned Subsidiary of the Company to the Company or another wholly owned Subsidiary of the Company;

(viii) any acquisition, disposition or sale of assets by any Company Entity outside the ordinary course of business for a purchase price that exceeds fifty million dollars ($50,000,000); *provided*, *however*, that any such transaction that is solely between two or more Company Entities (excluding any Company Entity that is not a wholly-owned Subsidiary) shall not constitute a Key Action; (ix)

(x) adoption of any stockholder rights plan, share purchase rights plan, poison pill or similar plan which is designed to impede the acquisition of a Common Stock and/or other equity interests in excess of a specified threshold; or

entering into any binding agreement or commitment to do any of the foregoing.

(uu)  "Lien" means any lien, encumbrance, claim, right, demand, charge, option, pledge, security interest or similar interest, title defect, hypothecation, right of first refusal, preemptive right, judgment, and all other impositions, imperfections, defects, limitations or restrictions of any nature or kind whatsoever.

7

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(vv)    "Majority Stockholder Approval" means the approval of one or more Stockholders holding, in the aggregate, more than fifty percent (50.0%) of the outstanding shares of Common Stock, which approval is obtained (i) by the affirmative vote of such Stockholders at a duly convened stockholder meeting or (ii) by the written consent of such Stockholders in accordance with the Bylaws.

(ww)    "Management Incentive Plan" means the management incentive plan to be established and implemented with respect to the Company (and/or its Subsidiaries) by the Board of Directors after the Effective Date, as provided for in the Plan.

(xx)    "MD&A" has the meaning specified in Section 7.1(b).

(yy)    "Millstreet Stockholders" has the meaning specified in Section 6.2(b).

(zz)    "New Securities" has the meaning specified in Section 5.1(a).

(aaa)    "Non-Employee Director" has the meaning specified in Section 6.5.

(bbb)    "Offered Shares" has the meaning specified in Section 10.2(b).

(ccc)    "Offering Equity Holder" has the meaning specified in Section 10.2(a).

(ddd)    "Permitted Lien" means any Liens that are imposed (i) by this Agreement or (ii) under applicable securities laws.

(eee)    "Person" means any natural person, corporation, limited liability, partnership, unincorporated organization, joint stock company, association, joint venture, trust, or other legal entity, or a governmental agency or political subdivision thereof.

(fff)    "Plan" has the meaning specified in the recitals to this Agreement.

(ggg)    "Preemptive Rights Notice" has the meaning specified in Section 5.1(a).

(hhh)    "Pro Rata Portion" has the meaning specified in Section 5.1(a).

(iii)    "Public Offering" means a public offering of Common Stock or other capital stock of the Company pursuant to an effective registration statement under the Securities Act (other than on Form S-4, Form S-8 or any successor to such forms).

(jjj)    "Qualified Institutional Buyer" has the meaning given to such term in Rule 144A under the Securities Act.

(kkk)    "Qualified Public Offering" means a bona fide, marketed underwritten Public Offering of Common Stock after the closing of which the Common Stock is listed or quoted on the New York Stock Exchange, the NASDAQ Stock Market or any other national securities exchange, or a "direct listing" of the Common Stock on any such exchange, in either case which satisfies at least one of the following two criteria: (i) the gross cash proceeds of such

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

offering exceed seventy-five million dollars ($75,000,000) or (ii) at least twenty percent (20%) of the outstanding shares of Common Stock shall have been issued or sold to the public in such offering.

(lll)    "Related Fund" means, with respect to any Person, any fund, account or investment vehicle that is controlled or managed by (x) such Person or an Affiliate thereof, (y) the same investment manager or advisor as such Person or (z) an Affiliate of such investment manager or advisor.

(mmm)"Related Party" means: (i) any Director or member of a Subsidiary Governing Body, any executive officer of a Company Entity, or an immediate family member of any such Person; (ii) any Person (other than a Company Entity) of which an individual described in clause (i) hereof is a partner, director or executive officer; (iii) any Person (or any Affiliate thereof) that beneficially owns, or otherwise controls (or shares control of), at least ten percent (10.0%) of the Total Equity Interests; or (iv) any director or executive officer of a Person described in clause (iii) hereof (or an immediate family member of any such director or executive officer).

(nnn)    "Related Party Transaction" means any transaction, contract, agreement, understanding, arrangement, loan, advance or guarantee (or series of related transactions, contracts, agreements, understandings, arrangements, loans, advances or guarantees) between any Company Entity and a Related Party, but shall exclude the following: (i) any purchase of conventional insurance products from national insurance companies for the benefit of the Company and its Subsidiaries in the ordinary course of the Company's business; (ii) any dividend payments or distributions to all holders of Common Stock that are approved by the Board of Directors; (iii) any payment of reasonable and customary compensation and fees to, and indemnities provided for the benefit of, and reimbursement of expenses incurred by, officers, directors, employees or consultants of any Company Entity in the ordinary course of the Company's business, in each case, as approved by the Board of Directors; (iv) any employment agreements, benefit plans (including the Management Incentive Plan) and similar arrangements for employees and directors of any Company Entity (including the issuance of Common Stock or other equity interests thereunder) which, in each case, are approved by the Board of Directors; (v) any advances and loans to officers, employees or consultants of any Company Entity in an amount less than one hundred thousand dollars ($100,000) in the aggregate outstanding at any time, in each case, in connection with the anticipated incurrence of business expenses by such officers, employees or consultants or the relocation of such officers, employees or consultant in connection with such individual's services to the Company; (vi) transactions with Related Parties that were the subject of a competitive bidding process involving multiple third-party bidders in the ordinary course consistent with past practice; and (vii) any transactions wholly between or among two or more Company Entities.

(ooo)    "Remaining Shares" has the meaning specified in Section 10.2(c).

9

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(ppp)    "Representative" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

(qqq)    "ROFO Holder" has the meaning specified in Section 10.2(a).

(rrr)    "ROFO Notice" has the meaning specified in Section 10.2(b).

(sss)    "ROFO Portion" has the meaning specified in Section 10.2(d).

(ttt)    "ROFO Securities" has the meaning specified in Section 10.2(a).

(uuu)    "ROFO Terms" has the meaning specified in Section 10.2(b).

(vvv)    "Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(www)    "Shares" has the meaning specified in Section 6.1.

(xxx)    "Significant Stockholder" means each Equity Holder that (i) was a Backstop Party (or is an Affiliate of a Backstop Party) and (ii) at the time of determination holds (including shares held by its Affiliates) at least the lesser of (x) five percent (5.0%) of the Total Equity Interests and (y) fifty percent (50.0%) of the Total Equity Interests that such Equity Holder (together with its Affiliates) received or was entitled to receive on the Effective Date.

(yyy)    "Stockholders" means, collectively, (i) the Initial Stockholders and (ii) all other Persons who (A) become a holder of shares of Common Stock (*provided*, that the Transfer or issuance by which such Person acquired such shares was made in accordance with the applicable provisions of this Agreement) and (B) become a party to this Agreement by duly executing and delivering to the Company a Joinder Agreement or are deemed or required by the Plan, the Confirmation Order, this Agreement or the Certificate of Incorporation to become a party hereto.

(zzz)    "Subsidiary" means any Person in which the Company, directly or indirectly through one or more Subsidiaries or otherwise, beneficially owns more than fifty percent (50.0%) of either the equity interests in, or the voting control of, such Person.

(aaaa)    "Subsidiary Governing Body" means the board of directors, board of managers or other governing body of any wholly-owned Subsidiary of the Company.

(bbbb)    "Supermajority Stockholder Approval" means the approval of one or more Stockholders holding, in the aggregate, more than sixty-six and two-thirds percent (66-2/3%) of the outstanding shares of Common Stock, which approval is obtained (i) by the affirmative vote of such Stockholders at a duly convened stockholder meeting or (ii) by the written consent of such Stockholders in accordance with the Bylaws.

10

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(cccc) "Tag-Along Buyer" has the meaning specified in Section 4.1(a).

(dddd) "Tag-Along Sale" has the meaning specified in Section 4.1(a).

(eeee) "Tag-Along Sale Notice" has the meaning specified in Section 4.1(a).

(ffff)    "Tag-Along Sellers" has the meaning specified in Section 4.1(a).

(gggg) "Third Party Purchaser" means, with respect to any Drag-Along Sale, any Person (other than the Company, the Initiating Holders, or any Affiliate thereof or any Related Party) or group of such Persons that is the purchaser in such Drag-Along Sale.

(hhhh) "Total Equity Interests" means, at any time of determination, a number of shares of Common Stock equal to the sum of (w) the total shares of Common Stock then outstanding *plus* (x) the total shares of Common Stock issuable upon conversion of all Convertible Notes then outstanding. For any Person, the percentage of the Total Equity Interests held by such Person at any time of determination shall be equal to the quotient (expressed as a percentage) of (y) the sum of the shares of Common Stock then held by such Person *plus* the shares of Common Stock issuable upon conversion of all Convertible Notes then held by such Person, *divided by* (z) the Total Equity Interests.

(iiii)    "Transfer" means any direct or indirect sale, transfer, gift, hypothecation, pledge, assignment, devise or other disposition of Equity Securities (including (x) the granting of any option or entering into any agreement for the future sale, transfer or other disposition of Common Stock or Convertible Notes, or (y) the sale, transfer, assignment or other disposition of any securities or rights convertible into, or exchangeable or exercisable for, Common Stock or Convertible Notes), whether voluntary or involuntary, whether of record, constructively or beneficially and whether by operation of law or otherwise, including by recapitalization, merger, consolidation, liquidation, dissolution, dividend, distribution or otherwise.  Notwithstanding the foregoing, the following transactions shall not constitute a Transfer of Equity Securities for purposes of this Agreement: (i) [the issuance, sale or other Transfer of publicly traded equity interests in an investment fund or pooled investment vehicle that is an Equity Holder or the direct or indirect parent of an Equity Holder, (ii) the issuance, sale or other Transfer of publicly traded equity securities in any Person that is an Equity Holder or the direct or indirect parent of an Equity Holder (for purposes hereof, "publicly traded equity interests" means equity interests of a class that is registered under Section 12(b) or 12(g) of the Securities Act [and][or] is actively traded on a national securities exchange or any of the OTC markets), and (iii)] any transaction in which an Equity Holder lends or borrows any Equity Securities to or from brokers, banks, or other financial institutions for the purpose of effecting margin transactions, or pledges or otherwise encumbers Equity Securities in connection with such Equity Holder's internal financing arrangements, in any case in the ordinary course of such Equity Holder's business, shall not constitute a Transfer of Equity Securities for purposes of this Agreement; *provided*, *however*, that any redemption or foreclosure (including the retention of shares of Common Stock in satisfaction of any obligations) on shares of Common Stock by any such broker, bank or other financial institution shall be deemed a Transfer of shares of Common Stock for purposes of this

11

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Agreement.  The terms "Transferee," "Transferor," "Transferred," and other forms of the word "Transfer" shall have the correlative meanings.

(jjjj)    "Transfer Notice" has the meaning specified in Section 10.1(c).

(kkkk)  "Whole Board" means, at any time of determination, the total number of Directors which the Company would have at such time if there were no vacancies on the Board of Directors.

(llll)    "Whole Board Approval" has the meaning specified in Section 8.1.

Section 1.2    Interpretation.  The definitions in this Article I shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. All references herein to Articles, Sections, Schedules and Exhibits shall be deemed to be references to Articles and Sections of, and Schedules and Exhibits to, this Agreement unless the context shall otherwise require. All Schedules and Exhibits attached hereto shall be deemed incorporated herein as if set forth in full herein and, unless otherwise defined therein, all terms used in any Schedule or Exhibit shall have the meaning ascribed to such term in this Agreement. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." All accounting terms not defined in this Agreement shall have the meanings determined by GAAP. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise expressly provided herein, any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. Any reference in this Agreement to "$" or "dollars" shall mean United States dollars. In calculating any Stockholder's ownership of Common Stock or Equity Securities for the purposes of determining whether such Stockholder shall have certain rights under this Agreement that are subject to a minimum ownership threshold, all shares of Common Stock and (for purposes of determining ownership of Equity Securities) shares of Common Stock issuable upon conversion of Convertible Notes held by such Stockholder and by Affiliates of such Stockholder shall be aggregated for the purposes of such determination.

## ARTICLE II

## STOCKHOLDERS; VOTING RIGHTS

Section 2.1    Stockholders; Voting Rights.

(a)      Each share of Common Stock shall be entitled to one (1) vote on all matters for which Stockholders are entitled to vote under the terms of this Agreement, the

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Certificate of Incorporation or under applicable law.  Except as expressly set forth herein, no Stockholder shall have any special or preferential voting or blocking rights.

(b)    A Person shall automatically cease to be a Stockholder for all purposes of this Agreement upon the disposition of all of such Person's [shares of Common Stock][Equity Interests] in accordance with Article X hereof; *provided*, *however*, that such Person shall continue to be bound by the provisions of Section 12.3.

Section 2.2    Limited Liability for Stockholders.  Without prejudice to any additional or further limitations on liability applicable to Stockholders, no Stockholder shall be personally liable to any other Stockholder or to the Company or any Affiliate or creditor of any of the foregoing or to any other Person for any losses, claims, damages, debts, obligations, or liabilities incurred by such other Stockholder or the Company or any Affiliate or creditor of any of the foregoing or to any other Person, whether such losses, claims, damages, debts, liabilities or obligations arise in contract, tort, or otherwise, solely by reason of being a Stockholder.

## ARTICLE III

## DRAG-ALONG SALE

Section 3.1    Drag-Along Sale.[1]

(a)    [If at any time after the date that is twelve (12) months after the Effective Date any one or more Equity Holders then holding, in the aggregate, more than fifty percent (50.0%) of the Total Equity Interests desire to effectuate a Company Stock Sale or Company Asset Sale, then such Stockholder(s) (collectively, the "Initiating Drag-Along Holders") shall have the right to elect to require that all Equity Holders participate in such transaction (a "Drag-Along Sale") on the terms and conditions set forth in this Article III, by delivering written notice of such election to the Company, and the Company shall promptly deliver a copy of such notice to all the other Equity Holders (collectively, the "Dragged Holders") in accordance with Section 12.2.  Any such notice (a "Drag-Along Notice") shall contain a reasonably detailed summary of the material terms and conditions of the Drag-Along Sale, including the identity of the applicable Third Party Purchaser (the "Drag-Along Purchaser"), the amount and form of consideration to be paid by the Drag-Along Purchaser, including the amount and form of consideration to be paid for each outstanding share of Common Stock, and shall be delivered promptly by the Company to the Dragged Holders.  With respect to any Drag-Along Sale [, the Initiating Stockholders in their sole discretion may require (provided that such requirement is set forth in the Drag-Along Notice that it delivers to the Company)] that all (but not less than all) Convertible Notes outstanding immediately prior to the closing of any Drag-Along Sale shall automatically be converted into shares of Common Stock pursuant to the Convertible Notes Indenture, and all such shares shall receive the same treatment in the Drag-Along Sale as the other outstanding shares of Common Stock (and the holders of such shares shall have the same rights and be subject to the same obligations under this Article III with respect thereto as apply to holders of the other outstanding

---

[1] Under review.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

shares of Common Stock with respect to such other outstanding shares), and the Company, the Initiating Holder and each of the Dragged Holders shall take such actions as may reasonably be required in order to effectuate such conversion.

(b)        In connection with any Drag-Along Sale, each of the Dragged Holders shall be obligated to do each of the following, in each case to the extent applicable to such transaction:  (i) at the closing of such Drag-Along Sale, sell or transfer to the Drag-Along Purchaser, for the same type and amount of per-share consideration and on the same terms as the Initiating Holders, all of such Dragged Holder's Equity Securities free and clear of any Liens (other than Permitted Liens) and duly endorsed for transfer, or accompanied by duly endorsed stock powers; (ii) vote all such Dragged Holder's shares of Common Stock, whether by proxy, voting agreement or otherwise, in favor of the Drag-Along Sale; (iii) enter into reasonable and customary agreements with the Drag-Along Purchaser on terms substantially identical to those applicable to the Initiating Holders (including with respect to representations, warranties, indemnities, covenants, conditions, escrow agreements and other provisions and agreements relating to such Drag-Along Sale as requested by the Drag-Along Purchaser), so long as the terms of any such agreements are not more onerous (on a per share basis) with respect to the Dragged Holders than with respect to the Initiating Holders; (iv) use commercially reasonable efforts to obtain any consents necessary for such Dragged Holder to consummate the Drag-Along Sale; (v) waive and refrain from exercising any appraisal or dissenters rights with respect to such Drag-Along Sale; (vi) effectuate the allocation and distribution of the aggregate consideration upon the Drag-Along Sale as set forth below; (vii) refrain from directly or indirectly taking (or causing any other Person to take) any action that is prejudicial to or inconsistent with such Drag-Along Sale; and (viii) take any and all reasonably necessary action in furtherance of the foregoing, to the extent requested by the Initiating Holders or the Board of Directors, at the Company's sole expense; *provided*, *however*, that no Dragged Holder shall be required to enter into any non-competition, non-solicitation or similar agreement in connection with any Drag-Along Sale. Each Equity Holder shall receive, in respect of each share of Common Stock sold by such Equity Holder in any Drag-Along Sale, the same form and amount of consideration paid to each other Equity Holder (including the Initiating Holders) in respect of their shares of Common Stock, except that if any Equity Holder is given an option as to the form of consideration to be received in respect of its Common Stock, each other Equity Holder shall be given the same option.

(c)        Notwithstanding anything to the contrary in this Article III, no Dragged Holder shall be required to agree to any covenants [that do not also apply to the Initiating Holders], make any representations or warranties with respect to the Company or its Subsidiaries or their respective businesses or assets, or provide any indemnity in connection with any Drag-Along Sale, except that each Dragged Holder may be required to (x) provide customary representations, warranties, covenants and agreements (and customary indemnification, on a several basis, with respect thereto) with respect to itself and its Equity Securities and/or (y) bear its *pro rata* share (in proportion to its ownership of Common Stock) of any escrows, holdbacks or adjustments in respect of the purchase price related obligations or any indemnification obligations; *provided*, that no Dragged Holder shall be obligated (A) to indemnify, other than on a several basis, any Person in connection with the Drag-Along Sale, (B) to incur liability to any

14

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Person in connection with the Drag-Along Sale, including under any indemnity, in excess of the lesser of (1) such Dragged Holder's *pro rata* share of such liability based on the relative amount of proceeds payable to the Equity Holders in such sale (other than in the case of fraud or willful breach) and (2) the proceeds payable to such Dragged Holder in such Drag-Along Sale (other than in the case of fraud or willful breach of such Dragged Holder) or (C) to agree to any non-competition, non-solicitation, non-disparagement or non-hire covenants or similar restrictive covenants.

(d)     Upon consummation of a Drag-Along Sale, or as otherwise expressly provided in paragraph (b) above, the Initiating Holders and the Dragged Holders shall receive, with respect to their shares of Common Stock, the same proportion (on a per-share basis) of the aggregate consideration from such Drag-Along Sale that such Equity Holders would have received if such aggregate consideration had been distributed by the Company in complete liquidation pursuant to the rights and preferences set forth in the Certificate of Incorporation and under the DGCL.

(e)     Each Initiating Holder and each Dragged Holder will bear its *pro rata* share (based upon the net proceeds received by each such holder in the Drag-Along Sale) of the costs of any Drag-Along Sale to the extent such costs are incurred for the benefit of all such holders and are not otherwise paid by the Company or the Drag-Along Purchaser.  Costs incurred by such holders on their own behalf will not be considered costs of the Drag-Along Sale.

(f)     The Company shall use commercially reasonable efforts to cause its officers, employees, agents, contractors and others under its control to cooperate in any proposed Drag-Along Sale and not to take any action which might impede any such Drag-Along Sale; *provided*, *however*, that in the case of a Drag-Along Sale that is structured as a merger or a Company Asset Sale, the Board of Directors shall act in accordance with its duties under applicable law.  Pending the completion of any proposed Drag-Along Sale, the Company shall use commercially reasonable efforts to operate in the ordinary course of business and to maintain all existing business relationships in good standing.

(g)     The Initiating Holders shall have power and authority, subject to the requisite Board of Directors approval in the case of a Drag-Along Sale that is structured as a merger or a Company Asset Sale, to cause the Company to enter into the definitive agreement for such Drag-Along Sale and to take any and all such further action in connection therewith as the Initiating Holders may reasonably deem necessary or appropriate in order to consummate or abandon any such Drag-Along Transaction; *provided*, *however*, that in the case of a Company Asset Sale or merger, the Board of Directors shall act in accordance with its duties under applicable law; *provided further*, *however*, that to the fullest extent permitted by law, the Initiating Holders shall not have any liability to any other Person if a Drag-Along Sale is not consummated for any reason.  Subject to any required approval by the Board of Directors (in the case of a Drag-Along Sale that is structured as a merger or a Company Asset Sale), the issuance of the Drag-Along Notice and the provisions of this Section 3.1, the Initiating Holders, in exercising their rights under this Section 3.1, shall have complete discretion over the terms and conditions of the Drag-Along Sale effected thereby, including price, payment terms, conditions

15

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

to closing, representations, warranties, affirmative covenants, negative covenants, indemnification, holdbacks and escrows.]

# ARTICLE IV

# TAG-ALONG SALE

Section 4.1    Tag-Along Sale.[2]

(a)    [In the event of any proposed Transfer by one or more Stockholders (the "Initiating Tag-Along Holders") of more than fifty percent (50.0%) of the outstanding shares of Common Stock to a single Person or group of related Persons (the "Tag-Along Buyer"), in a single transaction or series of related transactions over a twelve month period (a "Tag-Along Sale"), the Initiating Holders shall first give written notice of such proposed Transfer (a "Sale Notice") to the Company, and the Company shall promptly deliver a copy of such notice to each of the other Stockholders that is a Significant Stockholder or holds at least two percent (2%) of the Total Equity Interests (collectively, the "Tag-Along Sellers"), in accordance with Section 12.2; *provided*, *however*, that any such Transfer to an Affiliate of the Initiating Tag-Along Holders shall not constitute a Tag-Along Sale.  Such Notice (a "Tag-Along Sale Notice") shall offer to each of the Tag-Along Sellers the option to participate in such Tag-Along Sale on the same terms and conditions as the Initiating Holders, and at the same per-share sale price and in the same form of consideration as the Initiating Holders.  The Tag-Along Sale Notice shall include the names of the Tag-Along Buyer and the Tag-Along Seller, a reasonably detailed summary of the material terms and conditions of the proposed Tag-Along Sale, and the proposed amount and form of consideration per share of Common Stock and the terms and conditions of payment contemplated by the proposed Tag-Along Sale.  Each Tag-Along Seller may, by written notice to the Initiating Holders (or their designated representative) delivered within ten (10) calendar days after delivery of the Tag-Along Sale Notice, elect (which election shall be irrevocable) to sell shares in such Tag-Along Sale, on the terms and conditions set forth in the Tag-Along Sale Notice; *provided*, *however*, that if the Tag-Along Buyer is not willing to purchase on such terms and conditions the aggregate amount of Common Stock proposed to be sold in the Tag-Along Sale by the Initiating Holders and any Tag-Along Sellers electing to participate in the Tag-Along Sale, then the Initiating Holders may elect to either (A) terminate such Tag-Along Sale with respect to the Initiating Holders and each Tag-Along Seller or (B) consummate the Tag-Along Sale and sell to the Tag-Along Buyer such number of shares as it is willing to purchase on such terms and conditions, and the Initiating Holders and the Tag-Along Sellers electing to participate in such Tag-Along Sale shall each be permitted to sell to the Tag-Along Buyer a number of shares of Common Stock owned by the Initiating Holders or electing Tag-Along Sellers, as the case may be, equal to the product of (x) the total number of shares of Common Stock to be purchased by the Tag-Along Buyer and (y) such Initiating Holder's or Tag-Along Seller's proportionate percentage of the total number of shares of Common Stock held, in the aggregate, by the Initiating Holders and electing Tag-Along Sellers.

---

[2] Under review.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(b)    In no event shall any Tag-Along Seller have any rights under this Section 4.1 or otherwise with respect to a sale by any Initiating Holders of any securities of the Company other than the Common Stock. In connection with any Tag-Along Sale, no Tag-Along Seller shall be required to agree to any covenants that do not also apply to the Initiating Holders, or make any representations or warranties with respect to the Company or its Subsidiaries or their respective businesses or assets, or provide any indemnity, except such Tag-Along Seller may (x) be required to provide customary representations, warranties, covenants and agreements with respect to itself and its Common Stock or (y) be required to bear its pro rata share (in proportion to its ownership of Common Stock) of any escrows, holdbacks or adjustments in respect of the purchase price related obligations or any indemnification obligations; *provided*, that no Tag-Along Seller shall be obligated (A) to indemnify, other than on a several basis, any Person in connection with the Tag-Along Sale, (B) to incur liability to any Person in connection with the Tag-Along Sale, including under any indemnity, in excess of the lesser of (1) its *pro rata* share of such liability based on the relative amount of proceeds payable to the applicable Stockholders in such sale (other than in the case of fraud or willful breach) and (2) the proceeds payable to such Tag-Along Seller in such Tag-Along Sale (other than in the case of fraud or willful breach of such Tag-Along Seller), or (C) to agree to any non-competition, non-solicitation, non-disparagement or non-hire covenants or similar restrictive covenants. The election by any Tag-Along Seller to sell or not to sell all or any portion of such Tag-Along Seller's Common Stock in any Tag-Along Sale shall be irrevocable (except with the express consent of the Initiating Holders in their sole discretion) and shall not adversely affect such Tag-Along Seller's right to participate in any future Tag-Along Sale.

(c)    At the closing of any Tag-Along Sale, each Initiating Holder and Tag-Along Seller shall deliver, against payment of the purchase price therefor, certificates (or other evidence thereof reasonably acceptable to the transferee of such Common Stock) representing their Common Stock to be sold, duly endorsed for Transfer or accompanied by duly endorsed stock powers, evidence of good title to the Common Stock to be sold, the absence of Liens (other than Permitted Liens), encumbrances and adverse claims with respect thereto and such other documents as are deemed reasonably necessary by the Initiating Holders and the Company for the proper Transfer of such Common Stock on the books of the Company.

(d)    The provisions of this Section 4.1 shall not apply to any proposed Transfer pursuant to Section 3.1.]

## ARTICLE V

## PREEMPTIVE RIGHTS

Section 5.1    Preemptive Rights.

(a)    The Company shall not sell or issue to any Person (including any then-current Stockholder) after the Effective Date any shares of Common Stock, or other equity securities or debt convertible into or exchangeable for shares of Common Stock, or options,

17

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

warrants conferring any right to acquire Common Stock or other rights to acquire Common Stock, or any debt securities (any of the foregoing, the "New Securities") (other than the shares of Common Stock issued pursuant to the Plan, and any New Securities issued pursuant to an Excluded Issuance), unless the Company first submits written notice thereof (the "Preemptive Rights Notice") to each Significant Stockholder identifying the terms of the New Securities (including the price, number or aggregate principal amount and type of securities, and all other material terms) and offers to each Significant Stockholder the opportunity to purchase its Pro Rata Portion of the New Securities (prior to giving effect to such offering) on terms and conditions, including price, not less favorable to the Significant Stockholder than those on which the Company is proposing to sell or issue the New Securities. With respect to any sale or issuance of New Securities that is subject to this Section 5.1, the portion of such New Securities that each Significant Stockholder will be entitled to purchase (its "Pro Rata Portion") shall be equal to (x) the total number of New Securities subject to the sale or issuance *multiplied by* (y) a fraction in which the numerator is the total number of shares of Common Stock then held by such Significant Stockholder and the denominator is the total shares of Common Stock then outstanding and held by Significant Stockholders.

(b) The Company's offer to a Significant Stockholder shall remain open for a period of twenty (20) calendar days after the Preemptive Rights Notice is delivered in accordance with Section 12.2, during which time the Significant Stockholder may irrevocably accept such offer by written notice to the Company setting forth the number of such New Securities to be purchased by such Significant Stockholder, up to a maximum amount equal to such Significant Stockholder's Pro Rata Portion.[3]

(c) Any Significant Stockholder shall have the right to assign, to any one or more of its Affiliates, its right to purchase and/or receive delivery of all or any portion of the New Securities that such Significant Stockholder elects to purchase pursuant to this Section 5.1, by written notice to the Company, which notice (i) shall be duly executed by the assignee and shall include representations, in form and substance satisfactory to the Company, that each of the assignee and the assigning Significant Stockholder (A) is a Qualified Institutional Buyer or an Accredited Investor and (B) is not a Competitor and (ii) shall be accompanied by a Joinder Agreement, duly completed and executed by the Transferee, if such New Securities includes shares of Common Stock and the assignee has not already executed and delivered to the Company a counterpart signature page to this Agreement or a Joinder Agreement. Notwithstanding the foregoing, no such assignment shall relieve the Significant Stockholder from its obligations (including its obligation to purchase such securities) under this Section 5.1 with respect to such New Securities, and no such assignment shall be permitted if the assignee's purchase of such New Securities would result in any of the consequences described in Section 10.1(a).

---

[3] Under review.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

## ARTICLE VI

## BOARD OF DIRECTORS

Section 6.1    Agreement to Vote.  Each Stockholder hereby agrees to hold all of the shares of Common Stock registered in its name (and any other voting securities of the Company issued with respect to, upon conversion of, or in exchange or substitution of any Common Stock, and any other voting securities of the Company subsequently acquired by such Stockholder) subject to the provisions of this Article VI, and to vote all such securities at regular or special meetings of stockholders, and give written consents with respect to all such securities, as necessary to give full effect to the Designation Rights and the provisions of this Article VI, and to cause the Board of Directors to at all times be constituted as provided in this Article VI. The Company shall use commercially reasonable efforts to cause the Board of Directors to at all times be constituted as provided in this Article VI, and to give full effect to the Designation Rights and the provisions of this Article VI.

Section 6.2    Composition of the Board of Directors.

(a)    The Board of Directors shall at all times consist of seven (7) Directors, unless the size of the Board of Directors is increased or decreased by the Board of Directors pursuant to the affirmative vote of a majority of the Directors then in office; *provided*, *however*, that the size of the Board of Directors shall not be decreased to fewer than five (5) Directors nor increased to more than seven (7) Directors except with Majority Stockholder Approval. The Board of Directors, as of the Effective Date, shall be comprised of the seven (7) individuals listed in Schedule 6.2 attached hereto (the "Initial Board").

(b)    Following the Effective Date, and notwithstanding anything to the contrary in this Agreement or in the Bylaws:

(i)    for so long as Millstreet Capital Management LLC and its Affiliates and Related Funds  (collectively, the "Millstreet Stockholders") own, in the aggregate, (A) at least fifty percent (50.0%) of the Total Equity Interests that the Millstreet Stockholders received on the Effective Date pursuant to the Plan and the Backstop Purchase Agreement, the Millstreet Stockholders shall have a designation right with respect to two (2) seats on the Board of Directors, pursuant to which the Millstreet Stockholders shall have the exclusive right to nominate individuals for election to such Director seats, and (B) at least twenty-five percent (25.0%) (but less than fifty percent (50.0%)) of the Total Equity Interests that the Millstreet Stockholders received on the Effective Date pursuant to the Plan and the Backstop Purchase Agreement, the Millstreet Stockholders shall have a designation right with respect to one (1) seat on the Board of Directors, pursuant to which the Millstreet Stockholders shall have the exclusive right to nominate an individuals for election to such Director seat;

(ii)    for so long as Avenue Energy Opportunities Fund, L.P. and its Affiliates and Related Funds (collectively, the "Avenue Stockholders") own, in the aggregate, at least fifty percent (50.0%) of the Total Equity Interests that the Avenue

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Stockholders received on the Effective Date pursuant to the Plan and the Backstop Purchase Agreement, the Avenue Stockholders shall have a designation right with respect to one (1) seat on the Board of Directors, pursuant to which the Avenue Stockholders shall have the exclusive right to nominate an individual for election to such Director seat;

(iii)     for so long as Amzak Capital Management, LLC and its Affiliates and Related Funds (collectively, the "Amzak Stockholders") own, in the aggregate, at least fifty percent (50.0%) of the Total Equity Interests that the Amzak Stockholders received on the Effective Date pursuant to the Plan and the Backstop Purchase Agreement, the Amzak Stockholders shall have a designation right with respect to one (1) seat on the Board of Directors, pursuant to which the Amzak Stockholders shall have the exclusive right to nominate an individual for election to such Director seat;

(iv)     for so long as the Designating Stockholders have, in the aggregate, Designation Rights with respect to at least two (2) Director seats, the Designating Stockholders shall collectively have a designation right with respect to one (1) seat on the Board of Directors, pursuant to which the Designating Stockholders shall have the exclusive right to nominate an individual for election to such Director seat;

(v)     the Board of Directors shall include at least one At-Large Director; and

(vi)     at all times the individual then serving as the CEO, if any, shall automatically be a Director (the "CEO Director"), *provided*, that any such individual's status as a director shall automatically terminate upon their ceasing to be the CEO.

(c)     If at any time a Designating Stockholder loses a Designation Right because it ceases to satisfy the applicable Total Equity Interest ownership threshold set forth in subsection (b) of this Section 6.2, then the term of the Designated Director then serving on the Board of Directors as a result of such terminated Designation Right shall expire at the next annual meeting of stockholders following such termination, and thereafter such Director seat shall be an At-Large Director seat and that (including at such annual meeting) is subject to election by the Company's stockholders at such annual meeting or by written consent. Notwithstanding anything to the contrary in this Section 6.2, the then-current term of a Designated Director shall not be affected solely by the applicable Designating Stockholder's loss of its Designation Right.

(d)     A Designating Stockholder may not assign or otherwise Transfer its Designation Rights to any Person, except that (i) any Designating Stockholder may freely assign Designation Rights to any of its controlled Affiliates or Related Funds, (ii) any Designating Stockholder may assign its Designation Rights to the Transferee in connection with any Transfer of all (but not less than all) of the shares of Common Stock and Convertible Notes that such Designating Stockholder received or was entitled to receive on the Effective Date pursuant to the Plan and the Backstop Purchase Agreement, and (iii) any Designating Stockholder may assign its Designation Rights with respect to one (1) Director seat, to the Transferee in connection with any Transfer of shares of Common Stock and/or Convertible Notes representing at least ten percent

20

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(10.0%) of the Total Equity Interests, *provided*, that in each case the Designating Stockholder provides the Company with prior written notice of such assignment, and *provided further*, that in the case of (ii) and (iii), (x) the Transfer of Common Stock and/or Convertible Notes complies with all applicable provisions of this Agreement and the Transferee (if not already a signatory hereto) executes and delivers a Joinder Agreement and (y) the applicable Transferee shall only retain such Designation Rights so long as Transferee owns, in the aggregate, the minimum amount of Total Equity Interests that the Transferor would have been required to own pursuant to this Agreement in order to retain such Designation Rights in lieu of the Transfer to Transferee.

Section 6.3    Removal; Vacancies.  At any time, a Director may be removed with or without cause by Majority Stockholder Approval.  In the event of the death, resignation or removal of a Director, or if there is a vacancy on the Board of Directors for any other reason, the vacancy shall be promptly filled by the remaining Directors, in accordance with the Bylaws, subject (in the case of any Director seat that is subject to a Designation Right) to the exclusive right of the Designating Stockholder to designate the individual to fill such vacancy. Notwithstanding anything to the contrary in this Article VI, a Designating Stockholder shall have the exclusive right (exercisable at any time in its sole discretion) to remove its respective Designated Director and to fill any vacancy with respect to the Director seat to which its Designation Right relates.

Section 6.4    Voting.  Except as otherwise provided in this Agreement, approval of the Board of Directors of any action or decision will require unanimous written consent of all Directors then in office or approval of a majority of the Directors present at a validly convened meeting of the Board of Directors at which a quorum is present.

Section 6.5    Director Compensation.  From and after the Effective Date, each Director who is not an employee of the Company or any of its Subsidiaries (each, a "Non-Employee Director") shall be entitled to such market-rate compensation (which may include cash and/or equity awards) from the Company, as shall have been determined by the Required Backstop Parties (as defined in the Backstop Purchase Agreement) and the Company prior to the Effective Date and set forth in a written notice given to the Company prior to the Effective Date, subject to such changes as may be approved from time to time by the Board of Directors; *provided*, *however*, that such compensation shall not be increased (other than reasonable annual cost of living increases) unless such increase shall have been approved by Majority Stockholder Approval.  Any equity awards granted to Non-Employee Directors shall be in addition to the equity awards provided under the Management Incentive Plan.  All Directors will be reimbursed by the Company for all reasonable and documented expenses incurred in connection with his or her service as a Director and (as applicable) committee member, and will be entitled to customary indemnification/advancement and exculpation provisions and directors' and officers' liability insurance coverage.

Section 6.6    Chairman of the Board.  The initial Chairman of the Board, as of the Effective Date, shall be the Director identified as such in Schedule 6.2.  Following each annual meeting of the stockholders, the Board of Directors shall elect the Chairman of the Board from among the Directors.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Section 6.7    <u>Committees of the Board of Directors</u>.    The Board of Directors shall establish and maintain an Audit Committee and a Compensation Committee.  In addition, the Board of Directors may, by a majority vote of the Whole Board, establish one or more additional committees from time to time, in each case in accordance with the Certificate of Incorporation and the Bylaws.

Section 6.8    <u>Subsidiary Boards</u>.    The Company shall (except as otherwise determined by the Required Backstop Parties prior to the Effective Date) use commercially reasonable efforts to cause the size and composition of the board of directors, board of managers or similar governing body of each of the Company's wholly-owned Subsidiaries to at all times be identical to that of the Board of Directors; *provided*, *however*, that the foregoing requirement shall not apply to any wholly-owned Subsidiary which is (i) a limited liability company that is managed by its members, (ii) a limited partnership that is managed by its general partner, or (iii) required by law or contract to have a different composition.

# ARTICLE VII

# INFORMATION RIGHTS

Section 7.1    <u>Information Rights</u>.

(a)    For so long as the Company is not required to file periodic reports under the Exchange Act, the Company shall provide to each Stockholder who is not a Competitor the information, reports and other materials that Stockholders are entitled to receive under this <u>Article VII</u>, within the time periods and subject to the applicable terms and conditions set forth in this <u>Article VII</u>; *provided*, *however*, that notwithstanding anything contained in this <u>Article VII</u>, any Stockholder that has not duly executed and delivered to the Company a counterpart signature page to this Agreement or a Joinder Agreement (and has not otherwise entered into a confidentiality agreement, in form and substance acceptable to the Board of Directors in its sole discretion, with respect to such information, reports and other materials) shall not be entitled to receive any such information, reports or other materials, or access to the Data Room. All information, reports and other materials that the Company is required to provide to Stockholders under this <u>Article VII</u> shall be posted to an electronic data room on a secure website or electronic data room to which all Stockholders entitled to receive such information, reports and other materials are given access (the "<u>Data Room</u>").  The Company shall also provide access to the Data Room, upon request by any Stockholder entitled to such access, to any Transferee or potential Transferee of shares of Common Stock to whom such Stockholder would be entitled to disclose Information pursuant to <u>Section 12.3</u>, *provided*, that such Transferee or potential Transferee is a Qualified Institutional Buyer or Accredited Investor (or is otherwise acceptable to the Board of Directors, in its reasonable discretion).  All information provided by the Company to Stockholders pursuant to this <u>Article VII</u> (including all information provided to or obtained by any Significant Stockholder pursuant to <u>Section 7.1(d)</u>) shall be subject to the confidentiality provisions set forth in <u>Section 12.3</u>.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(b)      Each Stockholder who is not a Competitor shall have the right to receive, (i) within ninety (90) days after the end of each fiscal year of the Company, audited consolidated financial statements of the Company for such fiscal year (including balance sheets, statements of operations and statements of cash flows), certified by a national accounting firm and prepared in accordance with GAAP, along with a reasonably detailed management's discussion and analysis, in narrative form, commenting on the audited consolidated financial statements ("MD&A"), (ii) within sixty (60) days after the end of each of the first three fiscal quarters of each fiscal year of the Company, unaudited condensed consolidated financial statements of the Company for such quarter and the year-to-date period and the comparable period of the prior fiscal year (including balance sheets, statements of operations and statements of cash flows, prepared in accordance with GAAP, along with an MD&A with respect thereto.

(c)      Within a reasonable time after it provides quarterly or annual financial statements to Stockholders pursuant to Section 7.1(b), the Company shall hold quarterly conference calls with the Stockholders (and reasonable prior notice and dial-in information will be provided to each Stockholder entitled to participate in such call) to discuss the Company's results of operations and financial performance for the immediately preceding fiscal quarter and year-to-date, including a reasonable question and answer session.  Notwithstanding the foregoing, the Company in its sole discretion may exclude from any such calls any Stockholder who is a Competitor.

(d)      If at any time following the Effective Date the Company is required to register the Common Stock or any other class of equity security under Section 12(g) of the Exchange Act because the number of holders of record of such class exceeds any of the applicable thresholds, the Company shall provide a minimum of thirty (30) days prior written notice of such registration to all Equity Holders, and the Company shall not otherwise register the Common Stock or any class of equity security under Section 12 of the Exchange Act at any time prior to consummation of a Qualified Public Offering.  The Common Stock will not be listed or quoted on the New York Stock Exchange, the NASDAQ Stock Market or any other national securities exchange at any time prior to the consummation of a Qualified Public Offering.

## ARTICLE VIII

## KEY ACTIONS

Section 8.1    Approval Requirements for Key Actions.  In addition to any vote of stockholders of the Company that may be required by applicable law or by the provisions of the Certificate of Incorporation, the Company shall not directly or indirectly take (and, as applicable, the Company shall cause its Subsidiaries to refrain from taking) any Key Action without first obtaining approval of such Key Action by the Board of Directors pursuant to either (i) the affirmative vote, at a duly held meeting, of Directors that constitute a majority of the Whole Board or (ii) the unanimous written consent of all Directors then in office ("Whole Board Approval").  Notwithstanding the foregoing, Whole Board Approval shall not be required with

23

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

respect to any Company Stock Sale or Company Asset Sale effectuated pursuant to the terms and conditions set forth in Article III hereof.

## ARTICLE IX

## RELATED PARTY TRANSACTIONS

Section 9.1    Approval Requirements for Related Party Transactions.  In addition to any other vote of Stockholders of the Company that may be required by law or by the provisions of the Certificate of Incorporation, the Company shall not enter into, or permit any other Company Entity to enter into, any Related Party Transaction (or series of Related Party Transactions) that requires or (as determined by the disinterested members of the Board of Directors) would reasonably be expected to involve more than five million dollars ($5,000,000) in cash payments or other consideration or value, without first (i) obtaining approval of such Related Party Transaction(s) by Disinterested Director Approval, and (ii) (A) prior to obtaining Disinterested Director Approval described in clause (i) above, obtaining a fairness opinion from with respect to such proposed Related Party Transaction from a nationally recognized investment banking or valuation firm, or (B) obtaining prior approval of the Stockholders by Majority Stockholder Approval (excluding for such purpose any shares held by the applicable Related Party or any of its Affiliates).

## ARTICLE X

## TRANSFERS

Section 10.1    Restrictions on Transfer.[4]

(a)    [Each Stockholder covenants and agrees that it shall not Transfer any [shares of Common Stock][Equity Interests] except in accordance with the provisions of this Section 10.1 and the other applicable provisions of this Agreement.  The Board of Directors, in its sole discretion, may at any time and from time to time waive any of the restrictions or requirements set forth in this Section 10.1, other than clause (i) of Section 10.1(b).  The Board of Directors may delegate, to one or more specified officers of the Company, all or any portion of its authority to make decisions and determinations pursuant to this Section 10.1. Any Transfer must comply with Section 3.1, Section 4.1 and Section 5.1, as applicable.

(b)    [Shares of Common Stock][Equity Interests] shall not be Transferred by any Stockholder in any Transfer that would, if consummated, (i) result in a violation of the Securities Act or any state securities laws or regulations, or any other applicable federal or state laws or order of any Governmental Authority having jurisdiction over the Company, (ii) result in the Company's having (after taking into account any other pending Transfers for which a Transfer Notice has previously been given to the Company but have not yet been consummated, and assuming solely for purposes of this clause (ii) that all outstanding Convertible Notes have

---

[4] Under review.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

been fully converted into shares of Common Stock and that all such shares have been issued to the holders of such Convertible Notes prior to the effectiveness of such Transfer), (A) three hundred (300) or more "holders of record" (as such concept is understood for purposes of Section 12(g) of the Exchange Act) of Common Stock, except to the extent the Board of Directors, with respect to any Transfer after January 1, 2021, determines after consultation with outside counsel that such number of holders would not trigger an obligation for the Company to file reports pursuant to the Exchange Act, (B) such number of holders of record of Common Stock as would trigger an obligation for the Company to register the Common Stock under Section 12(g) of the Exchange Act or (C) such number of holders of record of Common Stock as would otherwise subject the Company to reporting obligations under Section 13 or Section 15 of the Exchange Act (if not already subject to such reporting obligations at such time).

(c)     It shall be a condition precedent to any Stockholder's Transfer of shares of Common Stock that, prior to the consummation thereof, the Stockholder provide written notice of such Transfer to the Company (a "Transfer Notice").  A Transfer Notice shall be delivered to the Company in accordance with Section 12.2 and, except as determined otherwise by the Board of Directors in its sole discretion, shall include (A) the name, address, telephone number and email address of the Transferor and the Transferee, (B) the number of shares of Common Stock (and, if applicable, the aggregate principal amount of Convertible Notes) proposed to be Transferred (C) the total shares of Common Stock and aggregate principal amount of Convertible Notes then held by the Transferor, (D) the date on which the Transfer is expected to take place and (E) such additional information and documentation as may be reasonably requested by the Company and the Company's stock transfer agent.  So long as the applicable provisions of this Agreement and the Certificate of Incorporation shall have been fully satisfied and complied with to the satisfaction of the Board, the Company shall, within seven (7) Business Days after delivery of the Transfer Notice (including, without limitation, the provision of any information and documentation requested pursuant to the foregoing clause (E) and, if applicable, the Joinder Agreement and/or legal opinion required by subsection (d) below), cause the Transfer to be registered on the books of the Company, unless the Board of Directors determines that the Transfer is not permitted pursuant to the terms of this Section 10.1, in which case the Company shall promptly inform the Transferor of such determination.

(d)     It shall be a condition precedent to any Stockholder's Transfer of [shares of Common Stock][Equity Interests] that the Transferee shall have delivered to the Company a Joinder Agreement, duly completed and executed by the Transferee, if the Transferee was not an original signatory to this Agreement and has not previously executed and delivered a Joinder Agreement. It shall also be a condition precedent to any Stockholder's Transfer of shares of Common Stock that, if requested by the Board of Directors in its sole discretion, the Transferor shall have delivered to the Company a legal opinion reasonably acceptable to the Board of Directors, stating that registration of the shares of Common Stock that are the subject of such proposed Transfer is not required under the Securities Act.  Notwithstanding the foregoing, such a legal opinion shall not be required for any Transfer of shares of Common Stock that were issued under the Plan in reliance on the registration exemption provided by Section 1145 of the Bankruptcy Code, unless the Company has reason to believe that such shares are "restricted securities" as such term is defined in Rule 144 under the Securities Act or that the Transferor

25

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

may be an Affiliate of the Company or an "underwriter" (as such term is defined in Section 1145(b) of the Bankruptcy Code) with respect to such shares.

(e)    Certificates.  All certificates (if any) evidencing shares of Common Stock shall conspicuously bear the applicable legends set forth below, with such changes as the Board of Directors, in its discretion, deems to be necessary and appropriate, and any other legends required by the Certificate of Incorporation.  Each Stockholder shall be deemed to have actual knowledge of the terms, provisions, restrictions and conditions set forth in the Certificate of Incorporation and this Agreement (including the restrictions on Transfer set forth in this Section 10.1), whether or not any certificate evidencing shares of Common Stock owned or held by such Stockholder bear the legends set forth below and whether or not any such Stockholder received a separate notice of such terms, provisions, restrictions and conditions.[5]

Each certificate, if any, representing shares of Common Stock issued under the Plan in reliance on the Securities Act exemption provided by Section 1145 of the Bankruptcy Code shall include a legend substantially to the following effect:

"THE SHARES REPRESENTED BY THIS CERTIFICATE (THE "SECURITIES") WERE ORIGINALLY ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 1145 OF THE U.S. BANKRUPTCY CODE. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAW, AND TO THE EXTENT THE HOLDER OF THE SECURITIES IS AN "UNDERWRITER", AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM.  THE SECURITIES ARE ALSO SUBJECT TO THE PROVISIONS OF THE COMPANY'S STOCKHOLDERS AGREEMENT DATED AS OF [•], 2020, INCLUDING RESTRICTIONS ON TRANSFER. THE SECURITIES ARE TRANSFERABLE ONLY IN ACCORDANCE WITH THE PROVISIONS OF THE STOCKHOLDERS AGREEMENT, AND ALL HOLDERS OF SHARES OF THE COMPANY (WHETHER ACQUIRED UPON ISSUANCE OR TRANSFER) SHALL BE, AND BE DEEMED TO BE, A PARTY TO AND BOUND BY SUCH AGREEMENT. A COPY OF THE STOCKHOLDERS AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

Each certificate, if any, representing shares of Common Stock issued in reliance on the Securities Act exemption provided by Section 4(a)(2) of the Securities Act shall include a legend substantially to the following effect:

---

[5] Under review.

26

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"THE SHARES REPRESENTED BY THIS CERTIFICATE (THE "SECURITIES") WERE ORIGINALLY ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 4(a)(2) OF THE SECURITIES ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAW, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM. THE SECURITIES ARE ALSO SUBJECT TO THE PROVISIONS OF THE COMPANY'S STOCKHOLDERS AGREEMENT DATED AS OF [•], 2020, INCLUDING RESTRICTIONS ON TRANSFER. THE SECURITIES ARE TRANSFERABLE ONLY IN ACCORDANCE WITH THE PROVISIONS OF THE STOCKHOLDERS AGREEMENT, AND ALL HOLDERS OF SHARES OF THE COMPANY (WHETHER ACQUIRED UPON ISSUANCE OR TRANSFER) SHALL BE, AND BE DEEMED TO BE, A PARTY TO AND BOUND BY SUCH AGREEMENT. A COPY OF THE STOCKHOLDERS AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

Each certificate, if any, representing other shares of Common Stock shall contain such legends as the Board of Directors, in its discretion, deems to be necessary and appropriate.

(f)    Certain Restricted Transfers.  [Shares of Common Stock][Equity Interests] shall not be Transferred by any Stockholder to a Competitor, except with the prior written approval of the Board of Directors in its sole discretion.  [Shares of Common Stock][Equity Interests] shall not be Transferred by any Stockholder pursuant to any Transfer (other than to an Affiliate of the Transferor) that would, if consummated, result in the Transferee (together with its Affiliates) becoming the holder of more than five percent (5%) of the Total Equity Interests, except with the prior written approval of the Board of Directors in its sole discretion, *provided*, *however*, that such restriction shall not apply to any if the Transferee is a Significant Stockholder, or if the Transferee (together with its Affiliates) already holds more than five percent (5%) of the Total Equity Interests and was the Transferee in another Transfer approved pursuant to this Section 10.1(f). The foregoing restrictions shall not apply to Transfers (i) between Significant Stockholders, (ii) in a Drag-Along Sale pursuant to Article III hereof, or (iii) by any Tag-Along Seller in a Tag-Along Sale pursuant to Article IV hereof.

(g)    Transfers Not in Compliance.  Any Transfer or attempted Transfer of any [shares of Common Stock][Equity Interests] that does not fully comply with the applicable provisions of this Agreement shall be null and void ab initio and of no force or effect whatsoever, and shall not be recognized by the Company.  Any such Transfer or attempted Transfer shall not be recorded on the Company's books and the purported Transferee shall not be treated as the owner of such shares of Common Stock [or Convertible Notes] for any purpose. The Company may institute legal proceedings to force rescission of any Transfer made in violation of any provision of this Agreement and to seek any other remedy available to it at law, in equity or otherwise, including an injunction prohibiting any such Transfer.]

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Section 10.2   Right of First Offer.[6]

(a)   In the event that any [Stockholder][Equity Holder] proposes to Transfer shares of Common Stock and/or Convertible Notes that represent more than five percent (5%) of the Total Equity Interests (such securities, the "ROFO Securities", and such [Stockholder][Equity Holder], the "Offering Equity Holder"), the Company shall have a right of first offer with respect to the ROFO Securities and, if the Company does not exercise such right to purchase all the ROFO Securities, each Significant Stockholder (excluding the Offering Equity Holder and its Affiliates, to the extent any of them is a Significant Stockholder) (a "ROFO Holder") shall have a right of first offer with respect to the ROFO Securities, which rights of first offer shall be exercised in accordance with the provisions of this Section 10.2.

(b)   With respect to any such proposed Transfer of Equity Securities, the Offering Equity Holder shall first deliver written notice to the Company and the ROFO Holders (the "ROFO Notice"), which ROFO Notice shall include a description of the material terms and conditions of the proposed Transfer, including the number of shares of Common Stock and/or Convertible Notes proposed to be Transferred (the "Offered Shares") and the purchase price per Offered Share (which must be a fixed price and not a range) (such material terms and conditions, collectively, the "ROFO Terms").  Delivery of a ROFO Notice shall constitute an irrevocable offer by the Offering Equity Holder to sell the Offered Shares to the Company and/or the ROFO Holders on the ROFO Terms pursuant to this Section 10.2.

(c)   For a period of ten (10) Business Days after the delivery of the ROFO Notice (the "Company ROFO Period"), the Company shall have the right to elect to purchase on the ROFO Terms all or any portion of the Offered Shares, which election shall be made by delivering written notice (the "Company ROFO Notice") thereof to the Offering Equity Holder. If the Company does not elect to purchase all of the Offered Shares within the Company ROFO Period, then the Offered Shares that the Company does not elect to purchase (the "Remaining Shares") shall be subject to purchase by the ROFO Holders pursuant to Section 10.2(d).

(d)   If there are Remaining Shares after the expiration of the Company ROFO Period (or such earlier date that Company delivers the Company ROFO Notice to the Offering Equity Holder or the date on which the Company notifies the Offering Equity Holder in writing that it will not elect to purchase any of the Offered Shares), then the ROFO Holders shall have the right (the "Holder ROFO Right"), for a period of ten (10) Business Days after the earlier of the expiration of the Company ROFO Period (or such earlier date that Company delivers the Company ROFO Notice to the Offering Equity Holder or the date on which the Company notifies the Offering Equity Holder in writing that it will not elect to purchase any of the Offered Shares), to elect to purchase on the ROFO Terms its ROFO Portion of the Remaining Shares, which election shall be made by delivering written notice thereof to the Offering Equity Holder. A ROFO Holder's "ROFO Portion" with respect to the Remaining Shares shall be equal to the product of (i) the total number of Remaining Shares and (ii) a fraction, the numerator of which is the number of Total Equity Interests owned or held by such ROFO Holder, and the denominator

---

[6] Under review.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

of which is the number of Total Equity Interests owned or held by all ROFO Holders.  If not all ROFO Holders subscribe for their full ROFO Portion of Remaining Shares, then the Offering Equity Holder shall notify in writing the fully-subscribing ROFO Holders and the Company of such fact and offer such fully-subscribing ROFO Holders the right to acquire such unsubscribed Remaining Shares on the ROFO Terms.  Subject to the preceding sentence, each fully-subscribing ROFO Holder shall have the right to elect to purchase its *pro rata* share of such unsubscribed Remaining Shares (in proportion to the ROFO Portions of all fully-subscribing ROFO Holders), by delivering written notice thereof to the Offering Equity Holder and the Company within two (2) Business Days from the date the notice from the Offering Equity Holder is delivered to such ROFO Holders.  To the extent the procedure described in the preceding sentence does not result in the subscription of all unsubscribed Remaining Shares, such procedure shall be repeated until either (A) there are no unsubscribed Remaining Shares or (B) no ROFO Holder elects to purchase any unsubscribed Remaining Shares.

(e)    If the Company and/or one or more ROFO Holders elect to purchase all of the Offered Shares, the closing for such purchase and sale shall take place within ten (10) Business Days after the expiration of the Company ROFO Period or, if there are Remaining Shares after the end of the Company ROFO Period (or such earlier date that Company delivers the Company ROFO Notice to the Offering Equity Holder or the date on which the Company notifies the Offering Equity Holder in writing that it will not elect to purchase any of the Offered Shares), the expiration of the last period in which ROFO Holders could elect to purchase Remaining Shares.

(f)    At the closing of any purchase and sale of Offered Shares under this Section 10.2, (i) the Offering Equity Holder shall deliver, against payment of the purchase price therefor, in accordance with the ROFO Terms, certificates (if any) or other documentation (or other evidence thereof reasonably acceptable to the Company and/or the ROFO Holders) representing such Offered Shares, duly endorsed for transfer or accompanied by duly endorsed instruments of transfer, and such other documents as are deemed reasonably necessary by the Company and/or the ROFO Holders for the proper transfer of such Offered Shares on the books of the Company free and clear of any Liens (other than Permitted Liens) and (ii) the Company and/or the ROFO Holders that have elected to purchase Offered Shares shall deliver to the Offering Equity Holder the purchase price for such Offered Shares in accordance with the ROFO Terms.

(g)    In the event that the Company and/or the ROFO Holders do not elect to purchase all of the Offered Shares, or fail to timely close the purchase of the Offered Shares in accordance with this Section 10.2, then (i) neither the Company nor any ROFO Holder shall be entitled to purchase any of the Offered Shares and (ii) the Offering Equity Holder will have one hundred and eighty (180) days after the earlier of (x) the expiration of the last period in which ROFO Holders could elect to purchase Remaining Shares and (y) the failure of the Company and/or the ROFO Holders that have elected to purchase Offered Shares to close the purchase of the Offered Shares in accordance with this Section 10.2, to Transfer all, but not less than all, of the Offered Shares to a third party (subject to compliance with the terms set forth in this Agreement, including Article IV, if applicable), at a price no less than one hundred and ten

29

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

percent (110%) of the price set forth in the ROFO Notice and on other terms not more favorable to the Offering Equity Holder, in the aggregate, than the other ROFO Terms.  In the event the Offering Equity Holder has not sold the Offered Shares within such one hundred and eighty (180) day period, the Offering Equity Holder shall not thereafter Transfer such Offered Shares to any Person without first offering such Offered Shares to the ROFO Holders in the manner provided in this Section 10.2.

(h)     The foregoing restrictions shall not apply to Transfers (i) between Significant Stockholders, (ii) by a Stockholder to any of its Affiliates, (iii) in a Drag-Along Sale pursuant to Article III hereof, or (iv) by any Tag-Along Seller in a Tag-Along Sale pursuant to Article IV hereof.

## ARTICLE XI
## REPRESENTATIONS AND WARRANTIES

Section 11.1   Equity Holder Representations and Warranties.   Each Equity Holder executing or otherwise becoming a party to this Agreement, severally and not jointly, hereby represents and warrants to the Company that as of the date of such execution or its becoming a party hereto, (a) such Equity Holder is duly organized and validly existing under the laws of the jurisdiction of its organization and is in good standing thereunder, (b) such Equity Holder and its signatories have the requisite power and authority to enter into, deliver and perform its obligations under this Agreement and (c) this Agreement constitutes the valid and binding obligation of such Equity Holder, enforceable in accordance with its terms (except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other laws relating to or affecting creditors' rights generally and the effect and application of general principles of equity and the availability of equitable remedies).

## ARTICLE XII

## MISCELLANEOUS

Section 12.1   Term and Termination.

(a)     This Agreement shall terminate automatically upon consummation of a Qualified Public Offering, a Company Asset Sale or Company Stock Sale,  subject to compliance with all applicable provisions of this Agreement relating to rights of Stockholders in connection with such transaction; *provided,* Section 12.3 (and any other provisions of this Agreement necessary to give effect to Section 12.3) shall survive any termination hereof.

(b)     Notwithstanding anything to the contrary in this Agreement, in the event of any termination of this Agreement, (i) the provisions of this Agreement shall survive to the extent necessary for any Party to enforce any right of such Party that accrued hereunder prior to or on account of such termination and (ii) Section 12.3 shall survive such termination.

Section 12.2   Notices.  All notices, requests, waivers and other communications made pursuant to this Agreement shall be in writing and shall be deemed to have been effectively

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

given (a) when personally delivered to the party to be notified; (b) when sent by confirmed facsimile or electronic mail to the party to be notified; (c) three (3) Business Days after deposit in the United States mail, postage prepaid, by certified or registered mail with return receipt requested, addressed to the party to be notified; or (d) one (1) Business Day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified with next-Business Day delivery guaranteed, in each case as follows:

In the case of any Stockholder, to such Stockholder at its address, electronic mail address or facsimile number set forth in the stock records of the Company; *provided*, that any Stockholder may change its address for purposes of notice hereunder at any time by giving notice of such change to the Company in the manner provided in this Section 12.2.

In the case of the Company, as follows (provided, that the Company may change its address for purposes of notice hereunder at any time by giving notice of such change to all other parties in the manner provided in this Section 12.2):

> Chaparral Energy, Inc.
> 701 Cedar Lake Blvd.
> Oklahoma City, OK 73114
> Attn:   Charles Duginski, Chief Executive Officer,
>            Justin Byrne, Vice President and General Counsel
> E-mail:   chuck.duginski@chaparralenergy.com
>              justin.byrne@chaparralenergy.com

Section 12.3    Confidentiality.

(a)        Each Stockholder shall, and shall cause its Representatives to, keep confidential and not divulge any information (including all budgets, business plans and analyses) concerning the Company and its Subsidiaries, including its assets, business, operations, financial condition, liabilities or business prospects ("Information"), and shall use, and cause its Representatives to use, such Information only in connection with the operation of the Company and its investment in the Company; *provided*, *however*, that nothing herein shall prevent any Stockholder from disclosing such Information (i) upon the order of any court or administrative agency, (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Stockholder, (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests, (iv) to the extent necessary in connection with the exercise of any remedy hereunder, (v) to other Stockholders who have entered into this Agreement, (vi) to such Stockholder's Representatives that in the reasonable judgment of such Stockholder need to know such Information and have an obligation to maintain the confidentiality of such Information, (vii) to any Related Party as long as the Related Party agrees in writing to be bound by the provisions of this Section 12.3 as if it were a Stockholder, (viii) to a potential Transferee of shares of Common Stock, to the extent reasonably necessary in connection with an actual or potential Transfer to such Person that would be permitted by this Agreement, *provided* that such potential Transferee is not a Competitor and (prior to such disclosure) enters into a non-disclosure agreement in a form approved by the Board of Directors

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

pursuant to which the potential Transferee agrees in writing to maintain the confidential nature of such Information in accordance with the terms of this Section 12.3, or (ix) with the prior written consent of the Company; *provided further*, *that* in the case of clause (i), (ii) or (iii), the applicable Stockholder shall notify the Company in writing of the proposed disclosure as far in advance of such disclosure as practicable and use reasonable efforts to ensure that any Information so disclosed is accorded confidential treatment, when and if available.

(b)     The restrictions set forth in Section 12.3(a) shall not apply to any information that (i) is or becomes generally available to the public other than as a result of a disclosure by a Stockholder or any of its Representatives in violation of this Agreement; (ii) is or becomes available to a Stockholder or any of its Representatives on a non-confidential basis prior to its disclosure by or on behalf of the Company to the receiving Stockholder and any of its Representatives, (iii) is or has been independently developed or conceived by such Stockholder or any of its Representatives without use of the Company's Information or (iv) becomes available to the receiving Stockholder or any of its Representatives on a non-confidential basis from a source other than the Company, any other Stockholder or any of their respective Representatives, *provided*, that such source is not known by the recipient of the information to be bound by a confidentiality agreement with the disclosing party or any of its Representatives.

Section 12.4    Binding Effect; No Assignment.  This Agreement shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the parties hereto. Except as expressly provided otherwise in this Agreement, no party to this Agreement may assign any of its respective rights (including Significant Stockholder status and/or any rights resulting from such status) or delegate any of its respective obligations under this Agreement, and any attempted assignment or delegation in violation of the foregoing shall be null and void *ab initio*. Notwithstanding the foregoing, (a) any Person to whom shares of Common Stock are Transferred in accordance with the provisions of Article X hereof will (by virtue of having executed a Joinder Agreement) have the rights and obligations of a Stockholder hereunder (b) any Significant Stockholder may freely assign, by written notice to the Company, Significant Stockholder rights to any of its Affiliates that hold Equity Securities.

Section 12.5    Entire Agreement.  Subject to Section 12.13, this Agreement supersedes all prior discussions and agreements among any of the parties hereto (and their Affiliates) with respect to the subject matter hereof and contains the sole entire understanding of the parties with respect to the subject matter hereof.

Section 12.6    Amendments.

(a)     This Agreement may not be amended or modified without first obtaining Majority Stockholder Approval and Whole Board Approval.  In addition, any amendment or modification to this Agreement shall, if applicable, require the following additional approvals in the circumstances set forth below:

(i)     [Supermajority Stockholder Approval shall be required for any amendment or modification to this Section 12.6, or any provisions of [Article II (Stockholders; Voting Rights), Article III (Drag-Along Sale), Article IV (Tag-Along

32

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Sale), Article V (Preemptive Rights), Section 6.6 (Management), Article VII (Information Rights), Article VIII (Key Actions), Article IX (Related Party Transactions), Section 12.1 (Termination), Section 12.3 (Confidentiality) and Article I (Certain Definitions), to the extent relating to any of the foregoing Articles or Sections], in each case to the extent that such amendment or modification adversely affects, in any material respect, the rights or obligations of the Stockholders under such provisions];[7]

(ii) any amendment or modification to the provisions of this Agreement that apply specifically to Significant Stockholders (including the definition thereof) shall require the prior written consent of all such Significant Stockholders, and any amendment or modification to the provisions of this Agreement that apply specifically to Designating Stockholders or Designation Rights shall require the prior written consent of such Designating Stockholders, in each case to the extent such amendment or modification would adversely affect such Significant Stockholders, Designating Stockholders or Designation Rights, as the case may be; and

(iii) any provision of this Agreement that by its terms confers consent or approval rights on a specified number or percentage of the Stockholders (or a specified subset of the Stockholders) shall not be amended without the prior written consent of such number or percentage of the Stockholders (or subset of the Stockholders, as applicable).

(b)    Notwithstanding anything to the contrary in this Section 12.6, the Board of Directors, in its sole discretion and without the need for any Stockholder approval, may amend or modify this Agreement to correct any typographical or ministerial error as long as such amendment or modification does not have an adverse impact on the rights or obligations of any of the Stockholders.

(c)    Each Stockholder agrees to vote all of its Common Stock or execute proxies or written consents, as the case may be, and to take all other actions necessary, to ensure that the Certificate of Incorporation or the Bylaws (i) facilitate, and do not at any time conflict with, any provision of this Agreement and (ii) permit each Stockholder to receive the benefits to which each such Stockholder is entitled under this Agreement. Each of the Parties agrees that it will not authorize or consent to any amendment, modification or repeal of any provision of the Certificate of Incorporation or the Bylaws that affects, in any material respect any of the provisions of this Agreement that apply specifically to Significant Stockholders (including the definition thereof) without the prior written consent of all Significant Stockholders, and any amendment or modification to the provisions of this Agreement that apply specifically to Designating Stockholders or Designation Rights shall require the prior written consent of all Designating Stockholders, in each case to the extent such amendment, modification or repeal would adversely affect the Significant Stockholders, Designating Stockholders or Designation Rights, as the case may be.

---

[7] Under review.

33

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Section 12.7    No Third Party Beneficiary.  The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and its successors and permitted assigns, and it is not the intention of the parties to confer third-party beneficiary rights upon any other Person.

Section 12.8    Deemed Execution; Effective Date.  On the Effective Date, pursuant to [the Confirmation Order and] Article IV Section C.3 of the Plan, the Company and each holder of Common Stock then outstanding shall be deemed to be parties to this Agreement, and this Agreement shall be binding on the Company and all Persons receiving Common Stock and all holders of Common Stock, in each case regardless of whether such Person actually executes this Agreement.  This Agreement shall take effect immediately and automatically on the Effective Date.

Section 12.9    Headings.  The headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

Section 12.10    Governing Law; Consent to Jurisdiction and Service of Process.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflicts of law doctrine.  The Company and each Stockholder hereby submits to the exclusive jurisdiction of (i) the Bankruptcy Court, and (ii) the courts of the State of Delaware, and any judicial proceeding brought against the Company or any Stockholder with respect to any dispute arising out of this Agreement or any matter related hereto shall be brought only in such courts.  The Company and each Stockholder hereby irrevocably waives, to the fullest extent permitted by law, any objection it may have or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.  The Company and each Stockholder hereby consents to process being served in any such proceeding by the mailing of a copy thereof by registered or certified mail, postage prepaid, to the address specified in Section 12.2, or in any other manner permitted by law.  THE COMPANY AND EACH STOCKHOLDER HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH ACTION OR PROCEEDING.

Section 12.11    Injunctive Relief.  It is hereby agreed and acknowledged that it will be impossible to measure in money the damages that would be suffered if the parties to this Agreement fail to comply with any of the obligations imposed on them by this Agreement and that in the event of any such failure, an aggrieved Person will be irreparably damaged and will not have an adequate remedy at law.  Any such Person shall, therefore, be entitled to injunctive relief, including specific performance, to enforce such obligations, and if any action should be brought in equity to enforce any of the provisions of this Agreement, none of the parties hereto shall raise the defense that there is an adequate remedy at law.  The parties hereby waive, and cause their respective representatives to waive, any requirement for the securing or posting of any bond in connection with any action brought for injunctive relief hereunder.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Section 12.12  <u>Severability</u>.  The invalidity or unenforceability of any provisions of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

Section 12.13  <u>Conflicts</u>.  In the event that any of the terms or provisions of this Agreement conflict with any of the terms or provisions of the Certificate of Incorporation, the terms and provisions of the Certificate of Incorporation shall control.  In the event that any of the terms or provisions of this Agreement conflict with any of the terms or provisions of the Plan, the terms and provisions of this Agreement shall control.

Section 12.14  <u>Recapitalization, etc.</u>  In the event that any capital stock or other securities are issued in respect of, in exchange for, or in substitution of, shares of capital stock of the Company by reason of any reorganization, recapitalization, reclassification, merger, consolidation, spin-off, partial or complete liquidation, stock dividend, split-up, sale of assets, distribution to Stockholders or combination of Common Stock or any other change in the Company's capital structure, appropriate adjustments shall be made to the provisions of this Agreement so as to fairly and equitably preserve, as far as practicable, the original rights and obligations of the parties hereto under this Agreement.

[*Signature Page Follows*]

35

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

CHAPARRAL ENERGY, INC.

By: _____

Name:

Title:

[*Signature Page to Stockholders Agreement of Chaparral Energy, Inc.*]

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**STOCKHOLDERS:**

[NAME OF STOCKHOLDER]


By: _____
       Name:
       Title:

[*Signature Page to Stockholders Agreement of Chaparral Energy, Inc.*]

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

**Schedule 6.2**

### INITIAL BOARD OF DIRECTORS

| Director Name | | Designating Stockholder (if applicable) |
|---|---|---|
| [●] | | Millstreet Stockholders |
| [●] | | Millstreet Stockholders |
| [●] | | Avenue Stockholders |
| [●] | | Amzak Stockholders |
| [●] | | All Designating Stockholders |
| [●] | | N/A (CEO Director) |
| [●] | | N/A (At-Large Director) |

* Initial Chairman of the Board

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

**Exhibit A**

**Bylaws**

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

**Exhibit B**

**Certificate of Incorporation**

NY 78181090

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

**Exhibit C**

**Form of Joinder to Stockholders Agreement**

The undersigned hereby (a) acknowledges that it has received and reviewed a complete copy of the Stockholders Agreement, dated as of [•], 2020 (as may be amended from time to time, the "Agreement"), by and among CHAPARRAL ENERGY, INC., a Delaware corporation (the "Company"), and the equity holders of the Company party thereto and (b) agrees that, effective as of the date hereof, the undersigned (i) shall become a party to the Agreement and be subject to and fully bound by the Agreement and all of the provisions thereof that are applicable to [Stockholders] [Equity Holder] (and entitled to all the rights incidental thereto), as though an original party to the Agreement and (ii) shall be included within the term ["Stockholder"] ["Equity Holder"] for all purposes under the Agreement.  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Agreement.

The undersigned hereby makes the representations and warranties set forth in Section 11.1 of the Agreement, and represents and warrants to the Company that the undersigned (a) is a Qualified Institutional Buyer or an Accredited Investor and (b) is not a Competitor.

The mailing address, e-mail address and (if applicable) facsimile number to which notices and other communications made pursuant to the Agreement, the Certificate of Incorporation or the Bylaws may be sent to the undersigned are as follows:

Mailing address:


E-mail address:
Facsimile number:



Date:                                                    _____
                                                          Name:

# Exhibit C

**Restructuring Steps Memorandum**

The restructuring steps are described in the Plan and Definitive Documents.

# Exhibit D

## Rejected Executory Contract and Unexpired Lease List

At this time, the Debtors have not identified any contracts to include on this exhibit. The Debtors reserve the right to add contracts to this schedule and/or file a motion to reject and/or assume any contracts.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Case 20-11947-MFW    Doc 143    Filed 09/09/20    Page 82 of 526

# Exhibit E

### Reorganized Chaparral Parent Board and the Officers of Reorganized Chaparral Parent

On the Effective Date, the terms of the current members of the Chaparral Parent board of directors shall expire and, without further order of the Bankruptcy Court, the Reorganized Chaparral Parent Board will be appointed.

The Reorganized Chaparral Parent Board will initially consist of seven (7) directors (each, a "**Director**"). The initial Directors, as of the Plan Effective Date (collectively, the "**Initial Directors**"), shall include (i) two (2) Directors selected by Millstreet Capital Management LLC ("**Millstreet**"), at least one of whom must be independent, (ii) one Director selected by Avenue Energy Opportunities Fund, L.P. ("**Avenue**"), (iii) one Director selected by Amzak Capital Management, LLC ("**Amzak**"), (iv) one independent Director selected by Millstreet, Avenue and Amzak, (v) one independent Director selected by the Ad Hoc Group (the "**At-Large Directo**r"), and (vi) the individual then serving as the Chaparral Parent Chief Executive Officer (the "**CEO Director**").

To the extent known, the identity of the members of the Reorganized Chaparral Parent Board will be disclosed in a Plan Supplement, as amended, revised or supplemented on or prior to the commencement of the Confirmation Hearing.

# Exhibit F

**Exit Facility Credit Agreement**

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

**ELEVENTH RESTATED CREDIT AGREEMENT**

**dated as of October [__], 2020**

**among**

**Chaparral Energy, Inc.,**
**as Borrower,**

**Royal Bank of Canada,**
**as Administrative Agent,**

**and**

**The Lenders Party Hereto**

**RBC Capital Markets,**
**as Sole Lead Arranger and Sole Bookrunner**

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

## TABLE OF CONTENTS

**Page**

### Article I
### Definitions and Accounting Matters

Section 1.01    Terms Defined Above ................................................................2
Section 1.02    Certain Defined Terms ..............................................................2
Section 1.03    Types of Loans and Borrowings ..............................................37
Section 1.04    Terms Generally; Rules of Construction ..................................37
Section 1.05    Accounting Terms and Determinations; GAAP .......................37
Section 1.06    Divisions ..................................................................................38
Section 1.07    Rates ........................................................................................38

### Article II
### The Credits

Section 2.01    Revolving Credit Commitments ...............................................38
Section 2.02    Loans and Borrowings .............................................................38
Section 2.03    Requests for Borrowings ..........................................................39
Section 2.04    Interest Elections .....................................................................40
Section 2.05    Funding of Borrowings ............................................................42
Section 2.06    Termination and Reduction of Revolving Credit Commitments and Aggregate Maximum Revolving Credit Amounts ...................43
Section 2.07    Borrowing Base .......................................................................44
Section 2.08    Letters of Credit ......................................................................47
Section 2.09    Defaulting Lenders ..................................................................55

### Article III
### Payments of Principal and Interest; Prepayments; Fees

Section 3.01    Repayment of Loans .................................................................57
Section 3.02    Interest .....................................................................................58
Section 3.03    Alternate Rate of Interest .........................................................59
Section 3.04    Prepayments .............................................................................60
Section 3.05    Fees .........................................................................................63

### Article IV
### Payments; Pro Rata Treatment; Sharing of Set-offs

Section 4.01    Payments Generally; Pro Rata Treatment; Sharing of Set-offs .........64
Section 4.02    Presumption of Payment by the Borrower ................................65
Section 4.03    Certain Deductions by the Administrative Agent ......................65
Section 4.04    Collection of Proceeds .............................................................66

### Article V
### Increased Costs; Break Funding Payments; Taxes; Illegality

Section 5.01    Increased Costs ........................................................................66
Section 5.02    Break Funding Payments ..........................................................68

i

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Section 5.03    Taxes ...................................................................................................68
Section 5.04    Mitigation Obligations; Replacement of Lenders ..............................73
Section 5.05    Illegality ..............................................................................................74

Article VI
Conditions Precedent

Section 6.01    Effective Date .....................................................................................74
Section 6.02    Each Credit Event ...............................................................................77

Article VII
Representations and Warranties

Section 7.01    Organization; Powers ..........................................................................79
Section 7.02    Authority; Enforceability ....................................................................79
Section 7.03    Approvals; No Conflicts ......................................................................79
Section 7.04    Financial Condition; No Material Adverse Change .............................80
Section 7.05    Litigation .............................................................................................80
Section 7.06    Environmental Matters ........................................................................81
Section 7.07    Compliance with the Laws and Agreements; No Defaults ..................82
Section 7.08    Investment Company Act ....................................................................82
Section 7.09    Taxes ...................................................................................................83
Section 7.10    ERISA ..................................................................................................83
Section 7.11    Disclosure; No Material Misstatements ..............................................83
Section 7.12    Insurance .............................................................................................84
Section 7.13    Restriction on Liens ............................................................................85
Section 7.14    Subsidiaries .........................................................................................85
Section 7.15    Location of Business and Offices ........................................................85
Section 7.16    Properties; Titles, Etc .........................................................................85
Section 7.17    Maintenance of Properties ..................................................................86
Section 7.18    Gas Imbalances, Prepayments ............................................................87
Section 7.19    Marketing of Production ......................................................................87
Section 7.20    Swap Agreements and Qualified ECP Guarantor ...............................87
Section 7.21    Use of Loans and Letters of Credit .....................................................88
Section 7.22    Solvency ..............................................................................................88
Section 7.23    Anti-Corruption Laws; Sanctions .......................................................88
Section 7.24    EEA Financial Institutions ..................................................................89
Section 7.25    Security Instruments ...........................................................................89

Article VIII
Affirmative Covenants

Section 8.01    Financial Statements; Other Information .............................................89
Section 8.02    Notices of Material Events ..................................................................93
Section 8.03    Existence; Conduct of Business ..........................................................94
Section 8.04    Payment of Obligations .......................................................................94
Section 8.05    Performance of Obligations under Loan Documents ...........................94

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Section 8.06     Operation and Maintenance of Properties..........................................................94
Section 8.07     Insurance ...................................................................................................95
Section 8.08     Books and Records; Inspection Rights ............................................................96
Section 8.09     Compliance with Laws ...............................................................................96
Section 8.10     Environmental Matters.................................................................................96
Section 8.11     Further Assurances.......................................................................................97
Section 8.12     Reserve Reports .........................................................................................98
Section 8.13     Title Information ........................................................................................100
Section 8.14     Additional Collateral and Additional Guarantors ...........................................101
Section 8.15     ERISA Compliance.....................................................................................102
Section 8.16     Commodity Price Risk Management Policy.....................................................102
Section 8.17     Deposit Accounts; Commodities Accounts and Securities Accounts...............103
Section 8.18     Commodity Exchange Act Keepwell Provisions.............................................103
Section 8.19     Unrestricted Subsidiaries ............................................................................103
Section 8.20     Post-Closing Obligations-Swap Agreements...................................................103

Article IX
Negative Covenants

Section 9.01     Financial Covenants....................................................................................104
Section 9.02     Debt..........................................................................................................105
Section 9.03     Liens.........................................................................................................107
Section 9.04     Dividends and Distributions; Redemptions of Permitted Senior
                 Additional Debt; Amendments to Permitted Senior Additional Debt
                 Documents; Redemptions of Permitted Second Lien Debt;
                 Amendments to Permitted Second Lien Debt Documents ............................108
Section 9.05     Investments, Loans and Advances..................................................................110
Section 9.06     Nature of Business; No International Operations .............................................111
Section 9.07     Limitation on Leases....................................................................................111
Section 9.08     Proceeds of Loans .......................................................................................111
Section 9.09     ERISA Compliance......................................................................................112
Section 9.10     Sale or Discount of Receivables ....................................................................113
Section 9.11     Mergers, Etc...............................................................................................113
Section 9.12     Sale of Properties and Termination of Swap Agreements ................................113
Section 9.13     Environmental Matters.................................................................................115
Section 9.14     Transactions with Affiliates...........................................................................115
Section 9.15     Subsidiaries ...............................................................................................116
Section 9.16     Negative Pledge Agreements; Dividend Restrictions........................................116
Section 9.17     Gas Imbalances, Take-or-Pay or Other Prepayments .......................................116
Section 9.18     Swap Agreements ........................................................................................116
Section 9.19     Marketing Activities ....................................................................................118
Section 9.20     Holding Company........................................................................................119
Section 9.21     Changes in Fiscal Year and Amendments to Organizational Documents ........119
Section 9.22     Non-Qualified ECP Guarantors ....................................................................119

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Section 9.23    Designation and Conversion of Restricted and Unrestricted Subsidiaries; Debt of Unrestricted Subsidiaries ........................................................................119

### Article X
### Events of Default; Remedies

Section 10.01    Events of Default ..............................................................................................120
Section 10.02    Remedies............................................................................................................122

### Article XI
### The Agents

Section 11.01    Appointment; Powers.........................................................................................124
Section 11.02    Duties and Obligations of Administrative Agent................................................124
Section 11.03    Action by Administrative Agent .........................................................................125
Section 11.04    Reliance by Administrative Agent ......................................................................126
Section 11.05    Subagents ...........................................................................................................126
Section 11.06    Resignation of Administrative Agent ..................................................................126
Section 11.07    Agents as Lenders ..............................................................................................127
Section 11.08    No Reliance.........................................................................................................127
Section 11.09    Administrative Agent May File Proofs of Claim.................................................127
Section 11.10    Authority of Administrative Agent to Release Collateral, Liens and Guarantors...........................................................................................................128
Section 11.11    The Lead Arranger .............................................................................................128

### Article XII
### Miscellaneous

Section 12.01    Notices ................................................................................................................129
Section 12.02    Waivers; Amendments........................................................................................129
Section 12.03    Expenses, Indemnity; Damage Waiver...............................................................131
Section 12.04    Successors and Assigns.......................................................................................134
Section 12.05    Survival; Revival; Reinstatement .......................................................................138
Section 12.06    Counterparts; Integration; Effectiveness............................................................139
Section 12.07    Severability .........................................................................................................140
Section 12.08    Right of Setoff.....................................................................................................140
Section 12.09    GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS ............................................................................................................140
Section 12.10    Headings .............................................................................................................142
Section 12.11    Confidentiality ....................................................................................................142
Section 12.12    Interest Rate Limitation .....................................................................................143
Section 12.13    EXCULPATION PROVISIONS .........................................................................144
Section 12.14    Collateral Matters; Swap Agreements ................................................................144
Section 12.15    No Third Party Beneficiaries ..............................................................................144
Section 12.16    USA Patriot Act Notice ......................................................................................145
Section 12.17    No Advisory or Fiduciary Responsibility............................................................145
Section 12.18    Acknowledgement and Consent to Bail-In of EEA Financial Institutions .......145

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Section 12.19    Acknowledgment Regarding Supported QFCs...................................................146
Section 12.20    Restatement; Prepetition Credit Agreement .....................................................147
Section 12.21    Intercreditor Agreements ................................................................................147

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

## ANNEXES, EXHIBITS AND SCHEDULES

Annex I                          List of Maximum Revolving Credit Amounts

Annex II                         Existing Letters of Credit

**Error! Reference source not found.**          Form of Note
**Error! Reference source not found.**          Form of Borrowing Request
**Error! Reference source not found.**          Form of Interest Election Request
**Error! Reference source not found.**          Form of Compliance Certificate
**Error! Reference source not found.**          Security Instruments as of the Effective Date
**Error! Reference source not found.**          Form of Guaranty Agreement
**Error! Reference source not found.**          Form of Security Agreement
**Error! Reference source not found.**          Form of Assignment and Assumption
**Error! Reference source not found.**          Form of U.S. Tax Compliance Certificate (Foreign Lenders; not partnerships)
**Error! Reference source not found.**          Form of U.S. Tax Compliance Certificate (Foreign Participants; not partnerships)
**Error! Reference source not found.**          Form of U.S. Tax Compliance Certificate (Foreign Participants; partnerships)
**Error! Reference source not found.**          Form of U.S. Tax Compliance Certificate (Foreign Lenders; partnerships)

Schedule 7.05          Litigation
Schedule 7.06          Environmental Matters
Schedule 7.14          Subsidiaries and Partnerships; Immaterial Subsidiaries
Schedule 7.18          Gas Imbalances
Schedule 7.19          Marketing Contracts
Schedule 7.20          Swap Agreements
Schedule 9.02          Existing Debt
Schedule 9.03          Existing Liens
Schedule 9.05          Investments

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

THIS ELEVENTH RESTATED CREDIT AGREEMENT, dated as of October [__], 2020, is among Chaparral Energy, Inc., a corporation duly formed and existing under the laws of the State of Delaware (the "Borrower"); each of the Lenders from time to time party hereto; and Royal Bank of Canada (in its individual capacity, "RBC"), as administrative agent for the Lenders (in such capacity, together with its successors in such capacity, the "Administrative Agent").

## RECITALS

A.      On August 16, 2020, the Credit Parties filed voluntary petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") commencing their respective cases (collectively, the "Bankruptcy Proceedings") under Chapter 11 of the United States Bankruptcy Code and have continued in the possession and operation of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the United States Bankruptcy Code.

B.      The Borrower, the Administrative Agent and the financial institutions named and defined therein as Lenders (the "Prepetition Lenders") are party to that certain Tenth Restated Credit Agreement, dated as of December 21, 2017 (as amended modified, or supplemented prior to the date hereof, the "Prepetition Credit Agreement"), pursuant to which the Prepetition Lenders provided loans and extensions of credit to the Borrower which remain outstanding (the "Prepetition Loans").

C.      The Credit Parties have filed the Debtors Joint Prepackaged Chapter 11 Plan of Reorganization, dated August 15, 2020 (together with all exhibits and schedules thereto, the "Plan of Reorganization") with the Bankruptcy Court, which was confirmed pursuant to an order entered by the Bankruptcy Court on [_____], 2020 (the "Confirmation Order"), which Confirmation Order, inter alia, authorized and approved the restructuring and rearrangement of the debt under the Prepetition Credit Agreement and the Borrower's entry into and performance under this Agreement.

D.      Pursuant to and upon consummation of the Plan of Reorganization, the Prepetition Lenders have agreed to continue their loans under the Prepetition Credit Agreement and provide certain extensions of credit and commitments to the Borrower subject to the terms and conditions of this Agreement, which debt is a restructuring and rearrangement of the debt of the Borrower through an amendment and restatement of the Prepetition Credit Agreement in the form of this Agreement.

E.      The Borrower intends to treat this amendment as resulting in a significant modification of the Prepetition Loans within the meaning of Section 1.1001-3 of the Treasury Regulations.

F.      In consideration of the mutual covenants and agreements herein contained, and other good and valuable consideration, the receipt and adequacy of which are hereby

1

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

acknowledged, and subject to the Administrative Agent's giving notice of the Effective Date as contemplated in Section 6.01 hereof, the parties hereto agree that the Prepetition Credit Agreement is hereby amended, renewed, extended and restated in its entirety on (and subject to) the terms and conditions set forth herein.  It is the intention of the parties hereto that this Agreement supersedes and replaces the Prepetition Credit Agreement in its entirety; *provided* that (i) such amendment and restatement shall operate to renew, amend, modify and extend all of the rights, duties, liabilities and obligations of the Borrower under the Prepetition Credit Agreement and the Prepetition Loan Documents (as defined herein), which rights, duties, liabilities and obligations are hereby renewed, amended, modified and extended to the Borrower, and shall not act as a novation thereof, and (ii) the Liens securing the Indebtedness under and as defined in the Prepetition Credit Agreement and the rights, duties, liabilities and obligations of the Borrower and the "Guarantors" under and as defined in the Prepetition Credit Agreement and the Prepetition Loan Documents to which they are a party shall not be extinguished but shall be carried forward and shall secure such obligations and liabilities as amended, renewed, extended and restated hereby.  The Borrower represents and warrants that, as of the Effective Date, there are no claims or offsets against, or defenses or counterclaims to, the obligations of the Borrower under the Prepetition Credit Agreement or any of the other Prepetition Loan Documents.

G.      In consideration of the mutual covenants and agreements herein contained and of the loans, extensions of credit and commitments hereinafter referred to, the parties hereto agree to amend and restate the Prepetition Credit Agreement in its entirety as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING MATTERS

Section 1.01    Terms Defined Above.  As used in this Agreement, each term defined above has the meaning indicated above.

Section 1.02    Certain Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"2025 Second Lien Notes" means the 9.0%/13.0% Second Lien Secured Convertible PIK Toggle Notes due 2025, issued by the Borrower on the Effective Date and in an initial aggregate principal amount of $35,000,000.

"2025 Second Lien Notes Documents" means the 2025 Second Lien Notes, the indenture governing the 2025 Second Lien Notes, the Second Lien Intercreditor Agreement, all guarantees thereof and all other agreements, documents or instruments executed and delivered by the Borrower or any Restricted Subsidiary in connection with, or pursuant to, the incurrence of the 2025 Second Lien Notes.

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

2

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"Account Control Agreement" means a control agreement, in form and substance reasonably satisfactory to the Administrative Agent, which grants the Administrative Agent "control" as defined in the Uniform Commercial Code in effect in the applicable jurisdiction over any Deposit Account, Securities Account or Commodities Account maintained by any Credit Party, in each case, among the Administrative Agent, the applicable Credit Party and the applicable financial institution at which such Deposit Account, Securities Account or Commodities Account is maintained.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period or for any ABR Borrowing, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to the LIBO Rate for such Interest Period multiplied by the Statutory Reserve Rate.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affected Loans" has the meaning assigned such term in Section 5.05.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified (other than any operating portfolio companies of the foregoing Persons).

"Agents" means, collectively, the Administrative Agent, the Lead Arranger and any syndication or documentation agent from time to time party hereto or appointed hereunder; and "Agent" shall mean any of them, as the context requires.

"Aggregate Maximum Revolving Credit Amounts" at any time shall equal the sum of the Maximum Revolving Credit Amounts, as the same may be reduced or terminated pursuant to Section 2.06.  The initial Aggregate Maximum Revolving Credit Amounts of the Lenders as of the Effective Date is $300,000,000.

"Agreement" means this Eleventh Restated Credit Agreement, as the same may from time to time be amended, modified, supplemented or restated.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the Adjusted LIBO Rate for a one-month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1%.  Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, respectively.  If the Alternate Base Rate is being used as an alternate rate of interest pursuant to Section 3.03 hereof, then the Alternate Base Rate shall be the greater of clause (a) and (b) above and shall be

3

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

determined without reference to clause (c) above.  For the avoidance of doubt, if the Alternate Base Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Anti-Corruption Laws" means all state or federal laws, rules, and regulations applicable to any Credit Party or any Subsidiary from time to time concerning or relating to bribery or corruption, including the FCPA.

"Applicable Margin" means, for any day, with respect to any ABR Loan or Eurodollar Loan, or with respect to the Revolving Credit Commitment Fee Rate, as the case may be, the rate per annum set forth in the Borrowing Base Utilization Grid below based upon the Borrowing Base Utilization Percentage then in effect:

| Borrowing Base Utilization Grid | | | | | |
|---|---|---|---|---|---|
| Borrowing Base Utilization Percentage | ≤ 25% | > 25% and ≤ 50% | > 50% and ≤ 75% | > 75% and ≤ 90% | > 90% |
| Eurodollar Loans | 3.500% | 3.750% | 4.000% | 4.250% | 4.500% |
| ABR Loans | 2.500% | 2.750% | 3.000% | 3.250% | 3.500% |
| Revolving Credit Commitment Fee Rate | 0.500% | 0.500% | 0.500% | 0.500% | 0.500% |

The Applicable Margin shall change on any Business Day on which the Borrowing Base Utilization Percentage changes and, as a result of such change, the Applicable Margin would be determined by reference to a different column in the table above. Each change in the Applicable Margin for Loans shall apply during the period commencing on the effective date of such change and ending on the date immediately preceding the effective date of the next such change; *provided* that if at any time the Borrower fails to deliver a Reserve Report pursuant to Section 8.12(a), then the "Applicable Margin" means the rate per annum set forth on the grid when the Borrowing Base Utilization Percentage is at its highest level until such Reserve Report is delivered.

"Applicable Revolving Credit Percentage" means, as of any date of determination, with respect to any Lender, the percentage of the Aggregate Maximum Revolving Credit Amounts represented by such Lender's Maximum Revolving Credit Amount as such percentage as of such date of determination.  The Applicable Revolving Credit Percentage of each Lender as of the Effective Date is set forth on Annex I.

"Approved Counterparty" means (a) any Lender or any Affiliate of a Lender, (b) any other Person if such Person has (or the credit support provider of such Person has) a long term senior unsecured debt rating at the time of entry into the applicable Swap Agreement of A-/A3

4

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

by S&P or Moody's (or their equivalent) or higher and (c) any Third Party Hedge Provider so long as, in the case of this clause (c), such Third Party Hedge Provider shall remain subject to a Third Party Hedge Intercreditor Agreement at all times through the expiration of the tenor of such Third Party Hedge Provider's Swap Agreements with the Borrower or the applicable Subsidiary.

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Approved Petroleum Engineers" means Cawley, Gillespie & Associates, Inc. and any other independent petroleum engineers reasonably acceptable to the Administrative Agent.

"ASC" means the Financial Accounting Standards Board Accounting Standards Codification, as in effect from time to time.

"Asset Coverage Ratio" has the meaning assigned to such term in Section 9.01(c).

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 12.04(b)), and accepted by the Administrative Agent, in the form of **Error! Reference source not found.** or any other form approved by the Administrative Agent.

"Auto-Renewal Letter of Credit" has the meaning assigned such term in Section 2.08(c)(ii).

"Availability" means, at any time, the amount that the total Revolving Credit Commitments at such time exceeds the total Revolving Credit Exposure at such time (but only to the extent that the Borrower is permitted to borrow such amount under the terms of this Agreement at such time, including, without limitation, Section 6.02).

"Availability Period" means the period from and including the Effective Date to but excluding the Termination Date.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of any EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"Bank Products" means any of the following bank services:  (a) commercial credit cards, (b) stored value cards, and (c) treasury management services (including, without limitation, controlled disbursement, automated clearinghouse transactions, return items, overdrafts and interstate depository network services).

"Bank Products Provider" means any Lender or Affiliate of a Lender that provides Bank Products to the Borrower, any Restricted Subsidiary or any Guarantor.

"Beneficial Ownership Certification" shall mean a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" shall mean 31 C.F.R. § 1010.230.

"BHC Act Affiliate" means, as to any Person, an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America or any successor Governmental Authority.

"Borrowing" means Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Base" means at any time an amount equal to the amount determined in accordance with Section 2.07, as the same may be adjusted from time to time pursuant to Section 8.13(c).

"Borrowing Base Deficiency" means at any time the total Revolving Credit Exposures exceeds the Borrowing Base then in effect.

"Borrowing Base Utilization Percentage" means, as of any day, the fraction expressed as a percentage, the numerator of which is the sum of the Revolving Credit Exposures of the Lenders on such day, and the denominator of which is the Borrowing Base in effect on such day.

"Borrowing Request" means a request by the Borrower for a Borrowing in accordance with Section 2.03.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City, New York, Houston, Texas or Oklahoma City, Oklahoma are authorized or required by law to remain closed; and if such day relates to a Borrowing or continuation of, a payment or prepayment of principal of or interest on, or a conversion of or into, or the Interest Period for, a Eurodollar Loan or a notice by the Borrower with respect to any such Borrowing or continuation, payment, prepayment, conversion or Interest Period, any day which is also a day on which banks are open for dealings in dollar deposits in the London interbank market.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"Capital Leases" means, in respect of any Person, all leases which shall have been, or should have been, in accordance with GAAP, recorded as capital leases on the balance sheet of the Person liable (whether contingent or otherwise) for the payment of rent thereunder; *provided* that operating leases that are reclassified or recharacterized as capital leases due to a change in GAAP after the "Effective Date" of the Prepetition Credit Agreement shall not constitute Capital Leases for any purpose under this Agreement but shall instead be treated as they would have been in accordance with GAAP as in effect on the "Effective Date" of the Prepetition Credit Agreement.

"Cash Collateral Order" means the Final Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Granting Related Relief [EFC No. [__]], entered by the Bankruptcy Court on [____], 2020.

"Casualty Event" means any loss, casualty or other insured damage to, or any nationalization, taking under power of eminent domain or by condemnation or similar proceeding of, any Property of the Borrower or any of its Restricted Subsidiaries.

"CERCLA" has the meaning set forth in the definition of "Environmental Laws".

"Change in Control" means (a) except as permitted by this Agreement, the Borrower or any Guarantor ceases to own 100% of the Equity Interests of any Guarantor, (b) for any reason whatsoever, any "person" or "group" (within the meaning of the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC thereunder as in effect on the date hereof), other than any Permitted Holder or any Affiliate of a Permitted Holder, shall beneficially own a percentage of the then outstanding Equity Interests of the Borrower that is more than 40% of the voting power of the total outstanding Equity Interests of the Borrower, [(c) the occupation of a majority of the seats (other than vacant seats) on the board of directors of the Borrower by Persons who were neither (i) nominated, appointed or approved for consideration by shareholders for election by the board of directors of the Borrower or (ii) appointed by directors so nominated, appointed or approved,] or (d) a Change of Control (as defined in any Permitted Senior Additional Debt Documents or any Permitted Second Lien Debt Documents to the extent that the applicable Permitted Senior Additional Debt and/or Permitted Second Lien Debt constitutes Material Debt) shall have occurred.

"Change in Law" means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender or the Issuing Bank (or, for purposes of Section 5.01(b), by any lending office of such Lender or by such Lender's or the Issuing Bank's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; *provided*, *however*, for the purposes of this Agreement, the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, guidelines or directives in connection therewith or promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision or the United States

7

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

or foreign regulatory authorities, in each case, pursuant to Basel III, are deemed to have gone into effect and to have been adopted after the date of this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any successor statute (in each case, except as otherwise provided herein).

"Commodities Account" shall have the meaning set forth in Article 9 of the UCC.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 *et seq.*), as amended from time to time, and any successor statute, and any regulations promulgated thereunder.

"Consolidated Net Income" means with respect to the Borrower and the Consolidated Restricted Subsidiaries, for any period, the aggregate of the net income (or loss) of the Borrower and the Consolidated Restricted Subsidiaries after allowances for taxes for such period determined on a consolidated basis in accordance with GAAP; *provided* that there shall be excluded from such net income (to the extent otherwise included therein) the following:  (a) the net income of any Person in which the Borrower or any Consolidated Restricted Subsidiary has an interest (which interest does not cause the net income of such other Person to be consolidated with the net income of the Borrower and the Consolidated Restricted Subsidiaries in accordance with GAAP), except to the extent of the amount of dividends or distributions actually paid in cash during such period by such other Person to the Borrower or to a Consolidated Restricted Subsidiary, as the case may be; (b) the net income (or loss) of any Person acquired in a pooling-of-interests transaction for any period prior to the date of such transaction; (c) any extraordinary non-cash gains or losses during such period and (d) any gains or losses attributable to writeups or writedowns of assets, including ceiling test writedowns.

"Consolidated Restricted Subsidiaries" means any Restricted Subsidiaries that are Consolidated Subsidiaries.

"Consolidated Subsidiaries" means each Subsidiary of the Borrower (whether now existing or hereafter created or acquired) the financial statements of which shall be (or should have been) consolidated with the financial statements of the Borrower in accordance with GAAP.

"Consolidated Unrestricted Subsidiaries" means any Unrestricted Subsidiaries that are Consolidated Subsidiaries.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  For the purposes of this definition, and without limiting the generality of the foregoing, any Person that owns directly or indirectly 20% or more of the Equity Interests having ordinary voting power for the election of the directors or other governing

8

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

body of a Person (other than as a limited partner of such other Person) will be deemed to "control" such other Person. "Controlling" and "Controlled" have meanings correlative thereto.

"Covered Entity" means any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Party" has the meaning assigned to such term in Section 12.19.

"Credit Parties" means, collectively, the Borrower and each Guarantor, and "Credit Party" means any one of the foregoing. For the avoidance of doubt, "Credit Parties" does not include any Unrestricted Subsidiaries.

"Debt" means, for any Person, the sum of the following (without duplication): (a) all obligations of such Person for borrowed money or evidenced by bonds, bankers' acceptances, debentures, notes or other similar instruments; (b) all obligations of such Person (whether contingent or otherwise) in respect of letters of credit, surety or other bonds and similar instruments; (c) all accounts payable and all accrued expenses, liabilities or other obligations of such Person to pay the deferred purchase price of Property or services; (d) all obligations under Capital Leases; (e) all obligations under Synthetic Leases; (f) all Debt (as defined in the other clauses of this definition) of others secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) a Lien on any Property of such Person, whether or not such Debt is assumed by such Person; (g) all Debt (as defined in the other clauses of this definition) of others guaranteed by such Person or in which such Person otherwise assures a creditor against loss of the Debt (howsoever such assurance shall be made) to the extent of the lesser of the amount of such Debt and the maximum stated amount of such guarantee or assurance against loss; (h) all obligations or undertakings of such Person to maintain or cause to be maintained the financial position or covenants of others and, to the extent entered into as a means of providing credit support for the obligations of others and not primarily to enable such Person to acquire any such Property, all obligations or undertakings of such Person to purchase the Debt or Property of others; (i) any Debt of a partnership for which such Person is liable either by agreement, by operation of law or by a Governmental Requirement but only to the extent of such liability; (j) Disqualified Capital Stock; and (k) the undischarged balance of any production payment created by such Person or for the creation of which such Person directly or indirectly received payment. The Debt of any Person shall include all obligations of such Person of the character described above to the extent such Person remains legally liable in respect thereof notwithstanding that any such obligation is not included as a liability of such Person under GAAP.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"Defaulting Lender" means any Lender that (a) has failed, within two (2) Business Days of the date required to be funded or paid, to (i) fund any portion of its Loans, (ii) fund any portion of its participations in Letters of Credit or (iii) pay over to any Credit Party any other amount required to be paid by it hereunder; (b) has notified the Administrative Agent, the Borrower or any Credit Party in writing, or has made a public statement, to the effect that it does not intend or expect to comply with any of its funding obligations under this Agreement or generally under other agreements in which it commits to extend credit; (c) has failed, within three (3) Business Days after request by the Administrative Agent or a Credit Party, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations to fund prospective Loans and participations in then outstanding Letters of Credit under this Agreement; *provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon such Credit Party's receipt of such certification in form and substance satisfactory to it and the Administrative Agent; or (d) has (or whose bank holding company has) been placed into receivership, conservatorship, bankruptcy or become the subject of a Bail-In Action; *provided* that a Lender shall not become a Defaulting Lender solely as a result of the acquisition or maintenance of an ownership interest in such Lender or Person controlling such Lender or the exercise of control over a Lender or Person controlling such Lender by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States of America or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Deposit Account" shall have the meaning set forth in Article 9 of the UCC.

"Disqualified Capital Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event, matures or is mandatorily redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock), pursuant to a sinking fund obligation or otherwise, or is convertible or exchangeable for Debt or redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock) at the option of the holder thereof, in whole or in part, on or prior to the date that is one year after the earlier of (a) the Maturity Date and (b) the date on which there are no Loans, LC Exposure or other obligations hereunder outstanding and all of the Revolving Credit Commitments are terminated.

"dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means any Restricted Subsidiary that is organized under the laws of the United States of America or any state thereof or the District of Columbia.

10

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"EBITDAX" means, for any period, the sum of Consolidated Net Income for such period plus the following expenses or charges to the extent deducted from Consolidated Net Income in such period: (a) interest, (b) income and franchise taxes, (c) depreciation, depletion, amortization, exploration expenses and other similar noncash charges (including (i) non-cash losses resulting from mark-to-market in respect of Swap Agreements (including those resulting from the requirements of ASC Topic 815), (ii) non-cash stock based compensation expenses and credit losses recorded pursuant to the current expected credit losses model of ASU 2016-13 and (iii) non-cash losses from the adoption of fresh start accounting in connection with the consummation of the Plan of Reorganization), (d) losses from asset dispositions (other than Hydrocarbons produced in the ordinary course of business), (e) losses, premiums, or fees related to or resulting from the full or partial extinguishment of Debt, (f) actual fees and transaction costs incurred by the Credit Parties in connection with any bankruptcy proceedings (whether incurred prior to or following the commencement thereof) and the closing of this Agreement and the Transactions occurring on or about the Effective Date (other than severance payments and consulting fees paid to former officers and employees but including any fees and expenses or charges incurred in connection with the implementation of fresh start accounting), (g) any penalties and interest assessed in connection with the collection and remittance of sales tax due pursuant to the sale by certain Credit Parties of certain Oil and Gas Properties pursuant to that certain Asset Purchase and Sale Agreement, dated as of October 13, 2017, among Chaparral Energy, L.L.C., Chaparral CO2, L.L.C., Chaparral Real Estate, L.L.C. and Perdure Petroleum, LLC in an aggregate amount not to exceed $1,000,000, (h) any litigation and similar expenses and losses in connection with the action captioned *Naylor Farms, Inc., individually and as a class representative on behalf of all similarly situated persons v. Chaparral Energy, L.L.C.*, Case No. 11-00634 (W.D. Ok. 2011) in an aggregate amount not to exceed $5,000,000, and (i) to the extent incurred on or after January 1, 2020, any severance payments, retirement payments, consulting fees, and/or related charges paid or incurred in connection with any retirement, severance, or departure of employees or former employees in an amount not to exceed $4,000,000 in the aggregate during any Reference Period, minus all gains from asset dispositions (other than Hydrocarbons produced in the ordinary course of business) and gains related to or resulting from the full or partial extinguishment of Debt and all noncash income, in each case to the extent added to Consolidated Net Income in such period. [For the purposes of calculating EBITDAX (including any component thereof) for any period of four (4) consecutive fiscal quarters (each, a "Reference Period") pursuant to any determination of the financial ratio contained in Section 9.01(a), if at any time during such Reference Period the Borrower or any Consolidated Restricted Subsidiary shall have made any Material Disposition or Material Acquisition, the EBITDAX for such Reference Period shall be calculated after giving pro forma effect thereto as if such Material Disposition or Material Acquisition had occurred on the first day of such Reference Period (such calculations to be determined by a Financial Officer in good faith and reasonably acceptable to the Administrative Agent).]

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of

11

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or clause (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the date on which the conditions specified in Section 6.01 are satisfied (or waived in accordance with Section 12.02).

"Election Notice" has the meaning assigned to such term in Section 3.04(c)(ii).

"Engineering Reports" has the meaning assigned to such term in Section 2.07(c)(i).

"Environmental Laws" means any and all Governmental Requirements pertaining in any way to health, safety, the environment, the preservation or reclamation of natural resources, or the management, Release or threatened Release of any Hazardous Materials, in effect in any and all jurisdictions in which the Borrower or any Subsidiary is conducting, or at any time has conducted, business, or where any Property of the Borrower or any Subsidiary is located, including, the Oil Pollution Act of 1990, as amended, the Clean Air Act, as amended, the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended, the Federal Water Pollution Control Act, as amended, the Occupational Safety and Health Act of 1970, as amended, the Resource Conservation and Recovery Act of 1976 ("RCRA"), as amended, the Safe Drinking Water Act, as amended, the Toxic Substances Control Act, as amended, the Superfund Amendments and Reauthorization Act of 1986, as amended, the Hazardous Materials Transportation Act, as amended, and other environmental conservation or protection Governmental Requirements.

"Environmental Permit" means any permit, registration, license, notice, approval, consent, exemption, variance, or other authorization required under or issued pursuant to applicable Environmental Laws.

"Equipment and Fixture Financing Debt" means Debt of the Credit Parties incurred to finance the acquisition, construction or improvement of any fixed or capital assets (whether or not constituting purchase money Debt), including equipment, motor vehicles, obligations under Capital Leases and any Debt assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and extensions, renewals and replacements of any such Debt; *provided* that (a) any such extensions, renewals and replacements do not increase the outstanding principal amount thereof, (b) in each case the acquired assets are reasonably related to the businesses of the Credit Parties engaged in on the

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Effective Date and (c) such Debt is incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such Equity Interest.  For the avoidance of doubt, the 2025 Second Lien Notes shall not constitute Equity Interests.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute.

"ERISA Affiliate" means each trade or business (whether or not incorporated) which together with the Borrower or a Subsidiary would be deemed to be a "single employer" within the meaning of section 4001(b)(1) of ERISA or subsections (b), (c), (m) or (o) of section 414 of the Code.

"ERISA Event" means (a) a "Reportable Event" described in section 4043 of ERISA, other than a Reportable Event as to which the provisions of thirty (30) days' notice to the PBGC is expressly waived under applicable regulations, with respect to a Pension Plan, (b) the withdrawal of the Borrower, a Subsidiary or any ERISA Affiliate from a Pension Plan during a plan year in which it was a "substantial employer" as defined in section 4001(a)(2) of ERISA, (c) the filing of a notice of intent to terminate a Pension Plan or the treatment of a Pension Plan amendment as a termination under section 4041 of ERISA, (d) the institution of proceedings to terminate a Pension Plan by the PBGC, (e) receipt by the Borrower, a Subsidiary or any ERISA Affiliate of a notice of withdrawal liability pursuant to section 4202 of ERISA, (f) any other event or condition which might constitute grounds under section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, (g) a determination that any Pension Plan is, or is expected to be, in "at risk" status (within the meaning of section 430 of the Code or section 303 of ERISA), (h) the receipt by Borrower, any Subsidiary or any of its ERISA Affiliates of any notice, or the receipt by any "Multiemployer Plan" (as defined in section 4001(a)(3) of ERISA) from the Borrower, any Subsidiary or any ERISA Affiliate of any notice, concerning a determination that a Multiemployer Plan is, or is expected to be, "insolvent" (within the meaning of section 4245 of ERISA), or in endangered or critical status (within the meaning of section 432 of the Code or section 305 of ERISA), (i) the present value of all accumulated benefit obligations under each Pension Plan (based on the assumptions used for purposes of ASC No. 715: Compensation-Retirement Benefits), as of the date of the most recent financial statements reflecting such amounts, exceeds the fair market value of the assets of such Pension Plan allocable to such obligations and (j) any other event or condition which might constitute grounds under section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

13

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Section 10.01.

"Excepted Liens" means:   (a) Liens for Taxes, assessments or other governmental charges or levies which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (b) Liens in connection with workers' compensation, unemployment insurance or other social security, old age pension or public liability obligations which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (c)  landlord's liens, operators', vendors', carriers', warehousemen's, repairmen's, mechanics', suppliers', workers', materialmen's, construction or other like Liens, in each case, arising in the ordinary course of business or incident to the exploration, development, operation and maintenance of Oil and Gas Properties each of which is in respect of obligations that are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP, *provided* that any such Lien referred to in this clause that is not a statutory Lien arising by operation of law does not materially impair the use of the Property covered by such Lien for the purposes for which such Property is held by the Borrower or any Restricted Subsidiary or materially impair the value of such Property subject thereto; (d) Liens which arise in the ordinary course of business under operating agreements, joint venture agreements, oil and gas partnership agreements, oil and gas leases, farm-out agreements, division orders, contracts for the sale, transportation or exchange of oil and natural gas, unitization and pooling declarations and agreements, area of mutual interest agreements, overriding royalty agreements, marketing agreements, processing agreements, net profits agreements, development agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or other geophysical permits or agreements, and other agreements which are usual and customary in the oil and gas business and are for claims which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP, *provided* that any such Lien referred to in this clause does not materially impair the use of the Property covered by such Lien for the purposes for which such Property is held by the Borrower or any Restricted Subsidiary or materially impair the value of such Property subject thereto; (e)  (i) Liens in favor of depository banks arising under documentation governing deposit accounts which Liens secure the payment of returned items, settlement item amounts, customary bank fees for maintaining deposit accounts and other related services, and similar items and fees, and (ii) banker's liens, rights of set-off or similar rights and remedies and burdening only deposit accounts or other funds maintained with a creditor depository institution, *provided* that, with respect to this clause (ii), no such deposit account is a dedicated cash collateral account; (f) easements, restrictions, servitudes, permits, conditions, covenants, exceptions, reservations, zoning and land use requirements in any Property of the Borrower or any Restricted Subsidiary for the purpose of

14

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

roads, pipelines, transmission lines, transportation lines, distribution lines for the removal of gas, oil, coal or other minerals or timber, and other like and/or usual and customary purposes, or for the joint or common use of real estate, rights of way, facilities and equipment, that do not secure any monetary obligations and which in the aggregate do not materially impair the use of such Property for the purposes of which such Property is held by the Borrower or any Restricted Subsidiary or materially impair the value of such Property subject thereto; (g) Liens on cash or securities pledged to secure (either directly or indirectly by securing letters of credit that in turn secure) performance of tenders, surety and appeal bonds, government contracts, performance and return of money bonds, bids, trade contracts, leases, statutory obligations, regulatory obligations and other obligations of a like nature incurred in the ordinary course of business; (h) judgment and attachment Liens not giving rise to an Event of Default, *provided* that any appropriate legal proceedings which may have been duly initiated for the review of such judgment shall not have been finally terminated or the period within which such proceeding may be initiated shall not have expired and no action to enforce such Lien has been commenced; (i) Liens arising from Uniform Commercial Code financing statement filings made solely as a precautionary measure regarding operating leases entered into by the Borrower or any Restricted Subsidiary in the ordinary course of business covering only the Property under lease; and (j) licenses of intellectual property, none of which, in the aggregate, interfere in any material respect with the business of the Borrower or its Restricted Subsidiaries or materially detract from the value of the relevant assets of the Borrower or its Restricted Subsidiaries; *provided* that (i) Liens described in clauses (a) through (e) shall remain "Excepted Liens" only for so long as no action to enforce such Lien has been commenced and no intention to subordinate the first priority Lien granted in favor of the Administrative Agent for the benefit of the Secured Parties is to be hereby implied or expressed by the permitted existence of such Excepted Liens and (ii) the term "Excepted Liens" shall not include any Lien securing Debt for borrowed money other than the Indebtedness.

"Excess Cash" means, on any day, the excess of (a) all cash and cash equivalents of the Credit Parties over (b) Excluded Funds of the Credit Parties to the extent that the aggregate amount of such excess exceeds the Excess Cash Threshold.

"Excess Cash Threshold" means $30,000,000.

"Excluded Accounts" has the meaning assigned to such term in the Security Agreement.

"Excluded Funds" means, with respect to the Credit Parties, on any day, the sum of (a) checks issued, wires initiated or ACH transfers initiated, in any case, to non-affiliate third parties or to Affiliates on account of transactions not prohibited under this Agreement, (b) cash or cash equivalents constituting purchase price deposits held in escrow pursuant to a binding and enforceable purchase and sale agreement with a third party containing customary provisions regarding the payment and refunding of such deposits, (c) cash and cash equivalents held in any of the following accounts: (i) accounts designated and used solely for payroll or employee benefits, (ii) cash collateral accounts with respect to Letters of Credit, (iii) trust accounts held and used exclusively for the payment of taxes of the Credit Parties, and (iv) suspense or trust

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

accounts held and used exclusively for royalty and working interest payments owing to third parties, (d) royalty obligations, working interest obligations, production payments, vendor payments, and severance and ad valorem taxes of the Credit Parties due and owing within five Business Days to unaffiliated third parties and for which the Credit Parties will issue checks or initiate wires or ACH transfers within such five Business Day period and (e) Net Proceeds from any Triggering Disposition or any incurrence of Permitted Senior Additional Debt that are then being held in cash by the Credit Parties and are otherwise required to be used to make any mandatory prepayment under Section 3.04(c) within one Business Day following such date of determination.

"Excluded Swap Obligation" means, with respect to any Credit Party individually determined on a Credit Party by Credit Party basis, any Indebtedness in respect of any Swap Agreement if, and solely to the extent that, all or a portion of the guarantee by such Credit Party of, or the grant by such Credit Party of a security interest to secure, such Indebtedness in respect of any Swap Agreement (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Credit Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time such guarantee or grant of a security interest becomes effective with respect to such related Indebtedness in respect of any Swap Agreement. If any Indebtedness in respect of any Swap Agreement arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Indebtedness in respect of any Swap Agreement that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to the Administrative Agent, any Lender or the Issuing Bank, (a) Taxes imposed on or measured by net income, franchise Taxes, and branch profits Taxes, in each case (i) imposed as a result of such recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender (other than an assignee pursuant to a request by the Borrower under Section 5.04(b)), any U.S. federal withholding Tax that is imposed on amounts payable to such Lender pursuant to a law in effect at the time such Lender becomes a party to this Agreement (or designates a new lending office, except to the extent that such Lender (or its assignor, if any) was entitled at the time of designation of a new lending office (or assignment) to receive additional amounts with respect to such withholding Tax pursuant to Section 5.03, (c) Taxes attributable to such Lender's failure to comply with Section 5.03(f), and (d) any United States federal withholding Taxes imposed under FATCA.

"Existing Letters of Credit" means the letters of credit listed on Annex II.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not

16

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of the foregoing.

"FCPA" means the Foreign Corrupt Practices Act of 1977, as amended.

"Federal Funds Effective Rate" means, for any day, the greater of (a) 0% and (b) the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate as set forth in this clause (b) is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Fee Letters" means (a) that certain letter agreement titled "$300,000,000 Senior Secured Exit Revolving Facility Fee Letter" dated as of August 15, 2020, between the Administrative Agent and the Borrower, as amended, restated, supplemented or otherwise modified from time to time, and (b) any other letter agreements entered into from time to time between the Borrower and the Administrative Agent providing for the payments of fees to the Administrative Agent, RBC and/or the Lenders in connection with this Agreement or any transactions contemplated hereby.

"Financial Officer" means, for any Person, the chief financial officer, principal accounting officer, treasurer or controller of such Person.  Unless otherwise specified, all references herein to a Financial Officer means a Financial Officer of the Borrower.

"Financial Statements" means the financial statement or statements of the Borrower and its Consolidated Restricted Subsidiaries referred to in Section 7.04(a).

"Flood Insurance Regulations" means (a) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (b) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (c) the National Flood Insurance Reform Act of 1994 (amending 42 USC § 4001, *et seq.*), as the same may be amended or recodified from time to time, and (d) the Flood Insurance Reform Act of 2004 and any regulations promulgated thereunder.

"Foreign Lender" means any Lender that is not a U.S. Person.

"Foreign Subsidiary" means any Restricted Subsidiary that is not a Domestic Subsidiary.

17

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"Fronting Exposure" means, at any time there is a Defaulting Lender, with respect to the Issuing Bank, such Defaulting Lender's LC Exposure other than LC Exposure as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or cash collateralized in accordance with the terms hereof.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time subject to the terms and conditions set forth in Section 1.05.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity (including supranational bodies such as the European Union or the European Central Bank) exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Governmental Requirement" means any law, statute, code, ordinance, order, determination, rule, regulation, judgment, decree, injunction, franchise, permit, certificate, license, rules of common law, authorization or other directive or requirement, whether now or hereinafter in effect, of any Governmental Authority.

["Guarantors" means: CEI Acquisition, L.L.C., a Delaware limited liability company, CEI Pipeline, L.L.C., a Texas limited liability company, Chaparral Biofuels, L.L.C., an Oklahoma limited liability company, Chaparral CO2, L.L.C., an Oklahoma limited liability company, Chaparral Energy, L.L.C., an Oklahoma limited liability company, Chaparral Exploration, L.L.C., a Delaware limited liability company, Chaparral Real Estate, L.L.C., an Oklahoma limited liability company, Chaparral Resources, L.L.C., an Oklahoma limited liability company, Green Country Supply, Inc., an Oklahoma corporation, Roadrunner Drilling, L.L.C., an Oklahoma limited liability company, Charles Energy, L.L.C., an Oklahoma limited liability company, Chestnut Energy, L.L.C., an Oklahoma limited liability company, Trabajo Energy, L.L.C., an Oklahoma limited liability company, and each other Material Subsidiary that guarantees the Indebtedness pursuant to Section 8.14(b).]

"Guaranty Agreement" means an agreement executed by the Guarantors in substantially the form of **Error! Reference source not found.** unconditionally guarantying, on a joint and several basis, payment of the Indebtedness, as the same may be amended, restated, modified or supplemented from time to time.

"Hazardous Material" means any substance regulated or as to which liability might arise under any applicable Environmental Law including:  (a) any chemical, compound, material, product, byproduct, substance or waste defined as or included in the definition or meaning of "hazardous substance," "hazardous material," "hazardous waste," "solid waste," "toxic waste," "extremely hazardous substance," "toxic substance," "contaminant," "pollutant," or words of similar meaning or import found in any applicable Environmental Law; (b) Hydrocarbons, petroleum products, petroleum substances, natural gas, oil, oil and gas waste, crude oil, and any

18

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

components, fractions, or derivatives thereof; and (c) radioactive materials, explosives, asbestos or asbestos containing materials, polychlorinated biphenyls, radon, infectious or medical wastes.

"Highest Lawful Rate" means, with respect to each Lender, the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Notes or on other Indebtedness under laws applicable to such Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws allow as of the date hereof.

"Hydrocarbon Interests" means all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature.

"Hydrocarbons" means oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"Immaterial Subsidiary" means any Subsidiary designated by the Borrower as an Immaterial Subsidiary if and for so long as (a) such Immaterial Subsidiary owns Property having a fair market value of $2,000,000 or less and (b) such Immaterial Subsidiary, together with all other Immaterial Subsidiaries so designated as Immaterial Subsidiaries, does not have total assets having a fair market value at any time exceeding $5,000,000; *provided* that no Subsidiary may be an Immaterial Subsidiary if it owns Oil and Gas Properties that are included in the then effective Borrowing Base.

"Immaterial Title Deficiencies" means minor defects or deficiencies in title which do not diminish by more than 2% the total value of the Proved Oil and Gas Properties evaluated in the Reserve Report used in the most recent determination of the Borrowing Base.

"Indebtedness" means any and all amounts owing or to be owing by the Borrower or any Subsidiary (whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising):  (a) to any Agent, the Issuing Bank or any Lender under any Loan Document, including, without limitation, all interest on any of the Loans (including any interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency or reorganization of any Credit Party (or would accrue but for the operation of applicable bankruptcy or insolvency laws), whether or not such interest is allowed or allowable as a claim in any such case, proceeding or other action); (b) to any Secured Swap Provider under any Swap Agreement including any Swap Agreement in existence prior to the date hereof and entered into during the pendency of the Bankruptcy Proceedings or thereafter, but excluding any additional transactions or confirmations entered into (i) after such Secured Swap Provider ceases to be a Lender or an Affiliate of a

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Lender or (ii) after assignment by a Secured Swap Provider to another Person that is not a Lender or an Affiliate of a Lender; provided, that with respect to any Secured Swap Providers that is a Third Party Hedge Provider, such Third Party Hedge Provider shall remain subject to a Third Party Hedge Intercreditor Agreement at all times through the expiration of the tenor of such Third Party Hedge Provider's Swap Agreements with the Borrower or the applicable Subsidiary; (c) to any Bank Products Provider in respect of Bank Products; and (d) all renewals, extensions and/or rearrangements of any of the above; *provided* that solely with respect to any Credit Party that is not an "eligible contract participant" under the Commodity Exchange Act, Excluded Swap Obligations of such Credit Party shall in any event be excluded from "Indebtedness" owing by such Credit Party.

"Indemnified Taxes" means Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Credit Party under any Loan Document.

"Indemnitee" shall have the meaning assigned to such term in Section 12.03(b).

"Information" shall have the meaning assigned to such term in Section 12.11.

"Initial Hedging Test Date" shall have the meaning assigned to such term in Section 8.20.

"Initial NGL Period" shall have the meaning assigned to such term in Section 8.20.

"Initial Reserve Report" means the internally prepared report of the Borrower dated as of September 1, 2020 with respect to the Proved Oil and Gas Properties of the Credit Parties.

"Intercreditor Agreements" means (a) any Second Lien Intercreditor Agreement and (b) any Third Party Hedge Intercreditor Agreement.

"Interest Election Request" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.04.

"Interest Payment Date" means (a) with respect to any ABR Loan, the last day of each March, June, September and December and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period.

"Interest Period" means with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months or, with the consent of each Lender, twelve months (or such period of less than one month as may be consented to by each applicable Lender), thereafter, as the Borrower may elect; *provided* that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding

20

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (b) any Interest Period pertaining to a Eurodollar Borrowing that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interim Redetermination" has the meaning assigned to such term in Section 2.07(b).

"Interim Redetermination Date" means the date on which a Borrowing Base that has been redetermined pursuant to an Interim Redetermination becomes effective as provided in Section 2.07(d).

"Investment" means, for any Person:  (a) the acquisition (whether for cash, Property, services or securities or otherwise) of Equity Interests of any other Person or any agreement to make any such acquisition (including, without limitation, any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such short sale); (b) the making of any deposit with, or advance, loan or capital contribution to, assumption of Debt of, purchase or other acquisition of any other Debt or equity participation or interest in, or other extension of credit to, any other Person (including the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person, but excluding any such advance, loan or extension of credit having a term not exceeding ninety (90) days representing the purchase price of inventory or supplies sold by such Person in the ordinary course of business); (c) the purchase or acquisition (in one or a series of transactions) of Property (other than Equity Interests) of another Person that constitutes a business unit; or (d) the entering into of any guarantee of, or other contingent obligation (including the deposit of any Equity Interests to be sold) with respect to, any Debt or other obligations of any other Person and (without duplication) any amount committed to be advanced, lent or extended to such Person.

"IRS" means the United States Internal Revenue Service.

"Issuing Bank" means RBC, in its capacity as the issuer of Letters of Credit hereunder, and its successors in such capacity as provided in Section 2.08(i).  The Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of the Issuing Bank, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"LC Commitment" at any time means five million dollars ($5,000,000).

"LC Disbursement" means a payment made by the Issuing Bank pursuant to a Letter of Credit.

21

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"LC Exposure" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time plus (b) the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time.  The LC Exposure of any Lender at any time shall be its Applicable Revolving Credit Percentage of the total LC Exposure at such time (as such LC Exposure may be increased from time to time pursuant to Section 2.09(a)(iv) if a Defaulting Lender then exists).

"Lead Arranger" means RBC Capital Markets, in its capacities as sole lead arranger and sole bookrunner hereunder.

"Lenders" means the Persons listed on Annex I and any Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"Letter of Credit" means any letter of credit issued pursuant to this Agreement and any Existing Letter of Credit.

"Letter of Credit Agreements" means all letter of credit applications and other agreements (including any amendments, modifications or supplements thereto) submitted by the Borrower, or entered into by the Borrower, with the Issuing Bank relating to any Letter of Credit.

"LIBO Rate" means, for any Interest Period with respect to any Eurodollar Borrowing:

(a)    the rate of interest per annum, expressed on the basis of a year of 360 days, which is equal to the offered rate that appears on the page of the Reuters LIBOR01 screen (or any successor thereto as may be selected by the Administrative Agent) set by ICE Benchmark Administration for deposits in Dollars with a term equivalent to such Interest Period, determined as of approximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period, or

(b)    if the rates referenced in the preceding subsection (a) are not available, the rate per annum determined by the Administrative Agent as the rate of interest, expressed on a basis of 360 days at which deposits in Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the Eurodollar Loan being made, continued or converted by the Administrative Agent and with a term and amount comparable to such Interest Period and principal amount of such Eurodollar Loan as would be offered by the Administrative Agent's London branch to major banks in the offshore Dollar market at their request at approximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period;

provided that if any such rate is below zero, the LIBO Rate will be deemed to be zero.

"Lien" means any interest in Property securing an obligation owed to, or a claim by, a Person other than the owner of the Property, whether such interest is based on the common law, statute or contract, and whether such obligation or claim is fixed or contingent, and including but

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

not limited to (a) the lien or security interest arising from a deed of trust, mortgage, encumbrance, pledge, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes or (b) production payments and the like payable out of Oil and Gas Properties.  The term "Lien" shall include easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations.  For the purposes of this Agreement, the Borrower and its Restricted Subsidiaries shall be deemed to be the owner of any Property which it has acquired or holds subject to a conditional sale agreement, or leases under a financing lease or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person in a transaction intended to create a financing.

"Loan Documents" means this Agreement, the Notes, the Intercreditor Agreements, the Letter of Credit Agreements, the Letters of Credit, the Fee Letters and the Security Instruments.

"Loans" means the loans made by the Lenders to the Borrower pursuant to this Agreement.

"Majority Lenders" means, (a) at any time while no Loans or LC Exposure is outstanding, Lenders having greater than fifty percent (50%) of  the total Revolving Credit Commitments; and (b)  at any time while any Loans or LC Exposure is outstanding, Lenders holding greater than fifty percent (50%) of the outstanding aggregate principal amount of the Loans and participation interests in Letters of Credit (without regard to any sale by a Lender of a participation in any Loan under Section 12.04(c)); *provided* that the Revolving Credit Commitments and the principal amount of the Loans and participation interests in Letters of Credit of the Defaulting Lenders (if any) shall be excluded from the determination of Majority Lenders.

"Material Acquisition" means any acquisition of Property or series of related acquisitions of Property that involves the payment of consideration by the Borrower and/or its Restricted Subsidiaries in excess of 5% of the then effective Borrowing Base.

"Material Adverse Effect" means a material adverse change in, or material adverse effect on (a) the business, operations, Property, or financial condition of the Borrower and the Restricted Subsidiaries taken as a whole, (b) the ability of the Credit Parties, taken as a whole, to perform their payment obligations or other material obligations under the Loan Documents, (c) the validity or enforceability of any Loan Document, or (d) the rights and remedies of, or benefits available to, taken as a whole, the Administrative Agent and the Lenders under the Loan Documents.

"Material Debt" means (a) Permitted Second Lien Debt and (b) any other Debt of any one or more of the Borrower and its Restricted Subsidiaries (other than the Loans and Letters of Credit), or obligations in respect of one or more Swap Agreements, of any one or more of the Borrower and its Restricted Subsidiaries in an aggregate principal amount, in the case of this clause (b), exceeding $[10,000,000].  For purposes of determining Material Debt, the "principal

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

amount" of the obligations of the Borrower or any Restricted Subsidiary in respect of any Swap Agreement at any time shall be the Swap Termination Value of such Swap Agreement.

"Material Disposition" means any sale or other disposition of Property or series of related sales or dispositions of property that yields gross proceeds to the Borrower or any of its Restricted Subsidiaries in excess of 5% of the then effective Borrowing Base.

"Material Subsidiary" means, as of any date, any Subsidiary that is not an Immaterial Subsidiary.

"Maturity Date" means [February __], 2024[1].

"Maximum Revolving Credit Amount" means, as to each Lender, the amount set forth opposite such Lender's name on Annex I under the caption "Maximum Revolving Credit Amounts", as the same may be (a) reduced or terminated from time to time in connection with a reduction or termination of the Aggregate Maximum Revolving Credit Amounts pursuant to Section 2.06(b) or (b) modified from time to time pursuant to any assignment permitted by Section 12.04(b).

"Moody's" means Moody's Investors Service, Inc. and any successor thereto that is a nationally recognized rating agency.

"Mortgaged Property" means any Property owned by the Borrower or any Guarantor which is subject to the Liens existing and to exist under the terms of the Security Instruments.

"Net Proceeds" means the aggregate cash proceeds received by a Credit Party in respect of any sale, lease, conveyance, disposition or other transfer of Property (including any cash subsequently received upon the sale or other disposition or collection of any non-cash consideration received in any sale), any issuance of Equity Interests, any incurrence of Debt, or Casualty Event, net of (a) the direct costs relating to such sale of Property, issuance of Equity Interests, incurrence of Debt or any Casualty Event (including legal, accounting and investment banking fees, sales commissions and underwriting discounts and commissions paid to unaffiliated third parties and other reasonable and customary fees and expenses actually incurred in connection therewith), (b) taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), (c) Debt (other than the Indebtedness) which is secured by a Lien upon any of the assets being sold or that are the subject of such Casualty Event, as the case may be, and which must be repaid as a result of such sale or such Casualty Event and (d) any amounts provided as a reserve, in accordance with GAAP, against any liabilities under any indemnification obligations or purchase price adjustments associated with such sale.

"New Borrowing Base Notice" has the meaning assigned such term in Section 2.07(d).

---

[1] **NTD**: to be the earlier of (a) May 31, 2024 and (b) forty (40) months after the Effective Date.

24

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Non-Renewal Notice Date" has the meaning assigned such term in Section 2.08(c)(ii).

"Notes" means the promissory notes of the Borrower described in Section 2.02(d) and being substantially in the form of **Error! Reference source not found.**, together with all amendments, modifications, replacements, extensions and rearrangements thereof.

"NYMEX" means the New York Mercantile Exchange.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"Oil and Gas Properties" means (a) Hydrocarbon Interests; (b) the Properties now or hereafter pooled or unitized with Hydrocarbon Interests; (c) all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including without limitation all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of the Hydrocarbon Interests; (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests; (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests; (f) all tenements, hereditaments, appurtenances and Properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests; and (g) all Properties, rights, titles, interests and estates described or referred to above, including any and all Property, real or personal, now owned or hereinafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or Property (excluding drilling rigs, automotive equipment, rental equipment or other personal Property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, buildings, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.  Unless otherwise expressly provided herein, all references in this Agreement to "Oil and Gas Properties" refer to Oil and Gas Properties owned by the Borrower and its Restricted Subsidiaries, as the context requires.

"Other Connection Taxes" means, with respect to any recipient, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means any and all present or future stamp, court or documentary, intangible, recording, filing, excise, property or other similar Taxes, charges or levies arising from any payment made hereunder or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement and any other Loan Document except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 5.04).

"Participant" has the meaning set forth in Section 12.04(c)(i).

"Participant Register" has the meaning set forth in Section 12.04(c)(i).

"PBGC" means the Pension Benefit Guaranty Corporation, or any successor thereto.

"PDP Reserves" means "proved developed producing oil and gas reserves" as such term is defined by the SPE in its standards and guidelines.

"Pension Plan" means any employee pension benefit plan, as defined in section 3(2) of ERISA, that is subject to Title IV of ERISA, section 302 of ERISA or section 412 of the Code and which (a) is currently or hereafter sponsored, maintained or contributed to by the Borrower, a Subsidiary or an ERISA Affiliate or (b) was at any time during the six calendar years preceding the date hereof, sponsored, maintained or contributed to by the Borrower or a Subsidiary or an ERISA Affiliate.

"Permitted Holder" means any Person that, on the Effective Date, after giving effect to the Plan of Reorganization, is the beneficial owner, together with any of its Affiliates, of Equity Interests representing 10% or more of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower at such time.

"Permitted Second Lien Debt" means Debt incurred by the Borrower or any Restricted Subsidiary under Section 9.02(k) and any refinancing or replacement thereof permitted under Section 9.02(l).

"Permitted Second Lien Debt Documents" means the 2025 Second Lien Notes Documents and any other indenture or other loan agreement governing any Permitted Second Lien Debt, all guarantees thereof and all other agreements, documents or instruments executed and delivered by the Borrower or any Restricted Subsidiary in connection with, or pursuant to, the incurrence of Permitted Second Lien Debt (including any Second Lien Intercreditor Agreement).

26

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"Permitted Senior Additional Debt" means Debt incurred by the Borrower or any Restricted Subsidiary under Section 9.02(h) and any refinancing or replacement thereof permitted under Section 9.02(l).

"Permitted Senior Additional Debt Documents" means any indenture or other loan agreement governing any Permitted Senior Additional Debt, all guarantees thereof and all other agreements, documents or instruments executed and delivered by the Borrower or any Restricted Subsidiary in connection with, or pursuant to, the incurrence of Permitted Senior Additional Debt.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee pension benefit plan, as defined in Section 3(2) of ERISA, which (a) is currently or hereafter sponsored, maintained or contributed to by the Borrower or any Subsidiary or (b) was at any time during the six calendar years preceding the date hereof, sponsored, maintained or contributed to by the Borrower or any Subsidiary.

"Prepetition Loan Documents" means the "Loan Documents" (as defined in the Prepetition Credit Agreement as in effect prior to the date hereof).

"Prime Rate" means the rate of interest per annum publicly announced from time to time by RBC as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.  Such rate is set by the Administrative Agent as a general reference rate of interest, taking into account such factors as the Administrative Agent may deem appropriate; it being understood that many of the Administrative Agent's commercial or other loans are priced in relation to such rate, that it is not necessarily the lowest or best rate actually charged to any customer and that the Administrative Agent may make various commercial or other loans at rates of interest having no relationship to such rate.

"Projected Revenue" means, at any time, the Borrower's reasonably anticipated projected future revenue from Oil and Gas Properties of the Borrower and the other Credit Parties as such revenue , net the effect of hedges, is reflected in the then most recently delivered Reserve Report.

"Projected Volume" means, at any time, the Borrower's reasonably anticipated projected future production from Oil and Gas Properties of the Borrower and the other Credit Parties as such production is set forth in the then most recently delivered Reserve Report.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including, without limitation, cash, securities, accounts and contract rights.

"Proposed Borrowing Base" has the meaning assigned to such term in Section 2.07(c)(i).

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"Proposed Borrowing Base Notice" has the meaning assigned to such term in Section 2.07(c)(ii).

"Proved Oil and Gas Properties" means Hydrocarbon Interests to which Proved Reserves are attributed.

"Proved Reserves" or "Proved" means collectively, "proved oil and gas reserves," "proved developed producing oil and gas reserves," "proved developed non-producing oil and gas reserves" (consisting of proved developed shut-in oil and gas reserves and proved developed behind pipe oil and gas reserves), and "proved undeveloped oil and gas reserves," as such terms are defined by the SPE in its standards and guidelines.

"PV-15" means, with respect to the Credit Parties' Proved Oil and Gas Properties, the net present value, discounted at 15% per annum, of the future net revenues expected to accrue to the Credit Parties' collective interests in such Proved Reserves during the remaining expected economic lives of such reserves, calculated in accordance with the most recent bank price deck of the Administrative Agent.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"QFC Credit Support" has the meaning assigned to such term in Section 12.19.

"Qualified ECP Guarantor" means, in respect of any Swap Agreement, each Credit Party that (a) has total assets exceeding $10,000,000 at the time any guaranty of obligations under such Swap Agreement or grant of the relevant security interest to secure such Swap Agreement becomes effective or (b) otherwise constitutes an "eligible contract participant" under the Commodity Exchange Act and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"RCRA" has the meaning set forth in the definition of "Environmental Laws".

"Redemption" means with respect to any Debt, the repurchase, redemption, prepayment, repayment, defeasance or any other acquisition or retirement for value (or the segregation of funds with respect to any of the foregoing) of such Debt.  "Redeem" has the correlative meaning thereto.

"Redetermination Date" means, with respect to any Scheduled Redetermination or any Interim Redetermination, the date that the redetermined Borrowing Base related thereto becomes effective pursuant to Section 2.07(d).  The Effective Date shall also constitute a Redetermination Date hereunder.

28

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"Reference Period" has the meaning assigned to such term in the definition of "EBITDAX."

"Register" has the meaning assigned such term in Section 12.04(b)(iv).

"Regulation D" means Regulation D of the Board, as the same may be amended, supplemented or replaced from time to time.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors (including attorneys, accountants and experts) of such Person and such Person's Affiliates.

"Release" means any depositing, spilling, leaking, pumping, pouring, placing, emitting, discarding, abandoning, emptying, discharging, migrating, injecting, escaping, leaching, dumping, or disposing.

"Remedial Work" has the meaning assigned such term in Section 8.10(a).

"Required Lenders" means, (a) at any time while no Loans or LC Exposure is outstanding, Lenders having at least sixty-six and two-thirds percent (66⅔%) of the Revolving Credit Commitments; and (b) at any time while any Loans or LC Exposure is outstanding, Lenders holding at least sixty-six and two-thirds percent (66⅔%) of the outstanding aggregate principal amount of the Loans and participation interests in Letters of Credit (without regard to any sale by a Lender of a participation in any Loan under Section 12.04(c)); *provided* that the Revolving Credit Commitments and the principal amount of the Loans and participation interests in Letters of Credit of the Defaulting Lenders (if any) shall be excluded from the determination of the Required Lenders.

"Reserve Report" means a report, in form and substance reasonably satisfactory to the Administrative Agent, setting forth, as of the dates set forth in Section 8.12(a) (or such other date in the event of an Interim Redetermination), the Proved Reserves attributable to the Oil and Gas Properties of the Credit Parties, together with a projection of the rate of production and future net income, taxes, operating expenses and capital expenditures with respect thereto as of such date, based upon the pricing assumptions consistent with the Administrative Agent's lending requirements at the time.

"Responsible Officer" means, as to any Person, the Chief Executive Officer, the Chief Operating Officer, President, any Financial Officer or any Vice President of such Person. Unless otherwise specified, all references to a Responsible Officer herein shall mean a Responsible Officer of the Borrower.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other Property) with respect to any Equity Interests in the Borrower or any of its Restricted Subsidiaries, or any payment (whether in cash, securities or other Property), including

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in the Borrower or any of its Restricted Subsidiaries or any option, warrant or other right to acquire any such Equity Interests in the Borrower or any of its Restricted Subsidiaries.

"Restricted Subsidiary" means any Subsidiary of the Borrower that is not an Unrestricted Subsidiary.

"Revolving Credit Commitment" means, with respect to each Lender, the commitment of such Lender to make Loans and to acquire participations in Letters of Credit hereunder, expressed as an amount representing the maximum aggregate amount of such Lender's Revolving Credit Exposure hereunder, as such commitment may be (a) modified from time to time pursuant to Section 2.06 and (b) modified from time to time pursuant to assignments by or to such Lender pursuant to Section 12.04.  The amount representing each Lender's Revolving Credit Commitment shall at any time be the lesser of such Lender's Maximum Revolving Credit Amount and such Lender's Applicable Revolving Credit Percentage of the then effective Borrowing Base.  The total Revolving Credit Commitment is the aggregate amount of the Revolving Credit Commitments of all the Lenders.

"Revolving Credit Commitment Fee Rate" has the meaning set forth in the definition of "Applicable Margin".

"Revolving Credit Exposure" means, with respect to any Lender at any time, the sum of the outstanding principal amount of such Lender's Loans and its LC Exposure at such time.

"S&P" means Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc., and any successor thereto that is a nationally recognized rating agency.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (as of the Effective Date, Crimea, Cuba, Iran, North Korea, Sudan and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by OFAC or the U.S. Department of State, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b).

"Sanctions" means all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including those administered by OFAC or the U.S. Department of State.

"Scheduled Redetermination" has the meaning assigned such term in Section 2.07(b).

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"Scheduled Redetermination Date" means the date on which a Borrowing Base that has been redetermined pursuant to a Scheduled Redetermination becomes effective as provided in Section 2.07(d).

"SEC" means the Securities and Exchange Commission or any successor Governmental Authority.

"Second Hedging Test Date" shall have the meaning assigned to such term in Section 8.20.

"Second Lien Intercreditor Agreement" means (a) that certain Intercreditor Agreement, dated as of the Effective Date, among the Credit Parties, the Administrative Agent and Wilmington Savings Fund Society FSB as collateral agent under the 2025 Second Lien Notes, as the same may from time to time be amended, modified, supplemented or restated in accordance with Section 12.21, and (b) any other customary intercreditor agreement providing for, among other things, (i) the subordination of the Liens on the property and assets of the Borrower and the Guarantors securing Permitted Second Lien Debt to the Liens on such property and assets securing the Indebtedness and (ii) the relative rights and other creditors' rights, as between the holders of the Indebtedness and the holders of such Permitted Second Lien Debt, by and among the Administrative Agent, the representative on behalf of the holders of such Permitted Second Lien Debt, the Borrower, the Guarantors and the other parties thereto, in form and substance satisfactory to the Borrower, the Administrative Agent and the Majority Lenders.

"Secured Parties" means, collectively, the Administrative Agent, the Lenders, the Issuing Bank, the Bank Products Providers and Secured Swap Providers, and "Secured Party" means any of them individually.

"Secured Swap Provider" means any (a) Person that is a party to a Swap Agreement with the Borrower or any of its Restricted Subsidiaries that entered into such Swap Agreement before or while such Person was a Lender or an Affiliate of a Lender, whether or not such Person at any time ceases to be a Lender or an Affiliate of a Lender, as the case may be, (b) assignee of any Person described in clause (a) above so long as such assignee is a Lender or an Affiliate of a Lender or (c) any Third Party Hedge Provider provided that such Third Party Hedge Provider shall remain subject to a Third Party Hedge Intercreditor Agreement at all times through the expiration of the tenor of such Third Party Hedge Provider's Swap Agreements with the Borrower or the applicable Subsidiary.

"Securities Account" shall have the meaning set forth in Article 8 of the UCC.

"Security Agreement" means an Amended and Restated Pledge and Security Agreement among the Borrower, the Guarantors and the Administrative Agent in substantially the form of **Error! Reference source not found.** (or otherwise in form and substance reasonably acceptable to the Administrative Agent) granting Liens and a security interest on the Credit Parties' personal property constituting Collateral (as defined therein) in favor of the Administrative Agent for the

31

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

benefit of the Secured Parties to secure the Indebtedness, as the same may be amended, modified, supplemented or restated from time to time.

"Security Instruments" means the Guaranty Agreement, the Security Agreement, mortgages, deeds of trust and other agreements, instruments or certificates described or referred to in **Error! Reference source not found.**, and any and all other agreements, instruments, consents or certificates now or hereafter executed and delivered by the Borrower or any other Person (other than Swap Agreements with any Lender or any Affiliate of a Lender, agreements with any Bank Products Provider in connection with any Bank Products or participation or similar agreements between any Lender and any other lender or creditor with respect to any Indebtedness pursuant to this Agreement) in connection with, or as security for the payment or performance of the Indebtedness, the Notes, this Agreement, or reimbursement obligations under the Letters of Credit, as such agreements may be amended, modified, supplemented or restated from time to time.

"SPE" means the Society of Petroleum Engineers.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board).  Such reserve percentages shall include those imposed pursuant to such Regulation D.  Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"subsidiary" means, with respect to any Person (the "parent") at any date, any other Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other Person (a) of which Equity Interests representing more than 50% of the equity or more than 50% of the ordinary voting power (irrespective of whether or not at the time Equity Interests of any other class or classes of such Person shall have or might have voting power by reason of the happening of any contingency) or, in the case of a partnership, any general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any subsidiary of the Borrower.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"Supermajority Lenders" means, (a) at any time while no Loans or LC Exposure is outstanding, Lenders having greater than eighty percent (80%) of the Revolving Credit Commitments; and (b) at any time while any Loans or LC Exposure is outstanding, Lenders holding greater than eighty percent (80%) of the outstanding aggregate principal amount of the Loans and participation interests in Letters of Credit (without regard to any sale by a Lender of a participation in any Loan under Section 12.04(c)); *provided* that the Revolving Credit Commitments and the principal amount of the Loans and participation interests in Letters of Credit of the Defaulting Lenders (if any) shall be excluded from the determination of Supermajority Lenders.

"Supported QFC" has the meaning assigned to such term in Section 12.19.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement, whether exchange traded, "over-the-counter" or otherwise, involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; *provided* that (a) no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or its Subsidiaries shall be a Swap Agreement and (b) no contract (or specified portion thereof or specified transaction thereunder) for the sale of Hydrocarbons for deferred shipment or delivery that is intended to be settled by physical delivery of such Hydrocarbons by the Borrower or any other Credit Party, including any forward sale contract in respect of Hydrocarbons and any physical basis contract, shall be a Swap Agreement so long as such contract does not provide, at the time such contract (or specified portion thereof or specified transaction thereunder) is entered into, for any portion of such contract to include a fixed price component (including any fixed commodity price component and/or any fixed basis differential component); provided, that, the Borrower's or any other Credit Party's election for "first of month" pricing or other one month pricing pursuant to a forward sale contract for deliveries of Hydrocarbons for the immediately following calendar month shall not, by itself, cause an agreement to be deemed to be a contract with a fixed price component for purposes of this definition.

"Swap Termination Value" means, in respect of any one or more Swap Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Agreements, (a) for any date on or after the date such Swap Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s) and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Agreements, as determined by the counterparties to such Swap Agreements.

"Synthetic Leases" means, in respect of any Person, all leases which shall have been, or should have been, in accordance with GAAP, treated as operating leases on the financial statements of the Person liable (whether contingently or otherwise) for the payment of rent

33

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

thereunder and which were properly treated as indebtedness for borrowed money for purposes of United States federal income taxes, if the lessee in respect thereof is obligated to either purchase for an amount in excess of, or pay upon early termination an amount in excess of, 80% of the residual value of the Property subject to such operating lease upon expiration or early termination of such lease.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the earlier of the Maturity Date and the date of termination of the Revolving Credit Commitments.

"Third Party Hedge Intercreditor Agreement" means a customary pari passu intercreditor agreement to be entered into after the Effective Date among the Borrower, the Guarantors, the applicable Third Party Hedge Provider and Administrative Agent, in such form as is reasonably acceptable to Administrative Agent, as amended or otherwise modified from time to time in accordance with Section 12.21.

"Third Party Hedge Provider" means Royal Dutch Shell PLC, BP plc, Cargill, Incorporated, any of their Affiliates or another Person reasonably satisfactory to the Administrative Agent.

"Threshold Amount" means $15,000,000.

"Total Debt" means, at any date, all Debt of the Borrower and the Consolidated Restricted Subsidiaries on a consolidated basis, (a) excluding (i) non-cash obligations under ASC 815, (ii) accounts payable and other accrued liabilities (for the deferred purchase price of Property or services) from time to time incurred in the ordinary course of business which are not greater than ninety (90) days past the date of receipt of the invoice or delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP, (iii) Debt with respect to letters of credit to the extent such letters of credit have not been drawn, (iv) obligations with respect to surety or performance bonds and similar instruments entered into in the ordinary course of business in connection with the operation of Oil and Gas Properties, and (v) Debt of the type described in clauses (f), (g), (h), (i) and (k) of the definition of "Debt", and (b) less, the lesser of (i) the unrestricted cash and cash equivalents of the Borrower and its Restricted Subsidiaries on such date and (ii) $30,000,000.

"Total PDP PV-15" means, with respect to the Credit Parties' PDP Reserves, the net present value, discounted at 15% per annum, of the future net revenues expected to accrue to the Credit Parties' collective interests in such PDP Reserves during the remaining expected economic lives of such PDP Reserves. Each calculation of such expected future net revenues shall be made in accordance with SEC guidelines for reporting PDP Reserves, provided that in any event (a) appropriate deductions shall be made for severance and ad valorem taxes, and for

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

operating, gathering, transportation and marketing costs required for the production and sale of such Oil and Gas Properties, (b) the pricing assumptions used in determining Total PDP PV-15 for any Oil and Gas Properties shall be based upon the 30-day average NYMEX strip pricing as of such date, adjusted to reflect the Borrower's and the Guarantors' swap or other hedging agreements then in effect on an undiscounted mark-to-market basis, (c) the cash flows derived from the pricing assumptions set forth in clause (b) above shall be further adjusted to account for the basis differential in a manner reasonably acceptable to the Administrative Agent, and (d) Total PDP PV-15 shall be calculated using the reserve engineering information contained in the Reserve Report most recently delivered to the Administrative Agent pursuant to Section 8.12 prior to the delivery of the compliance certificate pursuant to Section 8.01(c) in respect of the applicable Asset Coverage Ratio test date pursuant to Section 9.01(c), but with such information rolled forward to have an "as of" date that is the calendar day immediately following the applicable Asset Coverage Ratio test date.

"Transactions" means, with respect to (a) the Borrower, the execution, delivery and performance by the Borrower of this Agreement and each other Loan Document to which it is a party, the borrowing of Loans, the use of the proceeds thereof and the issuance of Letters of Credit hereunder, and the grant of Liens by the Borrower on the Mortgaged Properties pursuant to the Security Instruments and (b) each Guarantor, the execution, delivery and performance by such Guarantor of each Loan Document to which it is a party, the guaranteeing of the Indebtedness and the other obligations under the Guaranty Agreement by such Guarantor and such Guarantor's grant of Liens on the Mortgaged Properties pursuant to the Security Instruments.

"Triggering Disposition" means, subject to the last sentence hereof, any sale or other disposition of any Oil and Gas Properties (including Casualty Events but excluding any sale or other disposition of any Oil and Gas Properties to a Credit Party) and any termination or other liquidation of any commodity Swap Agreements (or any sale of Equity Interests in a Restricted Subsidiary that owns Oil and Gas Properties or is a party to commodity Swap Agreements (excluding, in each case, any sale of Equity Interests to a Credit Party)) if the aggregate Borrowing Base value (which, for purposes hereof, shall mean the value the Administrative Agent attributed in its sole discretion acting in good faith, but consistent with its customary oil and gas lending criteria as it exists at a particular time, to such Oil and Gas Property or Swap Agreement for purposes of the most recent determination of the Borrowing Base), if any, of such Oil and Gas Properties directly or indirectly sold or disposed of and Swap Agreements directly or indirectly terminated or otherwise liquidated (inclusive of the Oil and Gas Properties or Swap Agreements then being sold or liquidated) during any period between Redetermination Dates, exceeds 5% of the then effective Borrowing Base.  The following shall not constitute a "Triggering Disposition":  (a) any transfer (by novation or otherwise) of a Swap Agreement from the Borrower or any Restricted Subsidiary to the Borrower or any Restricted Subsidiary, (b) any assignment or novation of a Swap Agreement from the existing counterparty to an Approved Counterparty, with the Borrower or any Restricted Subsidiary being the "remaining party" for purposes of such assignment or novation, (c) the termination of a Swap Agreement at the end of

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

its stated term, and (d) any replacement, in a substantially contemporaneous transaction, of one or more Swap Agreements of the Borrower or any Restricted Subsidiary with one or more Swap Agreements with the Borrower or any Restricted Subsidiary covering Hydrocarbons of the type that were hedged pursuant to such replaced Swap Agreement(s) and with notional volumes, prices and tenors not less favorable to the Borrower or the applicable Restricted Subsidiary as those set forth in such replaced Swap Agreement(s) and without cash payments (other than transaction expenses) to the Borrower or any Restricted Subsidiary in connection therewith.

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Alternate Base Rate or the Adjusted LIBO Rate.

"UCC" means the Uniform Commercial Code, as in effect from time to time, of the State of New York or of any other state the laws of which are required as a result thereof to be applied in connection with the attachment, perfection or priority of, or remedies with respect to, Administrative Agent's or any Secured Party's Lien on any Mortgaged Property.

"Unrestricted Subsidiary" means any Subsidiary of the Borrower designated as such on Schedule 7.14 as of the date hereof or which the Borrower has designated in writing to the Administrative Agent to be an Unrestricted Subsidiary pursuant to Section 9.23(b).

"U.S. Special Resolution Regimes" has the meaning assigned to such term in Section 12.19.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning set forth in Section 5.03(f).

"USA Patriot Act" means the USA PATRIOT ACT (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"Wholly-Owned Subsidiary" means any Restricted Subsidiary of which all of the outstanding Equity Interests (other than any directors' qualifying shares mandated by applicable law), on a fully-diluted basis, are owned by the Borrower or one or more of the Wholly-Owned Subsidiaries or are owned by the Borrower and one or more of the Wholly-Owned Subsidiaries.

"Withholding Agent" means any Credit Party or the Administrative Agent.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

36

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Section 1.03    <u>Types of Loans and Borrowings</u>.  For purposes of this Agreement, Loans and Borrowings, respectively, may be classified and referred to by Type (*e.g.*, a "Eurodollar Loan" or a "Eurodollar Borrowing").

Section 1.04    <u>Terms Generally; Rules of Construction</u>.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" as used in this Agreement shall be deemed to be followed by the phrase "without limitation".  The word "will" as used in this Agreement shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, restated or otherwise modified (subject to any restrictions on such amendments, supplements, restatements or modifications set forth in the Loan Documents), (b) any reference herein to any law shall be construed as referring to such law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time, (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to the restrictions contained in the Loan Documents), (d) the words "herein", "hereof" and "hereunder", and words of similar import as used in this Agreement, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) with respect to the determination of any time period, the word "from" as used in this Agreement means "from and including" and the word "to" means "to and including" and (f) any reference herein to Articles, Sections, Annexes, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Annexes, Exhibits and Schedules to, this Agreement.  No provision of this Agreement or any other Loan Document shall be interpreted or construed against any Person solely because such Person or its legal representative drafted such provision.

Section 1.05    <u>Accounting Terms and Determinations; GAAP</u>.    Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all determinations with respect to accounting matters hereunder shall be made, and all financial statements and certificates and reports as to financial matters required to be furnished to the Administrative Agent or the Lenders hereunder shall be prepared, in accordance with GAAP (subject to the impact of fresh start accounting), applied on a basis consistent with the Financial Statements except for changes in which Borrower's independent certified public accountants concur and which are disclosed to Administrative Agent on the next date on which financial statements are required to be delivered to the Lenders pursuant to <u>Section 8.01(a)</u>; *provided* that, unless the Borrower and the Majority Lenders shall otherwise agree in writing, no such change shall modify or affect the manner in which compliance with the covenants contained herein is computed such that all such computations shall be conducted utilizing financial information presented consistently with prior periods.  Notwithstanding anything herein to the contrary, for the purposes of calculating any of the ratios tested under <u>Section 9.01</u> and the components of each of such ratios, all Unrestricted Subsidiaries and their subsidiaries (including their assets, liabilities, income, losses, cash flows, and the elements thereof) shall be excluded, except for any

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

cash dividends or distributions actually paid by any Unrestricted Subsidiary or any of its subsidiaries to the Borrower or any Restricted Subsidiary, which shall be deemed to be income to the Borrower or such Restricted Subsidiary when actually received by it.

Section 1.06    Divisions.    For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

Section 1.07    Rates.    The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to, the administration, submission or any other matter related to the rates in the definition of "LIBO Rate" or with respect to any comparable or successor rate thereto.

## ARTICLE II
## THE CREDITS

Section 2.01    Revolving Credit Commitments.    Subject to the terms and conditions set forth herein, each Lender agrees to make Loans to the Borrower during the Availability Period in an aggregate principal amount that will not result in (a) such Lender's Revolving Credit Exposure exceeding such Lender's Revolving Credit Commitment or (b) the total Revolving Credit Exposures exceeding the total Revolving Credit Commitments.    Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, repay and reborrow the Loans.

Section 2.02    Loans and Borrowings.

(a)    Borrowings; Several Obligations.    Each Loan shall be made as part of a Borrowing consisting of Loans made or deemed made by the Lenders ratably in accordance with their respective Applicable Revolving Credit Percentages.    The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; *provided* that the Revolving Credit Commitments are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b)    Types of Loans.    Subject to Section 3.03, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request in accordance herewith.    Each Lender at its option may make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; *provided* that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

38

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(c)     <u>Minimum Amounts; Limitation on Number of Borrowings</u>.   At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of $250,000 and not less than $500,000.  At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of $100,000 and not less than $200,000; *provided* that an ABR Borrowing of a Loan may be in an aggregate amount that is equal to the entire unused balance of the total Revolving Credit Commitments or that is required to finance the reimbursement of an LC Disbursement as contemplated by <u>Section 2.08(e)</u>.  Borrowings of more than one Type may be outstanding at the same time, *provided* that there shall not at any time be more than a total of six (6) Eurodollar Borrowings outstanding.  Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

(d)     <u>Notes</u>.  If requested by a Lender, the Loans made by such Lender shall be evidenced by a Note of the Borrower in substantially the form of **Error! Reference source not found.**, in each case dated, in the case of (i) any Lender party hereto as of the date of this Agreement, as of the date of this Agreement, or (ii) any Lender that becomes a party hereto pursuant to an Assignment and Assumption, as of the effective date of the Assignment and Assumption, each payable to such Lender or its registered assigns in a principal amount equal to its Maximum Revolving Credit Amount, as applicable, as in effect on such date, and otherwise duly completed.  In the event that any Lender's Maximum Revolving Credit Amount increases or decreases for any reason (whether pursuant to <u>Section 2.06</u>, <u>Section 12.04(b)</u> or otherwise), the Borrower shall, upon request of such Lender, deliver or cause to be delivered, to the extent such Lender is then holding a Note, on the effective date of such increase or decrease, a new Note, payable to such Lender or its registered assigns in a principal amount equal to its Maximum Revolving Credit Amount after giving effect to such increase or decrease, and otherwise duly completed, and each Lender shall endeavor to return to the Borrower the Note so replaced.  The date, amount, Type, interest rate and, if applicable, Interest Period of each Loan made by each Lender, and all payments made on account of the principal thereof, shall be recorded by such Lender on its books for its Note.  Failure to make any such recordation shall not affect any Lender's or the Borrower's rights or obligations in respect of such Loans or affect the validity of any transfer by any Lender of its Note.

Section 2.03   <u>Requests for Borrowings</u>.  To request a Borrowing, the Borrower shall notify the Administrative Agent of such request by telephone (a) in the case of a Eurodollar Borrowing, not later than 1:00 p.m., New York City time, three Business Days before the date of the proposed Borrowing or (b) in the case of an ABR Borrowing, not later than 11:00 a.m., New York City time, on the date of the proposed Borrowing; *provided* that if such notice is received on the date of the proposed Borrowing, the aggregate amount of the requested Borrowing on such date shall not exceed $20,000,000; *provided further* that no such notice shall be required for any deemed request of an ABR Borrowing to finance the reimbursement of an LC Disbursement as provided in <u>Section 2.08(e)</u>. Each such telephonic Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery or fax or other electronic communication subject

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

to Section 12.01(b) to the Administrative Agent of a written Borrowing Request in substantially the form of **Error! Reference source not found.** and signed by the Borrower.  Each such telephonic and written Borrowing Request shall specify the following information in compliance with Section 2.02:

>   (i)      the aggregate amount of the requested Borrowing;

>   (ii)     the date of such Borrowing, which shall be a Business Day;

>   (iii)    whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

>   (iv)     in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period";

>   (v)      the amount of the then effective Borrowing Base, the current total Revolving Credit Exposures (without regard to the requested Borrowing) and the *pro forma* total Revolving Credit Exposures (giving effect to the requested Borrowing);

>   (vi)     the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.05; and

>   (vii)    certifying that, if the principal amount of such Borrowing plus the aggregate amount of cash and cash equivalents (other than Excluded Funds) of the Credit Parties at the time of such Borrowing (before giving effect thereto) exceeds the Excess Cash Threshold, then (i) the proceeds of the Borrowing will be used as set forth on an exhibit to such Borrowing Request within three (3) Business Days of the date of such Borrowing (which use of proceeds shall be for a purpose other than cash on the balance sheet) and (ii) after giving effect to such use of proceeds, the Credit Parties will not have any Excess Cash.

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.  Each Borrowing Request shall constitute a representation by the Borrower that the amount of the requested Borrowing shall not cause the total Revolving Credit Exposures to exceed the total Revolving Credit Commitments (i.e., the lesser of the Aggregate Maximum Revolving Credit Amounts and the then effective Borrowing Base).

Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

40

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Section 2.04    <u>Interest Elections</u>.

(a)    <u>Conversion and Continuance</u>.  Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Borrowing Request.  Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this <u>Section 2.04</u>.  The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)    <u>Interest Election Requests</u>.  To make an election pursuant to this <u>Section 2.04</u>, the Borrower shall notify the Administrative Agent of such election by telephone by the time that a Borrowing Request would be required under <u>Section 2.03</u> if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election.  Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or fax or other electronic communication subject to <u>Section 12.01(b)</u> to the Administrative Agent of a written Interest Election Request in substantially the form of **Error! Reference source not found.** and signed by the Borrower.

(c)    <u>Information in Interest Election Requests</u>.  Each telephonic and written Interest Election Request shall specify the following information in compliance with <u>Section 2.02</u>:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to <u>Section 2.04(c)(iii)</u> and <u>(iv)</u> shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)    if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(d)        Notice to Lenders by the Administrative Agent.  Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)        Effect of Failure to Deliver Timely Interest Election Request and Events of Default on Interest Election.  If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing:  (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing (and any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective) and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

Section 2.05    Funding of Borrowings.

(a)        Funding by Lenders.  Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 1:00 p.m., New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders.  The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account of the Borrower maintained with the Administrative Agent and designated by the Borrower in the applicable Borrowing Request; *provided* that ABR Loans made to finance the reimbursement of an LC Disbursement as provided in Section 2.08(e) shall be remitted by the Administrative Agent to the Issuing Bank.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for its Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for its Loan in any particular place or manner.

(b)        Presumption of Funding by the Lenders.  Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.05(a) and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the interest rate applicable to ABR Loans that such Lender failed to fund.  If the Borrower and such Lender

42

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period.  If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.  Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

Section 2.06    Termination and Reduction of Revolving Credit Commitments and Aggregate Maximum Revolving Credit Amounts.

(a)    Scheduled Termination of Revolving Credit Commitments.  Unless previously terminated, the Revolving Credit Commitments shall terminate on the Maturity Date.  If at any time the Aggregate Maximum Revolving Credit Amounts or the Borrowing Base is terminated or reduced to zero, then the Revolving Credit Commitments shall terminate on the effective date of such termination or reduction.

(b)    Optional Termination and Reduction of Aggregate Maximum Revolving Credit Amounts.

(i)    The Borrower may at any time terminate, or from time to time reduce, the Aggregate Maximum Revolving Credit Amounts without payment of any premium or penalty subject to Section 5.02; *provided* that (A) each reduction of the Aggregate Maximum Revolving Credit Amounts shall be in an amount that is an integral multiple of $500,000 and not less than $1,000,000 and (B) the Borrower shall not terminate or reduce the Aggregate Maximum Revolving Credit Amounts if, (1) after giving effect to any concurrent prepayment of the Loans in accordance with Section 3.04(c), the total Revolving Credit Exposures would exceed the total Revolving Credit Commitments or (2) the Aggregate Maximum Revolving Credit Amount would be less than $5,000,000 (unless, with respect to this clause **Error! Reference source not found.**, the Aggregate Maximum Revolving Credit Amounts are reduced to $0).

(ii)    The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Aggregate Maximum Revolving Credit Amounts under Section 2.06(b)(i) at least three Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof.  Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each notice delivered by the Borrower pursuant to this Section 2.06(b)(ii) shall be irrevocable; *provided* that a notice of termination of the Aggregate Maximum Revolving Credit Amounts delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.  Any termination or reduction of the Aggregate Maximum Revolving Credit Amounts shall be

43

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

permanent and may not be reinstated.  Each reduction of the Aggregate Maximum Revolving Credit Amounts shall be made ratably among the Lenders in accordance with each Lender's Applicable Revolving Credit Percentage.

Section 2.07    Borrowing Base.

(a)    Initial Borrowing Base.  For the period from and including the Effective Date to but excluding the first Redetermination Date thereafter, the amount of the Borrowing Base shall be $[175,000,000].[2]  Notwithstanding the foregoing, the Borrowing Base may be subject to further adjustments prior to the first Redetermination Date after the date hereof from time to time pursuant to Section 2.07(e), Section 2.07(f), or Section 8.13(c).

(b)    Scheduled and Interim Redeterminations.  The Borrowing Base shall be redetermined semi-annually in accordance with this Section 2.07 (a "Scheduled Redetermination"), and, subject to Section 2.07(d), such redetermined Borrowing Base shall become effective and applicable to the Borrower, the Agents, the Issuing Bank and the Lenders on May 1st and November 1st of each year (or, in each case, such date promptly thereafter as reasonably practicable), commencing November 1, 2021.  In addition, the Borrower may, by notifying the Administrative Agent thereof, and the Administrative Agent may, at the direction of the Required Lenders, by notifying the Borrower thereof, one time between Scheduled Redeterminations, each elect to cause the Borrowing Base to be redetermined between Scheduled Redeterminations (an "Interim Redetermination") in accordance with this Section 2.07; provided that the Lenders may not direct the Administrative Agent to cause an Interim Redetermination prior to November 1, 2021.

(c)    Scheduled and Interim Redetermination Procedure.

(i)    Each Scheduled Redetermination and each Interim Redetermination shall be effectuated as follows:  upon receipt by the Administrative Agent of (A) the Reserve Report and the certificate required to be delivered by the Borrower to the Administrative Agent, in the case of a Scheduled Redetermination, pursuant to Section 8.12(a) and (c), and, in the case of an Interim Redetermination, pursuant to Section 8.12(b) and (c), and (B) such other reports, data and supplemental information, including, without limitation, the information provided pursuant to Section 8.12(c), as may, from time to time, be reasonably requested by the Required Lenders (the Reserve Report, such certificate and such other reports, data and supplemental information being the "Engineering Reports"), the Administrative Agent shall evaluate the information contained in the Engineering Reports and shall, in its sole

---

[2] Per the term sheet, such amount shall be the lesser of (i) $175.0 million and (ii) the net present value, discounted at fifteen percent (15%) per annum, of the future net revenues expected to accrue to the Borrower's and the Guarantors' collective interest in their proved developed producing oil and gas properties (as adjusted for swap or other hedging agreements in existence on the Closing Date) calculated on a six month roll-forward basis and using the RBC price deck.

44

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

discretion acting in good faith, propose a new Borrowing Base (the "Proposed Borrowing Base") based upon such information and such other information (including, without limitation, the status of title information with respect to the Proved Oil and Gas Properties as described in the Engineering Reports and the existence of any other Debt, the Credit Parties' other assets, liabilities, fixed charges, cash flow, business, properties, prospects, management and ownership, hedged and unhedged exposure of the Credit Parties to price, price and production scenarios, interest rate and operating cost changes) as the Administrative Agent deems appropriate in its sole discretion and consistent with its customary oil and gas lending criteria as it exists at the particular time. In no event shall the Proposed Borrowing Base exceed the Aggregate Maximum Revolving Credit Amounts;

(ii)    The Administrative Agent shall notify the Borrower and the Lenders of the Proposed Borrowing Base (the "Proposed Borrowing Base Notice") after the Administrative Agent has received complete Engineering Reports from the Borrower and has had a reasonable opportunity to determine the Proposed Borrowing Base in accordance with Section 2.07(c)(i); and

(iii)    Any Proposed Borrowing Base that would increase the Borrowing Base then in effect must be approved by all of the Non-Defaulting Lenders as provided in this Section 2.07(c)(iii); and any Proposed Borrowing Base that would decrease or maintain the Borrowing Base then in effect must be approved or be deemed to have been approved by the Required Lenders as provided in this Section 2.07(c)(iii), such approval in each case shall be in the Lenders' sole credit discretion exercised in good faith and consistent with their respective customary oil and gas lending criteria as it exists at the particular time. Upon receipt of the Proposed Borrowing Base Notice, each Lender shall have fifteen (15) days to agree with the Proposed Borrowing Base or disagree with the Proposed Borrowing Base by proposing an alternate Borrowing Base. If, in the case of any Proposed Borrowing Base that would decrease or maintain the Borrowing Base then in effect, at the end of such fifteen (15) days, any Lender has not communicated its approval or disapproval in writing to the Administrative Agent, such silence shall be deemed to be an approval of the Proposed Borrowing Base. If, in the case of any Proposed Borrowing Base that would increase the Borrowing Base then in effect, at the end of such fifteen (15) days, any Lender has not communicated its approval or disapproval in writing to the Administrative Agent, such silence shall be deemed to be a disapproval of the Proposed Borrowing Base. If, by the end of such 15-day period, all of the Non-Defaulting Lenders, in the case of a Proposed Borrowing Base that would increase the Borrowing Base then in effect, or the Required Lenders, in the case of a Proposed Borrowing Base that would decrease or maintain the Borrowing Base then in effect, have approved or, in the case of a decrease or reaffirmation, deemed to have approved, as aforesaid, then the Proposed Borrowing Base shall become the new Borrowing Base, effective on the date specified in Section 2.07(d). If, however, at the end of such 15-day period, all of the Non-Defaulting Lenders or the Required Lenders, as

45

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

applicable, have not approved or, in the case of a decrease or reaffirmation, deemed to have approved, as aforesaid, then the Administrative Agent shall (A) notify the Borrower of the Proposed Borrowing Base and which Lenders have not approved or been deemed to have approved of the Proposed Borrowing Base, and (B) poll the Lenders to ascertain the highest Borrowing Base then acceptable to (x) in the case of a decrease or reaffirmation, a number of Lenders sufficient to constitute the Required Lenders and (y) in the case of an increase, all of the Non-Defaulting Lenders, and such amount shall become the new Borrowing Base, effective on the date specified in Section 2.07(d).

(d)     Effectiveness of a Redetermined Borrowing Base. After a redetermined Borrowing Base is approved or is deemed to have been approved by all of the Non-Defaulting Lenders or the Required Lenders, as applicable, pursuant to Section 2.07(c)(iii), the Administrative Agent shall notify the Borrower and the Lenders of the amount of the redetermined Borrowing Base (the "New Borrowing Base Notice"), and such amount shall become the new Borrowing Base, effective and applicable to the Borrower, the Administrative Agent, the Issuing Bank and the Lenders:

(i)     in the case of a Scheduled Redetermination, (A) if the Administrative Agent shall have received the Engineering Reports required to be delivered by the Borrower pursuant to Section 8.12(a) and (c) in a timely and complete manner, then on the May 1st or November 1st (or, in each case, such date promptly thereafter as reasonably practicable), as applicable, following such notice, or (B) if the Administrative Agent shall not have received the Engineering Reports required to be delivered by the Borrower pursuant to Section 8.12(a) and (c) in a timely and complete manner, then on the Business Day next succeeding delivery of such notice; and

(ii)     in the case of an Interim Redetermination, on the Business Day next succeeding delivery of such notice.

Such amount shall then become the Borrowing Base until the next Scheduled Redetermination Date, the next Interim Redetermination Date or the next adjustment to the Borrowing Base under Section 2.07(e), Section 2.07(f) or Section 8.13(c), whichever occurs first. Notwithstanding the foregoing, no Scheduled Redetermination or Interim Redetermination shall become effective until the New Borrowing Base Notice related thereto is received by the Borrower.

(e)     Automatic Reduction of Borrowing Base – Issuance of Permitted Senior Additional Debt. Upon any issuance or incurrence of Permitted Senior Additional Debt (other than Permitted Senior Additional Debt that refinances or replaces then existing Permitted Senior Additional Debt or Permitted Second Lien Debt, up to the principal amount of such then existing Permitted Senior Additional Debt or Permitted Second Lien Debt that is refinanced or replaced), the Borrowing Base shall automatically be decreased by an amount equal to 25% of the aggregate notional principal amount of such Permitted Senior Additional Debt issued or incurred at such time. Such decrease in the Borrowing Base shall occur automatically upon the issuance or incurrence of such Permitted Senior Additional Debt on the date of issuance or incurrence,

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

without any vote of the Lenders or action by the Administrative Agent. Upon any such reduction in the Borrowing Base, the Administrative Agent shall promptly deliver a New Borrowing Base Notice to the Borrower and the Lenders.

(f)     Automatic Reduction of Borrowing Base – Triggering Disposition. Upon the consummation of a Triggering Disposition, the Borrowing Base shall be decreased by an amount equal to the aggregate Borrowing Base value (as determined by the Administrative Agent and approved by the Required Lenders in each case in their sole discretion exercised in good faith and consistent with their respective customary oil and gas lending criteria as it exists at the particular time) of the Oil and Gas Properties directly or indirectly sold or disposed of and Swap Agreements directly or indirectly terminated, as applicable. Such decrease in the Borrowing Base shall occur automatically upon (a) the consummation of such Triggering Disposition, upon the approval of the Required Lenders of the amount of such reduction as set forth above, and (b) the Administrative Agent's delivery of a New Borrowing Base Notice to the Borrower and the Lenders.

Section 2.08    Letters of Credit.

(a)     General.   Subject to the terms and conditions set forth herein, the Borrower may request the issuance of dollar denominated Letters of Credit for its own account or for the account of any of its Restricted Subsidiaries, in a form reasonably acceptable to the Administrative Agent and the Issuing Bank, at any time and from time to time during the Availability Period in an aggregate amount not to exceed the LC Commitment. In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrower to, or entered into by the Borrower with, the Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control. Notwithstanding anything herein to the contrary, the Issuing Bank shall have no obligation hereunder to issue, and shall not issue, any Letter of Credit (i) the proceeds of which would be made available to any Person (A) to fund any activity or business of or with any Sanctioned Person, or in any country or territory that, at the time of such funding, is the subject of any Sanctions or (B) in any manner that would result in a violation of any Sanctions by any party to this Agreement, (ii) if any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the Issuing Bank from issuing such Letter of Credit, or any Governmental Requirement relating to the Issuing Bank or any Governmental Authority with jurisdiction over the Issuing Bank shall prohibit, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon the Issuing Bank with respect to such Letter of Credit any restriction, reserve or capital requirement (for which the Issuing Bank is not otherwise compensated hereunder) not in effect on the Effective Date, or shall impose upon the Issuing Bank any unreimbursed loss, cost or expense which was not applicable on the Effective Date and which the Issuing Bank in good faith deems material to it or (iii) if the issuance of such Letter of Credit would violate one or more policies of the Issuing Bank applicable to letters of credit generally under similar circumstances for similarly situated borrowers; *provided* that, notwithstanding anything herein to the contrary,

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements or directives thereunder or issued in connection therewith or in the implementation thereof, and (y) all requests, rules, guidelines, requirements or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed not to be in effect on the Effective Date for purposes of <u>clause (ii)</u> above, regardless of the date enacted, adopted, issued or implemented.

(b)     <u>Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions</u>. The Existing Letters of Credit shall be deemed to have been issued hereunder as of the Effective Date.  To request the issuance of a Letter of Credit (or the amendment, renewal or extension of an outstanding Letter of Credit), the Borrower shall hand deliver or fax (or transmit by other electronic communication subject to <u>Section 12.01(b)</u>) to the Issuing Bank and the Administrative Agent (not less than five (5) Business Days in advance of the requested date of issuance, amendment, renewal or extension (or such shorter period of time as may be acceptable to the Administrative Agent and the Issuing Bank in its sole discretion exercised in good faith), a notice:

(i)     requesting the issuance of a Letter of Credit or identifying the Letter of Credit to be amended, renewed or extended;

(ii)     specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day);

(iii)     specifying the date on which such Letter of Credit is to expire (which shall comply with <u>Section 2.08(c)</u>);

(iv)     specifying the amount of such Letter of Credit;

(v)     specifying the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit; and

(vi)     specifying the amount of the then effective Borrowing Base and whether a Borrowing Base Deficiency exists at such time, the current total Revolving Credit Exposures (without regard to the requested Letter of Credit or the requested amendment, renewal or extension of an outstanding Letter of Credit) and the *pro forma* total Revolving Credit Exposures (giving effect to the requested Letter of Credit or the requested amendment, renewal or extension of an outstanding Letter of Credit).

Each notice shall constitute a representation and warranty by the Borrower that after giving effect to the requested issuance, amendment, renewal or extension, as applicable, (A) the LC Exposure shall not exceed the LC Commitment and (B) the total Revolving Credit Exposures shall not exceed the total Revolving Credit Commitments (*i.e.*, the lesser of the Aggregate

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Maximum Revolving Credit Amounts and the then effective Borrowing Base).  No letter of credit issued by the Issuing Bank (if the Issuing Bank is not the Administrative Agent) shall be deemed to be a "Letter of Credit" issued under this Agreement unless the Issuing Bank has requested and received written confirmation from the Administrative Agent that the representations by Borrower contained in the foregoing clauses (A) and (B) are true and correct.

If requested by the Issuing Bank, the Borrower also shall submit a letter of credit application on the Issuing Bank's standard form in connection with any request for a Letter of Credit; *provided* that, in the event of any conflict between such application or any Letter of Credit Agreement and the terms of this Agreement, the terms of this Agreement shall control.

(c)      Expiration Date.

(i)      Each Letter of Credit shall expire at or prior to the close of business on the earlier of (A) the date that is one year after the date of the issuance of such Letter of Credit (or, in the case of any renewal or extension thereof, one year after such renewal or extension) and (B) the date that is five Business Days prior to the Maturity Date.

(ii)      If the Borrower so requests in any request for a Letter of Credit, the Issuing Bank may, in its sole and absolute discretion, agree to issue a Letter of Credit that has automatic renewal provisions (each, an "Auto-Renewal Letter of Credit"); provided that any such Auto-Renewal Letter of Credit must permit the Issuing Bank to prevent any such renewal at least once in each twelve-month period (commencing with the date of issuance of such Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "Non-Renewal Notice Date") in each such twelve-month period to be agreed upon at the time such Letter of Credit is issued.  Unless otherwise directed by the Issuing Bank, the Borrower shall not be required to make a specific request to the Issuing Bank for any such renewal.  Once an Auto-Renewal Letter of Credit has been issued, the Lenders shall be deemed to have authorized (but may not require) the Issuing Bank to permit the renewal of such Letter of Credit at any time to an expiry date not later than the earlier of (A) one year from the date of such renewal and (B) the date that is five Business Days prior to the Maturity Date; provided that the Issuing Bank shall not permit any such renewal if (1) the Issuing Bank has determined that it would have no obligation at such time to issue such Letter of Credit in its renewed form under the terms hereof (by reason of the provisions of Section 2.08(f) or otherwise), or (2) it has received notice on or before the day that is two Business Days before the Non-Renewal Notice Date from the Administrative Agent, any Lender or the Borrower that one or more of the applicable conditions specified in Section 6.02 are not then satisfied.

(d)      Participations.  By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the Issuing Bank or the Lenders, the Issuing Bank hereby grants to each Lender, and each Lender

49

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

hereby acquires from the Issuing Bank, a participation in such Letter of Credit equal to such Lender's Applicable Revolving Credit Percentage of the aggregate amount available to be drawn under such Letter of Credit. In consideration and in furtherance of the foregoing, each Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the Issuing Bank, such Lender's Applicable Revolving Credit Percentage (which, for this purpose, if any Defaulting Lender then exists, shall be calculated as such Lender's percentage of the aggregate LC Exposure after giving effect to Section 2.09(a)(iv)) of each LC Disbursement made by the Issuing Bank and not reimbursed by the Borrower on the date due as provided in Section 2.08(e), or of any reimbursement payment required to be refunded to the Borrower for any reason. Each Lender acknowledges and agrees that its obligation to acquire participations pursuant to this Section 2.08(d) in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default, the existence of a Borrowing Base Deficiency or reduction or termination of the Revolving Credit Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(e)    Reimbursement. If the Issuing Bank shall make any LC Disbursement in respect of a Letter of Credit, the Borrower shall reimburse such LC Disbursement by paying to the Administrative Agent an amount equal to such LC Disbursement not later than 1:00 p.m., New York City time, on the date that such LC Disbursement is made, if the Borrower shall have received notice of such LC Disbursement prior to 11:00 a.m., New York City time, on such date, or, if such notice has not been received by the Borrower prior to such time on such date, then not later than 1:00 p.m., New York City time, on (i) the Business Day that the Borrower receives such notice, if such notice is received prior to 11:00 a.m., New York City time, on the day of receipt, or (ii) the Business Day immediately following the day that the Borrower receives such notice, if such notice is not received prior to such time on the day of receipt; *provided* that unless the Borrower has notified the Administrative Agent that it intends to reimburse all or part of such LC Disbursement without using Loan proceeds or has submitted a Borrowing Request with respect thereto, the Borrower shall, subject to the conditions to Borrowing set forth herein, be deemed to have requested, and the Borrower does hereby request under such circumstances, that such payment be financed with an ABR Borrowing of a Loan in an equivalent amount and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and replaced by the resulting ABR Borrowing. If the Borrower fails to make such payment when due, the Administrative Agent shall notify each Lender of the applicable LC Disbursement, the payment then due from the Borrower in respect thereof and such Lender's Applicable Revolving Credit Percentage thereof (which, for this purpose, if any Defaulting Lender then exists, shall be calculated as such Lender's percentage of the aggregate LC Exposure after giving effect to Section 2.09(a)(iv)). Promptly following receipt of such notice, each Lender shall pay to the Administrative Agent its Applicable Revolving Credit Percentage (which, for this purpose, if any Defaulting Lender then exists, shall be calculated as such Lender's percentage of the aggregate LC Exposure after giving effect to Section 2.09(a)(iv)) of the payment then due from the Borrower, in the same manner as provided in Section 2.05 with respect to Loans made by such

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Lender (and Section 2.05 shall apply, *mutatis mutandis*, to the payment obligations of the Lenders), and the Administrative Agent shall promptly pay to the Issuing Bank the amounts so received by it from the Lenders.  Promptly following receipt by the Administrative Agent of any payment from the Borrower pursuant to this Section 2.08(e), the Administrative Agent shall distribute such payment to the Issuing Bank or, to the extent that Lenders have made payments pursuant to this Section 2.08(e) to reimburse the Issuing Bank, then to such Lenders and the Issuing Bank as their interests may appear.  Any payment made by a Lender pursuant to this Section 2.08(e) to reimburse the Issuing Bank for any LC Disbursement (other than the funding of ABR Loans as contemplated above) shall not constitute a Loan and shall not relieve the Borrower of its obligation to reimburse such LC Disbursement.

(f)    Obligations Absolute.  The Borrower's obligation to reimburse LC Disbursements as provided in Section 2.08(e) shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit, any Letter of Credit Agreement or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by the Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit or any Letter of Credit Agreement, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section 2.08(f), constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder. Neither the Administrative Agent, the Lenders nor the Issuing Bank, nor any of their Related Parties shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuing Bank; *provided* that the foregoing shall not be construed to excuse the Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by the Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.  The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the Issuing Bank (as finally determined by a court of competent jurisdiction), the Issuing Bank shall be deemed to have exercised all requisite care in each such determination.  In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or

51

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g)      Disbursement Procedures.  The Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit.  The Issuing Bank shall promptly notify the Administrative Agent and the Borrower by telephone (confirmed by fax or other electronic communication subject to Section 12.01(b)) of such demand for payment and whether the Issuing Bank has made or will make an LC Disbursement thereunder; *provided* that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse the Issuing Bank and the Lenders with respect to any such LC Disbursement.

(h)      Interim Interest.  If the Issuing Bank shall make any LC Disbursement, then, until the Borrower shall have reimbursed the Issuing Bank for such LC Disbursement (either with its own funds or a Borrowing under Section 2.08(e)), the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the Borrower reimburses such LC Disbursement, at the rate per annum then applicable to ABR Loans.  Interest accrued pursuant to this Section 2.08(h) shall be for the account of the Issuing Bank, except that interest accrued on and after the date of payment by any Lender pursuant to Section 2.08(e) to reimburse the Issuing Bank shall be for the account of such Lender to the extent of such payment.

(i)      Replacement of the Issuing Bank.  The Issuing Bank may be replaced at any time by written agreement among the Borrower, the Administrative Agent, the replaced Issuing Bank and the successor Issuing Bank.  The Administrative Agent shall notify the Lenders of any such replacement of the Issuing Bank.  At the time any such replacement shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced Issuing Bank pursuant to Section 3.05(b).  From and after the effective date of any such replacement, (i) the successor Issuing Bank shall have all the rights and obligations of the Issuing Bank under this Agreement with respect to Letters of Credit to be issued thereafter and (ii) references herein to the term "Issuing Bank" shall be deemed to refer to such successor or to any previous Issuing Bank, or to such successor and all previous Issuing Banks, as the context shall require.  After the replacement of the Issuing Bank hereunder, the replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of the Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit.

(j)      Cash Collateralization.  If (i) any Event of Default shall occur and be continuing and the Borrower receives notice from the Administrative Agent (acting at the direction of the Majority Lenders) demanding the deposit of cash collateral pursuant to this Section 2.08(j) or (ii) the Borrower is required to pay to the Administrative Agent the excess attributable to an LC Exposure in connection with any prepayment pursuant to Section 3.04(c), then the Borrower shall deposit, in an account with the Administrative Agent, in the name of the Administrative Agent and for the benefit of the Lenders, an amount in cash equal to (A) in the

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

case of an Event of Default, the LC Exposure and (B) in the case of a payment required by Section 3.04(c), the amount of such excess as provided in Section 3.04(c), as of such date plus any accrued and unpaid interest thereon; *provided* that the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to the Borrower or any Restricted Subsidiary described in Section 10.01(h) or Section 10.01(i). The Borrower hereby grants to the Administrative Agent, for the benefit of the Issuing Bank and the Lenders, an exclusive first priority and continuing perfected security interest in and Lien on such account and all cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in such account, all deposits or wire transfers made thereto, any and all investments purchased with funds deposited in such account, all interest, dividends, cash, instruments, financial assets and other Property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing, and all proceeds, products, accessions, rents, profits, income and benefits therefrom, and any substitutions and replacements therefor. The Borrower's obligation to deposit amounts pursuant to this Section 2.08(j) shall be absolute and unconditional, without regard to whether any beneficiary of any such Letter of Credit has attempted to draw down all or a portion of such amount under the terms of a Letter of Credit, and, to the fullest extent permitted by applicable law, shall not be subject to any defense or be affected by a right of set-off, counterclaim or recoupment which the Borrower or any of its Subsidiaries may now or hereafter have against any such beneficiary, the Issuing Bank, the Administrative Agent, the Lenders or any other Person for any reason whatsoever. Such deposit shall be held as collateral securing the payment and performance of the Borrower's and the Guarantor's obligations under this Agreement and the other Loan Documents. The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account. Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Administrative Agent and at the Borrower's risk and expense, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in such account. Moneys in such account shall be applied by the Administrative Agent to reimburse the Issuing Bank for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrower for the LC Exposure at such time or, if the maturity of the Loans has been accelerated, be applied to satisfy other obligations of the Borrower and the Guarantors under this Agreement or the other Loan Documents. If the Borrower is required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, and the Borrower is not otherwise required to pay to the Administrative Agent the excess attributable to an LC Exposure in connection with any prepayment pursuant to Section 3.04(c), then such amount (to the extent not applied as aforesaid) shall be returned to the Borrower within three Business Days after all Events of Default have been cured or waived.

(k)    Defaulting Lenders. If, at any time, a Defaulting Lender exists hereunder, then, within one (1) Business Day following the written request of the Issuing Bank, the Borrower shall cash collateralize the Fronting Exposure of the Issuing Bank with respect to such Defaulting

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Lender (determined after giving effect to Section 2.09(a)(iv) and any cash collateral provided by such Defaulting Lender) with respect to the Defaulting Lender in an amount equal to the lesser of (x) the amount of such Fronting Exposure and (y) an amount otherwise agreeable to the Issuing Bank and the Administrative Agent in their sole discretion.

(i)     Grant of Security Interest.  The Borrower and, to the extent provided by any Defaulting Lender, such Defaulting Lender, hereby grants to the Administrative Agent, for the benefit of the Issuing Bank, and agrees to maintain, a first priority security interest in all such cash collateral as security for (A) in the case of the Defaulting Lender, the Defaulting Lender's obligation to fund participations in respect of LC Exposure, to be applied pursuant to clause (ii) below and (B) in the case of the Borrower, its obligations hereunder to reimburse the LC Exposure for which such Defaulting Lender is obligated as a participant.  Borrower or such Defaulting Lender, as applicable, shall execute any documents and agreements, including the Administrative Agent's standard form assignment of deposit accounts, that the Administrative Agent reasonably requests in connection therewith to establish such cash collateral account and to grant the Administrative Agent, for the benefit of the Issuing Bank, a first priority security interest in such account and the funds therein.  If at any time the Administrative Agent determines that cash collateral is subject to any right or claim of any Person other than the Administrative Agent and the Issuing Bank as herein provided, or that the total amount of such cash collateral is less than the amount required above, the Borrower will, promptly upon demand by the Administrative Agent, pay or provide to the Administrative Agent additional cash collateral in an amount sufficient to eliminate such deficiency (after giving effect to any cash collateral provided by the Defaulting Lender).

(ii)     Application.  Notwithstanding anything to the contrary contained in this Agreement, cash collateral provided by a Defaulting Lender under this Section 2.08(k) or Section 2.09 in respect of Letters of Credit shall be applied to the satisfaction of the Defaulting Lender's obligation to fund participations in respect of LC Exposure (including, as to cash collateral provided by a Defaulting Lender, any interest accrued on such obligation) for which the cash collateral was so provided, prior to any other application of such property as may otherwise be provided for herein.

(iii)     Termination of Requirement.  Cash collateral (or the appropriate portion thereof) provided to reduce the Issuing Bank's Fronting Exposure shall no longer be required to be held as cash collateral pursuant to this Section 2.08(k) following (A) the elimination of the applicable Fronting Exposure (including by the termination of Defaulting Lender status of the applicable Lender), or (B) the determination by the Administrative Agent and the Issuing Bank that there exists excess cash collateral; *provided* that, subject to Section 2.09, (x) the Issuing Bank may determine in its sole discretion that cash collateral provided by a Defaulting Lender shall be held to support future anticipated Fronting Exposure or other obligations of such Defaulting Lender and (y) the Borrower and the Issuing Bank may agree that cash collateral provided by the

54

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Borrower shall be held to support future anticipated Fronting Exposure or other obligations; and *provided further* that to the extent that such cash collateral was provided by the Borrower, such cash collateral shall remain subject to any other security interest granted pursuant to the Loan Documents.

(l)    LC Exposure Determination.  For all purposes of this Agreement, the amount of a Letter of Credit that, by its terms or the terms of any document related thereto, provides for one or more automatic increases in the stated amount thereof shall be deemed to be the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at the time of determination.

Section 2.09    Defaulting Lenders.

(a)    Defaulting Lender Adjustments.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)    Waivers and Amendments.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definitions of "Majority Lenders" and "Required Lenders" and as set forth in Section 12.02.

(ii)    Defaulting Lender Waterfall.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article X or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 12.08 shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; *second*, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to the Issuing Bank hereunder; *third*, to cash collateralize the Issuing Bank's Fronting Exposure with respect to such Defaulting Lender in accordance with Section 2.08(k); *fourth*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *fifth*, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released pro rata in order to (x) satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement and (y) cash collateralize the Issuing Bank's future Fronting Exposure with respect to such Defaulting Lender with respect to future Letters of Credit issued under this Agreement, in accordance with Section 2.08(k); *sixth*, to the payment of any amounts owing to the Lenders or the Issuing Bank as a result of any judgment of a court of competent jurisdiction obtained by any Lender or the Issuing Bank against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement;

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

*seventh*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *eighth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (x) such payment is a payment of the principal amount of any Loans or LC Exposure in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made or the related Letters of Credit were issued at a time when the conditions set forth in Section 6.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of, and LC Exposure owed to, all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, or LC Exposure owed to, such Defaulting Lender until such time as all Loans and funded and unfunded participations in LC Exposure are held by the Lenders pro rata in accordance with the Revolving Credit Commitments without giving effect to Section 2.09(a)(iv). Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post cash collateral pursuant to this Section 2.09(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

    (iii)    Certain Fees.

    (A)    No Defaulting Lender shall be entitled to receive any commitment fee pursuant to Section 3.05(a) for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

    (B)    Each Defaulting Lender shall be entitled to receive fees pursuant to Section 3.05(b) for any period during which that Lender is a Defaulting Lender only to the extent allocable to its Applicable Revolving Credit Percentage of the stated amount of Letters of Credit for which it has provided cash collateral pursuant to Section 2.08(k).

    (C)    With respect to any fee pursuant to Section 3.05(b) not required to be paid to any Defaulting Lender pursuant to sub-clause (B) above, the Borrower shall (x) pay to each Non-Defaulting Lender that portion of any such fee otherwise payable to such Defaulting Lender with respect to such Defaulting Lender's participation in Letter of Credit obligations that has been reallocated to such Non-Defaulting Lender pursuant to clause (iv) below, (y) pay to the Issuing Bank the amount of any such fee otherwise payable to such Defaulting Lender to the extent allocable to the Issuing Bank's Fronting Exposure to such Defaulting Lender and (z) not be required to pay the remaining amount of any such fee.

56

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(iv)    Reallocation of Participations to Reduce Fronting Exposure.  All or any part of such Defaulting Lender's participation in LC Exposure shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Applicable Revolving Credit Percentages (calculated without regard to such Defaulting Lender's Maximum Revolving Credit Amount) but only to the extent that such reallocation does not cause the Revolving Credit Exposure of any Non-Defaulting Lender to exceed such Non-Defaulting Lender's Revolving Credit Commitment then in effect.  Subject to Section 12.18, no reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(v)    Cash Collateral.  If the reallocation described in clause (iv) above cannot, or can only partially, be effected, the Borrower shall, without prejudice to any right or remedy available to it hereunder or under law, cash collateralize the Issuing Bank's Fronting Exposure in accordance with the procedures set forth in Section 2.08(k).

(b)    Defaulting Lender Cure.  If the Borrower, the Administrative Agent and the Issuing Bank agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any cash collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans and funded and unfunded participations in Letters of Credit to be held pro rata by the Lenders in accordance with the Revolving Credit Commitments (without giving effect to Section 2.09(a)(iv)), whereupon such Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and *provided*, *further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

(c)    New Letters of Credit.  So long as any Lender is a Defaulting Lender, the Issuing Bank shall not be required to issue, extend, renew or increase any Letter of Credit unless it is satisfied that it will have no Fronting Exposure after giving effect thereto.

## ARTICLE III
## PAYMENTS OF PRINCIPAL AND INTEREST; PREPAYMENTS; FEES

Section 3.01    Repayment of Loans.  The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan on the Termination Date.

57

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Section 3.02   Interest.

(a)   ABR Loans.  The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Margin, but in no event to exceed the Highest Lawful Rate.

(b)   Eurodollar Loans.  The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin, but in no event to exceed the Highest Lawful Rate.

(c)   Post-Default Rate.  Notwithstanding the foregoing, (i) if any Event of Default of the type described in Section 10.01(a), Section 10.01(b), Section 10.01(h), Section 10.01(i) or Section 10.01(j) occurs and is continuing, then (x) all principal in respect of Loans and (y) all fees and other obligations under any Loan Document, in either case, not paid when due shall in each case automatically bear interest at a rate per annum of two percent (2%) plus the rate applicable to (A) in the case of principal, such Loans as provided in Section 3.02(a) or Section 3.02(b), as applicable, or (B) in the case of fees and other obligations, ABR Loans as provided in Section 3.02(a) (including, in each case, the Applicable Margin), but in no event to exceed the Highest Lawful Rate, and shall be payable on written demand by the Administrative Agent and (ii) if any Event of Default occurs (other than an Event of Default described in Section 10.01(a), Section 10.01(b), Section 10.01(h), Section 10.01(i) or Section 10.01(j)) and is continuing, then at the election of the Majority Lenders (or the Administrative Agent at the direction of Majority Lenders), (x) all outstanding principal in respect of Loans and (y) all fees and other obligations under any Loan Document that, in the case of this clause (y), are not paid when due shall, in each case, bear interest at a rate per annum of two percent (2%) plus the rate applicable to (A) in the case of principal, such Loans as provided in Section 3.02(a) or Section 3.02(b), as applicable, or (B) in the case of fees and other obligations, ABR Loans as provided in Section 3.02(a) (including, in each case, the Applicable Margin), but in no event to exceed the Highest Lawful Rate, and shall be payable on written demand by the Administrative Agent.

(d)   Interest Payment Dates.  Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and on the Termination Date; *provided* that (i) interest accrued pursuant to Section 3.02(c) shall be payable on written demand, (ii) in the event of any repayment or prepayment of any Loan (other than an optional prepayment of an ABR Loan prior to the Termination Date), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment, and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)   Interest Rate Computations.  All interest hereunder shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of 365 days (or 366 days in a leap year), except that interest computed by reference to the Alternate Base Rate at times when the

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate, Adjusted LIBO Rate or LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error, and be binding upon the parties hereto.

Section 3.03   Alternate Rate of Interest.   (a) If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(i)      the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable (including, without limitation, because the LIBO Rate is not available or published on a current basis), for such Interest Period; or

(ii)      the Administrative Agent is advised by the Majority Lenders that the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone, fax or other electronic communication subject to Section 12.01(b) as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (iii) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective, and (iv) if any Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made either as an ABR Borrowing or at an alternate rate of interest determined by the Majority Lenders as their cost of funds.

(b)      Notwithstanding anything to the contrary set forth in the foregoing clause (a), if at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in clause (a)(i) have arisen and such circumstances are unlikely to be temporary, (ii) the circumstances set forth in clause (a)(i) have not arisen but the supervisor for the administrator of the LIBO Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the LIBO Rate shall no longer be used for determining interest rates for loans or (iii) new syndicated loans have started to adopt a new benchmark interest rate, then the Administrative Agent and the Borrower shall endeavor to establish an alternate rate of interest to the LIBO Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans in the United States of America at such time, and shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable, provided that to the extent that the Administrative Agent determines that adoption of any portion of such market convention is not administratively feasible or that no market convention for the administration of such alternate

59

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

rate of interest exists, the Administrative Agent shall administer such alternate rate of interest in a manner determined by the Administrative Agent in consultation with the Borrower. Notwithstanding anything to the contrary in Section 12.02, such amendment shall become effective without any further action or consent of any other party to this Agreement so long as the Administrative Agent shall not have received, within five Business Days of the date notice of such alternate rate of interest is provided to the Lenders, a written notice from the Required Lenders  stating that such Required Lenders object to such amendment.  If a notice of an alternate rate of interest has been given and no such alternate rate of interest has been determined, and (x) the circumstances under clause (i) or (iii) of the first sentence of this Section 3.03(b) exist or (y) the specific date referred to in clause (ii) has occurred (as applicable), Alternate Base Rate shall apply to all Borrowings without regard to clause (c) of the definition thereof; provided that, if such alternate rate of interest shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

Section 3.04    Prepayments.

(a)    Optional Prepayments.  The Borrower shall have the right at any time and from time to time to prepay, without premium or penalty subject to Section 5.02, any Borrowing in whole or in part, subject to prior notice in accordance with Section 3.04(b).

(b)    Notice and Terms of Optional Prepayment.  The Borrower shall notify the Administrative Agent by telephone (confirmed by fax or other electronic communication subject to Section 12.01(b)) of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Borrowing, not later than 1:00 p.m., New York City time, three Business Days before the date of prepayment, or (ii) in the case of prepayment of an ABR Borrowing, not later than 1:00 p.m., New York City time, one Business Day before the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; provided that, if a notice of prepayment is given in connection with a conditional notice of termination of the Revolving Credit Commitments as contemplated by Section 2.06(b), then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with Section 2.06(b).  Promptly following receipt of any such notice relating to a Borrowing, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any Borrowing shall be in an aggregate amount that is an integral multiple of $100,000 and a minimum principal amount of $1,000,000.  Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by accrued interest to the extent required by Section 3.02.

(c)    Mandatory Prepayments.

(i)    If, after giving effect to any termination or reduction of the Aggregate Maximum Revolving Credit Amounts pursuant to Section 2.06(b), the total Revolving Credit Exposures exceeds the total Revolving Credit Commitments, then the Borrower shall (A) prepay the Borrowings of Loans on the date of such termination or reduction in an aggregate principal amount equal to such excess, and (B) if any excess

60

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

remains after prepaying all of the Borrowings of Loans as a result of an LC Exposure, deposit with the Administrative Agent on behalf of the Lenders an amount equal to such excess to be held as cash collateral as provided in Section 2.08(j).

(ii)     Upon any redetermination of or adjustment to the amount of the Borrowing Base in accordance with Section 2.07 (other than Section 2.07(e) or Section 2.07(f)) or with Section 8.13(c), if there exists a Borrowing Base Deficiency, then the Borrower shall within ten (10) Business Days following receipt of the New Borrowing Base Notice in accordance with Section 2.07(d) or the date the adjustment occurs, provide written notice (the "Election Notice") to the Administrative Agent stating the action which the Borrower proposes to take to eliminate such Borrowing Base Deficiency, and the Borrower shall thereafter, at its option, either:

(A)     within forty-five (45) days following the delivery of the New Borrowing Base Notice, by instruments reasonably satisfactory in form and substance to the Administrative Agent, provide the Administrative Agent with additional security consisting of Oil and Gas Properties not evaluated in the most recently delivered Reserve Report with value and quality satisfactory to the Administrative Agent and the Required Lenders in their sole discretion (but determined consistent with their respective customary oil and gas lending criteria as it exists at the particular time) to eliminate such Borrowing Base Deficiency;

(B)     within forty-five (45) days following delivery of the New Borrowing Base Notice, prepay without premium or penalty, the Borrowings of Loans in an amount sufficient to eliminate such Borrowing Base Deficiency and, if any Borrowing Base Deficiency remains after prepaying all of the Borrowings of Loans as a result of an LC Exposure, pay to the Administrative Agent on behalf of the Lenders an amount necessary to eliminate such remaining Borrowing Base Deficiency to be held as cash collateral as provided in Section 2.08(j);

(C)     elect to prepay (and thereafter pay), without premium or penalty, the principal amount of Loans necessary to eliminate such Borrowing Base Deficiency in not more than six (6) equal monthly installments plus accrued interest thereon with the first such monthly payment being due within thirty (30) days following delivery of the New Borrowing Base Notice (and, if any Borrowing Base Deficiency remains after prepaying all of the Borrowings of Loans as a result of an LC Exposure, pay to the Administrative Agent on behalf of the Lenders an amount necessary to eliminate such remaining Borrowing Base Deficiency to be held as cash collateral as provided in Section 2.08(j)); or

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(D)      by any combination of prepayment and additional security as provided in the preceding clauses (A), (B) or (C), eliminate such Borrowing Base Deficiency; *provided* that all payments required to be made pursuant to this Section 3.04(c)(ii) must be made on or prior to the Termination Date.

(iii)      Upon any redetermination of the Borrowing Base pursuant to Section 2.07(e) in connection with incurrence of Permitted Senior Additional Debt or pursuant to Section 2.07(f) in connection with a Triggering Disposition, if there exists a Borrowing Base Deficiency, the Borrower shall prepay the Borrowings of Loans in an amount sufficient to eliminate such Borrowing Base Deficiency and, if any Borrowing Base Deficiency remains after prepaying all of the Borrowings of Loans as a result of an LC Exposure, pay to the Administrative Agent on behalf of the Lenders an amount necessary to eliminate such remaining Borrowing Base Deficiency to be held as cash collateral as provided in Section 2.08(j).  The Borrower shall be obligated to make such prepayment and/or deposit of cash collateral within one (1) Business Day following the receipt by any Credit Party of Net Proceeds in respect of such Permitted Senior Additional Debt or such Triggering Disposition, as applicable; *provided* that all payments required to be made pursuant to this Section 3.04(c)(iii) must be made on or prior to the Termination Date.

(iv)      Each prepayment of Borrowings pursuant to this Section 3.04(c) shall be applied first ratably to any ABR Borrowings then outstanding and thereafter to any Eurodollar Borrowings then outstanding, and if more than one Eurodollar Borrowing is then outstanding, to each such Eurodollar Borrowing in order of priority beginning with the Eurodollar Borrowing with the least number of days remaining in the Interest Period applicable thereto and ending with the Eurodollar Borrowing with the most number of days remaining in the Interest Period applicable thereto.

(v)      Each prepayment of Borrowings pursuant to this Section 3.04(c) shall be applied ratably to the Loans included in the prepaid Borrowings.  Prepayments pursuant to this Section 3.04(c) shall be accompanied by accrued interest to the extent required by Section 3.02.

(d)      Excess Cash Balances.  If, on the last Business Day of any calendar week, the Credit Parties have any Excess Cash on such Business Day (other than the proceeds of a Borrowing that will be used within three (3) Business Days of such Borrowing for the purposes set forth on an exhibit to the applicable Borrowing Request (as certified by the Borrower in such Borrowing Request)), the Borrower shall prepay Borrowings on or prior to the second following Business Day, which prepayment shall be in an amount equal to the lesser of (i) the amount of such Excess Cash and (ii) the outstanding principal amount of Loans hereunder.  Each prepayment of Borrowings pursuant to this Section 3.04(d) shall be applied to the Loans as directed by the Borrower, provided that if the Borrower does not provide instructions for the application of such prepayment, such prepayment shall be applied, first, ratably to any ABR

62

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Borrowings then outstanding, and, second, to any Eurodollar Borrowings then outstanding, and if more than one Eurodollar Borrowing is then outstanding, to each such Eurodollar Borrowing in order of priority beginning with the Eurodollar Borrowing with the least number of days remaining in the Interest Period applicable thereto and ending with the Eurodollar Borrowing with the most number of days remaining in the Interest Period applicable thereto. Each prepayment of Borrowings pursuant to this Section 3.04(d) shall be applied ratably to the Loans included in the prepaid Borrowings. Prepayments pursuant to this Section 3.04(d) shall be accompanied by accrued interest to the extent required by Section 3.02.

(e)     No Premium or Penalty. Prepayments permitted or required under this Section 3.04 shall be without premium or penalty, except as required under Section 5.02.

Section 3.05    Fees.

(a)     Revolving Credit Commitment Fees. The Borrower agrees to pay to the Administrative Agent for the account of each Lender a commitment fee, which shall accrue at the applicable Revolving Credit Commitment Fee Rate on the average daily amount of the unused amount of the Revolving Credit Commitment of such Lender during the period from and including the date of this Agreement to but excluding the Termination Date (it being understood that LC Exposure shall constitute usage of the Revolving Credit Commitments for purposes of this Section 3.05(a)). Accrued commitment fees shall be payable in arrears on the last day of March, June, September and December of each year and on the Termination Date, commencing on the first such date to occur after the date hereof. All commitment fees shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case commitment fees shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b)     Letter of Credit Fees. The Borrower agrees to pay (i) to the Administrative Agent for the account of each Lender a participation fee with respect to its participations in Letters of Credit, which shall accrue at the same Applicable Margin used to determine the interest rate applicable to Loans that are Eurodollar Loans on the average daily amount of such Lender's LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the date of this Agreement to but excluding the later of the date on which such Lender's Revolving Credit Commitment terminates and the date on which such Lender ceases to have any LC Exposure, (ii) to the Issuing Bank a fronting fee, which shall accrue at the rate of 0.125% per annum on the average daily amount of the LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the date of this Agreement to but excluding the later of the date of termination of the Revolving Credit Commitments and the date on which there ceases to be any LC Exposure, *provided* that in no event shall such fee be less than $500 during any quarter, and (iii) to the Issuing Bank, for its own account, its standard fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder. Participation fees and fronting fees

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

accrued through and including the last day of March, June, September and December of each year shall be payable on the third Business Day following such last day, commencing on the first such date to occur after the date of this Agreement; *provided* that all such fees shall be payable on the Termination Date and any such fees accruing after the Termination Date shall be payable on demand. Any other fees payable to the Issuing Bank pursuant to this Section 3.05(b) shall be payable within 10 days after demand. All participation fees and fronting fees shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case participation and fronting fees shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c)    Administrative Agent Fees.    The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times set forth in the Fee Letters.

## ARTICLE IV
## PAYMENTS; PRO RATA TREATMENT; SHARING OF SET-OFFS

Section 4.01    Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)    Payments by the Borrower.    The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees or reimbursement of LC Disbursements, or of amounts payable under Section 5.01, Section 5.02, Section 5.03 or otherwise) prior to 1:00 p.m., New York City time, on the date when due, in immediately available funds, without defense, deduction, recoupment, set-off or counterclaim. Fees, once paid, shall be fully earned and shall not be refundable under any circumstances absent manifest error. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at its offices specified in Section 12.01, except payments to be made directly to the Issuing Bank as expressly provided herein and except that payments pursuant to Section 5.01, Section 5.02, Section 5.03 and Section 12.03 shall be made directly to the Persons entitled thereto. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder shall be made in dollars.

(b)    Application of Insufficient Payments.    If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, unreimbursed LC Disbursements, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

parties, and (ii) second, towards payment of principal and unreimbursed LC Disbursements then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and unreimbursed LC Disbursements then due to such parties.

(c)    Sharing of Payments by Lenders.  If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or participations in LC Disbursements resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and participations in LC Disbursements and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans and participations in LC Disbursements of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and participations in LC Disbursements; *provided* that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this Section 4.01(c) shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in LC Disbursements to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this Section 4.01(c) shall apply).  The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

Section 4.02    Presumption of Payment by the Borrower.  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the Issuing Bank that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the Issuing Bank, as the case may be, the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders or the Issuing Bank, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

Section 4.03    Certain Deductions by the Administrative Agent.  If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.05(a), Section 2.08(d),

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Section 2.08(e) or Section 4.02, or otherwise hereunder, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.  If at any time prior to the acceleration or maturity of the Loans, the Administrative Agent shall receive any payment in respect of principal of a Loan or a reimbursement of an LC Disbursement while one or more Defaulting Lenders shall be party to this Agreement, the Administrative Agent shall apply such payment first to the Borrowing(s) for which such Defaulting Lender(s) shall have failed to fund its pro rata share until such time as such Borrowing(s) are paid in full or each Lender (including each Defaulting Lender) is owed its Applicable Revolving Credit Percentage of all Loans then outstanding.  After acceleration or maturity of the Loans, all principal will be paid as provided in Section 10.02(c).

Section 4.04    Collection of Proceeds.  The Security Instruments comprised of deeds of trust and mortgages contain an assignment by the Borrower and/or the Guarantors unto and in favor of the Administrative Agent for the benefit of the Secured Parties of all of the Borrower's or each Guarantor's interest in and to production and all proceeds attributable thereto which may be produced from or allocated to the Mortgaged Property.  The Security Instruments further provide in general for the application of such proceeds to the satisfaction of the Indebtedness and other obligations described therein and secured thereby.  Notwithstanding the terms of any such assignment contained in such Security Instruments, unless an Event of Default has occurred and is continuing, (a) the Administrative Agent and the Lenders agree that they will neither notify the purchaser or purchasers of such production nor take any other action to cause such proceeds to be remitted to the Administrative Agent or the Lenders, but the Administrative Agent and the Lenders will instead permit such proceeds to be paid to and retained by the Borrower and its Restricted Subsidiaries and (b) the Lenders hereby authorize the Administrative Agent to take such actions as may be necessary to cause such proceeds to be paid to the Borrower and/or such Restricted Subsidiaries.

**ARTICLE V**
**INCREASED COSTS; BREAK FUNDING PAYMENTS; TAXES; ILLEGALITY**

Section 5.01    Increased Costs.

(a)    Eurodollar Changes in Law.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate);

(ii)    subject the Administrative Agent, any Lender or the Issuing Bank to any Taxes (other than (A) Indemnified Taxes, or (B) Excluded Taxes) on its loans,

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender or the London interbank market any other condition (other than Taxes) affecting this Agreement or Eurodollar Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender or other recipient of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender or other recipient (whether of principal, interest or otherwise), then the Borrower will pay to such Lender or other recipient such additional amount or amounts as will compensate such Lender or other recipient for such additional costs incurred or reduction suffered.

(b)    Capital Requirements.  If any Lender or the Issuing Bank determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or the Issuing Bank's capital or on the capital of such Lender's or the Issuing Bank's holding company, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by the Issuing Bank, to a level below that which such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the Issuing Bank's policies and the policies of such Lender's or the Issuing Bank's holding company with respect to capital adequacy and liquidity), then from time to time, upon receipt of a certificate described in the following subsection (c), the Borrower will pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company for any such reduction suffered.

(c)    Certificates.  A certificate of a Lender or the Issuing Bank setting forth the amount or amounts necessary to compensate such Lender or the Issuing Bank or its holding company, as the case may be, as specified in Section 5.01(a) or (b) and reasonably detailed calculations thereof shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender or the Issuing Bank, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    Effect of Failure or Delay in Requesting Compensation.  Failure or delay on the part of any Lender or the Issuing Bank to demand compensation pursuant to this Section 5.01 shall not constitute a waiver of such Lender's or the Issuing Bank's right to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender or the Issuing Bank pursuant to this Section 5.01 for any increased costs or reductions incurred more than 270 days prior to the date that such Lender or the Issuing Bank, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the Issuing Bank's intention to claim compensation therefor; *provided*, *further* that, if

67

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

the Change in Law giving rise to such increased costs or reductions is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 5.02    Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan into an ABR Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto, or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 5.04(b), then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event.  In the case of a Eurodollar Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the eurodollar market.

A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 5.02 and reasonably detailed calculations thereof shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

Section 5.03    Taxes.

(a)    Payments Free of Taxes.  Any and all payments by or on account of any obligation of any Credit Party under any Loan Document shall be free and clear of and without deduction or withholding for any Taxes, except as required by applicable law**;** *provided* that if any Withholding Agent shall be required to deduct or withhold any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable by the applicable Credit Party shall be increased as necessary so that after making all required deductions or withholdings (including deductions and withholdings applicable to additional sums payable under this Section 5.03(a)), the Administrative Agent, Lender or Issuing Bank (as the case may be) receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the Withholding Agent shall make such deductions or withholdings and (iii) the Withholding Agent shall pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(b)      Payment of Other Taxes by the Borrower.  The Credit Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)      Indemnification by the Borrower.  The Credit Parties shall jointly and severally indemnify the Administrative Agent, each Lender and the Issuing Bank, within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 5.03) payable or paid by, or required to be deducted or withheld from payment to, the Administrative Agent, such Lender or the Issuing Bank, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate of the Administrative Agent, a Lender or the Issuing Bank as to the amount of such payment or liability under this Section 5.03 shall be delivered to the Borrower (with a copy to the Administrative Agent) and shall be conclusive absent manifest error.

(d)      Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent any Credit Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 12.04(c) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e)      Evidence of Payments.  As soon as practicable after any payment of Taxes by any Credit Party to a Governmental Authority pursuant to Section 5.03, such Credit Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)      Status of Lenders.  (i) Any Lender that is entitled to an exemption from or reduction of withholding tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit

69

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 5.03(f)(ii)(A), Section 5.03(f)(ii)(B) and Section 5.03(g) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

(A)     any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from United States federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States of America is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN (or IRS Form W-8BEN-E, as applicable) establishing an exemption from, or reduction of, United States federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN (or IRS Form W-8BEN-E, as applicable) establishing an exemption from, or reduction of, United States federal withholding tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed copies of IRS Form W-8ECI;

70

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of **Error! Reference source not found.** to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN (or IRS Form W-8BEN-E, as applicable); or

(4)     to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN (or IRS Form W-8BEN-E, as applicable), a U.S. Tax Compliance Certificate substantially in the form of **Error! Reference source not found.** or **Error! Reference source not found.**, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of **Error! Reference source not found.** on behalf of each such direct and indirect partner; and

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Withholding Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Withholding Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Withholding Agent to determine the withholding or deduction required to be made.

Each Lender agrees that if any form or certification it previously delivered under this Section 5.03(f) expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

71

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(g)     FATCA.   Each Lender shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA, to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this Section 5.03(g), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered under this Section 5.03(g) expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so. For purposes of determining withholding Taxes imposed under FATCA, from and after the Effective Date, the Borrower and the Administrative Agent shall treat (and the Lenders hereby authorize the Administrative Agent to treat) the Credit Agreement as not qualifying as a "grandfathered obligation" within the meaning of Treasury Regulation Section 1.1471-2(b)(2)(i).

(h)     Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 5.03 (including by the payment of additional amounts pursuant to this Section 5.03), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)     Survival.   Each party's obligations under this Section shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the

72

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

replacement of, a Lender, the termination of the Revolving Credit Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

(j)    Defined Terms.  For purposes of this Section, the term "Lender" includes any Issuing Bank and the term "applicable law" includes FATCA.

Section 5.04    Mitigation Obligations; Replacement of Lenders.

(a)    Designation of Different Lending Office.  If any Lender requests compensation under Section 5.01, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 5.03, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 5.01 or Section 5.03, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    Replacement of Lenders.  If (i) any Lender requests compensation under Section 5.01, (ii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 5.03, (iii) any Lender becomes a Defaulting Lender hereunder, (iv) any Lender has not approved an increase in the Borrowing Base proposed by the Administrative Agent pursuant to Section 2.07(c)(iii) that has been approved by the Supermajority Lenders, or (v) in addition to the foregoing, in connection with any consent to or approval of any proposed amendment, waiver, consent or release with respect to any Loan Document (other than an increase in the Borrowing Base) that requires the consent of each Lender or the consent of each Lender affected thereby, the consent of the Required Lenders shall have been obtained but such Lender has not so consented to or approved such proposed amendment, waiver, consent or release, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 12.04(b)), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that (1)  such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in LC Disbursements, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (2) in the case of any such assignment resulting from a claim for compensation under Section 5.01 or payments required to be made pursuant to Section 5.03, such assignment will result in a reduction in such compensation or payments.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 5.05    Illegality.  Notwithstanding any other provision of this Agreement, in the event that it becomes unlawful for any Lender or its applicable lending office to honor its obligation to make or maintain Eurodollar Loans either generally or having a particular Interest Period hereunder, then (a) such Lender shall promptly notify the Borrower and the Administrative Agent thereof and such Lender's obligation to make such Eurodollar Loans shall be suspended (the "Affected Loans") until such time as such Lender may again make and maintain such Eurodollar Loans and (b) all Affected Loans which would otherwise be made by such Lender shall be made instead as ABR Loans (and, if such Lender so requests by notice to the Borrower and the Administrative Agent, all Affected Loans of such Lender then outstanding shall be automatically converted into ABR Loans on the date specified by such Lender in such notice) and, to the extent that Affected Loans are so made as (or converted into) ABR Loans, all payments of principal which would otherwise be applied to such Lender's Affected Loans shall be applied instead to its ABR Loans.

## ARTICLE VI
## CONDITIONS PRECEDENT

Section 6.01    Effective Date.  The amendment and restatement of the Prepetition Credit Agreement by this Agreement and the obligations of the Lenders to make Loans (or to be deemed to have made Loans, as applicable) and of the Issuing Bank to issue Letters of Credit hereunder (excluding the Existing Letters of Credit) shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 12.02):

(a)        The Administrative Agent, the Lead Arranger and the Lenders shall have received all commitment, facility, arrangement and agency fees and all other fees and amounts due and payable on or prior to the Effective Date, including, (i) to the extent invoiced at least two (2) Business Days prior to the Effective Date, reimbursement or payment of all reasonable and documented out-of-pocket expenses required to be reimbursed or paid by the Borrower hereunder on or before the Effective Date (including, without limitation, the fees and expenses of Vinson & Elkins L.L.P., counsel to the Administrative Agent), unless such fees and amounts are subject to dispute (other than a dispute with any Credit Party) in accordance with the Cash Collateral Order and (ii) upfront fees for the account of the Lenders in an amount for each such Lender as set forth in the Fee Letters in effect on or prior to the Effective Date.

(b)        The Administrative Agent shall have received a certificate of the Secretary or an Assistant Secretary of the Borrower and each Guarantor setting forth (i) resolutions of its board of directors (or comparable governing body) with respect to the authorization of the Borrower or such Guarantor to execute and deliver the Loan Documents to which it is a party and to enter into the transactions contemplated in those documents, (ii) the officers of the Borrower or such Guarantor (A) who are authorized to sign the Loan Documents to which the Borrower or such Guarantor is a party and (B) who will, until replaced by another officer or officers duly

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

authorized for that purpose, act as its representative for the purposes of signing documents and giving notices and other communications in connection with this Agreement and the transactions contemplated hereby, (iii) specimen signatures of such authorized officers, and (iv) the articles or certificate of incorporation and bylaws (or comparable organizational documents for any Credit Parties that are not corporations) of the Borrower and such Guarantor, certified as being true and complete.  The Administrative Agent and the Lenders may conclusively rely on such certificate until the Administrative Agent receives notice in writing from the Borrower to the contrary.

(c)     The Administrative Agent shall have received certificates of the appropriate State agencies with respect to the existence, qualification and good standing of the Borrower and each Guarantor.

(d)     The Administrative Agent shall have received from each party hereto counterparts (in such number as may be requested by the Administrative Agent) of this Agreement signed on behalf of such party.

(e)     If requested by a Lender at least two (2) Business Days prior to the Effective Date, the Administrative Agent shall have received duly executed Notes payable to such Lender in principal amounts equal to its Maximum Revolving Credit Amount, dated as of the date hereof.

(f)     The Administrative Agent shall have received from each party thereto duly executed counterparts (in such number as may be requested by the Administrative Agent) of the Security Instruments, including the Guaranty Agreement, the Security Agreement, the mortgages and the other Security Instruments described on **Error! Reference source not found.**. In connection with the execution and delivery of the Security Instruments, the Administrative Agent shall:

(i)     be reasonably satisfied that the Security Instruments create first priority, perfected Liens (subject only to Excepted Liens, but subject to the provisos at the end of such definition) on (x) at least 95% of the PV-15 of the Proved Oil and Gas Properties evaluated in the Initial Reserve Report and (y) all other Property purported to be pledged as collateral pursuant to the Security Instruments; and

(ii)     have received certificates, if any, together with undated, blank stock powers for each such certificate, representing all of the issued and outstanding Equity Interests of each of the Guarantors, to the extent such Equity Interests are certificated.

(g)     The Administrative Agent shall have received an opinion of (i) Davis Polk & Wardwell LLP, special counsel to the Borrower, in form and substance reasonably acceptable to the Administrative Agent and its counsel, and (ii) local counsel in any other jurisdictions (including Oklahoma) reasonably requested by the Administrative Agent, in each case in form and substance reasonably acceptable to the Administrative Agent and its counsel.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(h)     The Administrative Agent shall have received a certificate of insurance coverage of the Credit Parties evidencing that the Credit Parties are carrying insurance in accordance with Section 7.12.

(i)     The Administrative Agent shall have received title information as the Administrative Agent may reasonably require satisfactory to the Administrative Agent setting forth the status of title to at least 95% of the PV-15 of the Proved Oil and Gas Properties evaluated in the Initial Reserve Report.

(j)     The Administrative Agent shall be reasonably satisfied with the environmental condition of the Oil and Gas Properties of the Borrower and its Subsidiaries.

(k)     The Borrower shall have received all consents and approvals required by Section 7.03.

(l)     The Administrative Agent shall have received the financial statements referred to in Section 7.04(a), a pro forma balance sheet of the Borrower (after giving effect to the Transactions) and detailed financial projections of the Borrower and its Consolidated Restricted Subsidiaries for five years following the Effective Date (prepared on a quarterly basis for 2021 and an annual basis for each fiscal year thereafter), and the Initial Reserve Report accompanied by a certificate covering the matters described in Section 8.12(c).

(m)     The Administrative Agent shall have received appropriate UCC search certificates and county-level real property record search results reflecting no prior Liens encumbering the Properties of the Borrower and its Restricted Subsidiaries for each jurisdiction requested by the Administrative Agent other than those being assigned or released on or prior to the Effective Date or Liens permitted by Section 9.03.

(n)     The Administrative Agent shall have received, and reasonably satisfactorily completed its review of, all due diligence information regarding the Credit Parties as it shall have requested including, without limitation, information regarding litigation, tax matters, accounting matters, insurance matters, labor matters, pension liabilities (actual or contingent), real estate leases, material contracts, debt agreements, property ownership, contingent liabilities and other legal matters of the Borrower and its Subsidiaries.

(o)     The capitalization structure and equity ownership of each Credit Party after giving effect to the Transactions shall be reasonably satisfactory to the Administrative Agent in all respects (the Administrative Agent acknowledges and agrees that such structure and ownership set forth in the Restructuring Support Agreement dated as of August 15, 2020 among the Borrower, the consenting creditors and the other parties thereto is satisfactory to the Administrative Agent).

(p)     The Administrative Agent shall have received from the Credit Parties, to the extent requested by the Lenders or the Administrative Agent, all documentation and other

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act, no later than 5 days prior to the Effective Date to the extent requested at least 10 days prior to the Effective Date.

(q)     The Administrative Agent shall have received executed copies of each 2025 Second Lien Notes Document (including the Second Lien Intercreditor Agreement) in effect on the Effective Date.

(r)     (i) The Administrative Agent shall have received evidence of the receipt by the Borrower of gross proceeds of the 2025 Second Lien Notes in an amount not less than $35,000,000 and (ii) the Borrower shall have repaid the Prepetition Loans in an amount not less than (A) $35,000,000 plus (B) (1) 100% of the Credit Parties' unrestricted cash on hand (after giving effect to the repayment of the Prepetition Loans contemplated by the foregoing clause (A)) less (2) $5,000,000 less (3) aggregate cash payments scheduled to be made as severance payments to former officers and employees on or about the Effective Date in accordance with the terms of the severance settlement agreements in an amount not to exceed $1,220,000 less (4) other cash payments required to be made on or about the Effective Date pursuant to the Plan of Reorganization.

(s)     (i) The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably satisfactory to the Administrative Agent and the Confirmation Order shall be in full force and effect, not subject to any stay, and shall not have been amended in any manner materially adverse to the Lenders, and (ii) all conditions to the Effective Date (as defined in the Plan of Reorganization) of the Plan of Reorganization shall have been satisfied (or will be satisfied upon the occurrence of the Effective Date) or waived, such Effective Date (as defined in the Plan of Reorganization) shall have occurred or shall occur substantially contemporaneously with the Effective Date, and the consummation of the Plan of Reorganization in accordance with its terms shall have occurred or shall occur substantially contemporaneously with the Effective Date.  The Confirmation Order shall approve the Loan Documents and authorize the Credit Parties' execution and delivery thereof.

(t)     After giving effect to the initial Loans made or deemed made and Letters of Credit issued or deemed issued hereunder on the Effective Date, Availability shall be not less than $20,000,000.

Without limiting the generality of the provisions of Section 11.04, for purposes of determining compliance with the conditions specified in this Section 6.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required under this Section 6.01 to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the Effective Date specifying its objection thereto.  All documents executed or submitted pursuant to this Section 6.01 by and on behalf of the Borrower or any of its Subsidiaries shall be in form and substance reasonably satisfactory to the

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Administrative Agent and its counsel.  The Administrative Agent shall notify the Borrower and the Lenders of the Effective Date, and such notice shall be conclusive and binding.

Section 6.02    Each Credit Event.  The obligation of each Lender to make a Loan (or to be deemed to have made a Loan, as applicable) on the occasion of any Borrowing (including the initial funding but excluding any conversion of Loans to the other Type or continuation of Eurodollar Loans), and of the Issuing Bank to issue, amend, renew or extend any Letter of Credit, is subject to the satisfaction of the following conditions:

(a)    At the time of and immediately after giving effect to such Borrowing or the issuance, amendment, renewal or extension of such Letter of Credit, as applicable, no Default or Borrowing Base Deficiency shall have occurred and be continuing.

(b)    The representations and warranties of the Borrower and the Guarantors set forth in this Agreement and in the other Loan Documents shall be true and correct in all material respects on and as of the date of such Borrowing or the date of issuance, amendment, renewal or extension of such Letter of Credit, as applicable, except to the extent (i) that any such representations and warranties are expressly limited to an earlier date, in which case, on and as of the date of such Borrowing or the date of issuance, amendment, renewal or extension of such Letter of Credit, as applicable, such representations and warranties shall continue to be true and correct in all material respects as of such specified earlier date, and (ii) that any such representation and warranty is expressly qualified by materiality or by reference to Material Adverse Effect, in which case such representation and warranty (as so qualified) shall continue to be true and correct in all respects.

(c)    The making of such Loan or the issuance, amendment, renewal or extension of such Letter of Credit, as applicable, would not conflict with, or cause any Lender or the Issuing Bank to violate or exceed, any applicable Governmental Requirement in any material respect, and no material litigation shall be pending or threatened in writing, which does or, with respect to any such threatened litigation, seeks to, enjoin, prohibit or restrain, the making or repayment of any Loan, the issuance, amendment, renewal, extension or repayment of any Letter of Credit or any participations therein or the consummation of the transactions contemplated by this Agreement or any other Loan Document.

(d)    The receipt by the Administrative Agent of a Borrowing Request in accordance with Section 2.03 or a request for a Letter of Credit (or an amendment, extension or renewal of a Letter of Credit) in accordance with Section 2.08(b), as applicable.

(e)    Solely with respect to any Borrowing of Loans, (i) the Credit Parties shall not have any Excess Cash at the time of such Borrowing and (ii) such Borrowing (after giving effect to the use of proceeds therefrom (as certified by the Borrower in the applicable Borrowing Request; provided that such use of proceeds must be something other than cash on the Credit Parties' balance sheet) within three (3) Business Days of such date) would not otherwise cause the Credit Parties to have any Excess Cash.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Each request for a Borrowing and each request for the issuance, amendment, renewal or extension of any Letter of Credit shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in Section 6.02(a) through (c) and (e).

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lenders that:

Section 7.01    Organization; Powers.    Each of the Borrower and the Restricted Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority, and has all material governmental licenses, authorizations, consents and approvals necessary, to own its assets and to carry on its business as now conducted, and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where failure to have such power, authority, licenses, authorizations, consents, approvals and qualifications could not reasonably be expected to have a Material Adverse Effect.

Section 7.02    Authority; Enforceability.    The Transactions are within the Borrower's and each Guarantor's corporate, limited liability company, or partnership powers and have been duly authorized by all necessary corporate, limited liability company, or partnership action and, if required, action by any holders of its Equity Interests (including, without limitation, any action required to be taken by any class of directors, managers or supervisors of the Borrower or any other Person, whether interested or disinterested, in order to ensure the due authorization of the Transactions).  Each Loan Document to which the Borrower and each Guarantor is a party has been duly executed and delivered by the Borrower and such Guarantor and constitutes a legal, valid and binding obligation of the Borrower and such Guarantor, as applicable, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 7.03    Approvals; No Conflicts.  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority or any other third Person (including holders of its Equity Interests or any class of directors, managers or supervisors, as applicable, whether interested or disinterested, of the Borrower or any other Person), nor is any such consent, approval, registration, filing or other action necessary for the validity or enforceability of any Loan Document or the consummation of the Transactions, except such as have been obtained or made and are in full force and effect other than (i) the recording and filing of the Security Instruments as required by this Agreement and (ii) those third party approvals or consents which, if not made or obtained, would not cause a Default hereunder, could not reasonably be expected to have a Material Adverse Effect or do not have an adverse effect on the enforceability of the Loan Documents, (b) will not violate any applicable law or regulation in any material respect or the charter, bylaws or other organizational

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

documents of the Borrower or any Restricted Subsidiary in any respect or any order of any Governmental Authority in any material respect, (c) will not violate or result in a default under any indenture, agreement or other instrument in respect of Material Debt binding upon the Borrower or any Restricted Subsidiary or any of their Properties, or give rise to a right thereunder to require any payment to be made by the Borrower or such Restricted Subsidiary, (d) will not violate in any material respect or result in a default under any indenture, agreement or other instrument (other than those in respect of Material Debt) binding upon the Borrower or any Restricted Subsidiary or any of their Properties, or give rise to a right thereunder to require any payment to be made by the Borrower or such Restricted Subsidiary,  and (e) will not result in the creation or imposition of any Lien on any Property of the Borrower or any Restricted Subsidiary (other than the Liens created by the Loan Documents).

Section 7.04    Financial Condition; No Material Adverse Change.

(a)    The Borrower has heretofore furnished to the Lenders its consolidated balance sheet and statements of income, stockholders equity and cash flows (i) as of and for the fiscal year ended December 31, 2019, reported on by Grant Thornton LLP, independent public accountants and (ii) as of and for the fiscal quarter ended June 30, 2020 and the portion of the fiscal year ended on such date certified by a Financial Officer.  Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower and its Consolidated Restricted Subsidiaries as of such dates and for such periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the unaudited quarterly financial statements.

(b)    Since the Effective Date, (i) there has been no event, development or circumstance that has had or could reasonably be expected to have a Material Adverse Effect and (ii) the business of the Borrower and its Restricted Subsidiaries has been conducted only in the ordinary course consistent with past business practices.

(c)    Neither the Borrower nor any Restricted Subsidiary has on the date hereof any material Debt (including Disqualified Capital Stock) or any material off-balance sheet liabilities or partnerships, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments, except for the Indebtedness or as referred to or reflected or provided for in the Financial Statements or other written information provided by the Borrower to the Administrative Agent and the Lenders prior to the date hereof.

Section 7.05    Litigation.

(a)    Except as set forth on Schedule 7.05, as of the Effective Date, there are no material actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority pending against the Borrower or any Restricted Subsidiary with respect to which the Borrower or any Restricted Subsidiary has received service of process or other written notice, or threatened in writing against or affecting the Borrower or any Restricted Subsidiary. There are no

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority pending against the Borrower or any Restricted Subsidiary with respect to which the Borrower or any Restricted Subsidiary has received service of process or other written notice, or threatened in writing against or affecting the Borrower or any Restricted Subsidiary (i) not fully covered by insurance (except for normal deductibles) as to which there is a reasonable probability of an adverse determination that, if adversely determined, would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, or (ii) that challenge the validity or enforceability of any Loan Document or the Transactions.

(b)    Since the date of this Agreement, there has been no change in the status of the matters disclosed in Schedule 7.05 that, individually or in the aggregate, has resulted in, or could reasonably be expected to have, a Material Adverse Effect.

Section 7.06    Environmental Matters.    Except for such matters as set forth on Schedule 7.06 or that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect on the Borrower:

(a)    the Borrower and its Subsidiaries and each of their respective Properties and operations thereon are, and within all applicable statute of limitation periods have been, in compliance with all applicable Environmental Laws.

(b)    the Borrower and its Subsidiaries have obtained all Environmental Permits required for their respective operations and each of their Properties, with all such Environmental Permits being currently in full force and effect, and none of Borrower or its Subsidiaries has received any written notice or otherwise has knowledge that any such existing Environmental Permit will be revoked or that any application for any new Environmental Permit or renewal of any existing Environmental Permit will be protested or denied.

(c)    there are no claims, demands, suits, orders, inquiries, or proceedings concerning any violation of, or any liability (including as a potentially responsible party) under, any applicable Environmental Laws that is pending or threatened in writing against the Borrower or any Subsidiary or any of their respective Properties or as a result of any operations at such Properties.

(d)    to the Borrower's knowledge, none of the Properties of the Borrower or any Subsidiary contain or have contained any:  (i) underground storage tanks; (ii) asbestos-containing materials; (iii) landfills or dumps; (iv) hazardous waste management units as defined pursuant to RCRA or any comparable state law; or (v) sites on or nominated for the National Priority List promulgated pursuant to CERCLA or any state remedial priority list promulgated or published pursuant to any comparable state law.

(e)    there has been no Release or, to the Borrower's knowledge, threatened Release, of Hazardous Materials at, on, under or from the Borrower's or any Subsidiary's Properties, there are no investigations, remediations, abatements, removals, or monitorings of

81

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Hazardous Materials required under applicable Environmental Laws at such Properties and, to the knowledge of the Borrower, none of such Properties are adversely affected by any Release or threatened Release of a Hazardous Material originating or emanating from any other real property.

(f)    neither the Borrower nor any Subsidiary has received any written notice asserting an alleged liability or obligation under any applicable Environmental Laws with respect to the investigation, remediation, abatement, removal, or monitoring of any Hazardous Materials at, under, or Released or threatened to be Released from any real properties offsite of the Borrower's or any Subsidiary's Properties and, to the Borrower's knowledge, there are no conditions or circumstances that could reasonably be expected to result in the receipt of such written notice.

(g)    there has been no exposure of any Person or Property to any Hazardous Materials as a result of or in connection with the operations and businesses of any of the Borrower's or its Subsidiaries' Properties that could reasonably be expected to form the basis for a claim for damages or compensation.

The Borrower and its Subsidiaries have made available to the Administrative Agent complete and correct copies of all material written environmental site assessment reports, investigations, studies, analyses, and correspondence on environmental matters (including matters relating to any alleged non-compliance with or liability under Environmental Laws) requested by the Administrative Agent that are in any of the Borrower's or the Subsidiaries' possession or control and relating to their respective Properties or operations thereon and that are not otherwise subject to the attorney-client privilege, work product doctrine, or any other confidentiality agreements.

Section 7.07    Compliance with the Laws and Agreements; No Defaults.

(a)    Each of the Borrower and each Restricted Subsidiary is in compliance with all Governmental Requirements applicable to it or its Property and all agreements and other instruments binding upon it or its Property, and possesses all licenses, permits, franchises, exemptions, approvals and other governmental authorizations necessary for the ownership of its Property and the conduct of its business, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)    Neither the Borrower nor any Restricted Subsidiary is in default nor has any event or circumstance occurred which, but for the expiration of any applicable grace period or the giving of notice, or both, would constitute a default or would require the Borrower or a Restricted Subsidiary to Redeem or make any offer to Redeem under any indenture, note, credit agreement or instrument pursuant to which any Material Debt is outstanding or by which the Borrower or any Restricted Subsidiary or any of their Properties is bound.

(c)    No Default has occurred and is continuing.

82

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Section 7.08    Investment Company Act.  Neither the Borrower nor any Subsidiary is an "investment company" or a company "controlled" by an "investment company," within the meaning of, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 7.09    Taxes.  Each of the Borrower and its Subsidiaries has timely filed or caused to be filed all material Tax returns and reports required to have been filed and has paid or caused to be paid all material Taxes required to have been paid by it, except Taxes that are being contested in good faith by appropriate proceedings and for which the Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves in accordance with GAAP. The charges, accruals and reserves on the books of the Borrower and its Subsidiaries in respect of Taxes and other governmental charges are, in the reasonable opinion of the Borrower, adequate.  No Tax Lien has been filed and, to the knowledge of the Borrower, no claim is being asserted with respect to any such Tax or other such governmental charge.

Section 7.10    ERISA.  Except as would not reasonably be expected to result in liability to the Borrower and its Subsidiaries in excess of the Threshold Amount:

(a)    The Borrower and its Subsidiaries have complied in all material respects with ERISA and, where applicable, the Code regarding each Plan.

(b)    Each Pension Plan and Plan is, and has been, established and maintained in substantial compliance with its terms, ERISA and, where applicable, the Code.

(c)    No act, omission or transaction has occurred which could result in imposition on the Borrower or any Subsidiary (whether directly or indirectly) of (i) either a civil penalty assessed pursuant to subsections (c), (i), (l) or (m) of section 502 of ERISA or a tax imposed pursuant to Chapter 43 of Subtitle D of the Code or (ii) breach of fiduciary duty liability damages under section 409 of ERISA.

(d)    Full payment when due has been made of all amounts which the Borrower, its Subsidiaries or the ERISA Affiliates are required under the terms of each Pension Plan and Plan or applicable law to have paid as contributions to such Pension Plan and Plan as of the date hereof.

(e)    Neither the Borrower nor its Subsidiaries sponsors, maintains, or contributes to an employee welfare benefit plan, as defined in section 3(1) of ERISA, including, without limitation, any such plan maintained to provide benefits to former employees of such entities, that may not be terminated by the Borrower or any Subsidiary in its sole discretion at any time without any material liability.

Section 7.11    Disclosure; No Material Misstatements.  The Borrower has disclosed to the Administrative Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Restricted Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Material Adverse Effect.  Taken as a whole, the reports, financial statements, certificates or other information furnished by or on behalf of the Borrower or any Restricted Subsidiary to the Administrative Agent or any Lender or any of their Affiliates in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or under any other Loan Document (as modified or supplemented by other information so furnished) do not contain any material misstatement of fact or omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading as of the date such information is dated or certified; *provided* that (a) with respect to projected financial information, pro forma financial information, prospect information, geological and geophysical data, Reserve Reports and engineering projections, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time (it being recognized by the Lenders, however, that projections as to future events are not to be viewed as facts and that results during the period(s) covered by such projections may differ from the projected results and that such differences may be material and that the Borrower makes no representation that such projections will be realized) and (b) as to statements, information and reports supplied by third parties, the Borrower represents only that it is not aware of any material misstatement or omission therein.  To the knowledge of the Borrower, there is no fact peculiar to the Borrower or any Restricted Subsidiary which could reasonably be expected to have a Material Adverse Effect or in the future is reasonably likely to have a Material Adverse Effect and which has not been set forth in this Agreement or the Loan Documents or the other documents, certificates and statements furnished to the Administrative Agent or the Lenders by or on behalf of the Borrower or any Restricted Subsidiary prior to, or on, the date hereof in connection with the transactions contemplated hereby.  There are no statements or conclusions in any Reserve Report which are based upon or include materially misleading information or fail to take into account material information known to the Borrower regarding the matters reported therein, provided that (i) with respect to any Reserve Report prepared by one or more Approved Petroleum Engineers, the Borrower represents only that it exercised due care in furnishing information to such Approved Petroleum Engineers so that they could prepare such Reserve Report, and that such information was not misleading and did not fail to take into account material information known to the Borrower regarding the matters reported therein, and (ii) it is understood that projections concerning volumes attributable to the Oil and Gas Properties of the Borrower and its Restricted Subsidiaries and production and cost estimates contained in each Reserve Report are necessarily based upon professional opinions, estimates and projections and that the Borrower and its Restricted Subsidiaries do not warrant that such opinions, estimates and projections will ultimately prove to have been accurate.

Section 7.12    Insurance.    The Borrower has, and has caused all of its Restricted Subsidiaries to have, (a) all insurance policies sufficient for the compliance by each of them with all material Governmental Requirements and all material agreements and (b) insurance coverage in at least amounts and against such risk (including, without limitation, public liability) that are usually insured against by companies similarly situated and engaged in the same or a similar business for the assets and operations of the Borrower and its Restricted Subsidiaries.  The Administrative Agent and the Lenders have been named as additional insureds in respect of such

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

liability insurance policies and the Administrative Agent has been named as lender loss payee with respect to Property loss insurance.

Section 7.13    Restriction on Liens.   Neither the Borrower nor any of its Restricted Subsidiaries is a party to any material agreement or arrangement (other than (i) Capital Leases creating Liens permitted by Section 9.03(d), but then only on the Property subject of such Capital Lease, (ii) the Permitted Second Lien Debt  Documents, and (iii) Permitted Senior Additional Debt Documents, or subject to any order, judgment, writ or decree, which either restricts or purports to restrict its ability to grant Liens to the Administrative Agent for the benefit of the Secured Parties on or in respect of their Properties to secure the Indebtedness and the Loan Documents.

Section 7.14    Subsidiaries.   Except as set forth on Schedule 7.14 or as disclosed in writing to the Administrative Agent (which shall promptly furnish a copy to the Lenders), which shall be a supplement to Schedule 7.14, the Borrower has no Subsidiaries and the Borrower has no Foreign Subsidiaries.  Each Subsidiary listed in Schedule 7.14 is a Material Subsidiary unless specifically designated as an Immaterial Subsidiary.  Each Subsidiary listed in Schedule 7.14 is a Restricted Subsidiary unless specifically designated as an Unrestricted Subsidiary on the date hereof or in accordance with Section 9.23(b).

Section 7.15    Location of Business and Offices.    The Borrower's jurisdiction of organization is Delaware; the name of the Borrower as listed in the public records of its jurisdiction of organization is Chaparral Energy, Inc.; and the organizational identification number of the Borrower in its jurisdiction of organization is 4030106 (or, in each case, as set forth in a notice delivered to the Administrative Agent pursuant to Section 8.01(n) in accordance with Section 12.01).  The Borrower's principal place of business and chief executive offices are located at the address specified in Section 12.01 (or as set forth in a notice delivered pursuant to Section 8.01(n)) and Section 12.01(c)).  Each Subsidiary's jurisdiction of organization, name as listed in the public records of its jurisdiction of organization, organizational identification number in its jurisdiction of organization, and the location of its principal place of business and chief executive office is stated on Schedule 7.14 (or as set forth in a notice delivered pursuant to Section 8.01(n)).

Section 7.16    Properties; Titles, Etc.

(a)    Each of the Borrower and the Restricted Subsidiaries has good and defensible title (subject to Immaterial Title Deficiencies) to the Proved Oil and Gas Properties evaluated in the most recently delivered Reserve Report and good title in all material respects to all its personal Properties, in each case, free and clear of all Liens except Liens permitted by Section 9.03.  After giving full effect to the Excepted Liens, the Borrower or the Restricted Subsidiary specified as the owner owns the net interests in production attributable to the Hydrocarbon Interests as reflected in the most recently delivered Reserve Report, and the ownership of such Properties shall not in any material respect obligate the Borrower or such Restricted Subsidiary to bear the costs and expenses relating to the maintenance, development and

85

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

operations of each such Property in an amount in excess of the working interest of each Property set forth in the most recently delivered Reserve Report that is not offset by a corresponding proportionate increase in the Borrower's or such Restricted Subsidiary's net revenue interest in such Property.

(b)     All material leases and agreements necessary for the conduct of the business of the Borrower and its Restricted Subsidiaries are valid and subsisting, in full force and effect, and there exists no default or event or circumstance which with the giving of notice or the passage of time or both would give rise to a default under any such lease or leases, which could reasonably be expected to have a Material Adverse Effect.

(c)     The rights and Properties presently owned, leased or licensed by the Borrower and its Restricted Subsidiaries including, without limitation, all easements and rights of way, include all rights and Properties necessary to permit the Borrower and its Restricted Subsidiaries to conduct their business in all material respects in the same manner as its business has been conducted prior to the date hereof.

(d)     All of the material Properties of the Borrower and its Restricted Subsidiaries which are reasonably necessary for the operation of their businesses are in good working condition and are maintained in accordance with prudent business standards.

(e)     The Borrower and each Restricted Subsidiary owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual Property material to its business, and the use thereof by the Borrower and such Restricted Subsidiary does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  The Borrower and its Restricted Subsidiaries either own or have valid licenses or other rights to use all databases, geological data, geophysical data, engineering data, seismic data, maps, interpretations and other technical information used in their businesses as presently conducted, subject to the limitations contained in the agreements governing the use of the same, which limitations are customary for companies engaged in the business of the exploration and production of Hydrocarbons, with such exceptions as could not reasonably be expected to have a Material Adverse Effect.

Section 7.17   <u>Maintenance of Properties</u>.  Except for such acts or failures to act as could not be reasonably expected to have a Material Adverse Effect, the Proved Oil and Gas Properties (and Properties unitized therewith) of the Borrower and its Restricted Subsidiaries have been maintained, operated and developed in a good and workmanlike manner and in conformity with all Governmental Requirements and in conformity with the provisions of all leases, subleases or other contracts comprising a part of the Hydrocarbon Interests and other contracts and agreements forming a part of such Oil and Gas Properties of the Borrower and its Restricted Subsidiaries.  Specifically in connection with the foregoing, except for those as could not be reasonably expected to have a Material Adverse Effect, (a) no Proved Oil and Gas Property of the Borrower or any Restricted Subsidiary is subject to having allowable production reduced

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

below the full and regular allowable (including the maximum permissible tolerance) because of any overproduction (whether or not the same was permissible at the time) and (b) none of the wells comprising a part of the Proved Oil and Gas Properties (or Properties unitized therewith) of the Borrower or any Restricted Subsidiary is deviated from the vertical more than the maximum permitted by Governmental Requirements, and such wells are, in fact, bottomed under and are producing from, and the well bores are wholly within, such Oil and Gas Properties (or in the case of wells located on Properties unitized therewith, such unitized Properties) in which the Borrower or such Restricted Subsidiary owns an interest.  All pipelines, wells, gas processing plants, platforms and other material improvements, fixtures and equipment owned in whole or in part by the Borrower or any of its Restricted Subsidiaries that are necessary to conduct normal operations are being maintained in a state adequate to conduct normal operations, and with respect to such of the foregoing which are operated by the Borrower or any of its Restricted Subsidiaries, in a manner consistent with the Borrower's or its Restricted Subsidiaries' past practices (other than those the failure of which to maintain in accordance with this Section 7.17 could not reasonably be expected to have a Material Adverse Effect).

Section 7.18    Gas Imbalances, Prepayments.  Except as set forth on Schedule 7.18 or on the most recent certificate delivered pursuant to Section 8.12(c), on a net basis there are no gas imbalances, take or pay or other prepayments which would require the Borrower or any of its Restricted Subsidiaries to deliver Hydrocarbons produced from their Proved Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor exceeding one bcf of gas (on an mcf equivalent basis) in the aggregate.

Section 7.19    Marketing of Production.  Except for contracts listed and in effect on the date hereof on Schedule 7.19, and thereafter either disclosed in writing to the Administrative Agent or included in the most recently delivered Reserve Report (with respect to all of which contracts the Borrower represents that it or its Restricted Subsidiaries are receiving a price for all production sold thereunder which is computed substantially in accordance with the terms of the relevant contract and are not having deliveries curtailed substantially below the subject Property's delivery capacity), no material agreements exist which are not cancelable on 60 days' notice or less without penalty or detriment for the sale of production from the Borrower's or its Restricted Subsidiaries' Hydrocarbons (including, without limitation, calls on or other rights to purchase, production, whether or not the same are currently being exercised) that (a) pertain to the sale of production at a fixed price and (b) have a maturity or expiry date of longer than six (6) months from the date hereof.

Section 7.20    Swap Agreements and Qualified ECP Guarantor.  Schedule 7.20, as of the date hereof, and after the date hereof, each report required to be delivered by the Borrower pursuant to Section 8.01(f), as of the date of (or as of the date(s) otherwise set forth in) such report, sets forth, a true and complete list of all Swap Agreements of the Borrower and each Restricted Subsidiary, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the estimated net mark to market value thereof, all credit support agreements relating thereto other than Loan Documents (including any

87

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

margin required or supplied) and the counterparty to each such agreement.  The Borrower is a Qualified ECP Guarantor.

Section 7.21    Use of Loans and Letters of Credit.  The proceeds of the Loans and the Letters of Credit shall be used for the deemed restructuring and rearrangement of the Debt under the Prepetition Credit Agreement, to pay fees, commissions and expenses in connection with the transactions contemplated hereunder, to provide working capital for exploration and production operations, for acquisitions of Oil and Gas Properties permitted hereunder and for general corporate purposes.  The Borrower and its Restricted Subsidiaries are not engaged principally, or as one of its or their important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying margin stock (within the meaning of Regulation T, U or X of the Board).  No part of the proceeds of any Loan or Letter of Credit will be used by the Borrower or any Restricted Subsidiary for any purpose which violates the provisions of Regulations T, U or X of the Board.

Section 7.22    Solvency.  After giving effect to the transactions contemplated hereby (including each Borrowing hereunder and each issuance or extension of any Letter of Credit), (a) the aggregate assets (after giving effect to amounts that could reasonably be received by reason of indemnity, offset, insurance or any similar arrangement), at a fair valuation, of the Borrower and the Guarantors, taken as a whole, will exceed the aggregate Debt of the Borrower and the Guarantors on a consolidated basis, as the Debt becomes absolute and matures, (b) the Borrower and the Guarantors, on a consolidated basis, will not have incurred or intended to incur, and will not believe that they will incur, Debt beyond their ability to pay such Debt (after taking into account the timing and amounts of cash to be received by the Borrower and the Guarantors and the amounts to be payable on or in respect of its liabilities, and giving effect to amounts that could reasonably be received by reason of indemnity, offset, insurance or any similar arrangement) as such Debt becomes absolute and matures, and (c)  the Borrower and the Guarantors, on a consolidated basis, will not have (and will have no reason to believe that they will have thereafter) unreasonably small capital for the conduct of their businesses.

Section 7.23    Anti-Corruption Laws; Sanctions.

(a)    The Borrower has implemented and maintains in effect such policies and procedures, if any, as it reasonably deems appropriate, in light of its business and international activities (if any), to achieve compliance in all material respects by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with applicable Anti-Corruption Laws and applicable Sanctions.

(b)    The Borrower, its Subsidiaries, and, to the knowledge of the Borrower, their respective officers, employees, directors and agents are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects.

(c)    The Borrower, its Subsidiaries, their respective officers and employees, and, to the knowledge of the Borrower, its directors and agents are not engaged in any activity

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

that would reasonably be expected to result in any Credit Party being designated as a Sanctioned Person.

(d)     None of (x) the Borrower, any Subsidiary or any of their respective directors, officers or employees, or (y) to the knowledge of the Borrower, any agent of the Borrower that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.   The Borrower will not directly or indirectly use the proceeds from the Loans or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person, for the purpose of financing the activities of any Person subject to any applicable Sanctions.

Section 7.24   EEA Financial Institutions.   No Credit Party is an EEA Financial Institution.

Section 7.25   Security Instruments.  The Security Instruments are effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Mortgaged Properties and proceeds thereof, subject, in the case of enforceability, to applicable bankruptcy, insolvency or similar laws affecting creditors' rights generally and to general principles of equity and principles of good faith and fair dealing.

**ARTICLE VIII**
**AFFIRMATIVE COVENANTS**

Until the Revolving Credit Commitments have expired or been terminated and the principal of and interest on each Loan and all fees payable hereunder and all other amounts (other than contingent indemnity obligations for which no claim has been made) payable under the Loan Documents shall have been paid in full and all Letters of Credit shall have expired or terminated and all LC Disbursements shall have been reimbursed, the Borrower covenants and agrees with the Lenders that:

Section 8.01   Financial Statements; Other Information.  The Borrower will furnish to the Administrative Agent for delivery to each Lender:

(a)     Annual Financial Statements.   As soon as available, but in any event in accordance with then applicable law and not later than ninety (90) days after the end of each fiscal year of the Borrower, its audited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case (other than after the implementation of fresh start accounting) in comparative form the figures for the previous fiscal year, all reported on by Grant Thornton LLP or other independent public accountants of recognized national standing or otherwise reasonably approved by the Administrative Agent (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

operations of the Borrower and its Consolidated Restricted Subsidiaries on a consolidated basis in accordance with GAAP consistently applied.

(b)      Quarterly Financial Statements.  As soon as available, but in any event in accordance with then applicable law and not later than forty-five (45) days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower, its consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case (other than after the implementation of fresh start accounting) in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its Consolidated Restricted Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes.

(c)      Certificate of Financial Officer — Compliance.  Not later than forty-five (45) days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower and not later than ninety (90) days after the end of each fiscal year of the Borrower, a certificate of a Financial Officer in substantially the form of **Error! Reference source not found.** hereto (i) certifying as to whether a Default has occurred and, if a Default has occurred and is continuing, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) setting forth reasonably detailed calculations demonstrating compliance (or non-compliance) with Section 9.01 and (iii) stating whether any change in GAAP or in the application thereof has occurred since the date of the most recent audited financial statements delivered hereunder that effects the financial statements accompanying such certificate and specifying the affects thereof on such financial statements.  In addition, concurrently with the delivery of any such certificate, with respect to any fiscal period for which the Asset Coverage Ratio was tested under Section 9.01(c) as of the last day of such fiscal period, the Borrower shall deliver to the Administrative Agent its internal engineering database as rolled forward pursuant to the definition of "Total PDP PV-15".

(d)      Cash Flow and Capital Expenditure Forecast.  As soon as available, but in any event not later than April 1st and October 1st of each fiscal year of the Borrower, a cash flow and capital expenditure forecast for the Borrower and its Consolidated Restricted Subsidiaries for the following twelve-month period, prepared on a quarterly basis.

(e)      Certificate of Financial Officer – Consolidating Information.  If, at any time, all of the Consolidated Subsidiaries of the Borrower are not Consolidated Restricted Subsidiaries, then concurrently with any delivery of financial statements under Section 8.01(a) or Section 8.01(b), a certificate of a Financial Officer setting forth consolidating spreadsheets that show all of the Consolidated Unrestricted Subsidiaries and the eliminating entries, in such form as would be presentable to the auditors of the Borrower.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(f)      <u>Certificate of Financial Officer – Swap Agreements</u>.  Concurrently with the delivery of each Reserve Report hereunder, a certificate of a Financial Officer, in form and substance reasonably satisfactory to the Administrative Agent, setting forth as of the last Business Day of such fiscal quarter or such fiscal year, as applicable, a true and complete list of all Swap Agreements of the Borrower and each Restricted Subsidiary, the material economic terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark-to-market value therefor, any new credit support agreements relating thereto not listed on <u>Schedule 7.20</u>, any margin required or supplied under any credit support document, and the counterparty to each such agreement.

(g)      <u>Certificate of Insurer – Insurance Coverage</u>.  Concurrently with any delivery of financial statements under <u>Section 8.01(a)</u>, a certificate of insurance coverage from each insurer with respect to the insurance required by <u>Section 8.07</u>, in form and substance reasonably satisfactory to the Administrative Agent, and, if requested by the Administrative Agent, all copies of the applicable policies.

(h)      <u>Other Accounting Reports</u>.  Promptly upon receipt thereof, a copy of each other report or letter submitted to the Borrower or any of its Consolidated Restricted Subsidiaries by independent accountants in connection with any annual, interim or special audit made by them of the books of the Borrower or any such Consolidated Restricted Subsidiary, and a copy of any delivered written response by the Borrower or any such Consolidated Restricted Subsidiary, or the board of directors (or comparable governing body) of the Borrower or any such Consolidated Restricted Subsidiary, to such letter or report.

(i)      <u>SEC and Other Filings; Reports to Shareholders</u>.  Promptly after the same become publicly available, (i) copies of all periodic and other reports, proxy statements and other materials filed by the Borrower or any Restricted Subsidiary with the SEC, or with any national securities exchange, other than Forms 10-Q and 10-K, or (ii) copies of materials distributed by the Borrower to its equityholders generally.

(j)      <u>Notices Under Material Instruments</u>.  Promptly after the furnishing thereof, copies of any financial statement, report or written notice furnished to or by any Person pursuant to the terms of any preferred stock designation, indenture, loan or credit or other similar agreement with respect to Material Debt, other than this Agreement and not otherwise required to be furnished to the Lenders pursuant to any other provision of this <u>Section 8.01</u>.

(k)      <u>Lists of Purchasers</u>.  Promptly following the written request of the Administrative Agent, a list of all Persons currently purchasing Hydrocarbons from the Borrower or any Restricted Subsidiary.

(l)      <u>Notice of Sales of Oil and Gas Properties</u>.  In the event the Borrower or any Restricted Subsidiary intends to sell, transfer, assign or otherwise dispose of any Oil and Gas Properties or any Equity Interests in any Subsidiary or to terminate or otherwise monetize any

91

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Swap Agreement in respect of commodities, in each case that could reasonably be expected to be a Triggering Disposition, prior written notice thereof in accordance with Section 9.12(f)(iv)(A).

(m)       Notice of Casualty Events.  Prompt written notice, and in any event within three Business Days, of the occurrence of any Casualty Event involving Property with a fair market value in excess of the Threshold Amount or the commencement of any action or proceeding that could reasonably be expected to result in a Casualty Event involving Property with a fair market value in excess of the Threshold Amount.

(n)       Information Regarding Borrower and Guarantors.  Prompt written notice (and in any event within ten (10) Business Days prior thereto (or such lesser amount of prior notice as may be reasonably acceptable to the Administrative Agent)) of any change (i) in the Borrower or any Guarantor's legal name, (ii) in the location of the Borrower or any Guarantor's chief executive office or principal place of business, (iii) in the Borrower or any Guarantor's identity or corporate structure or in the jurisdiction in which such Person is incorporated or formed, (iv) in the Borrower or any Guarantor's organizational identification number in such jurisdiction of organization, and (v) in the Borrower or any Guarantor's federal taxpayer identification number.

(o)       Production Report and Lease Operating Statements.  Concurrently with the delivery of each Reserve Report hereunder, a report setting forth, for each calendar month during the prior twelve (12) month period, the volume of production and sales attributable to production (and the prices at which such sales were made and the revenues derived from such sales) for each such calendar month from the Proved Oil and Gas Properties, and setting forth the related ad valorem, severance and production taxes and lease operating expenses attributable thereto and incurred for each such calendar month.

(p)       Incurrence of Permitted Senior Additional Debt or Permitted Second Lien Debt.  In the event the Borrower intends to incur any Permitted Senior Additional Debt or Permitted Second Lien Debt after the Effective Date, prior written notice of the intended incurrence of such Permitted Senior Additional Debt or Permitted Second Lien Debt, the anticipated amount thereof, and the anticipated date of closing and promptly when available will furnish a copy of the preliminary offering memorandum (if any) and the final offering memorandum (if any).

(q)       Deposit Accounts, Commodities Accounts and Securities Accounts.  Not less than ten (10) Business Days' prior written notice (or such shorter period of time as may be reasonably acceptable to the Administrative Agent) of the opening of any new Deposit Account, Commodities Account or Securities Account (other than Excluded Accounts).

(r)       Notices of Certain Changes.  Promptly, but in any event within five (5) Business Days after the execution thereof, copies of any amendment, modification or supplement to the certificate or articles of incorporation, bylaws, certificate or articles of organization, regulations, any preferred stock designation or any other organic document of the Borrower or

92

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

any Subsidiary if such amendment, modification or supplement is material to the Lenders or impacts any provision of the Loan Documents.

(s)    Other Requested Information.  Promptly following any written request therefor, (i) such other information regarding the operations, business affairs and financial condition of the Borrower or any Restricted Subsidiary (including, without limitation, any Plan, any Pension Plan and any reports or other information required to be filed with respect thereto under the Code or under ERISA), or compliance with the terms of this Agreement or any other Loan Document, as the Administrative Agent may reasonably request and (ii) information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with the Beneficial Ownership Regulation or applicable "know your customer" requirements under the USA Patriot Act or other applicable anti-money laundering laws.

Documents required to be delivered pursuant to Section 8.01(a), (b) or (i) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (a) on which the Borrower posts such documents, or provides a link thereto on the Borrower's public website or (b) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that the Borrower, as applicable, shall deliver paper copies of such documents to the Administrative Agent or any Lender upon its written request to the Borrower to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender.  The Administrative Agent shall have no obligation to request the delivery of or to maintain paper copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request by a Lender for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

Section 8.02    Notices of Material Events.    The Borrower will furnish to the Administrative Agent prompt (and in any event within three Business Days) written notice of the following:

(a)    the occurrence of any Default;

(b)    the filing or commencement of, or the threat in writing of, any action, suit, proceeding, investigation or arbitration by or before any arbitrator or Governmental Authority against or affecting the Borrower or any Affiliate thereof not previously disclosed in writing to the Lenders or any material adverse development in any action, suit, proceeding, investigation or arbitration (whether or not previously disclosed to the Lenders) that, in either case, if adversely determined, could reasonably be expected to result in liability in excess of $5,000,000, not fully covered by insurance, subject to normal deductibles (and excluding any actions, suits, proceedings, investigations or arbitrations arising under or otherwise related to Environmental Laws, which are subject to the terms of Section 8.10(b)); and

93

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(c)     any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section 8.02 shall be accompanied by a statement of a Responsible Officer setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 8.03   Existence; Conduct of Business.  The Borrower will, and will cause each Restricted Subsidiary to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business and maintain, if necessary, its qualification to do business in each other jurisdiction in which its Oil and Gas Properties are located or the ownership of its Properties requires such qualification, except where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect; *provided* that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 9.11.

Section 8.04   Payment of Obligations.   The Borrower will, and will cause each Restricted Subsidiary to, pay its obligations, including Tax liabilities of the Borrower and all of its Subsidiaries before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the Borrower or such Restricted Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP, and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect or result in the seizure or levy of any Proved Oil and Gas Property or other material Property of the Borrower or any Restricted Subsidiary.

Section 8.05   Performance of Obligations under Loan Documents.  The Borrower will pay the Notes according to the reading, tenor and effect thereof, and the Borrower will, and will cause each Restricted Subsidiary to, do and perform every act and discharge all of the obligations to be performed and discharged by them under the Loan Documents, including, without limitation, this Agreement, at the time or times and in the manner specified.

Section 8.06   Operation and Maintenance of Properties.   The Borrower, at its own expense, will, and will cause each Restricted Subsidiary to:

(a)     operate its Proved Oil and Gas Properties and other material Properties or cause such Proved Oil and Gas Properties and other material Properties to be operated in a careful and efficient manner in accordance with the practices of the industry and in compliance with all applicable contracts and agreements and in compliance with all Governmental Requirements, including, without limitation, applicable proration requirements and Environmental Laws, and all applicable laws, rules and regulations of every other Governmental Authority from time to time constituted to regulate the development and operation of its Proved Oil and Gas Properties and the

94

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

production and sale of Hydrocarbons and other minerals therefrom, except, in each case, where the failure to comply could not reasonably be expected to have a Material Adverse Effect;

(b)     maintain and keep in good repair, working order and efficiency (ordinary wear and tear and depletion excepted) all of its producing Oil and Gas Properties and other Properties material to the conduct of its business, including, without limitation, all equipment, machinery and facilities, unless the Borrower determines in good faith that the continued maintenance of such Oil and Gas Properties and other Properties is no longer economically desirable, necessary or useful to the business of the Credit Parties or such Oil and Gas Properties or other Properties are sold, assigned or transferred in a disposition permitted by Section 9.12, except, in each case, where the failure to do so could not reasonably be expected to have a Material Adverse Effect;

(c)     promptly pay and discharge, or make reasonable and customary efforts to cause to be paid and discharged, all delay rentals, royalties, expenses and indebtedness accruing under the leases or other agreements affecting or pertaining to its Proved Oil and Gas Properties and will do all other things necessary to keep unimpaired their rights with respect thereto and prevent any forfeiture thereof or default thereunder, except, in each case, where the failure to do so could not reasonably be expected to (i) have a Material Adverse Effect or (ii) result in a forfeiture or default with respect to any material Hydrocarbon Interests included in the Borrowing Base;

(d)     promptly perform or make reasonable and customary efforts to cause to be performed, in accordance with industry standards, the obligations required by each and all of the assignments, deeds, leases, sub-leases, contracts and agreements affecting its interests in its Proved Oil and Gas Properties and other Properties, except, in each case, where the failure to do so could not reasonably be expected to (i) have a Material Adverse Effect or (ii) result in a forfeiture or default with respect to any material Hydrocarbon Interests included in the Borrowing Base;

(e)     operate its Proved Oil and Gas Properties and other Properties or cause or make reasonable and customary efforts to cause such Oil and Gas Properties and other Properties to be operated in accordance with the practices of the industry and in compliance with all applicable contracts and agreements and in compliance with all Governmental Requirements, except, in each case, where the failure to do so could not reasonably be expected to have a Material Adverse Effect; and

(f)     to the extent the Borrower is not the operator of any Property, the Borrower shall use commercially reasonable efforts to cause the operator to comply with this Section 8.06, but any failure of the operator so to comply will not constitute a Default or Event of Default.

Section 8.07    Insurance.  The Borrower will, and will cause each Restricted Subsidiary to, maintain, with financially sound and reputable insurance companies, insurance (a) in such

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations and (b) in accordance in all material respects with all Governmental Requirements.  The loss payable clauses or provisions in said insurance policy or policies insuring any of the collateral for the Loans shall be endorsed in favor of and made payable to the Administrative Agent as its interests may appear and such policies shall name the Administrative Agent and the Lenders as "additional insureds" and/or "lender loss payees" as applicable and provide that the insurer will endeavor to give at least thirty (30) days prior notice of any cancellation to the Administrative Agent.

Section 8.08    Books and Records; Inspection Rights.  The Borrower will, and will cause each Restricted Subsidiary to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities in accordance with GAAP.  The Borrower will, and will cause each Restricted Subsidiary to, permit any representatives designated by the Administrative Agent (which may include any Lender designated by the Administrative Agent), upon reasonable prior notice, to visit and inspect its Properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times during normal business hours and as often as reasonably requested; *provided* that, unless an Event of Default or Borrowing Base Deficiency has occurred and is continuing, the Borrower shall bear the cost of only one such inspection per year by the Administrative Agent.

Section 8.09    Compliance with Laws.    The Borrower will, and will cause each Restricted Subsidiary to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its Property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  The Borrower will maintain in effect and enforce such policies and procedures, if any, as it reasonably deems appropriate, in light of its businesses and international activities (if any), to achieve compliance in all material respects by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with applicable Anti-Corruption Laws and applicable Sanctions.

Section 8.10    Environmental Matters.

(a)    The Borrower shall at its sole expense:  (i) comply, and shall cause its Properties and operations and each Subsidiary and each Subsidiary's Properties and operations to comply, with all applicable Environmental Laws, the breach of which could be reasonably expected to have a Material Adverse Effect; (ii) not Release or threaten to Release, and shall cause each Subsidiary not to Release or threaten to Release, any Hazardous Material on, under, about or from any of the Borrower's or its Subsidiaries' Properties or any other property offsite the Property to the extent caused by the Borrower's or any of its Subsidiaries' operations except in compliance with applicable Environmental Laws, the Release or threatened Release of which could reasonably be expected to have a Material Adverse Effect; (iii) timely obtain or file, and shall cause each Subsidiary to timely obtain or file, all Environmental Permits, if any, required under applicable Environmental Laws to be obtained or filed in connection with the operation or

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

use of the Borrower's or its Subsidiaries' Properties, which failure to obtain or file could reasonably be expected to have a Material Adverse Effect; (iv) promptly commence and diligently prosecute to completion, and shall cause each Subsidiary to promptly commence and diligently prosecute to completion, any assessment, evaluation, investigation, monitoring, containment, cleanup, removal, repair, restoration, remediation or other remedial obligations (collectively, the "Remedial Work") in the event any Remedial Work is required or reasonably necessary under applicable Environmental Laws because of or in connection with the actual or suspected past, present or future Release or threatened Release of any Hazardous Material on, under, about or from any of the Borrower's or its Subsidiaries' Properties, which failure to commence and diligently prosecute to completion could reasonably be expected to have a Material Adverse Effect; (v) conduct, and cause its Subsidiaries to conduct, their respective operations and businesses in a manner that will not expose any Property or Person to Hazardous Materials that could reasonably be expected to form the basis for a claim for damages or compensation that could reasonably be expected to cause a Material Adverse Effect; and (vi) establish and implement, and shall cause each Subsidiary to establish and implement, such procedures as may be necessary to continuously determine and assure that the Borrower's and its Subsidiaries' obligations under this Section 8.10(a) are timely and fully satisfied, which failure to establish and implement could reasonably be expected to have a Material Adverse Effect.

(b)      The Borrower will promptly, but in no event later than five Business Days after the Borrower obtains knowledge thereof, notify the Administrative Agent in writing of any action, investigation or inquiry threatened in writing by any Governmental Authority or any demand or lawsuit threatened in writing by any Person against the Borrower or its Subsidiaries or their Properties of which the Borrower has knowledge in connection with any Environmental Laws if the Borrower could reasonably anticipate that such action will result in liability (whether individually or in the aggregate) in excess of the Threshold Amount, not fully covered by insurance, subject to normal deductibles (such notice does not have to be provided until such time that Borrower reasonably determines that such matter could reasonably be expected to result in liability in excess of the Threshold Amount).

(c)      The Borrower will, and will cause each Subsidiary to, provide environmental assessments, audits and tests in accordance with the most current version of the American Society of Testing Materials standards where applicable upon reasonable request by the Administrative Agent and the Lenders and no more than once per year in the absence of any Event of Default (or as otherwise required to be obtained by the Administrative Agent or the Lenders by any Governmental Authority), in connection with any future acquisitions of Oil and Gas Properties or other Properties.

Section 8.11    Further Assurances.

(a)      The Borrower at its sole expense will, and will cause each Restricted Subsidiary to, promptly execute and deliver to the Administrative Agent all such other documents, agreements and instruments reasonably requested by the Administrative Agent to comply with, cure any defects or accomplish the conditions precedent, covenants and agreements

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

of the Borrower or any Restricted Subsidiary, as the case may be, in the Loan Documents, including the Notes, or to further evidence and more fully describe the collateral intended as security for the Indebtedness, or to correct any omissions in this Agreement or the Security Instruments, or to state more fully the obligations secured therein, or to perfect, protect or preserve any Liens created pursuant to this Agreement or any of the Security Instruments or the priority thereof, or to make any recordings, file any notices or obtain any consents, all as may be reasonably necessary or appropriate, in the sole discretion of the Administrative Agent, in connection therewith.

(b)    The Borrower hereby authorizes the Administrative Agent to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Mortgaged Property without the signature of the Borrower or any other Guarantor where permitted by law.  A carbon, photographic or other reproduction of the Security Instruments or any financing statement covering the Mortgaged Property or any part thereof shall be sufficient as a financing statement where permitted by law.  The Borrower acknowledges and agrees that any such financing statement may describe the collateral as "all assets" of the applicable Credit Party or words of similar effect as may be required by the Administrative Agent.

Section 8.12    Reserve Reports.

(a)    On or before April 1st and October 1st of each year, commencing April 1st, 2021, the Borrower shall furnish to the Administrative Agent and the Lenders a Reserve Report evaluating the Proved Oil and Gas Properties of the Credit Parties as of the immediately preceding January 1st and July 1st.  The Reserve Report as of January 1 of each year shall be prepared by one or more Approved Petroleum Engineers.  The July 1 Reserve Report of each year shall be prepared by or under the supervision of the chief engineer of the Borrower who shall certify that (x) such Reserve Report is based on information that was prepared in good faith based upon assumptions believed to be reasonable at the time, (y) there are no statements or conclusions in such Reserve Report which are based upon or include materially misleading information or fail to take into account material information known to the Borrower regarding the matters reported therein (it being understood that projections concerning volumes attributable to the Oil and Gas Properties of the Borrower and its Restricted Subsidiaries and production and cost estimates contained in each Reserve Report are necessarily based upon professional opinions, estimates and projections and that the Borrower and its Restricted Subsidiaries do not warrant that such opinions, estimates and projections will ultimately prove to have been accurate) and (z) such Reserve Report has been prepared in accordance with the procedures used in the immediately preceding January 1 Reserve Report.

(b)    In the event of an Interim Redetermination, the Borrower shall furnish to the Administrative Agent and the Lenders a Reserve Report prepared by or under the supervision of the chief engineer of the Borrower who shall certify on behalf of the Borrower that (x) such Reserve Report is based on information that was prepared in good faith based upon assumptions believed to be reasonable at the time, (y) there are no statements or conclusions in such Reserve Report which are based upon or include materially misleading information or fail to take into

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

account material information known to the Borrower regarding the matters reported therein (it being understood that projections concerning volumes attributable to the Oil and Gas Properties of the Borrower and its Restricted Subsidiaries and production and cost estimates contained in each Reserve Report are necessarily based upon professional opinions, estimates and projections and that the Borrower and its Restricted Subsidiaries do not warrant that such opinions, estimates and projections will ultimately prove to have been accurate) and (z) such Reserve Report has been prepared in accordance with the procedures used in the immediately preceding January 1 Reserve Report.  For any Interim Redetermination requested by the Administrative Agent or the Borrower pursuant to Section 2.07(b), the Borrower shall provide such Reserve Report with an "as of" date as required by the Administrative Agent as soon as possible, but in any event no later than thirty (30) days (or, solely in the case of Interim Redeterminations requested by the Borrower, such longer period of time as may be reasonably acceptable to the Administrative Agent) following the receipt of such request.

(c)      With the delivery of each Reserve Report, the Borrower shall provide to the Administrative Agent and the Lenders a certificate from a Responsible Officer certifying that, in all material respects: (i) the information contained in the Reserve Report and any other information delivered in connection therewith is based on information that was prepared in good faith based upon assumptions believed to be reasonable at the time and there are no statements or conclusions in the Reserve Report which are based upon or include materially misleading information or fail to take into account material information known to it regarding the matters reported therein (it being understood that projections concerning volumes attributable to the Oil and Gas Properties of the Borrower and its Restricted Subsidiaries and production and cost estimates contained in each Reserve Report are necessarily based upon professional opinions, estimates and projections and that the Borrower and its Restricted Subsidiaries do not warrant that such opinions, estimates and projections will ultimately prove to have been accurate), (ii) the Borrower or its Restricted Subsidiaries owns good and defensible title to the Proved Oil and Gas Properties evaluated in such Reserve Report and such Properties are free of all Liens except for Excepted Liens and Liens securing the Indebtedness, (iii) except as set forth on an exhibit to the certificate, on a net basis there are no gas imbalances, take or pay or other prepayments in excess of the volume specified in Section 7.18 with respect to its Proved Oil and Gas Properties evaluated in such Reserve Report which would require the Borrower or any Restricted Subsidiary to deliver Hydrocarbons either generally or produced from such Proved Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor, (iv) none of their Proved Oil and Gas Properties have been sold since the date of the last Borrowing Base determination except as set forth on an exhibit to the certificate, which certificate shall list all of its Proved Oil and Gas Properties sold and in such detail as reasonably required by the Administrative Agent, (v) attached to the certificate is a list of all marketing agreements entered into subsequent to the later of the date hereof or the most recently delivered Reserve Report which the Borrower could reasonably be expected to have been obligated to list on Schedule 7.19 had such agreement been in effect on the date hereof, and (vi) attached thereto is a schedule of the Proved Oil and Gas Properties evaluated by such Reserve Report that are Mortgaged Properties and demonstrating the percentage of the total value of such Proved Oil and Gas Properties

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

evaluated in such Reserve Report that the value of such Mortgaged Properties represent in compliance with Section 8.14(a).

Section 8.13    Title Information.

(a)    On or before the delivery to the Administrative Agent and the Lenders of each Reserve Report required by Section 8.12(a), the Borrower will deliver title information that is reasonably required by the Administrative Agent, in form and substance acceptable to the Administrative Agent, covering enough of the Proved Oil and Gas Properties evaluated by such Reserve Report that were not included in the immediately preceding Reserve Report, so that the Administrative Agent shall have received together with title information previously delivered to the Administrative Agent, satisfactory title information on at least 95% of the PV-15 of the Proved Oil and Gas Properties evaluated by such Reserve Report.

(b)    If the Borrower has provided title information for additional Proved Oil and Gas Properties under Section 8.13(a), the Borrower shall, within 60 days after notice from the Administrative Agent (or such longer period of time as may be reasonably acceptable to the Administrative Agent) that title defects or exceptions exist (excluding Liens permitted by Section 9.03) with respect to such additional Proved Oil and Gas Properties, either (i) cure any such title defects or exceptions (including defects or exceptions as to priority) which are not permitted by Section 9.03 raised by such information, (ii) substitute acceptable Mortgaged Properties with no title defects or exceptions except for Excepted Liens (other than Excepted Liens described in clauses (e), (g) and (h) of such definition) having an equivalent value, or (iii) deliver title information in form and substance reasonably acceptable to the Administrative Agent so that the Administrative Agent shall have received, together with title information previously delivered to the Administrative Agent, satisfactory title information on at least 95% of the PV-15 of the Proved Oil and Gas Properties evaluated by such Reserve Report.

(c)    If the Borrower is unable to cure any title defect (excluding Liens permitted by Section 9.03) requested by the Administrative Agent or the Lenders to be cured within the 60-day period (or such longer period of time as may be reasonably acceptable to the Administrative Agent) or the Borrower does not comply with the requirements to provide acceptable title information covering 95% of the PV-15 of the Proved Oil and Gas Properties evaluated in the most recent Reserve Report, such default shall not be a Default, but instead the Administrative Agent and/or the Required Lenders shall have the right to exercise the following remedy in their sole discretion from time to time, and any failure to so exercise this remedy at any time shall not be a waiver as to future exercise of the remedy by the Administrative Agent or the Lenders.  To the extent that the Administrative Agent or the Required Lenders are not satisfied with title to any Mortgaged Property after the 60-day period has elapsed, such unacceptable Mortgaged Property shall not count towards the 95% requirement, and the Administrative Agent may send a notice to the Borrower and the Lenders that the then outstanding Borrowing Base shall be reduced to reflect the exclusion of such unacceptable Mortgaged Properties by an amount as determined by the Required Lenders to cause the Borrower to be in compliance with the requirement to provide acceptable title information on 95% of the PV-15 of the Proved Oil and

100

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Gas Properties remaining in the Borrowing Base. This new Borrowing Base shall become effective immediately after the Borrower's receipt of such notice.

(d)    Notwithstanding anything to the contrary contained in this Section 8.13, if at any time the Administrative Agent concludes in its sole discretion that the cost of obtaining acceptable title information with respect to at least 95% of the PV-15 of the Proved Oil and Gas Properties evaluated in the most recent Reserve Report exceeds the expected value to the Lenders thereof, the Administrative Agent may notify the Borrower thereof and, until such notice is revoked or rescinded, each reference to 95% contained in this Section 8.13 shall be deemed to be a reference to 90%.

Section 8.14    Additional Collateral and Additional Guarantors.

(a)    In connection with each redetermination of the Borrowing Base, the Borrower shall review the Reserve Report and the list of current Mortgaged Properties (as described in Section 8.12(c)(vi)) to ascertain whether the Mortgaged Properties represent at least 95% of the PV-15 of the Proved Oil and Gas Properties evaluated in the most recently completed Reserve Report after giving effect to exploration and production activities, acquisitions, dispositions and production. In the event that the Mortgaged Properties do not represent at least 95% of such PV-15, then the Borrower shall, and shall cause its Restricted Subsidiaries to, grant, within thirty (30) days (or such longer period of time as may be reasonably acceptable to the Administrative Agent) of delivery of the certificate required under Section 8.12(c), to the Administrative Agent as security for the Indebtedness a first-priority Lien interest (*provided* that Excepted Liens of the type described in clauses (a) to (d), (f) and (i) of the definition thereof may exist, but subject to the provisos at the end of such definition) on additional Proved Oil and Gas Properties of the Credit Parties that are Qualified ECP Guarantors and which such Proved Oil and Gas Properties are not already subject to a Lien of the Security Instruments such that after giving effect thereto, the Mortgaged Properties will represent at least 95% of such PV-15. All such Liens will be created and perfected by and in accordance with the provisions of deeds of trust, mortgages, security agreements and financing statements or other Security Instruments, all in form and substance reasonably satisfactory to the Administrative Agent and in sufficient executed (and acknowledged where necessary or appropriate) counterparts for recording purposes. In order to comply with the foregoing, if any Restricted Subsidiary places a Lien on its Proved Oil and Gas Properties and such Restricted Subsidiary is not a Guarantor, then it shall become a Guarantor and comply with Section 8.14(b). Notwithstanding anything to the contrary contained in this Section 8.14(a), if at any time the Administrative Agent concludes in its sole discretion that the cost of obtaining mortgages or other Security Instruments with respect to at least 95% of the PV-15 of the Proved Oil and Gas Properties evaluated in the most recent Reserve Report exceeds the expected value to the Lenders thereof, the Administrative Agent may notify the Borrower thereof and, until such notice is revoked or rescinded, each reference to 95% contained in this Section 8.14(a) shall be deemed to be a reference to 90%.

(b)    In the event that (i) the Borrower determines that any Restricted Subsidiary is a Material Subsidiary, (ii) the Borrower or any Restricted Subsidiary creates, forms

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

or acquires any Material Subsidiary (or any Unrestricted Subsidiary becomes a Restricted Subsidiary), or (iii) any Domestic Subsidiary that is not already a Guarantor incurs or guarantees any other Debt of the Borrower or any other Restricted Subsidiary, the Borrower shall cause such Restricted Subsidiary to guarantee the Indebtedness pursuant to the Guaranty Agreement within thirty (30) days (or such longer period of time as may be reasonably acceptable to the Administrative Agent).  In connection with any such guaranty, the Borrower shall, or shall cause such Restricted Subsidiary to, (A) execute and deliver a supplement to the Guaranty Agreement and the Security Agreement executed by such Subsidiary, (B) pledge all of the Equity Interests of such Subsidiary (including, without limitation, delivery of original stock certificates evidencing the Equity Interests of such Subsidiary, together with an appropriate undated stock powers for each certificate duly executed in blank by the registered owner thereof), and (C) execute and deliver such other additional closing documents, certificates and legal opinions as shall reasonably be requested by the Administrative Agent.

(c)     The Borrower will at all times cause the other material tangible and intangible assets of the Borrower and each Restricted Subsidiary (including, without limitation, all Swap Agreements but excluding the Excluded Assets (as defined in the Security Agreement)) to be subject to a Lien of the Security Instruments.

(d)     Notwithstanding any provision in any of the Loan Documents to the contrary, in no event is any Building (as defined in the applicable Flood Insurance Regulations) or Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Regulations) owned by any Credit Party included in the Mortgaged Property and no Building or Manufactured (Mobile) Home shall be encumbered by any Security Instrument; provided, that (i) the applicable Credit Party's interests in all lands and Hydrocarbons situated under any such Building or Manufactured (Mobile) Home shall be included in the Mortgaged Property and shall be encumbered by the Security Instruments and (ii) the Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, permit to exist any Lien on any Building or Manufactured (Mobile) Home except Excepted Liens.

Section 8.15   ERISA Compliance.  The Borrower will promptly furnish and will cause the Subsidiaries to promptly furnish to the Administrative Agent (a) promptly after the filing thereof with the United States Secretary of Labor or the Internal Revenue Service, copies of each annual and other report with respect to each Pension Plan or any trust created thereunder, and (b) immediately upon becoming aware of the occurrence of any "prohibited transaction," as described in section 406 of ERISA or in section 4975 of the Code, in connection with any Plan or any trust created thereunder, which could reasonably be expected to result in liability to the Borrower and its Subsidiaries in excess of the Threshold Amount, a written notice signed by the President or the principal Financial Officer of the Borrower or the Subsidiary, as the case may be, specifying the nature thereof, what action the Borrower or the Subsidiary is taking or proposes to take with respect thereto, and, when known, any action taken or proposed by the Internal Revenue Service or the Department of Labor with respect thereto.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Section 8.16    Commodity Price Risk Management Policy.    The Credit Parties shall maintain a commodity price risk management policy, which policy shall be reasonably acceptable to the Administrative Agent.

Section 8.17    Deposit Accounts; Commodities Accounts and Securities Accounts.    The Borrower and each Guarantor will cause each of their respective Deposit Accounts, Commodities Accounts or Securities Accounts (in each case, other than Excluded Accounts) to at all times be subject to an Account Control Agreement in accordance with and to the extent required by the Security Agreement.

Section 8.18    Commodity Exchange Act Keepwell Provisions.    The Borrower hereby absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each Credit Party (other than the Borrower) that is not otherwise a Qualified ECP Guarantor in order for such Credit Party to honor its obligations under its respective Guaranty Agreement including obligations with respect to Swap Agreements (*provided*, *however*, that the Borrower shall only be liable under this Section 8.18 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 8.18, or otherwise under this Agreement or any Loan Document, as it relates to such other Credit Parties, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of the Borrower under this Section 8.18 shall remain in full force and effect until all Indebtedness is paid in full to the Lenders, the Administrative Agent and all other Secured Parties, and all of the Lenders' Revolving Credit Commitments are terminated. The Borrower intends that this Section 8.18 constitute, and this Section 8.18 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Credit Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

Section 8.19    Unrestricted Subsidiaries.    The Borrower:

(a)    will cause the management, business and affairs of each of the Borrower and its Restricted Subsidiaries to be conducted in such a manner (including by keeping separate books of account, furnishing separate financial statements of the Unrestricted Subsidiaries to creditors and potential creditors thereof and by not permitting Properties of the Borrower and its Restricted Subsidiaries to be commingled) so that each Unrestricted Subsidiary that is a corporation will be treated as a corporate entity separate and distinct from the Borrower and any Restricted Subsidiary;

(b)    will not, and will not permit any of the Restricted Subsidiaries to, incur, assume, guarantee or be or become liable for any Debt of any of the Unrestricted Subsidiaries; and

(c)    will not permit any Unrestricted Subsidiary to hold any Equity Interest in, or any Debt of, the Borrower or any Restricted Subsidiary.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Section 8.20    Post-Closing Obligations-Swap Agreements.  The Borrower shall, or shall cause another Credit Party to, (a) within 45 days following the Effective Date (the "Initial Hedging Test Date"), enter into Swap Agreements with a Lender or an Affiliate of a Lender to hedge notional volumes of crude oil, natural gas and natural gas liquids, as applicable, covering not less than, for each calendar month during the period of the first 24 consecutive full calendar months (or, in the case of natural gas liquids, 12 consecutive full calendar months (the "Initial NGL Period")) following the Initial Hedging Test Date, 50% of the Projected Volume of such crude oil and natural gas, calculated separately, and 50% of the Projected Revenue from such natural gas liquids, in each case attributable to PDP Reserves for such calendar month and (b) on or before the date that is 12 months following the Initial Hedging Test Date (the "Second Hedging Test Date") enter into Swap Agreements with a Lender or an Affiliate of a Lender to hedge notional amounts of natural gas liquids, covering not less than, for each calendar month during the period of the first 12 consecutive full calendar months following the Initial NGL Period, 50% of the Projected Revenue from such natural gas liquids, in each case attributable to PDP Reserves for such calendar month; *provided* that, in the case of the foregoing clauses (a) and (b), such Swap Agreements shall have effective floor prices of not less than eighty-five percent (85%) of the closing contract price for the applicable calendar month as quoted on NYMEX as of the date such Swap Agreement is entered into.  Within five (5) Business Days following each of the Initial Hedging Test Date and the Second Hedging Test Date, the Borrower will provide a certificate of a Financial Officer setting forth calculations demonstrating compliance with such minimum hedging requirements set forth in the immediately preceding sentence.  Notwithstanding the foregoing, if the Lenders (or any Affiliate thereof) are not willing to enter into Swap Agreements on market terms with the Borrower or a Credit Party that are sufficient for the Credit Parties to comply with the foregoing minimum hedging requirements, such minimum hedging requirements shall be deemed reduced to be the volumes and tenors for which Lenders or Affiliates of Lenders are willing to enter into Swap Agreements with the Borrower or a Credit Party on market terms.

**ARTICLE IX**
**NEGATIVE COVENANTS**

Until the Revolving Credit Commitments have expired or terminated and the principal of and interest on each Loan and all fees payable hereunder and all other amounts (other than contingent indemnity obligations for  which no claim has been made) payable under the Loan Documents have been paid in full and all Letters of Credit have expired or terminated and all LC Disbursements shall have been reimbursed, the Borrower covenants and agrees with the Lenders that:

Section 9.01    Financial Covenants.

(a)    Ratio of Total Net Debt to EBITDAX.  The Borrower will not, as of the last day of any fiscal quarter commencing with the last day of the fiscal quarter ending March 31, 2021, permit the ratio of (i) Total Debt as of such day to (ii) EBITDAX for the four fiscal quarters ending on such day to be greater than 3.0 to 1.0.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(b)     Current Ratio.  The Borrower will not, as of the last day of any fiscal quarter commencing with the last day of the fiscal quarter ending March 31, 2021, permit the ratio of (i) consolidated current assets of the Borrower and its Consolidated Restricted Subsidiaries (including Availability at such time), but excluding non-cash assets under ASC 815 and ASC 410) to (ii) consolidated current liabilities of the Borrower and its Consolidated Restricted Subsidiaries (excluding non-cash obligations under ASC 815 and ASC 410) to be less than 1.0 to 1.0; *provided*, *however*, that the current maturities of long term Debt (including the Loans) and non-cash liabilities recorded in connection with stock-based or similar incentive based compensation awards or arrangements shall not be considered consolidated current liabilities for purposes of this ratio.

(c)     Asset Coverage Ratio.  The Borrower will not, as of the last day of each fiscal quarter commencing with the first fiscal quarter ending after the Effective Date until and including the fiscal quarter ending September 30, 2021, permit the ratio of (i) Total PDP PV-15 to (ii) the aggregate principal amount of Loans outstanding as of such date (such ratio, the "Asset Coverage Ratio") to be less than 1.35 to 1.00.

(d)     Liquidity.  The Borrower will not permit, at any time, the sum of (i) Availability plus (b) the Credit Parties' unrestricted cash on hand to be less than $17,000,000.

Section 9.02  Debt.  The Borrower will not, and will not permit any Restricted Subsidiary to, incur, create, assume or suffer to exist any Debt, except:

(a)     the Notes or other Indebtedness arising under the Loan Documents or any guaranty of or suretyship arrangement for the Notes or other Indebtedness arising under the Loan Documents.

(b)     Debt of the Borrower and its Restricted Subsidiaries existing on the date hereof that is reflected on Schedule 9.02.

(c)     accounts payable and accrued expenses, liabilities or other obligations to pay the deferred purchase price of Property or services, from time to time incurred in the ordinary course of business which are not greater than ninety (90) days past the date of receipt of the invoice or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP.

(d)     Equipment and Fixture Financing Debt not to exceed $20,000,000 in the aggregate at any one time outstanding.

(e)     Debt associated with worker's compensation claims, performance, bid, surety or similar bonds or surety obligations required by Governmental Requirements or third parties in the ordinary course of business in connection with the operation of the Oil and Gas Properties.

105

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(f)    intercompany Debt between the Borrower and any Restricted Subsidiary or between Restricted Subsidiaries to the extent permitted by Section 9.05(g); *provided* that such Debt is not held, assigned, transferred, negotiated or pledged to any Person other than the Borrower or one of its Wholly-Owned Subsidiaries, and, *provided*, *further*, that any such Debt owed by either the Borrower or a Guarantor shall be subordinated to the Indebtedness on terms set forth in the Guaranty Agreement.

(g)    endorsements of negotiable instruments for collection in the ordinary course of business.

(h)    any Debt of the Borrower or any Restricted Subsidiary and guarantees thereof by any Credit Party or any other Restricted Subsidiary; *provided* that: (i) such Debt is unsecured, (ii) such Debt shall not provide for any amortization of principal or any scheduled or mandatory prepayments or Redemptions on any date prior to 180 days after the Maturity Date (other than customary high yield indenture provisions requiring offers to repurchase in connection with asset sales or any change of control, casualty or condemnation event prepayments or customary acceleration rights after an event of default), (iii) such Debt shall not contain a scheduled maturity date that is earlier than 180 days after the Maturity Date, (iv) such Debt (or the documents governing such Debt) shall (A) contain no financial covenant that is more restrictive or onerous with respect to the Credit Parties than the financial covenants herein, and (B) not contain covenants (other than financial covenants) and events of default that are, taken as a whole, more restrictive or onerous with respect on the Credit Parties than those contained in this Agreement are on the Credit Parties (as reasonably determined by the Borrower in good faith), (v) after giving effect to the incurrence of such Debt, the application of the proceeds thereof, and any automatic reduction of the Borrowing Base pursuant to Section 2.07(e) on account thereof, each on a pro forma basis: (A) no Event of Default or Borrowing Base Deficiency shall exist and (B) the Borrower shall be in pro forma compliance with Section 9.01 as of the last day of the applicable period covered by the most recent certificate delivered pursuant to Section 8.01(c), (vi) the Borrowing Base shall automatically be reduced on the date of the incurrence of such Debt in accordance with Section 2.07(e) and (vii) the Net Proceeds of such Debt shall be used to prepay the Loans in accordance with and to the extent required by Section 3.04(c)(iii).

(i)    Taxes, assessments or other governmental charges which are not yet due or are being contested in good faith in accordance with Section 8.04(a).

(j)    Debt (other than in connection with a loan or lending transaction) incurred in the ordinary course of business for drilling, completing, leasing and reworking oil, gas and $CO_2$ wells or the treatment, distribution, transportation or sale of production therefrom; *provided*, *however*, such Debt shall not be deemed to refer to or include any long term debt.

(k)    the 2025 Second Lien Notes, so long as the aggregate principal amount of such 2025 Second Lien Notes at any time outstanding does not exceed (i) $35,000,000 plus (ii) any amounts added to the principal amount of 2025 Second Lien Notes as a result of interest being paid in kind in accordance with the 2025 Second Lien Notes Documents at or prior to such

106

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

time minus (iii) the amount of principal prepayments (including conversions of such obligations to equity) made in respect of such 2025 Second Lien Notes from and after the date hereof and at or prior to such time.

(l)    Debt which represents an extension, refinancing, or renewal of any of the foregoing; *provided* that (i) the principal amount of such Debt is not increased (other than by the costs, fees, and expenses and by accrued and unpaid interest paid in connection with any such extension, refinancing or renewal), (ii) the interest rate of such Debt is not increased, (iii) any Liens securing such Debt are not extended to any additional property of any Credit Party, (iv) no Credit Party that is not originally obligated with respect to repayment of such Debt is required to become obligated with respect thereto, (v) such extension, refinancing or renewal does not result in a shortening of the average weighted maturity of the Debt so extended, refinanced or renewed, (vi) the terms of any such extension, refinancing, or renewal are not materially less favorable to the obligor thereunder, taken as a whole, than the original terms of such Debt, (vii) if the Debt that is refinanced, renewed, or extended was subordinated in right of payment to the Indebtedness, then the terms and conditions of the refinancing, renewal, or extension Debt must include subordination terms and conditions that are at least as favorable to the Administrative Agent and the Lenders as those that were applicable to the refinanced, renewed, or extended Debt, and (viii) if the Debt that is refinanced, renewed, or extended was in respect of Permitted Second Lien Debt, then any Liens securing such refinancing, renewal, or extension Debt must be junior to the Liens securing the Indebtedness and subject to a Second Lien Intercreditor Agreement.

(m)    Debt arising from the honoring by a bank or other financial institution of a check, draft or other similar instrument drawn against insufficient funds in the ordinary course of business.

(n)    other unsecured Debt not to exceed $15,000,000 in the aggregate at any one time outstanding.

Section 9.03    Liens.    The Borrower will not, and will not permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Lien on any of its Properties (now owned or hereafter acquired), except:

(a)    Liens securing the payment of any Indebtedness.

(b)    Excepted Liens.

(c)    Liens on Properties of the Borrower and its Restricted Subsidiaries existing on the date hereof that are reflected on Schedule 9.03.

(d)    Liens securing Equipment and Fixture Financing Debt permitted by Section 9.02(d) but only on the Property under lease or the Property purchased, constructed or improved with the proceeds of such Debt.

107

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(e)    Liens securing Permitted Second Lien Debt, so long as such Liens are at all times subordinate to the Liens securing the Indebtedness and subject to the Second Lien Intercreditor Agreement.

(f)    Liens not otherwise permitted under the preceding provisions of this Section 9.03 encumbering Properties (other than Equity Interests in Subsidiaries) and securing obligations in the aggregate principal amount not to exceed $[2,000,000] at any time; *provided* that (i) such Liens are not incurred in connection with any Debt and (ii) any such Liens encumbering Oil and Gas Properties do not secure obligations in an aggregate principal amount exceeding $[1,000,000] at any time.

Section 9.04    Dividends and Distributions; Redemptions of Permitted Senior Additional Debt; Amendments to Permitted Senior Additional Debt Documents; Redemptions of Permitted Second Lien Debt; Amendments to Permitted Second Lien Debt Documents.

(a)    Dividends and Distributions.  The Borrower will not, and will not permit any of its Restricted Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, return any capital to its stockholders or make any distribution of its Property to its Equity Interest holders, except (i) the Borrower may declare and pay dividends with respect to its Equity Interests payable solely in additional shares of its Equity Interests (other than Disqualified Capital Stock), (ii) Restricted Subsidiaries may declare and pay distributions and dividends ratably with respect to their Equity Interests, (iii) the Borrower may make Restricted Payments pursuant to and in accordance with stock option plans or other benefit or other equity based plans for management or employees of the Borrower and its Restricted Subsidiaries so long as any such Restricted Payments paid in cash does not exceed $5,000,000 in the aggregate in any fiscal year, *provided* that in the case of this clause (iii), (x) no Default or Borrowing Base Deficiency shall exist at the time of such payment or result therefrom and (y) after giving effect to such payment, the Borrower shall be in pro forma compliance with Section 9.01 and (iv) the Borrower may make Restricted Payments so long as (A) no Default shall exist at the time of such payment or result therefrom, (B) the Borrowing Base Utilization Percentage shall not exceed [seventy-five percent (75%)] immediately after giving effect to such payment (and any Borrowings made in connection therewith) and (C) immediately after giving effect to such payment (and any Borrowings made in connection therewith), the ratio of Total Debt as of the date of such payment to EBITDAX for the most recently ended four-fiscal quarter period for which financial statements are available does not exceed [2.00] to 1.00.

(b)    Redemption of Permitted Senior Additional Debt; Amendment of Terms of Permitted Senior Additional Debt Documents.  The Borrower will not, and will not permit any other Credit Party to, prior to the date that is 91 days after the Termination Date:

(i)    call, make or offer to make any optional or voluntary Redemption of or otherwise optionally or voluntarily Redeem (whether in whole or in part) any Permitted Senior Additional Debt, except that, (A) so long as no Borrowing Base Deficiency or Event of Default exists, the Borrower may, substantially

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

contemporaneously with its receipt of any Net Proceeds from (1) any incurrence of Permitted Senior Additional Debt or (2) any sale of Equity Interests in the Borrower (other than Disqualified Capital Stock), prepay or otherwise Redeem Permitted Senior Additional Debt in an amount no greater than the amount of such Net Proceeds of such incurrence of Permitted Senior Additional Debt that remain after giving effect to any mandatory prepayments hereunder with such proceeds or such sale of Equity Interests of the Borrower and (B) the Borrower may prepay or otherwise Redeem Permitted Senior Additional Debt so long as (1) no Default shall exist at the time of such prepayment or Redemption or would result therefrom, (2) the Borrowing Base Utilization Percentage shall not exceed [seventy-five percent (75%)] immediately after giving effect to such prepayment or Redemption (and any Borrowings made in connection therewith) and (3) immediately after giving effect to such prepayment or Redemption (and any Borrowings made in connection therewith), the ratio of Total Debt as of the date of such prepayment or Redemption to EBITDAX for the most recently ended four-fiscal quarter period for which financial statements are available does not exceed [2.00] to 1.00; or

(ii)     amend, modify, waive or otherwise change, consent or agree to any amendment, modification, waiver or other change to, any of the terms of the Permitted Senior Additional Debt Documents (except to the extent a new incurrence of Permitted Senior Additional Debt, the proceeds of which were used to Redeem existing Permitted Senior Additional Debt pursuant to the foregoing clause (i), would be permitted to have such terms as so amended, modified, waived or otherwise changed) if the effect thereof would be to (A) shorten its maturity to a date earlier than 180 days after the Maturity Date, or (B) modify or amend financial or negative covenants or events of default such that any resulting financial or negative covenant or event of default in respect thereof would be more restrictive with respect to the Credit Parties than the financial and negative covenants and Events of Default in this Agreement.

(c)     Redemption of Permitted Second Lien Debt; Amendment of Terms of Permitted Second Lien Debt Documents.  The Borrower will not, and will not permit any other Credit Party to, prior to the date that is 91 days after the Termination Date:

(i)     call, make or offer to make any optional or voluntary cash Redemption of or otherwise optionally or voluntarily Redeem in cash (whether in whole or in part) Permitted Second Lien Debt, except that, (A) so long as no Borrowing Base Deficiency or Event of Default exists, the Borrower may, substantially contemporaneously with its receipt of any Net Proceeds from (1) any incurrence of any other Permitted Second Lien Debt or Permitted Senior Additional Debt or (2) any sale of Equity Interests in the Borrower (other than Disqualified Capital Stock), prepay or otherwise Redeem Permitted Second Lien Debt in an amount no greater than the amount of such Net Proceeds of such incurrence of Debt that remain after giving effect to any mandatory prepayments hereunder with such proceeds or such sale of Equity Interests of

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

the Borrower, and (B) the conversion of any 2025 Second Lien Notes into common Equity Interests in the Borrower shall be permitted; or

(ii)    amend, modify, waive or otherwise change, consent or agree to any amendment, modification, waiver or other change to, any of the terms of the Permitted Second Lien Debt Documents to the extent prohibited by the Second Lien Intercreditor Agreement.

Section 9.05    Investments, Loans and Advances.    The Borrower will not, and will not permit any Restricted Subsidiary to, make or permit to remain outstanding any Investments in or to any Person, except that the foregoing restriction shall not apply to:

(a)    Investments as of the Effective Date which are disclosed to the Lenders in Schedule 9.05.

(b)    accounts receivable arising in the ordinary course of business.

(c)    direct obligations of the United States of America or any agency thereof, or obligations guaranteed by the United States of America or any agency thereof, in each case maturing within one year from the date of creation thereof.

(d)    commercial paper maturing within one year from the date of creation thereof rated in the highest grade by S&P or Moody's.

(e)    deposits maturing within one year from the date of creation thereof with, including certificates of deposit issued by, any Lender or any office located in the United States of America or any other bank or trust company which is organized under the laws of the United States of America or any state thereof, has capital, surplus and undivided profits aggregating at least $100,000,000 (as of the date of such bank or trust company's most recent financial reports) and has a short term deposit rating of no lower than A2 or P2, as such rating is set forth from time to time, by S&P or Moody's, respectively.

(f)    deposits in money market funds investing exclusively in Investments described in Section 9.05(c), Section 9.05(d) or Section 9.05(e).

(g)    Investments (i) made by the Borrower in or to the Guarantors (including any newly formed Restricted Subsidiary that becomes a Guarantor in accordance with this Agreement), (ii) made by any Restricted Subsidiary in or to the Borrower or any Guarantor (including any newly formed Restricted Subsidiary that becomes a Guarantor in accordance with this Agreement) and (iii) made by the Borrower or any Restricted Subsidiary in or to all other Domestic Subsidiaries which are not Guarantors in an aggregate amount at any one time outstanding not to exceed $[5,000,000].

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(h)      subject to the limits in Section 9.06, Investments of the type described in clause (c) of the definition thereof in direct ownership interests in additional Oil and Gas Properties and gas gathering systems related thereto or related to mineral leases; working interests; royalty interests; operating, processing, unitization, farm-out, farm-in, joint operating, joint venture, production sharing or area of mutual interest agreements; pooling arrangements; contracts for the sale, transportation or exchange of oil, natural gas and $CO_2$; gathering systems; pipelines or other similar agreements, transactions, properties, interests or arrangements which are usual and customary in the oil and gas exploration and production business located within the geographic boundaries of the United States of America.

(i)      Investments arising from the endorsement of financial instruments in the ordinary course of business.

(j)      Investments consisting of guarantees of Permitted Senior Additional Debt or Permitted Second Lien Debt (or any Debt which represents a permitted extension, refinancing or renewal of such Permitted Senior Additional Debt or Permitted Second Lien Debt) by any Credit Party.

(k)      Investments in Unrestricted Subsidiaries so long as (i) no Default, Event of Default or Borrowing Base Deficiency exists at the time of such Investment or would result therefrom, and (ii) the aggregate unrecovered amount of all such Investments shall not at any time exceed $[5,000,000].

(l)      other Investments not to exceed $[10,000,000] (valued at the time such Investment is made, without giving effect to any write downs, write offs or appreciation with respect to such Investment) in the aggregate at any time.

Section 9.06   Nature of Business; No International Operations.  The Borrower will not, and will not permit any Restricted Subsidiary to, allow any material change to be made in the character of its business as an independent oil and gas exploration and production company. From and after the Effective Date, the Borrower and its Domestic Subsidiaries will not acquire or make any other expenditure (whether such expenditure is capital, operating or otherwise) in or related to, any Oil and Gas Properties not located within the geographical boundaries of the United States of America.  The Borrower shall at all times remain organized under the laws of the United States of America or any State thereof or the District of Columbia.

Section 9.07   Limitation on Leases.  The Borrower will not, and will not permit any Restricted Subsidiary to, create, incur, assume or suffer to exist any obligation for the payment of rent or hire of Property of any kind whatsoever (real or personal but excluding Capital Leases and leases of Hydrocarbon Interests), under leases or lease agreements which would cause the aggregate amount of all payments made by the Borrower and its Restricted Subsidiaries pursuant to all such leases or lease agreements, including, without limitation, any residual payments at the end of any lease, to exceed $[12,500,000] in the aggregate during any fiscal year; *provided*, *however*, that, the foregoing restriction shall not apply to oil, gas and mineral leases, $CO_2$ leases

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

or supply agreements, or permits or similar agreements entered into in the ordinary course of business or orders of any Governmental Authority adjudicating the rights or pooling the interests of the owners of oil and gas properties or lease agreements in effect as of the date hereof.

Section 9.08    Proceeds of Loans.

(a)    The Borrower will not permit the proceeds of the Notes to be used for any purpose other than those permitted by Section 7.21.  Neither the Borrower nor any Person acting on behalf of the Borrower has taken or will take any action which might cause any of the Loan Documents to violate Regulation T, Regulation U or Regulation X or any other regulation of the Board or to violate Section 7 of the Securities Exchange Act of 1934 or any rule or regulation thereunder, in each case as now in effect or as the same may hereinafter be in effect.  If requested by the Administrative Agent, the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form U-1 or such other form referred to in Regulation U, Regulation T or Regulation X of the Board, as the case may be.

(b)    The Borrower will not request any Borrowing or Letter of Credit, and the Borrower shall not use, and shall cause that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Borrowing or Letter of Credit (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country to the extent such activities, businesses or transaction would be prohibited by Sanctions if conducted by a corporation incorporated in the United States of America or (iii) in any manner that would result in the violation of  any Sanctions applicable to any party hereto.

Section 9.09    ERISA Compliance.  Except as could not reasonably be expected to result in liability to the Borrower and its Subsidiaries in excess of the Threshold Amount, the Borrower will not, and will not permit any Subsidiary to, at any time:

(a)    engage in, or permit any ERISA Affiliate to engage in, any transaction in connection with which the Borrower or a Subsidiary could be subjected to either a civil penalty assessed pursuant to subsections (c), (i), (l) or (m) of section 502 of ERISA or a tax imposed by Chapter 43 of Subtitle D of the Code.

(b)    fail to make, or permit any ERISA Affiliate to fail to make, full payment when due of all amounts which, under the provisions of any Pension Plan, agreement relating thereto or applicable law, the Borrower, a Subsidiary or any ERISA Affiliate is required to pay as contributions thereto.

(c)    contribute to or assume an obligation to contribute to, any employee welfare benefit plan, as defined in section 3(1) of ERISA, including, without limitation, any such

112

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

plan maintained to provide benefits to former employees of such entities, that may not be terminated by such entities in their sole discretion at any time without any liability.

(d)    permit an ERISA Event to occur, or permit any ERISA Affiliate to incur an ERISA Event, that when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in liability of the Borrower and its Subsidiaries.

Section 9.10    Sale or Discount of Receivables.  Except for receivables obtained by the Borrower or any Restricted Subsidiary out of the ordinary course of business or the settlement of joint interest billing accounts in the ordinary course of business or discounts granted to settle collection of accounts receivable or the sale of defaulted accounts arising in the ordinary course of business in connection with the compromise or collection thereof and not in connection with any financing transaction, the Borrower will not, and will not permit any Restricted Subsidiary to, discount or sell (with or without recourse) any of its notes receivable or accounts receivable to any Person other than the Borrower or any Guarantor.

Section 9.11    Mergers, Etc.  The Borrower will not, and will not permit any Restricted Subsidiary to, merge into or with or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its Property to any other Person (whether now owned or hereafter acquired) (any such transaction, a "consolidation"), or liquidate or dissolve; *provided* that (a) any Restricted Subsidiary may participate in a consolidation with the Borrower (*provided* that the Borrower shall be the continuing or surviving entity), (b) any Restricted Subsidiary may participate in a consolidation with another Restricted Subsidiary (*provided* that if one of such Restricted Subsidiaries is a Guarantor, a Guarantor shall be the continuing or surviving entity), and (c) any Restricted Subsidiary may liquidate or dissolve so long as all of its assets (if any) are distributed to the Borrower or a Guarantor prior to such liquidation or dissolution.

Section 9.12    Sale of Properties and Termination of Swap Agreements.  The Borrower will not, and will not permit any Restricted Subsidiary to, sell, assign, farm-out, convey or otherwise transfer any Proved Oil and Gas Property or to terminate or otherwise monetize any Swap Agreement in respect of commodities (including, in each case, as a result of the designation of any Restricted Subsidiary as an Unrestricted Subsidiary in accordance with Section 9.23 and including the sale of any Restricted Subsidiary that owns any Proved Oil and Gas Properties or that is a party to any Swap Agreement in respect of commodities) except for:

(a)    the sale of Hydrocarbons in the ordinary course of business;

(b)    farmouts of undeveloped acreage to which no Proved Reserves are attributed and assignments in connection with such farmouts;

113

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(c)    the sale or transfer of equipment and other personal property that is no longer necessary for the business of the Borrower or such Restricted Subsidiary or is replaced by equipment or other personal property of at least comparable value and use;

(d)    the sale or other disposition of Property between or among Credit Parties subject to compliance with Section 8.14;

(e)    Casualty Events; *provided* that in the case of a Triggering Disposition, the Borrowing Base shall be automatically reduced on the date of such Triggering Disposition in accordance with Section 2.07(f) and the Net Proceeds of such Casualty Event shall be used to prepay the Loans in accordance with Section 3.04(c)(iii);

(f)    the sale or other disposition of any Oil and Gas Property or any interest therein or any Equity Interests in any Restricted Subsidiary owning Oil and Gas Properties and the termination or monetization of any Swap Agreement in respect of commodities (or the sale of any Equity Interests in any Subsidiary that is a party to any Swap Agreement in respect of commodities); *provided* that:

(i)    no Default or Borrowing Base Deficiency exists or results from such sale or disposition of Property or the termination or monetization of any Swap Agreement in respect of commodities (including after giving effect to any applicable reduction in the Borrowing Base pursuant to Section 2.07(f) and any corresponding mandatory prepayments under Section 3.04(c)(iii));

(ii)    not less than [85]% of the consideration received in respect of such sale or other disposition or termination shall be cash; *provided* that the consideration requirement in this clause (ii) shall not apply to trades or exchanges of Oil and Gas Properties for other Oil and Gas Properties so long as (A) the Borrowing Base value of the Oil and Gas Properties being traded or otherwise disposed of in such trade or series of related trades does not exceed [10]% of the Borrowing Base then in effect and (B) (1) the Borrowing Base value of the Oil and Gas Properties being traded or otherwise disposed of in such trade or series of related trades does not exceed the Borrowing Base value of the Oil and Gas Properties being received or otherwise acquired in such trade or series of related trades by an amount that exceeds [5%] of the Borrowing Base then in effect, it being agreed that Borrowing Base value as used in this clause (ii) shall mean the value the Administrative Agent attributes in its sole discretion acting in good faith, but consistent with its customary oil and gas lending criteria as it exists at a particular time, to such Oil and Gas Properties;

(iii)    the consideration received in respect of such sale or other disposition or termination or monetization of any Swap Agreement in respect of commodities shall be equal to or greater than the fair market value of the Oil and Gas Property, interest therein or Restricted Subsidiary subject of such sale or other disposition, or Swap Agreement subject of such termination or monetization (as

114

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

reasonably determined by the board of directors (or comparable governing body) of the Borrower or, if such consideration is less than $[25,000,000] and the organizational documents of the Borrower do not require such sale or other disposition to be approved by the board of directors, by a Responsible Officer of the Borrower, and, if requested by the Administrative Agent, the Borrower shall deliver a certificate of a Responsible Officer of the Borrower certifying to that effect);

(iv)    in the case of a Triggering Disposition, (A) the Borrower shall have delivered to the Administrative Agent at least ten (10) Business Days' prior written notice of such Triggering Disposition and such other information regarding such Triggering Disposition as the Administrative Agent may have reasonably requested, (B) the Borrowing Base shall automatically be reduced on the date of such Triggering Disposition in accordance with Section 2.07(f) and (C) the Net Proceeds of such Triggering Disposition shall be used to prepay the Loans in accordance with Section 3.04(c)(iii); and

(v)    if any such sale or other disposition is of a Subsidiary owning Oil and Gas Properties or that is a party to commodity Swap Agreements, such sale or other disposition shall include all the Equity Interests of such Subsidiary; and

(g)    the unwinding or termination of any Swap Agreement as may be necessary to comply with Section 9.18(b), so long as no Swap Agreements are unwound or terminated other than Swap Agreements in respect of the minimum volumes necessary to achieve such compliance; *provided* that in the case of a Triggering Disposition, the Borrowing Base shall be automatically reduced on the date of such Triggering Disposition in accordance with Section 2.07(f) and the Net Proceeds of such unwind or termination shall be used to prepay the Loans in accordance with Section 3.04(c)(iii).

Section 9.13    Environmental Matters. The Borrower will not, and will not permit any Subsidiary to, cause or permit any of its Property to be in violation of, or do anything or permit anything to be done which will subject any such Property to a Release or threatened Release of Hazardous Materials, exposure to any Hazardous Materials, or to any Remedial Work under any Environmental Laws, assuming disclosure to the applicable Governmental Authority of all relevant facts, conditions and circumstances, if any, pertaining to such Property where such violations, Release or threatened Release, exposure, or Remedial Work could reasonably be expected to have a Material Adverse Effect.

Section 9.14    Transactions with Affiliates. The Borrower will not, and will not permit any Restricted Subsidiary to, enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of Property or the rendering of any service, with any Affiliate (other than the Guarantors) or any operating portfolio company of any Affiliate unless such transactions are otherwise permitted under this Agreement and are upon fair and reasonable terms no less favorable to it than it would obtain in a comparable arm's length transaction with a Person not an Affiliate; *provided*, *however*, the foregoing provisions of this Section 9.14 shall

115

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

not apply to: (a) transactions solely among the Credit Parties, (b) the performance of employment, equity award, equity option or equity appreciation agreements, plans or other similar compensation or benefit plans or arrangements (including vacation plans, health and insurance plans, deferred compensation plans and retirement or savings plans) entered into by the Borrower or any Restricted Subsidiary in the ordinary course of its business with its or for the benefit of its employees, officers and directors, (c) fees and compensation to, and indemnity provided on behalf of, officers, directors, and employees of the Borrower or any Restricted Subsidiary in their capacity as such, to the extent such fees and compensation are customary, and (d) Restricted Payments permitted hereunder.

Section 9.15    Subsidiaries.  The Borrower will not, and will not permit any Restricted Subsidiary to, create or acquire any additional Restricted Subsidiary or redesignate an Unrestricted Subsidiary as a Restricted Subsidiary unless the Borrower gives written notice to the Administrative Agent of such creation, acquisition or redesignation and complies with Section 8.14(b).  The Borrower shall not, and shall not permit any Restricted Subsidiary to, sell, assign or otherwise dispose of any Equity Interests in any Restricted Subsidiary except in compliance with Section 9.12.  Neither the Borrower nor any Restricted Subsidiary shall have any Foreign Subsidiaries.  The Borrower will not permit any Person other than the Borrower or another Credit Party to own any Equity Interests in any Guarantor.

Section 9.16    Negative Pledge Agreements; Dividend Restrictions.  The Borrower will not, and will not permit any Restricted Subsidiary to, create, incur, assume or suffer to exist any contract, agreement or understanding (other than this Agreement, the Security Instruments, Debt creating Liens permitted by Section 9.03(c) or Section 9.03(d), agreements, documents, or instruments executed and delivered in connection with Debt permitted by Section 9.02(h), any leases or licenses or similar contracts as they affect any Property or Lien subject to a lease or license, or any restriction with respect to a Restricted Subsidiary imposed pursuant to an agreement entered into for the direct or indirect sale or disposition of all or substantially all the equity or Property of such Restricted Subsidiary (or the Property that is subject to such restriction) pending the closing of such sale or disposition) which in any way prohibits or restricts the granting, conveying, creation or imposition of any Lien on any of its Property in favor of the Administrative Agent for the benefit of the Secured Parties or restricts any Restricted Subsidiary from paying dividends or making distributions to the Borrower or any Guarantor, or which requires the consent of or notice to other Persons in connection therewith.

Section 9.17    Gas Imbalances, Take-or-Pay or Other Prepayments.  The Borrower will not, and will not permit any Restricted Subsidiary to, allow gas imbalances, take-or-pay or other prepayments (other than any gas imbalances, take-or-pay and other prepayments set forth on Schedule 7.18 or on the most recent certificate delivered pursuant to Section 8.12(c)) with respect to the Oil and Gas Properties of the Borrower or any Restricted Subsidiary that would require the Borrower or such Restricted Subsidiary to deliver Hydrocarbons at some future time without then or thereafter receiving full payment therefor to exceed one bcf of gas (on an mcf equivalent basis) in the aggregate.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Section 9.18    Swap Agreements.

(a)    The Borrower will not, and will not permit any Restricted Subsidiary to, enter into any Swap Agreements with any Person other than:

(i)    Subject to clause (b) of this Section 9.18, Swap Agreements with an Approved Counterparty in respect of commodities entered into not for speculative purposes the notional volumes of which (when aggregated with other commodity Swap Agreements then in effect) do not exceed, as of the date such Swap Agreement is entered into, (A) for each of the first full 24 calendar months following the date of determination, 85% of the Projected Volume for such month, and (B) for each of the 36 full calendar months following the period referred to in the foregoing clause (A), 75% of the Projected Volume for such month, in each case of crude oil, natural gas and natural gas liquids, calculated separately; *provided*, *however*, that (x) such Swap Agreements shall not, in any case, have a tenor of greater than 60 full calendar months following the date on which such Swap Agreement is entered into and (y) all purchased put options or price floors for Hydrocarbons shall be excluded for purposes of the foregoing volume limitations on commodity swaps so long as the total amount of obligations thereunder are fixed and known at the time such transaction is entered into.  It is understood that Swap Agreements in respect of commodities which may, from time to time, "hedge" the same volumes, but different elements of commodity risk thereof, shall not be aggregated together when calculating the foregoing limitations on notional volumes.

(ii)    Swap Agreements in respect of interest rates with an Approved Counterparty, as follows:

(A)    Swap Agreements effectively converting interest rates from fixed to floating, the notional amounts of which (when aggregated with all other Swap Agreements of the Borrower and its Restricted Subsidiaries then in effect effectively converting interest rates from fixed to floating) do not exceed 80% of the then outstanding principal amount of the Credit Parties' Debt for borrowed money which bears interest at a fixed rate, and which Swap Agreements shall not, in any case, have a tenor beyond the maturity date of such Debt, and

(B)    Swap Agreements effectively converting interest rates from floating to fixed, the notional amounts of which (when aggregated with all other Swap Agreements of the Borrower and its Restricted Subsidiaries then in effect effectively converting interest rates from floating to fixed) do not exceed 80% of the then outstanding principal amount of the Credit Parties' Debt for borrowed money which bears interest at a floating rate, and which Swap Agreements shall not, in any case, have a tenor beyond the maturity date of such Debt.

117

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(b)    If, after the end of any calendar quarter, commencing with the first full calendar quarter ending after the Effective Date, the Borrower determines that the aggregate notional volumes of all Swap Agreements in respect of commodities for such calendar quarter (other than basis differential swaps on volumes already hedged pursuant to other Swap Agreements) exceeded 100% of actual production of Hydrocarbons in such calendar quarter, then the Borrower (i) shall promptly notify the Administrative Agent of such determination and (ii) if requested by the Administrative Agent or the Required Lenders, shall, within 45 days following such request, terminate (only to the extent such terminations are permitted pursuant to Section 9.12), create off-setting positions, or otherwise unwind or monetize (only to the extent such unwinds or monetizations are permitted pursuant to Section 9.12) existing Swap Agreements such that, at such time, future hedging volumes will not exceed 100% of reasonably anticipated projected production for the then-current and any succeeding calendar quarters.

(c)    In no event shall any Swap Agreement contain any requirement, agreement or covenant for the Borrower or any Restricted Subsidiary to post collateral, credit support (including in the form of letters of credit) or margin to secure their obligations under such Swap Agreement or to cover market exposures other than, with respect to Approved Counterparties described in clauses (a) and (c) of such term, any requirement, agreement or covenant to enter into or maintain the Security Instruments.

(d)    The Borrower will not, and will not permit any Restricted Subsidiary to, terminate or monetize any Swap Agreement in respect of commodities without the prior written consent of the Required Lenders except to the extent such terminations are permitted pursuant to Section 9.12.

(e)    For purposes of entering into or maintaining Swap Agreement trades or transactions under Section 9.18(a)(i) and Section 9.18(b), respectively, forecasts of reasonably anticipated production from the Borrower's and its Restricted Subsidiaries' Oil and Gas Properties as set forth on the most recent Reserve Report delivered pursuant to the terms of this Agreement shall be deemed to be updated to account for any increase or decrease therein anticipated because of information obtained by the Borrower or any of its Restricted Subsidiaries and delivered to the Administrative Agent subsequent to the publication of such Reserve Report including, without limitation, (i) the Borrower's or any of its Restricted Subsidiaries' internal forecasts of production decline rates for existing wells, (ii) additions to or deletions from anticipated future production from new wells, (iii) completed dispositions, and (iv) completed acquisitions coming on stream or failing to come on stream; *provided* that (A) any such supplemental information shall be reasonably satisfactory to the Administrative Agent and (B) if any such supplemental information is delivered, such information shall be presented on a net basis (i.e., it shall take into account both increases and decreases in anticipated production subsequent to publication of the most recent Reserve Report).

Section 9.19    Marketing Activities.  The Borrower will not, and will not permit any of its Restricted Subsidiaries to, engage in marketing activities for any Hydrocarbons or enter into any contracts related thereto other than (i) contracts for the sale of Hydrocarbons scheduled or

118

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

reasonably estimated to be produced from their Proved Oil and Gas Properties during the period of such contract, (ii) contracts for the sale of Hydrocarbons scheduled or reasonably estimated to be produced from Proved Oil and Gas Properties of third parties during the period of such contract associated with the Oil and Gas Properties of the Borrower and its Restricted Subsidiaries that the Borrower or one of its Restricted Subsidiaries has the right to market pursuant to joint operating agreements, unitization agreements or other similar contracts that are usual and customary in the oil and gas business, and (iii) other contracts for the purchase and/or sale of Hydrocarbons of third parties (A) which have generally offsetting provisions (*i.e.*, corresponding pricing mechanics, delivery dates and points and volumes) such that no "position" is taken and (B) for which appropriate credit support has been taken to alleviate the material credit risks of the counterparty thereto.

Section 9.20    Holding Company.  The Borrower shall not engage in any business or activity or own any assets other than (a) holding 100% of the Equity Interests in its Subsidiaries and other miscellaneous non-material assets incidental to the maintenance of its corporate existence, (b) performing its obligations and activities incidental thereto under the Loan Documents, any Swap Agreements and any agreements entered into in connection with any Bank Products, (c) agreements relating to the issuance, sale, purchase, repurchase or registration of securities of the Borrower, (d) minute books and other corporate books and records of the Borrower, (e) paying, managing, incurring or otherwise addressing tax liabilities arising in the ordinary course of business, (f) corporate, administrative and operating expenses in the ordinary course of business and (g) incurring and guaranteeing Debt, and making Restricted Payments and Investments, in each case, to the extent permitted by this Agreement.

Section 9.21    Changes in Fiscal Year and Amendments to Organizational Documents. The Borrower shall not, and shall not permit any Restricted Subsidiary to (a) have its fiscal year end on a date other than December 31 or change its method of determining fiscal quarters or (b) amend its bylaws, limited liability company agreement, certificates of formation or other organizational documents in any manner that is, in the case of this clause (b), materially adverse to the interests of the Lenders.

Section 9.22    Non-Qualified ECP Guarantors.  The Borrower shall not permit any Credit Party that is not a Qualified ECP Guarantor to own, at any time, any Proved Oil and Gas Properties or any Equity Interests in any Restricted Subsidiaries.

Section 9.23    Designation and Conversion of Restricted and Unrestricted Subsidiaries; Debt of Unrestricted Subsidiaries.

(a)    Unless designated as an Unrestricted Subsidiary on Schedule 7.14 as of the date hereof or thereafter, assuming compliance with Section 9.23(b), any Person that becomes a Subsidiary of the Borrower or any of its Restricted Subsidiaries shall be classified as a Restricted Subsidiary.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(b)      The Borrower may designate by written notification thereof to the Administrative Agent, any Restricted Subsidiary, including a newly formed or newly acquired Subsidiary, as an Unrestricted Subsidiary if (i) prior, and after giving effect, to such designation, neither a Default nor a Borrowing Base Deficiency would exist, (ii) such designation is deemed to be an Investment in an Unrestricted Subsidiary in an amount equal to the fair market value as of the date of such designation of the Borrower's direct and indirect ownership interest in such Subsidiary and such Investment would be permitted to be made at the time of such designation under Section 9.05, (iii) such designation is deemed to be a disposition of Oil and Gas Properties to the extent such Subsidiary owns Proved Oil and Gas Properties and (iv) such Subsidiary is not a "restricted subsidiary" or guarantor with respect to any Permitted Senior Additional Debt or any Permitted Second Lien Debt.  Except as provided in this Section 9.23(b), no Restricted Subsidiary may be redesignated as an Unrestricted Subsidiary.

(c)      The Borrower may designate any Unrestricted Subsidiary to be a Restricted Subsidiary if after giving effect to such designation, (i) the representations and warranties of the Borrower and such Restricted Subsidiary contained in each of the Loan Documents with respect to such Restricted Subsidiary are true and correct on and as of such date as if made on and as of the date of such redesignation (or, if stated to have been made expressly as of an earlier date, were true and correct as of such date), (ii) no Default would be caused by such designation, and (iii) the Borrower and such Restricted Subsidiary each comply with the requirements under Section 8.14, Section 8.19 and Section 9.15.  Any such designation shall be treated as a recovery of Borrower's Investment in such Unrestricted Subsidiary in an amount equal to the lesser of the fair market value at such time of the Borrower's direct and indirect ownership interest in such Subsidiary or the amount of the Borrower's Investment previously made in (and not previously recovered from) such Unrestricted Subsidiary.

## ARTICLE X
## EVENTS OF DEFAULT; REMEDIES

Section 10.01  Events of Default.  One or more of the following events shall constitute an "Event of Default":

(a)      the Borrower shall fail to pay any principal of any Loan or any reimbursement obligation in respect of any LC Disbursement when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof, by acceleration or otherwise.

(b)      the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in Section 10.01(a)) payable under any Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three (3) Business Days.

(c)      any representation or warranty made or deemed made by or on behalf of the Borrower or any Restricted Subsidiary in or in connection with any Loan Document or any

120

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

amendment or modification of any Loan Document or waiver under such Loan Document or in any certificate furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any  material respect when made or deemed made (or incorrect in any respect in the case of any such representation or warranty that is already qualified by materiality or by reference to Material Adverse Effect).

(d)     the Borrower or any Restricted Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in Section 8.01(n), Section 8.02(a), Section 8.03 (with respect to either the Borrower's or any Restricted Subsidiary's existence), Section 8.14, Section 8.17, Section 8.20, or in Article IX.

(e)     the Borrower or any Restricted Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in Section 10.01(a), Section 10.01(b) or Section 10.01(d)) or any other Loan Document, and such failure shall continue unremedied for a period of 30 days after the earlier to occur of (i) written notice thereof from the Administrative Agent to the Borrower (which notice will be given at the request of any Lender) or (ii) a Responsible Officer of the Borrower or such Restricted Subsidiary otherwise becoming aware of such failure.

(f)     the Borrower or any Restricted Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Debt, when and as the same shall become due and payable.

(g)     any event or condition occurs that results in any Material Debt becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Debt or any trustee or agent on its or their behalf to cause any Material Debt to become due, or to require the Redemption thereof or any offer to Redeem to be made in respect thereof, prior to its scheduled maturity or require the Borrower or any Restricted Subsidiary to make an offer in respect thereof.

(h)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Borrower or any Restricted Subsidiary or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Restricted Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered.

(i)     the Borrower or any Restricted Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

proceeding or petition described in Section 10.01(h), (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Restricted Subsidiary or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors, or (vi) take any action for the purpose of effecting any of the foregoing.

(j)    the Borrower or any Restricted Subsidiary shall become unable, admit in writing its inability or fail generally to pay its debts as they become due.

(k)    (i) one or more final non-appealable judgments for the payment of money in an aggregate amount in excess of the Threshold Amount (to the extent not covered by independent third party insurance provided by insurers of the highest claims paying rating or financial strength as to which the insurer does not dispute coverage and is not subject to an insolvency proceeding) or (ii) any one or more non-monetary final non-appealable judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, shall be rendered against the Borrower, any Restricted Subsidiary or any combination thereof and the same shall remain undischarged for a period of sixty (60) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower or any Restricted Subsidiary to enforce any such judgment.

(l)    the Loan Documents after delivery thereof shall for any reason, except to the extent permitted by the terms thereof, cease to be in full force and effect and valid, binding and enforceable in accordance with their terms against the Borrower or a Guarantor party thereto or shall be repudiated by any of them, or cease to create a valid and perfected Lien of the priority required thereby in respect of collateral purported to be covered thereby with an individual fair market value in excess of $[1,000,000] or an aggregate fair market value in excess of $[2,000,000], except to the extent permitted by the terms of this Agreement or the Security Instruments, or the Borrower or any Restricted Subsidiary or any of their Affiliates shall so state in writing.

(m)    a Change in Control shall occur.

(n)    an ERISA Event shall have occurred that, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in liability of the Borrower and its Subsidiaries in an aggregate amount exceeding the Threshold Amount.

Section 10.02  Remedies.

(a)    In the case of an Event of Default other than one described in Section 10.01(h), Section 10.01(i) or Section 10.01(j), at any time thereafter during the continuance of such Event of Default, the Administrative Agent may, and at the request of the Majority Lenders, shall, by notice to the Borrower, take either or both of the following actions, at

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

the same or different times:  (i) terminate the Revolving Credit Commitments, and thereupon the Revolving Credit Commitments shall terminate immediately, and (ii) declare the Notes and the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower and the Guarantors accrued hereunder and under the Notes and the other Loan Documents (including, without limitation, the payment of cash collateral to secure the LC Exposure as provided in Section 2.08(j)), shall become due and payable immediately, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by the Borrower and each Guarantor; and in case of an Event of Default described in Section 10.01(h), Section 10.01(i) or Section 10.01(j), the Revolving Credit Commitments shall automatically terminate and the Notes and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and the other obligations of the Borrower and the Guarantors accrued hereunder and under the Notes and the other Loan Documents (including, without limitation, the payment of cash collateral to secure the LC Exposure as provided in Section 2.08(j)), shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower and each Guarantor.

(b)    In the case of the occurrence of an Event of Default, the Administrative Agent and the Lenders will have all other rights and remedies available at law and equity.

(c)    All proceeds realized from the liquidation or other disposition of collateral or otherwise received after maturity of the Loans, whether by acceleration or otherwise, shall be applied:

(i)    *first*, to payment or reimbursement of that portion of the Indebtedness constituting fees, expenses and indemnities payable to the Administrative Agent in its capacity as such;

(ii)    *second*, pro rata to payment or reimbursement of that portion of the Indebtedness constituting fees, expenses and indemnities payable to the Lenders;

(iii)    *third*, pro rata to payment of accrued interest on the Loans;

(iv)    *fourth*, pro rata to payment of (A) principal outstanding on the Loans, (B) LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time, (C) Indebtedness referred to in clause (b) of the definition of Indebtedness owing to Secured Swap Providers and (D) Indebtedness referred to in clause (c) of the definition of Indebtedness owing to Bank Products Providers;

(v)    *fifth*, pro rata to any other Indebtedness;

123

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(vi)    *sixth*, to serve as cash collateral to be held by the Administrative Agent to secure the remaining LC Exposure; and

(vii)    *seventh*, any excess, after all of the Indebtedness shall have been paid in full in cash, shall be paid to the Borrower or as otherwise required by any Governmental Requirement.

Notwithstanding the foregoing, amounts received from the Borrower or any Guarantor that is not an "eligible contract participant" under the Commodity Exchange Act shall not be applied to any Excluded Swap Obligations (it being understood, that in the event that any amount is applied to Indebtedness other than Excluded Swap Obligations as a result of this clause, the Administrative Agent shall make such adjustments as it determines are appropriate to distributions pursuant to clause *fourth* above from amounts received from "eligible contract participants" under the Commodity Exchange Act to ensure, as nearly as possible, that the proportional aggregate recoveries with respect to Indebtedness described in clause *fourth* above by the holders of any Excluded Swap Obligations are the same as the proportional aggregate recoveries with respect to other Indebtedness pursuant to clause *fourth* above).

## ARTICLE XI
## THE AGENTS

Section 11.01 <u>Appointment; Powers</u>.  Each of the Lenders and the Issuing Bank hereby irrevocably appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto.

Section 11.02 <u>Duties and Obligations of Administrative Agent</u>.  The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing (the use of the term "agent" herein and in the other Loan Documents with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law; rather, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties), (b) the Administrative Agent shall have no duty to take any discretionary action or exercise any discretionary powers, except as provided in <u>Section 11.03</u>, and (c) except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Borrower or a Lender, and shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or under any other Loan Document or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or in any other Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, (v) the satisfaction of any condition set forth in Article VI or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or as to those conditions precedent expressly required to be to the Administrative Agent's satisfaction, (vi) the existence, value, perfection or priority of any collateral security or the financial or other condition of the Borrower and its Subsidiaries or any other obligor or guarantor, or (vii) any failure by the Borrower or any other Person (other than itself) to perform any of its obligations hereunder or under any other Loan Document or the performance or observance of any covenants, agreements or other terms or conditions set forth herein or therein.  For purposes of determining compliance with the conditions specified in Article VI, each Lender shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received written notice from such Lender prior to the proposed closing date specifying its objection thereto.

Section 11.03  Action by Administrative Agent.  The Administrative Agent shall have no duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise in writing as directed by the Majority Lenders (or such other number, class or percentage of the Lenders as shall be necessary under the circumstances as set forth in other provisions this Agreement) and in all cases the Administrative Agent shall be fully justified in failing or refusing to act hereunder or under any other Loan Documents unless it shall (a) receive written instructions from the Majority Lenders or the Lenders, as applicable, (or such other number, class or percentage of the Lenders as shall be necessary under the circumstances as provided in other provisions of this Agreement) specifying the action to be taken and (b) be indemnified to its satisfaction by the Lenders against any and all liability and expenses which may be incurred by it by reason of taking or continuing to take any such action.  The instructions as aforesaid and any action taken or failure to act pursuant thereto by the Administrative Agent shall be binding on all of the Lenders.  If a Default has occurred and is continuing, then the Administrative Agent shall take such action with respect to such Default as shall be directed by the requisite Lenders in the written instructions (with indemnities) described in this Section 11.03, *provided* that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default as it shall deem advisable in the best interests of the Lenders.  In no event, however, shall the Administrative Agent be required to take any action which exposes the Administrative Agent to personal

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

liability or which is contrary to this Agreement, the Loan Documents or applicable law. If a Default has occurred and is continuing, no Agent shall have any obligation to perform any act in respect thereof. The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Majority Lenders or the Lenders (or such other number, class or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 12.02 provisions of this Agreement), and otherwise the Administrative Agent shall not be liable for any action taken or not taken by it hereunder or under any other Loan Document or under any other document or instrument referred to or provided for herein or therein or in connection herewith or therewith INCLUDING ITS OWN ORDINARY NEGLIGENCE, except for its own gross negligence or willful misconduct.

Section 11.04 Reliance by Administrative Agent. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon and each of the Borrower, the Lenders and the Issuing Bank hereby waives the right to dispute the Administrative Agent's record of such statement, except in the case of gross negligence or willful misconduct by the Administrative Agent. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. The Administrative Agent may deem and treat the payee of any Note as the holder thereof for all purposes hereof unless and until a written notice of the assignment or transfer thereof permitted hereunder shall have been filed with the Administrative Agent.

Section 11.05 Subagents. The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding Sections of this Article XI shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Section 11.06 Resignation of Administrative Agent. Subject to the appointment and acceptance of a successor Administrative Agent as provided in this Section 11.06, the Administrative Agent may resign at any time by notifying the Lenders, the Issuing Bank and the Borrower. Upon any such resignation, the Majority Lenders shall have the right, in consultation with and upon the approval of the Borrower (so long as no Event of Default of the type described in Section 10.01(a), Section 10.01(b), Section 10.01(h), Section 10.01(i) or Section 10.01(j) has occurred and is continuing), which approval shall not be unreasonably withheld, to appoint a

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

successor.  If no successor shall have been so appointed by the Majority Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the Lenders and the Issuing Bank, appoint a successor Administrative Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank.  Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder.  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the Administrative Agent's resignation hereunder, the provisions of this Article XI and Section 12.03 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent.

Section 11.07  Agents as Lenders.  Each bank serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not an Agent hereunder.

Section 11.08  No Reliance.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent, any other Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and each other Loan Document to which it is a party. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, any other Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document, any related agreement or any document furnished hereunder or thereunder.  The Agents shall not be required to keep themselves informed as to the performance or observance by the Borrower or any of its Subsidiaries of this Agreement, the Loan Documents or any other document referred to or provided for herein or to inspect the Properties or books of the Borrower or its Subsidiaries. Except for notices, reports and other documents and information expressly required to be furnished to the Lenders by the Administrative Agent hereunder, no Agent or Lead Arranger shall have any duty or responsibility to provide any Lender with any credit or other information concerning the affairs, financial condition or business of the Borrower (or any of its Affiliates) which may come into the possession of such Agent or any of its Affiliates.  In this regard, each Lender acknowledges that Vinson & Elkins L.L.P. is acting in this transaction as special counsel to the Administrative Agent only, except to the extent otherwise expressly stated in any legal opinion or any Loan Document.  Each other party hereto will consult with its own legal counsel

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

to the extent that it deems necessary in connection with the Loan Documents and the matters contemplated therein.

Section 11.09 <u>Administrative Agent May File Proofs of Claim</u>. In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to the Borrower or any of its Subsidiaries, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Indebtedness that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under <u>Section 12.03</u>) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under <u>Section 12.03</u>.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Indebtedness or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 11.10 <u>Authority of Administrative Agent to Release Collateral, Liens and Guarantors</u>. Each Lender and the Issuing Bank hereby authorizes the Administrative Agent to release (a) any collateral that is permitted to be sold or released pursuant to the terms of the Loan Documents and (b) any Guarantor if 100% of the Equity Interests in such Guarantor are sold in a transaction permitted under the Loan Documents. Each Lender and the Issuing Bank hereby authorizes the Administrative Agent to execute and deliver to the Borrower, at the Borrower's sole cost and expense (and the Administrative Agent hereby agrees to take such actions at the request of the Borrower), any and all releases of Liens, termination statements, assignments or other documents reasonably requested by the Borrower in connection with any sale or other

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

disposition of Property to the extent such sale or other disposition is permitted by the terms of Section 9.12 or is otherwise authorized by the terms of the Loan Documents.

Section 11.11 The Lead Arranger.    The Lead Arranger shall have no duties, responsibilities or liabilities under this Agreement and the other Loan Documents other than its duties, responsibilities and liabilities in its capacity as Lender hereunder.

## ARTICLE XII
## MISCELLANEOUS

Section 12.01 Notices.

(a)    Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to Section 12.01(b)), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax, as follows:

(i)    if to the Borrower, to it at c/o Chaparral Energy, Inc., 701 Cedar Lake Blvd., Oklahoma City, Oklahoma 73114, Attention:  Justin Byrne, Vice President, General Counsel and Secretary (Tel No. (405) 819-1450, Email: justin.byrne@chaparralenergy.com);

(ii)    if to the Administrative Agent, to it at Royal Bank of Canada, Agency Services Group, 4th Floor, 20 King Street West, Toronto, Ontario M5H 1C4, Attention:  Manager, Agency Services Group (Fax No. (416) 842-4023);

(iii)    if to the Issuing Bank, to it at Royal Bank of Canada, 30 Hudson Street, 28th Floor, Jersey City, New Jersey 07302-4699, Attn: Credit Administration (Fax No. (212) 428-3015);

(iv)    if to any other Lender, to it at its address (or fax number) set forth in its Administrative Questionnaire.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices pursuant to Article II, Article III, Article IV and Article V unless otherwise agreed by the Administrative Agent and the applicable Lender.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications.

(c)    Any party hereto may change its address or fax number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

Section 12.02  Waivers; Amendments.

(a)  No failure on the part of the Administrative Agent, any other Agent, the Issuing Bank or any Lender to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege, or any abandonment or discontinuance of steps to enforce such right, power or privilege, under any of the Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any of the Loan Documents preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies of the Administrative Agent, any other Agent, the Issuing Bank and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by Section 12.02(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent, any other Agent, any Lender or the Issuing Bank may have had notice or knowledge of such Default at the time.

(b)  Subject to Section 3.03(b), neither this Agreement nor any provision hereof nor any Security Instrument nor any provision thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Majority Lenders or by the Borrower and the Administrative Agent with the consent of the Majority Lenders; *provided* that no such agreement shall (i) increase the Revolving Credit Commitments or the Maximum Revolving Credit Amount of any Lender without the written consent of such Lender, (ii) increase the Borrowing Base without the written consent of each Non-Defaulting Lender, decrease or maintain the Borrowing Base without the consent of the Required Lenders, postpone any Scheduled Redetermination Date without the consent of the Required Lenders, or modify Section 2.07 in any manner that results in an increase in the Borrowing Base without the consent of each Lender (other than any Defaulting Lender), (iii) reduce the principal amount of any Loan or LC Disbursement or reduce the rate of interest thereon, or reduce any fees payable hereunder, or reduce any other Indebtedness hereunder or under any other Loan Document, without the written consent of each Lender affected thereby; *provided* that the imposition of the default rate of interest under Section 3.02(c) may be waived by the Majority Lenders, (iv) postpone the scheduled date of payment or prepayment of the principal amount of any Loan or LC Disbursement, or any interest thereon, or any fees payable hereunder, or any other Indebtedness hereunder or under any other Loan Document, or reduce the amount of, waive or excuse any such payment, or postpone or extend the Maturity Date or the Termination Date without the written consent of each Lender affected thereby, (v) change Section 4.01(b) or Section 4.01(c) in a manner that would alter the pro rata sharing of payments required thereby,

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

without the written consent of each Lender, (vi) waive or amend Section 3.04(c), Section 6.01, Section 10.02(c) or Section 12.14 or change the definition of the terms "Domestic Subsidiary", "Foreign Subsidiary", "Material Subsidiary", "Immaterial Subsidiary", "Subsidiary", "Restricted Subsidiary" or "Unrestricted Subsidiary" without the written consent of each Lender (other than any Defaulting Lender), (vii) release any Guarantor (except as set forth in Section 11.10 or in the Guaranty Agreement) or release all or substantially all of the Mortgaged Properties (other than as provided in Section 11.10), without the written consent of each Lender (other than any Defaulting Lender), or(viii) change any of the provisions of this Section 12.02(b) or the definition of "Majority Lenders", "Required Lenders", or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or under any other Loan Documents or make any determination or grant any consent hereunder or any other Loan Documents, without the written consent of each Lender (other than any Defaulting Lender); *provided*, *further* that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent, any other Agent, or the Issuing Bank hereunder or under any other Loan Document without the prior written consent of the Administrative Agent, such other Agent or the Issuing Bank, as the case may be.

(c)     Notwithstanding the foregoing, (i) any supplement to Schedule 7.14 (Subsidiaries) shall be effective simply by delivering to the Administrative Agent a supplemental schedule clearly marked as such and, upon receipt, the Administrative Agent will promptly deliver a copy thereof to the Lenders, (ii) the Borrower and the Administrative Agent may amend this Agreement or any other Loan Document without the consent of the Lenders in order to correct, amend or cure any ambiguity, inconsistency or defect or correct any typographical error or other manifest error in any Loan Document, and (iii) the Administrative Agent and the Borrower (or other applicable Credit Party) may enter into any amendment, modification or waiver of this Agreement or any other Loan Document or enter into any agreement or instrument to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Mortgaged Property or Property to become Mortgaged Property to secure the Indebtedness for the benefit of the Lenders or as required by any Governmental Requirement to give effect to, protect or otherwise enhance the rights or benefits of any Lender under the Loan Documents without the consent of any Lender.

(d)     Notwithstanding anything to the contrary contained in any Loan Documents, (i) the Revolving Credit Commitment of any Defaulting Lender may not be increased without its consent (it being understood, for avoidance of doubt, that no Defaulting Lender shall have any right to approve or disapprove any increase, decrease or reaffirmation of the Borrowing Base) and (ii) the Administrative Agent may with the consent of the Borrower and all other Non-Defaulting Lenders amend, modify or supplement the Loan Documents to effectuate an increase to the Borrowing Base where such Defaulting Lender does not consent to an increase to its Revolving Credit Commitment (including not increasing the Borrowing Base by the portion thereof applicable to the Defaulting Lender).

Section 12.03  Expenses, Indemnity; Damage Waiver.

131

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(a)      The Borrower shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and its Affiliates, including, without limitation, the reasonable fees, charges and disbursements of counsel (*provided*, that, the Borrower shall only bear such expenses for one primary counsel for the Administrative Agent, any specialist counsel (if reasonably required by the Administrative Agent) and one local or foreign counsel for the Administrative Agent in each relevant jurisdiction) and other outside consultants for the Administrative Agent, the reasonable travel, photocopy, mailing, courier, telephone and other similar expenses, and the cost of reasonably requested environmental invasive and non-invasive assessments and audits and surveys and appraisals (*provided* that, unless an Event of Default has occurred and is continuing, the Borrower shall bear the cost of only two such assessments, audits, surveys or appraisals per year), in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration (both before and after the execution hereof and including advice of counsel to the Administrative Agent as to the rights and duties of the Administrative Agent and the Lenders with respect thereto) of this Agreement and the other Loan Documents and any amendments, modifications or waivers of or consents related to the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all costs, expenses, Other Taxes, assessments and other charges incurred by any Agent or any Lender in connection with any filing, registration, recording or perfection of any security interest contemplated by this Agreement or any Security Instrument or any other document referred to therein, (iii) all reasonable and documented out-of-pocket expenses incurred by the Issuing Bank in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder and (iv) all documented out-of-pocket expenses incurred by any Agent, the Issuing Bank or any Lender, including the fees, charges and disbursements of any counsel for any Agent, the Issuing Bank or any Lender, during the existence of any Event of Default in connection with the enforcement or protection of its rights in connection with this Agreement or any other Loan Document, including its rights under this Section 12.03, or in connection with the Loans made or Letters of Credit issued hereunder, including, without limitation, all such documented out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit.

(b)      THE BORROWER SHALL INDEMNIFY EACH AGENT, THE LEAD ARRANGER, THE ISSUING BANK AND EACH LENDER, AND EACH RELATED PARTY OF ANY OF THE FOREGOING PERSONS (EACH SUCH PERSON BEING CALLED AN "INDEMNITEE") AGAINST, AND DEFEND AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES, TAXES AND RELATED EXPENSES, INCLUDING THE REASONABLE FEES, CHARGES AND DISBURSEMENTS OF ANY COUNSEL FOR ANY INDEMNITEE, INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (i) THE EXECUTION OR DELIVERY OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, THE PERFORMANCE BY THE PARTIES HERETO OR THE PARTIES TO ANY OTHER LOAN DOCUMENT OF THEIR

132

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

RESPECTIVE OBLIGATIONS HEREUNDER OR THEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR BY ANY OTHER LOAN DOCUMENT, (ii) THE FAILURE OF THE BORROWER OR ANY RESTRICTED SUBSIDIARY TO COMPLY WITH THE TERMS OF ANY LOAN DOCUMENT, INCLUDING THIS AGREEMENT, OR WITH ANY GOVERNMENTAL REQUIREMENT, (iii) ANY INACCURACY OF ANY REPRESENTATION OR ANY BREACH OF ANY WARRANTY OR COVENANT OF THE BORROWER OR ANY GUARANTOR SET FORTH IN ANY OF THE LOAN DOCUMENTS OR ANY INSTRUMENTS, DOCUMENTS OR CERTIFICATIONS DELIVERED IN CONNECTION THEREWITH, (iv) ANY LOAN OR LETTER OF CREDIT OR THE USE OF THE PROCEEDS THEREFROM, INCLUDING, WITHOUT LIMITATION, (A) ANY REFUSAL BY THE ISSUING BANK TO HONOR A DEMAND FOR PAYMENT UNDER A LETTER OF CREDIT IF THE DOCUMENTS PRESENTED IN CONNECTION WITH SUCH DEMAND DO NOT STRICTLY COMPLY WITH THE TERMS OF SUCH LETTER OF CREDIT, OR (B) THE PAYMENT OF A DRAWING UNDER ANY LETTER OF CREDIT NOTWITHSTANDING THE NON-COMPLIANCE, NON-DELIVERY OR OTHER IMPROPER PRESENTATION OF THE DOCUMENTS PRESENTED IN CONNECTION THEREWITH, (v) ANY OTHER ASPECT OF THE LOAN DOCUMENTS, (vi) THE OPERATIONS OF THE BUSINESS OF THE BORROWER AND ITS RESTRICTED SUBSIDIARIES BY THE BORROWER AND ITS RESTRICTED SUBSIDIARIES, (vii) ANY ASSERTION THAT THE LENDERS WERE NOT ENTITLED TO RECEIVE THE PROCEEDS RECEIVED PURSUANT TO THE SECURITY INSTRUMENTS, (viii) ANY ENVIRONMENTAL LAW APPLICABLE TO THE BORROWER OR ANY SUBSIDIARY OR ANY OF THEIR PROPERTIES OR OPERATIONS, INCLUDING, THE PRESENCE, GENERATION, STORAGE, RELEASE, THREATENED RELEASE, USE, TRANSPORT, DISPOSAL, ARRANGEMENT OF DISPOSAL OR TREATMENT OF HAZARDOUS MATERIALS ON OR AT ANY OF THEIR PROPERTIES, (ix) THE BREACH OR NON-COMPLIANCE BY THE BORROWER OR ANY SUBSIDIARY WITH ANY ENVIRONMENTAL LAW APPLICABLE TO THE BORROWER OR ANY SUBSIDIARY, (x) THE PAST OWNERSHIP BY THE BORROWER OR ANY RESTRICTED SUBSIDIARY OF ANY OF THEIR PROPERTIES OR PAST ACTIVITY ON ANY OF THEIR PROPERTIES WHICH, THOUGH LAWFUL AND FULLY PERMISSIBLE AT THE TIME, COULD RESULT IN PRESENT LIABILITY, (xi) THE PRESENCE, USE, RELEASE, STORAGE, TREATMENT, DISPOSAL, GENERATION, THREATENED RELEASE, TRANSPORT, ARRANGEMENT FOR TRANSPORT OR ARRANGEMENT FOR DISPOSAL OF HAZARDOUS MATERIALS ON OR AT ANY OF THE PROPERTIES OWNED OR OPERATED BY THE BORROWER OR ANY SUBSIDIARY OR ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY THE BORROWER OR ANY OF ITS SUBSIDIARIES, (xii) ANY ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO THE BORROWER OR ANY OF ITS SUBSIDIARIES, OR (xiii) ANY OTHER ENVIRONMENTAL, HEALTH OR SAFETY CONDITION IN CONNECTION WITH THE LOAN DOCUMENTS, OR (xiv) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING,

133

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO, AND SUCH INDEMNITY SHALL EXTEND TO EACH INDEMNITEE NOTWITHSTANDING THE SOLE OR CONCURRENT NEGLIGENCE OF EVERY KIND OR CHARACTER WHATSOEVER, WHETHER ACTIVE OR PASSIVE, WHETHER AN AFFIRMATIVE ACT OR AN OMISSION, INCLUDING WITHOUT LIMITATION, ALL TYPES OF NEGLIGENT CONDUCT IDENTIFIED IN THE RESTATEMENT (SECOND) OF TORTS OF ONE OR MORE OF THE INDEMNITEES OR BY REASON OF STRICT LIABILITY IMPOSED WITHOUT FAULT ON ANY ONE OR MORE OF THE INDEMNITEES; *PROVIDED* THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES (A) ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE, BAD FAITH, OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE, (B) ARE ON ACCOUNT OF A DISPUTE ARISING SOLELY AMONG INDEMNITEES (OTHER THAN THE ADMINISTRATIVE AGENT OR THE LEAD ARRANGER IN SUCH ROLES) TO THE EXTENT SUCH DISPUTE DOES NOT INVOLVE AND IS NOT RELATED TO ANY ACT, OMISSION OR REPRESENTATION ON THE PART OF, OR ANY INFORMATION PROVIDED BY OR ON BEHALF OF, THE BORROWER, ANY GUARANTOR OR AFFILIATES THEREOF, (C) RESULTED FROM A CLAIM BROUGHT BY THE BORROWER AGAINST ANY INDEMNITEE OF ANY MATERIAL BREACH IN BAD FAITH OF SUCH INDEMNITEE'S FUNDING OBLIGATIONS UNDER THIS AGREEMENT OR (D) IN RESPECT OF ANY PROPERTY FOR ANY OCCURRENCE ARISING FROM THE ACTS OR OMISSIONS OF THE ADMINISTRATIVE AGENT OR ANY OTHER INDEMNITEE DURING THE PERIOD AFTER WHICH SUCH PERSON, ITS SUCCESSORS OR ASSIGNS SHALL HAVE OBTAINED POSSESSION OF SUCH PROPERTY (WHETHER BY FORECLOSURE OR DEED IN LIEU OF FORECLOSURE, AS MORTGAGEE-IN-POSSESSION OR OTHERWISE).

(c)      To the extent that the Borrower fails to pay any amount required to be paid by it to any Agent, the Lead Arranger or the Issuing Bank under Section 12.03(a) or (b), each Lender severally agrees to pay to such Agent, the Lead Arranger or the Issuing Bank, as the case may be, such Lender's Applicable Revolving Credit Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Agent, the Lead Arranger or the Issuing Bank in its capacity as such.

(d)      To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any

134

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or Letter of Credit or the use of the proceeds thereof.

(e)     All amounts due under this Section 12.03 shall be payable promptly after written demand therefor.

Section 12.04  Successors and Assigns.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit), except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 12.04.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit), Participants (to the extent provided in Section 12.04(c)) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Issuing Bank and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     (i)     Subject to the conditions set forth in Section 12.04(b)(ii), any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Revolving Credit Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(A)     the Borrower, *provided* that no consent of the Borrower shall be required if such assignment is to a Lender, an Affiliate of a Lender, an Approved Fund or, if an Event of Default has occurred and is continuing, is to any other assignee; and

(B)     the Administrative Agent, *provided* that no consent of the Administrative Agent shall be required for an assignment to an assignee that is a Lender immediately prior to giving effect to such assignment.

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment to a Lender or an Affiliate of a Lender or an assignment of the entire remaining amount of the assigning Lender's Revolving Credit Commitment or Loans, the

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

amount of the Revolving Credit Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000 unless each of the Borrower and the Administrative Agent otherwise consent, *provided* that no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing;

(B)   each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)   the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation payable by the assigning Lender of $3,500; provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment;

(D)   the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and shall deliver notice of the Assignment and Assumption to the Borrower; and

(E)   in no event may any Lender assign all or a portion of its rights and obligations under this Agreement to (i) the Borrower or any Affiliate of the Borrower, (ii) any natural person or (iii) any Defaulting Lender or any of its subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (iii).

(iii)   Subject to Section 12.04(b)(iv) and the acceptance and recording thereof, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 5.01, Section 5.02, Section 5.03 and Section 12.03).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 12.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 12.04(c).

136

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(iv)    The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Maximum Revolving Credit Amount of, and principal amount (and stated interest) of the Loans and LC Disbursements owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent, the Issuing Bank and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower, the Issuing Bank and any Lender, at any reasonable time and from time to time upon reasonable prior notice.  In connection with any changes to the Register, if necessary, the Administrative Agent will reflect the revisions on Annex I and forward a copy of such revised Annex I to the Borrower, the Issuing Bank and each Lender.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 12.04(b) and any written consent to such assignment required by Section 12.04(b), the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this Section 12.04(b).

(c)    (i)    Any Lender may, without the consent of the Borrower, the Administrative Agent or the Issuing Bank, sell participations to one or more banks or other Persons (other than the Borrower, any Affiliate of the Borrower or any natural person) (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Revolving Credit Commitment and the Loans owing to it); *provided* that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent, the Issuing Bank and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the proviso to Section 12.02 that affects such Participant.  In addition such agreement must provide that the Participant be bound by the provisions of Section 12.03.  Subject to Section 12.04(c)(ii), the Borrower agrees that each Participant shall be entitled to the benefits of Section 5.01, Section 5.02 and Section 5.03 (subject to the requirements and limitations in

137

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Section 5.03, including the requirements under Section 5.03(f) and (g) (it being understood that the documentation required under Section 5.03(f) and (g) and  shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 12.04(b).  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 12.08 as though it were a Lender, *provided* such Participant agrees to be subject to Section 4.01(c) as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(ii)     Each Participant shall not be entitled to receive any greater payment under Sections 5.01 or 5.03, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including, without limitation, any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank having jurisdiction over such Lender, and this Section 12.04 shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)     Notwithstanding any other provisions of this Section 12.04, no transfer or assignment of the interests or obligations of any Lender or any grant of participations therein shall be permitted if such transfer, assignment or grant would require the Borrower and the Guarantors to file a registration statement with the SEC or to qualify the Loans under the "Blue Sky" laws of any state.

Section 12.05  Survival; Revival; Reinstatement.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(a)    All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, any other Agent, the Issuing Bank or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Revolving Credit Commitments have not expired or terminated.    The provisions of Section 5.01, Section 5.02, Section 5.03 and Section 12.03 and Article XI shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Letters of Credit and the Revolving Credit Commitments or the termination of this Agreement, any other Loan Document or any provision hereof or thereof.

(b)    To the extent that any payments on the Indebtedness or proceeds of any collateral are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver or other Person under any bankruptcy law, common law or equitable cause, then to such extent, the Indebtedness so satisfied shall be revived and continue as if such payment or proceeds had not been received and the Administrative Agent's and the Lenders' Liens, security interests, rights, powers and remedies under this Agreement and each Loan Document shall continue in full force and effect.    In such event, each Loan Document shall be automatically reinstated and the Borrower shall take such action as may be reasonably requested by the Administrative Agent and the Lenders to effect such reinstatement.

Section 12.06    Counterparts; Integration; Effectiveness.

(a)    This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

(b)    This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof.  **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES HERETO AND THERETO AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(c)    Except as provided in Section 6.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by fax or other electronic transmission (*e.g.*, .pdf) shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 12.07 Severability.    Any provision of this Agreement or any other Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof or thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 12.08 Right of Setoff.    If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations (of whatsoever kind, including, without limitation, obligations under Swap Agreements) at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower or any Restricted Subsidiary against any of and all the obligations of the Borrower or any Restricted Subsidiary owed to such Lender now or hereafter existing under this Agreement or any other Loan Document, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations may be unmatured; *provided* that in the event that any Defaulting Lender shall exercise any such right of setoff, (a) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.09 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, the Issuing Bank, and the Lenders, and (b) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender under this Section 12.08 are in addition to other rights and remedies (including other rights of setoff) which such Lender or its Affiliates may have.  Each Lender and the Issuing Bank agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

Section 12.09 GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS.

(a)    THIS AGREEMENT AND THE NOTES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK EXCEPT TO THE EXTENT THAT UNITED STATES FEDERAL LAW PERMITS

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

ANY LENDER TO CONTRACT FOR, CHARGE, RECEIVE, RESERVE OR TAKE INTEREST AT THE RATE ALLOWED BY THE LAWS OF THE STATE WHERE SUCH LENDER IS LOCATED.

(b)     ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THE LOAN DOCUMENTS MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EITHER CASE LOCATED IN NEW YORK COUNTY, NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY HEREBY ACCEPTS FOR ITSELF AND (TO THE EXTENT PERMITTED BY LAW) IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS.     EACH PARTY HEREBY IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING, WITHOUT LIMITATION, ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS.     THIS SUBMISSION TO JURISDICTION IS NON-EXCLUSIVE AND DOES NOT PRECLUDE A PARTY FROM OBTAINING JURISDICTION OVER ANOTHER PARTY IN ANY COURT OTHERWISE HAVING JURISDICTION.

(c)     EACH PARTY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO IT AT THE ADDRESS SPECIFIED IN SECTION 12.01 OR SUCH OTHER ADDRESS AS IS SPECIFIED PURSUANT TO SECTION 12.01 (OR ITS ASSIGNMENT AND ASSUMPTION), SUCH SERVICE TO BECOME EFFECTIVE THIRTY (30) DAYS AFTER SUCH MAILING (OR AS SOON THEREAFTER AS IS PROVIDED BY APPLICABLE LAW).   NOTHING HEREIN SHALL AFFECT THE RIGHT OF A PARTY OR ANY HOLDER OF A NOTE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANOTHER PARTY IN ANY OTHER JURISDICTION.

(d)     EACH     PARTY     HEREBY     (i) IRREVOCABLY     AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN; (ii) IRREVOCABLY WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY SUCH LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, OR DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES; *PROVIDED* THAT NOTHING CONTAINED IN THIS SECTION 12.09(D)(II) SHALL LIMIT THE BORROWER'S INDEMNIFICATION OBLIGATIONS TO THE EXTENT SET FORTH

141

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

IN SECTION 12.03 TO THE EXTENT SUCH SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES ARE INCLUDED IN ANY THIRD PARTY CLAIM IN CONNECTION WITH WHICH SUCH INDEMNITEE IS OTHERWISE ENTITLED TO INDEMNIFICATION HEREUNDER; (iii) CERTIFIES THAT NO PARTY HERETO NOR ANY REPRESENTATIVE OR AGENT OR COUNSEL FOR ANY PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, OR IMPLIED THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS, AND (iv) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT, THE LOAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS SECTION 12.09.

Section 12.10 Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 12.11 Confidentiality. Each of the Administrative Agent, the Issuing Bank and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested or required by any regulatory authority purporting to have jurisdiction over such Person, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement or any other Loan Document, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement for the express benefit of the Borrower containing provisions substantially the same as those of this Section 12.11, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any Swap Agreement relating to the Borrower and its obligations, (g) with the consent of the Borrower, or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section 12.11 or (ii) becomes available to the Administrative Agent, the Issuing Bank or any Lender on a nonconfidential basis from a source other than the Borrower. For the purposes of this Section 12.11, "Information" means all information received from the Borrower or any Subsidiary relating to the Borrower or any Subsidiary and their businesses, other than any such information that is available to the Administrative Agent, the Issuing Bank or any Lender on a nonconfidential basis prior to disclosure by the Borrower or a Subsidiary; provided that, in the case of information received from the Borrower or any Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 12.11 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

care to maintain the confidentiality of such Information as such Person would accord to its own confidential information. Notwithstanding anything herein to the contrary, "Information" shall not include, and the Borrower, the Borrower's Subsidiaries, the Administrative Agent, each Lender and the respective Affiliates of each of the foregoing (and the respective partners, directors, officers, employees, agents, advisors and other representatives of the aforementioned Persons), and any other party, may disclose to any and all Persons, without limitation of any kind (A) any information with respect to the United States federal and state income tax treatment of the transactions contemplated hereby and any facts that may be relevant to understanding the United States federal or state income tax treatment of such transactions ("tax structure"), which facts shall not include for this purpose the names of the parties or any other person named herein, or information that would permit identification of the parties or such other persons, or any pricing terms or other nonpublic business or financial information that is unrelated to such tax treatment or tax structure, and (B) all materials of any kind (including opinions or other tax analyses) that are provided to the Borrower, the Administrative Agent or such Lender relating to such tax treatment or tax structure.

Section 12.12 <u>Interest Rate Limitation</u>. It is the intention of the parties hereto that each Lender shall conform strictly to usury laws applicable to it. Accordingly, if the transactions contemplated hereby would be usurious as to any Lender under laws applicable to it (including the laws of the United States of America and any State therein or any other jurisdiction whose laws may be mandatorily applicable to such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in any of the Loan Documents or any agreement entered into in connection with or as security for the Notes, it is agreed as follows: (a) the aggregate of all consideration which constitutes interest under law applicable to any Lender that is contracted for, taken, reserved, charged or received by such Lender under any of the Loan Documents or agreements or otherwise in connection with the Notes shall under no circumstances exceed the maximum amount allowed by such applicable law, and any excess shall be canceled automatically and if theretofore paid shall be credited by such Lender on the principal amount of the Indebtedness (or, to the extent that the principal amount of the Indebtedness shall have been or would thereby be paid in full, refunded by such Lender to the Borrower); and (b) in the event that the maturity of the Notes is accelerated by reason of an election of the holder thereof resulting from any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically by such Lender as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such Lender on the principal amount of the Indebtedness (or, to the extent that the principal amount of the Indebtedness shall have been or would thereby be paid in full, refunded by such Lender to the Borrower). All sums paid or agreed to be paid to any Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to such Lender, be amortized, prorated, allocated and spread throughout the stated term of the Loans evidenced by the Notes until payment in full so that the rate or amount of interest on account of any Loans

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

hereunder does not exceed the maximum amount allowed by such applicable law. If at any time and from time to time (i) the amount of interest payable to any Lender on any date shall be computed at the Highest Lawful Rate applicable to such Lender pursuant to this Section 12.12 and (ii) in respect of any subsequent interest computation period the amount of interest otherwise payable to such Lender would be less than the amount of interest payable to such Lender computed at the Highest Lawful Rate applicable to such Lender, then the amount of interest payable to such Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such Lender until the total amount of interest payable to such Lender shall equal the total amount of interest which would have been payable to such Lender if the total amount of interest had been computed without giving effect to this Section 12.12. To the extent that Chapter 303 of the Texas Finance Code is relevant for the purpose of determining the Highest Lawful Rate applicable to a Lender, such Lender elects to determine the applicable rate ceiling under such Chapter by the weekly ceiling from time to time in effect. Chapter 346 of the Texas Finance Code does not apply to the Borrower's obligations hereunder.

Section 12.13 EXCULPATION PROVISIONS. EACH OF THE PARTIES HERETO SPECIFICALLY AGREES THAT IT HAS A DUTY TO READ THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND AGREES THAT IT IS CHARGED WITH NOTICE AND KNOWLEDGE OF THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; THAT IT HAS IN FACT READ THIS AGREEMENT AND IS FULLY INFORMED AND HAS FULL NOTICE AND KNOWLEDGE OF THE TERMS, CONDITIONS AND EFFECTS OF THIS AGREEMENT; THAT IT HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL OF ITS CHOICE THROUGHOUT THE NEGOTIATIONS PRECEDING ITS EXECUTION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; AND HAS RECEIVED THE ADVICE OF ITS ATTORNEY IN ENTERING INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; AND THAT IT RECOGNIZES THAT CERTAIN OF THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS RESULT IN ONE PARTY ASSUMING THE LIABILITY INHERENT IN SOME ASPECTS OF THE TRANSACTION AND RELIEVING THE OTHER PARTY OF ITS RESPONSIBILITY FOR SUCH LIABILITY. EACH PARTY HERETO AGREES AND COVENANTS THAT IT WILL NOT CONTEST THE VALIDITY OR ENFORCEABILITY OF ANY EXCULPATORY PROVISION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS ON THE BASIS THAT THE PARTY HAD NO NOTICE OR KNOWLEDGE OF SUCH PROVISION OR THAT THE PROVISION IS NOT "CONSPICUOUS."

Section 12.14 Collateral Matters; Swap Agreements. The benefit of the Security Instruments and of the provisions of this Agreement relating to any collateral securing the Indebtedness shall also extend to and be available to the Secured Swap Providers with respect to any Swap Agreement including any Swap Agreement in existence prior to the date hereof, but excluding any additional transactions or confirmations entered into (a) after such Secured Swap Provider ceases to be a Lender or an Affiliate of a Lender or (b) after assignment by a Secured

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Swap Provider to another Secured Swap Provider that is not a Lender or an Affiliate of a Lender. No Lender or any Affiliate of a Lender shall have any voting or consent rights under any Loan Document as a result of the existence of obligations owed to it under any such Swap Agreements.

Section 12.15 <u>No Third Party Beneficiaries</u>.   This Agreement, the other Loan Documents, and the agreement of the Lenders to make Loans and the Issuing Bank to issue, amend, renew or extend Letters of Credit hereunder are solely for the benefit of the Borrower, and no other Person (including, without limitation, any Subsidiary of the Borrower, any obligor, contractor, subcontractor, supplier or materialsman) shall have any rights, claims, remedies or privileges hereunder or under any other Loan Document against the Administrative Agent, any other Agent, the Issuing Bank or any Lender for any reason whatsoever.  There are no third party beneficiaries.

Section 12.16 <u>USA Patriot Act Notice</u>.  Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the US Patriot Act.

Section 12.17 <u>No Advisory or Fiduciary Responsibility</u>.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower acknowledges and agrees, and acknowledges its Subsidiaries' understanding, that:  (a) (i) no fiduciary, advisory or agency relationship between the Borrower and its Subsidiaries and the Administrative Agent or any Lender is intended to be or has been created in respect of the transactions contemplated hereby or by the other Loan Documents, irrespective of whether the Administrative Agent or any Lender has advised or is advising the Borrower or any Subsidiary on other matters; (ii) the arranging and other services regarding this Agreement provided by the Administrative Agent and the Lenders are arm's-length commercial transactions between the Borrower and its Subsidiaries, on the one hand, and the Administrative Agent and the Lenders, on the other hand; (iii) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent that it has deemed appropriate; and (iv) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; and (b) (i) the Administrative Agent and the Lenders each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower or any of its Subsidiaries, or any other Person; (ii) neither the Administrative Agent nor the Lenders has any obligation to the Borrower or any of its Subsidiaries with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent and the Lenders and their respective Affiliates may be engaged, for their own accounts or the accounts of customers, in a broad range of transactions that involve interests that differ from those of the Borrower and its Subsidiaries, and

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

neither the Administrative Agent nor the Lenders has any obligation to disclose any of such interests to the Borrower or its Subsidiaries.  To the fullest extent permitted by Law, the Borrower hereby waives and releases any claims that it may have against the Administrative Agent and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 12.18 <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)  the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)  the effects of any Bail-In Action on any such liability, including, if applicable:

(i)  a reduction in full or in part or cancellation of any such liability;

(ii)  a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)  the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

Section 12.19 <u>Acknowledgment Regarding Supported QFCs</u>.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for any Swap Agreement or any other agreement or instrument that is a QFC (such support, "<u>QFC Credit Support</u>", and each such QFC, a "<u>Supported QFC</u>"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "<u>U.S. Special Resolution Regimes</u>") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or the United States or any other state of the United States):

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent that such transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than the extent to which such Default Rights could be exercised under the U.S. Special Resolution Regime if such Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that the rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

Section 12.20  Restatement; Prepetition Credit Agreement.  The parties hereto agree that this Agreement is a restatement of, and an extension of, and amendment to, the Prepetition Credit Agreement.  This Agreement does not in any way constitute a novation of the Prepetition Credit Agreement, but is an amendment and restatement of same.  It is understood and agreed that, except to the extent released by the Administrative Agent as contemplated herein, the Liens securing the Indebtedness under and as defined in the Prepetition Credit Agreement and the rights, duties, liabilities and obligations of the Borrower under the Prepetition Credit Agreement and the Prepetition Loan Documents to which it is a party shall not be extinguished but shall be carried forward and shall secure such obligations and liabilities as amended, renewed, extended and restated by this Agreement. Upon the effectiveness of this Agreement, (a) each Lender who holds Loans in an aggregate amount less than its Applicable Revolving Credit Percentage (after giving effect to this amendment and restatement) of all Loans shall advance new Loans which shall be disbursed to the Administrative Agent and used to repay Loans outstanding to each Lender who holds Loans in an aggregate amount greater than its Applicable Revolving Credit Percentage of all Loans, (b) each Lender's participation in each Letter of Credit shall be automatically adjusted to equal its Applicable Revolving Credit Percentage (after giving effect to this amendment and restatement), and (c) such other adjustments shall be made as the Administrative Agent shall specify so that each Lender's Revolving Credit Exposure equals its Applicable Revolving Credit Percentage (after giving effect to this amendment and restatement) of the total Revolving Credit Exposures of all of the Lenders.

Section 12.21  Intercreditor Agreements.

147

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(a)     Each of the Lenders, the Issuing Bank, and the other Secured Parties acknowledges that obligations of the Borrower and the Guarantors with respect to Permitted Second Lien Debt may, to the extent set forth herein, be secured by Liens on assets of the Borrower and the Guarantors that constitute collateral security for the Indebtedness.  Each of the Lenders, the Issuing Bank, and the other Secured Parties hereby irrevocably authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party, the Second Lien Intercreditor Agreement, and upon the approval of the Majority Lenders, (i) from time to time upon the request of the Borrower, in connection with the establishment, incurrence, amendment, refinancing or replacement of any Permitted Second Lien Debt, a replacement Second Lien Intercreditor Agreement and (ii) any documents relating thereto.

(b)     Each of the Lenders, the Issuing Bank and the other Secured Parties acknowledges that obligations of the Borrower and the Guarantors with respect to any Indebtedness described in clause (b) of such term owed to a Third Party Hedge Provider may be secured by Liens created under the Loan Documents on assets of the Borrower and the other Guarantors that constitute collateral security for the Indebtedness.  Upon the approval of the Majority Lenders, each of the Lenders, the Issuing Bank and the other Secured Parties hereby irrevocably authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party, (i) upon the request of the Borrower, with respect to any Swap Agreement with a Third Party Hedge Provider, a Third Party Hedge Intercreditor Agreement and (ii) any documents relating thereto.

(c)     Each of the Lenders, the Issuing Bank, and the other Secured Parties hereby irrevocably (i) consents to the treatment of Liens to be provided for under the Intercreditor Agreements, (ii) agrees that, upon the execution and delivery thereof, such Secured Party will be bound by the provisions of any Intercreditor Agreement as if it were a signatory thereto and will take no actions contrary to the provisions of any Intercreditor Agreement, (iii) agrees that no Secured Party shall have any right of action whatsoever against the Administrative Agent as a result of any action taken by the Administrative Agent pursuant to this Section 12.21 or in accordance with the terms of any Intercreditor Agreement and (iv) authorizes and directs the Administrative Agent to carry out the provisions and intent of each Intercreditor Agreement.

(d)     Each of the Lenders, the Issuing Bank, and the other Secured Parties hereby irrevocably further authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party, any amendments, supplements or other modifications of any Intercreditor Agreement that the Borrower may from time to time request (i) to give effect to any establishment, incurrence, amendment, extension, renewal, refinancing or replacement of any Permitted Second Lien Debt to the extent permitted hereunder, (ii) to confirm for any party that such Intercreditor Agreement is effective and binding upon the Administrative Agent on behalf of the Secured Parties or (iii) to effect any other amendment, supplement or modification so long as

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

the resulting agreement would constitute an Intercreditor Agreement if executed at such time as a new agreement.

(e)    Each of the Lenders, the Issuing Bank, and the other Secured Parties hereby irrevocably further authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party, any amendments, supplements or other modifications of any Security Instrument to add or remove any legend that may be required pursuant to any Intercreditor Agreement.

(f)    The Administrative Agent shall have the benefit of the provisions of Article XI with respect to all actions taken by it pursuant to this Section 12.21 or in accordance with the terms of any Intercreditor Agreement to the full extent thereof.

*[SIGNATURES BEGIN NEXT PAGE]*

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

The parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

BORROWER:                                         **CHAPARRAL ENERGY, INC.**, a Delaware corporation


By: _____
Name:  Charles Duginski
Title:   Chief Executive Officer

[*SIGNATURE PAGE TO ELEVENTH RESTATED CREDIT AGREEMENT – CHAPARRAL ENERGY, INC.*]

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

ADMINISTRATIVE AGENT:                **ROYAL BANK OF CANADA**


By: _____
Name: Rodica Dutka
Title:   Manager, Agency Services Group

[*SIGNATURE PAGE TO ELEVENTH RESTATED CREDIT AGREEMENT – CHAPARRAL ENERGY, INC.*]

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

LENDER/ISSUING BANK:                          **ROYAL BANK OF CANADA**


By: _____

Name: Leslie P. Vowell

Title:  Authorized Signatory

[*SIGNATURE PAGE TO ELEVENTH RESTATED CREDIT AGREEMENT – CHAPARRAL ENERGY, INC.*]

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

LENDER:                                    **KENNEDY LEWIS CAPITAL PARTNERS MASTER FUND II LP**


By: _____
Name: _____
Title: _____

[*SIGNATURE PAGE TO ELEVENTH RESTATED CREDIT AGREEMENT – CHAPARRAL ENERGY, INC.*]

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

LENDER:                                  **CAPITAL ONE, NATIONAL ASSOCIATION**


By: _____
Name: _____
Title: _____

[*SIGNATURE PAGE TO ELEVENTH RESTATED CREDIT AGREEMENT – CHAPARRAL ENERGY, INC.*]

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

LENDER:                                    **KEYBANK NATIONAL ASSOCIATION**


By: _____

Name: _____

Title: _____

[*SIGNATURE PAGE TO ELEVENTH RESTATED CREDIT AGREEMENT – CHAPARRAL ENERGY, INC.*]

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

LENDER: **SOCIÉTÉ GÉNÉRALE**

By: _____

Name: _____

Title: _____

[*SIGNATURE PAGE TO ELEVENTH RESTATED CREDIT AGREEMENT – CHAPARRAL ENERGY, INC.*]

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

LENDER:                              **THE   TORONTO-DOMINION   BANK,   NEW YORK BRANCH**


By: _____
Name: _____
Title: _____

[*SIGNATURE PAGE TO ELEVENTH RESTATED CREDIT AGREEMENT – CHAPARRAL ENERGY, INC.*]

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

LENDER:                                    **BANK OF AMERICA, N.A.**


By:      _____
Name:   _____
Title:   _____

[*SIGNATURE PAGE TO ELEVENTH RESTATED CREDIT AGREEMENT – CHAPARRAL ENERGY, INC.*]

LENDER:                                              **CANADIAN    IMPERIAL    BANK    OF COMMERCE, NEW YORK BRANCH**


By:        _____
Name:    _____
Title:     _____


By:        _____
Name:    _____
Title:     _____

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

LENDER:  **BBVA USA**

By: _____

Name: _____

Title: _____

[*SIGNATURE PAGE TO ELEVENTH RESTATED CREDIT AGREEMENT – CHAPARRAL ENERGY, INC.*]

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

LENDER:                               **CREDIT AGRICOLE CORPORATE AND INVESTMENT BANK**


By: _____
Name: _____
Title: _____


By: _____
Name: _____
Title: _____

[*SIGNATURE PAGE TO ELEVENTH RESTATED CREDIT AGREEMENT – CHAPARRAL ENERGY, INC.*]

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

LENDER:                                          **AG ENERGY FUNDING, LLC**


By: Angelo, Gordon & Co., L.P., as its Manager


By: _____
Name: _____
Title: _____

[*SIGNATURE PAGE TO ELEVENTH RESTATED CREDIT AGREEMENT – CHAPARRAL ENERGY, INC.*]

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

LENDER: **COMERICA BANK**

By: _____

Name: _____

Title: _____

[*SIGNATURE PAGE TO ELEVENTH RESTATED CREDIT AGREEMENT – CHAPARRAL ENERGY, INC.*]

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

LENDER:                                    **EAST WEST BANK**

By: _____

Name: _____

Title: _____

[*SIGNATURE PAGE TO ELEVENTH RESTATED CREDIT AGREEMENT – CHAPARRAL ENERGY, INC.*]

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

LENDER:                                    **KENNEDY   LEWIS   CAPITAL   PARTNERS MASTER FUND LP**


By: _____
Name: _____
Title: _____

[*SIGNATURE PAGE TO ELEVENTH RESTATED CREDIT AGREEMENT – CHAPARRAL ENERGY, INC.*]

# Exhibit G

**New Convertible Notes Indenture**

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

CHAPARRAL ENERGY, INC.,
as the Issuer,

EACH OF THE GUARANTORS PARTY HERETO

and

WILMINGTON SAVINGS FUND SOCIETY FSB,
as Trustee and Collateral Agent

_____

INDENTURE[1]

Dated as of [__], 2020

_____

9.0%/13.0% Second Lien Secured Convertible PIK Toggle Notes due 2025

---

[1] NTD:  This draft Indenture is subject to further review and comment in all respects, including pending review of draft RBL Credit Agreement, by local counsel, by Trustee's counsel and by subject matter specialists.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

## TABLE OF CONTENTS

### ARTICLE I.

DEFINITIONS AND INCORPORATION BY REFERENCE                                        1

SECTION 1.1.    *Definitions*..........................................................................................1
SECTION 1.2.    *No Incorporation by Reference of TIA*..........................................46
SECTION 1.3.    *Rules of Construction*....................................................................46

### ARTICLE II.

THE NOTES                                                                         47

SECTION 2.1.    *Form and Dating*.............................................................................47
SECTION 2.2.    *Execution and Authentication; Aggregate Principal Amount*.......50
SECTION 2.3.    *Registrar, Paying Agent and Conversion Agent*............................51
SECTION 2.4.    *Paying Agent To Hold Assets in Trust*..........................................52
SECTION 2.5.    *Holder Lists*....................................................................................53
SECTION 2.6.    *Transfer and Exchange*..................................................................53
SECTION 2.7.    *Replacement Notes*.........................................................................63
SECTION 2.8.    *Outstanding Notes*..........................................................................63
SECTION 2.9.    *Treasury Notes*................................................................................64
SECTION 2.10.   *Temporary Notes*............................................................................64
SECTION 2.11.   *Cancellation*....................................................................................64
SECTION 2.12.   *Defaulted Interest*...........................................................................65
SECTION 2.13.   *CUSIP Number*................................................................................65
SECTION 2.14.   *Deposit of Monies*...........................................................................65
SECTION 2.15.   *Restrictive Legends*.........................................................................66
SECTION 2.16.   *Designation*.....................................................................................68

### ARTICLE III.

REDEMPTION                                                                        69

SECTION 3.1.    *Notices to Trustee*...........................................................................69
SECTION 3.2.    *Selection of Notes To Be Redeemed*..............................................69
SECTION 3.3.    *Optional Redemption*...................................**Error! Bookmark not defined.**
SECTION 3.4.    *[Reserved]*.......................................................................................69
SECTION 3.5.    *[Reserved]*.......................................................................................69
SECTION 3.6.    *Deposit of Redemption Price*..........................................................70
SECTION 3.7.    *Notes Redeemed in Part*..................................................................70

i

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

## ARTICLE IV.

COVENANTS                                                                                          70

SECTION 4.1.    *Payment of Notes.* ...................................................................70
SECTION 4.2.    *Maintenance of Office or Agency.* ...........................................72
SECTION 4.3.    *Organizational Existence.* ......................................................73
SECTION 4.4.    *Payment of Taxes and Other Claims.* .....................................73
SECTION 4.5.    *Maintenance of Properties and Insurance.* ............................73
SECTION 4.6.    *Compliance Certificate; Notice of Default.* ...........................74
SECTION 4.7.    *Compliance with Laws.* ...........................................................74
SECTION 4.8.    *Reports to Holders.* .................................................................75
SECTION 4.9.    *Waiver of Stay, Extension or Usury Laws.* ............................75
SECTION 4.10.   *Limitation on Restricted Payments.* .......................................75
SECTION 4.11.   *Limitations on Affiliate Transactions.* ...................................81
SECTION 4.12.   *Limitation on Incurrence of Indebtedness and Preferred Stock.* ..................83
SECTION 4.13.   *Limitation on Restrictions on Distributions from Restricted Subsidiaries.* ...87
SECTION 4.14.   *[Reserved].* ............................................................................90
SECTION 4.15.   *Offer to Convert or Repurchase upon Change of Control; Mandatory Conversion of Notes.* ...............................................................90
SECTION 4.16.   *Limitation on Sales of Assets and Subsidiary Stock.* ............93
SECTION 4.17.   *[Reserved].* ............................................................................97
SECTION 4.18.   *Limitation on Liens.* ...............................................................97
SECTION 4.19.   *Limitation on Lines of Business.* ............................................98
SECTION 4.20.   *Additional Subsidiary Guarantees.* ........................................98
SECTION 4.21.   *Suspension of Covenants.* .......................................................98
SECTION 4.22.   *Creation and Perfection of Liens Securing Collateral; Further Assurances.* 100
SECTION 4.23.   *Minimum Liquidity of the Issuer.* ..........................................101

## ARTICLE V.

SUCCESSOR CORPORATION                                                                101

SECTION 5.1.    *Merger, Consolidation and Sale of Assets.* ...........................101
SECTION 5.2.    *Successor Corporation Substituted.* .......................................103

## ARTICLE VI.

REMEDIES                                                                                          103

SECTION 6.1.    *Events of Default.* ..................................................................103
SECTION 6.2.    *Acceleration.* ..........................................................................106
SECTION 6.3.    *Other Remedies.* .....................................................................106

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

SECTION 6.4.    *Waiver of Past Defaults.* ...................................................................107
SECTION 6.5.    *Control by Majority.* .......................................................................107
SECTION 6.6.    *Limitation on Suits.* .........................................................................107
SECTION 6.7.    *Right of Holders To Receive Payment.* ...........................................108
SECTION 6.8.    *Collection Suit by Trustee.* ..............................................................108
SECTION 6.9.    *Trustee May File Proofs of Claim.* ..................................................108
SECTION 6.10.   *Priorities.* ........................................................................................109
SECTION 6.11.   *Undertaking for Costs.* .....................................................................109
SECTION 6.12.   *Restoration of Rights and Remedies.* ..............................................110

ARTICLE VII.

TRUSTEE                                                                                          110

SECTION 7.1.    *Duties of Trustee.* .............................................................................110
SECTION 7.2.    *Rights of Trustee.* .............................................................................111
SECTION 7.3.    *Individual Rights of Trustee.* ...........................................................113
SECTION 7.4.    *Trustee's Disclaimer.* .......................................................................113
SECTION 7.5.    *Notice of Default.* .............................................................................113
SECTION 7.6.    *Reports by Trustee to Holders.* .........................................................113
SECTION 7.7.    *Compensation and Indemnity.* ..........................................................114
SECTION 7.8.    *Replacement of Trustee.* ...................................................................115
SECTION 7.9.    *Successor Trustee by Merger, Etc.* ...................................................116
SECTION 7.10.   *Eligibility; Disqualification.* ............................................................116
SECTION 7.11.   *Preferential Collection of Claims Against the Issuer.* .......................116
SECTION 7.12.   *Force Majeure.* .................................................................................116
SECTION 7.13.   *Defaults and Events of Default.* .......................................................116

ARTICLE VIII.

DISCHARGE OF INDENTURE; DEFEASANCE                                               117

SECTION 8.1.    *Termination of Issuer's Obligations.* ...............................................117
SECTION 8.2.    *Application of Trust Money.* .............................................................119
SECTION 8.3.    *Repayment to the Issuer.* ..................................................................119
SECTION 8.4.    *Reinstatement.* ..................................................................................120
SECTION 8.5.    *Acknowledgment of Discharge by Trustee* .......................................120

ARTICLE IX.

MODIFICATION OF THE INDENTURE                                                          120

SECTION 9.1.    *Without Consent of Holders.* ............................................................120
SECTION 9.2.    *With Consent of Holders* ...................................................................121

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

SECTION 9.3.    *[Reserved].*................................................................................123
SECTION 9.4.    *Revocation and Effect of Consents.* ...........................................123
SECTION 9.5.    *Notation on or Exchange of Notes.*.............................................123
SECTION 9.6.    *Trustee To Sign Amendments, Etc.*.............................................124

ARTICLE X.    124

CONVERSION    124

SECTION 10.1.    *Voluntary Conversion Privilege* ................................................124
SECTION 10.2.    *Conversion Procedure*................................................................125
SECTION 10.3.    [Reserved.] ..................................................................................125
SECTION 10.4.    *Taxes on Conversion* .................................................................127
SECTION 10.5.    *Issuer to Provide Shares of New Common Stock of the Issuer*...................127
SECTION 10.6.    *Subdivision or Combination of Shares of New Common Stock of the Issuer*127
SECTION 10.7.    [Reserved.] ..................................................................................128
SECTION 10.8.    [Reserved.] ..................................................................................128
SECTION 10.9.    [Reserved.] ......................................................**Error! Bookmark not defined.**
SECTION 10.10.    *Notice of Adjustment*................................................................128
SECTION 10.11.    *Notice of Certain Transactions* ................................................128
SECTION 10.12.    *Effect of Reclassification, Consolidation, Merger, Share Exchange or Sale on Conversion Privilege* ....................................................................................129
SECTION 10.13.    *Trustee's Disclaimer* .................................................................131
SECTION 10.14.    *Voluntary Increase of the Conversion Rate* ..............................132
SECTION 10.15.    *Simultaneous Adjustments* .......................................................132

ARTICLE XI.    132

COLLATERAL AND SECURITY    132

SECTION 11.1.    *Grant of Security Interest* ..........................................................132
SECTION 11.2.    *Release of Collateral* .................................................................133
SECTION 11.3.    [Reserved] .........................................................**Error! Bookmark not defined.**
SECTION 11.4.    *Collateral Coverage Certificate* ......................**Error! Bookmark not defined.**
SECTION 11.5.    *Authorization of Actions by the Trustee Under the Security Documents*...134
SECTION 11.6.    *Authorization of Receipt of Funds by the Trustee Under the Security Documents*    134
SECTION 11.7.    *Termination of Security Interest* ................................................134
SECTION 11.8.    *Trustee's Duties with Respect to Collateral* ...............................135

ARTICLE XII.    135

MISCELLANEOUS    135

SECTION 12.1.    *[Reserved].*................................................................................135

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

SECTION 12.2.  *Notices.* ..................................................................................................135
SECTION 12.3.  *Communications by Holders with Other Holders*.......................................136
SECTION 12.4.  *Certificate and Opinion as to Conditions Precedent.* .................................136
SECTION 12.5.  *Statements Required in Certificate or Opinion.*..........................................137
SECTION 12.6.  *Rules by Trustee, Paying Agent, Registrar.* ...............................................137
SECTION 12.7.  *Legal Holidays.*...........................................................................................137
SECTION 12.8.  *Governing Law.*............................................................................................137
SECTION 12.9.  *No Adverse Interpretation of Other Agreements.*........................................138
SECTION 12.10. *No Personal Liability.* .................................................................................138
SECTION 12.11. *Successors.*..................................................................................................138
SECTION 12.12. *Duplicate Originals.*....................................................................................138
SECTION 12.13. *Severability.*................................................................................................138
SECTION 12.14. *Independence of Covenants.*.......................................................................138
SECTION 12.15. *Waiver of Jury Trial.*...................................................................................139
SECTION 12.16. *Electronic Storage.*.....................................................................................139

ARTICLE XIII.

SUBSIDIARY GUARANTEE OF NOTES                                                            139

SECTION 13.1.  *Unconditional Subsidiary Guarantee.*.........................................................139
SECTION 13.2.  *Limitations on Subsidiary Guarantees.*.......................................................140
SECTION 13.3.  *Execution and Delivery of Subsidiary Guarantee Notation.*.......................141
SECTION 13.4.  *Release of a Subsidiary Guarantor.* ...........................................................141
SECTION 13.5.  *Waiver of Subrogation.*................................................................................142
SECTION 13.6.  *Immediate Payment.*....................................................................................142
SECTION 13.7.  *No Set-Off.*..................................................................................................143
SECTION 13.8.  *Obligations Absolute.*..................................................................................143
SECTION 13.9.  *Obligations Continuing.*..............................................................................143
SECTION 13.10. *Obligations Not Reduced.* ..........................................................................143
SECTION 13.11. *Obligations Reinstated.*...............................................................................143
SECTION 13.12. *Obligations Not Affected.*...........................................................................144
SECTION 13.13. *Waiver.*........................................................................................................145
SECTION 13.14. *No Obligation To Take Action Against the Issuer.* ....................................145
SECTION 13.15. *Dealing with the Issuer and Others.*...........................................................145
SECTION 13.16. *Default and Enforcement.* ..........................................................................146
SECTION 13.17. *Amendment, Etc.*.........................................................................................146
SECTION 13.18. *Acknowledgment.*........................................................................................146
SECTION 13.19. *Costs and Expenses.*...................................................................................146
SECTION 13.20. *No Merger or Waiver; Cumulative Remedies.*............................................147
SECTION 13.21. *Survival of Obligations.* .............................................................................147
SECTION 13.22. *Subsidiary Guarantee in Addition to Other Obligations.*...........................147
SECTION 13.23. *Severability.* ...............................................................................................147
SECTION 13.24. *Successors and Assigns*...............................................................................147

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

INDENTURE, dated as of [__], 2020, among Chaparral Energy, Inc., a Delaware corporation (the "Issuer"), the Subsidiary Guarantors (as defined herein) from time to time party hereto and Wilmington Savings Fund Society FSB, a federal savings bank, as Trustee (together with its successors and assigns in such capacity, the "Trustee") and as Collateral Agent (together with its successors and assigns in such capacity, the "Collateral Agent").

The Issuer has duly authorized the creation of an original issue of $35,000,000.00 aggregate initial principal amount of 9.0%/13.0% Second Lien Secured Convertible PIK Toggle Notes due 2025 (the "Notes") and, to provide therefor, the Issuer and the Subsidiary Guarantors have duly authorized the execution and delivery of this Indenture. All things necessary to make the Notes, when duly issued and executed by the Issuer, and authenticated and delivered under this Indenture, the valid obligations of the Issuer, and to make this Indenture a valid and binding agreement of the Issuer, have been done.

Each party hereto agrees as follows for the benefit of the other party and for the equal and ratable benefit of the Holders of the Notes.

## ARTICLE I.

## DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.1.    *Definitions*.

"144A Global Note" means a Global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of, and registered in the name of, the Depository or its nominee that will be issued in a denomination equal to the outstanding principal amount of the Notes sold in reliance on Rule 144A.

"Acquired Indebtedness" means Indebtedness (i) of a Person or any of its Subsidiaries existing at the time such Person becomes, or is merged with and into, a Restricted Subsidiary or (ii) assumed in connection with the acquisition of assets from such Person, in each case whether or not Incurred by such Person in connection with, or in anticipation or contemplation of, such Person becoming a Restricted Subsidiary or such acquisition. Acquired Indebtedness shall be deemed to have been Incurred, with respect to clause (i) of the preceding sentence, on the date such Person becomes, or is merged with and into, a Restricted Subsidiary and, with respect to clause (ii) of the preceding sentence, on the date of consummation of such acquisition of assets.

"Additional Assets" means:

(1)    any properties or assets to be used by the Issuer or a Restricted Subsidiary in the Oil and Gas Business;

(2)    capital expenditures by the Issuer or a Restricted Subsidiary in the Oil and Gas Business;

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(3)    the Capital Stock of a Person that becomes a Restricted Subsidiary as a result of the acquisition of such Capital Stock by the Issuer or a Restricted Subsidiary; or

(4)    Capital Stock constituting a minority interest in any Person that at such time is a Restricted Subsidiary;

*provided*, *however*, that, in the case of clauses (3) and (4), such Restricted Subsidiary is primarily engaged in the Oil and Gas Business.

"Additional Notes" means Notes, in addition to, and having identical terms (except for a date of original issuance different than the Issue Date) as, the $35.0 million aggregate initial principal amount of Notes issued on the Issue Date, issued pursuant to Article II and in compliance with Section 4.12.

"Adjusted Consolidated Net Tangible Assets" of a Person means (without duplication), as of the date of determination, the remainder

(a)    the sum of:

(i)    discounted future net revenues from Proved Reserves of such Person and its Restricted Subsidiaries calculated in accordance with SEC guidelines before any state or federal income taxes, as estimated in a reserve report prepared as of the end of such Person's most recently completed fiscal year (or, if such date of determination is within 45 days after the end of such most recently completed fiscal year and no reserve report as of the end of such fiscal year has at the time been prepared or audited by independent petroleum engineers, the Person's second preceding fiscal year) or, at such Person's option, such Person's most recently completed fiscal quarter for which internal financial statements are available, in each case, which reserve report is prepared or audited by independent petroleum engineers as to Proved Reserves accounting for at least 80% of all such discounted future net revenues and by such Person's petroleum engineers with respect to any other Proved Reserves covered by such report, as increased by, as of the date of determination, the estimated discounted future net revenues from:

(A)    estimated Proved Reserves of such Person and its Restricted Subsidiaries acquired since such year-end, which reserves were not reflected in such year-end or quarterly reserve report, as applicable, and

(B)    estimated Proved Reserves of such Person and its Restricted Subsidiaries attributable to extensions, discoveries and other additions and upward revisions of estimates of Proved Reserves (including previously estimated development costs Incurred during the period and the accretion of discount since the prior period end) since the date of such year-end or quarterly reserve report, as applicable, due to exploration, development or exploitation, production or other activities, which would, in accordance with standard industry practice, cause such revisions, in each case calculated in accordance with SEC guidelines (utilizing the prices for the fiscal quarter ending prior to the date of determination), and decreased by, as of the date of determination, the estimated discounted future net revenues from:

2

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(C)    estimated Proved Reserves of such Person and its Restricted Subsidiaries reflected in such reserve report produced or disposed of since the date of such year-end or quarterly reserve report, as applicable, and

(D)    estimated Proved Reserves of such Person and its Restricted Subsidiaries reflected in such reserve report attributable to downward revisions of estimates of Proved Reserves since the date of such year-end or quarterly reserve report, as applicable, due to changes in geological conditions or other factors which would, in accordance with standard industry practice, cause such revisions, in each case calculated on a pre-tax basis and substantially in accordance with SEC guidelines (utilizing the prices for the fiscal quarter ending prior to the date of determination); *provided*, *however*, that in the case of each of the determinations made pursuant to clauses

(E)    through (D) above, such increases and decreases shall be as estimated by the Issuer's petroleum engineers;

(ii)    the capitalized costs that are attributable to oil and gas properties of such Person and its Restricted Subsidiaries to which no Proved Reserves are attributable, based on such Person's books and records as of a date no earlier than the date of such Person's latest available annual or quarterly financial statements;

(iii)    the Net Working Capital of such Person on a date no earlier than the date of such Person's latest annual or quarterly financial statements; and

(iv)    the greater of:

(A)    the net book value of other tangible assets of such Person and its Restricted Subsidiaries, as of a date no earlier than the date of such Person's latest annual or quarterly financial statement, and

(B)    the appraised value, as estimated by independent appraisers, of other tangible assets of such Person and its Restricted Subsidiaries, as of a date no earlier than the date of such Person's latest audited financial statements;

*minus*

(b)    the sum of:

(i)    Minority Interests;

(ii)    any net gas balancing liabilities of such Person and its Restricted Subsidiaries reflected in such Person's latest audited balance sheet;

(iii)    to the extent included in clause (a)(i) above, the discounted future net revenues, calculated in accordance with SEC guidelines (utilizing the prices utilized in such

3

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Person's year-end reserve report), attributable to reserves which are required to be delivered to third parties to fully satisfy the obligations of the Issuer and its Restricted Subsidiaries with respect to Volumetric Production Payments (determined, if applicable, using the schedules specified with respect thereto); and

(iv)    the discounted future net revenues, calculated in accordance with SEC guidelines, attributable to reserves subject to Dollar- Denominated Production Payments which, based on the estimates of production and price assumptions included in determining the discounted future net revenues specified in clause (a)(i) above, would be necessary to fully satisfy the payment obligations of such Person and its Subsidiaries with respect to Dollar-Denominated Production Payments (determined, if applicable, using the schedules specified with respect thereto).

If the Issuer changes its method of accounting from the full cost method of accounting to the successful efforts or a similar method, "Adjusted Consolidated Net Tangible Assets" will continue to be calculated as if the Issuer were still using the full cost method of accounting.

"Affiliate" of any specified Person means any other Person, directly or indirectly, controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing; *provided* that beneficial ownership of 10% or more of the Voting Stock of a Person shall be deemed to be control.

"Affiliate Transaction" has the meaning provided in Section 4.11.

"Agent" means any Registrar, Collateral Agent, Paying Agent, Conversion Agent or co-Registrar.

"Allowed Notes" has the meaning provided in Section 10.2.

"Applicable Percentage" has the meaning provided in Section 10.2.

"Applicable Procedures" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the Depository, Euroclear and/or Clearstream that apply to such transfer or exchange.

"ASC" means the Financial Accounting Standards Board's Accounting Standards Codification, as in effect from time to time.

"Asset Disposition" means any direct or indirect sale, lease (other than an operating lease entered into in the ordinary course of the Oil and Gas Business), transfer, issuance or other disposition, or a series of related sales, leases, transfers, issuances or dispositions that are part of

4

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

a common plan, of (A) shares of Capital Stock of a Restricted Subsidiary (other than directors' qualifying shares or shares required by applicable law to be held by a Person other than the Issuer or a Restricted Subsidiary), (B) all or substantially all the assets of any division or line of business of the Issuer or any Restricted Subsidiary, or (C) any other assets of the Issuer or any Restricted Subsidiary outside of the ordinary course of business of the Issuer or such Restricted Subsidiary (each referred to for the purposes of this definition as a "disposition"), in each case by the Issuer or any of its Restricted Subsidiaries, including any disposition by means of a merger, consolidation or similar transaction.

Notwithstanding the preceding, the following items shall not be deemed to be Asset Dispositions:

(1)     a disposition by a Restricted Subsidiary to the Issuer or by the Issuer or a Restricted Subsidiary to a Wholly Owned Subsidiary;

(2)     the sale of Cash Equivalents in the ordinary course of business;

(3)     a disposition of Hydrocarbons or mineral products inventory in the ordinary course of business;

(4)     a disposition of damaged, unserviceable, obsolete or worn out equipment or equipment that is no longer necessary for the proper conduct of the business of the Issuer and its Restricted Subsidiaries or other equipment otherwise disposed of in each case in the ordinary course of business;

(5)     transactions in accordance with Section 5.1;

(6)     an issuance of Capital Stock by a Restricted Subsidiary to the Issuer or to a Wholly Owned Subsidiary;

(7)     for purposes of Section 4.16 only, the making of a Permitted Investment or a Restricted Payment (or a disposition that would constitute a Restricted Payment but for the exclusions from the definition thereof) permitted in Section 4.10;

(8)     an Asset Swap;

(9)     any single transaction or series of related transactions that involves assets with a Fair Market Value in each case of less than $[__][2] million;

(10)     Permitted Liens;

---

[2] NTD: Under review.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(11)     dispositions of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings and exclusive of factoring or similar arrangements;

(12)     the licensing or sublicensing of intellectual property or other general intangibles and licenses, leases or subleases of other property in the ordinary course of business which do not materially interfere with the business of the Issuer and its Restricted Subsidiaries;

(13)     foreclosure on assets;

(14)     any Production Payments and Reserve Sales; *provided* that any such Production Payments and Reserve Sales, other than incentive compensation programs on terms that are reasonably customary in the Oil and Gas Business for geologists, geophysicists and other providers of technical services to the Issuer or a Restricted Subsidiary, shall have been created, Incurred, issued, assumed or Guaranteed in connection with the financing of, and within 60 days after the acquisition of, the property that is subject thereto;

(15)     [reserved];

(16)     surrender or waiver of contract rights, oil and gas leases, concessions or the settlement, release or surrender of contract, tort or other claims of any kind;

(17)     the abandonment, farm-out, lease or sublease of developed or undeveloped oil and gas properties in the ordinary course of business; and

(18)     the sale or transfer (whether or not in the ordinary course of business) of any oil and gas property or interest therein to which no proved reserves are attributable at the time of such sale or transfer.

"Asset Disposition Offer" has the meaning set forth in Section 4.16.

"Asset Disposition Offer Amount" has the meaning set forth in Section 4.16.

"Asset Disposition Offer Period" has the meaning set forth in Section 4.16.

"Asset Disposition Purchase Date" has the meaning set forth in Section 4.16.

"Asset Swap" means any substantially contemporaneous (and in any event occurring within 180 days of each other) purchase and sale or exchange of any oil or natural gas property used or useful in the Oil and Gas Business, an interest therein or equity interest in an entity that owns only such property between the Issuer or any of its Restricted Subsidiaries and another Person; *provided* that the Fair Market Value of the properties or assets traded or exchanged by the Issuer or such Restricted Subsidiary (together with any cash) is reasonably equivalent to the Fair Market Value of the properties or assets (together with any cash) to be received by the Issuer or such Restricted Subsidiary; and *provided*, *further*, that any cash received in connection

6

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

with such purchase and sale or exchange must be applied in accordance with Section 4.16 as if the Asset Swap were an Asset Disposition.

"Authenticating Agent" has the meaning provided in Section 2.2.

"Authentication Order" has the meaning provided in Section 2.2.

"Average Life" means, as of the date of determination, with respect to any Indebtedness or Preferred Stock, the quotient obtained by dividing (1) the sum of the products of the numbers of years from the date of determination to the dates of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Preferred Stock multiplied by the amount of such payment by (2) the sum of all such payments.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Bankruptcy Law" means Title 11, U.S. Code or any similar federal, state or foreign law for the relief of debtors.

"Bankruptcy Proceedings" means the bankruptcy proceedings of the Issuer and certain of its Subsidiaries in the Bankruptcy Court under Chapter 11 of the United States Bankruptcy Code, commenced by the voluntary petitions for relief filed by the Issuer and such Subsidiaries on August 16, 2020.

"Beneficial Owner" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time. The terms "Beneficially Owns" and "Beneficially Owned" have a corresponding meaning.

"Board of Directors" means, as to any Person that is a corporation, the board of directors of such Person or any duly authorized committee thereof or as to any Person that is not a corporation, the board of managers or such other individual or group serving a similar function.

"Book-Entry Note" means an uncertificated Note evidenced by a book entry on the records maintained by the Registrar and registered in the name of the Holder thereof.

"Borrowing Base" means, with respect to borrowings under the Senior Secured Credit Agreement and any amendment to and/or modification or replacement of the foregoing in the form of a reserve-based borrowing base credit facility, in each case with lenders that include commercial banks regulated by the U.S. Office of the Comptroller of the Currency, the maximum amount determined or re-determined by the lenders thereunder as the aggregate lending value to be ascribed to the Oil and Gas Properties and other assets of the Issuer and its

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Restricted Subsidiaries against which such lenders are prepared to provide loans, letters of credit or other Indebtedness to the credit parties, using customary practices and standards for determining reserve-based borrowing base loans and which are generally applied to borrowers in the Oil and Gas Business by commercial lenders, as determined semi-annually during each year and/or on such other occasions as may be required or provided for therein.

"Business Day" means each day that is not a Saturday, Sunday or other day on which commercial banking institutions in New York, New York or Dallas/Fort Worth, Texas are authorized or required by law to close.

"Capital Stock" of any Person means any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) equity of such Person, including any Preferred Stock, but excluding any debt securities convertible into such equity.

"Capitalized Lease Obligations" means an obligation that is required to be classified and accounted for as a capital lease for financial reporting purposes in accordance with GAAP, and the amount of Indebtedness represented by such obligation will be the capitalized amount of such obligation at the time any determination thereof is to be made as determined in accordance with GAAP, and the Stated Maturity thereof will be the date of the last payment of rent or any other amount due under such lease prior to the first date such lease may be terminated without penalty.

"Cash Equivalents" means:

(1)    securities issued or directly and fully guaranteed or insured by the United States Government or any agency or instrumentality of the United States (*provided* that the full faith and credit of the United States is pledged in support thereof), having maturities of not more than one year from the date of acquisition;

(2)    marketable general obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition (*provided* that the full faith and credit of the United States is pledged in support thereof) and, at the time of acquisition, having a credit rating of "A" (or the equivalent thereof) or better from either S&P or Moody's;

(3)    certificates of deposit, time deposits, eurodollar time deposits, overnight bank deposits or bankers' acceptances having maturities of not more than one year from the date of acquisition thereof issued by any commercial bank the long-term debt of which is rated at the time of acquisition thereof at least "A-2" or the equivalent thereof by S&P or "P-2" or the equivalent thereof by Moody's and having combined capital and surplus in excess of $500.0 million;

(4)    repurchase obligations with a term of not more than seven days for underlying securities of the types described in clauses (1), (2) and (3) entered into with any bank meeting the qualifications specified in clause (3) above;

8

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(5)      commercial paper rated at the time of acquisition thereof at least "A-2" or the equivalent thereof by S&P or "P-2" or the equivalent thereof by Moody's, or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of investments, and in any case maturing within one year after the date of acquisition thereof; and

(6)      interests in any investment company or money market fund which invests 95% or more of its assets in instruments of the type specified in clauses (1) through (5) above.

"Cash Interest" has the meaning provided in Section 4.1(d).

"Catch-Up Mechanism" has the meaning provided in Section 10.2.

"Change of Control" means:

(1)      any "person" or "group" of related persons (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act), other than Parent, is or becomes the Beneficial Owner, directly or indirectly, of more than 50% of the total voting power of the Voting Stock of the Issuer (or its successor by merger, consolidation or purchase of all or substantially all of its assets) (for the purposes of this clause (1), such person or group shall be deemed to Beneficially Own any Voting Stock of the Issuer held by a parent entity, if such person or group Beneficially Owns, directly or indirectly, more than 50% of the total voting power of the Voting Stock of such parent entity);

(2)      the sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the assets of the Issuer and its Restricted Subsidiaries taken as a whole to any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act);

(3)      the adoption by the stockholders of the Issuer of a plan or proposal for the liquidation or dissolution of the Issuer; or

(4)      [the first day on which Parent ceases to own 100% of the outstanding Capital Stock of the Issuer (after having acquired such Capital Stock).][3]

"Change of Control Offer" has the meaning provided in Section 4.15.

"Change of Control Payment" has the meaning provided in Section 4.15.

"Change of Control Payment Date" has the meaning provided in Section 4.15.

"Clearstream" means Clearstream Banking, s*ociété anonyme*.

"Code" means the Internal Revenue Code of 1986, as amended.

---

[3] NTD: Under review.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"Collateral" means collateral as such term is defined in the Security Documents, and any other property, whether now owned or hereafter acquired, upon which a Lien securing the Note Obligations, the Security Documents, the Notes or the Note Guarantees is granted under any Security Document.

"Collateral Agent" means Wilmington Savings Fund Society FSB, acting in its capacity as the collateral agent for the Holders until a successor replaces it in accordance with the provisions of this Indenture and thereafter means any such successor.

"Commodity Agreements" means, in respect of any Person, any forward contract, commodity swap agreement, commodity option agreement or other similar agreement or arrangement in respect of Hydrocarbons used, produced, processed or sold by such Person that is customary in the Oil and Gas Business and designed to protect such Person against fluctuation in Hydrocarbon prices and not for speculative purposes.

"Common Stock" means with respect to any Person, any and all shares, interests or other participations in, and other equivalents (however designated and whether voting or nonvoting) of such Person's common stock whether or not outstanding on the Issue Date, and includes, without limitation, all series and classes of such common stock.

"Consolidated Coverage Ratio" means as of any date of determination, the ratio of (x) the aggregate amount of Consolidated EBITDA of such Person for the period of the most recent four consecutive fiscal quarters ending prior to the date of such determination for which internal financial statements are in existence to (y) Consolidated Interest Expense for such four fiscal quarters; *provided*, *however*, that:

(1)     if the Issuer or any Restricted Subsidiary:

(a)     has Incurred any Indebtedness since the beginning of such period that remains outstanding on such date of determination or if the transaction giving rise to the need to calculate the Consolidated Coverage Ratio is an Incurrence of Indebtedness, Consolidated EBITDA and Consolidated Interest Expense for such period will be calculated after giving effect on a pro forma basis to such Indebtedness and the use of proceeds thereof as if such Indebtedness had been Incurred on the first day of such period and such proceeds had been applied as of such date (except that in making such computation, (x) the amount of Indebtedness under any revolving credit facility outstanding on the date of such calculation will be deemed to be (i) the average daily balance of such Indebtedness during such four fiscal quarters or such shorter period for which such facility was outstanding or (ii) if such facility was created after the end of such four fiscal quarters, the average daily balance of such Indebtedness during the period from the date of creation of such facility to the date of such calculation, in each case, provided that such average daily balance shall take into account any repayment of Indebtedness under such facility as provided in clause (b) below and (y) Indebtedness Incurred or issued on the date of determination pursuant to the second paragraph of Section 4.12, shall not be given pro forma effect); or

10

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(b)      has repaid, repurchased, defeased or otherwise discharged any Indebtedness since the beginning of the period, including with the proceeds of such new Indebtedness, that is no longer outstanding on such date of determination or if the transaction giving rise to the need to calculate the Consolidated Coverage Ratio involves a discharge of Indebtedness (in each case other than Indebtedness Incurred under any revolving credit facility unless such Indebtedness has been permanently repaid and the related commitment terminated), Consolidated EBITDA and Consolidated Interest Expense for such period will be calculated after giving effect on a pro forma basis to such discharge of such Indebtedness as if such discharge had occurred on the first day of such period;

(2)      if, since the beginning of such period, the Issuer or any Restricted Subsidiary will have made any Asset Disposition or if the transaction giving rise to the need to calculate the Consolidated Coverage Ratio is such an Asset Disposition, Consolidated EBITDA for such period will be reduced by an amount equal to the Consolidated EBITDA (if positive) directly attributable to the assets which are the subject of such Asset Disposition for such period or increased by an amount equal to the Consolidated EBITDA (if negative) directly attributable thereto for such period and Consolidated Interest Expense for such period shall be reduced by an amount equal to the Consolidated Interest Expense directly attributable to any Indebtedness of the Issuer or any Restricted Subsidiary repaid, repurchased, defeased or otherwise discharged with respect to the Issuer and its continuing Restricted Subsidiaries in connection with or with the proceeds from such Asset Disposition for such period (or, if the Capital Stock of any Restricted Subsidiary is sold, the Consolidated Interest Expense for such period directly attributable to the Indebtedness of such Restricted Subsidiary to the extent the Issuer and its continuing Restricted Subsidiaries are no longer liable for such Indebtedness after such sale);

(3)      if since the beginning of such period the Issuer or any Restricted Subsidiary (by merger or otherwise) will have made an Investment in any Restricted Subsidiary (or any Person which becomes a Restricted Subsidiary or is merged with or into the Issuer or a Restricted Subsidiary) or an acquisition (or will have received a contribution) of assets, including any acquisition or contribution of assets occurring in connection with a transaction causing a calculation to be made hereunder, which constitutes all or substantially all of a company, division, operating unit, segment, business, group of related assets or line of business, Consolidated EBITDA and Consolidated Interest Expense for such period will be calculated after giving pro forma effect thereto (including the Incurrence of any Indebtedness) as if such Investment or acquisition or contribution had occurred on the first day of such period; and

(4)      if since the beginning of such period any Person (that subsequently became a Restricted Subsidiary or was merged with or into the Issuer or any Restricted Subsidiary since the beginning of such period) made any Asset Disposition or any Investment or acquisition of assets that would have required an adjustment pursuant to clause (2) or (3) above if made by the Issuer or a Restricted Subsidiary during such period, Consolidated EBITDA and Consolidated Interest Expense for such period will be calculated after giving pro forma effect thereto as if such Asset Disposition or Investment or acquisition of assets had occurred on the first day of such period.

11

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

For purposes of this definition, whenever pro forma effect is to be given to any calculation under this definition, the pro forma calculations will be determined in good faith by a responsible financial or accounting Officer of the Issuer (including pro forma expense and cost reductions calculated on a basis consistent with Regulation S-X under the Securities Act). If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest expense on such Indebtedness will be calculated as if the average rate in effect from the beginning of such period to the date of determination had been the applicable rate for the entire period (taking into account any Interest Rate Agreement applicable to such Indebtedness, but if the remaining term of such Interest Rate Agreement is less than 12 months, then such Interest Rate Agreement shall only be taken into account for that portion of the period equal to the remaining term thereof). If any Indebtedness that is being given pro forma effect bears an interest rate at the option of the Issuer, the interest rate shall be calculated by applying such optional rate chosen by the Issuer. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be deemed to have been based upon the rate actually chosen, or, if none, then based upon such optional rate chosen as the Issuer may designate.

["Consolidated EBITDA" for any period means, without duplication, the Consolidated Net Income for such period, *plus* the following, without duplication and to the extent deducted (and not added back) in calculating such Consolidated Net Income:

(1)    Consolidated Interest Expense;

(2)    Consolidated Income Taxes of the Issuer and its Restricted Subsidiaries;

(3)    consolidated depletion and depreciation expense of the Issuer and its Restricted Subsidiaries;

(4)    consolidated amortization expense or impairment charges of the Issuer and its Restricted Subsidiaries recorded in connection with the application of Statement of Financial Accounting Standard No. 142—ASC Topic 350 Intangibles—Goodwill and Other, and Statement of Financial Accounting Standard No. 144—ASC Topic 360 Property, Plant & Equipment;

(5)    other non-cash charges of the Issuer and its Restricted Subsidiaries (including non-cash losses from the adoption of fresh start accounting in connection with the consummation of the Plan of Reorganization but excluding any such non-cash charge to the extent it represents an accrual of or reserve for cash charges in any future period or amortization of a prepaid cash expense that was paid in a prior period not included in the calculation);

(6)    consolidated exploration expense of the Issuer and its Restricted Subsidiaries, if applicable for such period;

(7)    actual fees and transaction costs incurred by the Issuer and the Subsidiary Guarantors in connection with the closing of the Senior Secured Credit Agreement on or about

12

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

the date hereof, the borrowings and issuance of letters of credit thereunder and the granting of Liens with respect thereto occurring on or about such date (other than, for the avoidance of doubt, severance payments and consulting fees paid to former officers and employees);

(8)    severance payments and consulting fees paid to former officers and employees not later than ten (10) days following the consummation of the Plan of Reorganization in connection with the Bankruptcy Proceedings in an amount not to exceed $[__] million; and

(9)    any fees and expenses or charges incurred in connection with the implementation of fresh start accounting in an amount not to exceed $[__] million,

and less, to the extent included in calculating such Consolidated Net Income and in excess of any costs or expenses attributable thereto that were deducted (and not added back) in calculating such Consolidated Net Income, the sum of (x) the amount of deferred revenues that are amortized during such period and are attributable to reserves that are subject to Volumetric Production Payments, (y) amounts recorded in accordance with GAAP as repayments of principal and interest pursuant to Dollar-Denominated Production Payments and (z) other non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDA in any prior period).

Notwithstanding the preceding sentence, clauses (2) through (6) relating to amounts of a Restricted Subsidiary of a Person will be added to Consolidated Net Income to compute Consolidated EBITDA of such Person only to the extent (and in the same proportion) that the net income (loss) of such Restricted Subsidiary was included in calculating the Consolidated Net Income of such Person and, to the extent the amounts set forth in clauses (2) through (6) are in excess of those necessary to offset a net loss of such Restricted Subsidiary or if such Restricted Subsidiary has net income for such period included in Consolidated Net Income, only if a corresponding amount would be permitted at the date of determination to be paid by dividend to the Issuer by such Restricted Subsidiary without prior approval (that has not been obtained), pursuant to the terms of its charter and all agreements, instruments, judgments, decrees, orders, statutes, rules and governmental regulations applicable to that Restricted Subsidiary or its stockholders.][4]

"Consolidated Income Taxes" means, with respect to any Person for any period, taxes imposed upon such Person or other payments required to be made by such Person to any governmental authority which taxes or other payments are calculated by reference to the income, profits or capital of such Person or such Person and its Restricted Subsidiaries (to the extent such income or profits were included in computing Consolidated Net Income for such period), regardless of whether such taxes or payments are required to be remitted to any governmental authority.

---

[4] NTD: Under review.

13

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"Consolidated Interest Expense" means, for any period, the total consolidated interest expense of the Issuer and its Restricted Subsidiaries, whether paid or accrued, *plus*, to the extent not included in such interest expense and without duplication:

(1)    interest expense attributable to Capitalized Lease Obligations and the interest component of any deferred payment obligations;

(2)    amortization of debt discount and debt issuance cost (*provided* that any amortization of bond premium will be credited to reduce Consolidated Interest Expense unless, pursuant to GAAP, such amortization of bond premium has otherwise reduced Consolidated Interest Expense);

(3)    non-cash interest expense;

(4)    commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing;

(5)    the interest expense on Indebtedness of another Person that is Guaranteed by the Issuer or one of its Restricted Subsidiaries or secured by a Lien on assets of the Issuer or one of its Restricted Subsidiaries;

(6)    costs associated with Interest Rate Agreements (including amortization of fees); *provided*, *however*, that if Interest Rate Agreements result in net benefits rather than costs, such benefits shall be credited to reduce Consolidated Interest Expense unless, pursuant to GAAP, such net benefits are otherwise reflected in Consolidated Net Income;

(7)    the consolidated interest expense of such Person and its Restricted Subsidiaries that was capitalized during such period;

(8)    all dividends paid or payable in cash, Cash Equivalents or Indebtedness or accrued during such period on any series of Disqualified Stock of the Issuer or on Preferred Stock of its Restricted Subsidiaries payable to a party other than the Issuer or a Wholly Owned Subsidiary; and

(9)    the cash contributions to any employee stock ownership plan or similar trust to the extent such contributions are used by such plan or trust to pay interest or fees to any Person (other than the Issuer) in connection with Indebtedness Incurred by such plan or trust;

*minus*, to the extent included above, write-off of deferred financing costs and interest attributable to Dollar-Denominated Production Payments.

For the purpose of calculating the Consolidated Coverage Ratio in connection with the Incurrence of any Indebtedness described in the final paragraph of the definition of "Indebtedness," the calculation of Consolidated Interest Expense shall include all interest expense (including any amounts described in clauses (1) through (9) above) relating to any

14

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Indebtedness of the Issuer or any Restricted Subsidiary described in the final paragraph of the definition of "Indebtedness."

"Consolidated Net Income" means, for any period, the aggregate net income (loss) (excluding non-controlling interests) of the Issuer and its consolidated Subsidiaries determined in accordance with GAAP and before any reduction in respect of preferred stock dividends of such Person; *provided*, *however*, that there will not be included in such Consolidated Net Income:

(1)    any net income (loss) of any Person (other than the Issuer) if such Person is not a Restricted Subsidiary, except that:

(a)    subject to the limitations contained in clauses (3), (4) and (5) below, the Issuer's equity in the net income of any such Person for such period will be included in such Consolidated Net Income up to the aggregate amount of cash actually distributed by such Person during such period to the Issuer or a Restricted Subsidiary as a dividend or other distribution (subject, in the case of a dividend or other distribution to a Restricted Subsidiary, to the limitations contained in clause (2) below); and

(b)    the Issuer's equity in a net loss of any such Person for such period will be included in determining such Consolidated Net Income to the extent such loss has been funded with cash from the Issuer or a Restricted Subsidiary during such period;

(2)    any net income (but not loss) of any Restricted Subsidiary if such Subsidiary is subject to restrictions, directly or indirectly, on the payment of dividends or the making of distributions by such Restricted Subsidiary, directly or indirectly, to the Issuer, except that:

(a)    subject to the limitations contained in clauses (3), (4) and (5) below, the Issuer's equity in the net income of any such Restricted Subsidiary for such period will be included in such Consolidated Net Income up to the aggregate amount of cash that could have been distributed by such Restricted Subsidiary during such period to the Issuer or another Restricted Subsidiary as a dividend or other distribution (subject, in the case of a dividend or other distribution paid to another Restricted Subsidiary, to the limitation contained in this clause); and

(b)    the Issuer's equity in a net loss of any such Restricted Subsidiary for such period will be included in determining such Consolidated Net Income;

(3)    any gain (loss) realized upon the sale or other disposition of any property, plant or equipment of the Issuer or its consolidated Subsidiaries (including pursuant to any Sale/Leaseback Transaction) which is not sold or otherwise disposed of in the ordinary course of business and any gain (loss) realized upon the sale or other disposition of any Capital Stock of any Person;

(4)    any extraordinary or nonrecurring gains or losses, together with any related provision for taxes on such gains or losses and all related fees and expenses;

15

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(5)    the cumulative effect of a change in accounting principles;

(6)    any asset impairment writedowns on Oil and Gas Properties of the Issuer and the Restricted Subsidiaries under GAAP or SEC guidelines;

(7)    any unrealized non-cash gains or losses or charges in respect of Hedging Obligations (including those resulting from the application of FASB ASC 815);

(8)    income or loss attributable to discontinued operations (including, without limitation, operations disposed of during such period whether or not such operations were classified as discontinued); and

(9)    any non-cash compensation charge arising from any grant of stock, stock options or other equity-based awards; *provided* that the proceeds resulting from any such grant will be excluded from Section 4.10(c)(ii).

Consolidated Net Income will be reduced by the amount of Permitted Payments to Parent paid during such period to the extent that the related taxes have not reduced Consolidated Net Income by at least such amount.

"Consolidated Total Debt" means, at any date, all Indebtedness of the Issuer and its Restricted Subsidiaries on a consolidated basis, excluding (i) non-cash obligations under FASB ASC 815, (ii) accounts payable and other accrued liabilities (for the deferred purchase price of property or services) from time to time incurred in the ordinary course of business (A) which are not greater than ninety (90) days past the date of receipt of the invoice or delinquent or (B) which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP, (iii) Indebtedness with respect to letters of credit to the extent such letters of credit have not been drawn, (iv) obligations with respect to surety or performance bonds and similar instruments entered into in the ordinary course of business in connection with the operation of Oil and Gas Properties and (v) Indebtedness of the type described in clauses (6), (7), (8) and (10) of the definition of "Indebtedness," and (b) less, so long as there are no loans outstanding under the Senior Secured Credit Agreement on such date, the lesser of (i) the unrestricted cash and cash equivalents of the Issuer and its Restricted Subsidiaries on such date and (ii) $[__] million.

"Consolidated Total Debt Ratio" means, as of any date, the ratio of (a) Consolidated Total Debt of the Issuer and the Restricted Subsidiaries as of such date to (b) the aggregate amount of EBITDA of the Issuer and the Restricted Subsidiaries for the period of the most recently completed four consecutive full fiscal quarters for which internal financial statements are available, with such pro forma adjustments to Consolidated Total Debt and Consolidated EBITDA as are appropriate and consistent with the pro forma adjustment provisions set forth in the definition of "Consolidated Coverage Ratio."

"Conversion Agent" has the meaning set forth in Section 2.3 hereof.

16

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"Conversion Date" has the meaning set forth in Section 10.2 hereof.

"Conversion Rate" means the conversion rate of [_____][5] shares of New Common Stock (subject to adjustment as provided in Article 10 hereof) per $1,000 of Converting Amount.

"Converting Amount" has the meaning set forth in Section 10.1 hereof.

"Corporate Trust Office" means the office of the Trustee at which at any particular time its corporate trust business shall be principally administered, which office at the date of execution of this Indenture is located at 500 Delaware Avenue, Wilmington, Delaware 19801, or at any other time at such other address as the Trustee may designate from time to time by notice to the Holders and the Issuer, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Holders and the Issuer).

"Covenant Defeasance" has the meaning set forth in Section 8.1.

"Credit Facility" means, with respect to the Issuer or any Subsidiary Guarantor, one or more debt facilities (including, without limitation, the Senior Secured Credit Agreement), indentures or commercial paper facilities providing for revolving credit loans, term loans, term debt, debt securities, receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from such lenders against such receivables) or letters of credit, in each case, as amended, restated, amended and restated, modified, renewed, refunded, replaced or refinanced in whole or in part from time to time (and whether or not with the original administrative agent and lenders or another administrative agent or agents or other lenders and whether provided under the original Senior Secured Credit Agreement or any other credit or other agreement or indenture).

"Currency Agreement" means in respect of a Person any foreign exchange contract, currency swap agreement, futures contract, option contract or other similar agreement as to which such Person is a party or a beneficiary.

"Custodian" means any receiver, trustee, assignee, liquidator, sequestrator or similar official under any Bankruptcy Law.

"Default" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"Default Interest Payment Date" has the meaning provided in Section 2.12.

"Definitive Note" means a certificated Note registered in the name of the Holder thereof and issued in accordance with Section 2.6(c) hereof, substantially in the form of Exhibit A hereto, except that such Note shall not bear the Global Note Legend.

---

[5] NTD: Under review.

17

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"Depository" or "DTC" means The Depository Trust Company, its nominees and any successors thereto.[6]

"Designated Non-cash Consideration" means the Fair Market Value of non-cash consideration received by the Issuer or a Restricted Subsidiary in connection with an Asset Disposition that is so designated as Designated Non-cash Consideration pursuant to an Officers' Certificate, setting forth the basis of such valuation and executed by the chief financial officer or treasurer and one other officer of the Issuer, less the amount of cash or Cash Equivalents received in connection with a subsequent sale of or collection on such Designated Non-cash Consideration.

"Disqualified Stock" means, with respect to any Person, any Capital Stock of such Person which by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) at the option of the holder of the Capital Stock or upon the happening of any event:

(1)    matures or is mandatorily redeemable (other than redeemable only for Capital Stock of such Person which is not itself Disqualified Stock) pursuant to a sinking fund obligation or otherwise;

(2)    is convertible or exchangeable for Indebtedness or Disqualified Stock (excluding Capital Stock which is convertible or exchangeable solely at the option of the Issuer or a Restricted Subsidiary); or

(3)    is redeemable at the option of the holder of the Capital Stock in whole or in part, in each case on or prior to the date that is 91 days after the earlier of the date (a) of the Stated Maturity of the Notes or (b) on which there are no Notes outstanding; *provided* that only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date will be deemed to be Disqualified Stock; *provided*, *further*, that any Capital Stock that would constitute Disqualified Stock solely because the holders thereof have the right to require the Issuer to repurchase such Capital Stock upon the occurrence of a change of control or asset sale (each defined in a substantially identical manner to the corresponding definitions in this Indenture) shall not constitute Disqualified Stock if the terms of such Capital Stock (and all such securities into which it is convertible or for which it is exchangeable) provide that (i) the Issuer may not repurchase or redeem any such Capital Stock (and all such securities into which it is convertible or for which it is exchangeable) pursuant to such provision prior to compliance by the Issuer with the provisions of this Indenture described under Section 4.15 and Section 4.16 and (ii) such repurchase or redemption will be permitted solely to the extent also permitted in accordance with the provisions of this Indenture described under Section 4.10.

The amount of any Disqualified Stock that does not have a fixed redemption, repayment or repurchase price will be calculated in accordance with the terms of such Disqualified Stock as

---

[6] NTD: Under review.

18

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

if such Disqualified Stock were redeemed, repaid or repurchased on any date on which the amount of such Disqualified Stock is to be determined pursuant to this Indenture; *provided*, *however*, that if such Disqualified Stock could not be required to be redeemed, repaid or repurchased at the time of such determination, the redemption, repayment or repurchase price will be the book value of such Disqualified Stock as reflected in the most recent financial statements of such Person.

"Dollar-Denominated Production Payments" means production payment obligations recorded as liabilities in accordance with GAAP, together with all undertakings and obligations in connection therewith.

"Equity Offering" means (i) a public offering for cash by the Issuer of Capital Stock (other than Disqualified Stock) made pursuant to a registration statement, other than public offerings registered on Form S-4 or S-8, and (ii) a private offering for cash by the Issuer of its Capital Stock (other than Disqualified Stock) (except that prior to the first underwritten public offering of the New Common Stock, such private offering may only be made to non-Affiliates).

"Euroclear" means Euroclear S.A./N.V., as operator of the Euroclear system.

"Event of Default" has the meaning provided in Section 6.1.

"Excess Notes" has the meaning specified in Section 10.2.

"Excess Proceeds" has the meaning set forth in Section 4.16.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Excluded Assets" has the meaning set forth in the Security Documents.

"Fair Market Value" means, with respect to any asset or property, the sale value that would be obtained in an arm's-length transaction between an informed and willing seller under no compulsion to sell and an informed and willing buyer under no compulsion to buy, in the case of any asset or property other than cash (whose Fair Market Value shall be the face amount thereof), as determined in good faith by the Board of Directors of the Issuer, whose determination shall be conclusive.

"FASB ASC 815" means Financial Accounting Standards Board Accounting Standards Codification Topic No. 815, Derivatives and Hedging.

"Foreign Subsidiary" means any Restricted Subsidiary that is not organized under the laws of the United States of America or any state thereof or the District of Columbia.

"Fulfillment Date" has the meaning set forth in Section 10.2.

19

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time; *provided* that any leases shall be accounted for under GAAP as in effect on the Issue Date. All ratios and computations based on GAAP contained in this Indenture will be computed in conformity with GAAP. At any time after the Issue Date, the Issuer may elect to apply IFRS accounting principles in lieu of GAAP and, upon any such election, references herein to GAAP shall thereafter be construed to mean IFRS (except as otherwise provided in this Indenture); *provided* that any such election, once made, shall be irrevocable, unless otherwise required by the SEC; *provided*, *further*, that any calculation or determination in this Indenture that requires the application of GAAP for periods that include fiscal quarters ended prior to the Issuer's election to apply IFRS shall remain as previously calculated or determined in accordance with GAAP. The Issuer shall give notice of any such election made in accordance with this definition to the Trustee and the Holders of the Notes.

"Global Note" has the meaning provided in Section 2.1.

"Global Note Legend" means the legend set forth in Section 2.15(a)(ii) hereof, which is required to be placed on all Global Notes issued under this Indenture.

"Guarantee" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness of any other Person and any obligation, direct or indirect, contingent or otherwise, of such Person:

(1)    to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness of such other Person (whether arising by virtue of partnership arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise); or

(2)    entered into for purposes of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part);

*provided*, *however*, that the term "Guarantee" will not include endorsements for collection or deposit in the ordinary course of business or any obligation to the extent it is payable only in Capital Stock of the Subsidiary Guarantor that is not Disqualified Stock. The term "Guarantee" used as a verb has a corresponding meaning.

"Guarantor Subordinated Obligation" means, with respect to a Subsidiary Guarantor, any Indebtedness of such Subsidiary Guarantor (whether outstanding on the Issue Date or thereafter Incurred) which is expressly subordinate in right of payment to the obligations of such Subsidiary Guarantor under its Subsidiary Guarantee pursuant to a written agreement.

"Hedging Obligations" of any Person means the obligations of such Person pursuant to any Interest Rate Agreement, Currency Agreement or Commodity Agreement.

"Holder" means a Person in whose name a Note is registered on the registrar's books.

20

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"Hydrocarbons" means oil, natural gas, casing head gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all other hydrocarbons and all constituents, elements or compounds thereof and products refined or processed therefrom.

"IFRS" means the International Financial Reporting Standards as adopted by the International Accounting Standards Board. "Immaterial Subsidiary" means, as of any date, any Restricted Subsidiary if and for so long as (a) such Restricted Subsidiary has total assets having a Fair Market Value of $2.0 million or less and (b) such Restricted Subsidiary, together with all other Immaterial Subsidiaries, does not have total assets having a Fair Market Value at any time exceeding $5.0 million; *provided* that a Restricted Subsidiary will not be considered to be an Immaterial Subsidiary if it, directly or indirectly, Guarantees or otherwise provides direct credit support for any Indebtedness of the Issuer.

"Incur" means issue, create, assume, Guarantee, incur or otherwise become directly or indirectly liable for, contingently or otherwise; *provided*, *however*, that any Indebtedness or Capital Stock of a Person existing at the time such Person becomes a Restricted Subsidiary (whether by merger, consolidation, acquisition or otherwise) will be deemed to be Incurred by such Restricted Subsidiary at the time it becomes a Restricted Subsidiary; and the terms "Incurred" and "Incurrence" have meanings correlative to the foregoing.

"Indebtedness" means, with respect to any Person on any date of determination (without duplication, whether or not contingent):

(1)    the principal of and premium (if any) in respect of indebtedness of such Person for borrowed money;

(2)    the principal of and premium (if any) in respect of obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(3)    the principal component of all obligations of such Person in respect of letters of credit, bankers' acceptances or other similar instruments (including reimbursement obligations with respect thereto except to the extent such reimbursement obligation relates to a trade payable, to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such obligation is satisfied within 30 days of payment on the letter of credit);

(4)    the principal component of all obligations of such Person (other than obligations payable solely in Capital Stock that is not Disqualified Stock) to pay the deferred and unpaid purchase price of property (except accrued expenses and accounts payable and other accrued liabilities (for the deferred purchase price of property or services) from time to time incurred in the ordinary course of business which are not greater than ninety (90) days past the date of receipt of the invoice or delinquent or (B) which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP), which purchase price is due more than six months after the date of placing such property in service or taking delivery and title thereto to the extent such obligations would appear as liabilities upon the consolidated balance sheet of such Person in accordance with GAAP;

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(5)    Capitalized Lease Obligations of such Person to the extent such Capitalized Lease Obligations would appear as liabilities on the consolidated balance sheet of such Person in accordance with GAAP;

(6)    the principal component or liquidation preference of all obligations of such Person with respect to the redemption, repayment or other repurchase of any Disqualified Stock or, with respect to any Subsidiary that is not a Subsidiary Guarantor, any Preferred Stock (but excluding, in each case, any accrued dividends);

(7)    the principal component of all Indebtedness of other Persons secured by a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person; *provided*, *however*, that the amount of such Indebtedness will be the lesser of (a) the Fair Market Value of such asset at such date of determination and (b) the amount of such Indebtedness of such other Persons;

(8)    the principal component of Indebtedness of other Persons to the extent Guaranteed by such Person;

(9)    to the extent not otherwise included in this definition, net obligations of such Person under Commodity Agreements, Currency Agreements and Interest Rate Agreements (the amount of any such obligations to be equal at any time to the termination value of such agreement or arrangement giving rise to such obligation that would be payable by such Person at such time); and

(10)    any Guarantee by such Person of production or payment with respect to a Production Payment (but, for the avoidance of doubt, excluding all other obligations associated with such Production Payments, such as guarantees with respect to operation and maintenance of the related oil and gas properties in a prudent manner, delivery of the associated production (if required) and other such contractual obligations);

*provided*, *however*, that any indebtedness which has been defeased in accordance with GAAP or defeased pursuant to the deposit of cash or Cash Equivalents (in an amount sufficient to satisfy all such indebtedness obligations at maturity or redemption, as applicable, and all payments of interest and premium, if any) in a trust or account created or pledged for the sole benefit of the holders of such indebtedness, and subject to no other Liens, shall not constitute "Indebtedness." Subject to the preceding sentence, neither Dollar-Denominated Production Payments nor Volumetric Production Payments shall be deemed to be Indebtedness.

The amount of Indebtedness of any Person at any date will be the outstanding balance at such date of all unconditional obligations as described above and the maximum liability, upon the occurrence of the contingency giving rise to the obligation, of any contingent obligations at such date.

Notwithstanding the preceding, "Indebtedness" shall not include:

22

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(1)     [reserved];

(2)     any obligation of a Person in respect of a farm-in agreement or similar arrangement whereby such Person agrees to pay all or a share of the drilling, completion or other expenses of an exploratory or development well (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interest therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well in exchange for an ownership interest in an oil or gas property;

(3)     any obligations under Currency Agreements, Commodity Agreements and Interest Rate Agreements; *provided*, that such Agreements are entered into for bona fide hedging purposes of the Issuer or its Restricted Subsidiaries (as determined in good faith by the Board of Directors or senior management of the Issuer, whether or not accounted for as a hedge in accordance with GAAP) and, in the case of Currency Agreements or Commodity Agreements, such Currency Agreements or Commodity Agreements are related to business transactions of the Issuer or its Restricted Subsidiaries entered into in the ordinary course of business and, in the case of Interest Rate Agreements, such Interest Rate Agreements substantially correspond in terms of notional amount, duration and interest rates, as applicable, to Indebtedness of the Issuer or its Restricted Subsidiaries Incurred without violation of this Indenture;

(4)     any obligation arising from agreements of the Issuer or a Restricted Subsidiary providing for indemnification, Guarantees, adjustment of purchase price, holdbacks, contingency payment obligations or similar obligations (other than Guarantees of Indebtedness), in each case, Incurred or assumed in connection with the acquisition or disposition of any business, assets or Capital Stock of a Restricted Subsidiary; *provided* that such Indebtedness is not reflected on the face of the balance sheet of the Issuer or any Restricted Subsidiary;

(5)     any obligation arising from the honoring by a bank or other financial institution of a check, draft or similar instrument (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business; *provided*, *however*, that such Indebtedness is extinguished within five business days of Incurrence;

(6)     in-kind obligations relating to net oil or natural gas balancing positions arising in the ordinary course of business; and

(7)     all contracts and other obligations, agreements, instruments or arrangements described in clauses (20), (21), (22), (29)(a) or (30) of the definition of "Permitted Liens."

In addition, "Indebtedness" of any Person shall include Indebtedness described in the first paragraph of this definition of "Indebtedness" that would not appear as a liability on the balance sheet of such Person if:

(1)     such Indebtedness is the obligation of a partnership or joint venture that is not a Restricted Subsidiary (a "Joint Venture");

23

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(2)    such Person or a Restricted Subsidiary of such Person is a general partner of the Joint Venture or otherwise liable for all or a portion of the Joint Venture's liabilities (a "General Partner"); and

(3)    there is recourse, by contract or operation of law, with respect to the payment of such Indebtedness to property or assets of such Person or a Restricted Subsidiary of such Person; and then such Indebtedness shall be included in an amount not to exceed:

(a)    the lesser of (i) the net assets of the General Partner and (ii) the amount of such obligations to the extent that there is recourse, by contract or operation of law, to the property or assets of such Person or a Restricted Subsidiary of such Person; or

(b)    if less than the amount determined pursuant to subclause (a) immediately above, the actual amount of such Indebtedness that is recourse to such Person or a Restricted Subsidiary of such Person, if the Indebtedness is evidenced by a writing and is for a determinable amount.

"Indenture" means this Indenture, as amended or supplemented from time to time in accordance with the terms hereof.

"Indirect Participant" means a Person who holds a beneficial interest in a Global Note through a Participant.

"Initial Lien" has the meaning provided in Section 4.18.

"Intercreditor Agreement" means an intercreditor agreement establishing the priority of the Liens securing any priority lien obligations over the Liens securing the Note Obligations, in form and substance reasonably acceptable to Holders of a majority in aggregate principal amount of the then-outstanding Notes, as it may be amended, restated, supplemented or otherwise modified from time to time.

"interest" when used with respect to any Note means the amount of all interest accruing on such Note, including any applicable defaulted interest pursuant to Section 2.12.

"Interest Make-Whole Premium" means, in respect of any event described in Section 4.1(i) herein with respect to any Notes, a make-whole premium with respect to such Notes in an amount equal to the sum of the value (as set forth in the immediately succeeding sentence) of all interest payments that would have been payable on the principal amount of such Notes (including all interest that has previously been paid in kind by increasing the principal amount of the Notes and any interest that would have been payable on interest that would have been added to such principal) from the last Interest Payment Date on which interest was paid on such Notes immediately prior to the date of the relevant acceleration or Interest Make-Whole Trigger Event, as the case may be, through, and including, the Maturity Date as though such Notes had remained outstanding through the Maturity Date. The Interest Make-Whole Premium shall be calculated on a net present value basis as of the date of the payment of principal or repurchase

24

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

following such acceleration or Interest Make-Whole Trigger Event, as the case may be, using a discount rate equal to the Treasury Rate, plus 50 basis points.

"Interest Make-Whole Trigger Event" means, with respect to any Note, a bankruptcy or insolvency event with respect to the Issuer.

"Interest Payment Date" means the stated maturity of an installment of interest on the Notes.

"Interest Rate" has the meaning set forth in Section 4.1(b).

"Interest Rate Agreement" means, with respect to any Person, any interest rate protection agreement, interest rate future agreement, interest rate option agreement, interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedge agreement or other similar agreement or arrangement as to which such Person is party or a beneficiary.

"Investment" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of any direct or indirect advance, loan or other extensions of credit (including by way of Guarantee or similar arrangement, but excluding any debt or extension of credit represented by a bank deposit other than a time deposit and advances or extensions of credit to customers in the ordinary course of business) or capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), or any purchase or acquisition of Capital Stock, Indebtedness or other similar instruments (excluding any interest in a crude oil or natural gas leasehold to the extent constituting a security under applicable law) issued by, such other Person and all other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP; *provided* that none of the following will be deemed to be an Investment:

(1)     Hedging Obligations entered into in the ordinary course of business and in compliance with this Indenture;

(2)     endorsements of negotiable instruments and documents in the ordinary course of business; and

(3)     an acquisition of assets, Capital Stock or other securities by the Issuer or a Subsidiary for consideration to the extent such consideration consists of New Common Stock.

The amount of any Investment shall not be adjusted for increases or decreases in value, write-ups, writedowns or write-offs with respect to such Investment.

For purposes of the definition of "Unrestricted Subsidiary" and Section 4.10,

(1)     "Investment" will include the portion (proportionate to the Issuer's equity interest in a Restricted Subsidiary to be designated as an Unrestricted Subsidiary) of the Fair Market

25

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Value of the net assets of such Restricted Subsidiary at the time that such Restricted Subsidiary is designated an Unrestricted Subsidiary; *provided*, *however*, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Issuer will be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary in an amount (if positive) equal to (a) the Issuer's "Investment" in such Subsidiary at the time of such redesignation less (b) the portion (proportionate to the Issuer's equity interest in such Subsidiary) of the Fair Market Value of the net assets of such Subsidiary at the time that such Subsidiary is so redesignated a Restricted Subsidiary; and

(2)    any property transferred to or from an Unrestricted Subsidiary will be valued at its Fair Market Value at the time of such transfer.

"Investment Grade Rating" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P (or the equivalent rating by any successor rating agency).

"Investment Grade Status" shall occur when the Notes receive an Investment Grade Rating from both Moody's and S&P (or, if any such entity ceases to rate the Notes for reasons outside of the control of the Issuer, the equivalent investment grade credit rating from any other "nationally recognized statistical rating organization" registered under Section 15E of the Exchange Act selected by the Issuer as a replacement agency).

"Issue Date" means [_____], 2020, the date of the original issuance of the Notes under this Indenture.

"Issuer" has the meaning assigned to such term in the introductory paragraph of this Indenture.

"Legal Defeasance" has the meaning set forth in Section 8.1.

"Legal Holiday" has the meaning provided in Section 11.7.

"Lien" means, with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, charge, security interest, preference, priority or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to %sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction; *provided* that in no event shall an operating lease be deemed to constitute a Lien.

26

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

["Liquidity" means at any date the Issuer's [consolidated cash and Cash Equivalents plus all funds available to the Issuer and its subsidiaries within 30 days under any credit agreement.]][7]

"Maturity Date" means [____][8], 2025.

"Minimum Liquidity" has the meaning set forth in Section 4.23.

"Minority Interest" means the percentage interest represented by any shares of any class of Capital Stock of a Restricted Subsidiary that are not owned by the Issuer or a Restricted Subsidiary.

"Moody's" means Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"Net Available Cash" from an Asset Disposition means cash payments received (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise and net proceeds from the sale or other disposition of any securities received as consideration, but only as and when received, but excluding any other consideration received in the form of assumption by the acquiring Person of Indebtedness or other obligations relating to the properties or assets that are the subject of such Asset Disposition or received in any other non-cash form) therefrom, in each case net of:

(1)    all legal, accounting, investment banking, title and recording tax expenses, commissions and other fees and expenses Incurred, and all federal, state, provincial, foreign and local taxes required to be paid or accrued as a liability under GAAP (after taking into account any available tax credits or deductions and any tax sharing agreements), as a consequence of such Asset Disposition;

(2)    all payments made on any Indebtedness which is secured by any assets subject to such Asset Disposition, in accordance with the terms of any Lien upon such assets, or which must by its terms, or in order to obtain a necessary consent to such Asset Disposition, or by applicable law be repaid out of the proceeds from such Asset Disposition;

(3)    all distributions and other payments required to be made to minority interest holders in Subsidiaries or joint ventures or to holders of royalty or similar interests as a result of such Asset Disposition; and

(4)    the deduction of appropriate amounts to be provided by the seller as a reserve, in accordance with GAAP, against any liabilities associated with the assets disposed of in such Asset Disposition and retained by the Issuer or any Restricted Subsidiary after such Asset Disposition.

---

[7] NTD: Under review.
[8] NTD: Under review.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"Net Cash Proceeds," with respect to any issuance or sale of Capital Stock or any contribution to equity capital, means the cash proceeds of such issuance, sale or contribution net of attorneys' fees, accountants' fees, underwriters' or placement agents' fees, listing fees, discounts or commissions and brokerage, consultant and other fees and charges actually Incurred in connection with such issuance, sale or contribution and net of taxes paid or payable as a result of such issuance or sale (after taking into account any available tax credit or deductions and any tax sharing arrangements).

"Net Working Capital" means (a) all current assets of the Issuer and its Restricted Subsidiaries except current assets from commodity price risk management activities arising in the ordinary course of the Oil and Gas Business, less (b) all current liabilities of the Issuer and its Restricted Subsidiaries, except current liabilities included in Indebtedness and any current liabilities from commodity price risk management activities arising in the ordinary course of the Oil and Gas Business, in each case as set forth in the consolidated financial statements of the Issuer prepared in accordance with GAAP.

"New Common Stock" means the common stock of the Issuer, par value $[_.__] per share, at the date of this Indenture, subject to Section 10.12.

"Non-Recourse Debt" means Indebtedness of a Person:

(1)     as to which neither the Issuer nor any Restricted Subsidiary (a) provides any Guarantee or credit support of any kind (including any undertaking, guarantee, indemnity, agreement or instrument that would constitute Indebtedness) or (b) is directly or indirectly liable (as a guarantor or otherwise);

(2)     no default with respect to which (including any rights that the holders thereof may have to take enforcement action against an Unrestricted Subsidiary) would permit (upon notice, lapse of time or both) any holder of any other Indebtedness of the Issuer or any Restricted Subsidiary to declare a default under such other Indebtedness or cause the payment thereof to be accelerated or payable prior to its stated maturity; and

(3)     the explicit terms of which provide there is no recourse against any of the assets of the Issuer or its Restricted Subsidiaries.

"Non-U.S. Person" means a person who is not a U.S. person, as defined in Regulation S.

"Note Documents" means (a) this Indenture, the Notes, the Note Guarantees, the Security Documents and each of the other agreements, documents or instruments evidencing or governing any Note Obligations and (b) any other related documents or instruments executed and delivered pursuant to any Note Document described in clause (a) above evidencing or governing any obligations thereunder (including Note Obligations), in each case, as amended, restated, modified, renewed, refunded, replaced (whether upon or after termination or otherwise) or refinanced (including by means of sales of debt securities to institutional investors) in whole or in part from time to time.

28

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"Note Guarantee" means the guarantee by each Subsidiary Guarantor of the Issuer's obligations under this Indenture and the Notes executed pursuant to the provisions of this Indenture.

"Note Obligations" means, without duplication, any principal, interest (including any interest accruing subsequent to the filing of a petition in bankruptcy, reorganization or similar proceeding at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable state, federal or foreign law), premium (including, without limitation, any Interest Make-Whole Premium), penalties, fees, indemnifications, reimbursements (including, without limitation, reimbursement obligations with respect to letters of credit and banker's acceptances), damages and other liabilities, and guarantees of payment of such principal, interest, premium (including, without limitation, any Interest-Make Whole Premium), penalties, fees, indemnifications, reimbursements, damages and other liabilities, in each case, payable under this Indenture, the Notes or any other Note Documents.

"Notes" has the meaning provided in the preamble to this Indenture.

"Notice of Conversion" has the meaning provided in Section 10.2.

"Officer" means the Chairman of the Board, the Chief Executive Officer, the President, the Chief Financial Officer, Chief Operating Officer, any Vice President, the Treasurer or the Secretary of the Issuer. Officer of any Subsidiary Guarantor has a correlative meaning.

"Officers' Certificate" means a certificate signed by two Officers of the Issuer.

"Oil and Gas Business" means: (1) the business of acquiring, exploring, exploiting, developing, producing, operating and disposing of interests in oil, natural gas, liquid natural gas and other Hydrocarbon and mineral properties or products produced in association with any of the foregoing; (2) the business of gathering, marketing, distributing, treating, processing, storing, refining, selling and transporting of any production from such interests or properties and products produced in association therewith and the marketing of oil, natural gas, other Hydrocarbons and minerals obtained from unrelated Persons; (3) any business or activity relating to exploration for or development, production, treatment, processing, refining, storage, transportation or marketing of oil, natural gas, Hydrocarbons and other minerals and products produced in association therewith; (4) any other related energy business, including power generation and electrical transmission business, directly or indirectly, from oil, natural gas and other Hydrocarbons and minerals produced substantially from properties in which the Issuer or its Restricted Subsidiaries, directly or indirectly, participates; (5) any business relating to oil field sales and service and any other business providing assets or services used or useful in connection with the activities described in clauses (1) through (4) of this definition, including the sale, leasing, ownership or operation of drilling rigs, fracturing units or other assets used or useful in any such business; and (6) any business or activity relating to, ancillary to, arising from, or

29

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

necessary, appropriate or incidental to the activities described in the foregoing clauses (1) through (5) of this definition.

"Oil and Gas Properties" means all properties, including equity or other ownership interest therein, owned by such Person or any of its Restricted Subsidiaries which contain or are believed to contain Proved Reserves.

"Opinion of Counsel" means a written opinion from legal counsel who is acceptable to the Trustee. The counsel may be an employee of or counsel to the Issuer or the Trustee.

["Parent" means any entity that acquires 100% of the outstanding Capital Stock of the Issuer in a transaction in which the Beneficial Owners of the Issuer immediately prior to such transaction are Beneficial Owners in the same proportion of the Issuer immediately after such transaction.]

"Pari Passu Indebtedness" means Indebtedness that ranks equally in right of payment to the Notes.

"Pari Passu Notes" has the meaning provided in Section 4.16.

"Participant" means, with respect to the Depository, Euroclear or Clearstream, a Person who has an account with the Depository, Euroclear or Clearstream, respectively (and, with respect to DTC, shall include Euroclear and Clearstream).

"Paying Agent" has the meaning provided in Section 2.3. "payment default" has the meaning provided in Section 6.1(6)(a).

"Permitted Business Investment" means any Investment made in the ordinary course of, and of a nature that is or shall have become customary in, the Oil and Gas Business including investments or expenditures for actively exploiting, exploring for, acquiring, developing, producing, processing, gathering, marketing or transporting oil, natural gas or other Hydrocarbons and minerals through agreements, transactions, interests or arrangements which permit one to share risks or costs, comply with regulatory requirements regarding local ownership or satisfy other objectives customarily achieved through the conduct of the Oil and Gas Business jointly with third parties, including, without limitation:

(1)    ownership interests in oil, natural gas, other Hydrocarbons and minerals properties or any interest therein or liquid natural gas facilities, processing facilities, gathering systems, transportation systems, pipelines, storage facilities or related systems or ancillary real property interests;

(2)    Investments in the form of or pursuant to operating agreements, working interests, royalty interests, mineral leases, processing agreements, farm-in agreements, farm-out agreements, contracts for the sale, transportation or exchange of oil, natural gas, other hydrocarbons and minerals, production sharing agreements, participation agreements,

30

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

development agreements, area of mutual interest agreements, unitization agreements, pooling agreements, joint bidding agreements, service contracts, joint venture agreements, partnership agreements (whether general or limited), subscription agreements, stock purchase agreements, stockholder agreements and other similar agreements (including for limited liability companies) with third parties (including Unrestricted Subsidiaries); and

(3)     direct or indirect ownership interests in drilling rigs, fracturing units and related equipment, including, without limitation, transportation equipment, or in Persons that own or provide such equipment.

"Permitted Investment" means an Investment by the Issuer or any Restricted Subsidiary in:

(1)     the Issuer, a Restricted Subsidiary or a Person which will, upon the making of such Investment, become a Restricted Subsidiary; *provided*, *however*, that the primary business of such Restricted Subsidiary is the Oil and Gas Business;

(2)     another Person whose primary business is the Oil and Gas Business if as a result of such Investment such other Person becomes a Restricted Subsidiary or is merged or consolidated with or into, or transfers or conveys all or substantially all its assets to, the Issuer or a Restricted Subsidiary and, in each case, any Investment held by such Person; *provided* that such Investment was not acquired by such Person in contemplation of such acquisition, merger, consolidation or transfer;

(3)     cash and Cash Equivalents;

(4)     receivables owing to the Issuer or any Restricted Subsidiary created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms; *provided*, *however*, that such trade terms may include such concessionary trade terms as the Issuer or any such Restricted Subsidiary deems reasonable under the circumstances;

(5)     payroll, commission, travel, relocation and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(6)     loans or advances to employees made in the ordinary course of business consistent with past practices of the Issuer or such Restricted Subsidiary not in excess of $[__] million outstanding at any one time, in the aggregate;

(7)     Capital Stock, obligations or securities received in settlement of debts created in the ordinary course of business and owing to the Issuer or any Restricted Subsidiary or in satisfaction of judgments;

(8)     Investments made as a result of the receipt of non-cash consideration from an Asset Disposition that was made pursuant to and in compliance with Section 4.16;

31

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(9)      Investments in existence on the Issue Date;

(10)     Commodity Agreements, Currency Agreements, Interest Rate Agreements and related Hedging Obligations, which transactions or obligations are Incurred in compliance with Section 4.12;

(11)     Guarantees issued in accordance with Section 4.12;

(12)     any Asset Swap or acquisition of Additional Assets made in accordance with Section 4.16;

(13)     Investments in any Unrestricted Subsidiary having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (13) that are at the time outstanding, not to exceed $[__] million (with the Fair Market Value of such Investment being measured at the time such Investment is made and without giving effect to subsequent changes in value); *provided* that no Default or Event of Default exists at the time of such Investment or would result therefrom;

(14)     Permitted Business Investments;

(15)     any Person where such Investment was acquired by the Issuer or any of its Restricted Subsidiaries (a) in exchange for any other Investment or accounts receivable held by the Issuer or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable or (b) as a result of a foreclosure by the Issuer or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(16)     any Person to the extent such Investments consist of prepaid expenses, negotiable instruments held for collection and lease, utility and workers' compensation, performance and other similar deposits made in the ordinary course of business by the Issuer or any Restricted Subsidiary;

(17)     Guarantees of performance or other obligations (other than Indebtedness) arising in the ordinary course in the Oil and Gas Business, including obligations under oil and natural gas exploration, development, joint operating, and related agreements and licenses or concessions related to the Oil and Gas Business;

(18)     acquisitions of assets, Capital Stock or other securities by the Issuer for consideration consisting of common equity securities of the Issuer;

(19)     Investments in the Notes; and

(20)     Investments by the Issuer or any of its Restricted Subsidiaries, together with all other Investments pursuant to this clause (20), in an aggregate amount outstanding at any one

32

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

time not to exceed the greater of (x) $[__] million and (y) 2.5% of the Issuer's Adjusted Consolidated Net Tangible Assets determined as of the date such Investment is made after giving effect to such Investment (with the Fair Market Value of such Investment being measured at the time such Investment is made and without giving effect to subsequent changes in value).

"Permitted Liens" means, with respect to any Person:

(1)     Liens securing Indebtedness and other obligations under, and related Hedging Obligations and Liens on assets of Restricted Subsidiaries securing Guarantees of Indebtedness and other obligations of the Issuer under, any Credit Facility permitted to be Incurred under this Indenture under the provisions described in clause (1) of the second paragraph of Section 4.12;

(2)     pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws, social security or old age pension laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits (which may be secured by a Lien) to secure public or statutory obligations of such Person including letters of credit and bank guarantees required or requested by the United States, any State thereof or any foreign government or any subdivision, department, agency, organization or instrumentality of any of the foregoing in connection with any contract or statute (including lessee or operator obligations under statutes, governmental regulations, contracts or instruments related to the ownership, exploration and production of oil, natural gas, other hydrocarbons and minerals on State, Federal or foreign lands or waters), or deposits of cash or United States government bonds to secure indemnity performance, surety or appeal bonds or other similar bonds to which such Person is a party, or deposits as security for contested taxes or import or customs duties or for the payment of rent, in each case Incurred in the ordinary course of business;

(3)     statutory and contractual Liens of landlords and Liens imposed by law, including carriers', warehousemen's, mechanics', materialmen's and repairmen's Liens, in each case for sums not yet due or being contested in good faith by appropriate proceedings if a reserve or other appropriate provisions, if any, as shall be required by GAAP shall have been made in respect thereof;

(4)     Liens for taxes, assessments or other governmental charges or claims not yet delinquent or which are being contested in good faith by appropriate proceedings; *provided* that adequate reserves, if any, required pursuant to GAAP have been made in respect thereof;

(5)     Liens in favor of issuers of surety or performance bonds or letters of credit or bankers' acceptances issued pursuant to the request of and for the account of such Person in the ordinary course of its business; *provided*, *however*, that such letters of credit do not constitute Indebtedness;

(6)     survey exceptions, encumbrances, ground leases, easements or reservations of, or rights of others for, licenses, rights of way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning, building codes or other restrictions (including, without

33

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

limitation, minor defects or irregularities in title and similar encumbrances) as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which do not in the aggregate materially adversely affect the value of the assets of such Person and its Restricted Subsidiaries, taken as a whole, or materially impair their use in the operation of the business of such Person;

(7)    Liens securing Hedging Obligations (excluding Hedging Obligations not entered into in the ordinary course of business) so long as the related Indebtedness is, and is permitted to be under this Indenture, secured by a Lien on the same property securing such Hedging Obligation;

(8)    leases, licenses, subleases and sublicenses of assets (including, without limitation, real property and intellectual property rights) which do not materially interfere with the ordinary conduct of the business of the Issuer or any of its Restricted Subsidiaries;

(9)    prejudgment Liens and judgment Liens not giving rise to an Event of Default so long as such Lien is adequately bonded and any appropriate legal proceedings which may have been duly initiated for the review of such judgment have not been finally terminated or the period within which such proceedings may be initiated has not expired;

(10)    Liens for the purpose of securing the payment of all or a part of the purchase price of, or Capitalized Lease Obligations, purchase money obligations or other payments Incurred to finance the acquisition, lease, improvement or construction of or repairs or additions to, assets or property acquired or constructed in the ordinary course of business; *provided* that:

(a)    the aggregate principal amount of Indebtedness secured by such Liens is otherwise permitted to be Incurred under this Indenture; and

(b)    such Liens are created within 180 days of the later of the acquisition, lease, completion of improvements, construction, repairs or additions or commencement of full operation of the assets or property subject to such Lien and do not encumber any other assets or property of the Issuer or any Restricted Subsidiary other than such assets or property and assets affixed or appurtenant thereto;

(11)    Liens arising solely by virtue of any statutory or common law provisions relating to banker's Liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a depositary institution; *provided* that:

(a)    such deposit account is not a dedicated cash collateral account and is not subject to restrictions against access by the Issuer in excess of those set forth by regulations promulgated by the Federal Reserve Board; and

(b)    such deposit account is not intended by the Issuer or any Restricted Subsidiary to provide collateral to the depository institution;

34

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(12)    Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Issuer and its Restricted Subsidiaries in the ordinary course of business;

(13)    Liens existing on the Issue Date (other than Liens securing Indebtedness under the Senior Secured Credit Facility);

(14)    Liens on property or shares of Capital Stock of a Person at the time such Person becomes a Subsidiary; *provided*, *however*, that such Liens are not created, Incurred or assumed in connection with, or in contemplation of, such other Person becoming a Subsidiary; *provided further*, *however*, that any such Lien may not extend to any other property owned by the Issuer or any Restricted Subsidiary (other than assets or property affixed or appurtenant thereto);

(15)    Liens on property at the time the Issuer or any of its Subsidiaries acquired the property, including any acquisition by means of a merger or consolidation with or into the Issuer or any of its Subsidiaries; *provided*, *however*, that such Liens are not created, Incurred or assumed in connection with, or in contemplation of, such acquisition; *provided further*, *however*, that such Liens may not extend to any other property owned by the Issuer or any Restricted Subsidiary (other than assets or property affixed or appurtenant thereto);

(16)    [reserved];

(17)    Liens securing the Notes, Subsidiary Guarantees and other obligations under this Indenture;

(18)    Liens securing Refinancing Indebtedness Incurred to refinance Indebtedness that was previously so secured; *provided* that any such Lien is limited to all or part of the same property or assets (*plus* improvements, accessions, proceeds or dividends or distributions in respect thereof) that secured (or, under the written arrangements under which the original Lien arose, could secure) the Indebtedness being refinanced or is in respect of property or assets that is the security for a Permitted Lien hereunder;

(19)    any interest or title of a lessor under any Capitalized Lease Obligation or operating lease;

(20)    Liens in respect of Production Payments and Reserve Sales, which Liens shall be limited to the property that is the subject of such Production Payments and Reserve Sales;

(21)    Liens arising under oil and gas leases or subleases, assignments, farm-out agreements, farm-in agreements, division orders, contracts for the sale, purchase, exchange, transportation, gathering or processing of Hydrocarbons, unitizations and pooling designations, declarations, orders and agreements, development agreements, joint venture agreements, partnership agreements, operating agreements, royalties, working interests, net profits interests, joint interest billing arrangements, participation agreements, production sales contracts, area of mutual interest agreements, gas balancing or deferred production agreements, injection,

35

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

repressuring and recycling agreements, salt water or other disposal agreements, seismic or geophysical permits or agreements, licenses, sublicenses and other agreements which are customary in the Oil and Gas Business; *provided*, *however*, in all instances that such Liens are limited to the assets that are the subject of the relevant agreement, program, order or contract;

(22)     Liens on pipelines or pipeline facilities that arise by operation of law;

(23)     Liens securing Indebtedness (other than Subordinated Obligations and Guarantor Subordinated Obligations) in an aggregate principal amount outstanding at any one time, added together with all other Indebtedness secured by Liens Incurred pursuant to this clause (23), not to exceed the greater of (x) $[__] million and (y) 3.0% of the Issuer's Adjusted Consolidated Net Tangible Assets determined as of the date of the Incurrence of such Lien;

(24)     Liens in favor of the Issuer or any Subsidiary Guarantor;

(25)     deposits made in the ordinary course of business to secure liability to insurance carriers;

(26)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(27)     Liens deemed to exist in connection with Investments in repurchase agreements permitted in Section 4.12; *provided* that such Liens do not extend to any assets other than those that are the subject of such repurchase agreement;

(28)     Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(29)     any (a) interest or title of a lessor or sublessor under any lease, liens reserved in oil, gas or other Hydrocarbons, minerals, leases for bonus, royalty or rental payments and for compliance with the terms of such leases; (b) restriction or encumbrance that the interest or title of such lessor or sublessor may be subject to (including, without limitation, ground leases or other prior leases of the demised premises, mortgages, mechanics' liens, tax liens, and easements); or (c) subordination of the interest of the lessee or sublessee under such lease to any restrictions or encumbrance referred to in the preceding clause (b);

(30)     Liens (other than Liens securing Indebtedness) on, or related to, assets to secure all or part of the costs incurred in the ordinary course of the Oil and Gas Business for the exploration, drilling, development, production, processing, transportation, marketing, storage or operation thereof;

(31)     Liens upon specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(32)    Liens arising under this Indenture in favor of the Trustee for its own benefit and similar Liens in favor of other trustees, agents and representatives arising under instruments governing Indebtedness permitted to be incurred under this Indenture; *provided*, *however*, that such Liens are solely for the benefit of the trustees, agents or representatives in their capacities as such and not for the benefit of the holders of such Indebtedness;

(33)    Liens arising from the deposit of funds or securities in trust for the purpose of decreasing or defeasing Indebtedness so long as such deposit of funds or securities and such decreasing or defeasing of Indebtedness are permitted under Section 4.10;

(34)    Liens in favor of collecting or payer banks having a right of setoff, revocation, or charge back with respect to money or instruments of the Issuer or any Subsidiary of the Issuer on deposit with or in possession of such bank; and

(35)    Liens on the Capital Stock of an Unrestricted Subsidiary held by the Issuer or its Restricted Subsidiaries in favor of any lender to such Unrestricted Subsidiary.

In each case set forth above, notwithstanding any stated limitation on the assets that may be subject to such Lien, a Permitted Lien on a specified asset or group or type of assets may include Liens on all improvements, additions and accessions thereto and all products and proceeds thereof (including dividends, distributions and increases in respect thereof).

"Permitted Payments to Parent" means, for any taxable period ending after the Issue Date for which the Issuer and/or any of the Issuer's Subsidiaries is a member of a group filing a consolidated, combined or similar income tax return of which a direct or indirect parent of the Issuer is the common parent (a "Tax Group"), payments to the direct or indirect parent in respect of the portion of any such consolidated, combined or similar income taxes for such taxable period that is attributable to the taxable income of the Issuer and its Subsidiaries ("Tax Payments"). The Tax Payments in respect of any taxable period shall not exceed the amount of any such income taxes that the Issuer and/or its applicable Subsidiaries would have been required to pay in respect of such taxable period if they had been stand-alone corporate taxpayers or a stand-alone Tax Group for all applicable taxable periods ending after the Issue Date; *provided* that the portion of any such payments attributable to any taxes of an Unrestricted Subsidiary shall be limited to the amount actually paid by such Unrestricted Subsidiary to the Issuer or any Subsidiary Guarantor for the purpose of paying such consolidated or combined income taxes. Any Tax Payments received from the Issuer shall be paid over to the appropriate taxing authority within 30 days of the direct or indirect parent's receipt of such Tax Payments or refunded to the Issuer.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company, government or any agency or political subdivision hereof or any other entity.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"PIK Interest" means interest paid in the form of (i) an increase in the outstanding principal amount of the Notes or (ii) the issuance of PIK Notes.

"PIK Interest Payment" means the payment of PIK Interest.

"PIK Notes" has the meaning set forth in Section 2.01(d) hereof.

"Plan of Reorganization" means the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization*, dated August 15, 2020 (together with all exhibits and schedules thereto), filed with the Bankruptcy Court, which was confirmed pursuant to an Order entered by the Bankruptcy Court on [_____], 2020.

"Preferred Stock" as applied to the Capital Stock of any corporation, means Capital Stock of any class or classes (however designated) which is preferred as to the payment of dividends, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such corporation, over shares of Capital Stock of any other class of such corporation.

"principal" of any Indebtedness (including the Notes) means the principal amount of such Indebtedness.

"Private Placement Legend" means the legend initially set forth on the Notes in the form set forth in Section 2.15(a)(i).

"pro forma" means, with respect to any calculation made or required to be made pursuant to the terms of this Indenture, a calculation in accordance with Article 11 of Regulation S-X under the Securities Act, as determined by the Board of Directors of the Issuer in consultation with its independent public accountants.

"Production Payments" means Dollar-Denominated Production Payments and Volumetric Production Payments, collectively. "Production Payments and Reserve Sales" means the grant or transfer by the Issuer or a Restricted Subsidiary to any Person of a royalty, overriding royalty, net profits interest, Production Payment, partnership or other interest in Oil and Gas Properties, reserves or the right to receive all or a portion of the production or the proceeds from the sale of production attributable to such properties where the holder of such interest has recourse solely to such production or proceeds of production, subject to the obligation of the grantor or transferor to operate and maintain, or cause the subject interests to be operated and maintained, in a reasonably prudent manner or other customary standard or subject to the obligation of the grantor or transferor to indemnify for environmental, title or other matters customary in the Oil and Gas Business, including any such grants or transfers pursuant to incentive compensation programs on terms that are reasonably customary in the Oil and Gas Business for geologists, geophysicists or other providers of technical services to the Issuer or a Restricted Subsidiary.

"Property" means, with respect to any Person, any interests of such Person in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including, without

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

limitation, Capital Stock, partnership interests and other equity or ownership interests in any other Person.

"Proved Reserves" means crude oil and natural gas reserves (including natural gas liquids) constituting ''proved oil and gas reserves'' as defined in Rule 4-10 of Regulation S-X of the Securities Act.

"Rating Agencies" means Moody's and S&P or if Moody's or S&P or both cease to rate the Notes for reasons outside of the control of the Issuer, a nationally recognized statistical rating organization or organizations, as the case may be, registered under Section 15E of the Exchange Act, selected by the Issuer which shall be substituted for Moody's or S&P or both, as the case may be.

"Qualified Institutional Buyer" or "QIB" shall have the meaning specified in Rule 144A.

"Record Date" means, with respect to the Notes, the Record Dates specified in the Notes and, with respect to any dividend, distribution or other transaction or event in which the holders of Common Stock have the right to receive any cash, securities or other property or in which the Common Stock is exchanged for or converted into any combination of cash, securities or other property, the date fixed for determination of stockholders entitled to receive such cash, securities or other property (whether such date is fixed by the Board of Directors of the Issuer or by statute, contract or otherwise).

"Redemption Date," when used with respect to any Note to be redeemed, means the date fixed for such redemption pursuant to this Indenture and the Notes.

"Redemption Price," when used with respect to any Note to be redeemed, means the price fixed for such redemption, including principal and premium, if any, pursuant to this Indenture and the Notes.

"Reference Property" has the meaning specified in Section 10.12.

"Refinancing Indebtedness" means Indebtedness that is Incurred to refund, refinance, replace, exchange, renew, repay, extend, prepay, redeem or retire (including pursuant to any defeasance or discharge mechanism) (collectively, "refinance," "refinances" and "refinanced" shall have correlative meanings) any Indebtedness (including Indebtedness of the Issuer that refinances Indebtedness of any Restricted Subsidiary and Indebtedness of any Restricted Subsidiary that refinances Indebtedness of another Restricted Subsidiary, but excluding Indebtedness of a Subsidiary that is not a Restricted Subsidiary that refinances Indebtedness of the Issuer or a Restricted Subsidiary), including Indebtedness that refinances Refinancing Indebtedness; *provided*, *however*, that:

(1)    (a) if the Stated Maturity of the Indebtedness being refinanced is earlier than the Stated Maturity of the Notes, the Refinancing Indebtedness has a Stated Maturity no earlier than the Stated Maturity of the Indebtedness being refinanced or (b) if the Stated Maturity of the

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Indebtedness being refinanced is later than the Stated Maturity of the Notes, the Refinancing Indebtedness has a Stated Maturity at least 91 days later than the Stated Maturity of the Notes;

(2)　　the Refinancing Indebtedness has an Average Life at the time such Refinancing Indebtedness is Incurred that is equal to or greater than the Average Life of the Indebtedness being refinanced;

(3)　　such Refinancing Indebtedness is Incurred in an aggregate principal amount (or if issued with original issue discount, an aggregate issue price) that is equal to or less than the sum of the aggregate principal amount (or if issued with original issue discount, the aggregate accreted value) then outstanding of the Indebtedness being refinanced (*plus*, without duplication, any additional Indebtedness Incurred to pay interest, premiums or defeasance costs required by the instrument governing such existing Indebtedness and fees and expenses Incurred in connection therewith); and

(4)　　if the Indebtedness being refinanced is subordinated in right of payment to the Notes or the Subsidiary Guarantee, such Refinancing Indebtedness is subordinated in right of payment to the Notes or the Subsidiary Guarantee on terms at least as favorable to the Holders as those contained in the documentation governing the Indebtedness being refinanced.

For the avoidance of doubt, Refinancing Indebtedness shall not include Indebtedness Incurred under a Credit Facility pursuant to clause (1) of the second paragraph of Section 4.12.

"Registrar" has the meaning provided in Section 2.3.

"Regulation S" means Regulation S under the Securities Act.

"Regulation S Global Note" means a Regulation S Temporary Global Note or Regulation S Permanent Global Note, as applicable.

"Regulation S Permanent Global Note" means a permanent Global Note in the form of Exhibit A hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of and registered in the name of the Depository or its nominee, issued in a denomination equal to the outstanding principal amount of the Regulation S Temporary Global Note upon expiration of the Restricted Period.

"Regulation S Temporary Global Note" means a temporary Global Note in the form of Exhibit A hereto bearing the Global Note Legend, the Private Placement Legend and the Regulation S Temporary Global Note Legend and deposited with or on behalf of and registered in the name of the Depository or its nominee, issued in a denomination equal to the outstanding principal amount of the Notes initially sold in reliance on Rule 903.

"Regulation S Temporary Global Note Legend" means the legend set forth in Section 2.15(a)(iii) hereof.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"Restricted Definitive Note" means a Definitive Note bearing the Private Placement Legend.

"Restricted Global Note" means a Global Note bearing the Private Placement Legend.

"Restricted Investment" means any Investment other than a Permitted Investment.

"Restricted Payment" has the meaning set forth in Section 4.10.

"Restricted Period" means the 40-day distribution compliance period as defined in Regulation S.

"Restricted Subsidiary" means any Subsidiary of the Issuer other than an Unrestricted Subsidiary.

"Reversion Date" has the meaning set forth in Section 4.21.

"Rule 144" means Rule 144 promulgated under the Securities Act.

"Rule 144A" means Rule 144A promulgated under the Securities Act.

"Rule 903" means Rule 903 promulgated under the Securities Act.

"Rule 904" means Rule 904 promulgated under the Securities Act.

"S&P" means S&P Global Ratings, a division of The McGraw-Hill Companies, Inc., or any successor to the rating agency business thereof.

"Sale/Leaseback Transaction" means an arrangement relating to property now owned or hereafter acquired whereby the Issuer or a Restricted Subsidiary transfers such property to a Person and the Issuer or a Restricted Subsidiary leases it from such Person.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Security Agreement" means the security agreement, dated as of the Issue Date, among the Issuer, the other parties thereto from time to time, and the Collateral Agent, as such agreement may be amended, supplemented, restated, amended and restated, or otherwise modified from time to time.

"Security Documents" means the Mortgages, the Security Agreement and the security agreements, pledge agreements, mortgages, deeds of trust, deeds to secure debt, collateral assignments, control agreements, any Intercreditor Agreement and related agreements (including, without limitation, financing statements under the Uniform Commercial Code of the relevant

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

states), as amended, supplemented, restated, renewed, refunded, replaced, restructured, repaid, refinanced or otherwise modified from time to time, under which rights or remedies with respect to any Lien are governed.

"Senior Secured Credit Agreement" means that certain Eleventh Restated Credit Agreement, dated as of [_____], 2020, among the Issuer, as borrower, Royal Bank of Canada, as administrative agent, and the lenders party thereto from time to time, including any guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements, refundings or refinancings thereof and any indentures or credit facilities or commercial paper facilities with banks or other institutional lenders or investors that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount borrowable thereunder or alters the maturity thereof (*provided* that such increase in borrowings is permitted in Section 4.12).

"Share Exchange Event" has the meaning specified in Section 10.12.

"Significant Subsidiary" means any Restricted Subsidiary that would be a "Significant Subsidiary" of the Issuer within the meaning of Rule 1-02 under Regulation S-X promulgated by the SEC, as in effect on the Issue Date.

"Stated Maturity" means, with respect to any security, the date specified in such security as the fixed date on which the payment of principal of such security is due and payable, including pursuant to any mandatory redemption provision, but shall not include any contingent obligations to repay, redeem or repurchase any such principal prior to the date originally scheduled for the payment thereof.

"Stockholders Agreement" means that certain shareholders agreement dated as of [●], 2020 by and among the Issuer and the holders listed therein, as may be amended from time to time.

"Subordinated Obligation" means any Indebtedness of the Issuer or a Subsidiary Guarantor (whether outstanding on the Issue Date or thereafter Incurred) that is subordinate or junior in right of payment to the Notes pursuant to a written agreement.

"Subsidiary" of any Person means (a) any corporation, association or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50% of the total ordinary voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or Persons performing similar functions) or (b) any partnership, joint venture, limited liability company or similar entity of which more than 50% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, is, in the case of clauses (a) and (b), at the time owned or controlled, directly or indirectly, by (1) such Person, (2) such Person and one or more Subsidiaries of such

42

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Person or (3) one or more Subsidiaries of such Person. Unless otherwise specified herein, each reference to a Subsidiary (other than in this definition) will refer to a Subsidiary of the Issuer.

"Subsidiary Guarantee" means, individually, any Guarantee of payment of the Notes by a Subsidiary Guarantor pursuant to the terms of this Indenture and any supplemental indenture thereto, and, collectively, all such Guarantees. Each such Subsidiary Guarantee will be in the form prescribed by this Indenture.

"Subsidiary Guarantor" means [(i) [CEI Acquisition, L.L.C., a Delaware limited liability company,] CEI Pipeline, L.L.C., a Texas limited liability company, [Chaparral Biofuels, L.L.C., an Oklahoma limited liability company,] Chaparral CO2, L.L.C., an Oklahoma limited liability company, Chaparral Energy, L.L.C., an Oklahoma limited liability company, [Chaparral Exploration, L.L.C., a Delaware limited liability company,] Chaparral Real Estate, L.L.C., an Oklahoma limited liability company, Chaparral Resources, L.L.C., an Oklahoma limited liability company, Charles Energy, L.L.C., an Oklahoma limited liability company, Chestnut Energy, L.L.C., an Oklahoma limited liability company, [Green Country Supply, Inc., an Oklahoma corporation, Roadrunner Drilling, L.L.C., an Oklahoma limited liability company,] and Trabajo Energy, L.L.C., an Oklahoma limited liability company, and (ii) each other Restricted Subsidiary (other than a Foreign Subsidiary) that (x) Incurs or guarantees Indebtedness under the Senior Secured Credit Agreement or (y) Incurs or guarantees any other Indebtedness created or acquired by the Issuer or one or more of its Restricted Subsidiaries in an aggregate principal amount exceeding $[__] million.][9]

"Suspended Covenants" has the meaning set forth in Section 4.21.

"Suspension Period" has the meaning set forth in Section 4.21.

"TIA" means the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa-77bbbb), as in effect on the date of this Indenture; *provided* that in the event the Trust Indenture Act of 1939 is amended after such date, "TIA" means, to the extent required by any such amendment, the Trust Indenture Act of 1939 as so amended.

"Treasury Rate" means, as of the date of any payment of principal or repurchase of the Notes following the occurrence of an Interest Make-Whole Trigger Event, the yield to maturity at the time of computation of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) which has become publicly available at least two Business Days prior to such date (or, if such Statistical Release is no longer published or the relevant information does not appear thereon, any publicly available source of similar market data)) most nearly equal to the period from such date to the Maturity Date; provided, however, that if the period from such date to the Maturity Date is not equal to the constant maturity of a United States Treasury security for which a weekly average yield is given, the Treasury Rate shall be obtained by linear interpolation (calculated to the nearest one-twelfth of a year) from the weekly average yields of United States

---

[9] NTD: Under review.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Treasury securities for which such yields are given, except that if the period from such date to the Maturity Date is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year shall be used. The Issuer shall (1) calculate the Treasury Rate as of the second Business Day preceding the applicable date of any payment of principal or repurchase of the Notes following the occurrence of an Interest Make-Whole Trigger Event and (2) prior to such date file with the Trustee an Officers' Certificate setting forth the Interest Make-Whole Premium and the Treasury Rate and showing the calculation in reasonable detail; provided that the Trustee shall not be responsible for such calculation.

"Trust Officer" means any officer within the Corporate Trust Office including any Vice President, Managing Director, Director, Assistant Vice President, Associate, or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers and also, with respect to a particular matter, any other officer to whom such matter is referred because of such officer's knowledge and familiarity with the particular subject and who shall have direct responsibility for the administration of this Indenture, or in the case of a successor trustee, an officer assigned to the department, division or group performing the corporation trust work of such successor and assigned to administer this Indenture.

"Trustee" means the party named as such in this Indenture until a successor replaces it in accordance with the provisions of this Indenture and thereafter means such successor.

"unit of Reference Property" has the meaning specified in Section 10.12.

"Unrestricted Subsidiary" means:

(1)     any Subsidiary of the Issuer that at the time of determination shall be designated an Unrestricted Subsidiary by the Board of Directors of the Issuer in the manner provided below; and

(2)     any Subsidiary of an Unrestricted Subsidiary.

The Board of Directors of the Issuer may designate any Subsidiary of the Issuer (including any newly acquired or newly formed Subsidiary or a Person becoming a Subsidiary through merger or consolidation or Investment therein) to be an Unrestricted Subsidiary only if:

(1)     such Subsidiary or any of its Subsidiaries does not own any Capital Stock or Indebtedness of or have any Investment in, or own or hold any Lien on any property of, any other Subsidiary of the Issuer which is not a Subsidiary of the Subsidiary to be so designated or otherwise an Unrestricted Subsidiary;

(2)     all the Indebtedness of such Subsidiary and its Subsidiaries shall, at the date of designation, and will at all times thereafter, consist of Non-Recourse Debt;

44

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(3)     on the date of such designation, such designation and the Investment of the Issuer in such Subsidiary complies with Section 4.10;

(4)     such Subsidiary is a Person with respect to which neither the Issuer nor any of its Restricted Subsidiaries has any direct or indirect obligation:

(a)     to subscribe for additional Capital Stock of such Person; or

(b)     to maintain or preserve such Person's financial condition or to cause such Person to achieve any specified levels of operating results; and

(5)     on the date such Subsidiary is designated an Unrestricted Subsidiary, such Subsidiary is not a party to any agreement, contract, arrangement or understanding with the Issuer or any Restricted Subsidiary with terms substantially less favorable to the Issuer than those that might have been obtained from Persons who are not Affiliates of the Issuer.

Any such designation by the Board of Directors of the Issuer shall be evidenced to the Trustee by filing with the Trustee a certified copy of a resolution of the Board of Directors of the Issuer giving effect to such designation and an Officers' Certificate certifying that such designation complies with the foregoing conditions. If, at any time, any Unrestricted Subsidiary would fail to meet the foregoing requirements as an Unrestricted Subsidiary, it shall thereafter cease to be an Unrestricted Subsidiary for purposes of this Indenture and any Indebtedness of such Subsidiary shall be deemed to be Incurred as of such date.

The Board of Directors of the Issuer may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided* that immediately after giving effect to such designation, (a) no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof and (b) either (i) the Issuer could Incur at least $1.00 of additional Indebtedness under the first paragraph of Section 4.12 or (ii) the Consolidated Coverage Ratio for the Issuer and its Restricted Subsidiaries would be equal to or greater than immediately prior to such designation, in either case on a pro forma basis taking into account such designation.

"U.S. Government Obligations" means securities that are (a) direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged or (b) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the timely payment of which is unconditionally guaranteed as a full faith and credit obligation of the United States of America, which, in either case, are not callable or redeemable at the option of the issuer thereof, and shall also include a depositary receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act), as custodian with respect to any such U.S. Government Obligations or a specific payment of principal of or interest on any such U.S. Government Obligations held by such custodian for the account of the holder of such depositary receipt; *provided* that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depositary receipt from any amount received by the custodian in respect of the U.S. Government

45

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Obligations or the specific payment of principal of or interest on the U.S. Government Obligations evidenced by such depositary receipt.

"U.S. Legal Tender" means such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts.

"Unrestricted Definitive Note" means one or more Definitive Notes that do not bear and are not required to bear the Private Placement Legend.

"Unrestricted Global Note" means a permanent Global Note, substantially in the form of Exhibit A attached hereto, that bears the Global Note Legend and that is deposited with or on behalf of and registered in the name of the Depository, representing Notes that do not bear the Private Placement Legend.

"Volumetric Production Payments" means production payment obligations recorded as deferred revenue in accordance with GAAP, together with all undertakings and obligations in connection therewith.

"Voting Stock" of an entity means all classes of Capital Stock of such entity then outstanding and normally entitled to vote in the election of members of such entity's Board of Directors.

"Wholly Owned Subsidiary" means a Restricted Subsidiary, all of the Capital Stock of which (other than directors' qualifying shares) is owned by the Issuer or another Wholly Owned Subsidiary.

SECTION 1.2.    ***No Incorporation by Reference of TIA***.

This Indenture is not qualified under the TIA, and the TIA shall not apply to or in any way govern the terms of this Indenture. As a result, no provisions of the TIA are incorporated into this Indenture unless expressly incorporated pursuant to this Indenture.

SECTION 1.3.    ***Rules of Construction***.

Unless the context otherwise requires:

(1)    a term has the meaning assigned to it;

(2)    an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(3)    "or" is not exclusive;

(4)    words in the singular include the plural, and words in the plural include the singular;

46

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(5)      "herein," "hereof" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision;

(6)      any reference to a statute, law or regulation means that statute, law or regulation as amended and in effect from time to time and includes any successor statute, law or regulation; *provided*, *however*, that any reference to the Bankruptcy Law shall mean the Bankruptcy Law as applicable to the relevant case;

(7)      unless the context requires otherwise, references to "Notes" for all purposes of this Indenture shall include any PIK Notes that are actually issued and any increase in the principal amount of the outstanding Notes (including PIK Notes) as a result of a PIK Interest Payment, and references to "principal amount" of the Notes include any increase in the principal amount of the outstanding Notes (including PIK Notes) as a result of a PIK Interest Payment;

(8)      all references to "interest" on the Notes means Cash Interest or PIK Interest as the context may require;

(9)      all references to unpaid accrued interest on the Notes in respect of an interest period for which the Issuer has not yet made an election (or deemed election) as to the method of payment for such interest, shall assume such interest accrues at the Interest Rate for Cash Interest; and

(10)      references to sections of or rules under the Securities Act or the Exchange Act will be deemed to include substitute, replacement of successor sections enacted into law or rules adopted by the SEC, as the case may be, from time to time.

ARTICLE II.

THE NOTES

SECTION 2.1.      *Form and Dating*.

(a)      General. The Notes and the Trustee's certificate of authentication relating thereto shall be substantially in the form of Exhibit A hereto, which is incorporated in and expressly made a part of this Indenture, or may be in the form of Book-Entry Notes. The Notes may have notations, legends or endorsements required by law, stock exchange rule or depository rule or usage. The Issuer shall approve the form of the Notes and any notation, legend or endorsement on them. Each Note shall be dated the date of its issuance and shall show the date of its authentication.

The terms and provisions contained in the Notes, a form of which is annexed hereto as Exhibit A, shall constitute, and are hereby expressly made, a part of this Indenture and, to the extent applicable, the Issuer, the Subsidiary Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.

47

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

The aggregate principal amount of the Notes which may be authenticated and delivered under this Indenture is $35,000,000.00 in principal amount of Notes, plus any PIK Notes or any increases in the principal amount of the outstanding Notes as a result of a PIK Interest Payment (or otherwise pursuant to this Indenture), and Notes authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Notes pursuant to the terms of this Indenture.   The proceeds of the Notes shall be used only to fund certain payments and distributions as expressly set forth in the Plan of Reorganization and to provide the Issuer with working capital for operations and for other general corporate purposes, in each case, after the effective date of the Plan of Reorganization.

(b)      Global Notes. Notes issued in global form shall be substantially in the form of Exhibit A (the "Global Note") attached hereto (including the Global Note Legend thereon), which is incorporated in and expressly made a part of this Indenture. Notes issued in definitive form shall be substantially in the form of Exhibit A attached hereto (but without the Global Note Legend thereon). Each Global Note shall provide that it shall represent up to the aggregate principal amount of Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as applicable, to reflect exchanges and redemptions. Any endorsement of a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby shall be made by the Trustee or the [Custodian], at the direction of the Trustee, in accordance with instructions given by the Holder thereof as required by Section 2.6 hereof.

(c)      PIK Notes.   In connection with the payment of PIK Interest in respect of the Notes (including the PIK Notes), the Issuer shall be entitled, without the consent of the Holders, to increase the outstanding principal amount of the Notes or issue additional Notes (the "PIK Notes") under this Indenture on the same terms and conditions as the Notes issued on the Issue Date (other than the issuance dates and the date from which interest will accrue). The Notes and any PIK Notes subsequently issued under this Indenture shall be treated as a single class for all purposes under this Indenture, including waivers, amendments, redemptions and offers to purchase. Unless the context requires otherwise, references to "Notes" for all purposes of this Indenture shall include any PIK Notes that are actually issued and any increase in the principal amount of the outstanding Notes (including PIK Notes) as a result of a PIK Interest Payment, and references to "principal amount" of the Notes include any increase in the principal amount of the outstanding Notes (including PIK Notes) as a result of a PIK Interest Payment.

(d)      Temporary Global Notes. Notes offered and sold in reliance on Regulation S shall be issued initially in the form of the Regulation S Temporary Global Note, which shall be deposited on behalf of the purchasers of the Notes represented thereby with the Trustee, as custodian for the Depository, and registered in the name of the Depository or the nominee of the Depository for the accounts of designated agents holding on behalf of Euroclear or Clearstream,

48

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

duly executed by the Issuer and authenticated by the Trustee as hereinafter provided. The Restricted Period shall be terminated upon the receipt by the Trustee of:

(i)       a written certificate from the Depository, together with copies of certificates from Euroclear and Clearstream certifying that they have received certification of non-United States beneficial ownership of 100% of the aggregate principal amount of the Regulation S Temporary Global Note (except to the extent of any beneficial owners thereof who acquired an interest therein during the Restricted Period pursuant to another exemption from registration under the Securities Act and who shall take delivery of a beneficial ownership interest in a 144A Global Note bearing a Private Placement Legend, all as contemplated by Section 2.6(b) hereof); and

(ii)      an Officers' Certificate from the Issuer.

Following the termination of the Restricted Period, beneficial interests in the Regulation S Temporary Global Note shall be exchanged for beneficial interests in the Regulation S Permanent Global Note pursuant to the Applicable Procedures. Simultaneously with the authentication of the Regulation S Permanent Global Note, the Trustee shall cancel the Regulation S Temporary Global Note. The aggregate principal amount of the Regulation S Temporary Global Note and the Regulation S Permanent Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee and the Depository or its nominee, as the case may be, in connection with transfers of interest as hereinafter provided.

(e)       Terms. The aggregate principal amount of Notes that may be authenticated and delivered under this Indenture is unlimited.

The Notes shall be subject to repurchase by the Issuer pursuant to a Change of Control Offer as provided in Section 4.15 hereof or an Asset Disposition Offer as provided under Section 4.16 hereof. The Notes shall not be redeemable, other than as provided in Article III.

Additional Notes ranking *pari passu* with the Notes issued on the Issue Date may be created and issued from time to time by the Issuer without notice to or consent of the Holders and shall be consolidated with and form a single class with the Notes issued on the Issue Date and shall have the same terms as to status, redemption or otherwise as the Notes issued on the Issue Date; *provided* that the Issuer's ability to issue Additional Notes shall be subject to the Issuer's compliance with Section 4.12 hereof. Any Additional Notes shall be issued with the benefit of an indenture supplemental to this Indenture.

(f)       Euroclear and Clearstream Procedures Applicable. The provisions of the "Operating Procedures of the Euroclear System" and "Terms and Conditions Governing Use of Euroclear" and the "General Terms and Conditions of Clearstream Banking" and "Customer Handbook" of Clearstream shall be applicable to transfers of beneficial interests in the Regulation S Temporary Global Note and the Regulation S Permanent Global Notes that are held by Participants through Euroclear or Clearstream.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

SECTION 2.2.    ***Execution and Authentication; Aggregate Principal Amount***.

At least one Officer shall execute the Notes for the Issuer by manual or facsimile signature (including by means of an electronic transmission of a pdf or similar file).

If an Officer whose signature is on a Note or a Subsidiary Guarantee was an Officer at the time of such execution but no longer holds that office or position at the time the Trustee authenticates the Note, the Note shall nevertheless be valid.

A Note shall not be valid until an authorized signatory of the Trustee manually or by facsimile signs the certificate of authentication on the Note. The signature shall be conclusive evidence that the Note has been authenticated under this Indenture.

The Trustee shall authenticate (i) Notes for original issue on the Issue Date in the aggregate principal amount not to exceed $35.0 million, (ii) any PIK Notes and (iii) subject to Section 4.12, Additional Notes, in each case, upon a written order of the Issuer in the form of an Officers' Certificate (an "Authentication Order"). Each Authentication Order shall specify the amount of Notes to be authenticated and the date on which the Notes are to be authenticated, whether the Notes are to be Notes or Additional Notes and whether the Notes are to be issued as Definitive Notes or Global Notes or such other information as the Trustee may reasonably request. Any Additional Notes shall be part of the same issue as the Notes being issued on the Issue Date and will vote on all matters as one class with the Notes being issued on the Issue Date, including, without limitation, waivers, amendments, redemptions, Change of Control Offers and Asset Disposition Offers; *provided* that Additional Notes will not be issued with the same CUSIP or ISIN, as applicable, as the Notes issued on the Issue Date unless such Additional Notes are fungible with the Notes issued on the Issue Date for U.S. federal income tax purposes. For the purposes of this Indenture, except for Section 4.12, references to the Notes include Additional Notes, if any. In addition, with respect to authentication pursuant to clause (iii) of the first sentence of this paragraph, such written order from the Issuer shall be accompanied by an Opinion of Counsel of the Issuer in a form reasonably satisfactory to the Trustee stating that the issuance of the Additional Notes does not give rise to an Event of Default, complies with this Indenture and has been duly authorized by the Issuer.

The Trustee may appoint an authenticating agent (the "Authenticating Agent") reasonably acceptable to the Issuer to authenticate Notes. Unless otherwise provided in the appointment, an Authenticating Agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such Authenticating Agent. An Authenticating Agent has the same rights as an Agent to deal with the Issuer or with any Affiliate of the Issuer.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

[The Notes shall be issuable in fully registered form only, without coupons, in denominations of at least $1,000 and any integral multiple of $1,000 thereafter (except, for the avoidance of doubt, as set forth in Section 2.3 in respect of PIK Interest Payments).][10]

SECTION 2.3.    *Registrar, Paying Agent and Conversion Agent*.

The Issuer shall maintain an office or agency where (a) Notes may be presented or surrendered for registration of transfer or for exchange ("Registrar"), (b) Notes may be presented or surrendered for payment ("Paying Agent") and (c) Notes may be presented for conversion ("Conversion Agent"). The Registrar shall keep a register of the Notes and of their transfer and exchange. The Issuer, upon prior written notice to the Trustee, may have one or more co-Registrars and one or more additional paying agents and one or more additional conversion agents each reasonably acceptable to the Trustee. The term "Paying Agent" includes any additional Paying Agent and the term "Conversion Agent" includes any additional Conversion Agent. The Issuer may act as Paying Agent, Registrar or Conversion Agent, except that, for the purposes of payments on the Notes pursuant to Sections 4.15 and 4.16, neither the Issuer nor any Affiliate of the Issuer may act as Paying Agent. The Issuer shall notify the Trustee in writing of the name and address of any Agent not a party to this Indenture.  If the Issuer fails to appoint or maintain another entity as Paying Agent, Registrar or Conversion Agent, the Trustee shall act as such.

In authenticating any Notes under this Indenture, and accepting the additional responsibilities under this Indenture in relation to such Notes, the Trustee shall be entitled to receive, and shall be fully protected in relying upon an Opinion of Counsel stating:

(1)    that the form or forms of such Notes have been established in conformity with the provisions of this Indenture; and

(2)    that the terms of such Notes have been established in conformity with the provisions of this Indenture.

The Trustee shall not be required to authenticate the Notes if the issue of such Notes pursuant to this Indenture will affect the Trustee's own rights, duties, obligations or immunities under the Notes and this Indenture or otherwise in a manner that is not reasonably acceptable to the Trustee.

On any Interest Payment Date on which the Issuer pays PIK Interest with respect to a Global Note and/or one or more Book-Entry Notes, upon receipt of an Officers' Certificate stating the amount of PIK Interest due, directing the Trustee to increase the principal amount of the Global Note or Book-Entry Notes, the Trustee shall increase the aggregate principal amount of such Global Note or Book-Entry Notes by an amount equal to the interest payable, rounded to the nearest $1.00, for the relevant interest period on the aggregate principal amount of such Global Note or Book-Entry Notes as of the relevant Record Date for such Interest Payment Date.

---

[10] NTD:  Under review.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

The foregoing notwithstanding, PIK Interest on a Global Note may be paid on an Interest Payment Date in the form of PIK Notes should the Applicable Procedures of the Depository, if any, so require or the Issuer so elects, in which case PIK Notes in a principal amount equal to the interest payable, rounded up to the nearest $1.00, for the relevant interest period will be issued to the Holders on the Record Date for such Interest Payment Date, *pro rata* in accordance with their interests, as provided in the Authentication Order from the Issuer to the Trustee pursuant to this Section 2.3.

On any Interest Payment Date on which the Issuer pays PIK Interest with respect to a Definitive Note, PIK Notes in a principal amount equal to the interest payable, rounded to the nearest $1.00, for the relevant interest period on the aggregate principal amount of such Definitive Notes as of the relevant Record Date for such Interest Payment Date will be issued to the Holders of such Definitive Notes as of such Record Date.

The Issuer shall enter into an appropriate agency agreement with any Agent not a party to this Indenture, which agreement shall implement the provisions of this Indenture that relate to such Agent. The Issuer shall notify the Trustee, in advance, of the name and address of any such Agent. If the Issuer fails to maintain a Registrar or Paying Agent, or fails to give the foregoing notice, the Trustee shall act as such.

The Issuer initially appoints the Trustee as Registrar, Paying Agent and Conversion Agent and agent for service of demands and notices in connection with the Notes, until such time as the Trustee has resigned or a successor has been appointed. Any of the Registrar, the Paying Agent, the Conversion Agent or any other agent may resign upon 30 days' prior written notice to the Issuer. The Conversion Agent shall act solely as an agent of the Issuer, and will not thereby assume any obligation towards or relationship of agency or trust for or with any Holder.

SECTION 2.4.    *__Paying Agent To Hold Assets in Trust__*.

The Issuer shall require each Paying Agent other than the Trustee to agree in writing that such Paying Agent shall hold in trust for the benefit of the Holders or the Trustee all assets held by the Paying Agent for the payment of principal of, premium, if any, or interest on, the Notes (whether such assets have been distributed to it by the Issuer or any other obligor on the Notes), and the Issuer and the Paying Agent shall notify the Trustee of any Default by the Issuer (or any other obligor on the Notes) in making any such payment. The Issuer at any time may require a Paying Agent to distribute all assets held by it to the Trustee and account for any assets disbursed and the Trustee may at any time during the continuance of any payment Default, upon written request to a Paying Agent, require such Paying Agent to distribute all assets held by it to the Trustee and to account for any assets distributed. If the Issuer acts as Paying Agent, it shall segregate and hold in a separate trust fund for the benefit of the Holders all assets held by it as Paying Agent. Upon distribution to the Trustee of all assets that shall have been delivered by the Issuer to the Paying Agent, the Paying Agent (if other than the Issuer) shall have no further liability for such assets.

52

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

SECTION 2.5.    _**Holder Lists**_.

The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of the Holders and shall otherwise comply with TIA § 312(a). If the Trustee is not the Registrar, the Issuer shall furnish or cause the Registrar to furnish to the Trustee before each Record Date and at such other times as the Trustee may request in writing a list as of such date and in such form as the Trustee may reasonably require of the names and addresses of the Holders, which list may be conclusively relied upon by the Trustee.

SECTION 2.6.    _**Transfer and Exchange**_.

(a)    <u>Transfer and Exchange of Global Notes</u>. Except as otherwise set forth in this Section 2.6, a Global Note may be transferred, in whole and not in part, only to another nominee of the Depository or to a successor Depository or a nominee of such successor Depository. A beneficial interest in a Global Note may not be exchanged for a Definitive Note unless (i) the Depository (x) notifies the Issuer that it is unwilling or unable to continue as Depository for such Global Note or (y) has ceased to be a clearing agency registered under the Exchange Act and, in either case, a successor Depository is not appointed by the Issuer within 90 days, (ii) the Issuer, at its option, notifies the Trustee in writing that the Issuer elects to cause the issuance of Definitive Notes or (iii) there shall have occurred and be continuing a Default with respect to the Notes and the Depository notifies the Trustee of its decision to cause the issuance of Definitive Notes. Upon the occurrence of any of the preceding events in clause (i) or (ii) above, Definitive Notes delivered in exchange for any Global Note or beneficial interests therein will be registered in the names, and issued in any approved denominations, requested by or on behalf of the Depository (in accordance with its customary procedures). Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.7 and 2.10 hereof. Every Note authenticated and delivered in exchange for, or in lieu of, a Global Note or any portion thereof, pursuant to this Section 2.6 or Section 2.7 or 2.10 hereof, shall be authenticated and delivered in the form of, and shall be, a Global Note, except for Definitive Notes issued subsequent to any of the preceding events in clause (i) or (ii) above and pursuant to Section 2.6(c) hereof. A Global Note may not be exchanged for another Note other than as provided in this Section 2.6 (a); _provided_, _however_, beneficial interests in a Global Note may be transferred and exchanged as provided in Section 2.6(b) or (c) hereof.

(b)    <u>Transfer and Exchange of Beneficial Interests in the Global Notes</u>. The transfer and exchange of beneficial interests in the Global Notes shall be effected through the Depository, in accordance with the provisions of this Indenture and the Applicable Procedures. Beneficial interests in the Restricted Global Notes shall be subject to restrictions on transfer comparable to those set forth herein to the extent required by the Securities Act. Transfers of beneficial interests in the Global Notes also shall require compliance with either subparagraph (i) or (ii) below, as applicable, as well as one or more of the other following subparagraphs, as applicable:

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(i)     Transfer of Beneficial Interests in the Same Global Note. Beneficial interests in any Restricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Restricted Global Note in accordance with the transfer restrictions set forth in the Private Placement Legend; *provided*, *however*, that prior to the expiration of the Restricted Period, transfers of beneficial interests in the Regulation S Temporary Global Note may not be made to a U.S. Person or for the account or benefit of a U.S. Person. Beneficial interests in any Unrestricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note. No written orders or instructions shall be required to be delivered to the Registrar to effect the transfers described in this Section 2.6(b)(i).

(ii)    All Other Transfers and Exchanges of Beneficial Interests in Global Notes. In connection with all transfers and exchanges of beneficial interests that are not subject to Section 2.6(b)(i) hereof, the transferor of such beneficial interest must deliver to the Registrar either (A) (1) a written order from a Participant or an Indirect Participant given to the Depository in accordance with the Applicable Procedures directing the Depository to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged and (2) instructions given in accordance with the Applicable Procedures containing information regarding the Participant account to be credited with such increase or (B) (1) a written order from a Participant or an Indirect Participant given to the Depository in accordance with the Applicable Procedures directing the Depository to cause to be issued a Definitive Note in an amount equal to the beneficial interest to be transferred or exchanged and (2) instructions given by the Depository to the Registrar containing information regarding the Person in whose name such Definitive Note shall be registered to effect the transfer or exchange referred to in (1) above; *provided* that in no event shall Definitive Notes be issued upon the transfer or exchange of beneficial interests in the Regulation S Temporary Global Note prior to (A) the expiration of the Restricted Period and (B) the receipt by the Registrar of any certificates required pursuant to Rule 903. Upon satisfaction of all of the requirements for transfer or exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or otherwise applicable under the Securities Act, the Trustee shall adjust the principal amount of the relevant Global Note(s) pursuant to Section 2.6(g) hereof.

(iii)   Transfer of Beneficial Interests to Another Restricted Global Note. A beneficial interest in any Restricted Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in another Restricted Global Note if the transfer complies with the requirements of Section 2.6(b)(ii) hereof and the Registrar receives the following:

(A)     if the transferee will take delivery in the form of a beneficial interest in the 144A Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof; or

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(B)      if the transferee will take delivery in the form of a beneficial interest in the Regulation S Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (2) thereof.

(iv)      Transfer and Exchange of Beneficial Interests in a Restricted Global Note for Beneficial Interests in an Unrestricted Global Note. A beneficial interest in any Restricted Global Note may be exchanged by any holder thereof for a beneficial interest in an Unrestricted Global Note or transferred to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note if the exchange or transfer complies with the requirements of Section 2.6(b)(ii) hereof and the Registrar receives the following:

(A)      if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a beneficial interest in an Unrestricted Global Note, a certificate from such Holder substantially in the form of Exhibit C hereto, including the certifications in item (1)(a) thereof; or

(B)      if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each case set forth in this Section 2.6(b)(iv), if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

If any such transfer is effected pursuant to this Section 2.6(b)(iv) at a time when an Unrestricted Global Note has not yet been issued, the Issuer shall issue and, upon receipt of an Authentication Order in accordance with Section 2.2 hereof, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of beneficial interests transferred pursuant to this Section 2.6(b)(iv).

Beneficial interests in an Unrestricted Global Note cannot be exchanged for, or transferred to Persons who take delivery thereof in the form of, a beneficial interest in a Restricted Global Note.

(c)      Transfer or Exchange of Beneficial Interests for Definitive Notes.

(i)      Beneficial Interests in Restricted Global Notes to Restricted Definitive Notes. If any holder of a beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Restricted Definitive Note, then, upon the occurrence of any of the events in paragraph (i) or (ii) of Section 2.6(a) hereof and receipt by the Registrar of the following documentation:

55

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(A)    if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note, a certificate from such holder substantially in the form of Exhibit C hereto, including the certifications in item (2)(a) thereof;

(B)    if such beneficial interest is being transferred to a QIB in accordance with Rule 144A, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (1) thereof;

(C)    if such beneficial interest is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (2) thereof;

(D)    if such beneficial interest is being transferred pursuant to an exemption from the registration requirements of the Securities Act other than in accordance with Rule 144, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (3)(a) thereof;

(E)    if such beneficial interest is being transferred to the Issuer or any of its Restricted Subsidiaries, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (3)(b) thereof; or

(F)    if such beneficial interest is being transferred pursuant to an effective registration statement under the Securities Act, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (3)(c) thereof, the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.6(g) hereof, and the Issuer shall execute and, upon receipt of an Authentication Order in accordance with Section 2.2 hereof, the Trustee shall authenticate and send to the Person designated in the instructions a Definitive Note in the applicable principal amount. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.6(c) shall be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions from the Depository and the Participant or Indirect Participant. The Trustee shall send such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.6(c)(i) (except transfers pursuant to clause (F) above) shall bear the Private Placement Legend and shall be subject to all restrictions on transfer contained therein.

(ii)    Beneficial Interests in Regulation S Temporary Global Note to Definitive Notes. Notwithstanding Sections 2.6(c)(i)(A) and (C) hereof, a beneficial interest in the Regulation S Temporary Global Note may not be exchanged for a Definitive Note or transferred to a Person who takes delivery thereof in the form of a Definitive Note prior to (A) the expiration of the Restricted Period and (B) the receipt by the Registrar of any certificates required pursuant

56

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

to Rule 903(b)(3)(ii)(B) of the Securities Act, except in the case of a transfer pursuant to an exemption from the registration requirements of the Securities Act other than Rule 903 or Rule 904.

(iii)    <u>Beneficial Interests in Restricted Global Notes to Unrestricted Definitive Notes</u>. A holder of a beneficial interest in a Restricted Global Note may exchange such beneficial interest for an Unrestricted Definitive Note or may transfer such beneficial interest to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note only upon the occurrence of any of the events in subsection (i) or (ii) of Section 2.6(a) hereof and if the Registrar receives the following:

(A)    if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for an Unrestricted Definitive Note, a certificate from such holder substantially in the form of <u>Exhibit C</u> hereto, including the certifications in item (1)(b) thereof; or

(B)    if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such holder substantially in the form of <u>Exhibit B</u> hereto, including the certifications in item (4) thereof;

and, in each case set forth in this Section 2.6(c)(iii), if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(iv)    <u>Beneficial Interests in Unrestricted Global Notes to Unrestricted Definitive Notes</u>. If any holder of a beneficial interest in an Unrestricted Global Note proposes to exchange such beneficial interest for a Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Definitive Note, then, upon the occurrence of any of the events in subsection (i) or (ii) of Section 2.6(a) hereof and satisfaction of the conditions set forth in Section 2.6(b)(ii) hereof, the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.6(g) hereof, and, upon receipt of an Authentication Order in accordance with Section 2.2 hereof, the Issuer shall execute and the Trustee shall authenticate and send to the Person designated in the instructions a Definitive Note in the applicable principal amount. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.6(c)(iv) shall be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions from or through the Depository and the Participant or Indirect Participant. The Trustee shall send such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.6(c)(iv) shall not bear the Private Placement Legend.

57

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(d)    Transfer and Exchange of Definitive Notes for Beneficial Interests.

(i)    Restricted Definitive Notes to Beneficial Interests in Restricted Global Notes. If any Holder of a Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note or to transfer such Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in a Restricted Global Note, then, upon receipt by the Registrar of the following documentation:

(A)    if the Holder of such Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note, a certificate from such Holder substantially in the form of Exhibit C hereto, including the certifications in item (2)(b) thereof;

(B)    if such Restricted Definitive Note is being transferred to a QIB in accordance with Rule 144A, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (1) thereof;

(C)    if such Restricted Definitive Note is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (2) thereof;

(D)    if such Restricted Definitive Note is being transferred pursuant to an exemption from the registration requirements of the Securities Act other than in accordance with Rule 144, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (3)(a) thereof;

(E)    if such Restricted Definitive Note is being transferred to the Issuer or any of its Restricted Subsidiaries, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (3)(b) thereof; or

(F)    if such Restricted Definitive Note is being transferred pursuant to an effective registration statement under the Securities Act, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (3)(c) thereof,

the Trustee shall cancel the Restricted Definitive Note, increase or cause to be increased the aggregate principal amount of, in the case of clause (A) above, the applicable Restricted Global Note, in the case of clause (B) above, the applicable 144A Global Note, and in the case of clause (C) above, the applicable Regulation S Global Note.

(ii)    Restricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes. A Holder of a Restricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note only if the Registrar receives the following:

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(A)      if the Holder of such Definitive Notes proposes to exchange such Notes for a beneficial interest in the Unrestricted Global Note, a certificate from such Holder substantially in the form of Exhibit C hereto, including the certifications in item (1)(c) thereof; or

(B)      if the Holder of such Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of a beneficial interest in the Unrestricted Global Note, a certificate from such Holder substantially in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this Section 2.6(d)(ii), if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

Upon satisfaction of the applicable conditions of this Section 2.6(d)(ii), the Trustee shall cancel the Definitive Notes and increase or cause to be increased the aggregate principal amount of the Unrestricted Global Note.

(iii)    Unrestricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes. A Holder of an Unrestricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note at any time. Upon receipt of a request for such an exchange or transfer, the Trustee shall cancel the applicable Unrestricted Definitive Note and increase or cause to be increased the aggregate principal amount of one of the Unrestricted Global Notes.

If any such exchange or transfer from a Definitive Note to a beneficial interest is effected pursuant to Section 2.6(d)(ii) or (iii) above at a time when an Unrestricted Global Note has not yet been issued, the Issuer shall issue and, upon receipt of an Authentication Order in accordance with Section 2.2 hereof, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the principal amount of Definitive Notes so transferred.

(e)      Transfer and Exchange of Definitive Notes for Definitive Notes. Upon request by a Holder of Definitive Notes and such Holder's compliance with the provisions of this Section 2.6(e), the Registrar shall register the transfer or exchange of Definitive Notes. Prior to such registration of transfer or exchange, the requesting Holder shall present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer or exchange in form satisfactory to the Registrar duly executed by such Holder or by its attorney, duly authorized in writing. In addition, the requesting Holder shall provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.6(e):

59

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(i)    <u>Restricted Definitive Notes to Restricted Definitive Notes</u>. Any Restricted Definitive Note may be transferred to and registered in the name of Persons who take delivery thereof in the form of a Restricted Definitive Note if the Registrar receives the following:

(A)    if the transfer will be made to a QIB in accordance with Rule 144A, then the transferor must deliver a certificate substantially in the form of <u>Exhibit B</u> hereto, including the certifications in item (1) thereof;

(B)    if the transfer will be made pursuant to Rule 903 or Rule 904, then the transferor must deliver a certificate in the form of <u>Exhibit B</u> hereto, including the certifications in item (2) thereof; or

(C)    if the transfer will be made pursuant to any other exemption from the registration requirements of the Securities Act, then the transferor must deliver a certificate in the form of <u>Exhibit B</u> hereto, including the certifications required by item (3) thereof, if applicable.

(ii)    <u>Restricted Definitive Notes to Unrestricted Definitive Notes</u>. Any Restricted Definitive Note may be exchanged by the Holder thereof for an Unrestricted Definitive Note or transferred to a Person or Persons who take delivery thereof in the form of an Unrestricted Definitive Note if the Registrar receives the following:

(A)    if the Holder of such Restricted Definitive Notes proposes to exchange such Notes for an Unrestricted Definitive Note, a certificate from such Holder substantially in the form of <u>Exhibit C</u> hereto, including the certifications in item (1)(d) thereof; or

(B)    if the Holder of such Restricted Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such Holder substantially in the form of <u>Exhibit B</u> hereto, including the certifications in item (4) thereof;

and, in each case set forth in this Section 2.6(e)(ii), if the Registrar so requests, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(iii)    <u>Unrestricted Definitive Notes to Unrestricted Definitive Notes</u>. A Holder of Unrestricted Definitive Notes may transfer such Notes to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note. Upon receipt of a request to register such a transfer, the Registrar shall register the Unrestricted Definitive Notes pursuant to the instructions from the Holder thereof.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(f)      [Rule 144. Notwithstanding anything to the contrary, transfers in reliance upon Rule 144 will not be permitted, even if then legally available.][11]

(g)      Cancellation and/or Adjustment of Global Notes. At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note shall be returned to or retained and canceled by the Trustee in accordance with Section 2.11 hereof. At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note shall be reduced accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depository at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note shall be increased accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depository at the direction of the Trustee to reflect such increase.

(h)      General Provisions Relating to Transfers and Exchanges.

(i)      To permit registrations of transfers and exchanges, the Issuer shall execute and the Trustee shall authenticate Global Notes and Definitive Notes upon receipt of an Authentication Order in accordance with Section 2.2 hereof or at the Registrar's request.

(ii)      No service charge shall be made to a holder of a beneficial interest in a Global Note or to a Holder of a Definitive Note for any registration of transfer or exchange, but the Issuer may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange or transfer pursuant to Sections 2.7, 2.10, 3.7, 4.15, 4.16 and 9.5 hereof).

(iii)      Neither the Registrar nor the Issuer shall be required to register the transfer of or exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part; *provided* that new Notes will only be issued in minimum denominations of $1,000 and integral multiples of $[1,000] thereafter.

(iv)      All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes shall be the valid obligations of the Issuer, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(v)      The Issuer shall not be required (A) to issue, to register the transfer of or to exchange any Notes during a period beginning at the opening of business 15 days before the

---

[11] Under review.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

day of any selection of Notes for redemption under Section 3.2 hereof and ending at the close of business on the day of selection, (B) to register the transfer of or to exchange any Note so selected for redemption or tendered (and not withdrawn) for repurchase in connection with a Change of Control Offer, an Asset Disposition Offer or other tender offer in whole or in part, except the unredeemed portion of any Note being redeemed in part or (C) to register the transfer of or to exchange a Note between a Record Date and the next succeeding Interest Payment Date.

(vi)     Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Issuer may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of (and premium, if any) and interest on such Notes and for all other purposes, and none of the Trustee, any Agent or the Issuer shall be affected by notice to the contrary.

(vii)     Upon surrender for registration of transfer of any Note at the office or agency of the Issuer designated pursuant to Section 4.2 hereof, the Issuer shall execute, and the Trustee shall authenticate and send, in the name of the designated transferee or transferees, one or more replacement Notes of any authorized denomination or denominations of a like aggregate principal amount.

(viii)     At the option of the Holder, Notes may be exchanged for other Notes of any authorized denomination or denominations of a like aggregate principal amount upon surrender of the Notes to be exchanged at such office or agency. Whenever any Global Notes or Definitive Notes are so surrendered for exchange, the Issuer shall execute, and the Trustee shall authenticate and send, the replacement Global Notes and Definitive Notes which the Holder making the exchange is entitled to in accordance with the provisions of Section 2.2 hereof.

(ix)     All certifications, certificates and Opinions of Counsel required to be submitted to the Registrar pursuant to this Section 2.6 to effect a registration of transfer or exchange may be submitted by facsimile.

(x)     Neither the Trustee nor the Registrar shall have any duty to monitor the Issuer's compliance with or have any responsibility with respect to the Issuer's compliance with any federal or state securities laws in connection with registrations of transfers and exchanges of the Notes. The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Notes (including any transfers between or among the Depository's participants or beneficial owners of interests in any Global Note) other than to require delivery of such certificates and other documentation, as is expressly required by, and to do so if and when expressly required by, the terms of this Indenture or the Notes and to examine the same to determine substantial compliance as to form with the express requirements hereof.

(xi)     The Issuer, the Trustee, and the Registrar reserve the right to require the delivery by any Holder or purchaser of a Note of such legal opinions, certifications or other

62

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

evidence as may reasonably be required in order to determine that the proposed transfer of any Restricted Global Note or Restricted Definitive Note is being made in compliance with the Securities Act or the Exchange Act, or rules or regulations adopted by the SEC from time to time thereunder, and applicable state securities laws.

(xii)    Transfers of Notes are subject to restrictions as set forth in the Stockholders Agreement. No transfer of any Note (or any beneficial interest therein, as applicable) will be effective or registered by the Registrar unless the transferee, if not already a party to the Stockholders Agreement, has delivered to the Issuer a duly completed and executed joinder agreement, in substantially the form attached as Exhibit [E] hereto, or other documentation in form and substance acceptable to the Issuer in its sole discretion (any such agreement or documentation, a "Joinder Agreement") pursuant to which such transferee agrees to be bound by, and acknowledges that all Notes, and shares of New Common Stock issued upon conversion thereof, will be subject to, the terms and conditions of the Stockholders Agreement.

SECTION 2.7.    ***Replacement Notes***.

If a mutilated Note is surrendered to the Trustee or if the Holder of a Note claims that the Note has been lost, destroyed or wrongfully taken, the Issuer shall issue and the Trustee shall authenticate a replacement Note and the Subsidiary Guarantors shall execute a Subsidiary Guarantee thereon if the Trustee's requirements are met. If required by the Trustee or the Issuer, such Holder must provide an indemnity bond or other indemnity of reasonable tenor, sufficient in the reasonable judgment of the Issuer, the Subsidiary Guarantors and the Trustee, to protect the Issuer, the Subsidiary Guarantors, the Trustee or any Agent from any loss which any of them may suffer if a Note is replaced. Every replacement Note shall constitute an additional obligation of the Issuer and the Subsidiary Guarantors.

SECTION 2.8.    ***Outstanding Notes***.

The Notes outstanding at any time are all the Notes that have been authenticated by the Trustee except for those canceled by it, those delivered to it for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof and those described in this Section as not outstanding. Subject to the provisions of Section 2.9, a Note does not cease to be outstanding because the Issuer or any of its Affiliates holds the Note.

If a Note is replaced pursuant to Section 2.7 (other than a mutilated Note surrendered for replacement), it ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replaced Note is held by a *bona fide* purchaser for value. A mutilated Note ceases to be outstanding upon surrender of such Note and replacement thereof pursuant to Section 2.7.

If on a Redemption Date or the Maturity Date the Paying Agent (other than the Issuer, a Subsidiary or an Affiliate of any thereof) holds U.S. Legal Tender or U.S. Government Obligations sufficient to pay all of the principal, premium, if any, and interest due on the Notes payable on that date and is not prohibited from paying such money to the Holders thereof

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

pursuant to the terms of this Indenture, then on and after that date such Notes shall be deemed not to be outstanding and interest on them shall cease to accrue.

SECTION 2.9.    ***Treasury Notes***.

In determining whether the Holders of the required principal amount of Notes have concurred in any direction, waiver, consent or notice, Notes owned by the Issuer or any Subsidiary Guarantor or an [Affiliate][12] of the Issuer or any Subsidiary Guarantor shall be considered as though they are not outstanding, except that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Notes which a Trust Officer of the Trustee actually knows are so owned shall be so considered. The Issuer shall notify the Trustee, in writing, when, to its knowledge, any of its Affiliates repurchase or otherwise acquire Notes, of the aggregate principal amount of such Notes so repurchased or otherwise acquired and such other information as the Trustee may reasonably request and the Trustee shall be entitled to rely thereon.

SECTION 2.10.    ***Temporary Notes***.

Until definitive Notes are ready for delivery, the Issuer may prepare and the Trustee shall authenticate temporary Notes upon receipt of an Authentication Order. The Authentication Order shall specify the amount of temporary Notes to be authenticated and the date on which the temporary Notes are to be authenticated. Temporary Notes shall be substantially in the form of definitive Notes but may have variations that the Issuer considers appropriate for temporary Notes and so indicate in the Authentication Order. Without unreasonable delay, the Issuer shall prepare, the Trustee shall authenticate and the Subsidiary Guarantors shall execute Subsidiary Guarantees on, upon receipt of an Authentication Order in accordance with Section 2.2 hereof, definitive Notes in exchange for temporary Notes.

SECTION 2.11.    ***Cancellation***.

The Issuer at any time may deliver Notes to the Trustee for cancellation. The Registrar, Paying Agent and Conversion Agent shall forward to the Trustee any Notes surrendered to them for registration of transfer, exchange, conversion or payment. The Trustee, or at the direction of the Trustee, the Registrar or the Paying Agent, and no one else, shall cancel and, at the written direction of the Issuer, shall dispose, in its customary manner, of all Notes surrendered for registration of transfer, exchange, conversion, payment or cancellation. The Trustee shall maintain a record of all canceled Notes. Subject to Section 2.7, the Issuer may not issue new Notes to replace Notes that it has paid or delivered to the Trustee for cancellation. If the Issuer shall acquire any of the Notes, such acquisition shall not operate as a redemption or satisfaction of the Indebtedness represented by such Notes unless and until the same are surrendered to the Trustee for cancellation pursuant to this Section 2.11.

---

[12] Under review.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

SECTION 2.12.    *__Defaulted Interest__*.

Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months, and, in the case of a partial month, the actual number of days elapsed. If the Issuer defaults in a payment of interest on the Notes, it shall pay the defaulted interest, *plus* (to the extent lawful) an additional amount at the rate of 2.0% per annum, payable in cash, to the Persons who are Holders on a subsequent special record date, which special record date shall be the fifteenth day next preceding the date fixed by the Issuer for the payment of defaulted interest or the next succeeding Business Day if such date is not a Business Day. The Issuer shall notify the Trustee in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment (a "Default Interest Payment Date"), and at the same time the Issuer shall deposit with the Trustee an amount of money equal to the aggregate amount proposed to be paid in respect of such defaulted interest or shall make arrangements satisfactory to the Trustee for such deposit on or prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Persons entitled to such defaulted interest as provided in this Section 2.12; *provided*, *however*, that in no event shall the Issuer deposit monies proposed to be paid in respect of defaulted interest later than 11:00 a.m. New York City time on the proposed Default Interest Payment Date. At least 15 days before the subsequent special record date, the Issuer shall send (or cause to be sent) to each Holder, as of a recent date selected by the Issuer, with a copy to the Trustee, a notice that states the subsequent special record date, the payment date and the amount of defaulted interest, and interest payable on such defaulted interest, if any, to be paid. Notwithstanding the foregoing, (a) any interest which is paid prior to the expiration of the 30-day period set forth in Section 6.1(1) shall be paid to Holders as of the regular record date for the Interest Payment Date for which interest has not been paid, and (b) the Issuer may make payment of any defaulted interest in any other lawful manner not inconsistent with the requirements of any securities exchange on which the Notes may be listed, and upon such notice as may be required by such exchange.

SECTION 2.13.    *__CUSIP Number__*.

The Issuer in issuing the Notes may use a "CUSIP" number, and, if so, the Trustee shall use the CUSIP number in notices of redemption or exchange as a convenience to Holders; *provided*, *however*, that no representation is hereby deemed to be made by the Trustee as to the correctness or accuracy of the CUSIP number printed in the notice or on the Notes, and that reliance may be placed only on the other identification numbers printed on the Notes. The Issuer shall promptly notify the Trustee of any change in the CUSIP number.

SECTION 2.14.    *__Deposit of Monies__*.

Prior to 11:00 a.m. New York City time on each Interest Payment Date, Maturity Date, Redemption Date, Change of Control Payment Date and Asset Disposition Purchase Date, the Issuer shall have deposited with the Paying Agent in immediately available funds money sufficient to make cash payments, if any, due on such Interest Payment Date, Maturity Date, Redemption Date, Change of Control Payment Date and Asset Disposition Purchase Date, as the

65

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

case may be, in a timely manner which permits the Paying Agent to remit payment to the Holders on such Interest Payment Date, Maturity Date, Redemption Date, Change of Control Payment Date and Asset Disposition Purchase Date, as the case may be.

SECTION 2.15.   ***Restrictive Legends***.

(a)      Legends. The following legends shall appear on the face of all Global Notes and Definitive Notes issued under this Indenture unless specifically stated otherwise in the applicable provisions of this Indenture:

(i)      Private Placement Legend.

(A)      Except as permitted by subparagraph (B) below, each Global Note and each Definitive Note (and all Notes issued in exchange therefor or substitution thereof and any shares of New Common Stock issued upon conversion thereof) shall bear the legend in substantially the following form:

"THIS SECURITY AND THE COMMON STOCK, IF ANY, ISSUABLE UPON CONVERSION OF THIS SECURITY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER:

(1)      REPRESENTS THAT IT AND ANY ACCOUNT FOR WHICH IT IS ACTING IS [A "QUALIFIED INSTITUTIONAL BUYER" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT)][AN "ACCREDITED INVESTOR" AS SUCH TERM IS DEFINED IN RULE 501 UNDER THE SECURITIES ACT][IS NOT A "U.S. PERSON" AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT] AND THAT IT EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO EACH SUCH ACCOUNT, AND

(2)      AGREES FOR THE BENEFIT OF CHAPARRAL ENERGY, INC. (THE "COMPANY") THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY OR ANY BENEFICIAL INTEREST HEREIN PRIOR TO THE APPLICABLE RESALE RESTRICTION TERMINATION DATE, EXCEPT:

(A)      TO THE COMPANY OR ANY SUBSIDIARY THEREOF, OR

(B)      PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT, OR

(C)      TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, OR

66

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(D)    IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT

(E)    PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH CLAUSE (2)(D) ABOVE, THE COMPANY AND THE TRUSTEE RESERVE THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

THIS SECURITY AND THE COMMON STOCK, IF ANY, ISSUABLE UPON CONVERSION OF THIS SECURITY, IS SUBJECT TO RESTRICTIONS ON TRANSFER AS SET FORTH IN THAT CERTAIN STOCKHOLDERS AGREEMENT AMONG THE COMPANY AND THE OTHER PARTIES THERETO DATED AS OF [___], 2020. ANY TRANSFEREE OF THIS SECURITY MUST, IF NOT ALREADY A PARTY TO SUCH STOCKHOLDERS AGREEMENT, DELIVER TO THE COMPANY A DULY COMPLETED AND EXECUTED JOINDER AGREEMENT, IN SUBSTANTIALLY THE FORM ATTACHED AS EXHIBIT [E] TO THE INDENTURE, OR OTHER DOCUMENTATION IN FORM AND SUBSTANCE ACCEPTABLE TO THE ISSUER IN ITS SOLE DISCRETION PURSUANT TO WHICH SUCH TRANSFEREE AGREES TO BE BOUND BY, AND ACKNOWLEDGES THAT THIS SECURITY, AND SHARES OF COMMON STOCK ISSUED UPON CONVERSION THEREOF, WILL BE SUBJECT TO, THE TERMS AND CONDITIONS OF THE STOCKHOLDERS AGREEMENT."

(B)    Notwithstanding the foregoing, any Global Note or Definitive Note issued pursuant to subparagraph (b)(iv), (c)(iii), (c)(iv), (d)(ii), (d)(iii), (e)(ii), (e)(iii) or (f) of Section 2.6 (and all Notes issued in exchange therefor or substitution thereof) shall not bear the Private Placement Legend.

(ii)    Global Note Legend. Each Global Note shall bear a legend in substantially the following form:

"THIS GLOBAL NOTE IS HELD BY THE DEPOSITORY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT

67

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

THAT (I) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.6(g) OF THE INDENTURE, (II) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.6(a) OF THE INDENTURE, (III) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (IV) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITORY WITH THE PRIOR WRITTEN CONSENT OF THE ISSUER. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITORY TO A NOMINEE OF THE DEPOSITORY OR BY A NOMINEE OF THE DEPOSITORY TO THE DEPOSITORY OR ANOTHER NOMINEE OF THE DEPOSITORY OR BY THE DEPOSITORY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITORY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITORY. UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("DTC") TO THE ISSUER OR ITS AGENTS FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN."

(iii)    Regulation S Temporary Global Note Legend. The Regulation S Temporary Global Note shall bear a legend in substantially the following form:

"THE RIGHTS ATTACHING TO THIS REGULATION S TEMPORARY GLOBAL NOTE, AND THE CONDITIONS AND PROCEDURES GOVERNING ITS EXCHANGE FOR CERTIFICATED NOTES, ARE AS SPECIFIED IN THE INDENTURE (AS DEFINED HEREIN)."

SECTION 2.16.    *Designation*.

The Indebtedness evidenced by the Notes and the Subsidiary Guarantees is hereby irrevocably designated as "senior indebtedness" or such other term denoting seniority for the purposes of any other existing or future Indebtedness of the Issuer or a Subsidiary Guarantor, as the case may be, which the Issuer or such Subsidiary Guarantor, as the case may be, makes subordinate to any senior (or such other term denoting seniority) indebtedness of such Person.

68

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

## ARTICLE III.

## REDEMPTION

SECTION 3.1.    ***Notices to Trustee*.**

If the Issuer elects to redeem Notes pursuant to Paragraph 5 of the Notes, they shall notify the Trustee and the Paying Agent in writing of the Redemption Date and the principal amount of the Notes to be redeemed.

The Issuer shall give each notice provided for in this Section 3.1 at least 60 days before the Redemption Date (unless a shorter notice period shall be satisfactory to the Trustee, as evidenced in a writing signed on behalf of the Trustee), together with an Officers' Certificate stating that such redemption shall comply with the conditions contained herein and in the Notes.

SECTION 3.2.    ***Selection of Notes To Be Redeemed*.**

If less than all of the Notes are to be redeemed at any time, selection of such Notes, or portions thereof, for redemption will be made by the Trustee on a pro rata basis (or, in the case of Notes in global form, the Notes will be selected for redemption based on DTC's applicable procedures); *provided* that no Notes with a principal amount of $2,000 or less shall be redeemed in part. If any Note is to be redeemed in part only, the notice of redemption that relates to such Note shall state the portion of the principal amount thereof to be redeemed. A new Note in a principal amount equal to the unredeemed portion thereof will be issued in the name of the Holder thereof upon cancellation of the original Note. On and after the applicable Redemption Date, interest will cease to accrue on such Notes or portions thereof called for redemption unless the Issuer defaults in the payment thereof. Redemption amounts shall only be paid upon presentation and surrender of any such Notes to be redeemed.

SECTION 3.3.    ***Optional Redemption*.**

Except in the manner expressly set forth in Section 4.15 in connection with a Change of Control Offer, the Issuer will not be entitled to redeem any of the Notes prior to the Maturity Date.

SECTION 3.4.    ***Mandatory Redemption*.**[13]

SECTION 3.5.    ***[Reserved]*.**

SECTION 3.6.    ***[Reserved]*.**

---

[13] NTD: Under review.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

SECTION 3.7.    *Deposit of Redemption Price*.

On or before the Redemption Date and in accordance with Section 2.14, the Issuer shall deposit with the Paying Agent U.S. Legal Tender sufficient to pay the Redemption Price *plus* unpaid accrued interest, if any, of all Notes to be redeemed on that date. The Paying Agent shall promptly return to the Issuer any U.S. Legal Tender so deposited which is not required for that purpose, except with respect to monies owed as obligations to the Trustee pursuant to Article VII.

Unless the Issuer fails to comply with the preceding paragraph and defaults in the payment of such Redemption Price *plus* unpaid accrued interest, if any, interest on the Notes to be redeemed will cease to accrue on and after the applicable Redemption Date, whether or not such Notes are presented for payment.

SECTION 3.8.    *Notes Redeemed in Part*.

Upon surrender of a Note that is to be redeemed in part, upon receipt of an Authentication Order in accordance with Section 2.2 hereof, the Trustee shall authenticate for the Holder a new Note or Notes equal in principal amount to the unredeemed portion of the Note surrendered.

ARTICLE IV.

COVENANTS[14]

SECTION 4.1.    *Payment of Notes*.

(a)    The Issuer shall pay or cause to be paid the principal of, premium (including any Interest Make-Whole Premium), if any, on and interest, if any, on the Notes on the dates and in the manner provided in the Notes and in this Indenture.  Principal of the Notes shall be payable in full on the Maturity Date (unless payable earlier pursuant to terms of this Indenture). Principal, premium (including any Interest Make-Whole Premium) and interest will be considered paid on the date due if the Paying Agent holds, as of 11:00 a.m. New York City time on the due date (or, if such due date is not a Business Day, then on the next Business Day thereafter) money deposited by or for the account of the Issuer in immediately available funds and designated for and sufficient to pay all principal, premium (including any Interest Make-Whole Premium), and interest then due; provided, however, that to the extent any such deposit is received by the Paying Agent after 11:00 a.m., New York City time on such date, such deposit will be deemed deposited the following Business Day.

(b)    Interest on the Notes will accrue at the rate of 9.0% per annum, payable in cash on a quarterly basis, or, at the Issuer's election, 13.0% per annum, payable in kind on a quarterly basis (such applicable interest rate, together with any default interest, the "Interest Rate"). The

---

[14] NTD: Under review.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Issuer may elect to pay such interest through a combination of cash and payment in kind, in each case, at the applicable Interest Rate as set forth in Section 4.1(d).

(c)　　　The Issuer shall pay interest quarterly on March 31, June 30, September 30 and December 31 of each year (each, an "Interest Payment Date"), commencing December 31, 2020, and all outstanding interest shall be payable in cash on the scheduled maturity of the Notes.  The Issuer shall pay interest on overdue principal at the rate therefor borne by the Notes, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

(d)　　　Subject to Section 4.1(b), interest on any Interest Payment Date will be payable, at the election of the Issuer (made by delivering a written notice to the Trustee on or before the Record Date for such Interest Payment Date), (1) entirely in cash ("Cash Interest"), (2) by increasing the principal amount of the Notes or by issuing additional PIK Notes or (3) with a combination of Cash Interest and PIK Interest. [For the avoidance of doubt, any payment of interest by a combination of Cash Interest and PIK Interest shall be payable at the applicable Interest Rate in respect of the proportions of principal with respect to which such interest is being paid through Cash Interest or PIK Interest, as the case may be.]

(e)　　　Interest on the Notes will accrue from the Issue Date or, if interest has already been paid, from the date it was most recently paid. Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months and, for partial months, on the basis of the number of days actually elapsed in a 30-day month.

(f)　　　PIK Interest shall be considered paid on the date due if on such date the Trustee has received (i) with respect to PIK Interest to be paid by increasing the outstanding amount of any Notes, an Officers' Certificate, pursuant to Section 2.2, to increase the outstanding amount of any Notes and (ii) with respect to any PIK Interest to be paid through the issuance of PIK Notes, PIK Notes duly executed by the Issuer together with an Authentication Order, pursuant to Section 2.2, and an Officers' Certificate and Opinion of Counsel requesting the authentication of such PIK Notes by the Trustee.

(g)　　　PIK Interest on the Notes will be payable with respect to Notes represented by one or more Global Notes or Book-Entry Notes (x) by increasing the principal amount of the outstanding Note by an amount equal to the amount of PIK Interest for the applicable interest period (rounded to the nearest whole dollar), and making corresponding adjustments to reflect such increase on the books and records of the Registrar, as provided in the Officers' Certificate from the Issuer to the Trustee pursuant to Section 2.2, or (y) if so required by the Applicable Procedures of the Depository, if any, or if the Issuer so elects, by issuing PIK Notes in certificated form in an aggregate principal amount equal to the amount of PIK Interest for the applicable interest period (rounded up to the nearest whole dollar) as provided in the Authentication Order from the Issuer to the Trustee pursuant to Section 2.2. PIK Interest on the Notes will be payable with respect to Notes represented by one or more Definitive Notes by issuing PIK Notes in certificated form in an aggregate principal amount equal to the amount of PIK Interest for the applicable interest period (rounded to the nearest whole dollar), as provided

71

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

in the Authentication Order from the Issuer to the Trustee pursuant to Section 2.2. In the case of Definitive Notes, if any, Holders shall be entitled to surrender to the Registrar for transfer or exchange Definitive Notes to receive one or more new Definitive Notes reflecting such increase in principal amount in accordance with the terms of this Indenture. Following an increase in the principal amount of the outstanding Global Notes or Book-Entry Notes, or any Definitive Notes, as a result of a PIK Interest Payment, the Notes will bear interest on such increased principal amount from and after the date of such PIK Interest Payment. Any PIK Notes will be dated as of the applicable Interest Payment Date and will bear interest from and after such date. All PIK Notes issued pursuant to a PIK Interest Payment will mature on the same date as the Notes issued on the Issue Date, will be governed by, and subject to the terms, provisions and conditions of, this Indenture and shall have the same rights and benefits as the Notes issued on the Issue Date. Any PIK Notes will be issued with the description "PIK" on the face of such PIK Notes.

(h)    Upon the occurrence and during the continuance of an Event of Default under this Indenture, all principal, overdue interest, premium, fees and other amounts shall bear interest at the applicable Cash Interest or PIK Interest Interest Rate specified Section 4.1(a), plus an additional 2.0% per annum.

(i)    Upon the principal of any Notes becoming payable (i) (x) pursuant to an acceleration (whether pursuant to an Event of Default, by operation of law or otherwise) or (y) an Interest Make-Whole Trigger Event or (ii) upon any payment, repurchase, redemption (other than a Change of Control Redemption (as defined herein)) or purchase of any Notes by the Issuer or any Affiliate thereof after the occurrence of an Interest Make-Whole Trigger Event, the Holder(s) of such Notes becoming due pursuant to such an Interest Make-Whole Trigger Event, or being paid, repurchased, redeemed or purchased in connection therewith, shall be entitled to receive the Interest Make-Whole Premium with respect to such Notes. The Interest Make-Whole Premium shall be paid in cash.

SECTION 4.2.    ***Maintenance of Office or Agency*.**

The Issuer shall maintain the office or agency (which may be an office of the Trustee or an affiliate of the Trustee, Registrar or co-registrar, or Paying Agent or Conversion Agent) required under Section 2.3 where Notes may be surrendered for registration of transfer, exchange, purchase, redemption or conversion and where notices and demands to or upon the Issuer in respect of the Notes and this Indenture may be served. The Issuer shall give prior written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Issuer shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the address of the Trustee set forth in Section 11.2.

The Issuer hereby designates the Corporate Trust Office of the Trustee as one such office or agency of the Issuer.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

SECTION 4.3.     *Organizational Existence*.

Except as otherwise permitted by Article V, the Issuer shall do or cause to be done, at its own cost and expense, all things necessary to preserve and keep in full force and effect its organizational existence and the organizational existence of each of its Restricted Subsidiaries in accordance with the respective organizational documents of each such Restricted Subsidiary and the material rights (charter and statutory) and franchises of the Issuer and each such Restricted Subsidiary; *provided*, *however*, that the Issuer shall not be required to preserve, with respect to itself, any material right or franchise and, with respect to any of its Restricted Subsidiaries, any such existence, material right or franchise, if the Board of Directors of the Issuer shall determine in good faith that the preservation thereof is no longer desirable in the conduct of the business of the Issuer and its Subsidiaries, taken as a whole.

SECTION 4.4.     *Payment of Taxes and Other Claims*.

The Issuer shall pay or discharge or cause to be paid or discharged, before the same shall become delinquent, (i) all material taxes, assessments and governmental charges (including withholding taxes and any penalties, interest and additions to taxes) levied or imposed upon it or any of its Restricted Subsidiaries or properties of it or any of its Restricted Subsidiaries and (ii) all material lawful claims for labor, materials and supplies that, if unpaid, might by law become a Lien upon the property of the Issuer or any of its Restricted Subsidiaries; *provided*, *however*, that the Issuer shall not be required to pay or discharge or cause to be paid or discharged any such tax, assessment, charge or claim whose amount, applicability or validity is being contested in good faith by appropriate negotiations or proceedings properly instituted and diligently conducted for which adequate reserves, to the extent required under GAAP, have been taken.

SECTION 4.5.     *Maintenance of Properties and Insurance*.

(a)     The Issuer shall, and shall cause each of the Restricted Subsidiaries to, maintain all properties used or useful in the conduct of its business in good working order and condition (subject to ordinary wear and tear) and make all necessary repairs, renewals, replacements, additions, betterments and improvements thereto and actively conduct and carry on its business; *provided*, *however*, that nothing in this Section 4.5 shall prevent the Issuer or any of the Restricted Subsidiaries from discontinuing the operation and maintenance of any of its properties, if such discontinuance is (i) in the ordinary course of business pursuant to customary business terms or (ii) in the good faith judgment of the respective Board of Directors or other governing body of the Issuer or such Restricted Subsidiary, as the case may be, desirable in the conduct of their respective businesses and is not disadvantageous in any material respect to the Holders.

(b)     The Issuer shall provide or cause to be provided, for itself and each of the Restricted Subsidiaries, insurance (including appropriate self-insurance) against loss or damage of the kinds that, in the good faith judgment of the Issuer, are adequate and appropriate for the conduct of the business of the Issuer and its Restricted Subsidiaries in a prudent manner, with

73

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

reputable insurers or with the government of the United States of America, Canada or an agency or instrumentality thereof, in such amounts, with such deductibles, and by such methods as shall be customary, in the good faith judgment of the Issuer, for companies similarly situated in the industry.

SECTION 4.6.    *Compliance Certificate; Notice of Default*.

(a)    The Issuer shall deliver to the Trustee, within 120 days after the end of each fiscal years of the Issuer, an Officers' Certificate (*provided*, *however*, that one of the signatories to each such Officers' Certificate must state that he or she is the Issuer's principal executive officer, principal financial officer or principal accounting officer), as to such Officers' knowledge, without independent investigation, of the Issuer's compliance with all conditions and covenants under this Indenture (without regard to any period of grace or requirement of notice provided under this Indenture) and in the event any Default under this Indenture exists, such Officers shall specify the nature of such Default. Each such Officers' Certificate shall also notify the Trustee should the Issuer elect to change the manner in which it fixes its fiscal year-end.

(b)    So long as not contrary to the then current recommendations of the American Institute of Certified Public Accountants, the annual financial statements delivered pursuant to Section 4.8 shall be accompanied by a written report of the Issuer's independent certified public accountants (who shall be a firm of established national reputation) stating (A) that their audit examination has included a review of the terms of this Indenture and the form of the Notes as they relate to accounting matters, and (B) whether, in connection with their audit examination, any Default or Event of Default has come to their attention and if such a Default or Event of Default has come to their attention, specifying the nature and period of existence thereof; *provided*, *however*, that, without any restriction as to the scope of the audit examination, such independent certified public accountants shall not be liable by reason of any failure to obtain knowledge of any such Default or Event of Default that would not be disclosed in the course of an audit examination conducted in accordance with generally accepted auditing standards.

(c)    (i) If any Default or Event of Default has occurred and is continuing or (ii) if any Holder seeks to exercise any remedy under this Indenture with respect to a claimed Default under this Indenture or the Notes, the Issuer shall deliver to the Trustee, at its address set forth in Section 11.2 hereof, by registered or certified mail or by facsimile transmission followed by hard copy by registered or certified mail an Officers' Certificate specifying such event, notice or other action within 30 days of the occurrence thereof.

SECTION 4.7.    *Compliance with Laws*.

The Issuer shall comply, and shall cause each of its Restricted Subsidiaries to comply, with all applicable statutes, rules, regulations, orders and restrictions of the United States of America, all states and municipalities thereof, and of any governmental department, commission, board, regulatory authority, bureau, agency and instrumentality of the foregoing, in respect of the conduct of its respective businesses and the ownership of its respective properties, except for

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

such non-compliances as could not singly or in the aggregate reasonably be expected to have a material adverse effect on the financial condition or results of operations of the Issuer and the Restricted Subsidiaries taken as a whole.

SECTION 4.8.    ***Reports to Holders***.[15]

(a)    [*To be confirmed*].

SECTION 4.9.    ***Waiver of Stay, Extension or Usury Laws***.

The Issuer and each of the Subsidiary Guarantors covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any usury law or other law that would prohibit or forgive the Issuer from paying all or any portion of the principal of or interest, if any, on the Notes as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this Indenture; and (to the extent that it may lawfully do so) the Issuer and each of the Subsidiary Guarantors hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

SECTION 4.10.    ***Limitation on Restricted Payments***.

The Issuer will not, and will not permit any of its Restricted Subsidiaries, directly or indirectly, to:

(1)    declare or pay any dividend or make any payment or distribution on or in respect of the Issuer's Capital Stock (including any payment or distribution in connection with any merger or consolidation involving the Issuer or any of its Restricted Subsidiaries) except:

(a)    dividends or distributions by the Issuer payable solely in Capital Stock of the Issuer (other than Disqualified Stock) or in options, warrants or other rights to purchase such Capital Stock of the Issuer; and

(b)    dividends or distributions payable to the Issuer or a Restricted Subsidiary and if such Restricted Subsidiary is not a Wholly Owned Subsidiary, to minority stockholders (or owners of an equivalent interest in the case of a Subsidiary that is an entity other than a corporation) so long as the Issuer or a Restricted Subsidiary receives at least its pro rata share of such dividend or distribution;

(2)    purchase, redeem, defease, retire or otherwise acquire for value any Capital Stock of the Issuer or any direct or indirect parent of the Issuer held by Persons other than the Issuer or

---

[15] NTD:  Under review.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

a Restricted Subsidiary (other than in exchange for Capital Stock of the Issuer (other than Disqualified Stock));

(3)      purchase, repurchase, redeem, defease or otherwise acquire or retire for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment, any Subordinated Obligations or Guarantor Subordinated Obligations (other than (x) Indebtedness permitted under clause (3) of the second paragraph of Section 4.12 or (y) the purchase, repurchase, redemption, defeasance or other acquisition or retirement of Subordinated Obligations or Guarantor Subordinated Obligations purchased in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of purchase, repurchase, redemption, defeasance or other acquisition or retirement); or

(4)      make any Restricted Investment in any Person

(any such dividend, distribution, purchase, redemption, repurchase, defeasance, other acquisition, retirement or Restricted Investment referred to in clauses (1) through (4) shall be referred to herein as a "Restricted Payment"), if at the time the Issuer or such Restricted Subsidiary makes such Restricted Payment:

(a)      a Default shall have occurred and be continuing (or would result therefrom);

(b)      the Issuer is not able to Incur an additional $1.00 of Indebtedness pursuant to the first paragraph of Section 4.12 after giving effect, on a pro forma basis, to such Restricted Payment; or

(c)      the aggregate amount of such Restricted Payment and all other Restricted Payments declared or made subsequent to the Issue Date would exceed the sum of:

(i)      50% of Consolidated Net Income for the period (treated as one accounting period) from the first day of the first full fiscal quarter after the Issue Date occurs to the end of the most recent fiscal quarter ending prior to the date of such Restricted Payment for which internal financial statements are in existence (or, in case such Consolidated Net Income is a deficit, *minus* 100% of such deficit);

(ii)      100% of the aggregate Net Cash Proceeds, and the Fair Market Value of property or securities other than cash (including Capital Stock of Persons engaged primarily in the Oil and Gas Business or assets used in the Oil and Gas Business), in each case received by the Issuer from the issue or sale of its Capital Stock (other than Disqualified Stock) or other capital contributions subsequent to the Issue Date (other than Net Cash Proceeds received from an issuance or sale of such Capital Stock to (x) management, employees, directors or any direct or indirect parent of the Issuer, to the extent such Net Cash Proceeds have been used to make a Restricted Payment pursuant to clause (5)(a) of the next succeeding paragraph, (y) a Subsidiary of the Issuer or (z) an employee stock ownership plan, option plan or similar trust (to the extent such sale to an employee stock ownership plan, option plan or similar trust is financed by loans

76

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

from or Guaranteed by the Issuer or any Restricted Subsidiary unless such loans have been repaid with cash on or prior to the date of determination));

(iii)     the amount by which Indebtedness of the Issuer or its Restricted Subsidiaries is reduced on the Issuer's balance sheet upon the conversion or exchange (other than by a Wholly Owned Subsidiary of the Issuer) subsequent to the Issue Date of any Indebtedness of the Issuer or its Restricted Subsidiaries convertible or exchangeable for Capital Stock (other than Disqualified Stock) of the Issuer (less the amount of any cash, or the Fair Market Value of any other property (other than such Capital Stock), distributed by the Issuer upon such conversion or exchange), together with the net proceeds, if any, received by the Issuer or any of its Restricted Subsidiaries upon such conversion or exchange; and

(iv)     the amount equal to the aggregate net reduction in Restricted Investments made by the Issuer or any of its Restricted Subsidiaries in any Person resulting from:

(A)     repurchases, repayments or redemptions of such Restricted Investments by such Person, proceeds realized upon the sale of such Restricted Investment (other than to a Subsidiary of the Issuer), repayments of loans or advances or other transfers of assets (including by way of dividend or distribution) by such Person to the Issuer or any Restricted Subsidiary;

(B)     the redesignation of Unrestricted Subsidiaries as Restricted Subsidiaries (valued in each case as provided in the definition of "Investment") not to exceed, in the case of any Unrestricted Subsidiary, the amount of Investments previously made by the Issuer or any Restricted Subsidiary in such Unrestricted Subsidiary, which amount in each case under this clause

(C)     was included in the calculation of the amount of Restricted Payments; *provided*, *however*, that no amount will be included under this clause (iv) to the extent it is already included in Consolidated Net Income; and

(D)     the sale (other than to the Issuer or a Restricted Subsidiary) of the Capital Stock of an Unrestricted Subsidiary or a distribution from an Unrestricted Subsidiary or a dividend from an Unrestricted Subsidiary.

The provisions of the preceding paragraph will not prohibit:

(1)     any Restricted Payment made by exchange for, or out of the proceeds of the substantially concurrent sale of, Capital Stock of the Issuer (other than Disqualified Stock and other than Capital Stock issued or sold to a Subsidiary or an employee stock ownership plan or similar trust to the extent such sale to an employee stock ownership plan or similar trust is financed by loans from or Guaranteed by the Issuer or any Restricted Subsidiary unless such loans have been repaid with cash on or prior to the date of determination) or a substantially concurrent cash capital contribution received by the Issuer from its shareholders; *provided*, *however*, that (a) such Restricted Payment will be excluded from subsequent calculations of the

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

amount of Restricted Payments and (b) the Net Cash Proceeds from such sale of Capital Stock or capital contribution will be excluded from clause (c)(ii) of the preceding paragraph;

(2)    any purchase, repurchase, redemption, defeasance or other acquisition or retirement of Subordinated Obligations of the Issuer or Guarantor Subordinated Obligations of any Subsidiary Guarantor made by exchange for, or out of the proceeds of the substantially concurrent sale of, Subordinated Obligations of the Issuer or any purchase, repurchase, redemption, defeasance or other acquisition or retirement of Guarantor Subordinated Obligations made by exchange for or out of the proceeds of the substantially concurrent sale of Guarantor Subordinated Obligations that, in each case, is permitted to be Incurred pursuant to Section 4.12; *provided*, *however*, that such purchase, repurchase, redemption, defeasance, acquisition or retirement will be excluded from subsequent calculations of the amount of Restricted Payments;

(3)    any purchase, repurchase, redemption, defeasance or other acquisition or retirement of Disqualified Stock of the Issuer or a Restricted Subsidiary made by exchange for or out of the proceeds of the substantially concurrent sale of Disqualified Stock of the Issuer or such Restricted Subsidiary, as the case may be, that, in each case, is permitted to be Incurred pursuant to Section 4.12; *provided***,** *however*, that such purchase, repurchase, redemption, defeasance, acquisition or retirement will be excluded from subsequent calculations of the amount of Restricted Payments;

(4)    dividends paid or distributions made within 60 days after the date of declaration if at such date of declaration such dividend or distribution would have complied with this Section 4.10; *provided*, *however*, that such dividends and distributions will be included in subsequent calculations of the amount of Restricted Payments; and *provided*, *however*, that for purposes of clarification, this clause (4) shall not include cash payments in lieu of the issuance of fractional shares included in clause (9) below;

(5)    (a) so long as no Default has occurred and is continuing, the purchase of Capital Stock, or options, warrants, equity appreciation rights or other rights to purchase or acquire Capital Stock of Parent, the Issuer or any Restricted Subsidiary held by any existing or former employees, management or directors of Parent, the Issuer or any Subsidiary of the Issuer or their assigns, estates or heirs, in each case in connection with the repurchase provisions under employee stock option or stock purchase agreements or other agreements to compensate management, employees or directors; *provided* that such redemptions or repurchases pursuant to this subclause (a) during any calendar year will not exceed $[__] million in the aggregate (with unused amounts in any calendar year being carried over to the immediately succeeding calendar year); *provided*, *further*, that such amount in any calendar year may be increased by an amount not to exceed (A) the cash proceeds received by the Issuer from the sale of Capital Stock of the Issuer to members of management or directors of the Issuer and its Restricted Subsidiaries that occurs after the Issue Date (to the extent the cash proceeds from the sale of such Capital Stock have not otherwise been applied to the payment of Restricted Payments by virtue of clause (c) of the preceding paragraph), *plus* (B) the cash proceeds of key man life insurance policies received by the Issuer and its Restricted Subsidiaries after the Issue Date, less (C) the amount of any

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Restricted Payments made pursuant to clauses (A) and (B) of this subclause (a); *provided*, *further*, *however*, that the amount of any such repurchase or redemption under this subclause (a) will be excluded in subsequent calculations of the amount of Restricted Payments and the proceeds received from any such sale will be excluded from clause (c)(ii) of the preceding paragraph; and

(b)      the cancellation of loans or advances to employees or directors of the Issuer or any Subsidiary of the Issuer the proceeds of which are used to purchase Capital Stock of the Issuer, in an aggregate amount not in excess of $[__] million at any one time outstanding; *provided*, *however*, that the Issuer and its Subsidiaries will comply in all material respects with all applicable provisions of the Sarbanes-Oxley Act of 2002 and the rules and regulations promulgated in connection therewith in connection with such loans or advances; *provided*, *further*, that the amount of such cancelled loans and advances will be included in subsequent calculations of the amount of Restricted Payments;

(6)      repurchases, redemptions or other acquisitions or retirements for value of Capital Stock deemed to occur upon the exercise of stock options, warrants, rights to acquire Capital Stock or other convertible securities if such Capital Stock represents a portion of the exercise or exchange price thereof, and any repurchases, redemptions or other acquisitions or retirements for value of Capital Stock made in lieu of withholding taxes in connection with any exercise or exchange of warrants, options or rights to acquire Capital Stock; *provided*, *however*, that such repurchases will be excluded from subsequent calculations of the amount of Restricted Payments;

(7)      the purchase, repurchase, redemption, defeasance or other acquisition or retirement for value of any Subordinated Obligation (i) at a purchase price not greater than 101% of the principal amount of such Subordinated Obligation in the event of a Change of Control in accordance with provisions similar to Section 4.15 or (ii) at a purchase price not greater than 100% of the principal amount thereof in accordance with provisions similar to Section 4.16; *provided* that, prior to or simultaneously with such purchase, repurchase, redemption, defeasance or other acquisition or retirement, the Issuer has made the Change of Control Offer or Asset Disposition Offer, as applicable, as provided in such section with respect to the Notes and has completed the repurchase or redemption of all Notes validly tendered for payment in connection with such Change of Control Offer or Asset Disposition Offer; *provided*, *however*, that such repurchases will be included in subsequent calculations of the amount of Restricted Payments;

(8)      payments or distributions to dissenting stockholders pursuant to applicable law or in connection with the settlement or other satisfaction of legal claims made pursuant to or in connection with a consolidation, merger or transfer of assets; *provided*, *however*, that any payment pursuant to this clause (8) shall be included in the calculation of the amount of Restricted Payments;

79

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(9)    cash payments in lieu of the issuance of fractional shares; *provided*, *however*, that any payment pursuant to this clause (9) shall be excluded in the calculation of the amount of Restricted Payments;

(10)    Permitted Payments to Parent;

(11)    payments by the Issuer on account of the purchase, redemption, retirement, acquisition, cancellation or termination of its Capital Stock in an amount not to exceed $[__] million in the aggregate for all such payments during the term of the Notes; *provided* that in the case of this clause (11), (x) no Default shall exist at the time of such payment or result therefrom and (y) immediately after giving pro forma effect to such payment (and any Indebtedness Incurred in connection therewith), the Consolidated Total Debt Ratio does not exceed 3.00 to 1.00; *provided*, *further*, that any payment made pursuant to this clause (11) shall be excluded in the calculation of the amount of Restricted Payments; and

(12)    Restricted Payments in an amount not to exceed $[__] million at any one time outstanding; *provided*, *however*, that the amount of such Restricted Payments will be included in subsequent calculations of the amount of Restricted Payments.

For purposes of this Section 4.10, the phrase "substantially concurrent" is intended to mean within 90 days of the occurrence of the specified event.

For purposes of determining compliance with this Section 4.10, if a Restricted Payment meets the criteria of more than one of the types of Restricted Payments described in clauses (1)–(12) above, the Issuer, in its sole discretion, may order and classify, and subsequently re-order and re-classify, such Restricted Payment in any manner in compliance with this Section 4.10.

The amount of all Restricted Payments (other than cash) shall be the Fair Market Value on the date of such Restricted Payment of the asset(s) or securities proposed to be paid, transferred or issued by the Issuer or such Restricted Subsidiary, as the case may be, pursuant to such Restricted Payment. The Fair Market Value of any assets or securities that are required to be valued by this Section 4.10 shall be determined in accordance with the definition of Fair Market Value. No later than the date of making any Restricted Payment or series of related Restricted Payments in an aggregate amount in excess of $[__] million, the Issuer shall deliver to the Trustee an Officers' Certificate stating that such Restricted Payment is permitted and setting forth the basis upon which the calculations required by this Section 4.10 were computed, together with a copy of any fairness opinion or appraisal required by this Indenture.

As of the Issue Date, all of the Issuer's Subsidiaries will be Restricted Subsidiaries. The Issuer will not permit any Unrestricted Subsidiary to become a Restricted Subsidiary except pursuant to the last sentence of the definition of "Unrestricted Subsidiary." For purpose of designating any Restricted Subsidiary as an Unrestricted Subsidiary, all outstanding Investments by the Issuer and its Restricted Subsidiaries (except to the extent repaid) in the Subsidiary so designated will be deemed to be Restricted Payments in an amount determined as set forth in the last sentence of the definition of "Investment." Such designation will be permitted only if a

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Restricted Payment in such amount would be permitted at such time, whether pursuant to the first paragraph of this Section 4.10 or under clause (12) of the second paragraph of this Section 4.10, or pursuant to the definition of "Permitted Investments," and if such Subsidiary otherwise meets the definition of an Unrestricted Subsidiary. Unrestricted Subsidiaries will not be subject to any of the restrictive covenants set forth in this Indenture.

SECTION 4.11.   ***Limitations on Affiliate Transactions***.

The Issuer will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, enter into, make, amend or conduct any transaction (including making a payment to, the purchase, sale, lease or exchange of any property or the rendering of any service), contract, agreement or understanding with or for the benefit of any Affiliate of the Issuer (an "Affiliate Transaction") involving aggregate consideration to or from the Issuer or a Restricted Subsidiary in excess of $[__] million, unless:

(x)     the terms of such Affiliate Transaction are no less favorable to the Issuer or such Restricted Subsidiary, as the case may be, than those that could be obtained in a comparable transaction at the time of such transaction in arm's-length dealings with a Person who is not such an Affiliate;

(y)     if such Affiliate Transaction involves an aggregate consideration in excess of $[__] million, the terms of such transaction have been approved by a majority of the members of the Board of Directors of the Issuer and by a majority of the members of such Board having no personal stake in such transaction, if any (and such majority or majorities, as the case may be, determines that such Affiliate Transaction satisfies the criteria in clause (x) above); and

(z)     if such Affiliate Transaction involves an aggregate consideration in excess of $[__] million, the Board of Directors of the Issuer has received a written opinion from an independent investment banking, accounting or appraisal firm of nationally recognized standing that such Affiliate Transaction is fair, from a financial standpoint, to the Issuer or such Restricted Subsidiary or is not materially less favorable than those that could reasonably be expected to be obtained in a comparable transaction at such time on an arm's-length basis from a Person that is not an Affiliate.

The preceding paragraph will not apply to:

(1)     any Restricted Payment permitted to be made pursuant to Section 4.10;

(2)     any issuance of Capital Stock (other than Disqualified Stock), or other payments, awards or grants in cash, Capital Stock (other than Disqualified Stock) or otherwise pursuant to, or the funding of, employment or severance agreements and other compensation arrangements, options to purchase Capital Stock (other than Disqualified Stock) of the Issuer, restricted stock plans, long-term incentive plans, stock appreciation rights plans, participation plans or similar employee benefits plans and/or indemnity provided on behalf of directors, officers and employees approved by the Board of Directors of the Issuer;

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(3)    loans, advances or expense reimbursements to employees, officers or directors in the ordinary course of business of the Issuer or any of its Restricted Subsidiaries;

(4)    any transaction between the Issuer and a Restricted Subsidiary or between Restricted Subsidiaries and Guarantees issued by the Issuer or a Restricted Subsidiary for the benefit of the Issuer or a Restricted Subsidiary, as the case may be, permitted under Section 4.12;

(5)    any transaction with a joint venture or other entity which would constitute an Affiliate Transaction solely because the Issuer or a Restricted Subsidiary owns, directly or indirectly, an equity interest in or otherwise controls such joint venture or other entity;

(6)    the issuance or sale of any Capital Stock (other than Disqualified Stock) of the Issuer or the receipt by the Issuer of any capital contribution from its shareholders;

(7)    indemnities of officers, directors and employees of the Issuer or any of its Restricted Subsidiaries permitted by charter documents or statutory provisions and any employment agreement or other employee compensation plan or arrangement entered into in the ordinary course of business by the Issuer or any of its Restricted Subsidiaries;

(8)    the payment of reasonable compensation and fees paid to, and indemnity provided on behalf of, officers or directors of the Issuer or any Restricted Subsidiary;

(9)    the performance of obligations of the Issuer or any of its Restricted Subsidiaries under the terms of any agreement to which the Issuer or any of its Restricted Subsidiaries is a party as of or on the Issue Date, as these agreements may be amended, modified, supplemented, extended or renewed from time to time; *provided*, *however*, that any future amendment, modification, supplement, extension or renewal entered into after the Issue Date will be permitted to the extent that its terms are not materially more disadvantageous, taken as a whole, to the holders of the Notes than the terms of the agreements in effect on the Issue Date;

(10)    transactions with customers, clients, suppliers, or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Indenture which are fair to the Issuer and its Restricted Subsidiaries, in the good faith determination of the Board of Directors of the Issuer or the senior management thereof, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party;

(11)    any transaction in which the Issuer or any of its Restricted Subsidiaries, as the case may be, delivers to the Trustee a letter from an accounting, appraisal, advisory or investment banking firm of national standing stating that such transaction is fair to the Issuer or such Restricted Subsidiary from a financial point of view or that such transaction meets the requirements of clause (x) of the preceding paragraph;

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(12)    payments to an Affiliate in respect of the Notes or any other Indebtedness of the Issuer or any of its Restricted Subsidiaries on the same basis as concurrent payments are made or offered to be made in respect thereof to non-Affiliates;

(13)    pledges by the Issuer or any Restricted Subsidiary of the Issuer of Capital Stock in Unrestricted Subsidiaries for the benefit of lenders or other creditors of such Unrestricted Subsidiaries; and

(14)    in the case of contracts for exploring for, drilling, developing, producing, processing, gathering, transporting, marketing or storing Hydrocarbons, or activities or services reasonably related or ancillary thereto, or other operational contracts, any such contracts entered into in the ordinary course of business on terms substantially similar to those contained in similar contracts entered into by the Issuer or any of its Restricted Subsidiaries with unrelated third parties, or if neither the Issuer nor any Restricted Subsidiary has entered into a similar

(15)    contract with a third party, then on the terms no less favorable than those available from third parties on an arm's length basis, in each case as determined in good faith by the Issuer.

SECTION 4.12.    ***Limitation on Incurrence of Indebtedness and Preferred Stock***.

The Issuer will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Indebtedness (including Acquired Indebtedness) and the Issuer will not permit any of its Restricted Subsidiaries to issue Preferred Stock; *provided*, *however*, that the Issuer may Incur Indebtedness and any of the Subsidiary Guarantors may Incur Indebtedness and issue Preferred Stock if on the date thereof:

(x)    the Consolidated Coverage Ratio for the Issuer and its Restricted Subsidiaries is at least 2.25 to 1.00, determined on a pro forma basis (including a pro forma application of proceeds); and

(y)    no Default will have occurred or be continuing or would occur as a consequence of Incurring the Indebtedness or transactions relating to such Incurrence.

The first paragraph of this Section 4.12 will not prohibit the Incurrence of the following Indebtedness:

(1)    Indebtedness of the Issuer or any Subsidiary Guarantor Incurred pursuant to one or more Credit Facilities in an aggregate amount not to exceed the greatest of (a) $[__] million, (b) [30]% of the Issuer's Adjusted Consolidated Net Tangible Assets determined as of the date of the Incurrence of such Indebtedness after giving effect to the application of the proceeds therefrom and (c) the Borrowing Base in effect under the Senior Secured Credit Agreement at the time of Incurrence, in each case outstanding at any one time;

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(2)    Guarantees by the Issuer or Subsidiary Guarantors of Indebtedness of the Issuer or a Subsidiary Guarantor, as the case may be, Incurred in accordance with the provisions of this Indenture; *provided* that in the event such Indebtedness that is being Guaranteed is a Subordinated Obligation or a Guarantor Subordinated Obligation, then the related Guarantee shall be subordinated in right of payment to the Notes or the Subsidiary Guarantee to at least the same extent as the Indebtedness being Guaranteed, as the case may be;

(3)    Indebtedness of the Issuer owing to and held by any Restricted Subsidiary or Indebtedness of a Restricted Subsidiary owing to and held by the Issuer or any Restricted Subsidiary; *provided*, *however*, that (i) any subsequent issuance or transfer of Capital Stock or any other event which results in any such Indebtedness being held by a Person other than the Issuer or a Restricted Subsidiary of the Issuer and (ii) any sale or other transfer of any such Indebtedness to a Person other than the Issuer or a Restricted Subsidiary of the Issuer shall be deemed, in each case, to constitute an Incurrence of such Indebtedness by the Issuer or such Subsidiary, as the case may be;

(4)    Indebtedness represented by (a) the Notes issued on the Issue Date (including the related Subsidiary Guarantees), (b) any PIK Notes issued after the date hereof in accordance with Section 4.1(d), (c)any Indebtedness (other than the Indebtedness described in clauses (1), (2) and (4)(a)) outstanding on the Issue Date and (c) any Refinancing Indebtedness Incurred in respect of any Indebtedness described in this clause (4) or clause (5) or Incurred pursuant to the first paragraph of this Section 4.12;

(5)    Indebtedness of a Person that becomes a Restricted Subsidiary or is acquired by the Issuer or a Restricted Subsidiary or merged into the Issuer or a Restricted Subsidiary in accordance with this Indenture and outstanding on the date on which such Person became a Restricted Subsidiary or was acquired by or was merged into the Issuer or such Restricted Subsidiary (other than Indebtedness Incurred (a) to provide all or any portion of the funds utilized to consummate the transaction or series of related transactions pursuant to which such Person became a Restricted Subsidiary or was otherwise acquired by or was merged into the Issuer or a Restricted Subsidiary or (b) otherwise in connection with, or in contemplation of, such acquisition); *provided*, *however*, that at the time such Person becomes a Restricted Subsidiary or is acquired by or was merged into the Issuer or a Restricted Subsidiary, either (x) the Issuer would have been able to Incur $1.00 of additional Indebtedness pursuant to the first paragraph of this Section 4.12 or (y) the Consolidated Coverage Ratio for the Issuer and its Restricted Subsidiaries would be equal to or greater than immediately prior to such time, in either case after giving effect to the Incurrence of such Indebtedness pursuant to this clause (5);

(6)    the Incurrence by the Issuer or any Restricted Subsidiary of Indebtedness represented by Capitalized Lease Obligations, mortgage financings or purchase money obligations, in each case Incurred for the purpose of financing all or any part of the purchase price or cost of construction or improvements or carrying costs of property used in the business of the Issuer or such Restricted Subsidiary, and Refinancing Indebtedness Incurred to Refinance any Indebtedness Incurred pursuant to this clause (6) in an aggregate outstanding principal

84

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

amount which, when taken together with the principal amount of all other Indebtedness Incurred pursuant to this clause (6) and then outstanding, will not exceed $[__] million at any time outstanding;

(7)     Indebtedness Incurred in respect of (a) self-insurance obligations, bid, appeal, reimbursement, performance, surety and similar bonds and completion guarantees provided by the Issuer or a Restricted Subsidiary in the ordinary course of business and any Guarantees or letters of credit functioning as or supporting any of the foregoing bonds or obligations and (b) obligations represented by letters of credit for the account of the Issuer or a Restricted Subsidiary in order to provide security for workers' compensation claims (in the case of clauses (a) and (b) other than for an obligation for money borrowed);

(8)     Capital Stock (other than Disqualified Stock) of the Issuer or of any of the Subsidiary Guarantors;

(9)     any Guarantee by the Issuer or any Restricted Subsidiary that directly owns Capital Stock of an Unrestricted Subsidiary that is recourse only to, or secured only by, such Capital Stock;

(10)     reimbursement obligations in respect of letters of credit; *provided* that the aggregate amount thereof at any time outstanding does not exceed $[__] million and such obligations are reimbursed within 30 days after a draw on a letter of credit; and

(11)     in addition to the items referred to in clauses (1) through (10) above, Indebtedness of the Issuer and its Subsidiary Guarantors in an aggregate outstanding principal amount which, when taken together with the principal amount of all other Indebtedness Incurred pursuant to this clause (11) and then outstanding, will not exceed the greater of (x) $[__] million and (y) [3]% of the Issuer's Adjusted Consolidated Net Tangible Assets determined as of the date of the Incurrence of such Indebtedness after giving effect to the application of the proceeds therefrom, in each case at any time outstanding.

For purposes of determining compliance with, and the outstanding principal amount of any particular Indebtedness Incurred pursuant to and in compliance with, this Section 4.12:

(i)     in the event an item of that Indebtedness meets the criteria of more than one of the types of Indebtedness described in the first and second paragraphs of this Section 4.12, the Issuer, in its sole discretion, will classify such item of Indebtedness on the date of Incurrence, and in that connection shall be entitled to treat a portion of such Indebtedness as having been Incurred under the first paragraph and thereafter the remainder of such Indebtedness having been Incurred under the second paragraph, and, subject to clause (ii) below may later reclassify such item of Indebtedness and only be required to include the amount and type of such Indebtedness in one of such clauses;

85

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(ii)    all Indebtedness outstanding on the date of this Indenture under the Senior Secured Credit Agreement shall be deemed Incurred on the Issue Date under clause (1) of the second paragraph of this Section 4.12;

(iii)    Guarantees of, or obligations in respect of letters of credit supporting, Indebtedness which is otherwise included in the determination of a particular amount of Indebtedness shall not be included;

(iv)    if obligations in respect of letters of credit are Incurred pursuant to a Credit Facility and are being treated as Incurred pursuant to clause (1) of the second paragraph above and the letters of credit relate to other Indebtedness, then such other Indebtedness shall not be included;

(v)    the principal amount of any Disqualified Stock of the Issuer or a Restricted Subsidiary, or Preferred Stock of a Restricted Subsidiary, will be equal to the greater of the maximum mandatory redemption or repurchase price (not including, in either case, any redemption or repurchase premium) or the liquidation preference thereof;

(vi)    Indebtedness permitted by this Section 4.12 need not be permitted solely by reference to one provision permitting such Indebtedness but may be permitted in part by one such provision and in part by one or more other provisions of this Section 4.12 permitting such Indebtedness; and

(vii)    the amount of Indebtedness issued at a price that is less than the principal amount thereof will be equal to the amount of the liability in respect thereof determined in accordance with GAAP.

Accrual of interest, accrual of dividends, the amortization of debt discount or the accretion of accreted value, the payment of interest in the form of additional Indebtedness, the payment of dividends in the form of additional shares of Preferred Stock or Disqualified Stock and unrealized losses or charges in respect of Hedging Obligations (including those resulting from the application of FASB ASC 815) will not be deemed to be an Incurrence of Indebtedness for purposes of this Section 4.12. The amount of any Indebtedness outstanding as of any date shall be (i) the accreted value thereof in the case of any Indebtedness issued with original issue discount and (ii) the principal amount or liquidation preference thereof, together with any interest thereon that is more than 30 days past due, in the case of any other Indebtedness.

If at any time an Unrestricted Subsidiary becomes a Restricted Subsidiary, any Indebtedness of such Subsidiary shall be deemed to be Incurred by a Restricted Subsidiary as of such date (and, if such Indebtedness is not permitted to be Incurred as of such date under this Section 4.12, the Issuer shall be in Default of this Section 4.12).

For purposes of determining compliance with any U.S. dollar-denominated restriction on the Incurrence of Indebtedness, the U.S. dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

rate in effect on the date such Indebtedness was Incurred, in the case of term Indebtedness, or first committed, in the case of revolving credit Indebtedness; *provided* that if such Indebtedness is Incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such Refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced. Notwithstanding any other provision of this Section 4.12, the maximum amount of Indebtedness that the Issuer may Incur pursuant to this Section 4.12 shall not be deemed to be exceeded solely as a result of fluctuations in the exchange rate of currencies. The principal amount of any Indebtedness Incurred to refinance other Indebtedness, if Incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such Refinancing Indebtedness is denominated that is in effect on the date of such refinancing.

This Indenture will not treat (1) unsecured Indebtedness as subordinated or junior to secured Indebtedness merely because it is unsecured or (2) senior Indebtedness as subordinated or junior to any other senior Indebtedness merely because it has a junior priority with respect to the same collateral.

SECTION 4.13.  **_Limitation on Restrictions on Distributions from Restricted Subsidiaries_.**

The Issuer will not, and will not permit any Restricted Subsidiary to, create or otherwise cause or permit to exist or become effective any consensual encumbrance or consensual restriction on the ability of any Restricted Subsidiary to:

(1)     pay dividends or make any other distributions on its Capital Stock or pay any Indebtedness or other obligations owed to the Issuer or any Restricted Subsidiary (it being understood that the priority of any Preferred Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on Common Stock shall not be deemed a restriction on the ability to make distributions on Capital Stock);

(2)     make any loans or advances to the Issuer or any Restricted Subsidiary (it being understood that the subordination of loans or advances made to the Issuer or any Restricted Subsidiary to other Indebtedness Incurred by the Issuer or any Restricted Subsidiary shall not be deemed a restriction on the ability to make loans or advances); or

(3)     sell, lease or transfer any of its property or assets to the Issuer or any Restricted Subsidiary.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

The preceding provisions will not prohibit:

(i)     any encumbrance or restriction pursuant to or by reason of an agreement in effect at or entered into on the Issue Date, including, without limitation, this Indenture in effect on such date;

(ii)     any encumbrance or restriction with respect to a Person pursuant to or by reason of an agreement relating to any Capital Stock or Indebtedness Incurred by a Person on or before the date on which such Person was acquired by the Issuer or another Restricted Subsidiary (other than Capital Stock or Indebtedness Incurred as consideration in, or to provide all or any portion of the funds utilized to consummate, the transaction or series of related transactions pursuant to which such Person was acquired by the Issuer or a Restricted Subsidiary or in contemplation of the transaction) and outstanding on such date; *provided* that any such encumbrance or restriction shall not extend to any assets or property of the Issuer or any other Restricted Subsidiary other than the assets and property so acquired;

(iii)     encumbrances and restrictions contained in contracts entered into in the ordinary course of business, not relating to any Indebtedness, and that do not, individually or in the aggregate, detract from the value of, or from the ability of the Issuer and the Restricted Subsidiaries to realize the value of, property or assets of the Issuer or any Restricted Subsidiary in any manner material to the Issuer or any Restricted Subsidiary;

(iv)     any encumbrance or restriction with respect to an Unrestricted Subsidiary pursuant to or by reason of an agreement that the Unrestricted Subsidiary is a party to entered into before the date on which such Unrestricted Subsidiary became a Restricted Subsidiary; *provided* that such agreement was not entered into in anticipation of the Unrestricted Subsidiary becoming a Restricted Subsidiary and any such encumbrance or restriction shall not extend to any assets or property of the Issuer or any other Restricted Subsidiary other than the assets and property so acquired;

(v)     with respect to any Foreign Subsidiary, any encumbrance or restriction contained in the terms of any Indebtedness or any agreement pursuant to which such Indebtedness was Incurred if:

(a)     either (1) the encumbrance or restriction applies only in the event of a payment default or a default with respect to a financial covenant in such Indebtedness or agreement or (2) the Issuer determines that any such encumbrance or restriction will not materially affect the Issuer's ability to make principal or interest payments on the Notes, as determined in good faith by the Board of Directors of the Issuer, whose determination shall be conclusive; and

(b)     the encumbrance or restriction is not materially more disadvantageous to the holders of the Notes than is customary in comparable financing (as determined by the Issuer);

(vi)     any encumbrance or restriction with respect to a Restricted Subsidiary pursuant to an agreement effecting a refunding, replacement or refinancing of Indebtedness

88

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Incurred pursuant to an agreement referred to in clauses (i) through (v) or clause (xii) of this paragraph or this clause (vi) or contained in any amendment, restatement, modification, renewal, supplement, refunding, replacement or refinancing of an agreement referred to in clauses (i) through (v) or clause (xii) of this paragraph or this clause (vi); *provided*, *however*, that the encumbrances and restrictions with respect to such Restricted Subsidiary contained in any such agreement taken as a whole are no less favorable in any material respect to the holders of the Notes than the encumbrances and restrictions contained in such agreements referred to in clauses (i) through (v) or clause (xii) of this paragraph on the Issue Date or the date such Restricted Subsidiary became a Restricted Subsidiary or was merged into a Restricted Subsidiary, whichever is applicable, as determined in good faith by the Board of Directors of the Issuer, whose determination shall be conclusive;

(vii)    in the case of clause (3) of the first paragraph of this Section 4.13, any encumbrance or restriction:

(a)    that restricts in a customary manner the subletting, assignment or transfer of any property or asset that is subject to a lease (including leases governing leasehold interests or farm-in agreements or farm-out agreements relating to leasehold interests in oil and gas properties), license or similar contract, or the assignment or transfer of any such lease (including leases governing leasehold interests or farm-in agreements or farm-out agreements relating to leasehold interests in oil and gas properties), license or other contract;

(b)    contained in mortgages, pledges or other security agreements permitted under this Indenture securing Indebtedness of the Issuer or a Restricted Subsidiary to the extent such encumbrances or restrictions restrict the transfer of the property subject to such mortgages, pledges or other security agreements;

(c)    pursuant to customary provisions restricting dispositions of real property interests set forth in any reciprocal easement agreements of the Issuer or any Restricted Subsidiary;

(d)    on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business; or

(e)    with respect to the disposition or distribution of assets or property in operating agreements, joint venture agreements, development agreements, area of mutual interest agreements and other agreements that are customary in the Oil and Gas Business and entered into in the ordinary course of business;

(viii)   (A) purchase money obligations for property acquired in the ordinary course of business and (B) Capitalized Lease Obligations permitted under this Indenture, in each case, that impose encumbrances or restrictions of the nature described in clause (3) of the first paragraph of this Section 4.13 on the property so acquired;

(ix)    any encumbrance or restriction with respect to a Restricted Subsidiary (or any of its property or assets) imposed pursuant to an agreement entered into for the direct or

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

indirect sale or disposition of all or substantially all the Capital Stock or assets of such Restricted Subsidiary (or the property or assets that are subject to such restriction) pending the closing of such sale or disposition;

(x)    any customary encumbrances or restrictions imposed pursuant to any agreement of the type described in the definition of "Permitted Business Investment";

(xi)    encumbrances or restrictions arising or existing by reason of applicable law or any applicable rule, regulation or order; and

(xii)    the Senior Secured Credit Agreement as in effect as of the Issue Date, and any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings thereof; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are no more restrictive, taken as a whole, with respect to such dividend and other payment restrictions than those contained in the Senior Secured Credit Agreement as in effect on the Issue Date, as determined in good faith by the Board of Directors of the Issuer, whose determination shall be conclusive.

SECTION 4.14.    *[Reserved]*.

SECTION 4.15.    ***Offer to Repurchase upon Change of Control; Mandatory Conversion or Redemption of Notes***.

If a Change of Control occurs, each Holder will have the right to require the Issuer to repurchase all or any part (equal to $2,000 or an integral multiple of $[1,000] thereafter) of such Holder's Notes pursuant to the offer described below (a "Change of Control Offer") in cash on the terms set forth herein. The purchase price for any Notes in respect of any Change of Control Offer (a "Change of Control Payment") shall be an amount in cash equal to 100% of the aggregate principal amount of such Notes (including any interest previously paid by increasing the principal amount), plus all accrued and unpaid interest, if any, to the date of purchase, subject to the rights of Holders on the relevant Record Date to receive interest due on the relevant Interest Payment Date. For the avoidance of doubt, in no event shall any Change of Control Payment include any Interest Make-Whole Premium.

Within 30 days following any Change of Control, the Issuer will deliver such Change of Control Offer by first-class mail, with a copy to the Trustee, to each Holder to the address of such Holder appearing in the security register (or otherwise in accordance with the Applicable Procedures, if applicable), with the following information:

(1)    that a Change of Control has occurred and that such Holder has the right to require the Issuer to purchase such Holder's Notes for the Change of Control Payment;

90

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(2)     the repurchase date (which shall be no earlier than 30 days nor later than 60 days (or such later date as may be extended as provided below) from the date such notice is sent) (the "Change of Control Payment Date");

(3)     the last day of the offer period, which will be no later than the third Business Day prior to the Change of Control Payment Date;

(4)     that unless the Issuer defaults in the payment of the Change of Control Payment, all Notes accepted for payment pursuant to the Change of Control Offer will cease to accrue interest on the Change of Control Payment Date;

(5)     that Holders electing to have any Notes purchased pursuant to a Change of Control Offer will be required to surrender such Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of such Notes completed, to the paying agent specified in the notice at the address specified in the notice prior to the close of business on the third Business Day preceding the Change of Control Payment Date;

(6)     that Holders will be entitled to withdraw their tendered Notes and their election to require the Issuer to purchase such Notes; *provided* that the paying agent receives, not later than the close of business on the third Business Day preceding the Change of Control Payment Date, a telegram, telex, facsimile transmission or letter setting forth the name of the Holder, the principal amount of Notes tendered for purchase, and a statement that such Holder is withdrawing its tendered Notes and its election to have such Notes purchased;

(7)     if such notice is mailed prior to the occurrence of a Change of Control, stating the Change of Control Offer is conditional on the occurrence of such Change of Control;

(8)     that if the Issuer is redeeming less than all of the Notes, the Holders of the remaining Notes will be issued new Notes and such new Notes will be equal in principal amount to the unpurchased portion of the Notes surrendered. The unpurchased portion of the Notes must be equal to $2,000 or an integral multiple of $1,000 thereafter; and

(9)     the procedures determined by the Issuer, consistent with this Indenture, that a Holder must follow in order to have its Notes repurchased.

On the Change of Control Payment Date, the Issuer will, to the extent lawful:

(x)     accept for payment all Notes or portions of Notes (of at least $2,000 or an integral multiple of [$1,000] thereafter) properly tendered pursuant to the Change of Control Offer;

(y)     deposit with the paying agent an amount equal to the Change of Control Payment in respect of all Notes or portions of Notes properly tendered and not properly withdrawn; and

91

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(z)     deliver or cause to be delivered to the Trustee the Notes so accepted together with an Officers' Certificate stating the aggregate principal amount of Notes or portions of Notes being purchased by the Issuer.

The Paying Agent will promptly mail to each Holder properly tendered and not properly withdrawn the Change of Control Payment for such Notes (or, if the Notes are in global form, make such payment through the facilities of DTC), and, upon receipt of an Authentication Order in accordance with Section 2.2 hereof, the Trustee will promptly authenticate and mail (or cause to be transferred by book entry) to each Holder a new Note equal in principal amount to any unpurchased portion of the Notes surrendered, if any; *provided* that each such new Note will be in a principal amount of $2,000 or an integral multiple of [$1,000] thereafter.

If the Change of Control Payment Date is on or after an interest Record Date and on or before the related Interest Payment Date, any accrued and unpaid interest, will be paid to the Person in whose name a Note is registered at the close of business on such Record Date, and no further interest will be payable to holders who tender pursuant to the Change of Control Offer.

The Change of Control provisions described above will be applicable whether or not any other provisions of this Indenture are applicable. Except as described above with respect to a Change of Control, this Indenture does not contain provisions that permit the Holders to require that the Issuer repurchase or redeem the Notes in the event of a takeover, recapitalization or similar transaction.

The Issuer will not be required to make a Change of Control Offer upon a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in this Indenture applicable to a Change of Control Offer made by the Issuer and purchases all Notes validly tendered and not withdrawn under such Change of Control Offer. Notwithstanding anything to the contrary herein, a Change of Control Offer may be made in advance of a Change of Control, conditional upon such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making of the Change of Control Offer and the Change of Control Payment Date may be extended automatically until such Change of Control occurs.

If Holders of not less than [51]% in aggregate principal amount of the outstanding Notes validly tender and do not withdraw such Notes in a Change of Control Offer and the Issuer, or any third party making a Change of Control Offer in lieu of the Issuer as described above, purchases all of the Notes validly tendered and not withdrawn by such Holders, the Issuer or such third party will have the right, upon not less than 30 nor more than 60 days' prior notice, given not more than 30 days following such purchase pursuant to the Change of Control Offer described above, to redeem all Notes that remain outstanding following such purchase at a price in cash equal to 100% of the principal amount of the Notes *plus* accrued and unpaid interest, if any, to the date of purchase.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

If Holders of a majority of the aggregate principal amount of the outstanding Notes elect to convert such Notes to New Common Stock following the announcement of a Change of Control and prior to the last day of the related Change of Control Offer period, all other Notes that remain outstanding following such day shall be automatically converted as if such day were the Conversion Date.

The Issuer will comply, to the extent applicable, with the requirements of Rule 14e-1 of the Exchange Act and any other securities laws or regulations in connection with the repurchase of Notes as a result of a Change of Control. To the extent that the provisions of any securities laws or regulations conflict with provisions of this Indenture, or compliance with the Change of Control provisions of this Indenture would constitute a violation of any such laws or regulations, the Issuer will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations described in this Indenture by virtue of its compliance with such securities laws or regulations.

[All Notes outstanding immediately prior to the closing of any Drag-Along Sale (under and as defined in Section 3.1(a) of the Stockholders Agreement of the Issuer) shall automatically be converted into shares of Common Stock upon such Drag-Along Sale, and all such shares shall receive the same treatment in the Drag-Along Sale as the other outstanding shares of Common Stock (and the holders of such shares shall have the same rights and be subject to the same obligations under Article III of the Stockholders Agreement of the Issuer with respect thereto as apply to holders of the other outstanding shares of Common Stock with respect to such other outstanding shares), and the Issuer, the initiating Holders and each of the dragged Holders shall take such actions as may reasonably be required in order to effectuate such conversion.][16]

SECTION 4.16.    *Limitation on Sales of Assets and Subsidiary Stock.*

The Issuer will not, and will not permit any of its Restricted Subsidiaries to, make any Asset Disposition unless:

(1)    the Issuer or such Restricted Subsidiary, as the case may be, receives consideration at the time of such Asset Disposition at least equal to the Fair Market Value (such Fair Market Value to be determined as of the date of such Asset Disposition (or, if earlier, as of the date of contractually agreeing to such Asset Disposition)), of the shares and assets subject to such Asset Disposition;

(2)    at least 75% of the aggregate consideration received by the Issuer or such Restricted Subsidiary, as the case may be, from such Asset Disposition and all other Asset Dispositions since the Issue Date is in the form of cash or Cash Equivalents or Additional Assets, or any combination thereof; and

(3)    except as provided in the next paragraph an amount equal to 100% of the Net Available Cash from such Asset Disposition is applied, within one year from the later of the date

---

[16] NTD: Under review.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

of such Asset Disposition or the receipt of such Net Available Cash, by the Issuer or such Restricted Subsidiary, as the case may be:

(a)    to the extent the Issuer or any Restricted Subsidiary, as the case may be, elects (or is required by the terms of any Indebtedness) to prepay, repay, redeem or purchase Indebtedness of the Issuer under the Senior Secured Credit Agreement, any other Indebtedness of the Issuer or a Subsidiary Guarantor that is secured by a Lien permitted to be Incurred under this Indenture or Indebtedness (other than Disqualified Stock) of any Wholly Owned Subsidiary that is not a Subsidiary Guarantor; *provided*, *however*, that, in connection with any prepayment, repayment, redemption or purchase of Indebtedness pursuant to this subclause (a), the Issuer or such Restricted Subsidiary will retire such Indebtedness and will cause the related commitment (if any) to be permanently reduced in an amount equal to the principal amount so prepaid, repaid or purchased;

(b)    to the extent the Issuer elects, to make an offer to the applicable Holders (and to holders of Pari Passu Notes with similar provisions requiring the Issuer to make an offer to purchase such Pari Passu Notes with the proceeds from any Asset Disposition) to purchase Notes (and such other Pari Passu Notes) pursuant to terms and subject to the conditions contained in this Indenture in respect of Asset Disposition Offers; or

(c)    to invest in Additional Assets;

*provided* that pending the final application of any such Net Available Cash in accordance with this Section 4.16, the Issuer and its Restricted Subsidiaries may temporarily reduce Indebtedness or otherwise invest such Net Available Cash in any manner not prohibited by this Indenture.

Any Net Available Cash from Asset Dispositions that is not applied or invested as provided in the preceding paragraph will be deemed to constitute "Excess Proceeds." Not later than the day following the date that is one year from the later of the date of such Asset Disposition or the receipt of such Net Available Cash, if the aggregate amount of Excess Proceeds exceeds $[__] million, the Issuer will be required to make an offer ("Asset Disposition Offer") to all Holders and to the extent required by the terms of other Pari Passu Indebtedness, to all holders of other Pari Passu Indebtedness outstanding with similar provisions requiring the Issuer to make an offer to purchase such Pari Passu Indebtedness with the proceeds from any Asset Disposition ("Pari Passu Notes"), to purchase the maximum principal amount of Notes and any such Pari Passu Notes to which the Asset Disposition Offer applies that may be purchased out of the Excess Proceeds, at an offer price in cash in an amount equal to 100% of the principal amount (or, in the event such Pari Passu Indebtedness was issued with significant original issue discount, 100% of the accreted value thereof) of the Notes and Pari Passu Notes *plus* accrued and unpaid interest, if any (or in respect of such Pari Passu Indebtedness, such lesser price, if any, as may be provided for by the terms of such Indebtedness), to the date of purchase (subject to the right of holders of record on the relevant record date to receive interest due on the relevant Interest Payment Date), in accordance with the procedures set forth in this Indenture or the agreements governing the Pari Passu Notes, as applicable, in each case in denominations of at

94

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

least $2,000 or an integral multiple of $1,000 thereafter. If the aggregate principal amount of Notes surrendered by holders thereof and other Pari Passu Notes surrendered by holders or lenders, collectively, exceeds the amount of Excess Proceeds, the Trustee shall select the Notes to be purchased on a pro rata basis (or, in the case of Notes in global form, the Notes will be selected by such method as DTC or its nominee or successor may require or, where such nominee or successor is the Trustee, a method that most nearly approximates pro rata selection as the Trustee deems fair and appropriate) on the basis of the aggregate principal amount of tendered Notes and Pari Passu Notes. To the extent that the aggregate amount of Notes and Pari Passu Notes so validly tendered and not properly withdrawn pursuant to an Asset Disposition Offer is less than the amount of Excess Proceeds, the Issuer may use any remaining Excess Proceeds for general corporate purposes, subject to the other covenants contained in this Indenture. Upon completion of such Asset Disposition Offer, the amount of Excess Proceeds shall be reset at zero.

The requirement of clause (3)(c) of the first paragraph of this Section 4.16 shall be deemed to be satisfied if a bona fide binding commitment to make the investment referred to therein is entered into by the Issuer or any of its Restricted Subsidiaries with a Person other than an Affiliate of the Issuer within the time period specified in the first paragraph of this Section 4.16 and such Net Available Cash is subsequently applied in accordance with such commitment within 180 days following the date such commitment is entered into.

The Asset Disposition Offer will remain open for a period of 20 Business Days following its commencement, except to the extent that a longer period is required by applicable law (the "Asset Disposition Offer Period"). No later than five Business Days after the termination of the Asset Disposition Offer Period (the "Asset Disposition Purchase Date"), the Issuer will purchase the principal amount of Notes and Pari Passu Notes required to be purchased pursuant to this Section 4.16 (the "Asset Disposition Offer Amount") or, if less than the Asset Disposition Offer Amount has been so validly tendered, all Notes and Pari Passu Notes validly tendered in response to the Asset Disposition Offer.

If the Asset Disposition Purchase Date is on or after an interest record date and on or before the related Interest Payment Date, accrued and unpaid interest, if any, will be paid to the Person in whose name a Note is registered at the close of business on such record date, and no further interest will be payable to holders who tender Notes pursuant to the Asset Disposition Offer.

On or before the Asset Disposition Purchase Date, the Issuer will, to the extent lawful, accept for payment, on a pro rata basis to the extent necessary, the Asset Disposition Offer Amount of Notes and Pari Passu Notes or portions of Notes and Pari Passu Notes so validly tendered and not properly withdrawn pursuant to the Asset Disposition Offer, or if less than the Asset Disposition Offer Amount has been validly tendered and not properly withdrawn, all Notes and Pari Passu Notes so validly tendered and not properly withdrawn, in each case in denominations of at least $2,000 or an integral multiple of $1,000 thereafter. The Issuer will deliver to the Trustee an Officers' Certificate stating that such Notes or portions thereof were

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

accepted for payment by the Issuer in accordance with the terms of this Section 4.16 and, in addition, the Issuer will deliver all certificates and notes required, if any, by the agreements governing the Pari Passu Notes. The Issuer or the paying agent, as the case may be, will promptly (but in any case not later than five Business Days after the termination of the Asset Disposition Offer Period) send or deliver (or, if the Notes are in global form, make such payments through the facilities of DTC) to each tendering Holder or holder or lender of Pari Passu Notes, as the case may be, an amount equal to the purchase price of the Notes or Pari Passu Notes so validly tendered and not properly withdrawn by such holder or lender, as the case may be, and accepted by the Issuer for purchase, and the Issuer will promptly issue a new Note, and the Trustee, upon delivery of an Officers' Certificate from the Issuer, will authenticate and mail or deliver such new Note to such Holder, in a principal amount equal to any unpurchased portion of the Note surrendered; *provided* that each such new Note will be in a principal amount of $2,000 or an integral multiple of $1,000 thereafter. In addition, the Issuer will take any and all other actions required by the agreements governing the Pari Passu Notes. Any Note not so accepted will be promptly mailed or delivered by the Issuer to the Holder thereof. The Issuer will publicly announce the results of the Asset Disposition Offer on the Asset Disposition Purchase Date.

The Issuer will comply, to the extent applicable, with the requirements of Rule 14e-1 of the Exchange Act and any other securities laws or regulations in connection with the repurchase of Notes pursuant to this Indenture. To the extent that the provisions of any securities laws or regulations conflict with provisions of this Section 4.16, the Issuer will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this Indenture by virtue of its compliance with such securities laws or regulations.

For the purposes of clause (2) of the first paragraph of this Section 4.16, the following will be deemed to be cash:

(1)    the assumption by the transferee of Indebtedness (other than Subordinated Obligations or Disqualified Stock) of the Issuer or Indebtedness of a Restricted Subsidiary (other than Guarantor Subordinated Obligations or Disqualified Stock of any Restricted Subsidiary that is a Subsidiary Guarantor) and the release of the Issuer or such Restricted Subsidiary from all liability on such Indebtedness in connection with such Asset Disposition (or in lieu of such a release, the agreement of the acquirer or its parent company to indemnify and hold the Issuer or such Restricted Subsidiary harmless from and against any loss, liability or cost in respect of such assumed Indebtedness; *provided*, *however*, that such indemnifying party (or its long term debt securities) shall have an Investment Grade Rating (with no indication of a negative outlook or credit watch with negative implications, in any case, that contemplates such indemnifying party (or its long term debt securities) failing to have an Investment Grade Rating), in which case the Issuer will, without further action, be deemed to have applied such deemed cash to Indebtedness in accordance with clause (3)(a) of the first paragraph of this Section 4.16);

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(2)  securities, notes or other obligations received by the Issuer or any Restricted Subsidiary from the transferee that are converted by the Issuer or such Restricted Subsidiary into cash within 180 days after receipt thereof;

(3)  any Designated Non-cash Consideration received by the Issuer or such Restricted Subsidiary in such Asset Disposition having an aggregate Fair Market Value, taken together with all other Designated Non-cash Consideration received pursuant to this clause (3), not to exceed an amount equal to 3.0% of the Issuer's Adjusted Consolidated Net Tangible Assets (determined at the time of receipt of such Designated Non-cash Consideration), with the Fair Market Value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value; and

(4)  with respect to any Asset Disposition of interests in oil and gas properties by the Issuer or any of its Restricted Subsidiaries where the Issuer or such Restricted Subsidiary retains an interest in such property, any agreement by the transferee (or an Affiliate thereof) to pay all or a portion of the Issuer's or such Restricted Subsidiary's allocable share of the costs and expenses related to the exploration, development, completion or production of such properties and activities related thereto.

Notwithstanding the foregoing, the 75% limitation referred to in clause (2) of the first paragraph of this Section 4.16 shall be deemed satisfied with respect to any Asset Disposition in which the cash or Cash Equivalents portion of the consideration received therefrom, determined in accordance with the foregoing provision on an after-tax basis, is equal to or greater than what the after-tax proceeds would have been had such Asset Disposition complied with the aforementioned 75% limitation.

The requirement of clause (3)(b) of the first paragraph of this Section 4.16 above shall be deemed to be satisfied if an agreement (including a lease, whether a capital lease or an operating lease) committing to make the acquisitions or expenditures referred to therein is entered into by the Issuer or its Restricted Subsidiary within the specified time period and such Net Available Cash is subsequently applied in accordance with such agreement within six months following such agreement.

SECTION 4.17.  *[Reserved]*.

SECTION 4.18.  ***Limitation on Liens***.

The Issuer will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create, Incur or suffer to exist any Lien (the "Initial Lien") other than Permitted Liens upon any of its property or assets (including Capital Stock of Restricted Subsidiaries), including any income or profits therefrom, whether owned on the date of this Indenture or acquired after that date, which Lien is securing any Indebtedness, unless contemporaneously with the Incurrence of such Lien effective provision is made to secure the Indebtedness due under the Notes or, in respect of Liens on any Restricted Subsidiary's property or assets, any Subsidiary Guarantee of such Restricted Subsidiary, equally and ratably with (or senior in priority to in the

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

case of Liens with respect to Subordinated Obligations or Guarantor Subordinated Obligations, as the case may be) the Indebtedness secured by such Lien for so long as such Indebtedness is so secured.

Any Lien created for the benefit of the holders of the Notes pursuant to the preceding paragraph shall provide by its terms that such Lien shall be automatically and unconditionally released and discharged upon the release and discharge of the Initial Lien.

SECTION 4.19.    *Limitation on Lines of Business*.

The Issuer will not, and will not permit any Restricted Subsidiary to, engage in any business other than the Oil and Gas Business, except to the extent as would not be material to the Issuer and its Restricted Subsidiaries taken as a whole.

SECTION 4.20.    *Additional Subsidiary Guarantees*.

If any of the Issuer's Restricted Subsidiaries that is not a Subsidiary Guarantor (other than a Foreign Subsidiary) (x) Incurs or guarantees any Indebtedness under the Senior Secured Credit Agreement or (y) otherwise Incurs or guarantees any other Indebtedness created or acquired by the Issuer or one or more of its Restricted Subsidiaries in an aggregate principal amount exceeding $[__] million, in each case, then the Issuer shall cause such Restricted Subsidiary to become within 60 days a Subsidiary Guarantor; *provided* that any Restricted Subsidiary that constitutes an Immaterial Subsidiary need not become a Subsidiary Guarantor until such time as it ceases to be an Immaterial Subsidiary. If required to become a Subsidiary Guarantor pursuant to the immediately preceding sentence, such transferee or acquired or other Restricted Subsidiary shall:

(1)    execute and deliver to the Trustee a supplemental indenture in form reasonably satisfactory to the Trustee pursuant to which such Restricted Subsidiary shall unconditionally guarantee all of the Issuer's obligations under the Notes and this Indenture on the terms set forth in this Indenture; and

(2)    deliver to the Trustee an Opinion of Counsel that such supplemental indenture has been duly authorized, executed and delivered by such Restricted Subsidiary and constitutes a legal, valid, binding and enforceable obligation of such Restricted Subsidiary. Thereafter, such Restricted Subsidiary shall be a Subsidiary Guarantor for all purposes of this Indenture.

SECTION 4.21.    *Suspension of Covenants*.

Following the first day that (a) the Notes have achieved Investment Grade Status and (b) no Default or Event of Default has occurred and is continuing under this Indenture, then, beginning on that day and continuing until the Reversion Date, the Issuer and its Restricted Subsidiaries shall not be subject to the following covenants (collectively, the "Suspended Covenants"):

98

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

     (i)     Section 4.10;

     (ii)     Section 4.11;

     (iii)     Section 4.12;

     (iv)     Section 4.13;

     (v)     Section 4.16;

     (vi)     Section 4.20; and

     (vii)     clause (3) of the first paragraph of Section 5.1.

If at any time the Notes cease to have such Investment Grade Status or if a Default or Event of Default occurs and is continuing, then the Suspended Covenants will thereafter be reinstated as if such covenants had never been suspended (the "Reversion Date") and be applicable pursuant to the terms of this Indenture (including in connection with performing any calculation or assessment to determine compliance with the terms of this Indenture), unless and until the Notes subsequently attain Investment Grade Status and no Default or Event of Default is in existence (in which event the Suspended Covenants shall no longer be in effect for such time that the Notes maintain an Investment Grade Status and no Default or Event of Default is in existence); *provided*, *however*, that no Default, Event of Default or breach of any kind shall be deemed to exist under this Indenture, the Notes or the Subsidiary Guarantees with respect to the Suspended Covenants based on, and neither the Issuer nor any of its Subsidiaries shall bear any liability for, any actions taken or events occurring during the Suspension Period, or any actions taken at any time pursuant to any contractual obligation arising prior to the Reversion Date, regardless of whether such actions or events would have been permitted if the applicable Suspended Covenants remained in effect during such period. The period of time between the date of suspension of the covenants and the Reversion Date is referred to as the "Suspension Period."

On the Reversion Date, all Indebtedness Incurred during the Suspension Period will be classified to have been Incurred pursuant to the first paragraph of Section 4.12 or one of the clauses set forth in the second paragraph of Section 4.12 (to the extent such Indebtedness would be permitted to be Incurred thereunder as of the Reversion Date and after giving effect to the Indebtedness Incurred prior to the Suspension Period and outstanding on the Reversion Date). To the extent such Indebtedness would not be so permitted to be Incurred pursuant to the first and second paragraphs of Section 4.12, such Indebtedness will be deemed to have been outstanding on the Issue Date, so that it is classified as permitted under clause (4)(b) of the second paragraph of Section 4.12. Calculations made after the Reversion Date of the amount available to be made as Restricted Payments under Section 4.10 shall be made as though Section 4.10 had been in effect since the Issue Date and throughout the Suspension Period. Accordingly, Restricted Payments made during the Suspension Period will reduce the amount available to be made as Restricted Payments under the first paragraph of Section 4.10. For purposes of determining

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

compliance with Section 4.16, on the Reversion Date, the Net Available Cash from Asset Dispositions not applied in accordance with Section 4.16 will be deemed reset at zero. In addition, any future obligation to grant further Subsidiary Guarantees shall be released. All such further obligation to grant Subsidiary Guarantees shall be reinstated upon the Reversion Date. The Issuer will provide written notice to the Trustee of the occurrence of any Suspension Period or Reversion Date.

During any Suspension Period, the Issuer may not designate any of the Issuer's Subsidiaries as Unrestricted Subsidiaries pursuant to this Indenture

SECTION 4.22.    ***Creation and Perfection of Liens Securing Collateral; Further Assurances.***

(a)    On or prior to the Issue Date, the Issuer and the Guarantors shall have granted, created and perfected the Liens created or purported to be created by the Security Documents in the Collateral in favor of the Collateral Agent for the benefit of the Trustee, the Collateral Agent and the Holders[; *provided*, that to the extent any such security interest, mortgage or other Lien was not perfected by the Issue Date, the Issuer and the Guarantors shall use commercially reasonable efforts to have such Lien perfected as promptly as practicable following the Issue Date, and so long as such Lien is perfected concurrently with the perfection of Liens in the same assets pursuant to the Senior Secured Credit Agreement, the Issuer and the Guarantors shall be deemed to have satisfied their obligations under this Section 4.22(a).]

(b)    Subject to the terms, conditions and provisions of the Security Documents and this Indenture, the Issuer and the Guarantors shall execute any and all further documents, financing statements, agreements and instruments, and take all further action that may be required under applicable law, or that the Holders, the Trustee or the Collateral Agent may reasonably request, in order to grant, create, preserve, maintain, enforce, protect and perfect the validity and priority of the Liens created or purported to be created by this Indenture and the Security Documents in the Collateral; *provided,* that the Issuer and the Guarantors shall not be required to provide, and the Collateral Agent shall not request, any additional Liens in respect of any Excluded Assets.[17]

(c)    From and after the Issue Date, if the Issuer and the Guarantors are required to deliver to the Administrative Agent or the Collateral Agent under the Senior Secured Credit Agreement additional security under the Senior Secured Credit Agreement, the Issuer and the Guarantors shall deliver to the Collateral Agent, within such time periods as permitted by the Senior Secured Credit Agreement or otherwise agreed to by the Collateral Agent under the Senior Secured Credit Agreement), such additional security to the Collateral Agent and/or the Trustee, subject to exceptions and limitations otherwise set forth in this Indenture and the Security Documents (to the extent appropriate in the applicable jurisdiction), in each case with the priority required by the Security Documents.

---

[17] NTD: Under review.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(d)      The documents and/or actions required pursuant to this Section shall be deemed to be satisfactory in respect of such matters under this Indenture and the Security Documents to the extent that such documents and/or actions are determined, in the judgment of the Collateral Agent under the Senior Secured Credit Agreement, to be satisfactory in respect of any such matters under the Senior Secured Credit Agreement.

SECTION 4.23.    *Minimum Liquidity of the Issuer.*

The Liquidity of the Issuer shall at all times remain at or above $20,000,000.00 (the "Minimum Liquidity"); *provided* that, should the Liquidity of the Issuer at any time fall below the Minimum Liquidity, the sole remedy available to the Holders at any time prior to the Maturity Date shall be that the Issuer shall be deemed to have elected to pay PIK Interest in respect of all interest periods for which the Record Date occurs at a time when the Issuer's liquidity is below the Minimum Liquidity (notwithstanding any notice or purported election to the contrary). Interest due on the related Interest Payment Date shall be paid by PIK Interest.

SECTION 4.24.    **Withholding Taxes**

Notwithstanding anything to the contrary contained in this Indenture, the Issuer may, to the extent it is required to do so by law, deduct or withhold income or other similar taxes from principal or interest payments, or make such withholdings are required in the event of a conversion, under this Indenture. To the extent that any amounts required to be withheld under applicable law or regulations are so withheld, such amounts shall be deemed for purposes of this Indenture to have been paid to the Persons in respect of which such withholding was made. Without limiting the forgoing, if the Issuer is required by applicable law to pay withholding tax the Issuer may, at its option, (i) apply a portion of any cash distribution or consideration to be made or paid under this Indenture to pay applicable withholding taxes and/or (ii) liquidate a portion of any non-cash distribution or consideration to be made or delivered (including Common Stock issuable upon conversion and any PIK Interest) under this Indenture to generate sufficient funds to pay applicable withholding taxes.

ARTICLE V.

SUCCESSOR CORPORATION

SECTION 5.1.    *Merger, Consolidation and Sale of Assets*.

The Issuer will not consolidate with or merge with or into or wind up into (whether or not the Issuer is the surviving corporation), or convey, transfer or lease all or substantially all its assets in one or more related transactions to, any Person, *unless*:

(1)      the resulting, surviving or transferee Person (the "Successor Issuer") will be a corporation, partnership, trust or limited liability company organized and existing under the laws of the United States of America, any State of the United States or the District of Columbia and the Successor Issuer (if not the Issuer) will expressly assume, by supplemental indenture,

101

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

executed and delivered to the Trustee, in form reasonably satisfactory to the Trustee, all the obligations of the Issuer under the Notes and this Indenture; *provided* that in the case where the Successor Issuer of the Issuer is not a corporation, a co-issuer of the Notes is a corporation;

(2)     immediately after giving effect to such transaction (and treating any Indebtedness that becomes an obligation of the Successor Issuer or any Subsidiary of the Successor Issuer as a result of such transaction as having been Incurred by the Successor Issuer or such Subsidiary at the time of such transaction), no Default shall have occurred and be continuing;

(3)     immediately after giving effect to such transaction, either (a) the Successor Issuer would be able to Incur at least an additional $1.00 of Indebtedness pursuant to the first paragraph of Section 4.12 or (b) the Consolidated Coverage Ratio for the Issuer and its Restricted Subsidiaries would be equal to or greater than immediately prior to giving effect to such transaction;

(4)     each Subsidiary Guarantor (unless it is the other party to the transactions above, in which case clause (1) shall apply) shall have by supplemental indenture confirmed that its Subsidiary Guarantee shall apply to such Person's obligations in respect of this Indenture and the Notes; and

(5)     the Issuer shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such supplemental indenture (if any) comply with this Indenture.

For purposes of this Section 5.1, the sale, lease, conveyance, assignment, transfer, or other disposition of all or substantially all of the properties and assets of one or more Subsidiaries of the Issuer, which properties and assets, if held by the Issuer instead of such Subsidiaries, would constitute all or substantially all of the properties and assets of the Issuer on a consolidated basis, shall be deemed to be the transfer of all or substantially all of the properties and assets of the Issuer.

The Successor Issuer will succeed to, and be substituted for, and may exercise every right and power of, the Issuer under this Indenture; and its predecessor Issuer, except in the case of a lease of all or substantially all its assets, will be released from the obligation to pay the principal of and interest on the Notes.

Notwithstanding the preceding clause (3), (x) any Restricted Subsidiary may consolidate with, merge into or transfer all or part of its properties and assets to the Issuer and the Issuer may consolidate with, merge into or transfer all or part of its properties and assets to a Wholly Owned Subsidiary and (y) the Issuer may merge with an Affiliate incorporated solely for the purpose of reincorporating the Issuer in another jurisdiction; *provided* that in the case of a Restricted Subsidiary that consolidates with, merges into or transfers all or part of its properties and assets to the Issuer, the Issuer will not be required to comply with the preceding clause (3).

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

In addition, the Issuer will not permit any Subsidiary Guarantor to consolidate with or merge with or into, and will not permit the conveyance, transfer or lease of substantially all of the assets of any Subsidiary Guarantor to, any Person (other than the Issuer or another Subsidiary Guarantor) *unless*:

(1)    (a) the resulting, surviving or transferee Person will be a corporation, partnership, trust or limited liability company organized and existing under the laws of the United States of America, any State of the United States or the District of Columbia (b) and such Person (if not such Subsidiary Guarantor) will expressly assume, by supplemental indenture, executed and delivered to the Trustee, all the obligations of such Subsidiary Guarantor under its Subsidiary Guarantee and this Indenture, (c) immediately after giving effect to such transaction (and treating any Indebtedness that becomes an obligation of the resulting, surviving or transferee Person or any Restricted Subsidiary as a result of such transaction as having been Incurred by such Person or such Restricted Subsidiary at the time of such transaction), no Default shall have occurred and be continuing, and (d) the Issuer shall have delivered to the Trustee an Officers' Certificate and Opinion of Counsel each stating that such consolidation, merger or transfer and such supplemental indenture complies with this Indenture; or

(2)    the transaction is made in compliance with Section 4.16 and Section 12.4.

SECTION 5.2.    ***Successor Corporation Substituted*.**

Upon any consolidation, combination or merger or any transfer of all or substantially all of the assets of the Issuer in accordance with Section 5.1, in which the Issuer is not the continuing corporation, the successor Person formed by such consolidation or into which the Issuer is merged or to which such conveyance, lease or transfer is made shall succeed to, and be substituted for, and may exercise every right and power of, the Issuer under this Indenture and the Notes with the same effect as if such surviving entity had been named as such.

ARTICLE VI.

REMEDIES

SECTION 6.1.    ***Events of Default*.**

An "Event of Default" means any of the following events:

(1)    default in any payment of interest on any Note when due, continued unremedied for [30] days;[18]

(2)    default in the payment of principal of or premium, if any, on any Note when due at its Stated Maturity, [upon optional redemption,] upon required repurchase, upon declaration of acceleration or otherwise, continued unremedied for [3] days;

---

[18] NTD: Under review.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(3)     failure by the Issuer or any Subsidiary Guarantor to comply with its obligations under Section 5.1;

(4)     failure by the Issuer to comply for 30 days after notice as provided below with any of its obligations under Sections 4.8, 4.10, 4.11, 4.12, 4.13, 4.15, 4.16, 4.18, 4.19 or 4.20 above (in each case, other than a failure to purchase Notes which will constitute an Event of Default under clause (2) above and other than a failure to comply with Section 5.1 which is covered by clause (3));

(5)     failure by the Issuer to comply for 60 days after notice as provided below with its other agreements (not including, for the avoidance of doubt, Section 4.23) contained in this Indenture;

(6)     default under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness for money borrowed by the Issuer or any of its Restricted Subsidiaries (or the payment of which is guaranteed by the Issuer or any of its Restricted Subsidiaries), other than Indebtedness owed to the Issuer or a Restricted Subsidiary, whether such Indebtedness or guarantee now exists, or is created after the date of this Indenture, which default:

(a)     is caused by a failure to pay principal of such Indebtedness prior to the expiration of the grace period provided in such Indebtedness (and any extensions of any grace period) ("payment default"); or

(b)     results in the acceleration of such Indebtedness prior to its maturity;

and, in each case, the principal amount of any such Indebtedness, together with the principal amount of any other such Indebtedness under which there has been a payment default or the maturity of which has been so accelerated, aggregates $[__] million or more;

(7)     (a) the Issuer or any of its Restricted Subsidiaries that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary, pursuant to or within the meaning of any Bankruptcy Law:

(i)     commences proceedings to be adjudicated bankrupt or insolvent;

(ii)     consents to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of a petition or answer or consent seeking reorganization or relief under applicable Bankruptcy law;

(iii)     consents to the appointment of a receiver, liquidator, assignee, trustee, sequestrator or other similar official of it or for all or substantially all of its property;

(iv)     makes a general assignment for the benefit of its creditors; or

104

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

        (v)      generally is not paying its debts as they become due; or

      (b)      a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

        (i)      is for relief against the Issuer or any of its Restricted Subsidiaries that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary, in a proceeding in which the Issuer or any such Restricted Subsidiaries, that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary, is to be adjudicated bankrupt or insolvent;

        (ii)      appoints a receiver, liquidator, assignee, trustee, sequestrator or other similar official of the Issuer or any of its Restricted Subsidiaries that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary, or for all or substantially all of the property of the Issuer or any of its Restricted Subsidiaries that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary; or

        (iii)      orders the liquidation of the Issuer or any of its Restricted Subsidiaries that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary;

and, in the case of any of (b)(i), (ii) or (iii), the order or decree remains unstayed and in effect for 60 consecutive days;

      (8)      failure by the Issuer or any Significant Subsidiary or group of Restricted Subsidiaries that, taken together (as of the latest audited consolidated financial statements for the Issuer and its Restricted Subsidiaries), would constitute a Significant Subsidiary to pay final judgments aggregating in excess of $[__] million (to the extent not covered by insurance by a reputable and creditworthy insurer as to which the insurer has not disclaimed coverage), which judgments are not paid or discharged, and there shall be any period of 60 consecutive days following entry of such final judgment or decree during which a stay of enforcement of such final judgment or decree, by reason of pending appeal or otherwise, shall not be in effect;

      (9)      any Subsidiary Guarantee of a Significant Subsidiary or group of Restricted Subsidiaries that, taken together (as of the latest audited consolidated financial statements for the Issuer and its Restricted Subsidiaries) would constitute a Significant Subsidiary ceases to be in full force and effect (except as contemplated by the terms of this Indenture) or is declared null and void in a judicial proceeding or any Subsidiary Guarantor that is a Significant Subsidiary or group of Subsidiary Guarantors that, taken together (as of the latest audited consolidated financial statements of the Issuer and its Restricted Subsidiaries) would constitute a Significant Subsidiary denies or disaffirms its obligations under this Indenture or its Subsidiary Guarantee; or

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(10)    any of the Security Documents shall cease, for any reason, to be in full force and effect (except in accordance with its terms), or the Issuer or any Subsidiary Guarantor shall so assert, or any Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby in respect of collateral purported to be covered thereby with an individual fair market value in excess of $1,000,000 or an aggregate fair market value in excess of $2,000,000 (except in accordance with its terms);

However, a Default under clauses (4) and (5) of this paragraph will not constitute an Event of Default until the Trustee or the holders of 25% in aggregate principal amount of the outstanding Notes notify the Issuer and, in the case of a notice given by the Holders, the Trustee, in writing of the Default and the Issuer does not cure such Default within the time specified in clauses (4) and (5) of this paragraph after receipt of such notice.

SECTION 6.2.    *Acceleration*.

If an Event of Default (other than an Event of Default described in clause (7) of Section 6.1) occurs and is continuing, the Trustee by notice to the Issuer, or the holders of at least 25% in aggregate principal amount of the outstanding Notes by notice to the Issuer and the Trustee, may, and the Trustee at the request of such holders shall, declare the principal of, premium, if any, and accrued and unpaid interest, if any, on all the Notes to be due and payable. If an Event of Default described in clause (7) of Section 6.1 occurs and is continuing, the principal of, premium, if any, and accrued and unpaid interest, if any, on all the Notes will become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holders. The holders of at least a majority in principal amount of the outstanding Notes may waive all past defaults (except with respect to nonpayment of principal, premium, if any, or interest, if any) and rescind any such acceleration with respect to the Notes and its consequences if (1) rescission would not conflict with any judgment or decree of a court of competent jurisdiction and (2) all existing Events of Default, other than the nonpayment of the principal of, premium, if any, and interest on the Notes that have become due solely by such declaration of acceleration, have been cured or waived.

SECTION 6.3.    *Other Remedies*.

If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy by proceeding at law or in equity to collect the payment of the principal of, premium, if any, or interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

All rights of action and claims under this Indenture or the Notes may be enforced by the Trustee even if it does not possess any of the Notes or does not produce any of them in the proceeding. A delay or omission by the Trustee or any Holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. No remedy is exclusive of any other remedy. All available remedies are cumulative to the extent permitted by law.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

SECTION 6.4.    _**Waiver of Past Defaults**_.

At any time prior to the declaration of acceleration of the Notes, the Holders of not less than a majority in aggregate principal amount of the Notes then outstanding by notice to the Trustee may, on behalf of the Holders of all the Notes, waive any existing Default or Event of Default and its consequences under this Indenture, except a Default or Event of Default specified in Section 6.1(1) or (2) or in respect of any provision hereof which cannot be modified or amended without the consent of the Holder so affected pursuant to Section 9.2. When a Default or Event of Default is so waived, it shall be deemed cured and shall cease to exist.

SECTION 6.5.    _**Control by Majority**_.

Holders of the Notes may not enforce this Indenture or the Notes except as provided in this Article VI. The Holders of at least a majority in aggregate principal amount of the outstanding Notes shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred on the Trustee; _provided_, _however_, that the Trustee may refuse to follow any direction (a) that conflicts with any rule of law or this Indenture, (b) that the Trustee reasonably determines may be unduly prejudicial to the rights of any other Holder (it being understood that the Trustee does not have an affirmative duty to ascertain whether or not any such direction is unduly prejudicial to the rights of any other Holder), or (c) that may expose the Trustee to personal liability for which reasonable indemnity provided to the Trustee against such liability shall be deemed inadequate by the Trustee; _provided_, _further_, _however_, that the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction or this Indenture.

SECTION 6.6.    _**Limitation on Suits**_.

Subject to the provisions of this Indenture relating to the duties of the Trustee, if an Event of Default occurs and is continuing, the Trustee will be under no obligation to exercise any of the rights or powers under this Indenture at the request or direction of any of the holders unless such Holders have offered to the Trustee indemnity or security satisfactory to the Trustee against any loss, liability or expense. Except to enforce the right to receive payment of principal, premium, if any, or interest when due, no Holder may pursue any remedy with respect to this Indenture or the Notes _unless_:

(1)    such Holder has previously given the Trustee notice that an Event of Default is continuing;

(2)    Holders of at least 25% in principal amount of the outstanding Notes have requested the Trustee to pursue the remedy;

(3)    such Holder has offered the Trustee security or indemnity satisfactory to the Trustee against any loss, liability or expense;

107

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(4)      the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or indemnity; and

(5)      the Holders of a majority in principal amount of the outstanding Notes have not waived such Event of Default or otherwise given the Trustee a direction that, in the opinion of the Trustee, is inconsistent with such request within such 60-day period.

A Holder may not use this Indenture to prejudice the rights of any other Holders or to obtain priority or preference over such other Holders (it being understood that the Trustee does not have an affirmative duty to ascertain whether or not any action or forbearance by a Holder prejudices the rights of any other Holders or to obtain priority or preference over such other Holders).

SECTION 6.7.    *Right of Holders To Receive Payment*.

Notwithstanding any other provision of this Indenture, the right of any Holder of a Note to receive payment of the principal of, premium, if any, and interest on such Note, on or after the respective due dates expressed or provided for in such Note, to convert the Notes in accordance with Article X, or to bring suit for the enforcement of any such payment on or after the respective due dates, expressed in the Note (including in connection with an offer to purchase) or such right to convert, shall be absolute and unconditional and shall not be impaired or affected without the consent of such Holder.

SECTION 6.8.    *Collection Suit by Trustee*.

If an Event of Default specified in clause (1) or (2) of Section 6.1 occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Issuer or any other obligor on the Notes for the whole amount of the principal of, premium, if any, and accrued interest remaining unpaid, together with interest on overdue principal and, to the extent that payment of such interest is lawful, interest on overdue installments of interest, in each case at the rate per annum provided for by the Notes and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

SECTION 6.9.    *Trustee May File Proofs of Claim*.

The Trustee may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents, counsel, accountants and experts) and the Holders allowed in any judicial proceedings relative to the Issuer or the Restricted Subsidiaries (or any other obligor upon the Notes), their creditors or their property and shall be entitled and empowered to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same, and any Custodian in any such judicial proceedings is hereby authorized by each Holder to make such payments to

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents, counsel, accountants and experts, and any other amounts due the Trustee under Section 7.7. To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents, counsel, accountants and experts and any other amounts due the Trustee under Section 7.7 out of the estate in any such proceeding shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise. Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

SECTION 6.10.    *__Priorities__*.

If the Trustee collects any money pursuant to this Article VI it shall pay out such money in the following order:

First: to the Trustee for amounts due under Section 7.7;

Second: to Holders for interest accrued on the Notes, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for interest;

Third: to Holders for the principal amounts (including any premium) owing under the Notes, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for the principal (including any premium); and

Fourth: the balance, if any, to the Issuer.

The Trustee, upon prior written notice to the Issuer, may fix a record date and payment date for any payment to Holders pursuant to this Section 6.10.

SECTION 6.11.    *__Undertaking for Costs__*.

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court may in its discretion require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.11 does not apply to any suit by the Trustee, any suit by a Holder pursuant to Section 6.7, or a suit by a Holder or Holders of more than 10% in aggregate principal amount of the outstanding Notes.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

SECTION 6.12.    *Restoration of Rights and Remedies*.

If the Trustee or any Holder has instituted any proceeding to enforce any right or remedy under this Indenture or any Note and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Holder, then and in every such case the Issuer, the Trustee and the Holders shall, subject to any determination in such proceeding, be restored severally and respectively to their former positions under this Indenture, and thereafter all rights and remedies of the Trustee and the Holders shall continue as though no such proceeding had been instituted.

ARTICLE VII.

TRUSTEE

SECTION 7.1.    *Duties of Trustee*.

(a)    If an Event of Default has occurred and is continuing and is actually known to the Trustee, the Trustee shall exercise such of the rights and powers vested in it by this Indenture and shall use the same degree of care and skill in its exercise thereof as a prudent person would exercise or use under the circumstances in the conduct of his own affairs in exercising any rights or remedies or performing any of its duties hereunder.

(b)    Except during the continuance of an Event of Default:

(1)    the Trustee need perform only those duties as are specifically set forth in this Indenture and no covenants or obligations shall be implied in this Indenture that are adverse to the Trustee. The permissive right of the Trustee to do things enumerated in this Indenture shall not be construed as a duty; and

(2)    in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture. However, in the case of any such certificates or opinions that by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture.

(c)    Notwithstanding anything to the contrary herein contained, the Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(1)    this paragraph does not limit the effect of paragraph (b) of this Section 7.1;

(2)    the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer, unless it is conclusively determined by a court of competent jurisdiction that the Trustee was negligent in ascertaining the pertinent facts; and

110

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(3)    the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.2, 6.4 or 6.5.

(d)    No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties under this Indenture or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(e)    Every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b), (c) and (d) of this Section 7.1 and Section 7.2.

(f)    The Trustee shall not be liable for interest on any money or assets received by it except as the Trustee may agree in writing with the Issuer. Assets held in trust by the Trustee need not be segregated from other assets except to the extent required by law.

SECTION 7.2.    *Rights of Trustee*.

Subject to Section 7.1:

(a)    The Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any document believed by it to be genuine and to have been signed or presented by the proper Person or Persons or to have been prepared and furnished pursuant to any of the provisions of this Indenture; and the Trustee shall be under no duty to make any investigation as to any statement contained in any such instance, but may accept the same conclusive evidence of the truth and accuracy of such statement or the correctness of such opinions. The Trustee need not investigate any fact or matter stated in the document.

(b)    Before the Trustee acts or refrains from acting, it may consult with counsel of its selection and may require an Officers' Certificate or an Opinion of Counsel or both, which shall conform to Sections 11.4 and 11.5. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on such advice or such Officers' Certificate or Opinion of Counsel.

(c)    The Trustee may act through attorneys, agents, custodians or nominees and shall not be responsible for the misconduct or negligence of any attorney, agent, custodian or nominee appointed with due care.

(d)    The Trustee shall not be liable for any action that it takes or omits to take in good faith which it believes to be authorized or within its rights or powers conferred upon it by this Indenture.

(e)    The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, notice, request, direction, consent, order, bond, debenture, or other paper or document, but the Trustee, in its discretion,

111

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled, upon reasonable notice to the Issuer, to examine the books, records, and premises of the Issuer, personally or by agent or attorney and to consult with the officers and representatives of the Issuer, including the Issuer's accountants and attorneys, and to take such memoranda from and in regard thereto as may be desired.

(f)     The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request, order or direction of any of the Holders pursuant to the provisions of this Indenture, unless such Holders shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which may be incurred by it in compliance with such request, order or direction.

(g)     The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties under this Indenture.

(h)     Delivery of reports, information and documents to the Trustee under Section 4.8 is for informational purposes only and the Trustee's receipt of the foregoing shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Issuer's compliance with any of its covenants under this Indenture (as to which the Trustee is entitled to rely exclusively on Officers' Certificates).

(i)     Other than a consent revoked in accordance with Section 9.4, any action taken, or omitted to be taken, by the Trustee in good faith pursuant to this Indenture upon the request or authority or consent of any person who, at the time of making such request or giving such authority or consent, is a Holder shall be conclusive and binding upon every subsequent Holder of a Note or portion of a Note that evidences the same debt as the requesting or consenting Holder's Note.

(j)     In no event shall the Trustee be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(k)     The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

(l)     The Trustee and the Collateral Agent shall not be responsible for filing any financing or continuation statements or for recording any documents or instruments in any public office at any time or times or for otherwise perfecting or maintaining the perfection of any security interest in the Collateral.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

SECTION 7.3.    ***Individual Rights of Trustee***.

The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuer, any of its respective Subsidiaries, or its respective Affiliates with the same rights it would have if it were not Trustee. Any Agent may do the same with like rights. However, the Trustee must comply with Sections 7.10 and 7.11.

SECTION 7.4.    ***Trustee's Disclaimer***.

The Trustee makes no representation as to the validity or adequacy of this Indenture or the Notes, and it shall not be accountable for the Issuer's use of the proceeds from the Notes, and it shall not be responsible for any statement of the Issuer in this Indenture or the Notes other than the Trustee's certificate of authentication.

Under no circumstances shall the Trustee be liable in its individual capacity for the obligations evidenced by the Notes. In accepting the trust hereby created, the Trustee acts solely as Trustee for the Holders and not in its individual capacity and all Persons, including, without limitation, the Holders and the Issuer having any claim against the Trustee arising from this Indenture shall look only to the funds and accounts held by the Trustee hereunder for payment except as otherwise provided herein.

SECTION 7.5.    ***Notice of Default***.

If a Default or an Event of Default occurs and is continuing and is known to the Trustee, the Trustee shall mail (or, if the Notes are in global form, in accordance with applicable DTC procedures, send electronically) to each Holder notice of the uncured Default or Event of Default within 90 days after the occurrence thereof. Except in the case of a Default or an Event of Default in payment of principal of, premium, if any, or interest, if any, on, any Note, including an accelerated payment, a Default in payment on the Change of Control Payment Date pursuant to a Change of Control Offer or on the Asset Disposition Purchase Date pursuant to an Asset Disposition Offer and a Default in compliance with Article V hereof, the Trustee shall be protected in withholding such notice if and so long as its Board of Directors, the executive committee of its Board of Directors or a committee of its directors and/or Trust Officers in good faith determines that withholding the notice is in the interest of the Holders.

SECTION 7.6.    ***Reports by Trustee to Holders***.

Within 60 days after May 15 of each year beginning with the first May 15 after the Issue Date and for so long as Notes remain outstanding, the Trustee shall send to each Holder a brief report dated as of such date that complies with TIA § 313(a).

A copy of each report at the time it is sent to Holders shall be sent to the Issuer.

The Issuer shall promptly notify the Trustee if the Notes become listed or de-listed on any stock exchange and the Trustee shall comply with TIA § 313(d).

113

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

SECTION 7.7.    ***Compensation and Indemnity***.

The Issuer shall pay to the Trustee from time to time such compensation for its ordinary services as has been agreed to in writing signed by the Issuer and the Trustee. The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust. The Issuer shall reimburse the Trustee upon request for all reasonable out-of-pocket expenses incurred or made by it in connection with the performance of its duties under this Indenture. Such expenses shall include the reasonable fees and expenses of the Trustee's agents, counsel, accountants and experts. In the event that it should become necessary for the Trustee to perform extraordinary services, the Trustee shall be entitled to reasonable additional compensation therefor and to reimbursement for reasonable and necessary extraordinary expenses in connection therewith; *provided* that if such extraordinary services or extraordinary expenses are occasioned by the negligence or willful misconduct of the Trustee it shall not be entitled to compensation or reimbursement therefore.

The Issuer and the Subsidiary Guarantors shall indemnify each of the Trustee (or any predecessor Trustee) and its agents, employees, stockholders, Affiliates and directors and officers for, and hold them each harmless against, any and all loss, liability, damage, claim or expense (including reasonable fees and expenses of counsel), including taxes (other than taxes based on the income of the Trustee) incurred by them except for such actions to the extent caused by any negligence, bad faith or willful misconduct on their part, arising out of or in connection with the acceptance or administration of this Indenture including the reasonable costs and expenses of defending themselves against any claim or liability in connection with the exercise or performance of any of their rights, powers or duties under this Indenture. The Trustee shall notify the Issuer promptly of any claim asserted against the Trustee for which it may seek indemnity. At the Trustee's sole discretion, the Issuer or such Subsidiary Guarantor shall defend the claim and the Trustee shall cooperate and may participate in the defense; *provided*, *however*, that any settlement of a claim shall be approved in writing by the Trustee if such settlement would result in an admission of liability by the Trustee or if such settlement would not be accompanied by a full release of the Trustee for all liability arising out of the events giving rise to such claim.

Alternatively, the Trustee may at its option have separate counsel of its own choosing and the Issuer shall pay the reasonable fees and expenses of such counsel.

To secure the Issuer's and the Subsidiary Guarantors' payment obligations in this Section 7.7, the Trustee shall have a Lien prior to the Notes on all assets or money held or collected by the Trustee, in its capacity as Trustee, except assets or money held in trust to pay principal of or premium, if any, or interest on particular Notes.

When the Trustee incurs expenses or renders services after an Event of Default specified in Section 6.1(7) occurs, such expenses and the compensation for such services are intended to constitute expenses of administration under any Bankruptcy Law.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

The provisions of this Section 7.7 shall survive the discharge of this Indenture or the earlier resignation or removal of the Trustee.

SECTION 7.8.    ***Replacement of Trustee***.

The Trustee may resign at any time by so notifying the Issuer. The Holders of a majority in principal amount of the outstanding Notes may remove the Trustee and appoint a successor Trustee with the Issuer's consent by so notifying the Issuer and the Trustee. The Issuer may remove the Trustee if:

(1)    the Trustee fails to comply with Section 7.10;

(2)    the Trustee is adjudged bankrupt or insolvent;

(3)    a receiver or other public officer takes charge of the Trustee or its property; or

(4)    the Trustee becomes incapable of acting.

If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Issuer shall notify each Holder of such event and shall promptly appoint a successor Trustee. Within one year after the successor Trustee takes office, the Holders of a majority in aggregate principal amount of the outstanding Notes may appoint a successor Trustee to replace the successor Trustee appointed by the Issuer.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Issuer. Immediately after that, the retiring Trustee shall transfer all property held by it as Trustee to the successor Trustee, provided all sums owing to the Trustee hereunder have been paid and subject to the Lien provided in Section 7.7, the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture. The Issuer shall send notice of such successor Trustee's appointment to each Holder.

If a successor Trustee does not take office within 30 days after the retiring Trustee resigns or is removed, the retiring Trustee, the Issuer or the Holders of at least 10% in aggregate principal amount of the outstanding Notes may petition any court of competent jurisdiction for the appointment of a successor Trustee.

If the Trustee, after written notice by any Holder of a Note who has been a Holder of a Note for at least six months, fails to comply with Section 7.10, such Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

Notwithstanding any resignation or replacement of the Trustee pursuant to this Section 7.8, the Issuer's and the Subsidiary Guarantors' obligations under Section 7.7 shall continue for the benefit of the retiring Trustee.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

SECTION 7.9.    *Successor Trustee by Merger, Etc.*

If the Trustee consolidates with, merges or converts into, or sells or transfers all or substantially all of its corporate trust business to, another corporation or banking association, the resulting, surviving or transferee corporation or banking association without any further act shall, if such resulting, surviving or transferee corporation or banking association is otherwise eligible under this Indenture, be the successor Trustee; *provided*, *however*, that such corporation shall be otherwise qualified and eligible under this Article VII.

SECTION 7.10.    *Eligibility; Disqualification.*

There shall at all times be a Trustee hereunder that is a corporation organized and doing business under the laws of the United States of America or of any state thereof that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities and that has a combined capital and surplus of at least $50,000,000 as set forth in its most recent published annual report of condition.

This Indenture shall always have a Trustee who satisfies the requirements of TIA §§ 310(a)(1), (2) and (5). The Trustee is subject to TIA § 310(b).

SECTION 7.11.    *Preferential Collection of Claims Against the Issuer.*

The Trustee shall comply with TIA § 311(a), excluding any creditor relationship listed in TIA § 311(b). A Trustee who has resigned or been removed shall be subject to TIA § 311(a) to the extent indicated therein. The provisions of TIA § 311 shall apply to the Issuer, as obligor on the Notes.

SECTION 7.12.    *Force Majeure.*

In no event shall the Trustee be liable for any failure or delay in the performance of its obligations under this Indenture because of circumstances beyond the Trustee's control, including, but not limited to, acts of God, flood, war (whether declared or undeclared), terrorism, fire, riot, embargo, government action, including any laws, ordinances, regulations, governmental action or the like which delay, restrict or prohibit the providing of the services contemplated by this Indenture.

SECTION 7.13.    *Defaults and Events of Default.*

The Trustee shall not be required to take notice or be deemed to have notice of any Default, except failure of the Issuer to cause to be made any of the payments required to be made to the Trustee, unless the Trustee shall be specifically notified by a writing of such Default by the Issuer or by the Holders of at least 25% in aggregate principal amount of all Notes then outstanding delivered to the Corporate Trust Office of the Trustee and, in the absence of such notice so delivered, the Trustee may conclusively assume no Default exists.

116

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

ARTICLE VIII.

DISCHARGE OF INDENTURE; DEFEASANCE

SECTION 8.1.     ***Termination of Issuer's Obligations***.

This Indenture will be discharged and will cease to be of further effect (except as to surviving rights of registration of transfer or exchange of the Notes, as expressly provided for in this Indenture) as to all outstanding Notes when (a) either (i) all the Notes, theretofore authenticated (except lost, stolen or destroyed Notes that have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Issuer and thereafter repaid to the Issuer or discharged from such trust) have been delivered to the Trustee for cancellation or (ii) all Notes not theretofore delivered to the Trustee for cancellation have become due and payable or will become due and payable within one year by reason of the giving of a notice of redemption or otherwise and the Issuer or any Subsidiary Guarantor has irrevocably deposited or caused to be irrevocably deposited with the Trustee as trust funds in trust solely for such purpose, cash in U.S. dollars, U.S. Government Obligations, or a combination thereof, in such amounts as will be sufficient in the opinion of a nationally recognized investment banking firm, appraisal firm or firm of independent public accountants without consideration of any reinvestment of interest, to pay and discharge the entire Indebtedness on the Notes not theretofore delivered to the Trustee for cancellation, for principal of, premium, if any, and interest on the Notes to the date of maturity or redemption together with irrevocable instructions from the Issuer directing the Trustee to apply such funds to the payment thereof at maturity or redemption, as the case may be; (b) the Issuer has paid all other sums payable under this Indenture by the Issuer; and (c) the Issuer has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel stating that all conditions precedent under this Indenture relating to the satisfaction and discharge of this Indenture have been complied with; *provided*, *however*, that such counsel may rely, as to matters of fact, on a certificate or certificates of officers of the Issuer.

The Issuer may, at its option and at any time, elect to have its obligations and the corresponding obligations of the Subsidiary Guarantors discharged with respect to the outstanding Notes and Subsidiary Guarantees ("Legal Defeasance"). Such Legal Defeasance means that the Issuer shall be deemed to have paid and discharged the entire Indebtedness represented by the outstanding Notes, and satisfied all of its obligations with respect to the Notes, except for: (1) the rights of Holders to receive payments in respect of the principal of, premium, if any, and interest on the Notes when such payments are due, (2) the Issuer's obligations with respect to the Notes concerning issuing temporary Notes, registration of Notes, mutilated, destroyed, lost or stolen Notes and the maintenance of an office or agency for payments, (3) the rights, powers, trust, duties and immunities of the Trustee under this Indenture and the Issuer's and the Subsidiary Guarantors' obligations in connection therewith and (4) the Legal Defeasance provisions of this Section 8.1. In addition, the Issuer may, at its option and at any time, elect to terminate its obligations with respect to covenants contained in Sections 4.4, 4.5, 4.8 and 4.10 through 4.20 and the operation of clauses (6), (7) (with respect to Significant

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Subsidiaries), (8) and (9) of Section 6.1 and the limitations described in clause (3) of the first paragraph of Section 5.1 ("Covenant Defeasance") and thereafter any omission to comply with such obligations shall not constitute a Default or Event of Default with respect to the Notes. The Issuer may exercise its Legal Defeasance option notwithstanding its prior exercise of its Covenant Defeasance option. In the event of Legal Defeasance, payment of the Notes may not be accelerated because of an Event of Default with respect thereto. In the event of Covenant Defeasance, payment of the Notes may not be accelerated because of an Event of Default specified in clause (4), (5), (6), (7) (with respect to Significant Subsidiaries), (8) or (9) of Section 6.1 or because of the failure of the Issuer to comply with clause (3) of the first paragraph of Section 5.1.

In order to exercise either Legal Defeasance or Covenant Defeasance:

(1)    the Issuer must irrevocably deposit with the Trustee, in trust, for the benefit of the Holders cash in United States dollars, non-callable U.S. Government Obligations, or a combination thereof, in such amounts as will be sufficient, in the opinion of a nationally recognized investment banking firm, appraisal firm or firm of independent public accountants, without consideration of any reinvestment of interest, to pay the principal of, premium, if any, and interest, if any, on the Notes on the stated date for payment thereof or on the applicable Redemption Date, as the case may be;

(2)    in the case of Legal Defeasance, the Issuer shall have delivered to the Trustee an Opinion of Counsel in the United States reasonably acceptable to the Trustee confirming that (a) the Issuer has received from, or there has been published by, the Internal Revenue Service a ruling or (b) since the date of this Indenture, there has been a change in the applicable U.S. federal income tax law, in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, the beneficial owners of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Legal Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(3)    in the case of Covenant Defeasance, the Issuer shall have delivered to the Trustee an Opinion of Counsel in the United States reasonably acceptable to the Trustee confirming that the beneficial owners of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Covenant Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(4)    no Default or Event of Default, of which the Trustee is deemed to have notice, shall have occurred and be continuing on the date of such deposit or insofar as Events of Default under Section 6.1(7) from bankruptcy or insolvency events are concerned, at any time in the period ending on the 91st day after the date of deposit;

118

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(5)      such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a default under this Indenture or any other agreement or instrument to which the Issuer or any of its Restricted Subsidiaries is a party or by which the Issuer or any of its Restricted Subsidiaries is bound;

(6)      the Issuer shall have delivered to the Trustee (x) an Officers' Certificate stating that no Default or Event of Default has occurred and is continuing and that the deposit was not made by the Issuer with the intent of preferring the Holders over any other creditors of the Issuer or with the intent of defeating, hindering, delaying or defrauding creditors of the Issuer;

(7)      the Issuer shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent provided for or relating to the Legal Defeasance or the Covenant Defeasance, as the case may be, have been complied with; *provided*, *however*, that such counsel may rely, as to matters of fact, on a certificate or certificates of officers of the Issuer; and

(8)      the Issuer shall have delivered to the Trustee an Opinion of Counsel to the effect that after the 91st day following the deposit, the trust funds will not be subject to the effect of any applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally; *provided*, *however*, that such counsel may rely, as to matters of fact, on a certificate or certificates of officers of the Issuer.

SECTION 8.2.      ***Application of Trust Money***.

The Trustee or Paying Agent shall hold in trust U.S. Legal Tender or U.S. Government Obligations deposited with it pursuant to Section 8.1, and shall apply the deposited U.S. Legal Tender and the money from U.S. Government Obligations in accordance with this Indenture to the payment of the principal of, premium, if any, and interest on the Notes. The Trustee shall be under no obligation to invest said U.S. Legal Tender or U.S. Government Obligations except as it may agree in writing with the Issuer.

The Issuer and the Subsidiary Guarantors shall pay jointly and severally and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the U.S. Legal Tender or U.S. Government Obligations deposited pursuant to Section 8.1 or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of outstanding Notes.

SECTION 8.3.      ***Repayment to the Issuer***.

Subject to Section 8.1, the Trustee and the Paying Agent shall promptly pay to the Issuer upon request any excess U.S. Legal Tender or U.S. Government Obligations held by them at any time and thereupon shall be relieved from all liability with respect to such money. The Trustee and the Paying Agent shall pay to the Issuer upon request any money held by them for the payment of principal, interest or premium, if any, that remains unclaimed for one year; *provided*, *however*, that the Trustee or such Paying Agent, before being required to make any payment,

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

may at the expense of the Issuer cause to be published once in a newspaper of general circulation in the City of New York or mail to each Holder entitled to such money notice that such money remains unclaimed and that after a date specified therein which shall be at least 30 days from the date of such publication or mailing any unclaimed balance of such money then remaining will be repaid to the Issuer. After payment to the Issuer, Holders entitled to such money must look to the Issuer for payment as general creditors unless an applicable law designates another Person.

SECTION 8.4.    *Reinstatement*.

If the Trustee or Paying Agent is unable to apply any U.S. Legal Tender or U.S. Government Obligations in accordance with Section 8.1 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's and the Subsidiary Guarantors' obligations under this Indenture and the Notes and the Subsidiary Guarantees shall be revived and reinstated as though no deposit had occurred pursuant to Section 8.1 until such time as the Trustee or Paying Agent is permitted to apply all such U.S. Legal Tender or U.S. Government Obligations in accordance with Section 8.1; *provided*, *however*, that if the Issuer has made any payment of interest or premium, if any, on or principal of any Notes because of the reinstatement of its obligations, the Issuer shall be subrogated to the rights of the Holders of such Notes to receive such payment from the U.S. Legal Tender or U.S. Government Obligations held by the Trustee or Paying Agent.

SECTION 8.5.    *Acknowledgment of Discharge by Trustee*.

After (i) the conditions of Section 8.1 have been satisfied, (ii) the Issuer has paid or caused to be paid all other sums payable under this Indenture by the Issuer and (iii) the Issuer has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent referred to in clause (i) of this Section 8.5 relating to the satisfaction and discharge of this Indenture have been complied with, the Trustee upon request shall acknowledge in writing the discharge of the Issuer's obligations under this Indenture except for (x) the Issuer's and the Subsidiary Guarantors' obligations in connection with the rights, powers, trust, duties and immunities of the Trustee under this Indenture and (y) those surviving obligations specified in Section 7.7 and Section 8.1; *provided* the legal counsel delivering such Opinion of Counsel may rely as to matters of fact on one or more Officers' Certificates of the Issuer.

ARTICLE IX.

MODIFICATION OF THE INDENTURE

SECTION 9.1.    *Without Consent of Holders*.

Without the consent of any Holder, the Issuer, the Subsidiary Guarantors and the Trustee may amend this Indenture and the Notes to:

(1)    cure any ambiguity, omission, defect, mistake or inconsistency;

120

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(2)     provide for the assumption by a successor corporation of the obligations of the Issuer or any Subsidiary Guarantor under this Indenture;

(3)     provide for uncertificated Notes of any series in addition to or in place of certificated Notes (*provided* that such uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code);

(4)     add Guarantees with respect to the Notes, including Subsidiary Guarantees, or release a Subsidiary Guarantor from its Subsidiary Guarantee and terminate such Subsidiary Guarantee; *provided*, *however*, that the release and termination is in accord with the applicable provisions of this Indenture;

(5)     secure the Notes or Subsidiary Guarantees;

(6)     add to the covenants of the Issuer or a Subsidiary Guarantor for the benefit of the Holders or surrender any right or power conferred upon the Issuer or a Subsidiary Guarantor;

(7)     make any change that does not adversely affect the rights of any Holder;

(8)     comply with any requirement of the SEC in connection with the qualification of this Indenture under the TIA;

(9)     modify this Indenture solely for the purpose of providing for the removal of the Private Placement Legend on any Note and to allow for the transfer of a Definitive Note or a beneficial interest in a global Note to a Note that has an unrestricted CUSIP number, in each case in accordance with applicable securities laws;

(10)     provide for the succession of a successor Trustee; *provided* that the successor Trustee is otherwise qualified and eligible to act as such under this Indenture;

(11)     in connection with any Share Exchange Event, provide that the Notes are convertible into Reference Property, subject to the provisions of Section 10.12, and make such related changes to the terms of the Notes to the extent expressly required by Section 10.12; or

(12)     issue PIK Notes.

SECTION 9.2.     ***With Consent of Holders***.

Except as provided in Section 9.1 or this Section 9.2, modifications and amendments of this Indenture, the Notes and the Subsidiary Guarantees may be made with the consent of the Holders of a majority in principal amount of the Notes then outstanding (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes) and, except as provided in Section 9.1 or this Section 9.2, any past Default or compliance with any provisions may be waived with the consent of the Holders of a majority in principal amount of the Notes then outstanding (including, without limitation, consents obtained

121

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

in connection with a purchase of, or tender offer or exchange offer for, Notes). However, without the consent of each Holder of an outstanding Note affected, no amendment may:

(1)      reduce the principal amount of Notes whose Holders must consent to an amendment, supplement or waiver;

(2)      reduce the stated rate of or extend the stated time for payment of interest on any Note;

(3)      reduce the principal of or extend the Stated Maturity of any Note;

(4)      make any change to the covenants described in Section 4.15 after the occurrence of a Change of Control, or make any change to the provisions relating to an Asset Disposition Offer that has been made, in each case whether through an amendment or waiver of provisions in the covenants, definitions or otherwise;

(5)      make any Note payable in money other than that stated in the Note;

(6)      impair the right of any Holder to receive payment of, premium, if any, principal of and interest on such Holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such Holder's Notes;

(7)      make any change in the amendment provisions which require each Holder's consent or in the waiver provisions;

(8)      modify the Subsidiary Guarantees in any manner adverse to the holders of the Notes;

(9)      make any change to or modify the ranking of the Notes that would adversely affect the Holders or

(10)      amend, change or modify the obligation of the Issuer to make and consummate a Change of Control Offer or to convert the Notes into New Common Stock at maturity or in the event of a Change of Control following maturity or after such Change of Control has occurred, including, amending, changing or modifying any definition relating thereto.

Notwithstanding the foregoing, the provisions under this Indenture relative to the Issuer's obligation to make an offer to repurchase the Notes as a result of a Change of Control may be waived or modified or terminated with the written consent of the Holders of a majority in principal amount of the Notes then outstanding (including consents obtained in connection with a tender offer or exchange offer for the Notes) prior to the occurrence of such Change of Control.

The consent of the Holders is not necessary under this Indenture to approve the particular form of any proposed amendment. It is sufficient if such consent approves the substance of the proposed amendment. A consent to any amendment or waiver under this Indenture by any

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Holder given in connection with a tender of such Holder's Notes will not be rendered invalid by such tender. After an amendment under this Indenture becomes effective, the Issuer is required to send to the Holders a notice briefly describing such amendment. However, failure to give such notice to all the Holders, or any defect in such notice, will not impair or affect the validity of the amendment.

SECTION 9.3.     *[Reserved]*.

SECTION 9.4.     ***Revocation and Effect of Consents***.

Until an amendment, waiver or supplement becomes effective, a consent to it by a Holder is a continuing consent by the Holder and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note. Subject to the following paragraph, any such Holder or subsequent Holder may revoke the consent as to such Holder's Note or portion of such Note by notice to the Trustee or the Issuer received before the date on which the Trustee receives an Officers' Certificate certifying that the Holders of the requisite principal amount of Notes have consented (and not theretofore revoked such consent) to the amendment, supplement or waiver. An amendment, supplement or waiver becomes effective upon receipt by the Trustee of such Officers' Certificate and evidence of consent by the Holders of the requisite percentage in principal amount of outstanding Notes.

The Issuer may, but shall not be obligated to, fix a Record Date for the purpose of determining the Holders entitled to consent to any amendment, supplement or waiver, which Record Date shall be at least 30 days prior to the first solicitation of such consent. If a Record Date is fixed, then notwithstanding the second sentence of the immediately preceding paragraph, those Persons who were Holders at such Record Date (or their duly designated proxies), and only those Persons, shall be entitled to revoke any consent previously given, whether or not such Persons continue to be Holders after such Record Date. No such consent shall be valid or effective for more than 90 days after such Record Date unless consents from Holders of the requisite percentage in principal amount of outstanding Notes required under this Indenture for the effectiveness of such consents shall have also been given and not revoked within such 90 day period.

SECTION 9.5.     ***Notation on or Exchange of Notes***.

If an amendment, supplement or waiver changes the terms of a Note, the Trustee may require the Holder of such Note to deliver it to the Trustee. The Trustee may place an appropriate notation on the Note about the changed terms and return it to the Holder. Alternatively, if the Issuer or the Trustee so determines, the Issuer in exchange for the Note shall issue and, upon receipt of an Authentication Order in accordance with Section 2.2 hereof, the Trustee shall authenticate a new Note that reflects the changed terms.

123

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

SECTION 9.6.    ***Trustee To Sign Amendments, Etc*.**

The Trustee shall execute any amendment, supplement or waiver authorized pursuant to this Article IX; *provided*, *however*, that the Trustee may, but shall not be obligated to, execute any such amendment, supplement or waiver which affects the Trustee's own rights, duties or immunities under this Indenture. In executing such amendment, supplement or waiver the Trustee shall be entitled to receive indemnity satisfactory to it, and shall be fully protected in relying upon an Opinion of Counsel and an Officers' Certificate of the Issuer stating that no Event of Default shall occur as a result of such amendment, supplement or waiver and that the execution of such amendment, supplement or waiver is authorized or permitted by this Indenture; *provided* the legal counsel delivering such Opinion of Counsel may rely as to matters of fact on one or more Officers' Certificates of the Issuer. Such Opinion of Counsel shall not be an expense of the Trustee.

ARTICLE X.

CONVERSION

SECTION 10.1.    ***Voluntary Conversion Privilege***

Subject to the provisions of this Indenture, each Holder of a Note shall have the right, at such Holder's option, at any time prior to the close of business on the Business Day immediately preceding the Maturity Date to voluntarily convert such Note (for the avoidance of doubt, together with any accrued and unpaid interest thereon to, but not including, the Conversion Date, and any previously paid PIK Interest) into shares of New Common Stock. Any such conversion must be in respect of a principal amount of Notes that is an integral multiple of $1.00. For the avoidance of doubt, in no event will any Converting Amount include any Interest Make-Whole Premium, and no Interest Make-Whole Premium shall be directly or indirectly payable upon any conversion.

The total number of shares of New Common Stock that shall be issuable upon conversion of a Note shall be determined by multiplying (a) 0.001 times (b) the sum of (x) principal amount of the Note or portion thereof surrendered for conversion (including all interest that has been previously paid in kind by increasing the principal amount of such Note), plus (y) the amount of any accrued and unpaid interest thereon to, but not including, the Conversion Date, plus (z) the Interest Make-Whole Premium with respect to such Note, if any (such sum, the "Converting Amount") times (c) the applicable Conversion Rate for shares of New Common Stock in effect on the Conversion Date. In the event that a conversion of a Note results in fractional shares of New Common Stock, the Issuer may, at its option, (i) issue such fractional shares, (ii) pay cash in lieu of issuing such fractional shares (such cash payment to be equal to the product of (x) such fraction of a share of New Common Stock and (y) the fair market value of a share of New Common Stock on the applicable Conversion Date as determined in good faith by the Issuer) or (iii) round the number of shares to be issued to the nearest whole number with no consideration paid for any fractional shares so eliminated.

124

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

A Note in respect of which a Holder has exercised the option of such Holder to require the Issuer to repurchase such Note pursuant to a Change of Control Offer may be converted only if such Holder withdraws such Note from such Change of Control Offer in accordance with the terms of such Change of Control Offer and complies in respect of such Note with the conversion procedures specified in Section 10.2.

Following conversion of any portion of the principal amount of a Note (including all interest that has been previously paid in kind by increasing the principal amount of such Note), the Holder thereof shall not receive in respect of such portion (i) any additional cash or PIK Interest Payment, (ii) any Interest Make-Whole Premium or (iii) any other rights in respect thereof.

SECTION 10.2.    ***Conversion Procedure***

To convert a Note, a Holder must (i) complete, manually sign and deliver a medallion-stamped guaranteed irrevocable conversion notice in the form as set forth on the back of the Note (a "Notice of Conversion") to the Conversion Agent, (ii) surrender the Note to the Conversion Agent, (iii) with respect to any converting Holders or recipient of shares of New Common Stock issuable upon such conversion that are not already party to the Stockholders Agreement, deliver to the Issuer a duly completed and executed Joinder Agreement, pursuant to which such Holder or recipient, as the case may be, agrees to be bound by, and acknowledges that all New Common Stock issued upon such exercise will be subject to, the terms and conditions of the Stockholders Agreement, (iv) furnish appropriate endorsements and transfer documents if required by the Registrar or the Conversion Agent and (v) pay any transfer or other tax, if required by Section 10.4; *provided*, *however*, if the Note is held in book-entry form, then such Holder must surrender the Note to the Conversion Agent, and complete and deliver to the Registrar or the Depository, as the case may be, appropriate instructions pursuant to the Applicable Procedures. The Issuer may refuse to deliver the certificates (or book-entry evidence) representing the shares of New Common Stock being issued in a name other than the Holder's name until the Issuer receives a sum sufficient to pay any tax that is due by such Holder and a Joinder Agreement in accordance with the immediately preceding sentence.

[Any date on which a converting Holder satisfies all of the foregoing requirements shall be referred to as a "Fulfillment Date." The Trustee (and if different, the Conversion Agent) shall notify the Issuer of any conversion pursuant to this Article X on the Fulfillment Date for such conversion.  Except as permitted by the Catch-Up Mechanism (as defined below), any conversion of Notes requested by a converting Holder pursuant to this Section 10.2 shall not be deemed effective until twenty-five (25) days following the applicable Fulfillment Date (the "Conversion Date").  Following receipt of a Notice of Conversion and satisfaction of the foregoing requirements, the Issuer shall cause to be filed with the Trustee and the Conversion Agent and to be sent to each other Holder, as promptly as practical but in any event no later than seven (7) days after the applicable Fulfillment Date, a notice, which may be in the form of an Officers' Certificate, stating (A) that a Holder has converted Notes pursuant to this Article X, (B) a fraction, expressed as a percentage, the numerator of which is the principal amount of Notes

125

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

being converted by the converting Holder and the denominator of which is the principal amount of Notes held by the converting Holder and, to the extent known to the Issuer, the converting Holder's Affiliates on the applicable Fulfillment Date (the "Applicable Percentage"), (C) the applicable Conversion Rate, (D) the Converting Amount of the converted Notes and the calculation thereof, (E) the total number of shares of New Common Stock issuable upon conversion with respect to the Converting Amount of the convert Notes and (F) the Conversion Date.  [Each Holder (other than the Holder whose conversion was the subject of the notice given pursuant to the preceding sentence) that satisfies the conditions set forth in the first sentence of this Section 10.2 by 5:00 p.m. Eastern time on the date that is five (5) days prior to such Conversion Date set forth in such notice from the Issuer shall be permitted to convert, and, notwithstanding anything to the contrary in this Indenture, such conversion shall be effective on such Conversion Date, a Converting Amount relating to principal amount of Notes of not more than the product of (1) such Holder's principal amount of outstanding Notes on the applicable Fulfillment Date and (2) the Applicable Percentage (the "Allowed Notes") (the procedure set forth in this sentence, the "Catch-Up Mechanism").]  To the extent a Holder desires to convert more than the Allowed Notes (such difference, the "Excess Notes"), such Excess Notes may be converted only by following the procedures set forth in this Section 10.2 (which will result in a later Fulfillment Date and a later Conversion Date with respect to the Excess Notes, and will cause other Holders to be provided an opportunity to convert a proportionate share of Notes on such later Conversion Date by utilizing the Catch-Up Mechanism, it being understood that all Holders shall have the opportunity to utilize the Catch-Up Mechanism with respect to a proportionate amount of Notes being converted on any particular Conversion Date until five (5) days before such Conversion Date).][19]

As soon as practicable, but in no event more than seven (7) Business Days after a Conversion Date, the Issuer shall deliver to the converting Holder or Holders book-entry notations or physical certificates, as applicable, of the number of shares of New Common Stock issuable upon the conversion in satisfaction of the Issuer's conversion obligation pursuant to this Indenture.

If a Holder converts more than one Note at the same time, the number of shares of New Common Stock issuable upon the conversion shall be based on the Converting Amount for all Notes converted by such Holder.

Upon surrender of a Note that is converted in part, the Issuer shall execute, and the Trustee shall, upon receipt of an Authentication Order, authenticate and deliver to the Holder, a new Note equal in aggregate principal amount to the unconverted portion of the principal amount of the Note surrendered.

Upon the conversion of an interest in a Global Note, the Trustee shall make a notation on such Global Note as to the reduction in the principal amount represented thereby. The Issuer

---

[19] NTD: Under review.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

shall notify the Trustee in writing of any conversion of Notes effected through any Conversion Agent other than the Trustee.

The Person in whose name any shares of New Common Stock shall be issuable upon conversion shall be treated as a stockholder of record of such shares as of the close of business on the relevant Conversion Date.

SECTION 10.3.    ***Mandatory Conversion***

All outstanding Notes shall automatically convert to Common Stock at the election of the Holders of a majority of the then outstanding principal amount of the Notes as if the "Conversion Date" for such Notes is the date the Issuer receives notice of such election from the requisite Holders (with a copy to the Trustee and the Conversion Agent). The Issuer shall promptly forward such notice to the Holders.

SECTION 10.4.    ***Taxes on Conversion***

Upon conversion of a Note, the Issuer shall pay any documentary, stamp or similar issue or transfer tax due on the issue of shares of New Common Stock upon such conversion. However, the converting Holder shall pay any such tax which is due because such Holder requests the shares of New Common Stock to be issued in a name other than the Holder's name. The Issuer may refuse to deliver the shares of New Common Stock being issued in a name other than the Holder's name until the Issuer receive a sum sufficient to pay any tax which will be due because the shares of New Common Stock are to be issued in a name other than the Holder's name. Nothing in this Section 10.4 or elsewhere in this Indenture shall preclude any tax withholding required by law or regulations.

SECTION 10.5.    ***Issuer to Provide Shares of New Common Stock***

The Issuer shall from time to time as may be necessary, reserve, out of its authorized but unissued shares of New Common Stock a sufficient number of shares of New Common Stock to permit the conversion of all outstanding Notes and accrued and unpaid interest thereon for shares of New Common Stock.

The Issuer covenants that all shares of New Common Stock delivered upon conversion of the Notes shall be newly issued shares of New Common Stock, shall be duly authorized, validly issued, fully paid and non-assessable and shall be free from preemptive rights and free of any lien or adverse claim.

The Issuer will endeavor promptly to comply with all federal and state securities laws regulating to the offer and delivery of shares of New Common Stock upon conversion of Notes, if any, and will list or cause to be approved for listing or included for quotation, as the case may be, such shares of New Common Stock on each national securities exchange or in the over-the-counter market or such other market on which the shares of New Common Stock are then listed or quoted, if any.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

SECTION 10.6.    *__Subdivision or Combination of Shares of New Common Stock__*

In case the Issuer shall at any time subdivide its outstanding shares of New Common Stock into a greater number of shares of New Common Stock, exclusively issue shares of New Common Stock as a dividend or distribution on shares of the New Common Stock or combine its outstanding shares of New Common Stock into a smaller number of shares of New Common Stock, the Conversion Rate in effect immediately prior to such subdivision, dividend or combination shall be appropriately adjusted in a manner deemed equitable by the Board of Directors. Notwithstanding anything to the contrary in this Indenture or otherwise, the Conversion Rate shall not be adjusted upon the issuance of any shares of New Common Stock or options or rights to purchase those shares pursuant to any present or future employee, management, director or consultant benefit plan or program of or assumed by the Issuer or any of the Issuer's Subsidiaries.

SECTION 10.7.    *__Calculations__*.    All calculations and other determinations under this Article X shall be made by the Issuer and shall be made to the nearest one-ten thousandth (1/10,000th) of a share.

SECTION 10.8.    *__Adjustment for Tax Purposes__*.    The Issuer shall be entitled to make such increases in the Conversion Rate, in addition to any adjustments made pursuant to Section 10.6, as the Board of Directors considers to be advisable in order to avoid or diminish income tax to beneficial owners of Common Stock or rights to purchase shares of Common Stock in connection with a dividend or a distribution of shares (or rights to acquire shares) or similar event.

SECTION 10.9.    [Reserved.]

SECTION 10.10.    [Reserved.]

SECTION 10.11.    *__Notice of Adjustment__*

Whenever the Conversion Rate is adjusted, the Issuer shall promptly file with the Trustee and any Conversion Agent an Officers' Certificate setting forth the Conversion Rate after such adjustment and setting forth a brief statement of the facts requiring such adjustment. Unless and until a Responsible Officer of the Trustee and the Conversion Agent shall have received such Officers' Certificate at the Corporate Trust Office of the Trustee, neither the Trustee nor the Conversion Agent shall be deemed to have knowledge of any adjustment of the Conversion Rate and may assume without inquiry that the last Conversion Rate of which it has knowledge are still in effect. Promptly after delivery of such Officers' Certificate, the Issuer shall prepare a notice of such adjustment of the Conversion Rate setting forth the adjusted Conversion Rate and the date on which each adjustment becomes effective and shall send such notice of such adjustment of the Conversion Rate to each Holder, within 20 days after execution thereof. Failure to deliver such notice shall not affect the legality or validity of any such adjustment.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

SECTION 10.12.  *Notice of Certain Transactions*

In case:

(a)      the Issuer shall declare a dividend (or any other distribution) on its shares of New Common Stock, other than a Permitted Payments to Parent; or

(b)      the Issuer shall declare the granting to the holders of its shares of New Common Stock, of rights, warrants or options to subscribe for or purchase any share of any class or any other rights, warrants or options; or

(c)      of any reclassification of the shares of New Common Stock (other than a subdivision or combination of outstanding shares of New Common Stock), or of any consolidation, merger, or equity exchange to which the Issuer is a party and for which approval of any equity holders of the Issuer is required, or of the sale or transfer of all or substantially all of the assets of the Issuer; or

(d)      of the voluntary or involuntary dissolution, liquidation or winding-up of the Issuer;

then the Issuer shall cause to be filed with the Trustee and the Conversion Agent and to be sent to each Holder, as promptly as possible but in any event at least 30 days prior to the applicable date hereinafter specified, a written notice stating (x) the date on which a record is to be taken for the purpose of such dividend, distribution or granting of rights, warrants or options, or, if a record is not to be taken, the date as of which the holders of shares of New Common Stock of record to be entitled to such dividend, distribution or grant of rights, warrants or options are to be determined, or (y) the date on which such reclassification, consolidation, merger, share exchange, sale, transfer, dissolution, liquidation or winding-up is expected to become effective or occur, and, if applicable, the date as of which it is expected that holders of shares of New Common Stock of record shall be entitled to exchange their shares of New Common Stock for securities or other property deliverable upon such reclassification, consolidation, merger, share exchange, sale, transfer, dissolution, liquidation or winding-up. Failure to give such notice, or any defect therein, shall not affect the legality or validity of such dividend, distribution, grant, reclassification, consolidation, merger, sale, share exchange, transfer, dissolution, liquidation or winding-up.  For the avoidance of doubt, delivery of such notice to the Trustee and the Conversion Agent is for informational purposes only, and neither the Trustee's nor Conversion Agent's receipt of such shall constitute constructive notice of any information contained therein or determinable from information contained therein.

SECTION 10.13.  *Effect of Reclassification, Consolidation, Merger, Share Exchange or Sale on Conversion Privilege*

If any of the following shall occur: (i) any reclassification or change of outstanding shares of New Common Stock (other than as a result of a subdivision or combination involving only shares of New Common Stock); (ii) any consolidation, combination, merger or share

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

exchange to which the Issuer is a party other than a merger in which the Issuer is the continuing Person and which does not result in any reclassification of, or change (other than as a result of a subdivision or combination involving only shares of New Common Stock) of or in outstanding shares of New Common Stock; (iii) any sale or conveyance of all or substantially all of the assets of the Issuer, then the Issuer, or such successor or purchasing Person; or (iv) any statutory share exchange, in each case, as a result of which the New Common Stock would be converted into, or exchanged for, stock, other securities, other property or assets (including cash or any combination thereof) (any such event, a "Share Exchange Event"), then, at and after the effective time of such Share Exchange Event, the right to convert each Note shall be changed into a right to convert such Note into the kind and amount of shares of stock, other securities or other property or assets that a holder of a number of shares of New Common Stock equal to the Conversion Rate immediately prior to such Share Exchange Event would have owned or been entitled to receive (the "Reference Property," with each "unit of Reference Property" meaning the kind and amount of Reference Property that a holder of one share of New Common Stock is entitled to receive) upon such Share Exchange Event and, prior to or at the effective time of such Share Exchange Event, the Issuer or the successor or purchasing Person, as the case may be, shall execute with the Trustee and deliver to the Trustee a supplemental indenture providing that, on such terms and subject to such conditions as shall be as nearly equivalent as may be practicable to the provisions set forth in this Indenture; *provided*, *however*, that at and after the effective time of the Share Exchange Event any shares of New Common Stock that the Issuer would have been required to deliver upon conversion of the Notes in accordance with Section 10.1 shall instead be deliverable in the amount and type of Reference Property that a holder of that number of shares of New Common Stock would have been entitled to receive in such Share Exchange Event.

If the Share Exchange Event causes the New Common Stock to be converted into, or exchanged for, the right to receive more than a single type of consideration (determined based in part upon any form of stockholder election), then (i) the Reference Property into which the Notes will be convertible shall be deemed to be the types and amounts of consideration actually received by the holders of New Common Stock, and (ii) the unit of Reference Property for purposes of the immediately preceding paragraph shall refer to the weighted average of the consideration referred to in clause (i) attributable to one share of New Common Stock. If the holders of the New Common Stock receive only cash in such Share Exchange Event, then for all conversions for which the relevant Conversion Date occurs after the effective date of such Share Exchange Event (A) the consideration due upon conversion of each Notes shall be solely cash in an amount equal to the Conversion Obligation in effect on the Conversion Date, multiplied by the price paid per share of New Common Stock in such Share Exchange Event and (B) the Issuer shall satisfy the Conversion Obligation by paying cash to converting Holders on or prior to the seventh Business Day immediately following the relevant Conversion Date. The Issuer shall notify Holders, the Trustee and the Conversion Agent (if other than the Trustee) of such weighted average as soon as practicable after such determination is made.

Such supplemental indenture described in the second immediately preceding paragraph shall provide for adjustments of the Conversion Rate which shall be as nearly equivalent as may

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

be practicable to the adjustments of the Conversion Rate provided for in this Article X. If, in the case of any such Share Exchange Event, the Reference Property includes shares of Capital Stock or other securities and property of a Person other than the successor or purchasing Person, as the case may be, in such reclassification, change, consolidation, combination, merger, share exchange, sale or conveyance, then such supplemental indenture shall also be executed by such other Person and shall contain such additional provisions to protect the interests of the Holders as the Board of Directors shall reasonably consider necessary by reason of the foregoing.

The provisions of this Section 10.12 shall similarly apply to successive reclassifications, changes, combinations, consolidations, mergers, share exchanges, sales or conveyances.

In the event the Issuer shall execute a supplemental indenture pursuant to this Section 10.12, the Issuer shall promptly file with the Trustee an Officers' Certificate briefly stating the reasons therefor, the kind or amount of shares of stock or securities or property (including cash) receivable by Holders upon the conversion of their Notes after any such reclassification, change, consolidation, combination, merger, share exchange, sale or conveyance, any adjustment to be made with respect thereto and that all conditions precedent have been complied with.

SECTION 10.14.  *Trustee's Disclaimer*

The Trustee and any Conversion Agent shall not at any time be under any duty to or have any responsibility to any Holder to determine or make any calculations in this Article X nor shall it or they have any duty to or responsibility to any Holder to determine when an adjustment under this Article X should be made, how it should be made or what such adjustment should be made or to confirm the accuracy of any such adjustment, but may accept as conclusive evidence of the correctness of any such adjustment, and shall be protected in relying upon, the Officers' Certificate with respect thereto which the Issuer are obligated to file with the Trustee pursuant to Section 10.10 or upon request therefor. The Trustee and any Conversion Agent shall not be accountable for and make no representation as to the validity or value (or the kind or amount) of any securities or assets or cash, that may at any time be issued upon conversion of Notes; and the Trustee and any Conversion Agent shall not be responsible for the Issuer's failure to comply with any provisions of this Article X. Neither the Trustee nor the Conversion Agent shall be responsible for any failure of the Issuer to make or calculate any cash payment or to issue, transfer or deliver any shares of New Common Stock or certificates or other securities or property or cash upon surrender of any Note for the purpose of conversion. The Issuer will make all calculations in good faith and, absent manifest error, its calculations will be final and binding on the Holders. The Trustee and/or Conversion Agent will forward such calculations to any Holder upon the request of such Holder. Each Conversion Agent (other than the Issuer or an Affiliate of the Issuer) shall have the same protection under this Section 10.13 as the Trustee.

The Trustee and any Conversion Agent shall not be under any responsibility to determine the correctness of any provisions contained in any supplemental indenture executed pursuant to Section 10.12, but may accept as conclusive evidence of the correctness thereof, and shall be protected in relying upon, the Officers' Certificate with respect thereto which the Issuer are

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

obligated to file with the Trustee pursuant to Section 10.12; provided, that the Trustee or Conversion Agent's conduct does not constitute willful misconduct or gross negligence.

The rights, privileges, protections, immunities and benefits given to the Trustee under this Indenture, including, without limitation, its right to be compensated, reimbursed, and indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, including its capacity as Conversion Agent.

SECTION 10.15.  *Voluntary Increase of the Conversion Rate*

The Issuer from time to time may increase the Conversion Rate by any amount for a period of at least twenty (20) days so long as the Board of Directors shall have made a determination that such increase would be in the best interests of the Issuer, which determination shall be conclusive. Whenever the Conversion Rate is increased  pursuant to this Section 10.14, a notice of the increase in the Conversion Rate must be disclosed in accordance with Section 10.10 and must be sent to Holders at least fifteen (15) days prior to the date the increased Conversion Rate takes effect, which notice shall state the increased Conversion Rate, and the period during which such Conversion Rate will be in effect.

SECTION 10.16.  *Simultaneous Adjustments*

If more than one event requiring adjustment pursuant to this Article 10 shall occur before completing the determination of the Conversion Rate for the first event requiring such adjustment, then the Board of Directors (whose determination shall be conclusive), shall make such adjustments to the Conversion Rate (and the calculation thereof) after giving effect to all such events as shall preserve for Holders the Conversion Rate protection provided in this Article 10.

ARTICLE XI.

COLLATERAL AND SECURITY

SECTION 11.1.  *Grant of Security Interest*

The due and punctual payment of the principal of, and interest or premium (including the Interest Make-Whole Premium) on the Notes when and as the same shall be due and payable, whether on an interest payment date, at maturity, by acceleration, repurchase, redemption or otherwise, and interest on the overdue principal of and interest or premium (including the Interest Make-Whole Premium) (to the extent permitted by law) on the Notes (including, but not limited to, all interest accrued or accruing (or which would, absent commencement of an insolvency or liquidation proceeding (and the effect of provisions such as Section 502(b)(2) of the Bankruptcy Law), accrue) after commencement of an insolvency or liquidation proceeding, whether or not the claim for such interest is allowed as a claim in such insolvency or liquidation proceeding), and performance of all other Note Obligations of the Issuer and the Guarantors to the Holders or the Trustee under this Indenture and the Notes, according to the terms hereunder

132

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

or thereunder, shall be secured by the Collateral, subject to any Intercreditor Agreement. Each Holder, by its acceptance of Notes, consents and agrees to the terms of any Intercreditor Agreement and the other Security Documents (including, without limitation, the provisions providing for foreclosure and release of Collateral) as the same may be in effect or may be amended, waived, supplemented or modified from time to time in accordance with its terms and authorizes and directs the Collateral Agent to enter into any Intercreditor Agreement and the other Security Documents and to perform its Note Obligations and exercise its rights thereunder in accordance therewith. At all times when the Trustee is not itself the Collateral Agent, the Issuer will deliver to the Trustee copies of all documents delivered to the Collateral Agent pursuant to the Security Documents. The Trustee and the Collateral Agent are hereby authorized to enter into the Security Documents, including any Intercreditor Agreement.

SECTION 11.2. ***Release of Collateral***

(a)      Subject to subsections (b), (c) and (d) of this Section 11.2, Collateral will be released from the Lien and security interest created by the Security Documents in accordance with the provisions of the Security Documents and under the following circumstances:

(i)      if any Subsidiary that is a Guarantor is released from its Note Guarantee pursuant to the terms of this Indenture, that Subsidiary Guarantor's assets will also be released from the Liens securing the Notes;

(ii)      pursuant to Section 9.2 hereof, with consent of Holders of the requisite percentage of the outstanding Notes;

(iii)      if required in accordance with the terms of any Intercreditor Agreement;

(iv)      if such Collateral becomes Excluded Assets or is permitted to be sold or disposed of pursuant to the terms of the Note Documents;

(v)      if the Issuer exercises its Legal Defeasance option or Covenant Defeasance option pursuant to Sections 8.1, 8.2 and 8.3 hereof;

(vi)      upon satisfaction and discharge of this Indenture or payment in full of all Note Obligations that are then due and payable pursuant to Section 13.1 hereof.

(b)      In addition, upon the request of the Issuer pursuant to an Officers' Certificate certifying that all conditions precedent hereunder have been met and stating whether or not such release is in connection with a sale or disposition of assets and (at the sole cost and expense of the Issuer) the Collateral Agent will release Collateral that is sold, conveyed or disposed of in compliance with the provisions of this Indenture.

(c)      Notwithstanding anything to the contrary contained herein, at any time the Trustee or Collateral Agent is requested to acknowledge or execute a release of Collateral, the Trustee and/or the Collateral Agent shall be entitled to receive an Officers' Certificate that,

133

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

unless such release is required to be made automatically pursuant to the terms of the relevant Security Document, all conditions precedent in this Indenture or the Security Documents to such release have been complied with. The Trustee may, to the extent permitted by Sections 7.1 and 7.2 hereof, accept as conclusive evidence of compliance with the foregoing provisions the appropriate statements contained in such documents. Upon receipt of such documents the Trustee and/or Collateral Agent shall execute, deliver or acknowledge any instruments of termination, satisfaction or release reasonably requested of it to evidence the release of any Collateral permitted to be released pursuant to this Indenture or the Security Documents.

SECTION 11.3.   *Authorization of Actions by the Trustee Under the Security Documents*

Subject to the provisions of Sections 7.1 and 7.2 hereof and the terms of any Intercreditor Agreement, the Trustee may, in its sole discretion and without the consent of Holders, direct, on behalf of the Holders, the Collateral Agent to take all actions it deems necessary or appropriate in order to:

(i)   enforce any of the terms of the Security Documents; and

(ii)   collect and receive any and all amounts payable in respect of the Note Obligations of the Issuer hereunder.

The Trustee will have power to institute and maintain such suits and proceedings as it may deem expedient to prevent any impairment of the Collateral by any acts that may be unlawful or in violation of the Security Documents or this Indenture, and such suits and proceedings as the Trustee may deem expedient to preserve or protect its interests and the interests of Holders in the Collateral (including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest hereunder or be prejudicial to the interests of Holders or of the Trustee).

SECTION 11.4.   *Authorization of Receipt of Funds by the Trustee Under the Security Documents*

The Trustee is authorized to receive any funds for the benefit of Holders distributed under the Security Documents, and to make further distributions of such funds to the Holders according to the provisions of this Indenture and the Security Documents.

SECTION 11.5.   *Termination of Security Interest*

Upon the payment in full of all obligations of the Issuer, or upon Legal Defeasance, the Trustee will, at the request of the Issuer, deliver a certificate to the Collateral Agent stating that such obligations have been paid in full, and instruct the Collateral Agent to release the Liens pursuant to this Indenture.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

SECTION 11.6.    ***Trustee's Duties with Respect to Collateral***

(a)    Beyond the exercise of reasonable care in the custody thereof, the Trustee shall have no duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and the Trustee shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral. The Trustee shall be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property and shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Trustee in good faith.

(b)    The Trustee shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence, bad faith or willful misconduct on the part of the Trustee, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of the Issuer to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Trustee shall have no duty to ascertain or inquire as to the performance or observance of any of the terms of this Indenture or the Security Documents.

ARTICLE XII.

MISCELLANEOUS

SECTION 12.1.    ***[Reserved]***.

SECTION 12.2.    ***Notices***.

Any notices or other communications required or permitted under this Indenture shall be in writing, and shall be sufficiently given if made by hand delivery, by telex, by telecopier or registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

if to the Issuer and/or any Subsidiary Guarantor:

c/o Chaparral Energy, Inc.
701 Cedar Lake Boulevard
Oklahoma City, OK 73114
Attn: General Counsel

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

if to the Trustee:

> Wilmington Savings Fund Society FSB
> 500 Delaware Avenue
> Wilmington, Delaware 19801
> Telecopier Number⊗302) 421-9137
> Attn: Geoffrey J. Lewis

The Issuer, the Subsidiary Guarantors and the Trustee by written notice to the other may designate additional or different addresses for notices to such Person. Any notice or communication to the Issuer or the Trustee shall be deemed to have been given or made as of the date so delivered if hand delivered; when receipt is acknowledged, if faxed; and five (5) calendar days after mailing if sent by registered or certified mail, postage prepaid (except that a notice of change of address shall not be deemed to have been given until actually received by the addressee).

Any notice or communication sent to a Holder shall be (x) mailed to him by first class mail or other equivalent means at his address as it appears on the registration books of the Registrar ten (10) days prior to such mailing and shall be sufficiently given to him if so mailed within the time prescribed or (y) sent as otherwise provided by the applicable procedures of DTC.

Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders. If a notice or communication is mailed in the manner provided above, it is duly given, whether or not the addressee receives it.

SECTION 12.3.   ***Communications by Holders with Other Holders*.**

Holders may communicate pursuant to TIA § 312(b) with other Holders with respect to their rights under this Indenture or the Notes. The Issuer, the Trustee, the Registrar and any other Person shall have the protection of TIA § 312(c).

SECTION 12.4.   ***Certificate and Opinion as to Conditions Precedent*.**

Upon any request or application by the Issuer and/or any Subsidiary Guarantor to the Trustee to take any action under this Indenture, the Issuer and/or any Subsidiary Guarantor shall furnish to the Trustee:

(1)      an Officers' Certificate, in form and substance satisfactory to the Trustee, stating that, in the opinion of the signers, all conditions precedent to be performed by the Issuer, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(2)      an Opinion of Counsel stating that, in the opinion of such counsel, all such conditions precedent to be performed by the Issuer, if any, provided for in this Indenture relating

136

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

to the proposed action have been complied with (which counsel, as to factual matters, may rely on an Officers' Certificate).

SECTION 12.5.    *__Statements Required in Certificate or Opinion__*.

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture, other than the Officers' Certificate required by Section 4.6, shall include:

(1)    a statement that the Person making such certificate or opinion has read such covenant or condition;

(2)    a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3)    a statement that, in the opinion of such Person, he has made such examination or investigation as is reasonably necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(4)    a statement as to whether or not, in the opinion of each such Person, such condition or covenant has been complied with.

SECTION 12.6.    *__Rules by Trustee, Paying Agent, Registrar__*.

The Trustee may make reasonable rules in accordance with the Trustee's customary practices for action by or at a meeting of Holders. The Paying Agent or Registrar may make reasonable rules for its functions.

SECTION 12.7.    *__Legal Holidays__*.

A "Legal Holiday" used with respect to a particular place of payment is a Saturday, a Sunday or a day on which commercial banking institutions in New York, New York or Dallas/Fort Worth, Texas or at such place of payment are authorized or required by law to close. If a payment date is a Legal Holiday at such place, payment may be made at such place on the next succeeding day that is not a Legal Holiday, and no interest shall accrue for the intervening period.

SECTION 12.8.    *__Governing Law__*.

THIS INDENTURE, THE NOTES AND THE SUBSIDIARY GUARANTEES SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. Each of the parties hereto agrees to submit to the jurisdiction of the courts of the State of New York in any action or proceeding arising out of or relating to this Indenture.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

SECTION 12.9.    *No Adverse Interpretation of Other Agreements*.

This Indenture may not be used to interpret another indenture, loan or debt agreement of the Issuer or any of its Subsidiaries. Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

SECTION 12.10.    *No Personal Liability*.

No director, officer, employee, incorporator or stockholder of the Issuer or director, officer, employee, incorporator or stockholder of any Subsidiary Guarantor, as such, shall have any liability for any of the Issuer's obligations under the Notes or this Indenture, the Subsidiary Guarantors' obligations under the Subsidiary Guarantees or this Indenture or any claim based on, in respect of, or by reason of these obligations or their creation. Each Holder, by accepting a Note, waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. The waiver may not be effective to waive liabilities under the federal securities laws and it is the view of the SEC that such a waiver is against public policy.

SECTION 12.11.    *Successors*.

All agreements of the Issuer and the Subsidiary Guarantors in this Indenture, the Notes and the Subsidiary Guarantees shall bind their successors. All agreements of the Trustee in this Indenture shall bind its successors.

SECTION 12.12.    *Duplicate Originals*.

All parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together shall represent the same agreement. Delivery of an executed signature page to this Indenture by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart thereof.

SECTION 12.13.    *Severability*.

In case any one or more of the provisions in this Indenture or in the Notes shall be held invalid, illegal or unenforceable, in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions shall not in any way be affected or impaired thereby, it being intended that all of the provisions hereof shall be enforceable to the full extent permitted by law.

SECTION 12.14.    *Independence of Covenants*.

All covenants and agreements in this Indenture and the Notes shall be given independent effect so that if any particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

SECTION 12.15.  *Waiver of Jury Trial.*

EACH OF THE ISSUER, EACH SUBSIDIARY GUARANTOR AND THE TRUSTEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES, THE SUBSIDIARY GUARANTEES OR THE TRANSACTION CONTEMPLATED HEREBY.

SECTION 12.16.  *Electronic Storage.*

The parties hereto agree that the transactions described herein may be conducted and related documents may be stored by electronic means. Copies, telecopies, facsimiles, electronic files, and other reproductions of original executed documents shall be deemed to be authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action, or suit in the appropriate court of law.

ARTICLE XIII.

SUBSIDIARY GUARANTEE OF NOTES

SECTION 13.1.  *Unconditional Subsidiary Guarantee.*

Subject to the provisions of this Article XII, each Subsidiary Guarantor, if any, hereby, jointly and severally, unconditionally and irrevocably guarantees, on an unsecured senior basis to each Holder of a Note authenticated and delivered by the Trustee and to the Trustee and its successors and assigns, irrespective of the validity and enforceability of this Indenture, the Notes or the obligations of the Issuer or any other Subsidiary Guarantors to the Holders or the Trustee under this Indenture or thereunder, that: (a) the principal of, premium, if any, and interest on the Notes shall be duly and punctually paid in full when due, whether at maturity, upon redemption at the option of Holders pursuant to the provisions of the Notes relating thereto, by acceleration or otherwise, and interest on the overdue principal and (to the extent permitted by law) interest, if any, on the Notes and all other obligations of the Issuer or the Subsidiary Guarantors to the Holders or the Trustee under this Indenture or thereunder (including amounts due the Trustee under Section 7.7 hereof) and all other obligations shall be promptly paid in full or performed, all in accordance with the terms hereof and thereof; and (b) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, the same shall be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at maturity, by acceleration or otherwise. Failing payment when due of any amount so guaranteed, or failing performance of any other obligation of the Issuer to the Holders under this Indenture or under the Notes, for whatever reason, each Subsidiary Guarantor shall be obligated to pay, or to perform or cause the performance of, the same immediately. An Event of Default under this Indenture or the Notes shall constitute an event of default under the Subsidiary Guarantees, and shall entitle the Holders of Notes to accelerate the obligations of the Subsidiary

139

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Guarantors under this Indenture in the same manner and to the same extent as the obligations of the Issuer.

Each of the Subsidiary Guarantors hereby agrees that its obligations under this Indenture shall be unconditional, irrespective of the validity, regularity or enforceability of the Notes or this Indenture, the absence of any action to enforce the same, any waiver or consent by any Holder of the Notes with respect to any provisions hereof or thereof, any release of any other Subsidiary Guarantor, the recovery of any judgment against the Issuer, any action to enforce the same, whether or not a Subsidiary Guarantee is affixed to any particular Note, or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor. Each of the Subsidiary Guarantors hereby waives the benefit of diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Issuer, any right to require a proceeding first against the Issuer, protest, notice and all demands whatsoever and covenants that its Subsidiary Guarantee shall not be discharged except by complete performance of the obligations contained in the Notes, this Indenture and its Subsidiary Guarantee. Each Subsidiary Guarantee is a guarantee of payment and not of collection. If any Holder or the Trustee is required by any court or otherwise to return to the Issuer or to any Subsidiary Guarantor, or any custodian, trustee, liquidator or other similar official acting in relation to the Issuer or such Subsidiary Guarantor, any amount paid by the Issuer or such Subsidiary Guarantor to the Trustee or such Holder, its Subsidiary Guarantee, to the extent theretofore discharged, shall be reinstated in full force and effect. Each Subsidiary Guarantor further agrees that, as between it, on the one hand, and the Holders of Notes and the Trustee, on the other hand, (a) subject to this Article XII, the maturity of the obligations guaranteed hereby may be accelerated as provided in Article VI hereof for the purposes of its Subsidiary Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed hereby, and (b) in the event of any acceleration of such obligations as provided in Article VI hereof, such obligations (whether or not due and payable) shall forthwith become due and payable by the Subsidiary Guarantors for the purpose of its Subsidiary Guarantee.

No stockholder, officer, director, employee, partner or incorporator, past, present or future, or any Subsidiary Guarantor, as such, shall have any personal liability under the Subsidiary Guarantees by reason of his, her or its status as such stockholder, officer, director, employee, partner or incorporator.

SECTION 13.2.    *Limitations on Subsidiary Guarantees*.

The obligations of each Subsidiary Guarantor under its Subsidiary Guarantee will be limited to the maximum amount which, after giving effect to all other contingent and fixed liabilities of such Subsidiary Guarantor and after giving effect to any collections from or payments made by or on behalf of any other Subsidiary Guarantor in respect of the obligations of such other Subsidiary Guarantor under its Subsidiary Guarantee or pursuant to its contribution obligations under this Indenture, will result in the obligations of such Subsidiary Guarantor under

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

its Subsidiary Guarantee not constituting a fraudulent conveyance or fraudulent transfer under federal or state law.

SECTION 13.3.    *Execution and Delivery of Subsidiary Guarantee Notation*.

To further evidence its Subsidiary Guarantee set forth in Section 12.1, each Subsidiary Guarantor hereby agrees that a notation of such Subsidiary Guarantee, substantially in the form of Exhibit D herein, shall be endorsed on each Note authenticated and delivered by the Trustee. Such notation shall be executed on behalf of each Subsidiary Guarantor by either manual or facsimile signature of one Officer of each Subsidiary Guarantor, who, in each case, shall have been duly authorized to so execute by all requisite corporate action. The validity and enforceability of any Subsidiary Guarantee shall not be affected by the fact that such notation is not affixed to any particular Note.

Each of the Subsidiary Guarantors hereby agrees that its Subsidiary Guarantee set forth in Section 12.1 shall remain in full force and effect notwithstanding any failure to endorse on each Note a notation of such Subsidiary Guarantee.

If an Officer of a Subsidiary Guarantor whose signature is on this Indenture or on a notation of a Subsidiary Guarantee no longer holds that office at the time the Trustee authenticates the Note on which such notation is endorsed or at any time thereafter, such Subsidiary Guarantor's Subsidiary Guarantee of such Note shall be valid nevertheless.

The delivery of any Note by the Trustee, after the authentication thereof under this Indenture, shall constitute due delivery of any Subsidiary Guarantee set forth in this Indenture on behalf of each Subsidiary Guarantor.

SECTION 13.4.    *Release of a Subsidiary Guarantor*.

(a)    If no Default exists or would exist under this Indenture, (i) upon the sale or disposition of all of the Capital Stock of a Subsidiary Guarantor by the Issuer or a Restricted Subsidiary of the Issuer in a transaction constituting an Asset Disposition in accordance with Section 4.16, or upon the consolidation or merger of a Subsidiary Guarantor with or into any Person in compliance with Article V (in each case, other than to the Issuer or an Affiliate of the Issuer or a Restricted Subsidiary), (ii) upon the designation of a Subsidiary Guarantor as an Unrestricted Subsidiary in accordance with the definition of "Unrestricted Subsidiary," (iii) in connection with any Legal Defeasance or satisfaction and discharge of the Notes as provided in Section 8.1 or (iv) upon the liquidation or dissolution of such Subsidiary Guarantor in a transaction or series of related transactions that does not violate the terms of this Indenture, such Subsidiary Guarantor and each Subsidiary of such Subsidiary Guarantor that is also a Subsidiary Guarantor shall be deemed released from all obligations under this Article XII without any further action required on the part of the Trustee or any Holder; *provided*, *however*, that each such Subsidiary Guarantor is sold or disposed of or designated in accordance with this Indenture. Any Subsidiary Guarantor not so released or the entity surviving such Subsidiary Guarantor, as

141

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

applicable, shall remain or be liable under its Subsidiary Guarantee as provided in this Article XII.

(b)    The Trustee shall deliver an appropriate instrument evidencing the release of a Subsidiary Guarantor upon receipt of a request by the Issuer or such Subsidiary Guarantor accompanied by an Officers' Certificate certifying as to the compliance with this Section 12.4 and an Opinion of Counsel; *provided* the legal counsel delivering such Opinion of Counsel may rely as to matters of fact on one or more Officers Certificates of the Issuer.

Except as set forth in Articles IV and V and this Section 12.4, nothing contained in this Indenture or in any of the Notes shall prevent any consolidation or merger of a Subsidiary Guarantor with or into the Issuer or another Subsidiary Guarantor or shall prevent any sale or conveyance of the property of a Subsidiary Guarantor as an entirety or substantially as an entirety to the Issuer or another Subsidiary Guarantor.

SECTION 13.5.    ***Waiver of Subrogation***.

Until this Indenture is discharged and all of the Notes are discharged and paid in full, each Subsidiary Guarantor hereby irrevocably waives and agrees not to exercise any claim or other rights which it may now or hereafter acquire against the Issuer that arise from the existence, payment, performance or enforcement of the Issuer's obligations under the Notes or this Indenture and such Subsidiary Guarantor's obligations under its Subsidiary Guarantee and this Indenture, in any such instance including, without limitation, any right of subrogation, reimbursement, exoneration, contribution, indemnification, and any right to participate in any claim or remedy of the Holders against the Issuer, whether or not such claim, remedy or right arises in equity, or under contract, statute or common law, including, without limitation, the right to take or receive from the Issuer, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim or other rights. If any amount shall be paid to any Subsidiary Guarantor in violation of the preceding sentence and any amounts owing to the Trustee or the Holders of Notes under the Notes, this Indenture, or any other document or instrument delivered under or in connection with such agreements or instruments, shall not have been paid in full, such amount shall have been deemed to have been paid to such Subsidiary Guarantor for the benefit of, and held in trust for the benefit of, the Trustee or the Holders and shall forthwith be paid to the Trustee for the benefit of itself or such Holders to be credited and applied to the obligations in favor of the Trustee or the Holders, as the case may be, whether matured or unmatured, in accordance with the terms of this Indenture. Each Subsidiary Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated by this Indenture and that the waiver set forth in this Section 12.5 is knowingly made in contemplation of such benefits.

SECTION 13.6.    ***Immediate Payment***.

Each Subsidiary Guarantor agrees to make immediate payment to the Trustee on behalf of the Holders of all obligations under the Notes and this Indenture owing or payable to the

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

respective Holders upon receipt of a demand for payment therefor by the Trustee to such Subsidiary Guarantor in writing.

SECTION 13.7.    *No Set-Off*.

Each payment to be made by a Subsidiary Guarantor under this Indenture in respect of the obligations under the Notes and this Indenture shall be payable in the currency or currencies in which such obligations are denominated, and shall be made without set-off, counterclaim, reduction or diminution of any kind or nature.

SECTION 13.8.    *Obligations Absolute*.

The obligations of each Subsidiary Guarantor under this Indenture are and shall be absolute and unconditional and any monies or amounts expressed to be owing or payable by each Subsidiary Guarantor under this Indenture which may not be recoverable from such Subsidiary Guarantor on the basis of a Subsidiary Guarantee shall be recoverable from such Subsidiary Guarantor as a primary obligor and principal debtor in respect thereof.

SECTION 13.9.    *Obligations Continuing*.

The obligations of each Subsidiary Guarantor under this Indenture shall be continuing and shall remain in full force and effect until all the obligations have been paid and satisfied in full. Each Subsidiary Guarantor agrees with the Trustee that it will from time to time deliver to the Trustee suitable acknowledgments of this continued liability under this Indenture and under any other instrument or instruments in such form as counsel to the Trustee may advise and as will prevent any action brought against it in respect of any default under this Indenture being barred by any statute of limitations now or hereafter in force and, in the event of the failure of a Subsidiary Guarantor so to do, it hereby irrevocably appoints the Trustee the attorney and agent of such Subsidiary Guarantor to make, execute and deliver such written acknowledgment or acknowledgments or other instruments as may from time to time become necessary or advisable, in the judgment of the Trustee on the advice of counsel, to fully maintain and keep in force the liability of such Subsidiary Guarantor under this Indenture.

SECTION 13.10.    *Obligations Not Reduced*.

The obligations of each Subsidiary Guarantor under this Indenture shall not be satisfied, reduced or discharged solely by the payment of such principal, premium, if any, interest, fees and other monies or amounts as may at any time prior to discharge of this Indenture pursuant to Article VIII be or become owing or payable under or by virtue of or otherwise in connection with the Notes or this Indenture.

SECTION 13.11.    *Obligations Reinstated*.

The obligations of each Subsidiary Guarantor under this Indenture shall continue to be effective or shall be reinstated, as the case may be, if at any time any payment which would

143

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

otherwise have reduced the obligations of any Subsidiary Guarantor under this Indenture (whether such payment shall have been made by or on behalf of the Issuer or by or on behalf of a Subsidiary Guarantor) is rescinded or reclaimed from any of the Holders upon the insolvency, bankruptcy, liquidation or reorganization of the Issuer or any Subsidiary Guarantor or otherwise, all as though such payment had not been made. If demand for, or acceleration of the time for, payment by the Issuer is stayed upon the insolvency, bankruptcy, liquidation or reorganization of the Issuer, all such Indebtedness otherwise subject to demand for payment or acceleration shall nonetheless be payable by each Subsidiary Guarantor as provided herein.

SECTION 13.12. *Obligations Not Affected*.

The obligations of each Subsidiary Guarantor under this Indenture shall not be affected, impaired or diminished in any way by any act, omission, matter or thing whatsoever, occurring before, upon or after any demand for payment under this Indenture (and whether or not known or consented to by any Subsidiary Guarantor or any of the Holders) which, but for this provision, might constitute a whole or partial defense to a claim against any Subsidiary Guarantor under this Indenture or might operate to release or otherwise exonerate any Subsidiary Guarantor from any of its obligations under this Indenture or otherwise affect such obligations, whether occasioned by default of any of the Holders or otherwise, including, without limitation:

(a)    any limitation of status or power, disability, incapacity or other circumstance relating to the Issuer or any other person, including any insolvency, bankruptcy, liquidation, reorganization, readjustment, composition, dissolution, winding up or other proceeding involving or affecting the Issuer or any other person;

(b)    any irregularity, defect, unenforceability or invalidity in respect of any Indebtedness or other obligation of the Issuer or any other person under this Indenture, the Notes or any other document or instrument;

(c)    any failure of the Issuer, whether or not without fault on its part, to perform or comply with any of the provisions of this Indenture or the Notes, or to give notice thereof to a Subsidiary Guarantor;

(d)    the taking or enforcing or exercising or the refusal or neglect to take or enforce or exercise any right or remedy from or against the Issuer or any other person or their respective assets or the release or discharge of any such right or remedy;

(e)    the granting of time, renewals, extensions, compromises, concessions, waivers, releases, discharges and other indulgences to the Issuer or any other Person;

(f)    any change in the time, manner or place of payment of, or in any other term of, any of the Notes, or any other amendment, variation, supplement, replacement or waiver of, or any consent to departure from, any of the Notes or this Indenture, including, without limitation, any increase or decrease in the principal amount of or premium, if any, or interest on any of the Notes;

144

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(g)    any change in the ownership, control, name, objects, businesses, assets, capital structure or constitution of the Issuer or a Subsidiary Guarantor;

(h)    any merger or amalgamation of the Issuer or a Subsidiary Guarantor with any Person or Persons;

(i)    the occurrence of any change in the laws, rules, regulations or ordinances of any jurisdiction by any present or future action of any governmental authority or court amending, varying, reducing or otherwise affecting, or purporting to amend, vary, reduce or otherwise affect, any of the Issuer's obligations under the Notes or this Indenture or the obligations of a Subsidiary Guarantor under its Subsidiary Guarantee; and

(j)    any other circumstance (other than by complete, irrevocable payment), including release of any other Subsidiary Guarantor pursuant to Section 12.4, that might otherwise constitute a legal or equitable discharge or defense of the Issuer under this Indenture or the Notes or of a Subsidiary Guarantor in respect of its Subsidiary Guarantee under this Indenture.

SECTION 13.13.  *Waiver.*

Without in any way limiting the provisions of Section 12.1 hereof, each Subsidiary Guarantor hereby waives notice of acceptance hereof, notice of any liability of any Subsidiary Guarantor under this Indenture, notice or proof of reliance by the Holders upon the obligations of any Subsidiary Guarantor under this Indenture, and diligence, presentment, demand for payment on the Issuer, protest, notice of dishonor or non-payment of any of the Issuer's obligations, under the Notes or this Indenture, or other notice or formalities to the Issuer or any Subsidiary Guarantor of any kind whatsoever.

SECTION 13.14.  *No Obligation To Take Action Against the Issuer.*

Neither the Trustee nor any other Person shall have any obligation to enforce or exhaust any rights or remedies or to take any other steps under any security for the Issuer's obligations under the notes or this Indenture, or against the Issuer or any other Person or any Property of the Issuer or any other Person before the Trustee is entitled to demand payment and performance by any or all Subsidiary Guarantors of their liabilities and obligations under their Subsidiary Guarantees or under this Indenture.

SECTION 13.15.  *Dealing with the Issuer and Others.*

The Holders, without releasing, discharging, limiting or otherwise affecting in whole or in part the obligations and liabilities of any Subsidiary Guarantor under this Indenture and without the consent of or notice to any Subsidiary Guarantor, may:

(a)    grant time, renewals, extensions, compromises, concessions, waivers, releases, discharges and other indulgences to the Issuer or any other Person;

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(b)      take or abstain from taking security or collateral from the Issuer or from perfecting security or collateral of the Issuer;

(c)      release, discharge, compromise, realize, enforce or otherwise deal with or do any act or thing in respect of (with or without consideration) any and all collateral, mortgages or other security given by the Issuer or any third party with respect to the obligations or matters contemplated by this Indenture or the Notes;

(d)      accept compromises or arrangements from the Issuer;

(e)      apply all monies at any time received from the Issuer or from any security upon such part of the Issuer's obligations under the Notes and this Indenture as the Holders may see fit or change any such application in whole or in part from time to time as the Holders may see fit; and

(f)      otherwise deal with, or waive or modify their right to deal with, the Issuer and all other Persons and any security as the Holders or the Trustee may see fit.

SECTION 13.16.  *Default and Enforcement*.

If any Subsidiary Guarantor fails to pay in accordance with Section 12.6 hereof, the Trustee may proceed in its name as trustee under this Indenture in the enforcement of the Subsidiary Guarantee of any such Subsidiary Guarantor and such Subsidiary Guarantor's obligations thereunder and under this Indenture by any remedy provided by law, whether by legal proceedings or otherwise, and to recover from such Subsidiary Guarantor its obligations thereunder and under this Indenture.

SECTION 13.17.  *Amendment, Etc*.

No amendment, modification or waiver of any provision of this Indenture relating to any Subsidiary Guarantor or consent to any departure by any Subsidiary Guarantor or any other Person from any such provision will in any event be effective unless it is signed by such Subsidiary Guarantor and the Trustee.

SECTION 13.18.  *Acknowledgment*.

Each Subsidiary Guarantor hereby acknowledges communication of the terms of this Indenture and the Notes and consents to and approves of the same.

SECTION 13.19.  *Costs and Expenses*.

Each Subsidiary Guarantor shall pay on demand by the Trustee any and all reasonable costs, fees and expenses (including, without limitation, legal fees on a solicitor and client basis) incurred by the Trustee, its agents, advisors and counsel or any of the Holders in enforcing any of their rights under any Subsidiary Guarantee.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

SECTION 13.20.  *__No Merger or Waiver; Cumulative Remedies__*.

No Subsidiary Guarantee shall operate by way of merger of any of the obligations of a Subsidiary Guarantor under any other agreement, including, without limitation, this Indenture. No failure to exercise and no delay in exercising, on the part of the Trustee or the Holders, any right, remedy, power or privilege under this Indenture or the Notes shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege under this Indenture or the Notes preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges in the Subsidiary Guarantee and under this Indenture, the Notes and any other document or instrument between a Subsidiary Guarantor and/or the Issuer and the Trustee are cumulative and not exclusive of any rights, remedies, powers and privilege provided by law.

SECTION 13.21.  *__Survival of Obligations__*.

Without prejudice to the survival of any of the other obligations of each Subsidiary Guarantor under this Indenture, the obligations of each Subsidiary Guarantor under Section 12.1 shall survive the payment in full of the Issuer's obligations under the Notes and this Indenture and shall be enforceable against such Subsidiary Guarantor without regard to and without giving effect to any defense, right of offset or counterclaim available to or which may be asserted by the Issuer or any Subsidiary Guarantor.

SECTION 13.22.  *__Subsidiary Guarantee in Addition to Other Obligations__*.

The obligations of each Subsidiary Guarantor under its Subsidiary Guarantee and this Indenture are in addition to and not in substitution for any other obligations to the Trustee or to any of the Holders in relation to this Indenture or the Notes and any guarantees or security at any time held by or for the benefit of any of them.

SECTION 13.23.  *__Severability__*.

Any provision of this Article XII which is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction unless its removal would substantially defeat the basic intent, spirit and purpose of this Indenture and this Article XII.

SECTION 13.24.  *__Successors and Assigns__*.

Each Subsidiary Guarantee shall be binding upon and inure to the benefit of each Subsidiary Guarantor and the Trustee and the other Holders and their respective successors and permitted assigns, except that no Subsidiary Guarantor may assign any of its obligations under this Indenture or thereunder.

[Signature pages follow]

147

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first written above.

**ISSUER**:

CHAPARRAL ENERGY, INC.

By: _____
　　　Name:
　　　Title:

**SUBSIDIARY GUARANTORS**:

CHAPARRAL RESOURCES, L.L.C.
CHAPARRAL REAL ESTATE, L.L.C.
CHAPARRAL CO2, L.L.C.
CEI PIPELINE, L.L.C.
CHAPARRAL ENERGY, L.L.C.
[CEI ACQUISITION, L.L.C.
GREEN COUNTRY SUPPLY, INC.
CHAPARRAL BIOFUELS, L.L.C.
CHAPARRAL EXPLORATION, L.L.C.
ROADRUNNER DRILLING, L.L.C.]
CHARLES ENERGY, L.L.C
CHESTNUT ENERGY, L.L.C.
TRABAJO ENERGY, L.L.C.

By: _____
　　　Name:
　　　Title:

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

WILMINGTON SAVINGS FUND SOCIETY
FSB, as Trustee and as Collateral Agent


By: _____
     Name: Geoffrey J. Lewis
     Title:  Vice President

[Chaparral – Signature Page to Indenture]

# Exhibit H

**New Warrants Agreement and Certificate**

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

WARRANT AGREEMENT

Dated as of

[●], 2020

between

[Chaparral Energy, Inc.][1]

and

[AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC][2],

as Warrant Agent

For [●] Series A Warrants and [●] Series B Warrants

---

[1] NTD: To confirm.

[2] NTD: To be determined.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

**Table of Contents**

**Page**

ARTICLE I

DEFINITIONS

Section 1.01.  Definitions..................................................................................................1
Section 1.02.  Other Definitions. ........................................................................................3
Section 1.03.  Rules of Construction. ..................................................................................4

ARTICLE II

WARRANTS

Section 2.01.  Form. ............................................................................................................4
Section 2.02.  Execution and Countersignature. .................................................................6
Section 2.03.  Registry. .......................................................................................................6
Section 2.04.  Transfer and Exchange. ...............................................................................7
Section 2.05.  Definitive Warrants......................................................................................9
Section 2.06.  Replacement Certificates. ..........................................................................10
Section 2.07.  Outstanding Warrants. ...............................................................................11
Section 2.08.  Cancellation. ..............................................................................................11
Section 2.09.  CUSIP Numbers.........................................................................................11
Section 2.10.  Withholding and Reporting Requirements. ...............................................11
Section 2.11.  Proxies........................................................................................................12

ARTICLE III

EXERCISE TERMS

Section 3.01.  Exercise......................................................................................................12
Section 3.02.  Manner of Exercise and Issuance of Shares. .............................................12
Section 3.03.  Covenants Relating to Common Stock Issuable Upon Warrant Exercise. ............12
Section 3.04.  Exercise Calculations.................................................................................13

ARTICLE IV

ANTIDILUTION PROVISIONS

Section 4.01.  Antidilution Adjustments; Notice of Adjustment.......................................13
Section 4.02.  Adjustment to Warrant Certificate.............................................................13

ARTICLE V

WARRANT AGENT

Section 5.01.  Appointment of Warrant Agent. ................................................................14
Section 5.02.  Rights and Duties of Warrant Agent. .........................................................14
Section 5.03.  Individual Rights of Warrant Agent. ..........................................................16
Section 5.04.  Warrant Agent's Disclaimer. .....................................................................16
Section 5.05.  Compensation and Indemnity. ...................................................................16
Section 5.06.  Successor Warrant Agent. ..........................................................................17
Section 5.07.  Representations of the Company. ...............................................................18

## ARTICLE VI

## MISCELLANEOUS

Section 6.01.  Persons Benefitting. ...................................................................................19
Section 6.02.  Amendment. ...............................................................................................19
Section 6.03.  Notices. ......................................................................................................21
Section 6.04.  Governing Law. .........................................................................................22
Section 6.05.  Successors. .................................................................................................22
Section 6.06.  Multiple Originals; Counterparts. ..............................................................22
Section 6.07.  Inspection of Agreement. ...........................................................................22
Section 6.08.  Table of Contents. ......................................................................................22
Section 6.09.  Severability. ...............................................................................................22
Section 6.10.  Customer Identification Program. ..............................................................22
Section 6.11.  Confidentiality. ..........................................................................................23
Section 6.12.  Force Majeure. ...........................................................................................23


EXHIBIT A    Form of Series A Warrant
EXHIBIT B    Form of Series B Warrant

ii

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

This WARRANT AGREEMENT is dated as of [●], 2020 (this "Agreement"), among [Chaparral Energy, Inc.], a Delaware corporation (the "Company"), and [American Stock Transfer & Trust Company, LLC], a [New York limited liability trust company], as Warrant Agent (the "Warrant Agent").  All terms used but not defined in this Agreement shall have the respective meanings assigned to them in the applicable form of Warrant Certificates attached to this Agreement as Exhibit A and Exhibit B.

Pursuant to the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization under Chapter 11 of the Bankruptcy Code, as confirmed by the United States Bankruptcy Court for the District of Delaware on [●], 2020, the Company hereby issues Series A warrants substantially in the form attached hereto as Exhibit A (the "Series A Warrants") to purchase initially [●] shares of Common Stock, $[___] par value per share, of the Company (the "Common Stock") and Series B warrants substantially in the form attached hereto as Exhibit B (the "Series B Warrants" and together with the Series A Warrants, the "Warrants") to purchase initially [●] shares of Common Stock, in each case subject to Section 13(E) of the respective Warrant Certificate.

Each Warrant entitles the registered holder thereof (the "Holder") to receive, upon exercise thereof, a number of shares of Common Stock determined by the provisions of the relevant Warrant Certificate.  Each Warrant Certificate (including any Global Warrant) shall evidence such number of Warrants as is set forth therein, subject to adjustment pursuant to the provisions of the Warrant Certificate.

The Warrants and the shares of Common Stock issuable upon exercise of the Warrants will be freely transferable by Holders that are not Affiliates of the Company, subject to any applicable restrictions in the relevant Warrant Certificate.  The Company desires the Warrant Agent to act on behalf of the Company in connection with the registration, transfer, exchange, exercise and cancellation of the Warrants as provided in this Agreement and the Warrant Certificates, and the Warrant Agent is willing to so act.

Each party agrees as follows for the benefit of the other party and for the equal and ratable benefit of the Holders of Warrants:

ARTICLE I

DEFINITIONS

Section 1.01.  Definitions.

"Affiliate" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under common control with, such other Person.  For purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with") when used with respect to any Person, means the possession, directly or indirectly, of the power to cause the direction of management and/or policies of such Person, whether through the ownership of voting securities by contract or otherwise.

1

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"Agent Members" means the securities brokers and dealers, banks and trust companies, clearing organizations and other similar organizations that are participants in the Depositary's system.

"Business Day" means any day except Saturday, Sunday and any day on which banking institutions in the State of New York are authorized or required by law or other governmental actions to close.

"Custodian" means [American Stock Transfer & Trust Company, LLC], as custodian for the Depositary, or any successor thereto.

"Definitive Warrant" means a Warrant Certificate in definitive form that is not deposited with the Depositary or with the Custodian.

"Depositary" means The Depository Trust Company, its nominees and their respective successors.

"Exchange Act" means the U.S. Securities Exchange Act of 1934, as amended, or any successor statute, and the rules and regulations promulgated thereunder.

"Exercise Period" means the Series A Exercise Period or the Series B Exercise Period, as applicable.

"Exercise Price" means the Series A Exercise Price or the Series B Exercise Price, as applicable.

"Expiration Time" has the meaning set forth in the applicable Warrant Certificate.

"Officer" means the Chairman of the Board, President, Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, General Counsel, Treasurer and Secretary of the Company, any Assistant Treasurer or any Assistant Secretary of the Company, and any Executive or Senior Vice President or any Vice President (whether or not designated by a number or numbers or word or words added before or after the title "Vice President") of the Company.

"Officer's Certificate" means a certificate signed by any Officer.

"Opinion of Counsel" means a written opinion from legal counsel who is reasonably acceptable to the Warrant Agent. Such counsel may be an employee of or counsel to the Company or the Warrant Agent.

"Person" means an individual, corporation, partnership, joint venture, association, joint-stock company, limited liability company, limited liability partnership, trust, unincorporated organization, or government or any agency or political subdivision thereof or any other entity.

2

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"Series A Exercise Period" means the "Exercise Period" as set forth in the form of Warrant Certificate attached as Exhibit A hereto.

"Series A Exercise Price" means the "Exercise Price" as set forth in the form of Warrant Certificate attached as Exhibit A hereto.

"Series A Shares" means the "Shares" as set forth in the form of Warrant Certificate attached as Exhibit A hereto.

"Series A Warrant Share Number" means the "Warrant Share Number" as set forth in the form of Warrant Certificate attached as Exhibit A hereto.

"Series B Exercise Period" means the "Exercise Period" as set forth in the form of Warrant Certificate attached as Exhibit B hereto.

"Series B Exercise Price" means the "Exercise Price" as set forth in the form of Warrant Certificate attached as Exhibit B hereto.

"Series B Shares" means the "Shares" as set forth in the form of Warrant Certificate attached as Exhibit B hereto.

"Series B Warrant Share Number" means the "Warrant Share Number" as set forth in the form of Warrant Certificate attached as Exhibit B hereto.

"Shares" means the Series A Shares or the Series B Shares, as applicable.

"Warrant Certificate" means any registered certificate (including a Global Warrant) issued by the Company and authenticated by the Warrant Agent under this Agreement evidencing the Series A Warrants (in the form attached as Exhibit A hereto) or the Series B Warrants (in the form attached as Exhibit B hereto), as applicable.

"Warrant Share Number" means the Series A Warrant Share Number or the Series B Warrant Share Number, as applicable.

Section 1.02.   Other Definitions.

| Term | Defined in Section |
|---|---|
| "Agreement" | Recitals |
| "Company" | Recitals |
| "Common Stock" | Recitals |
| "Customer Identification Program" | 6.10 |
| "Global Warrant" | 2.01(a) |
| "Holder" or "Holders" | Recitals |
| "Loss" or "Losses" | 5.05(b) |

3

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

|                         |                                   | Defined in Section |
|-------------------------|-----------------------------------|--------------------|
| **Term**                |                                   |                    |
| "Registry" ............................................................................. | | 2.03 |
| "Series A Warrant" ................................................................ | | Recitals |
| "Series B Warrant" ................................................................ | | Recitals |
| "Warrant"................................................................................ | | Recitals |
| "Warrant Agent" ................................................................... | | Recitals |

Section 1.03.   Rules of Construction.

Unless the text otherwise requires:

(a)  a defined term has the meaning assigned to it;

(b)  an accounting term not otherwise defined has the meaning assigned to it in accordance with United States generally accepted accounting principles as in effect on the date hereof;

(c)  "or" is not exclusive;

(d)  "including" means including, without limitation; and

(e)  words in the singular include the plural and words in the plural include the singular.

ARTICLE II

WARRANTS

Section 2.01.   Form.

(a)  Global Warrants.  Except as provided in Section 2.04 or 2.05, Warrants, including Warrants issued upon any transfer or exchange thereof, shall be issued in the form of one or more permanent global Warrants in fully registered form with the global securities legend set forth in the form of Warrant Certificate attached as Exhibit A hereto in the case of Series A Warrants and attached as Exhibit B hereto in the case of Series B Warrants (each, a "Global Warrant"), which shall be deposited on behalf of the Company with the Depositary (or, at the direction of the Depositary, with the Custodian or such other custodian as the Depositary may direct), and registered in the name of the Depositary or a nominee of the Depositary, duly executed by the Company and countersigned by the Warrant Agent as hereinafter provided.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(b) <u>Book-Entry Provisions</u>. This Section 2.01(b) shall apply only to a Global Warrant deposited with, at the direction of or on behalf of the Depositary.

(i)     The Company shall execute and the Warrant Agent shall, in accordance with Section 2.02, countersign, either by manual or facsimile signature, and deliver one or more Global Warrants that (A) shall be registered in the name of the Depositary or the nominee of the Depositary and (B) shall be delivered by the Warrant Agent to the Depositary or pursuant to the Depositary's instructions or held by the Custodian.  Each Global Warrant shall be dated the date of its countersignature by the Warrant Agent.

(ii)     Agent Members shall have no rights under this Agreement with respect to any Global Warrant held on their behalf by the Depositary or by the Warrant Agent as the custodian of the Depositary or under such Global Warrant except to the extent set forth herein or in a Warrant Certificate, and the Depositary may be treated by the Company, the Warrant Agent and any agent of the Company or the Warrant Agent as the absolute owner of such Global Warrant for all purposes whatsoever.  Notwithstanding the foregoing, nothing herein shall (A) prevent the Company, the Warrant Agent or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or (B) impair, as between the Depositary and the Agent Members, the operation of customary practices of the Depositary governing the exercise of the rights of a holder of a beneficial interest in any Global Warrant.  The rights of beneficial owners in a Global Warrant shall be exercised through the Depositary subject to the applicable procedures of the Depositary except to the extent set forth herein or in a Warrant Certificate.

(c) <u>Definitive Securities</u>.  Except as provided in Section 2.04 or 2.05, owners of beneficial interests in Global Warrants will not be entitled to receive physical delivery of Definitive Warrants.

(d) <u>Warrant Certificates</u>.  Warrant Certificates shall be in substantially the form attached as Exhibit A hereto in the case of Series A Warrants and attached as Exhibit B hereto in the case of Series B Warrants and shall be typed, printed, lithographed or engraved or produced by any combination of such methods or produced in any other manner permitted by the rules of any securities exchange on which the relevant Warrants may be listed, all as determined by the Officer or Officers executing such Warrant Certificates, as evidenced by their execution thereof.  Any Warrant Certificate shall have such insertions as are appropriate or required or permitted by this Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements, stamped, printed, lithographed or engraved thereon, (i) as the Company may deem appropriate and as are not inconsistent with the provisions of this Agreement (and which insertions, letters, numbers, marks of identification, legends or endorsements do not affect the rights, duties, immunities or obligations of the Warrant Agent), (ii) as may be required to comply with this Agreement, any applicable law or any rule of any securities exchange on which the relevant Warrants may be listed, or (iii) as may be necessary to conform to customary usage.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Section 2.02.   Execution and Countersignature.

(a) Execution by the Company.  At least one Officer shall sign the Warrant Certificates for the Company by manual or facsimile signature.  If an Officer whose signature is on a Warrant Certificate no longer holds that office at the time the Warrant Agent countersigns the Warrant Certificate, the Warrants evidenced by such Warrant Certificate shall be valid nevertheless.

(b) Countersignature by the Warrant Agent.  The Warrant Agent shall initially countersign, either by manual or facsimile signature, and deliver Warrant Certificates evidencing, in the aggregate, [●] Series A Warrants and [●] Series B Warrants.  Each Warrant Certificate shall be dated the date of its countersignature by the Warrant Agent.

(c) Subsequent Issue of Warrant Certificates.  At any time and from time to time after the execution of this Agreement, the Warrant Agent shall upon receipt of a written order of the Company signed by an Officer countersign, by either manual or facsimile signature, and issue a Warrant Certificate evidencing the number of Warrants specified in such order; *provided* that the Warrant Agent shall be entitled to receive, in connection with such countersignature of Warrants described in this Section 2.02(c), an Officer's Certificate and an Opinion of Counsel of the Company to the effect that issuance and execution of such Warrants is authorized or permitted by this Agreement and the organizational documents of the Company.  Such written order of the Company shall specify the number of Warrants to be evidenced on the Warrant Certificate to be countersigned, the date on which such Warrant Certificate is to be countersigned and the number of Warrants then authorized.  Each Warrant Certificate shall be dated the date of its countersignature by the Warrant Agent.

(d) Validity of Warrant Certificates.  The Warrants evidenced by a Warrant Certificate shall not be valid until an authorized signatory of the Warrant Agent countersigns the Warrant Certificate either manually or by facsimile signature. Such signature shall be solely for the purpose of authenticating the Warrant Certificate and shall be conclusive evidence that the Warrant Certificate so countersigned has been duly authenticated and issued under this Agreement.  Countersigned Warrant Certificates may be delivered, notwithstanding the fact that the persons or any one of them who countersigned the Warrants shall have ceased to be proper signatories prior to the delivery of such Warrants or were not proper signatories on the date of this Agreement.

Section 2.03.   Registry.

The Warrants shall be issued in registered form only.  The Warrant Agent shall keep a registry (the "Registry") of the Warrant Certificates and of their transfer and exchange. The Registry shall show the names and addresses of the respective Holders and the date and number of Warrants evidenced on the face of each of the Warrant Certificates, and record all exchanges, exercise, cancellation and transfers of the Warrants. The Holder of any Global Warrant will be the Depositary or a nominee of the Depositary in whose name such Global Warrant is registered.  The Warrant holdings of Agent Members will be recorded on the books of

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

the Depositary.  The beneficial interests in any Global Warrant held by customers of Agent Members will be reflected on the books and records of such Agent Members and will not be known to the Warrant Agent, to the Company or to the Depositary.  Any Warrant Certificate may be surrendered for transfer, cancellation, exchange or exercise, in accordance with its terms, at the office of the Warrant Agent designated for such purpose.  The Company and the Warrant Agent may deem and treat any Person in whose name a Warrant Certificate is registered in the Registry as the absolute owner of such Warrant Certificate for all purposes whatsoever and neither the Company nor the Warrant Agent shall be affected by notice to the contrary.

Section 2.04.   Transfer and Exchange.

(a) Transfer and Exchange of Global Warrants.

(i) The transfer and exchange of Global Warrants or beneficial interests therein shall be effected through the book-entry system maintained by the Depositary, in accordance with this Agreement and the relevant Warrant Certificates and the procedures of the Depositary therefor.

(ii) Notwithstanding any other provisions of this Agreement (other than the provisions set forth in Section 2.05), a Global Warrant may only be transferred as a whole, and not in part, and only by (A) the Depositary, to a nominee of the Depositary, (B) a nominee of the Depositary, to the Depositary or another nominee of the Depositary, or (C) the Depositary or any such nominee to a successor Depositary or its nominee.

(iii) In the event that a Global Warrant is exchanged and transferred for Definitive Warrants pursuant to Section 2.05, such Warrants may be exchanged only in accordance with Section 9 of the relevant Warrant Certificate and such procedures as are substantially consistent with the provisions of this Section 2.04 and the requirements of any relevant Warrant Certificate and such other procedures as may from time to time be adopted by the Company that are not inconsistent with the terms of this Agreement or of any relevant Warrant Certificate.

(b) Cancellation or Adjustment of Global Warrant.  At such time as all beneficial interests in a Global Warrant have been exchanged for Definitive Warrants, repurchased, exercised or canceled, such Global Warrant shall be returned by the Depositary for cancellation or retained and canceled by the Warrant Agent. At any time prior to such cancellation, if any beneficial interest in a Global Warrant is exchanged (including, without limitation, for Definitive Warrants and/or new Warrants), repurchased, exercised or canceled, the number of Warrants represented by such Global Warrant shall be reduced and the Warrant Agent shall make an adjustment on its books and records to reflect such reduction; *provided* that, in the case of an adjustment on account of an exercise of Warrants, the Warrant Agent shall have no duty or obligation to make such adjustment until it has received notice from the Holder of the amount thereof.

7

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(c) <u>Obligations with Respect to Transfers and Exchanges of Warrants</u>.

(i)     To permit registrations of transfers and exchanges, the Company shall execute and the Warrant Agent shall countersign, either by manual or facsimile signature, Global Warrants and Definitive Warrants as required pursuant to the provisions of Section 2.02 and this Section 2.04. A transferor of a Global Warrant or a Definitive Warrant shall deliver to the Warrant Agent a written instruction of transfer in the form attached to the relevant Warrant Certificate as Annex C, duly executed by the Holder thereof or by its attorney, duly authorized in writing. Additionally, prior to registration of any transfer or exchange of a Warrant, the requirements for the Warrant issued upon such transfer or exchange to be issued in a name other than the registered Holder shall be met. Such requirements include, *inter alia*, a signature guarantee from an eligible guarantor institution participating in a signature guarantee program approved by the Securities Transfer Association (at a guarantee level reasonably acceptable to the Company's transfer agent), and any other reasonable evidence of authority that may be required by the Warrant Agent. Upon satisfaction of the conditions in this clause (i), the Warrant Agent shall, in accordance with such instructions, register the transfer or exchange of the relevant Global Warrant or Definitive Warrant.

(ii)     No service charge shall be made to a Holder for any registration of transfer or exchange, but the Company may require payment from a Holder of a sum sufficient to cover any transfer tax, assessments or similar governmental charge payable in connection therewith as set forth in the relevant Warrant Certificate. The Warrant Agent shall have no duty or obligation pursuant to any Section of this Agreement requiring the payment of taxes, assessments, and/or governmental charges unless and until the Warrant Agent is satisfied that all such taxes, assessments, and/or governmental charges have been paid.

(iii)     All Warrants issued upon any transfer or exchange pursuant to the terms of this Agreement shall be the valid obligations of the Company, entitled to the same benefits under this Agreement as the Warrants surrendered upon such transfer or exchange.

(d) <u>No Obligation of the Warrant Agent</u>.

(i)     The Warrant Agent shall have no responsibility or obligation to any beneficial owner of a Global Warrant, any Agent Member or other Person with respect to the accuracy of the records of the Depositary or its nominee or of any participant or member thereof, with respect to any ownership interest in the Warrants or with respect to the delivery to any Agent Member, beneficial owner or other Person (other than the Depositary) of any notice or the payment of any amount, under or with respect to such Warrants.  All notices and communications to be given to the Holders and all payments to be made to Holders under the Warrants shall be given or made only to or upon the order of the registered Holders (which shall be the Depositary or its nominee in the case of a Global Warrant).  Except as set forth in the relevant Warrant Certificate, the

8

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

rights of beneficial owners in any Global Warrant shall be exercised only through the Depositary subject to the applicable rules and procedures of the Depositary.  The Warrant Agent may rely and shall be fully protected in relying upon information furnished by the Depositary with respect to its members, participants and any beneficial owners.

(ii)   The Warrant Agent shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Agreement or under applicable law with respect to any transfer of any interest in any Warrant (including any transfer between or among the Agent Members or beneficial owners in any Global Warrant) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, the terms of this Agreement and the relevant Warrant Certificate, and to examine the same to determine substantial compliance as to form with the express requirements hereof and thereof.

Section 2.05.  Definitive Warrants.

(a) Issuance of Definitive Warrants.  Beneficial interests in a Global Warrant deposited with the Depositary or with the Custodian pursuant to Section 2.01 shall be transferred to each beneficial owner thereof in the form of Definitive Warrants evidencing a number of the relevant Warrants equivalent to such owner's beneficial interest in such Global Warrant, in exchange for such Global Warrant, only if such transfer complies with Section 2.04 and (i) the Depositary notifies the Company that it is unwilling or unable to continue as Depositary for such Global Warrant or if at any time the Depositary ceases to be a "clearing agency" registered under the Exchange Act and, in each such case, a successor Depositary is not appointed by the Company within 90 days of such notice, (ii) the Company, in its sole discretion, notifies the Warrant Agent in writing that it elects to cause the issuance of Definitive Warrants under this Agreement in accordance with the applicable rules and procedures of the Depositary, or (iii) the Company shall be adjudged a bankrupt or insolvent or make an assignment for the benefit of its creditors or institute proceedings to be adjudicated a bankrupt or shall consent to the filing of a bankruptcy proceeding against it, or shall file a petition or answer or consent seeking reorganization under federal bankruptcy laws or any other similar applicable federal or state law, or shall consent to the filing of any such petition, or shall consent to the appointment of a receiver or custodian of all or any substantial part of its property, or shall admit in writing its inability to pay or meet its debts as they mature, or if a receiver or custodian of it or all or any substantial part of its property shall be appointed, or if a public officer shall have taken charge or control of the Company or of its property or affairs, for the purpose of rehabilitation, conservation or liquidation.

(b) Surrender of Global Warrants and Exchange for Definitive Warrants.  Any Global Warrant that is to be exchanged, in whole or in part, for Definitive Warrants pursuant to this Section 2.05 shall be surrendered by the Depositary to the Warrant Agent, to be so exchanged, in whole or from time to time in part, without charge, and the Warrant Agent shall countersign, either by manual or facsimile signature, and deliver to each beneficial owner of such Global Warrant (or, in the case of clause (ii) in Section 2.05(a), to each beneficial owner

9

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

requesting such an exchange) in the name of such beneficial owner, Definitive Warrants evidencing a number of the relevant Warrants equivalent to such beneficial owner's beneficial interest in the Global Warrant. The Warrant Agent shall register such exchange in the Registry, and if the entire Global Warrant has been exchanged for Definitive Warrants the surrendered Global Warrant shall be canceled by the Warrant Agent.

(c) Validity of Definitive Warrants. All Definitive Warrants issued upon transfer pursuant to this Section 2.05 shall be the valid obligations of the Company, evidencing the same obligations of the Company and entitled to the same benefits under this Agreement as the Global Warrant surrendered upon such transfer.

(d) Definitive Warrant Certificates. In the event of the occurrence of any of the events specified in Section 2.05(a), the Company will promptly make available to the Warrant Agent a reasonable supply of Definitive Warrants in definitive, fully registered form.

(e) No Liability. Neither the Company nor the Warrant Agent will be liable or responsible for any registration or transfer of any Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary.

Section 2.06.    Replacement Certificates.

If a mutilated Warrant Certificate is surrendered to the Warrant Agent or if the Holder of a Warrant Certificate provides evidence reasonably satisfactory to the Company and the Warrant Agent that the Warrant Certificate has been lost, destroyed or wrongfully taken, the Company shall issue and the Warrant Agent shall countersign, by either manual or facsimile signature, a replacement Warrant Certificate of like tenor and representing an equivalent number of the relevant Warrants, if the reasonable requirements of the Warrant Agent and Section 8-405 of the Uniform Commercial Code as in effect in the State of New York are met. In the case of the Warrant Certificate that is lost, destroyed or wrongfully taken, if required by the Warrant Agent or the Company, such Holder shall furnish an indemnity sufficient in the judgment of the Company and the Warrant Agent to protect the Company and the Warrant Agent from any loss that either of them may suffer if a Warrant Certificate is replaced. The Company and the Warrant Agent may charge the Holder for their reasonable, out-of-pocket expenses in replacing a Warrant Certificate prior to issuing and delivering a replacement Warrant Certificate to such Holder. Every replacement Warrant Certificate evidences an additional obligation of the Company.

Section 2.07.    Outstanding Warrants.

Subject to Section 6.02, the Warrants outstanding at any time are all Warrants evidenced on all Warrant Certificates authenticated by the Warrant Agent except for those canceled by it and those delivered to it for cancellation. The Company shall not sell, and shall use commercially reasonable efforts to prevent any Affiliate of the Company from selling, any Warrant if the Warrant would constitute a "restricted security" (within the meaning of Rule 144 under the Securities Act) upon such resale.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

If a Warrant Certificate is replaced pursuant to Section 2.06, the Warrants evidenced thereby cease to be outstanding unless the Warrant Agent and the Company receive proof satisfactory to them that the replaced Warrant Certificate is held by a bona fide purchaser.

Section 2.08.   Cancellation.

In the event the Company shall purchase or otherwise acquire Definitive Warrants, the same shall thereupon be delivered to the Warrant Agent for cancellation.

The Warrant Agent and no one else shall cancel and destroy all Warrant Certificates surrendered for transfer, exchange, replacement, exercise or cancellation and deliver a certificate of such destruction to the Company unless the Company directs the Warrant Agent to deliver any canceled Warrant Certificates to the Company.  The Company may not issue new Warrant Certificates to replace Warrant Certificates to the extent they evidence Warrants that have been exercised or Warrants that the Company has purchased or otherwise acquired.

Section 2.09.   CUSIP Numbers.

In issuing the Warrants, the Company may use CUSIP numbers (if then generally in use) and, if so, the Warrant Agent shall use CUSIP numbers in notices as a convenience to Holders; *provided* that any such notice may state that no representation is made as to the correctness of such CUSIP numbers either as printed on the Warrant Certificates or as contained in any notice and that reliance may be placed only on the other identification numbers printed on the Warrant Certificates.

Section 2.10.   Withholding and Reporting Requirements.

The Company shall comply with all applicable tax withholding and reporting requirements imposed by any governmental unit, including in connection with all distributions, deemed distributions, redemptions or other situations requiring withholding under applicable law.  Notwithstanding any provision to the contrary, the Company will be authorized to (i) take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements, (ii) apply a portion of any cash distribution or consideration to be made or paid under the Warrants to pay applicable withholding taxes, (iii) liquidate a portion of any non-cash distribution or consideration to be made or delivered (including Common Stock issuable upon exercise of the Warrants) under the Warrants to generate sufficient funds to pay applicable withholding taxes or (iv) establish any other mechanisms the Company believes are reasonable and appropriate, including requiring Holders to submit appropriate tax and withholding certifications (such as IRS Forms W-9 and the appropriate IRS Forms W-8, as applicable) and/or requiring Holders to pay the withholding tax amount to the Company in cash as a condition of receiving the benefit of any adjustment pursuant to Article IV.

Section 2.11.   Proxies.

11

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

The registered Holder of a Global Warrant may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold beneficial interests through Agent Members, to take any action that a Holder is entitled to take under this Agreement or the Warrants.

## ARTICLE III

## EXERCISE TERMS

Section 3.01.   Exercise.

The Exercise Price of each Warrant, the Warrant Share Number, the number of Warrants evidenced by any Warrant Certificate and the Exercise Period of each Warrant shall be set forth in the related Warrant Certificate. The Exercise Price of each Warrant and the Warrant Share Number are subject to adjustment pursuant to the terms set forth in the relevant Warrant Certificate.

Section 3.02.   Manner of Exercise and Issuance of Shares.

Warrants may be exercised in the manner set forth in Sections 3 and 4 of the relevant Warrant Certificate, and upon any such exercise, if any Shares are issuable pursuant to Section 4 of such Warrant Certificate, such Shares shall be issued in the manner set forth in Section 5 of such Warrant Certificate.

Section 3.03.   Covenants Relating to Common Stock Issuable Upon Warrant Exercise.

(a) Common Stock Certificates.  The Warrant Agent is hereby authorized to request from time to time from any stock transfer agents of the Company those stock certificates required to honor outstanding Warrants upon exercise thereof in accordance with the terms of this Agreement and the applicable Warrant Certificate, and the Company agrees to authorize and direct such transfer agents to comply with all such requests of the Warrant Agent. The Company shall supply such transfer agents with duly executed stock certificates for such purposes and shall provide or otherwise make available any cash that may be payable upon exercise of Warrants as provided herein and in each Warrant Certificate.

(b) Common Stock Reserve.  The Company hereby confirms that it previously has authorized and instructed its transfer agent and registrar for the Common Stock to create a special account for the reserve of a number of shares of Common Stock equal to the aggregate Warrant Share Number for all outstanding Warrants to be issued upon exercise of the Warrants, and such reserve account shall be maintained until the earlier of (1) the latest Expiration Time of any Warrant and (2) the time at which all Warrants have been canceled.

Section 3.04.   Exercise Calculations.

12

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

To the extent applicable, the Company shall calculate and transmit to the Warrant Agent, and the Warrant Agent shall have no obligation under this Agreement to calculate, the number of Shares deliverable pursuant to any exercise of Warrants. The number of Shares to be issued on such exercise will be determined by the Company (with written notice thereof to the Warrant Agent) as set forth in the relevant Warrant Certificate. The Warrant Agent shall have no duty or obligation to investigate or confirm whether the Company's determination of the number of Shares to be issued on such exercise is accurate or correct.

## ARTICLE IV

### ANTIDILUTION PROVISIONS

Section 4.01.   Antidilution Adjustments; Notice of Adjustment.

The Exercise Prices and the Warrant Share Numbers shall be subject to adjustment from time to time as provided in Section 13 of the relevant Warrant Certificate. Whenever an Exercise Price or Warrant Share Number is so adjusted or is proposed to be adjusted as provided in Section 13 of the relevant Warrant Certificate, the Company shall deliver to the Warrant Agent the notices or statements, and shall cause a copy of such notices or statements to be sent or communicated to each Holder pursuant to Section 6.03, as provided in Section [13(I)] of the relevant Warrant Certificate.

Section 4.02.   Adjustment to Warrant Certificate.

The form of Warrant Certificate need not be changed because of any adjustment made pursuant to the Warrant Certificate (except as expressly provided in Section 13(E) of the Warrant Certificate), and Warrant Certificates issued after such adjustment may state the same Exercise Price and the same Warrant Share Number as are stated in the Warrant Certificates initially issued pursuant to this Agreement. The Company, however, may at any time in its sole discretion make any ministerial change in the form of Warrant Certificate that it may deem appropriate to give effect to such adjustments and that does not affect the substance of the Warrant Certificate, and any Warrant Certificate thereafter issued or countersigned, whether in exchange or substitution for an outstanding Warrant Certificate or otherwise, may be in the form as so changed.  In the event of any such change, the Company shall give prompt notice thereof to all registered Holders and, if appropriate, notation thereof shall be made on all Warrant Certificates thereafter surrendered for registration of transfer or exchange.

## ARTICLE V

### WARRANT AGENT

Section 5.01.   Appointment of Warrant Agent.

The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the provisions of this Agreement and the Warrant Agent hereby accepts such

13

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

appointment.  The Warrant Agent shall not be liable for anything that it may do or refrain from doing in connection with this Agreement, except for its own gross negligence, willful misconduct, fraud or bad faith. Notwithstanding anything in this Agreement to the contrary, in no event shall the Warrant Agent be liable for special, punitive, incidental, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Warrant Agent has been advised of the likelihood of such loss or damage and regardless of the form of the action. The rights and obligations of the parties set forth in this Section 5.01 shall survive the termination of this Agreement and the resignation, replacement or removal of the Warrant Agent.

Section 5.02.   Rights and Duties of Warrant Agent.

(a) Agent for the Company.  In acting under this Warrant Agreement and in connection with the Warrant Certificates, the Warrant Agent is acting solely as agent of the Company and does not assume any obligation of agency or trust or any relationship of agency or trust for or with any of the holders of Warrant Certificates or beneficial owners of Warrants.

(b) Counsel.  The Warrant Agent may consult with counsel reasonably satisfactory to it, and the advice of such counsel shall be full and complete authorization and protection to the Warrant Agent in respect of any action taken, suffered or omitted by it hereunder in good faith and in accordance with the advice of such counsel.

(c) Documents.  The Warrant Agent shall be protected and shall incur no liability for or in respect of any action taken or thing suffered by it, absent gross negligence, willful misconduct, fraud or bad faith, in reliance upon any Warrant Certificate, notice, direction, consent, certificate, affidavit, statement or other paper or document reasonably believed by it to be genuine and to have been presented or signed by the proper officers or other parties of the Company.  The Warrant Agent shall not take any instructions or directions except those given in accordance with this Agreement.

(d) No Implied Obligations.  The Warrant Agent shall be obligated to perform only such duties as are specifically set forth herein and in the Warrant Certificates, and no implied or inferred duties, responsibility or obligations of the Warrant Agent shall be read into this Agreement or the Warrant Certificates against the Warrant Agent. The Warrant Agent shall not be under any obligation to take any action hereunder that may cause it to incur any expense or liability for which it does not receive indemnity if such indemnity is reasonably requested. The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Company of any of the Warrant Certificates countersigned by the Warrant Agent and delivered by it to the Holders or on behalf of the Holders pursuant to this Agreement or for the application by the Company of the proceeds of the Warrants (if any).  The Warrant Agent shall have no duty or responsibility in the case of any default by the Company in the performance of its covenants or agreements contained herein or in the Warrant Certificates or in the case of the receipt of any written demand from a Holder with respect to such default, including any duty or responsibility to initiate or attempt to initiate any proceedings at law or otherwise. The Warrant Agent shall

14

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

have no duty or responsibility to ensure compliance with any applicable federal or state securities law in connection with the issuance, transfer or exchange of any Warrants under this Agreement.

(e) Not Responsible for Adjustments or Validity of Stock. The Warrant Agent shall not at any time be under any duty or responsibility to any Holder to determine whether any facts exist that may require an adjustment of a Warrant Share Number or Exercise Price or to calculate any such adjustment, or to make any determination with respect to the nature or extent of any adjustment when made, or with respect to the method employed, herein or in any supplemental agreement provided to be employed, in making the same.  The Warrant Agent shall not be accountable with respect to the validity or value of any Shares or of any securities or property that may at any time be issued or delivered upon the exercise of any Warrant or upon any adjustment pursuant to Section 13 of any Warrant Certificate, and it makes no representation with respect thereto.  The Warrant Agent shall not be responsible for any failure of the Company to make any cash payment or to issue, transfer or deliver any Shares or stock certificates upon the surrender of any Warrant Certificate for the purpose of exercise or upon any adjustment pursuant to Section 13 of a Warrant Certificate, or to comply with any of the covenants of the Company contained in a Warrant Certificate or this Agreement.

(f) Notices or Demands Addressed to the Company.  If the Warrant Agent receives any notice or demand addressed to the Company by the Holder of a Warrant, the Warrant Agent shall promptly forward such notice or demand to the Company.

(g) Ambiguity.  In the event the Warrant Agent reasonably believes any ambiguity or uncertainty exists hereunder or in any Warrant Certificate, notice, instruction, direction, request or other communication, paper or document received by the Warrant Agent hereunder, the Warrant Agent shall notify the Company in writing as soon as practicable, and upon delivery of such notice may, in its sole discretion, refrain from taking any action, and shall be fully protected and shall not be liable in any way to the Company or any Holder or other Person for refraining from taking such action, unless the Warrant Agent receives written instructions signed by the Company which eliminate such ambiguity or uncertainty to the reasonable satisfaction of the Warrant Agent. Notwithstanding anything in this Agreement to the contrary, the Warrant Agent is authorized and directed hereby to comply with any orders, judgments, or decrees of any court that it believes has jurisdiction over it and, absent gross negligence, willful misconduct, fraud or bad faith, will not be liable as a result of its compliance with the same.

Section 5.03.   Individual Rights of Warrant Agent.

Subject to its obligations hereunder, the Warrant Agent and any stockholder, director, officer or employee of the Warrant Agent may buy, sell or deal in any of the Warrants or other securities of the Company or its Affiliates or become pecuniarily interested in transactions in which the Company or its Affiliates may be interested, or contract with or lend money to the Company or its Affiliates or otherwise act as fully and freely as though it were not the Warrant Agent under this Agreement. Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.

15

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Section 5.04.   Warrant Agent's Disclaimer.

The Warrant Agent shall not be responsible for, and makes no representation as to the validity or adequacy of, this Agreement (except the due and valid authorized execution and delivery of this Agreement by the Warrant Agent) or the Warrant Certificates (except the due countersignature of the Warrant Certificate(s) by the Warrant Agent) and it shall not be responsible for any statement in this Agreement or the Warrant Certificates other than its countersignature thereon; nor will the Warrant Agent be under any duty or responsibility to insure compliance with any applicable federal or state securities laws in connection with the issuance, transfer or exchange of Warrant Certificates.

Section 5.05.   Compensation and Indemnity.

(a) Compensation of Warrant Agent.  The Company agrees to pay the Warrant Agent the compensation to be agreed upon with the Company for all services rendered by the Warrant Agent under this Agreement and to reimburse the Warrant Agent upon request for all reasonable out-of-pocket expenses, including the reasonable and documented counsel fees and expenses, incurred by the Warrant Agent in connection with the preparation, delivery, administration, execution and amendment of this Agreement and the performance of the services rendered by the Warrant Agent under this Agreement. The Company is not obligated to reimburse any expense incurred by the Warrant Agent through gross negligence, willful misconduct, fraud or bad faith.

(b) Indemnification by the Company.  The Company shall indemnify and hold harmless the Warrant Agent and its officers and directors against any loss, liability or expense (including reasonable attorneys' fees and expenses) incurred by it (each, a "Loss" and, collectively, "Losses") without gross negligence, willful misconduct, fraud or bad faith on its part arising out of or in connection with the acceptance, administration, exercise or performance of its duties under this Agreement. The Company shall further indemnify and hold the Warrant Agent harmless from and against any Loss arising out of or attributable to the Warrant Agent's acting on the written instructions of the Company, so long as the Warrant Agent so acted without gross negligence, willful misconduct, fraud or bad faith. The Warrant Agent shall notify the Company promptly of any claim for which it may seek indemnity. The costs and expenses incurred by the Warrant Agent in successfully enforcing its right of indemnification hereunder shall be paid by the Company. The Company is not obligated to indemnify the Warrant Agent against any loss or liability incurred by the Warrant Agent through willful misconduct, gross negligence, fraud or bad faith. The rights and obligations of the parties set forth in Sections 5.05(a) and (b) shall survive the termination of this Agreement and the resignation, replacement or removal of the Warrant Agent.

Section 5.06.   Successor Warrant Agent.

(a) Company to Provide and Maintain Warrant Agent.  The Company agrees for the benefit of the Holders that there shall at all times be a Warrant Agent hereunder until all the Warrants have been exercised or canceled or are no longer exercisable.

16

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

(b) Resignation and Removal. The Warrant Agent may at any time resign by giving written notice to the Company of such intention on its part, specifying the date on which its desired resignation shall become effective; *provided* that such date shall not be less than 90 days after the date on which such notice is given unless the Company otherwise agrees. The Warrant Agent hereunder may be removed at any time by the filing with it of an instrument in writing signed by or on behalf of the Company and specifying such removal and the date when it shall become effective, which date shall not be less than 90 days after such notice is given unless the Warrant Agent otherwise agrees. Any removal under this Section 5.06(b) shall take effect upon the appointment by the Company as hereinafter provided of a successor Warrant Agent (which shall be (i) a bank or trust company, (ii) organized under the laws of the United States of America or one of the states thereof, (iii) authorized under the laws of the jurisdiction of its organization to exercise corporate trust powers, (iv) having a combined capital and surplus of at least $50,000,000 (as set forth in its most recent reports of condition published pursuant to law or to the requirements of any United States federal or state regulatory or supervisory authority) and (v) having an office in the Borough of Manhattan, the City of New York) and the acceptance of such appointment by such successor Warrant Agent.

(c) Company to Appoint Successor. In the event that at any time the Warrant Agent resigns, is removed, becomes incapable of acting, fails to perform any of its obligations hereunder or under any Warrant Certificate in accordance with the terms hereof or thereof, is adjudged bankrupt or insolvent, commences a voluntary case under the federal bankruptcy laws, as now or hereafter constituted, or under any other applicable federal or state bankruptcy, insolvency or similar law, consents to the appointment of or taking possession by a receiver, custodian, liquidator, assignee, trustee, sequestrator or other similar official of the Warrant Agent or its property or affairs, makes an assignment for the benefit of creditors, admits in writing its inability to pay its debts generally as they become due, or takes corporate action in furtherance of any such action, or a decree or order for relief by a court having jurisdiction in the premises has been entered in respect of the Warrant Agent in an involuntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or similar law, or a decree or order by a court having jurisdiction in the premises has been entered for the appointment of a receiver, custodian, liquidator, assignee, trustee, sequestrator or similar official of the Warrant Agent or of its property or affairs, or any public officer takes charge or control of the Warrant Agent or of its property or affairs for the purpose of rehabilitation, conservation, winding up or liquidation, a successor Warrant Agent, meeting the qualifications specified in Section 5.06(b), shall be appointed by the Company by an instrument in writing, filed with the successor Warrant Agent. In the event that a successor Warrant Agent is not appointed by the Company, a successor Warrant Agent, qualified as aforesaid, may be appointed by the Warrant Agent or the Warrant Agent may petition a court to appoint a successor Warrant Agent. Upon the appointment as aforesaid of a successor Warrant Agent and acceptance by the successor Warrant Agent of such appointment, the Warrant Agent shall cease to be Warrant Agent hereunder; *provided* that in the event of the resignation of the Warrant Agent under this subsection (c) such resignation shall be effective on the earlier of (i)

17

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

the date specified in the Warrant Agent's notice of resignation and (ii) the appointment and acceptance of a successor Warrant Agent hereunder.

(d) <u>Successor to Expressly Assume Duties</u>.  Any successor Warrant Agent appointed hereunder shall execute, acknowledge and deliver to its predecessor and to the Company an instrument accepting such appointment hereunder, and thereupon such successor Warrant Agent, without any further act, deed or conveyance, shall become vested with all the rights and obligations of such predecessor with like effect as if originally named as Warrant Agent hereunder, and such predecessor, upon payment of its charges and disbursements then unpaid, shall thereupon become obligated to transfer, deliver and pay over, and such successor Warrant Agent shall be entitled to receive, all monies, securities and other property on deposit with or held by such predecessor, as Warrant Agent hereunder.

(e) <u>Successor by Merger</u>.  Any entity into which the Warrant Agent hereunder may be merged or consolidated, or any entity resulting from any merger or consolidation to which the Warrant Agent is a party, or any entity to which the Warrant Agent sells or otherwise transfers all or substantially all of its assets and business (including with respect to the administration of this Agreement), shall be the successor Warrant Agent under this Agreement without the execution or filing of any paper or any further act on the part of any of the parties hereto; *provided* that it is open for business on each Business Day and (i) (A) is organized under the laws of the United States of America or one of the states thereof, (B) is authorized under the laws of the jurisdiction of its organization to exercise corporate trust or stock transfer powers and (C) has a combined capital and surplus of at least $50,000,000 or (ii) is an Affiliate of an entity that meets the requirements set forth in clause (i).

Section 5.07.    Representations of the Company.

The Company represents and warrants to the Warrant Agent that:

(a) the Company has been duly organized and is validly existing under the laws of the jurisdiction of its incorporation;

(b) this Agreement has been duly authorized, executed and delivered by the Company and is enforceable against the Company in accordance with its terms, except as may be limited by bankruptcy, insolvency, moratorium, reorganization and other similar laws affecting the enforcement of creditors' rights generally and general equitable principles, regardless of whether such enforceability is considered in a proceeding at law or in equity; and

(c) the execution and delivery of this Agreement does not, and the issuance of the Warrants in accordance with the terms of this Agreement and the Warrant Certificates will not, (i) violate the Company's certificate of incorporation or by-laws, (ii) violate any law or regulation applicable to the Company or order or decree of any court or public authority having jurisdiction over the Company, or (iii) result in a breach of any material mortgage, indenture, contract, agreement or undertaking to which the Company is a party or by which it is bound,

18

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

except in the case of (ii) and (iii) for any violations or breaches that would not reasonably be expected to have a material adverse effect on the Company and its subsidiaries, taken as a whole.

ARTICLE VI

MISCELLANEOUS

Section 6.01.   Persons Benefitting.

Nothing in this Agreement is intended or shall be construed to confer upon any Person other than the Company, the Warrant Agent, the Holders and the owners of a beneficial interest in any Global Warrant any right, remedy or claim under or by reason of this Agreement or any part hereof.

Section 6.02.   Amendment.

This Agreement, the Series A Warrants and the Series B Warrants may be amended by the parties hereto without the consent of any Holder for the purpose of curing any ambiguity, or of curing, correcting or supplementing any defective provision contained herein or therein or adding or changing any other provisions with respect to matters or questions arising under this Agreement, the Series A Warrants or the Series B Warrants as the Company, acting in good faith, and the Warrant Agent may deem necessary or desirable; *provided* that such amendment shall not adversely affect the rights of any of the Holders of the relevant Warrants in any material respect.  Any amendment or supplement to this Agreement, the Series A Warrants or the Series B Warrants, or any waiver hereunder or thereunder, in each case, that has an adverse effect on the interests of any of the Holders of the relevant Warrants or owners of a beneficial interest in a relevant Global Warrant in any material respect shall require the written consent of the Holders of a majority of the then outstanding Series A Warrants (if such modification, amendment or waiver relates to the Series A Warrants) or the written consent of the Holders of a majority of the then outstanding Series B Warrants (if such modification, amendment or waiver relates to the Series B Warrants).  Notwithstanding anything herein to the contrary and without limitation of the immediately foregoing sentence, the consent of each Holder of the applicable Warrants affected thereby shall be required for any amendment or supplement pursuant to which (i) the Series A Exercise Price or Series B Exercise Price, as the case may be, would be increased, the Series A Warrant Share Number or Series B Warrant Share Number, as the case may be, would be decreased or the kind or amount of other property issuable upon exercise of the Series A Warrants or Series B Warrants, as the case may be, would be changed or decreased, as applicable (in each case, other than pursuant to adjustments provided for in Section 13 of the applicable Warrant Certificate), (ii) the time period during which Series A Warrants or Series B Warrants, as the case may be, are exercisable would be shortened, (iii) any change adverse to such Holder would be made to the antidilution provisions set forth in Article IV of this Agreement or Section 13 of the applicable Warrant Certificate (including all definitions used therein) (excluding any amendment following a Reorganization, pursuant to Section 13(E) of the applicable Warrant Certificate), (iv) such Holder's right to exercise the Series A Warrants or Series B Warrants, as the case may be, and receive Series A Shares or

19

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Series B Shares, as the case may be, upon such exercise, or the ability of any Holder or Agent Member (on behalf of itself or any beneficial owner) to enforce such right, would otherwise be materially impaired, or (v) the percentage of Holders required to amend the Series A Warrants or Series B Warrants, as the case may be, or this Agreement or grant a waiver thereunder or hereunder would be reduced.  In determining whether the Holders of the required number of Series A Warrants or Series B Warrants, as the case may be, have concurred in any direction, waiver or consent, Series A Warrants or Series B Warrants, as the case may be, owned by the Company or by any Affiliate of the Company shall be disregarded and deemed not to be outstanding, except that, for the purpose of determining whether the Warrant Agent shall be protected in relying on any such direction, waiver or consent, only the Series A Warrants or Series B Warrants, as the case may be, that the Warrant Agent knows are so owned shall be so disregarded.  Also, subject to the foregoing, only Warrants outstanding at the time shall be considered in any such determination.  The Company and the Warrant Agent may set a record date for any such direction, waiver or consent and only the Holders of the relevant Warrants as of such record date shall be entitled to make or give such direction, waiver or consent. The Warrant Agent shall have no duty to determine whether any such amendment or supplement would have an effect on the rights or interests of the holders of the Series A Warrants or Series B Warrants, as the case may be.  Upon receipt by the Warrant Agent of an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent to the execution of the amendment or supplement have been complied with and such execution is permitted by this Agreement and the applicable Warrant Certificate, the Warrant Agent shall join in the execution of such amendment or supplement; *provided* that the Warrant Agent may, but shall not be obligated to, execute any such amendment or supplement which affects the rights or changes or increases the duties or obligations of the Warrant Agent. Promptly following execution of any amendment or supplement to this Agreement or a Warrant Certificate, the Company shall send a copy thereof to the Warrant Agent and cause such document to be sent or communicated to the relevant Warrantholders and holders of a beneficial interest in a Global Warrant in the manner set forth in Section 21 of the applicable Warrant Certificate; *provided* that failure to deliver such copy to the Warrant Agent or otherwise deliver such document to all relevant Warrantholders or holders of a beneficial interest in a Global Warrant or any defect therein shall not affect the validity of such amendment or supplement. As a condition precedent to the Warrant Agent's execution of any such amendment or supplement, the Company shall deliver to the Warrant Agent an Officer's Certificate that states that the proposed amendment or supplement is in compliance with the terms of this Section 6.02.

Section 6.03.   Notices.

Any notice or communication shall be in writing and delivered in person, by certified or registered mail, or nationally-recognized courier, or by facsimile or e-mail transmission, if acceptable to the parties, addressed as follows:

20

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

if to the Company:

> [Chaparral Energy, Inc.]
> 701 Cedar Lake Blvd.
> Oklahoma City, OK 73114
> Attention:  Charles Duginski, Chief Executive Officer
>                      Justin Byrne, General Counsel
> Email:        chuck.duginski@chaparralenergy.com
>                      justin.byrne@chaparralenergy.com

with a copy to:

> [●]

if to the Warrant Agent:

> [American Stock Transfer & Trust Company, LLC
> 6201 15th Avenue
> Brooklyn, NY 11219
> Attention:  Corporate Actions
> Telephone:  (718) 921-8200]

The Company or the Warrant Agent by notice to the other may designate additional or different addresses for subsequent notices or communications.

Any notice or communication mailed to a Holder shall be mailed to the Holder at the Holder's address as it appears on the Registry and shall be sufficiently given if so mailed within the time prescribed.  Any notice to the owners of a beneficial interest in a Global Warrant shall be distributed through the Depositary in accordance with the procedures of the Depositary. Communications to such owners shall be deemed to be effective at the time of dispatch to the Depositary.

Failure to provide a notice or communication to a Holder or owner of a beneficial interest in a Global Warrant or any defect in it shall not affect its sufficiency with respect to other Holders or owners of a beneficial interest in a Global Warrant. If a notice or communication is provided in the manner provided above, it is duly given, whether or not the intended recipient actually receives it.

Section 6.04.   Governing Law.

**This Agreement will be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State.**

21

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Section 6.05.   Successors.

All agreements of the Company in this Agreement and the Warrants shall bind its successors and permissible assigns. All agreements of the Warrant Agent in this Agreement shall bind its successors and permissible assigns.

Section 6.06.   Multiple Originals; Counterparts.

The parties may sign any number of copies of this Agreement. Each signed copy shall be an original, but all of them together represent the same agreement. One signed copy is enough to prove this Agreement. A signature to this Agreement transmitted electronically shall have the same authority, effect, and enforceability as an original signature.

Section 6.07.   Inspection of Agreement.

A copy of this Agreement shall be made available at all reasonable times for inspection by any registered Holder or owner of a beneficial interest in a Global Warrant at the office of the Warrant Agent (or successor warrant agent) designated for such purpose.

Section 6.08.   Table of Contents.

The table of contents and headings of the Articles and Sections of this Agreement have been inserted for convenience of reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

Section 6.09.   Severability.

The provisions of this Agreement are severable, and if any clause or provision shall be held invalid, illegal or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect in that jurisdiction only such clause or provision, or part thereof, and shall not in any manner affect such clause or provision in any other jurisdiction or any other clause or provision of this Agreement in any jurisdiction.

Section 6.10.   Customer Identification Program.

Each Person that is a party hereto acknowledges that the Warrant Agent is subject to the customer identification program ("Customer Identification Program") requirements under the USA PATRIOT Act and its implementing regulations, and that the Warrant Agent must obtain, verify and record information that allows the Warrant Agent to identify each such Person. Accordingly, prior to accepting an appointment hereunder, the Warrant Agent may request information from any such Person that will help the Warrant Agent to identify such Person, including without limitation, as applicable, such Person's physical address, tax identification number, organizational documents, certificate of good standing or license to do business. Each Person that is a party hereto agrees that the Warrant Agent cannot accept an appointment

22

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

hereunder unless and until the Warrant Agent verifies each such Person's identity in accordance with the Customer Identification Program requirements.

Section 6.11.   Confidentiality.

The Warrant Agent and the Company agree that all books, records, information and data pertaining to the business of the other party, including inter alia, personal, non-public Warrantholder information, which are exchanged or received pursuant to the negotiation or the carrying out of this Agreement, including the fees for services, shall remain confidential, and shall not be voluntarily disclosed to any other person, except as may be required by law, including, without limitation, pursuant to subpoenas from state or federal government authorities (e.g., in divorce and criminal actions).

Section 6.12.   Force Majeure.

Notwithstanding anything to the contrary contained herein, the Warrant Agent will not be liable for any delays or failures in performance resulting from acts beyond its reasonable control including, without limitation, acts of God, terrorist acts, shortage of supply, breakdowns or malfunctions, interruptions or malfunction of computer facilities, or loss of data due to power failures or mechanical difficulties with information storage or retrieval systems, labor difficulties, war, or civil unrest.

*[Remainder of page intentionally left blank]*

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

IN WITNESS WHEREOF, the parties have caused this Warrant Agreement to be duly executed as of the date first written above.

[CHAPARRAL ENERGY, INC.]


by _____
    Name:
    Title:


[AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC],
as Warrant Agent


by _____
Name:
Title:

24

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

**EXHIBIT A**

**FORM OF SERIES A WARRANT**

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

**EXHIBIT B**

**FORM OF SERIES B WARRANT**

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

**FORM OF SERIES [A][B] WARRANT**

**[Global Warrant Legend]**

**[UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), NEW YORK, NEW YORK, TO [CHAPARRAL ENERGY, INC.] OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY WARRANT CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.**

**TRANSFERS OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE WARRANT AGREEMENT REFERRED TO ON THE REVERSE HEREOF.]**

**NO AFFILIATE OF [CHAPARRAL ENERGY, INC.] THAT OWNS THIS SECURITY (OR ANY INTEREST HEREIN) MAY SELL THIS SECURITY (OR ANY INTEREST HEREIN) IF UPON SUCH RESALE THIS SECURITY (OR SUCH INTEREST) WOULD CONSTITUTE A "RESTRICTED SECURITY" WITHIN THE MEANING OF RULE 144 UNDER THE SECURITIES ACT OF 1933, AS AMENDED.**

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

**[GLOBAL][DEFINITIVE] WARRANT**
**representing**

**SERIES [A] [B] WARRANTS**

**to acquire**
**shares of**
**Common Stock**
**of**
**[CHAPARRAL ENERGY, INC.]**

No.  [    ]                                                   CUSIP No.: [      ]

1.      Definitions.  Unless the context otherwise requires, when used herein the following terms shall have the meanings indicated. Any capitalized terms used but not defined herein that are defined in the Warrant Agreement shall have the meanings set forth in the Warrant Agreement.

"*Affiliate*" shall have the meaning ascribed to it in the Warrant Agreement.

"*Agent Members*" shall have the meaning ascribed to it in the Warrant Agreement.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*

"*Board of Directors*" means the board of directors of the Company.

"*Business Day*" shall have the meaning ascribed to it in the Warrant Agreement.

"*Charter*" means, with respect to any Person, its certificate or articles of incorporation, articles of association, or similar organizational document.

"*Common Stock*" means the Company's Common Stock, $[__] par value per share, subject to Section 13(E).

"*Company*" means [Chaparral Energy, Inc.], a Delaware corporation.

"*Custodian*" shall have the meaning ascribed to it in the Warrant Agreement.

"*Definitive Warrant*" means a Warrant Certificate in definitive form that is not deposited with the Depositary or with the Custodian.

"*Depositary*" means The Depository Trust Company, its nominees and their respective successors.

"*Determination Date*" means, in respect of any exercise of Warrants, the relevant Exercise Date for such exercise.

A-2

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"*Effective Date*" means [_____], 2020.

"*Exchange*" means a U.S. national or regional securities exchange.

"*Exchange Act*" means the U.S. Securities Exchange Act of 1934, as amended, or any successor statute, and the rules and regulations promulgated thereunder.

"*Exchange Property*" means, with respect to any Reorganization, the cash, securities or other property that the Common Stock is converted into, is exchanged for or becomes the right to receive, in each case, in such Reorganization.

"*Exercise Date*" shall have the meaning ascribed to it in Section 3.

"*Exercise Notice*" means a notice in the form attached hereto as Annex B delivered by the Warrantholder to the Warrant Agent in accordance with Section 6.03 of the Warrant Agreement to exercise the Warrant.

"*Exercise Period*" shall have the meaning ascribed to it in Section 3.

"*Exercise Price*" means $[●] per Share subject to any adjustment or adjustments in accordance with Section 13. [1]

"*Expiration Time*" shall have the meaning ascribed to it in Section 3.

"*Fair Market Value*" means:

(i)     in the case of shares of stock that are listed on an Exchange on the day as of which Fair Market Value is being determined, the average of the Last Reported Sale Prices for such shares for the 10 consecutive Trading Days immediately preceding such day (or such less number of days for which such shares were so listed); *provided* that, with respect to any determination of Fair Market Value pursuant to this clause (i), the Company, in its good faith determination, shall make appropriate adjustments to such Last Reported Sale Prices to account for any adjustments to the Exercise Price and Warrant Share Number that become effective, or any event requiring any adjustments to the Exercise Price and Warrant Share Number where the record date, effective date or expiration date, as the case may be, of the event occurs, during such period of consecutive Trading Days or on the relevant Determination Date;

(ii)     in the case of cash, the amount thereof; and

(iii)     in the case of securities not covered by clause (i) above or any other property, as determined in good faith and in a commercially reasonable manner by the Board of Directors or an Officer (or committee of Officers) to whom the Board of Directors expressly delegates authority to make determinations of Fair Market Value hereunder.

"*Global Warrant*" means a Warrant Certificate in global form that is deposited with the Depositary or with the Custodian.

"*Joinder Agreement*" shall have the meaning ascribed to it in Section 3.

---

[1]     NTD: Under review.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

"*Last Reported Sale Price*" means, on any day, (i) in the case of shares of stock that are listed on a Principal Exchange on such day, the closing sale price per share (or if no closing sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices) on that day as reported in composite transactions for the Principal Exchange and (ii) in the case of shares of stock that are listed on an Exchange other than a Principal Exchange on such day, the closing sale price per share (or if no closing sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices) on that day as reported in composite transactions for the principal Exchange on which such shares are traded.

"*Majority Holders*" means, at any time, Warrantholders holding a majority of the then-outstanding Warrants.

"*Person*" shall have the meaning ascribed to it in the Warrant Agreement.

"*Principal Exchange*" means each of The New York Stock Exchange, The Nasdaq Global Market and The Nasdaq Global Select Market (or any of their respective successors).

"*Registry*" shall have the meaning ascribed to it in the Warrant Agreement.

"*Reorganization*" means any consolidation, merger, statutory share exchange, business combination or similar transaction with a third party, any sale, lease or other transfer to a third party of all or substantially all of the consolidated assets of the Company and its Subsidiaries, or any recapitalization, reclassification or transaction that results in a change of the Common Stock (other than as described in Section 13(A)), in each case, in which the Common Stock is converted into, is exchanged for or becomes the right to receive cash, securities or other property.

"*Securities Act*" means the U.S. Securities Act of 1933, as amended, or any successor statute, and the rules and regulations promulgated thereunder.

"*Settlement Date*" shall have the meaning ascribed to it in Section 5.

"*Shares*" shall have the meaning ascribed to it in Section 2.

"*Stockholders Agreement*" means that certain shareholders agreement dated as of [●], 2020 by and among the Company and the Company's stockholders, as may be amended from time to time.

"*Subsidiary*" means, with respect to any Person, any corporation, partnership, joint venture, limited liability company or other entity (x) of which such Person or a subsidiary of such Person is a general partner or (y) of which a majority of the voting securities or other voting interests, or a majority of the securities or other interests of which having by their terms ordinary voting power to elect a majority of the board of directors or persons performing similar functions with respect to such entity, is directly or indirectly owned by such Person and/or one or more subsidiaries thereof.

"*Trading Day*" means a day on which (i) trading in the Common Stock (or other security for which a closing sale price must be determined) generally occurs on the Principal Exchange or, if the Common Stock (or such other security) is not then listed on a Principal Exchange, on the principal other Exchange on which the Common Stock (or such other security) is then listed, and (ii) a Last Reported

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Sale Price for the Common Stock (or closing sale price for such other security) is available on such securities exchange; *provided* that if the Common Stock (or such other security) is not so listed or traded, "*Trading Day*" means a Business Day.

"*Transfer Agent*" means [American Stock Transfer & Trust Company, LLC], as the Company's transfer agent and registrar for the Common Stock, and any successor transfer agent for the Common Stock.

"*Unit of Exchange Property*" means, with respect to any Reorganization, the type and amount of Exchange Property that the holder of one share of Common Stock is entitled to receive in such Reorganization.

"*Warrant*" means a right to acquire a number of shares of Common Stock calculated pursuant to Section 4, which is designated as a Series [A] [B] Warrant.  References herein to "Warrant" shall include the Global Warrant where the context requires.  For the avoidance of doubt, "Warrant" does not include any other warrants.

"*Warrant Agent*" shall have the meaning ascribed to it in Section 18.

"*Warrant Agreement*" shall have the meaning ascribed to it in Section 18.

"*Warrant Certificate*" means a registered certificate evidencing Warrants.

"*Warrant Share Number*" means one, as subsequently adjusted from time to time pursuant to the terms of this Warrant Certificate and the Warrant Agreement.

"*Warrantholder*" means a registered owner of Warrants as set forth in the Registry.

2.    Number of Shares; Exercise Price.  This certifies that, for value received, [Cede & Co.][2][_____][3], and any of its registered assigns, is the registered owner of [the number of Warrants set forth on Annex A hereto][4][_____ Warrants][5], each of which entitles the Warrantholder, upon exercise thereof pursuant to Section 3, to acquire from the Company a number of fully paid and nonassessable shares of Common Stock (each a "*Share*" and collectively the "*Shares*") calculated pursuant to Section 4.  The Warrant Share Number and the Exercise Price are subject to adjustment as provided herein, and unless otherwise specified, all references to "Warrant Share Number" and "Exercise Price" herein shall be deemed to include any such adjustment or series of adjustments.

3.    Exercise of Warrant; Term.  Subject to Section 2, to the extent permitted by applicable laws and regulations, each Warrant is exercisable by the relevant Warrantholder, at any time or from time to time during the Exercise Period by (i) the surrender of such Warrant to the Warrant Agent and the delivery to the Warrant Agent of the Exercise Notice annexed hereto, duly completed and executed (or to the Company or to such other office or agency of the Company in the United States as the Company may designate by notice in writing to the Warrantholders pursuant to Section 21), together with payment for transfer taxes as set forth in Section 8, and (ii) with respect to exercising Warrantholders (or

---

[2]    Include for Global Warrant.
[3]    Include for Definitive Warrant.
[4]    Include for Global Warrant.
[5]    Include for Definitive Warrant.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

beneficial owners of an interest in a Global Warrant) that are not already party to the Stockholders Agreement, the delivery to the Company of a duly completed and executed joinder agreement, in substantially the form attached as Annex D hereto, or other documentation in form and substance acceptable to the Company in its sole discretion (any such agreement or documentation, a "*Joinder Agreement*") pursuant to which such Warrantholder agrees to be bound by, and acknowledges that all Shares issued upon such exercise will be subject to, the terms and conditions of the Stockholders Agreement.  The "*Exercise Period*" shall commence upon the execution and delivery of this Warrant Certificate by the Company on the date hereof and shall continue up to, and including, the Expiration Time.  The "*Expiration Time*" shall be 5:00 p.m. New York City time on the [fourth][6] [fifth][7] anniversary of the Effective Date or, if such day is not a Business Day, the next succeeding day that is a Business Day.  The "*Exercise Date*" shall be the date on which a Warrantholder surrenders the Warrant and delivers an Exercise Notice and, if applicable, a Joinder Agreement, in conformity with this Section 3 (unless such surrender and delivery occur after 5:00 p.m. New York City time on a Business Day or on a date that is not a Business Day, in which event the Exercise Date shall be the next following Business Day).  In the case of a Global Warrant, any person with a beneficial interest in such Global Warrant shall effect compliance with the requirements of clause (i) of the first sentence of this Section 3 through the relevant Agent Members in accordance with the procedures of the Depositary.

In the case of a Global Warrant, whenever some but not all of the Warrants represented by such Global Warrant are exercised in accordance with the terms thereof and of the Warrant Agreement, such Global Warrant shall be surrendered by the Warrantholder to the Warrant Agent, which shall cause an adjustment to be made to Annex A to such Global Warrant so that the number of Warrants represented thereby will be equal to the number of Warrants theretofore represented by such Global Warrant less the number of Warrants then exercised.  The Warrant Agent shall thereafter promptly return such Global Warrant to the Warrantholder or its nominee or custodian.  In the case of a Definitive Warrant, whenever some but not all of the Warrants represented by such Definitive Warrant are exercised in accordance with the terms thereof and of the Warrant Agreement, the Warrantholder shall be entitled, at the request of such Warrantholder, to receive from the Company within a reasonable time, and in any event not exceeding five Business Days, a new Definitive Warrant in substantially identical form for the number of Warrants equal to the number of Warrants theretofore represented by such Definitive Warrant less the number of Warrants then exercised.

If this Warrant Certificate shall have been exercised in full, the Warrant Agent shall promptly cancel such certificate following its receipt thereof from the Warrantholder or the Depositary, as applicable.

Notwithstanding anything in this Warrant Certificate to the contrary, in the case of Warrants evidenced by a Global Warrant, any Agent Member may, without the consent of the Warrant Agent or any other person, on its own behalf and on behalf of any beneficial owner for which it is acting, (i) enforce the Warrant Agreement and/or the Global Warrant, including its right to exercise and to receive Shares for its Warrants as provided in the Global Warrant, and (ii) institute and maintain any suit, action or proceeding against the Company suitable to enforce or otherwise in respect of the Warrant Agreement and/or the Global Warrant.

A Warrantholder shall be deemed to own and have all of the rights associated with any Shares or other securities or property to which it is entitled pursuant to this Warrant Certificate (and to be

---

[6]      Include for Series A Warrant.
[7]      Include for Series B Warrant.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

subject to all obligations associated with such Shares or other securities or property including without limitation under the Company's constituent documents and the Stockholders Agreement, as applicable) as of the close of business on the relevant Determination Date upon the exercise of the Warrants in accordance with this Section 3 and Section 5 below.

4.      Settlement.  Notwithstanding any provisions herein to the contrary, the method of settlement of the Warrants shall be the net settlement set forth in this Section 4. In the event that a Warrantholder elects to exercise any Warrants evidenced by this Warrant Certificate in accordance with Section 3 hereof, the Warrantholder shall receive, and the Company shall promptly issue to such Warrantholder, a number of Shares for each Warrant so exercised equal to the greater of (x) zero and (y) "X" as determined pursuant to the following formula:

$$X = Y \times \frac{(A - B)}{A}$$

Where:

Y = the Warrant Share Number (as of the Determination Date);

A = the Fair Market Value of one share of the Common Stock (as of the Determination Date); and

B = the Exercise Price (as of the Determination Date).

The Company shall make all calculations under this Section 4, and the Warrant Agent shall have no duty or obligation to verify or confirm the Company's calculations.

5.      Issuance of Shares; Authorization; Listing.  Shares issued upon the exercise of Warrants evidenced by this Warrant Certificate shall be (i) issued in such name or names as the exercising Warrantholder may designate and (ii) delivered by the Transfer Agent to such Warrantholder or its nominee or nominees in direct registration uncertificated form via book-entry transfer crediting the account of such Warrantholder on the books of the Transfer Agent or, at the Company's election, in certificated form by physical delivery to the address specified by the Warrantholder in the Exercise Notice.  The Company shall cause the number of full Shares to which such Warrantholder shall be entitled to be so delivered by the Transfer Agent within a reasonable time, and in any event on or prior to the tenth Business Day after the applicable Determination Date (such date of delivery, the "*Settlement Date*").

The Company hereby represents, warrants and covenants that any Shares issued upon the exercise of Warrants evidenced by this Warrant Certificate in accordance with the provisions of Sections 3, 4 and 5 will be duly and validly authorized and issued, fully paid and nonassessable and free from all liens and charges (other than liens or charges created by a Warrantholder, and the applicable restrictions and obligations set forth in the Stockholders Agreement).  The Company agrees that the Shares so issued will be deemed to have been issued to a Warrantholder for all purposes as of the close of business on the applicable Determination Date, notwithstanding that the stock transfer books of the Company may then be closed or certificates representing such Shares may not be actually delivered on such date.  The Company will at all times reserve and keep available, out of its authorized but unissued Common Stock, solely for the purpose of providing for the exercise of Warrants evidenced by this

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Warrant Certificate, the aggregate Warrant Share Number for all Warrants evidenced by this Warrant Certificate.  The Company will procure, at its sole expense, the listing of the Shares issuable upon exercise of the Warrants evidenced by this Warrant Certificate, subject to issuance or notice of issuance, on all principal stock exchanges on which the Common Stock is then listed or traded, if any.  The Company will use its reasonable best efforts to ensure that the Shares may be issued without violation of any law or regulation applicable to the Company or of any requirement applicable to the Company of any securities exchange on which the Shares are listed or traded.

6.      No Fractional Shares or Scrip.  No fractional Shares or scrip representing fractional Shares shall be issued upon any exercise of Warrants evidenced by this Warrant Certificate.  In lieu of any fractional Share to which a Warrantholder would otherwise be entitled upon an exercise of Warrants, such Warrantholder shall be entitled to receive a cash payment equal to the value of such fractional Share based on the Last Reported Sale Price of the Common Stock as of the last Trading Day of the period described in clause (i) of the definition of Fair Market Value (or, if such clause (i) is not applicable, the Fair Market Value per share as of the Determination Date). The number of full Shares that shall be issuable upon an exercise of Warrants by a Warrantholder at any time shall be computed on the basis of the aggregate number of Shares which may be issuable pursuant to the Warrants being exercised by that Warrantholder at that time.  The beneficial owners of the Warrants and the Warrantholder, by their acceptance hereof, expressly agree to receive cash in lieu of any fractional Share in accordance with this Section 6 and hereby waive their right to receive a physical certificate representing such fractional Share upon exercise of any Warrant.

Whenever a payment for fractional Shares is to be made by the Warrant Agent under any section of this Warrant Certificate or the Warrant Agreement, the Company shall (i) provide to the Warrant Agent in reasonable detail the facts related to such payments and the prices and/or formulas utilized in calculating such payments, and (ii) provide sufficient monies to the Warrant Agent in the form of fully collected funds to make such payments.

7.      No Rights as Stockholders; Transfer Books.  Warrants evidenced by this Warrant Certificate do not entitle the Warrantholder or the owner of any beneficial interest in such Warrants to any voting rights or other rights as a stockholder of the Company prior to the applicable Determination Date. The Company will at no time close its transfer books against transfer of the Warrants in any manner that interferes with the timely transfer and exercise of the Warrants.

8.      Charges, Taxes and Expenses.  Issuance of Shares in certificated or book-entry form to a Warrantholder upon the exercise of Warrants evidenced by this Warrant Certificate shall be made without charge to the Warrantholder for any documentary, stamp or similar issue or transfer taxes (other than any such taxes due because the Warrantholder requests such Shares to be issued in a name other than the Warrantholder's name) or other incidental expense in respect of the issuance of such Shares, all of which such taxes, if any, and expenses shall be paid by the Company.  The Warrantholder shall pay to the Company a sum sufficient to cover any documentary, stamp or similar issue or transfer taxes due because the Warrantholder requests Shares to be issued in a name other than the Warrantholder's name, and the Company may refuse to deliver any such Shares until it receives a sum sufficient to pay such taxes.

9.      Transfer/Assignment.  Subject to compliance with applicable securities laws and the requirements set forth in the Warrant Agreement, this Warrant Certificate and all rights hereunder are transferable, in whole or in part, upon the books of the Company (or an agent duly appointed by the Company) by the registered holder hereof in person or by duly authorized attorney, and one or more new

A-8

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

Warrant Certificates shall be made and delivered by the Company, of the same tenor and date as this Warrant Certificate but registered in the name of one or more transferees, upon surrender of this Warrant Certificate, duly endorsed, to the office or agency of the Company described in Section 3. All expenses and other charges payable in connection with the preparation, execution and delivery of the new Warrant Certificate pursuant to this Section 9 shall be paid by the Company, except the Warrantholder of the old Warrant Certificate surrendered for transfer shall pay to the Company a sum sufficient to cover any documentary, stamp or similar issue or transfer tax due because the name of the Warrantholder of the new Warrant Certificate issued upon such transfer is different from the name of the Warrantholder of the old Warrant Certificate surrendered for transfer.

If this Warrant Certificate is a Global Warrant, then so long as the Global Warrant is registered in the name of the Depositary, (a) the holders of beneficial interests in the Warrants evidenced thereby shall have no rights under this Warrant Certificate with respect to the Global Warrant held on their behalf by the Depositary or the Custodian, and (b) the Depositary may be treated by the Company, the Warrant Agent and any agent of the Company or the Warrant Agent as the absolute owner of the Global Warrant for all purposes whatsoever, except, in each case, to the extent set forth herein. Accordingly, any such owner's beneficial interest in the Global Warrant will be shown only on, and the transfer of such interest shall be effected only through, records maintained by the Depositary or the Agent Members, and neither the Company nor the Warrant Agent shall have any responsibility with respect to such records maintained by the Depositary or the Agent Members. Notwithstanding the foregoing, nothing herein shall (i) prevent the Company, the Warrant Agent or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or (ii) impair, as between the Depositary and the Agent Members, the operation of customary practices governing the exercise of the rights of a holder of a beneficial interest in any Warrant. Except as otherwise may be provided in this Warrant Certificate or the Warrant Agreement, the rights of beneficial owners in a Global Warrant shall be exercised through the Depositary subject to the applicable procedures of the Depositary. Any holder of the Global Warrant shall, by acceptance of the Global Warrant, agree that transfers of beneficial interests in the Global Warrant may be effected only through a book-entry system maintained by the Depositary, and that ownership of a beneficial interest in the Warrants represented thereby shall be required to be reflected in book-entry form.

A Global Warrant shall be exchanged for Definitive Warrants, and Definitive Warrants may be transferred or exchanged for a beneficial interest in a Global Warrant, only at such times and in the manner specified in the Warrant Agreement. The holder of a Global Warrant may grant proxies and otherwise authorize any person, including Agent Members and persons that may hold beneficial interests in such Global Warrant through Agent Members, to take any action that a Warrantholder is entitled to take under a Warrant or the Warrant Agreement.

10.    Exchange of Warrants. This Warrant Certificate is exchangeable, upon the surrender hereof by the Warrantholder to the Warrant Agent, for a new Warrant Certificate or Warrant Certificates of like tenor and representing the same aggregate number of Warrants.

11.    Compliance with Law. The Warrants are issued in reliance upon the exemption from the registration requirements of Section 5 of the Securities Act provided by section 1145 of the Bankruptcy Code; *provided* that any Warrants issued to any Person that the Company determines, in its sole discretion, may be an "underwriter" as defined in section 1145(b) of the Bankruptcy Code shall instead be issued pursuant to section 4(a)(2) of the Securities Act or another available exemption from the registration requirements of Section 5 of the Securities Act. To the extent the Company determines that the exemption from registration provided under section 1145 of the Bankruptcy Code is not available with

A-9

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

respect to any issuance or transfer of Warrants, the Warrant Certificates representing such Warrants may be stamped or otherwise imprinted with a legend, and the Registry may include a restrictive notation with respect to such Warrants, in substantially the following form:

**THE WARRANTS REPRESENTED BY THIS CERTIFICATE WERE ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND HAVE NOT BEEN REGISTERED PURSUANT TO THE SECURITIES ACT OR OTHER APPLICABLE SECURITIES LAWS. THESE WARRANTS (AND THE SHARES OF COMMON STOCK ISSUABLE UPON EXERCISE THEREOF) MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, OR OTHERWISE DISPOSED EXCEPT (A) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION THEREUNDER.**

Any legend or restrictive notation referenced in this Section 11 shall be removed from the Warrant Certificates or Registry at any time after the restrictions described in such legend or restrictive notation cease to be applicable; *provided* that the Company may request from any Warrantholder opinions, certificates or other evidence that such restrictions have ceased to be applicable before removing such legend or restrictive notation.

12.    Saturdays, Sundays, Holidays, etc.  If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall not be a Business Day, then such action may be taken or such right may be exercised on the next succeeding day that is a Business Day.

13.    Adjustments and Other Rights.  The Exercise Price and the Warrant Share Number shall be subject to adjustment from time to time as set forth in this Section 13; *provided* that no single event shall give rise to an adjustment under more than one subsection of this Section 13 (other than in the case of a dividend or other distribution of different types of property, in which case Section 13(A), 13(B) or 13(C) shall apply to the appropriate parts of each such dividend or distribution); *provided further* that any issuance of Common Stock upon exercise of the Warrants shall not itself give rise to any adjustment under this Section 13.

(A)    Adjustments upon Certain Transactions.  The Exercise Price and Warrant Share Number shall be adjusted pursuant to the formulas below in the event the Company (i) pays a dividend or makes any other distribution with respect to its Common Stock solely in shares of its Common Stock, (ii) subdivides or reclassifies its outstanding shares of Common Stock into a greater number of shares or (iii) combines or reclassifies its outstanding shares of Common Stock into a smaller number of shares. Such adjustments shall become effective (x) in the case of clause (i) above, at the close of business on the record date for such dividend or distribution or (y) in the case of clause (ii) or (iii) above, at the open of business on the effective date of such event. In the event that a dividend or distribution described in clause (i) above is not so paid or made, the Exercise Price and the Warrant Share Number shall be readjusted, effective as of the date when the Board of Directors determines not to make such dividend or distribution, as the case may be, to be the Exercise Price and the Warrant Share Number that would be in effect if such dividend or distribution had not been declared.

$$U_a = U_b \text{ x } \frac{O_a}{O_b}$$

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

$$Pa = Pb \times \frac{Ob}{Oa}$$

Where:

$Ub$ = Warrant Share Number before the adjustment

$Ua$ = Warrant Share Number after the adjustment

$Pb$ = Exercise Price before the adjustment

$Pa$ = Exercise Price after the adjustment

$Ob$ = Number of shares of Common Stock outstanding immediately before the transaction in question

$Oa$ = Number of shares of Common Stock outstanding immediately after the transaction in question

(B)    Certain Rights, Options and Warrants.  The Exercise Price and Warrant Share Number shall be adjusted pursuant to the formulas below in the event the Company issues to all or substantially all holders of the Common Stock any rights, options or warrants (other than in connection with a shareholder rights plan or management incentive plan) entitling them, for a period of not more than 60 calendar days after the announcement date of such issuance, to subscribe for or purchase shares of the Common Stock at a price per share that is less than the Fair Market Value of one share of Common Stock as of the announcement date of such issuance; *provided* that the Exercise Price shall not be increased (and Warrant Share Number shall not be decreased) as a result of this Section 13(B).  Such adjustments shall be made successively whenever any such rights, options or warrants are issued and shall become effective at the close of business on the record date for such issuance. To the extent that shares of the Common Stock are not delivered after the expiration of such rights, options or warrants, the Exercise Price and the Warrant Share Number shall be readjusted to be the Exercise Price and the Warrant Share Number that would then be in effect had the adjustment with respect to the issuance of such rights, options or warrants been made on the basis of delivery of only the number of shares of Common Stock actually delivered.  In the event that such rights, options or warrants are not so issued, the Exercise Price and the Warrant Share Number shall be readjusted to be the Exercise Price and the Warrant Share Number that would then be in effect if such record date had not occurred.  For purposes of this Section 13(B), in determining whether any rights, options or warrants entitle the holders to subscribe for or purchase shares of the Common Stock at less than such Fair Market Value of one share of Common Stock as of the announcement date of such issuance, and in determining the aggregate offering price of such shares of Common Stock, there shall be taken into account the Fair Market Value of any consideration received by the Company for such rights, options or warrants and any amount payable on exercise or conversion thereof.

$$Ua = Ub \times \frac{Ob + X}{Ob + Y}$$

$$Pa = Pb \times \frac{Ob + Y}{}$$

A-11

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

$$Ob + X$$

Where:

$Ub$ = Warrant Share Number before the adjustment

$Ua$ = Warrant Share Number after the adjustment

$Pb$ = Exercise Price before the adjustment

$Pa$ = Exercise Price after the adjustment

$Ob$ = Number of shares of Common Stock outstanding immediately before the transaction in question

$X$ = Number of shares of Common Stock issuable pursuant to such rights, options or warrants

$Y$ = Number of shares of Common Stock equal to the aggregate price payable to exercise such rights, options or warrants, *divided by* the Fair Market Values of one share of Common Stock as of the announcement date of the issuance of such rights, options or warrants

(C)    <u>Certain Dividends and Distributions</u>.  If the Company shall fix a record date for the payment of a dividend or the making of a distribution with respect to the Common Stock consisting of shares of securities, evidences of indebtedness, assets, cash, rights, options or warrants (other than (i) dividends, distributions or issuances for which an adjustment is made pursuant to Section 13(A) or Section 13(B) and (ii) regular cash dividends paid out of earnings or earned surplus, determined in accordance with United States generally accepted accounting principles) to all or substantially all holders of the Common Stock, the Exercise Price and Warrant Share Number shall be adjusted pursuant to the formulas below.  Such adjustments shall become effective at the close of business on the record date for such dividend or distribution. In the event that such dividend or distribution is not so paid or made, the Exercise Price and the Warrant Share Number shall be readjusted, effective as of the date when the Board of Directors determines not to make such dividend or distribution, as the case may be, to be the Exercise Price and the Warrant Share Number that would be in effect if such dividend or distribution had not been declared.

$$Ua = Ub \ \times \ \frac{M}{M-D}$$

$$Pa = Pb \ \times \ \frac{M-D}{M}$$

Where:

$Ub$ = Warrant Share Number before the adjustment

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

$U_a$ = Warrant Share Number after the adjustment

$P_b$ = Exercise Price before the adjustment

$P_a$ = Exercise Price after the adjustment

$M$ = Fair Market Value of one share of Common Stock as of the ex-date for such dividend or distribution

$D$ = Fair Market Value of the dividend or distribution made per share of Common Stock as of such ex-date

(D)    Tender and Exchange Offers.  If a publicly-announced tender or exchange offer made by the Company or any of its Subsidiaries for the Common Stock (other than a Reorganization) shall be consummated, to the extent that the cash and Fair Market Value of any other consideration included in the payment per share of Common Stock exceeds the Fair Market Value of one share of Common Stock as of the eleventh Trading Day immediately following the date on which such tender or exchange offer expires, then the Exercise Price and the Warrant Share Number shall be adjusted pursuant to the formulas below; provided that the Exercise Price shall not be increased (and Warrant Share Number shall not be decreased) as a result of this Section 13(D).  Such adjustments shall be determined on the eleventh Trading Day immediately following the date on which such tender or exchange offer expires, but shall become effective as of the date on which such tender or exchange offer expires.

$$U_a = U_b \ \times \ \frac{(O_a \times M) + E}{O_b \times M}$$

$$P_a = P_b \ \times \ \frac{O_b \times M}{(O_a \times M) + E}$$

Where:

$U_b$ = Warrant Share Number before the adjustment

$U_a$ = Warrant Share Number after the adjustment

$P_b$ = Exercise Price before the adjustment

$P_a$ = Exercise Price after the adjustment

$M$ = Fair Market Value of one share of Common Stock as of the eleventh Trading Day immediately following the date on which such tender or exchange offer expires

$E$ = Aggregate Fair Market Value of all cash and any other consideration paid or payable for shares of Common Stock in such tender or exchange offer

A-13

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

$Ob$ = Number of shares of Common Stock outstanding immediately before giving effect to such tender or exchange offer

$Oa$ = Number of shares of Common Stock outstanding immediately after giving effect to such tender or exchange offer

Because the Company will make such adjustments with retroactive effect, the Company will delay the settlement of any exercise of Warrants where the Exercise Date occurs on or after the date on which such tender or exchange offer expires and prior to the eleventh Trading Day immediately following the date on which such tender or exchange offer expires until up to the tenth business day after the eleventh Trading Day immediately following the date on which such tender or exchange offer expires and, in respect of any such delay, the Company shall be deemed not to have breached its obligation to deliver the consideration due upon such exercise by the date otherwise specified in this Warrant Certificate. If the Company or one of its Subsidiaries is obligated to purchase Common Stock pursuant to any such tender or exchange offer but is permanently prevented by applicable law from effecting any such purchase or all such purchases are rescinded and the Company or such Subsidiary does not make any payment in respect of such purchases, or such payment is refunded to the Company or such Subsidiary, the Exercise Price and the Warrant Share Number shall be readjusted to be the Exercise Price and the Warrant Share Number that would be in effect if such tender or exchange offer had not been made.

(E)    Reorganizations. In the case of any Reorganization, then, following the effective time of such Reorganization, a Warrantholder's right to receive Shares upon exercise of the Warrants evidenced by this Warrant Certificate shall be converted into the right to receive, with respect to each Share that would have otherwise been deliverable hereunder, one Unit of Exchange Property; *provided* that if the Exchange Property consists solely of cash, on the effective date of such Reorganization, each Warrantholder shall receive, in respect of each Warrant such Warrantholder holds, at the same time and upon the same terms as holders of Common Stock receive the cash in exchange for their shares of Common Stock, an amount of cash equal to the greater of (i) (x) the amount of cash that such Warrantholder would receive in such Reorganization if such Warrantholder owned, as of the record date for such Reorganization, a number of shares of Common Stock equal to the Warrant Share Number in effect on such record date, *minus* (y) the Exercise Price in effect on such record date *multiplied by* the Warrant Share Number in effect on such record date and (ii) $0, and upon the Company's delivery of such cash (if any) in respect of such Warrant, such Warrant shall be deemed to have been exercised in full and canceled. With respect to any exercise of Warrants following the effective time of such Reorganization, the number of Units of Exchange Property issuable upon exercise of a Warrant shall be calculated pursuant to Section 4; *provided* that, with respect to each Determination Date following such Reorganization, each reference in Section 4 to a "Share" or a "share of Common Stock" shall be deemed to refer to a Unit of Exchange Property.

In the case of any Reorganization in which holders of Common Stock may make an election as between different types of Exchange Property, a Warrantholder shall be deemed to have elected to receive upon exercise of the Warrants, the types and amounts of consideration actually received by the holders of Common Stock. The Company shall not consummate any Reorganization unless the Company first shall have made appropriate provision to ensure that applicable provisions of this Warrant Certificate (including, without limitation, the applicable provisions of this Section 13) shall immediately after giving effect to such Reorganization be assumed by and binding on the other party to the Reorganization (or the surviving entity, successor, parent company and/or issuer of such Exchange Property, as appropriate) and applicable to any Exchange Property deliverable upon the exercise of Warrants, pursuant to a customary assumption agreement in form and substance reasonably satisfactory to the Majority Holders.  Any such

A-14

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

assumption agreement shall also include any amendments to this Warrant Certificate necessary to effect the changes to the terms of the Warrants described in this Section 13(E) and preserve the intent of the provisions of this Warrant Certificate (including, without limitation, the adjustment provisions in this Section 13).  The provisions of this Section 13(E) shall similarly apply to successive Reorganizations.

The Company shall notify the Warrant Agent of any such proposed Reorganization reasonably prior to the consummation thereof so as to provide the Warrantholders with a reasonable opportunity to confirm compliance with the terms hereof and, if they elect, to exercise the Warrants in accordance with the terms and conditions hereof prior to consummation of the Reorganization, and the Company shall cause such notice to be sent or communicated to the Warrantholders and holders of a beneficial interest in a Global Warrant in the manner set forth in Section 21 hereof; *provided* that in the case of a transaction which requires notice to be given to the holders of the Common Stock, the Warrant Agent and the Warrantholders and holders of a beneficial interest in a Global Warrant shall be provided the same notice given to the holders of the Common Stock.

(F)    Certain Other Events.  The Company may make decreases in the Exercise Price and/or increases in the Warrant Share Number as the Board of Directors deems advisable in good faith in order to avoid or diminish any income tax to holders of the Common Stock resulting from any dividend or distribution of stock (or rights to acquire stock) or from any event treated as such for income tax purposes.

(G)    Shareholder Rights Plans.  If the Company has a shareholder rights plan in effect upon any exercise of Warrants, each share of Common Stock issued upon such exercise shall be entitled to receive the appropriate number of rights, if any, and the certificates representing the Common Stock issued upon such exercise shall bear such legends, if any, in each case as may be provided by the terms of any such shareholder rights plan, as the same may be amended from time to time. However, if, prior to any exercise of Warrants, the rights have separated from the shares of Common Stock in accordance with the provisions of the applicable shareholder rights plan, the Exercise Price and Warrant Share Number shall be adjusted at the time of separation as if the Company made a distribution of the type for which an adjustment is made pursuant to Section 13(C), subject to readjustment in the event of the expiration, termination or redemption of such rights.

(H)    Rounding of Calculations; Minimum Adjustments.  All calculations under this Section 13 shall be made to the nearest one-tenth (1/10th) of a cent or to the nearest one-hundredth (1/100th) of a share, as the case may be. Any provision of this Section 13 to the contrary notwithstanding, no adjustment in the Exercise Price or the Warrant Share Number shall be made if the amount of such adjustment would be less than $0.01 or one-tenth (1/10th) of a share of Common Stock, but any such amount shall be carried forward and an adjustment with respect thereto shall be made at the time of and together with any subsequent adjustment which, together with such amount and any other amount or amounts so carried forward, shall aggregate $0.01 or 1/10th of a share of Common Stock, or more, or upon exercise of a Warrant if it shall earlier occur.

(I)    Notice of Adjustment.  Whenever the Warrant Share Number, the number of shares of stock or property other than Common Stock issuable upon the exercise of the Warrants or the Exercise Price is adjusted, or the type of securities or property to be delivered upon exercise of the Warrants is changed, as herein provided, the Company shall deliver to the Warrant Agent a notice of such adjustment or adjustments and shall deliver to the Warrant Agent a statement setting forth the Warrant Share Number, the number and type of shares of stock or property other than Common Stock issuable upon the exercise of a Warrant and the Exercise Price after such adjustment, setting forth a brief statement

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

of the facts requiring such adjustment and setting forth the computation by which such adjustment was made, and the Company shall cause such notice and statement to be sent or communicated to the Warrantholders and holders of a beneficial interest in a Global Warrant in the manner set forth in Section 21 hereof.  Any failure by the Company to deliver such notice or statement shall not affect the validity of the relevant adjustments.

(J)    Notice of Action.  In the event that the Company shall propose to take any action of the type described in this Section 13 (but only if the action of the type described in this Section 13 would result in an adjustment in the Exercise Price or the Warrant Share Number or a change in the type of securities or property to be delivered upon exercise of a Warrant), the Company shall deliver to the Warrant Agent a notice and shall cause such notice to be sent or communicated to the Warrantholders and holders of a beneficial interest in a Global Warrant in the manner set forth in Section 21 hereof, which notice shall specify the record date, if any, with respect to any such action and the approximate date on which such action is to take place. Such notice shall also set forth the facts with respect thereto as shall be reasonably necessary to indicate the effect on the Exercise Price and the number, kind or class of shares or other securities or property that shall be deliverable upon exercise of a Warrant. In the case of any action which would require the fixing of a record date, such notice shall be given at least 10 days prior to the date so fixed, and in case of all other action, such notice shall be given at least 15 days prior to the taking of such proposed action. Failure to give such notice, or any defect therein, shall not affect the legality or validity of any such action.

(K)    Adjustment Rules.  If an adjustment in the Exercise Price made hereunder would reduce the Exercise Price to an amount below $[*insert par value*] then such adjustment in the Exercise Price made hereunder shall reduce the Exercise Price to $[*insert par value*] and not lower.

(L)    Proceedings Prior to Any Action Requiring Adjustment.  As a condition precedent to the taking of any action which would require an adjustment pursuant to this Section 13, the Company shall take any action that may be necessary, including obtaining regulatory, New York Stock Exchange, Nasdaq Global Market, Nasdaq Global Select Market or other applicable national securities exchange or stockholder approvals or exemptions, in order that the Company may thereafter validly and legally issue as fully paid and nonassessable all Shares that a Warrantholder is entitled to receive upon exercise of a Warrant pursuant to Section 4, after giving effect to the adjustment that would be made under this Section 13.

14.    Notice of Dividends and Distributions.  At any time when the Company declares any dividend or other distribution on the Common Stock and the Common Stock is not listed on a national securities exchange, it shall give notice to the Warrant Agent of any such declaration not less than 15 days prior to the related record date for payment of the dividend or distribution so declared and shall cause such notice to be sent or communicated to the Warrantholders and holders of a beneficial interest in a Global Warrant in the manner set forth in Section 21 hereof.

15.    No Impairment.  The Company will not, by amendment of its Charter or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Warrant Certificate and in taking of all such action as may be necessary or appropriate in order to protect the rights of the Warrantholders.

THIS DOCUMENT IS IN DRAFT FORM, REMAINS SUBJECT TO ONGOING REVIEW AND COMMENT BY THE DEBTORS AND INTERESTED PARTIES WITH RESPECT THERETO SUBJECT TO THE APPLICABLE CONSENT RIGHTS UNDER THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND IS THEREFOR SUBJECT TO MATERIAL CHANGE.

16.    Governing Law. **This Warrant Certificate and the Warrants evidenced hereby will be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State.**

17.    Binding Effect; Countersignature by Warrant Agent.  This Warrant Certificate shall be binding upon any successors or assigns of the Company.  This Warrant Certificate shall not be valid until an authorized signatory of the Warrant Agent (as defined below) countersigns this Warrant Certificate. Such signature shall be solely for the purpose of authenticating this Warrant Certificate and shall be conclusive evidence that this Warrant Certificate has been countersigned under the Warrant Agreement.

18.    Warrant Agreement; Amendments.  This Warrant Certificate is issued under and in accordance with a Warrant Agreement dated as of [●] (the "*Warrant Agreement*"), between the Company and [American Stock Transfer & Trust Company, LLC] (the "*Warrant Agent*," which term includes any successor Warrant Agent under the Warrant Agreement), and is subject to the terms and provisions contained in the Warrant Agreement, to all of which terms and provisions the beneficial owners of the Warrants and the Warrantholders consent by acceptance hereof.  The Warrant Agreement is hereby incorporated herein by reference in its entirety and made a part hereof.  Reference is hereby made to the Warrant Agreement which sets forth certain of the respective rights, limitations of rights, duties and obligations of the Company, the Warrant Agent and the Warrantholders and beneficial owners of the Warrants.  A copy of the Warrant Agreement may be obtained for inspection by the Warrantholders upon written request to the Warrant Agent at the address of the Warrant Agent set forth in the Warrant Agreement.  The Warrant Agreement and this Warrant Certificate may be amended and supplemented and the observance of any term of the Warrant Agreement or this Warrant Certificate may be waived only as and to the extent expressly provided in the Warrant Agreement or this Warrant Certificate.

19.    Prohibited Actions.  The Company agrees that it will not take any action that would entitle the Warrantholders to an adjustment of the Exercise Price if the aggregate Warrant Share Number after such action for the Warrants evidenced by this Warrant Certificate, together with all shares of Common Stock then outstanding and all shares of Common Stock then issuable upon the exercise of, or underlying, all outstanding options, warrants, conversion and other rights (without duplication), would exceed the total number of shares of Common Stock then authorized by its Charter.

20.    Reports to Warrantholders. The Company will provide to the Warrantholders, on a continuous basis for so long as any Warrants remain outstanding, any and all quarterly and annual financial and other information with respect to the Company and its Subsidiaries as is provided to the holders of the Common Stock, in each case, in the form in which such information is so provided to the holders of the Common Stock (which may include, without limitation, posting such information to the Company's public website or a password-protected website created by the Company for such purpose).

21.    Notices.  Any notice or communication mailed to the Warrantholders shall be mailed to each Warrantholder at the Warrantholder's address as it appears in the Registry and shall be sufficiently given if so mailed within the time prescribed.  Any notice to holders of a beneficial interest in a Global Warrant shall be distributed through the Depositary in accordance with the procedures of the Depositary.  Communications to such holders shall be deemed to be effective at the time of dispatch to the Depositary.

IN WITNESS WHEREOF, each of the Company and the Warrant Agent has caused this Warrant Certificate to be duly executed by a duly authorized officer.  This Warrant Certificate shall not be valid or obligatory for any purpose until it shall have been countersigned by the Warrant Agent.

Dated:  [_____]

[CHAPARRAL ENERGY, INC.]


By: _____
      Name:
      Title:


Countersigned by:

[AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC], as Warrant Agent


By: _____
      Authorized Signatory


[SIGNATURE PAGE TO WARRANT CERTIFICATE]


A-18

**ANNEX A**

**[Annex A to Global Warrant][8]**

The initial number of Warrants represented by this Global Warrant is [_____].

The following decreases in the number of Warrants represented by this Global Warrant have been made as a result of the exercise, cancellation, exchange or redemption of certain Warrants represented by this Global Warrant:

| Date of Exercise/ Cancellation/ Exchange of Warrants | Number of Warrants Exercised/ Canceled/ Exchanged | Total Number of Warrants Represented Hereby Following Such Exercise/ Cancellation/ Exchange | Notation Made by Warrant Agent/Custodian |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

---

[8]     Include for Global Warrant.

A-A-1

**ANNEX B**

FORM OF EXERCISE NOTICE

(TO BE EXECUTED ONLY UPON EXERCISE OF SERIES [A] [B] WARRANTS)

DATE: _____, 20__

TO:    [American Stock Transfer & Trust Company, LLC]
       [6201 15th Avenue
       Brooklyn, NY 11219
       Attention:  Corporate Actions]

RE:    Election to Purchase Common Stock

        The undersigned registered holder of [              ] Series [A] [B] Warrants irrevocably elects to exercise the number of Series [A] [B] Warrants set forth below represented by the Global Warrant (or, in the case of a Definitive Warrant, the Warrant Certificate enclosed herewith), and surrenders all right, title and interest in the number of Series [A] [B] Warrants exercised hereby to the Company, and directs that the shares of Common Stock or other securities or property delivered upon exercise of such Series [A] [B] Warrants, and any interests in the Global Warrant or Definitive Warrant representing unexercised Series [A] [B] Warrants, be registered or placed in the name and at the address specified below and delivered thereto.

Number of Series [A] [B] Warrants: _____

Warrantholder: _____
By:            _____
Name:          _____
Title:         _____

Joinder:    ☐    The Person to whom the Common Stock is to be issued upon such exercise is already a party to the Stockholders Agreement.

        ☐    The Person to whom the Common Stock is to be issued upon such exercise is not already a party to the Stockholders Agreement and shall deliver a duly completed and executed Joinder Agreement to the Company pursuant to Section 3 of the Warrant Certificate as a condition precedent to the issuance of the Shares to be issued pursuant to the exercise hereof.

Signature guaranteed by*:

_____

* The signature must correspond with the name as written upon the face of the within Warrant Certificate in every particular, without alteration or enlargement or any change whatever, and must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level reasonably acceptable to the Transfer Agent.

A-B-1

A-B-2

Securities and/or check to be issued to:

Social Security Number
or Other Identifying Number:

Name:

Street Address:

City, State and Zip Code:

Any unexercised Series [A] [B] Warrants evidenced by the exercising Warrantholder's interest in the Global Warrant or Definitive Warrant, as the case may be, to be issued to:

If in book-entry form through the Depositary:

Depositary Account Number:

Name of Agent Member:

If in definitive form:

Social Security Number
or Other Identifying Number:

Name:

Street Address:

City, State and Zip Code:

**ANNEX C**

**Form of Assignment**

For value received, the undersigned registered Warrantholder of the within Warrant Certificate hereby sells, assigns and transfers unto the Assignee(s) named below (including the undersigned with respect to any Series [A] [B] Warrants constituting a part of the Series [A] [B] Warrants evidenced by the within Warrant Certificate not being assigned hereby) all of the right, title and interest of the undersigned under the within Warrant Certificate with respect to the number of Series [A] [B] Warrants set forth below and does irrevocably constitute and appoint [_____], the undersigned's attorney, to make such transfer on the books of the Company maintained for the purpose, with full power of substitution in the premises.

| **Name of Assignees** | **Address** | **Number of Warrants** | **Social Security Number or other Identifying Number** |
|---|---|---|---|
| | | | |

Dated:

Holder: _____
By: _____
Name: _____
Title: _____

Signature guaranteed by*:

_____

* The signature must correspond with the name as written upon the face of the within Warrant Certificate in every particular, without alteration or enlargement or any change whatever, and must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level reasonably acceptable to the Company's transfer agent.

**ANNEX D**

**Form of Joinder to the Stockholders Agreement**

This Joinder Agreement (this "*Joinder Agreement*") is made as of [_____ ___, 20__] by the undersigned (the "*Stockholder*") in accordance with the requirement pursuant to the terms of the Series [A][B] Warrants of [Chaparral Energy, Inc.] (the "*Company*") to become a party to the Stockholders Agreement of the Company dated as of [●] (as the same may be amended from time to time in accordance with its terms, the "*Stockholders Agreement*") in connection with the Stockholder's receipt of shares of Common Stock upon exercise of such Series [A][B] Warrants.  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Stockholders Agreement.

The Stockholder hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, it shall become a party to the Stockholders Agreement and shall be fully bound by and subject to, all of the covenants, terms and conditions of the Stockholders Agreement as though an original party thereto and shall be deemed and is hereby admitted as, a stockholder for all purposes thereof and entitled to all the rights incidental thereto, as of the date first written above.

The Stockholder hereby represents and warrants that (i) the Stockholder has all requisite power and authority to execute this Joinder Agreement and to perform its obligations under the Stockholders Agreement and (ii) the execution and delivery of this Joinder Agreement and the performance of Stockholder's obligations under the Stockholders Agreement will not conflict with or constitute a default under any material contract to which the Stockholder is a party, constitute a default under the Stockholder's governing documents or conflict with or constitute a violation of any applicable law.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of the date first written above and hereby authorizes this signature page to be attached to a counterpart of the Stockholders Agreement.

[STOCKHOLDER]

By: _____
      Name:
      Title:

# Exhibit I

**Backstop Commitment Agreement**

*Execution Version*

**BACKSTOP PURCHASE AGREEMENT**

**BY AND AMONG**

**CHAPARRAL ENERGY, INC.,**

**EACH OF ITS DIRECT AND INDIRECT SUBSIDIARIES**

**AND**

**THE BACKSTOP PARTIES HERETO**

**Dated as of August 15, 2020**

**TABLE OF CONTENTS**

Page

1.  **Rights Offering and Backstop Commitments**.................................................2

    1.1.  **The Rights Offering**. ............................................................................2

    1.2.  **Backstop Commitments**. .....................................................................2

    1.3.  **Put Option Premium**............................................................................4

2.  **Closing; Certain Expenses and Payments**. .............................................5

    2.1.  **Closing**. ................................................................................................5

    2.2.  **Backstop Expenses.**. ............................................................................5

3.  **Representations and Warranties of the Debtors**. ..................................6

    3.1.   **Organization of the Debtors.** ...............................................................6

    3.2.   **Organization and Capitalization of the Subsidiaries.**........................7

    3.3.   **Authority; No Conflict**. .......................................................................7

    3.4.   **Proceedings.**.........................................................................................9

    3.5.   **Brokers or Finders.**.............................................................................9

    3.6.   **Exemption from Registration.**............................................................9

    3.7.   **Issuance.**...............................................................................................9

    3.8.   **No Violation or Default**.......................................................................9

    3.9.   **Intellectual Property**.........................................................................10

    3.10.  **Licenses and Permits**........................................................................11

    3.11.  **Compliance with Environmental Laws** ...........................................12

    3.12.  **Compliance with ERISA**. .................................................................12

    3.13.  **Compliance with Anti-Corruption, Money Laundering and Import Laws; Export Controls and Economic Sanctions**. ...........................14

    3.14.  **Absence of Certain Changes or Events.**. ..........................................15

    3.15.  **Material Contracts**. ..........................................................................16

    3.16.  **Financial Statements; No Undisclosed Liabilities**..........................16

    3.17.  **Title to Property**................................................................................16

    3.18.  **Tax Matters** ......................................................................................17

    3.19.  **Labor and Employment Compliance**. ..............................................18

    3.20.  **Related Party Transactions.**. ............................................................19

    3.21.  **Insurance**. ..........................................................................................19

    3.22.  **SEC Reports and Bankruptcy Documents.**......................................20

    3.23.  **Internal Control Over Financial Reporting**. ...................................20

    3.24.  **Disclosure Controls and Procedures** ...............................................20

    3.25.  **Investment Company Act** .................................................................20

    3.26.  **Oil and Gas Matters**..........................................................................21

    3.27.  **Takeover Statutes.**.............................................................................21

4.  **Representations and Warranties of the Backstop Parties**...................22

    4.1.   **Organization of Such Backstop Party** .............................................22

    4.2.   **Authority; No Conflict**. .....................................................................22

    4.3.   **Backstop Securities Not Registered.**................................................23

i

4.4. **Acquisition for Own Account.** ...................................................................23
4.5. **Qualified Institutional Buyer.** ...............................................................23
4.6. **Proceedings.** .........................................................................................23
4.7. **Sufficiency of Funds.** ...........................................................................24
4.8. **Access to Information.** ..........................................................................24
4.9. **Party to RSA.** ........................................................................................24
4.10. **No Brokers Fee.** ...................................................................................24
4.11. **Ownership of Claims.** ..........................................................................24

5. **Covenants of the Debtors** ...........................................................................24
5.1. **Approval of this Agreement.** ................................................................24
5.2. **Exit Facility.** .........................................................................................25
5.3. **Conditions Precedent.** ..........................................................................26
5.4. **Notification.** ..........................................................................................26
5.5. **Use of Proceeds.** ...................................................................................26
5.6. **HSR Act and Foreign Competition Filings** .........................................26
5.7. **Royalty Class Action Settlement.** ........................................................26
5.8. **RSA Covenants.** ....................................................................................27
5.9. **Access** ...................................................................................................27

6. **Covenants of the Backstop Parties.** ............................................................27
6.1. **Conditions Precedent.** ..........................................................................27
6.2. **HSR Act and Foreign Competition Filings.** .........................................28

7. **Conditions to Closing.** ................................................................................28
7.1. **Conditions Precedent to Obligations of the Backstop Parties.** ...........28
7.2. **Conditions Precedent to Obligations of the Company.** ........................32

8. **Termination.** ...............................................................................................33

9. **Indemnification.** .........................................................................................36

10. **Survival** ......................................................................................................38

11. **Amendments and Waivers** .........................................................................38

12. **Notices.** ......................................................................................................39

13. **Miscellaneous.** ...........................................................................................40
13.1. **Assignments.** .........................................................................................40
13.2. **Severability.** ..........................................................................................40
13.3. **Entire Agreement.** ................................................................................41
13.4. **Counterparts.** ........................................................................................41
13.5. **Governing Law.** ....................................................................................41
13.6. **Submission to Jurisdiction.** .................................................................41
13.7. **Waiver of Trial by Jury; Waiver of Certain Damages.** ........................41
13.8. **Further Assurances.** ..............................................................................42
13.9. **Specific Performance.** ..........................................................................42
13.10. **Headings.** .............................................................................................42
13.11. **Interpretation; Rules of Construction.** ................................................42

ii

13.12. **Several, Not Joint, Obligations**. ........................................................................43
13.13. **Disclosure**. ......................................................................................................43
13.14. **No Recourse Party**. ...........................................................................................43
13.15. **Settlement Discussions**. ....................................................................................44
13.16. **No Third Party Beneficiaries** .............................................................................44
13.17. **Arm's Length.** ...................................................................................................44

14.   **Definitions**. ..............................................................................................................44
14.1. **Definitions in the RSA**..........................................................................................44
14.2. **Certain Defined Terms.** .......................................................................................44
14.3. **Interpretation**. ....................................................................................................56

**Exhibits**

A          Rights Offering Procedures

**Schedules**

1          Backstop Commitment Schedule

NY 78156220

**THIS BACKSTOP PURCHASE AGREEMENT** (as amended, supplemented, amended and restated or otherwise modified from time to time in accordance with the terms hereof, together with any schedules, exhibits and annexes hereto, this "Agreement") is entered into as of August 15, 2020 (the "Execution Date"), by and among (a) Chaparral Energy, Inc., a Delaware corporation (including as a debtor-in-possession in the Chapter 11 Cases (as defined below) and as a reorganized debtor, as applicable, the "Company"), (b) each of the direct and indirect Subsidiaries (as defined below) of the Company listed on the signature pages hereto under the title "Debtors" (such Subsidiaries, including each as a debtor-in-possession in the Chapter 11 Cases and as a reorganized debtor, as applicable, together with the Company, each, a "Debtor" and, collectively, the "Debtors"), and (c) each of the undersigned entities set forth on Schedule 1 hereto (each, a "Backstop Party" and such schedule, the "Backstop Commitment Schedule").  Capitalized terms used in this Agreement are defined in Section 14 hereof.

## RECITALS

**WHEREAS**, the Debtors, the Backstop Parties and certain other Persons have entered into a Restructuring Support Agreement, dated as of August 15, 2020 (as amended, supplemented, amended and restated or otherwise modified from time to time in accordance with the terms thereof, together with any schedules, exhibits and annexes thereto, the "RSA"), which provides for the restructuring of the Debtors' capital structure and financial obligations pursuant to a pre-packaged plan of reorganization attached to the RSA as Exhibit B thereto (as it may be amended, supplemented or otherwise modified from time to time in accordance with the terms of the RSA, the "Plan"), to be filed in jointly administered voluntary reorganization cases of the Debtors (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

**WHEREAS**, pursuant to (and subject to the terms and conditions set forth in) the Plan, the Debtors will conduct a rights offering, on the terms set forth in the Plan, the Rights Offering Procedures and this Agreement (the "Rights Offering"), by distributing to each Eligible Holder (as defined in the Rights Offering Procedures) as of the applicable record date, non-certificated Subscription Rights that entitle such Eligible Holders who timely exercise Subscription Rights, fund the applicable purchase price and do not "opt out" of being a Releasing Party (as defined in the Plan) to purchase Rights Offering Securities on the terms and conditions set forth in the Rights Offering Procedures;

**WHEREAS**, in order to facilitate the Rights Offering, pursuant to this Agreement, and subject to the terms, conditions and limitations set forth herein, and in reliance on the representations and warranties set forth herein, each of the Backstop Parties, severally and not jointly, has agreed to provide the Company with the right to require such Backstop Party to purchase, and upon exercise of such right by the Company, each Backstop Party has agreed to purchase from the Company, on the Effective Date, such Backstop Party's Backstop Commitment Percentage of the aggregate amount of Rights Offering Securities that, as of the Subscription Instruction and Payment Deadline, have not been duly subscribed for by Rights Offering Participants in accordance with the Rights Offering Procedures (the "Unsubscribed Securities");

**NOW, THEREFORE,** in consideration of the foregoing, and the representations, warranties and covenants set forth herein, and other good and valuable consideration, the Debtors and the Backstop Parties hereby agree as follows:

1. **Rights Offering and Backstop Commitments**.

    1.1. **The Rights Offering**.

    (a)     The Company shall conduct and consummate the Rights Offering in accordance with Rights Offering Procedures, and otherwise on the applicable terms and conditions set forth in this Agreement and the Plan. Each Backstop Party hereby covenants and agrees with each of the other Backstop Parties that it shall not exercise any of the Subscription Rights issued to it in the Rights Offering, except as otherwise mutually agreed by the Backstop Parties in which event each Backstop Party shall have until the Deposit Deadline to fund, into the Deposit Account, the Aggregate Purchase Price for all Rights Offering Securities that such Backstop Party subscribes for in the Rights Offering, and such funding shall be deemed timely notwithstanding any earlier funding deadline as the Rights Offering Procedures may require with respect to other Rights Offering Participants.

    (b)     The Company hereby agrees and undertakes to deliver to each of the Backstop Parties, by e-mail, a certification by an executive officer of the Company (the "Backstop Certificate") indicating (i) if there are Unsubscribed Securities, a true and accurate calculation of the total principal amount thereof and wire instructions for the Deposit Account, or (ii) if there are no Unsubscribed Securities, the fact that there are no Unsubscribed Securities (it being understood that the Backstop Commitments shall terminate at the Closing).  The Backstop Certificate shall be delivered by the Company to each of the Backstop Parties on or before the date that is three (3) Business Days after the Subscription Instruction and Payment Deadline, which shall be, in any event, at least ten (10) Business Days prior to the Effective Date.

    1.2. **Backstop Commitments**.

    (a)     On the terms, subject to the conditions (including the entry of the Backstop Order and the Confirmation Order by the Bankruptcy Court and such orders becoming Final Orders) and limitations, and in reliance on the representations and warranties set forth in this Agreement, each of the Backstop Parties hereby agrees, severally and not jointly, to give the Company the right to require such Backstop Party, and upon exercise of such right by the Company, each Backstop Party has agreed, to purchase from the Company, on the Effective Date, at a purchase price equal to the total principal amount of such Unsubscribed Securities, its Backstop Commitment Percentage of all Unsubscribed Securities (with respect to each Backstop Party, the Unsubscribed Securities that it is required to purchase pursuant to this Section 1.2(a) are referred to herein as its "Backstop Commitment Securities").  The Backstop Commitments of the Backstop Parties are several, not joint, obligations of the Backstop Parties, such that no Backstop Party shall be liable or otherwise responsible for the Backstop Commitment of any other Backstop Party.

    (b)     On or prior to the date that is five (5) Business Days after the Company's delivery of the Backstop Certificate to such Backstop Party or (if applicable) such later date as is

2

specified in the Backstop Notice (the "Deposit Deadline"), each Backstop Party shall, severally and not jointly, deposit into a segregated account of the Rights Offering Subscription Agent identified in the Backstop Certificate (the "Deposit Account"), by wire transfer of immediately available funds, an amount equal to the total principal amount of such Backstop Party's Backstop Commitment Securities (such amount, such Backstop Party's "Aggregate Purchase Price"). If the Closing has not occurred on or prior to the seventh (7th) Business Day following the Deposit Deadline (or, if a Funding Default shall have occurred, the seventh (7th) Business Day following the date on which the procedure described in Section 1.2(c) hereof shall have been completed), any funds deposited in the Deposit Account by a Backstop Party shall be returned by the Debtors to an account designated by such Backstop Party upon written request of such Backstop Party, subject to such Backstop Party's obligation to re-deposit such funds at least one Business Day prior to any new anticipated Effective Date (provided that the Company provides at least two (2) Business Days written notice of such new anticipated Effective Date).

(c)       In the event that a Backstop Party defaults (a "Funding Default") on its obligation to deposit the Aggregate Purchase Price for its Backstop Commitment Securities in the Deposit Account by the Deposit Deadline pursuant to Section 1.2(b) hereof (each such Backstop Party, a "Defaulting Backstop Party"), then each applicable Non-Defaulting Backstop Party shall have the right (the "Default Purchase Right"), but not the obligation, to elect to commit to purchase from the Company, at a purchase price equal to the total principal amount thereof, up to such Non-Defaulting Backstop Party's Adjusted Commitment Percentage of all applicable Backstop Commitment Securities required to be purchased by such Defaulting Backstop Party pursuant to Section 1.2(a) but which such Defaulting Backstop Party did not make the required deposit in accordance with Section 1.2(b). Within two (2) Business Days after a Funding Default, the Company shall send a written notice to each applicable Non-Defaulting Backstop Party specifying (i) the aggregate purchase price (which shall be equal to the total principal amount of such Backstop Commitment Securities) for all applicable Backstop Commitment Securities subject to such Funding Default (collectively, the "Default Securities") and (ii) the maximum principal amount of Default Securities that such Non-Defaulting Backstop Party may elect to commit to purchase (determined in accordance with the first sentence of this Section 1.2(c)). Each applicable Non-Defaulting Backstop Party will have two (2) Business Days after receipt of such notice to elect to exercise its Default Purchase Right by notifying the Company in writing of its election and specifying the total purchase price for Default Securities that it is committing to purchase (up to the maximum principal amount of Default Securities that such Non-Defaulting Backstop Party is permitted to commit to purchase pursuant to the first sentence of this Section 1.2(c)). If any Non-Defaulting Backstop Party elects to commit to purchase less than the maximum principal amount of Default Securities that such Non-Defaulting Backstop Party is permitted to commit to purchase pursuant to the first sentence of this Section 1.2(c) or if any Non-Defaulting Backstop Party does not elect to commit to purchase any Default Securities within the two-Business Day period referred to in the immediately preceding sentence, then the Default Securities that such Non-Defaulting Backstop Party does not commit to purchase may be purchased by applicable Non-Defaulting Backstop Parties that exercised in full their respective Default Purchase Rights (the right to make such purchase to be made on a *pro rata* basis based on the respective applicable Adjusted Commitment Percentages of such Non-Defaulting Backstop Parties, and the process for providing commitments for such purchases to be made by utilizing substantially the same procedures set forth in the two immediately preceding sentences).

3

(d)     If Non-Defaulting Backstop Parties elect to commit to purchase Default Securities in accordance with Section 1.2(c), each Non-Defaulting Backstop Party that has elected to commit to purchase Default Securities hereby agrees, severally and not jointly, to deposit into the Deposit Account, by wire transfer of immediately available funds, an amount equal to the purchase price for such Default Securities no later than two (2) Business Days after the date of such election.

1.3.    **Put Option Premium**.

(a)     The Debtors and the Backstop Parties hereby acknowledge that, in consideration for the Debtors' right to require the Backstop Parties to purchase the Backstop Commitment Securities pursuant to their Backstop Commitments on the terms and subject to the conditions set forth in this Agreement, the Debtors shall be required to pay to the Non-Defaulting Backstop Parties, as a premium (the "Put Option Premium"), an aggregate number of shares of New Common Stock equal to 10% of the Total New Equity Interests (the "Put Option Securities"), which Put Option Premium shall be paid to the Non-Defaulting Backstop Parties on a *pro rata* basis (in each case rounded up or down to the nearest whole share of New Common Stock) based upon their respective Backstop Commitment Percentages. The Debtors shall pay the Put Option Premium on the Effective Date and such payment shall be satisfied by issuing to the Non-Defaulting Backstop Parties (or their designees) a number of Put Option Securities (rounded up or down to the nearest whole share of New Common Stock) equal to its Commitment Percentage of the aggregate number of Put Option Securities; provided, however, that if the Closing does not occur and this Agreement is terminated, the Debtors shall be required to pay the Put Option Premium to the Non-Defaulting Backstop Parties in cash (in lieu of issuing Put Option Securities), in an amount equal to the Put Option Premium Cash Amount, to the extent provided in Section 8(e). The Debtors' obligation to pay the Put Option Premium Cash Amount, if applicable, shall survive termination of this Agreement, other than termination pursuant to Section 8(c). No Defaulting Backstop Party shall be entitled to receive any portion of the Put Option Premium, and any Non-Defaulting Backstop Party that purchases Default Securities constituting Backstop Commitment Securities of a Defaulting Backstop Party shall be entitled to receive an additional portion of the Put Option Premium equal to the product of (x) the number of the Put Option Securities that would be payable to such Defaulting Backstop Party if such Defaulting Backstop Party had not committed a Funding Default and (y) a fraction, the numerator of which is the amount of Default Securities constituting Backstop Commitment Securities of such Defaulting Backstop Party which such Non-Defaulting Backstop Party purchases and the denominator of which is the total amount of Default Securities constituting Backstop Commitment Securities of such Defaulting Backstop Party.

(b)     The Debtors hereby further acknowledge and agree that the Put Option Premium (i) shall be fully earned as of the Execution Date, (ii) shall not be refundable under any circumstance or creditable against any other amount paid or to be paid in connection with this Agreement or any of the Contemplated Transactions or otherwise, (iii) shall be paid without setoff or recoupment and shall not be subject to defense or offset on account of any claim, defense or counterclaim, and (iv) shall be paid free and clear of any issue, stamp, transfer or similar Taxes. The parties hereto further acknowledge and agree that (i) the Put Option Premium is intended to be treated for U.S. federal income Tax purposes as a premium (and, as applicable, an adjustment to tax basis or adjustment to issue price) for an option to put the Backstop Commitment Securities

4

NY 78156220

of the Backstop Parties to the Backstop Parties, and (ii) the parties shall not take any position or action inconsistent with such treatment and/or characterization (including, for the avoidance of doubt, with respect to any withholding or deduction for Taxes), except as otherwise required by a final "determination" (within the meaning of Section 1313(a) of the Code).

2.     **Closing; Certain Expenses and Payments**.

2.1.     **Closing**.

(a)     The closing of the purchase, sale and/or issuance of Backstop Securities hereunder (the "Closing") will occur at 10:00 a.m., New York City time (or such other time as is mutually agreed by the Company and the Required Backstop Parties), on the Effective Date. At the Closing, the Debtors shall deliver to each Backstop Party (i) a statement from the Company or the New Convertible Notes Indenture Trustee reflecting the total principal amount of Backstop Commitment Securities and (if applicable) Default Securities purchased by such Backstop Party, (ii) a statement from the Company or the transfer agent for the New Common Stock reflecting the book-entry position of the Put Option Securities issued to such Backstop Party, and (iii) such certificates, counterparts to agreements, documents or instruments required to be delivered by such Debtor to such Backstop Party pursuant to Section 7.1 hereof. The agreements, instruments, certificates and other documents to be delivered on the Effective Date by or on behalf of the Debtors will be delivered to the Backstop Parties at the offices of Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038, or to such other location as is mutually agreed by the Company and the Required Backstop Parties.

(b)     All Backstop Securities will be delivered free and clear of any and all Encumbrances with any and all issue, stamp, transfer or similar Taxes or duties payable in connection with such delivery duly paid by the Debtors.

(c)     Anything in this Agreement to the contrary notwithstanding (but without limiting the provisions of Section 13.1 hereof), any Backstop Party, in its sole discretion, may designate that some or all of the Backstop Securities be issued in the name of, and delivered to, one or more of its Affiliates that (in any such case) is a Qualified Institutional Buyer. Any such designation shall be made by a Backstop Party by delivering written notice thereof to the Company no less than two (2) Business Days prior to the Effective Date, which notice shall (i) specify the name of each such Affiliate, (ii) specify the amount of Backstop Securities that should be issued or delivered to each such Affiliate, and (iii) contain a certification from each such Affiliate of the accuracy of the representations and warranties made by each Backstop Party in Section 4 hereof as applied to such Affiliate.

2.2.     **Backstop Expenses.** Whether or not the transactions contemplated by this Agreement or any of the other Contemplated Transactions are consummated, the Debtors hereby agree, on a joint and several basis, to reimburse in cash or pay in cash, as the case may be, the Backstop Expenses, without duplication of any reimbursement by any Debtor of any Backstop Expense other than pursuant to this Agreement, as follows: (a) all accrued and unpaid Backstop Expenses incurred or estimated to be incurred up to (and including) the Execution Date shall be paid in full in cash on the Execution Date, including advance retainers to Stroock & Stroock & Lavan LLP, as counsel to the Backstop Parties, Young Conaway Stargatt & Taylor, LLP, as local

5

counsel to the Backstop Parties, and Perella Weinberg Partners LP, as financial advisor to Stroock & Stroock & Lavan LLP in connection with its representation of the Backstop Parties, in each case in amounts reasonably agreed by the Company and such advisors; (b) all accrued and unpaid Backstop Expenses incurred up to (and including) the date of entry by the Bankruptcy Court of the Backstop Order shall be paid in full in cash on or promptly following such date (but in no event later than two (2) Business Days after submission of invoices therefor following entry of the Backstop Order), and thereafter on a regular and continuing basis promptly (but in any event within five (5) Business Days) after submission of invoices therefor, in each case without Bankruptcy Court review or further Bankruptcy Court Order; (c) all accrued and unpaid Backstop Expenses incurred up to (and including) the Effective Date shall be paid in full in cash on the Effective Date, without Bankruptcy Court review or further Bankruptcy Court Order; and (d) if applicable, upon termination of this Agreement, all accrued and unpaid Backstop Expenses incurred up to (and including) the date of such termination shall be paid in full in cash promptly (but in any event within five (5) Business Days) after submission of invoices therefor.  All Backstop Expenses of a Backstop Party shall be paid to such Backstop Party (or its designee) by wire transfer of immediately available funds to the account(s) specified by such Backstop Party. The Backstop Expenses shall constitute allowed administrative expenses against the Debtors' estates under the Bankruptcy Code, and shall be paid without setoff or recoupment and shall not be subject to defense or offset on account of any claim, defense or counterclaim.  The terms set forth in this Section 2.2 shall survive termination of this Agreement and shall remain in full force and effect regardless of whether the transactions contemplated by this Agreement or any of the other Contemplated Transactions are consummated.  The obligations set forth in this Section 2.2 are in addition to, and do not limit, the Debtors' obligations under Sections 1.3, 8 and 9 hereof.

3.    **Representations and Warranties of the Debtors**.  Except (a) as set forth in the corresponding section of the disclosure schedules delivered by the Debtors to the Backstop Parties on the Execution Date and attached to this Agreement (the "Debtor Disclosure Schedule"), (b) as disclosed in SEC Reports filed after December 31, 2018 and at least one (1) Business Day prior to the Execution Date and publicly available on the SEC's Electronic Data-Gathering, Analysis and Retrieval System (excluding any disclosures contained in the "Forward-Looking Statements" or "Risk Factors" section thereof, or any other statements that are similarly predictive or cautionary in nature), or (c) as disclosed in the Company's draft Form 10-Q (the "Draft 10-Q") for the quarter ended June 30, 2020 delivered to counsel to the Backstop Parties on August 13, 2020 (excluding any disclosures contained in the "Forward-Looking Statements" or "Risk Factors" section thereof, or any other statements that are similarly predictive or cautionary in nature), the Debtors hereby, jointly and severally, represent and warrant to the Backstop Parties as set forth in this Section 3. Each representation and warranty of the Debtors is made as of the Execution Date and as of the Effective Date:

3.1.    **Organization of the Debtors.**  Each Debtor is a corporation or limited liability company (as the case may be) duly incorporated, organized or formed (as applicable), validly existing and in good standing under the Laws of its jurisdiction of incorporation, organization or formation (as applicable), and has full corporate or limited liability company (as applicable) power and authority to conduct its business as it is now conducted. Each Debtor is duly qualified or registered to do business as a foreign corporation or limited liability company (as applicable) and is in good standing (to the extent such concept is applicable) under the Laws of each jurisdiction in which either the ownership or use of the properties owned or used by it, or the

6

NY 78156220

nature of the activities conducted by it, requires such qualification or registration, except where the failure to be so qualified or registered would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole.

### 3.2. **Organization and Capitalization of the Subsidiaries.**

(a)      Section 3.2(a) of the Debtor Disclosure Schedule sets forth the name and jurisdiction of incorporation, organization or formation (as applicable) of each Subsidiary of the Company.  The Company legally and beneficially, directly or indirectly, owns all of the issued and outstanding Equity Interests of each of the other Debtors. Except for the Company's Subsidiaries set forth on Section 3.2(a) of the Debtor Disclosure Schedule, the Company does not own, hold or control any direct or indirect Equity Interests of any corporation, partnership, limited liability company, trust or other Person or business.  Except as described on Section 3.2(a) of the Debtor Disclosure Schedule, neither the Company nor any of its Subsidiaries has any Contract to directly or indirectly acquire any direct or indirect Equity Interest in any Person or business.

(b)      All of the outstanding Equity Interests of each Subsidiary of the Company have been duly authorized and validly issued and are fully paid and nonassessable, and except as set forth on Section 3.2(b) of the Debtor Disclosure Schedule, the Company or one or more of its Subsidiaries has good and marketable title to such Equity Interests, free and clear of all Encumbrances (other than transfer restrictions imposed under applicable securities Laws).  Except as set forth on Section 3.2(b) of the Debtor Disclosure Schedule, there are, and there will be on the Effective Date, no (i) Contracts relating to the issuance, grant, sale or transfer of any Equity Interests of any Subsidiary of the Company or (ii) Contracts of the Company or any Subsidiary of the Company to repurchase, redeem or otherwise acquire any Equity Interests of the Company or any Subsidiary of the Company, in each case that would not be cancelled or discharged pursuant to the terms of the Plan.  No Subsidiary of the Company has granted any registration rights with respect to any of its Equity Interests.

### 3.3. **Authority; No Conflict**.

(a)      Subject to the entry by the Bankruptcy Court of the Backstop Order and the Confirmation Order, each Debtor (i) has the requisite corporate or limited liability company (as applicable) power and authority (A) to enter into, execute and deliver this Agreement and the other Definitive Documents to which it is (or will be) a party, and to enter into, execute and file with the Bankruptcy Court the Plan and (B) to perform and consummate the Contemplated Transactions, and (ii) has taken all necessary corporate or limited liability company (as applicable) action required for (x) the due authorization, execution and delivery of this Agreement and the other Definitive Documents to which it is (or will be) a party, (y) the due authorization, execution and filing with the Bankruptcy Court of the Plan and (z) the performance and consummation of the Contemplated Transactions.  Subject to entry by the Bankruptcy Court of the Backstop Order and the Confirmation Order, this Agreement has been (or, in the case of each Definitive Document to be entered into by a Debtor at or prior to the Closing, will be) duly executed and delivered by each Debtor (or, in the case of any other Definitive Document, the Debtor party thereto).  Subject to entry by the Bankruptcy Court of the Backstop Order, this Agreement constitutes (or, in the case of each Definitive Document to be entered into by a Debtor after the Execution Date and at or prior to the Closing, will constitute) the legal, valid and binding obligation of each Debtor (or, in

7

NY 78156220

the case of a Definitive Document other than this Agreement, the Debtor party thereto), enforceable against such Debtor in accordance with its terms.  Subject to entry of the Confirmation Order and the expiration or waiver by the Bankruptcy Court of the fourteen (14)-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), the Plan constitutes the legal, valid and binding obligation of each Debtor, enforceable against such Debtor in accordance with its terms.

(b)     At the time of the execution and delivery of the RSA, each Debtor (i) had the requisite corporate or limited liability company (as applicable) power and authority (A) to enter into, execute and deliver the RSA and (B) subject to the entry by the Bankruptcy Court of the Confirmation Order, to perform and consummate the Contemplated Transactions, and (ii) had taken all necessary corporate or limited liability company (as applicable) action required for (x) the due authorization, execution and delivery of the RSA, and (y) subject to the entry by the Bankruptcy Court of the Confirmation Order, the performance and consummation of the Contemplated Transactions.  The RSA has been duly executed and delivered by each Debtor.  The RSA constitutes the legal, valid and binding obligation of each Debtor, enforceable against such Debtor in accordance with its terms.

(c)     Neither the execution and delivery by the Debtors of this Agreement or any of the other Definitive Documents, and subject to the Confirmation Order, the execution or filing with the Bankruptcy Court by the Debtors of the Plan nor the performance or consummation by the Debtors of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time or both):

(i)     contravene, conflict with or result in a violation or breach of any provision of the Organizational Documents of any Debtor;

(ii)     contravene, conflict with or result in a violation of any Law or Order to which any Debtor or any of the properties, assets, rights or interests owned, leased or used by any Debtor are bound or may be subject;

(iii)     contravene, conflict with or result in a violation or breach of any provision of, or give rise to any right of termination, acceleration or cancellation under, any Material Contract, except for any violation or breach of any such Material Contract that (A) arises out of the rejection by any of the Debtors of such Material Contract, which rejection was done with the prior written consent of the Required Backstop Parties or (B) results from commencement of the Chapter 11 Cases; or

(iv)     result in the imposition or creation of any Encumbrance upon or with respect to any of the assets, properties, rights or interests owned, leased or used by any Debtor (other than as provided for in the Plan) that will not be released and discharged pursuant to the Plan;

except, in the case of clauses (ii), (iii) and (iv) above, where such occurrence, event or result would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole.

8

NY 78156220

(d)    Subject to the Approvals, none of the Debtors will be required to give any notice to, make any filing with or obtain any Consent from, any Person in connection with the execution and delivery of this Agreement or any other Definitive Document, or the execution and filing with the Bankruptcy Court of the Plan, or the performance or consummation of any of the Contemplated Transactions.

3.4.    **Proceedings.**  Except as set forth on Section 3.4 of the Debtor Disclosure Schedule, there is no Proceeding pending, existing, instituted, outstanding or, to the Knowledge of the Debtors, threatened to which any Debtor is a party or to which any property, asset, right or interest owned, leased or used by any Debtor is bound or subject, except for (a) any claim of a creditor or party in interest in the Chapter 11 Cases (excluding any Proceeding by a Governmental Body) and (b) any Proceeding that if adversely determined to such Debtor would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole.

3.5.    **Brokers or Finders.**  Except for the fees payable to Rothschild & Co. US Inc. and Intrepid Partners, LLC, in each case pursuant to an engagement letter with the Debtors dated April 7, 2020, neither the Debtors nor any of their respective Representatives has incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with this Agreement, any of the other Definitive Documents, the Plan or any of the Contemplated Transactions.

3.6.    **Exemption from Registration.**  Assuming the accuracy of the Backstop Parties' representations set forth in Section 4 hereof and assuming the accuracy of all of the representations, warranties and certifications made by each Rights Offering Participant in its Holders Questionnaire and Beneficial Holder Subscription Form, each of the Specified Issuances will be exempt from the registration and prospectus delivery requirements of the Securities Act.

3.7.    **Issuance.**  Subject to entry by the Bankruptcy Court of the Confirmation Order, each of the Specified Issuances has been duly and validly authorized by the Company and, when (a) the shares of New Common Stock are issued to the holders of Notes Claims, (b) the Rights Offering Securities are issued and delivered against payment therefor in the Rights Offering, (c) the Backstop Commitment Securities and (if applicable) Default Securities of the Backstop Parties are issued and delivered against payment therefor as provided herein, (d) the Put Option Securities are issued and delivered pursuant to this Agreement, and (e) the shares of New Common Stock are issued upon conversion of the Convertible Notes issued as Rights Offering Securities and Backstop Securities, all such New Common Stock, Rights Offering Securities and Backstop Securities will be duly and validly issued, free and clear of all issue, stamp, transfer or similar Taxes, liens, Encumbrances (other than transfer restrictions imposed under applicable securities Laws), pre-emptive rights, rights of first refusal, subscription rights and similar rights, in each case except as set forth herein or as may be set forth in the Stockholders Agreement, and, in the case of the New Common Stock and Put Option Securities, will be fully paid and non-assessable.

3.8.    **No Violation or Default**.  No Debtor is in violation of its Organizational Documents.  Except as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole, no Debtor is (a) in violation or default,

9

and no event has occurred that, with notice or lapse of time or both, would constitute a violation or default, under any Material Contract or (b) in violation of any Law or Order.

### 3.9.   **Intellectual Property**.

(a)   The Debtors own or possess adequate rights to use all patents, inventions and discoveries (whether patentable or not), trademarks, service marks, trade names, trade dress, internet domain names, copyrights, published and unpublished works of authorship (including software), and all registrations, recordations and applications of the foregoing and know-how (including trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures) and licenses related to any of the foregoing (collectively, "IP Rights") owned, licensed or used by any Debtor (collectively, "Debtor IP Rights") as such Debtor IP Rights are used in the business of any Debtor, except where the failure to own or possess such rights to (or have adequate licenses related to) any such IP Rights would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole.   The conduct of the businesses and operations of each Debtor does not infringe or misappropriate any IP Rights of any third party, except in such instances as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole.   No Debtor has received any written notice of any claim of infringement or misappropriation of any IP Rights of any third party as a result of the operation of the respective businesses and operations of any of the Debtors, except in such instances as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole.   None of the Debtor IP Rights have been adjudged invalid or unenforceable, except in such instances as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole.   The Debtors have maintained all patents, trademarks, copyrights and all applications for any Debtor IP Rights owned by any Debtor in full force and effect and used commercially reasonable efforts to protect and maintain the secrecy and value of all trade secrets, except in such instances as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole.   To the Knowledge of the Debtors, no third party has infringed, misappropriated or otherwise violated any Debtor IP Rights or is infringing, misappropriating or otherwise violating any Debtor IP Rights, except in such instances as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole.

(b)   Each Debtor owns or possesses adequate rights to use all computer systems (including hardware, software databases, firmware and related equipment), communications systems, and networking systems (the "IT Systems") used by each Debtor (the "Debtor IT Systems") in the manner in which they are used in the operation of such Debtor's businesses and operations, except where the failure to own or possess such rights would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole.   Each Debtor has established, implemented and tested backup and disaster recovery policies, procedures and systems consistent with generally accepted standards for the industry in which the Debtors operate and sufficient to maintain the businesses and operations of the Debtors, except where the failure to establish, implement or test would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole.   The Debtor IT Systems are adequate in all material respects for their intended use in the operation of each Debtor's businesses and operations, except in such instances would not, individually or in the

10

aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole.  There has not been any material malfunction with respect to any of the Debtor IT Systems that has caused material disruption to any Debtor's businesses or operations in the past three (3) years that has not been remedied or replaced, except in such instance would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole.

(c)     Each Debtor has complied at all times in all material respects with applicable Laws regarding the collection, retention, use and protection of personal information. No Person (including any Governmental Body) has made any claim or commenced any Proceeding relating to any Debtor's businesses privacy or data security practices, including with respect to the access, disclosure or use of personal information maintained by or on behalf of any Debtor or, to the Knowledge of the Debtors, threatened any such Proceeding or conducted any investigation or inquiry thereof.  The Debtors have implemented and maintained organizational, physical, administrative and technical measures consistent with generally accepted standards for the industry in which the Debtors operate to protect the operation, confidentiality, integrity, and security of all confidential business information, personal data and Debtor IT Systems against unauthorized access, acquisition, interruption, alteration, modification, or use, except in such instance would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole.  To the Knowledge of the Debtors, the respective businesses and operations of the Debtors have not, in the past three (3) years, experienced any loss, damage, or unauthorized access, disclosure, use or breach of security of any confidential business information, personal data or IT Systems in any Debtor's possession, custody or control, or otherwise held or processed on its behalf, except in such instance would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole.

3.10.    **Licenses and Permits**.    Each Debtor possesses or has obtained all Governmental Authorizations from, has made all declarations and filings with, and has given all notices to, the appropriate Governmental Bodies that are necessary or required for the ownership, lease or use of its properties, assets, rights or interests, or the conduct or operation of its businesses or operations (collectively, the "Licenses and Permits"), except where the failure to possess, obtain, make or give any of the foregoing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole.  The operation of the businesses of the Debtors has at all times been in accordance with the Licenses and Permits, and no event has occurred which permits (nor has an event occurred which with notice or lapse of time or both would permit) the revocation or termination of any of the Licenses and Permits or which might result in any other impairment of the rights of any of the Debtors therein or thereunder, except to the extent that any such non-compliance, revocation or termination would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole.  No Debtor has received notice of any revocation, suspension or modification of any of the Licenses and Permits, or has any reason to believe that any of the Licenses and Permits will be revoked or suspended, or will not be renewed in the ordinary course, or that any such renewal will be materially impeded, delayed, hindered, conditioned or burdensome to obtain, except to the extent that any of the foregoing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole.

11

3.11.    **Compliance with Environmental Laws**.  Each Debtor:

(a)    is, and for the past two (2) years has been, in compliance with any and all applicable Environmental Laws, except for matters that have been fully resolved;

(b)    is, and for the past two (2) years has been, in compliance with all Governmental Authorizations required of it under applicable Environmental Laws to conduct its businesses and operations, and there is no Order or Proceeding pending or, to the Knowledge of the Debtors, threatened which would prevent the conduct of its businesses or operations or which would revoke, terminate or adversely modify any such Governmental Authorization;

(c)    has no knowledge and has not received written notice that is currently pending (including a request for information) from any Governmental Body or any other Person of:

(i)    any violations of, or liability under, any Environmental Laws; or

(ii)    any actual or potential liability for the investigation, removal, remediation or monitoring of any Release of Hazardous Materials on, at, under or emanating from any currently or formerly owned or operated property or facility or at any location to which Hazardous Materials from the operations or activities of such Debtor have come to be located;

(d)    is not subject to any Proceedings or Orders under any Environmental Laws and has no knowledge of any threatened Proceedings or Orders under any Environmental Laws;

(e)    has not treated, stored, disposed of, arranged for or permitted the disposal of, or Released any Hazardous Material at any property owned or operated by any Debtor, or, to the Knowledge of the Debtors owned or operated any property or facility which is or has been contaminated by any Hazardous Material, in each case, as would reasonably be expected to give rise to any current or future liabilities under any Environmental Laws; and

(f)    has not assumed, undertaken, provided an indemnity with respect to, or otherwise become subject to, any liability of any other Person relating to Environmental Laws or Hazardous Materials; except in each case of clauses (a) through (f) above, that which would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole.

3.12.    **Compliance with ERISA**.

(a)    Section 3.12(a) of the Debtor Disclosure Schedule sets forth a complete and accurate list of all material Benefit Plans.  "Benefit Plans" means any of the following (whether written or unwritten):  (i) any "employee welfare benefit plan," as defined in Section 3(1) of ERISA, including any medical plan, life insurance plan, short-term or long-term disability plan, dental plan, or sick leave plan, (ii) any "employee pension benefit plan," as defined in Section 3(2) of ERISA, including any excess benefit, top hat plan or any qualified or nonqualified deferred compensation or retirement plan or arrangement, or (iii) any other plan, policy, program or Contract which provides compensation or benefits, including any severance Contract or plan,

12

personnel policy, vacation time, holiday pay, tuition reimbursement program, service award, moving expense reimbursement programs, tool allowance, safety equipment allowance, fringe benefit plan or program, bonus or incentive plan, equity, equity appreciation, stock option, restricted stock, phantom stock, stock bonus or deferred bonus or compensation plan, salary reduction, change-of-control or employment Contract (or consulting Contract with a former employee or otherwise), maintained, administered or contributed to by any Debtor, or with respect to which any Debtor has, or could reasonably be expected to have any liability for, on behalf of, or with respect to any current or former employees, leased employees, dependents, beneficiaries, officers, directors, managers or independent contractors of any Debtor or predecessor thereof. Each Benefit Plan has been administered and maintained in compliance in all material respects with its terms and the requirements of any applicable Laws, including ERISA and the Internal Revenue Code of 1986, as amended (the "Code"). Each Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Code is so qualified, has received a favorable determination letter from the IRS to the effect that the Benefit Plan satisfies the requirements of Section 401(a) of the Code, and, to the Knowledge of the Debtors, no circumstances exist that are likely to result in the loss of the qualification of any such Benefit Plan. No Benefit Plan is currently subject to any claims, investigations, or audits (and to the Knowledge of the Debtors none are contemplated or threatened) by any Governmental Body (other than routine claims for benefits) which, individually or in the aggregate, if determined or resolved adversely in accordance with the plaintiff's demands, could reasonably be expected to be adverse in any material respect to the Debtors, taken as a whole.

(b)    None of the Benefit Plans are, and neither the Debtors nor any of their respective ERISA Affiliates maintain, contribute to, have an obligation to contribute to, or have or could reasonably be expected to have any liability with respect to, or in the past six (6) years has maintained, contributed to, had an obligation to contribute to, or had any liability with respect to, (i) a multiemployer plan (within the meaning of Section 4001(a)(3) of ERISA or Section 413(c) of the Code), whether or not subject to Title IV of ERISA; (ii) a multiple employer plan (within the meaning of Section 413(c) of the Code); (iii) a "multiple employer welfare arrangement" (within the meaning of Section 3(40) of ERISA); (iv) a "voluntary employee beneficiary association" (within the meaning of Section 501(c)(9) of the Code); or (v) a plan subject to Title IV of ERISA or Section 412 or Section 4971 of the Code.

(c)    No Benefit Plan provides medical, health, life insurance or other welfare-type benefits to retirees or former employees, consultants or individuals whose employment with any Debtor has terminated or the spouses or dependents of any of the foregoing (except for limited continued medical and dental benefit coverage for former employees, their spouses and other dependents as required to be provided under Section 4980B of the Code or Part 6 of Subtitle B of Title I of ERISA ("COBRA") or applicable similar state law and at the sole cost of such former employee, spouse or other dependent).

(d)    Except as set forth in Section 3.12(d) of the Debtor Disclosure Schedule, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in combination with another event) (i) result in any payment becoming due, or increase the amount of any compensation due, to any current or former officer, director, employee, leased employee, consultant or agent (or their respective beneficiaries) of any Debtor; (ii) increase any benefits otherwise payable under any Benefit Plan; (iii) result in

13

the acceleration of the time of payment or vesting of any such compensation or benefits; or (iv) result in the payment of any amount that could, individually or in combination with any other such payment, constitute an "excess parachute payment," as defined in Section 280G(b)(1) of the Code. No current or former officer, director, employee, leased employee, consultant or agent (or their respective beneficiaries) of any Debtor has or will obtain a right to receive a gross up payment from any Debtor with respect to any excise or additional income taxes that may be imposed upon such individual pursuant to Section 409A of the of the Code, Section 4999 of the Code or otherwise.

(e)    Neither the Debtors nor any of their respective ERISA Affiliates, any Benefit Plan, any trust created thereunder, nor, to the Knowledge of the Debtors, any trustee, fiduciary or administrator thereof has engaged in a transaction in connection with which any of the Debtors or any of their respective ERISA Affiliates, any Benefit Plan, any such trust, or any trustee, fiduciary or administrator thereof, or any party dealing with any Benefit Plan or any such trust could be subject to a civil penalty or Tax under ERISA or the Code, including a civil penalty assessed pursuant to Section 409 or Section 502(i) of ERISA or a Tax imposed pursuant to Section 4975 or Section 4976 of the Code, except any of the foregoing that would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole.

(f)    There is no Benefit Plan of any Debtor, or any of ERISA Affiliate or predecessor of any Debtor, subject to the Laws of a jurisdiction other than the United States for which liability remains outstanding or for which any Debtor could reasonably be expected to have any liability.

3.13.    **Compliance with Anti-Corruption, Money Laundering and Import Laws; Export Controls and Economic Sanctions**.

(a)    During the past five (5) years, none of the Debtors nor, to the Knowledge of the Debtors, any of the officers, directors, employees, agents, consultants, representatives, or other Persons acting on behalf of any of the Debtors, has: (i) directly or indirectly, given, promised, offered, authorized the offering of, or paid anything of value to any public official or employee of any Governmental Body, in each case, for purposes of (A) influencing any official act or official decision of such public official or employee, (B) inducing such public official or employee to do or omit to do any act in violation of such official's or employee's lawful duty, (C) securing any improper advantage or (D) inducing such public official or employee to use such official's or employee's influence with a Governmental Body, or commercial enterprise owned or controlled by any Governmental Body (including state owned or controlled facilities), in order to assist any of the Debtors in obtaining or retaining business; or (ii) taken any action in violation of any applicable anticorruption Law, including the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§ 78dd-1, et seq., the U.K. Bribery Act of 2010 and any other applicable anti-corruption or anti-bribery Law of any Governmental Body of any jurisdiction applicable to any of the Debtors or any of their respective businesses or operations.  There is no pending or, to the Knowledge of the Debtors, threatened Proceeding with respect to any violation of any applicable anti-corruption Law relating to any of the Debtors or any of their respective businesses or operations.  Each of the Debtors has in place adequate controls to ensure compliance with any applicable anti-corruption Laws.

14

(b)    Each of the Debtors is in material compliance, and at all times during the past five (5) years has materially complied, with all applicable Laws relating to the prevention of money laundering of any Governmental Body applicable to it or its property or in respect of its operations, including all applicable criminal Laws and all applicable financial record-keeping, customer identification, know-your-customer and reporting requirements of the Currency and Foreign Transactions Reporting Act of 1970 (the "Money Laundering Laws").  No Proceeding by or before any Governmental Body involving any of the Debtors with respect to the Money Laundering Laws is pending or, to the Knowledge of the Debtors, threatened.

(c)    Each of the Debtors has at all times during the past five (5) years been in material compliance with all applicable trade Laws, including import and export control Laws, economic/trade embargoes and sanctions, and anti-boycott Laws, and, except as authorized by the applicable Governmental Body or Governmental Bodies, has not: (i) exported, re-exported, transferred, or brokered the sale of any goods, services, technology, or technical data to any destination to which, or individual for whom, a license or other authorization is required under the U.S. International Traffic In Arms Regulations ("ITAR") (22 C.F.R. § 120 *et seq.*), or the Export Administration Regulations (the "Export Regulations") (15 C.F.R. § 730 *et seq.*), or the economic sanctions programs administered by the U.S. Office of Foreign Assets Control ("OFAC") (31 C.F.R. Part 500 *et seq.*); (ii) entered into, funded, financed, or facilitated any activities, business or transaction that is prohibited under any applicable trade Law or with or for the benefit of any Person subject to economic or trade sanctions under applicable trade Laws, including any Person (A) designated as a Specially Designated National by OFAC, (B) on the Denied Persons, Entity, or Unverified Lists of the U.S. Bureau of Industry and Security or (C) on the Debarred List of the Directorate of Defense Trade Controls of the U.S. Department of State; (iii) exported any goods, services, technology, or technical data that have been or will be used for any purposes associated with nuclear activities, missiles, chemical or biological weapons, or terrorist activities, or that have been or will be used, transshipped or diverted contrary to applicable U.S. export controls and economic/trade sanctions; (iv) manufactured any defense article (as defined in the ITAR, "Defense Article"), including within the United States, and without regard to whether such Defense Article was subsequently exported, without being registered and in good standing with the Directorate of Defense Trade Controls of the U.S. Department of State; (v) imported any goods except in compliance with the import and customs Laws of the United States, including Title 19 of the United States Code, Title 19 of the Code of Federal Regulations, and all other regulations administered or enforced by U.S. Customs and Border Protection and the U.S. Department of Commerce; or (vi) materially violated the anti-boycott prohibitions, or materially failed to comply with the reporting requirements, of the Export Regulations and the Tax Reform Act of 1976 (26 U.S.C. § 999).

3.14.    **Absence of Certain Changes or Events**.    Since June 30, 2020, and excluding any transactions effected in connection with the Chapter 11 Cases that are specifically contemplated by the RSA, (a) each Debtor has conducted its businesses in the Ordinary Course of Business except as set forth in Section 3.14 of the Debtor Disclosure Schedule, (b) there has not been any change with respect to any material finance or Tax accounting elections, methods, principles or practices of any Debtor, (c) no Debtor has incurred any physical damage, destruction, loss or casualty to its property or assets with a value, individually or in the aggregate, in excess of $1,000,000 (whether or not covered by insurance).

15

3.15.  **Material Contracts**.

(a)    Each Material Contract is in full force and effect and is valid, binding and enforceable against the applicable Debtor and, to the Knowledge of the Debtors, each other party thereto, in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar Laws of general applicability relating to or affecting creditor's rights generally and by the application of general principles of equity. Except as set forth on Section 3.15(a) of the Debtor Disclosure Schedule, neither the Debtors nor, to the Knowledge of the Debtors, any other party to any Material Contract is in breach of or default under any obligation thereunder or has given notice of default to any other party thereunder, except for breaches and defaults that would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole.

(b)    The Debtors have not received any written notice from any lessor (including copies of any such notices provided to the Debtors by third party operators) under any of the Leases seeking to terminate, cancel or rescind any Lease, and the Debtors have not received any written notice from any lessor under any of the Leases (including copies of any such notices provided to the Debtors by third party operators) alleging any default or event or circumstance which, with the giving of notice or the passage of time or both, would give rise to a default under any the Leases, except (i) where such termination, cancelation, rescission or default would not reasonably be expected to have a material adverse effect on the Debtors taken as a whole or (ii) in connection with the commencement of the Chapter 11 Cases.

3.16.  **Financial Statements; No Undisclosed Liabilities**.  The audited consolidated balance sheet of the Company and its Subsidiaries as of December 31, 2019, and the related audited consolidated statements of operations, shareholders' equity, and cash flows for the fiscal year ended December 31, 2019 (the "Audited Financial Statements"), and the unaudited consolidated balance sheet of the Company and its Subsidiaries as of June 30, 2020, and the related unaudited consolidated statements of operations, shareholders' equity, and cash flows for the fiscal quarter ended June 30, 2020, in the form attached to the Draft 10-Q (collectively, the "Interim Financial Statements" and, together with the Audited Financial Statements, the "Financial Statements"), were prepared in accordance with GAAP, applied on a consistent basis for the periods involved, and fairly present, in all material respects, the financial position of the Company and its Subsidiaries as of the date thereof and the results of their operations for the period then ended.  Except as set forth in Section 3.16 of the Debtor Disclosure Schedule, there are no liabilities or obligations of the Debtors of any kind whatsoever, whether accrued, contingent, absolute, determined or determinable, other than (a) liabilities or obligations set forth on the face of the balance sheet included in the Financial Statements, (b) liabilities or obligations which were incurred in the Ordinary Course of Business after June 30, 2020, (c) liabilities or obligations incurred in connection with the Contemplated Transactions, and (d) liabilities or obligations that, individually or in the aggregate, are not material to the Debtors, taken as a whole.

3.17.  **Title to Property**.  The Debtors have, and upon the consummation of the Contemplated Transactions will have, good and valid title to (or, in the case of leased assets or properties, a valid and subsisting leasehold interest in), free and clear of any Encumbrances (except for Permitted Encumbrances), all of the assets and properties reflected on the Audited Balance Sheet or acquired by any of the Debtors since the date of the Audited Balance Sheet or used by

16

any of the Debtors in connection with their businesses or operations, except for (a) inventory sold, consumed, used or otherwise disposed of in the Ordinary Course of Business since the date of the Audited Balance Sheet, (b) dispositions of worn out or obsolete assets or properties since the date of the Audited Balance Sheet in the Ordinary Couse of Business, and where the failure to have good and valid title or a valid and subsisting leasehold in interest, as applicable, would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole.  All assets and properties used by any of the Debtors in the operation of their businesses or operations are in good condition and repair, subject to reasonable wear and tear considering the age and ordinary course of use of such assets or properties, except where the failure to have such assets and properties in good condition and repair would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole.  The properties and assets owned or leased by any of the Debtors, or which they otherwise have the right to use, constitute sufficient assets and properties necessary for, or reasonably required to be held for use in, the conduct of their businesses and operations in the Ordinary Course of Business.

3.18.    **Tax Matters**.  Except as set forth on Section 3.18 of the Debtor Disclosure Schedule:

(a)    All material Tax Returns required to be filed by or on behalf of any Debtor, including any consolidated, combined or unitary Tax Return of which any Debtor is or was includable, have been properly prepared in all material respects and duly and timely filed with the appropriate Taxing Authorities in all jurisdictions in which such Tax Returns are required to be filed (after giving effect to any valid extensions of time in which to make such filings).  All material Taxes payable by or on behalf of any Debtor directly, as part of the consolidated, combined or unitary Tax Return of another taxpayer, or otherwise, have been fully and timely paid, and adequate reserves or accruals for Taxes have been provided in the Audited Balance Sheet or, in the case of tax periods that begin following the date of the Audited Balance Sheet, the accounting books and records of the Debtors in respect of any period for which Tax Returns have not yet been filed or for which Taxes are not yet due and owing.  No agreement, waiver or other document or arrangement extending or having the effect of extending the period for assessment or collection of a material amount of Taxes (including any applicable statute of limitations) has been executed or filed with the IRS or any other Governmental Body by or on behalf of any Debtor (or any consolidated, combined or unitary group of which any Debtor was or is includable for Tax purposes) and no power of attorney in respect of any Tax matter is currently in force.

(b)    Each Debtor has complied in all material respects with all applicable Laws relating to the payment and withholding of Taxes and has duly and timely withheld from employee salaries, wages, and other compensation and have paid over to the appropriate Taxing Authorities or other applicable Governmental Bodies all amounts required to be so withheld and paid over for all periods under all applicable Laws.

(c)    All material deficiencies asserted or assessments made as a result of any examinations by any Taxing Authority or any other Governmental Body of the Tax Returns of or covering or including any Debtor have been fully paid, and there are no other material audits, investigations or other Proceedings by any Taxing Authority or any other Governmental Body in progress, nor has any Debtor received notice from any Taxing Authority or other applicable

17

NY 78156220

Governmental Body that it intends to conduct or commence such an audit, investigation or other Proceeding.  No material issue has been raised by any Taxing Authority or other applicable Governmental Body in any current or prior examination that, by application of the same or similar principles, could reasonably be expected to result in a proposed material deficiency for any subsequent taxable period.  There are no material Encumbrances for Taxes with respect to any Debtor, or with respect to the assets or business of any Debtor, nor is there any such Encumbrance that is pending or threatened, other than Permitted Encumbrances.

### 3.19.  **Labor and Employment Compliance**.

(a)  Each Debtor is in compliance with all applicable Laws respecting labor and employment matters, including, without limitation, labor relations, terms and conditions of employment, equal employment opportunity, discrimination, harassment, retaliation, family and medical leave and other leaves of absence, disability benefits, affirmative action, employee privacy and data protection, health and safety, wage and hours, worker classification as employees or independent contractors, exempt or non-exempt, child labor, immigration, recordkeeping, Tax withholding, unemployment insurance, workers' compensation, and plant closures and layoffs, except where the failure to comply with such applicable Laws would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Debtors, taken as a whole.  There is no, and during the past three (3) years there has been no, Proceeding pending or, to the Knowledge of the Debtors, threatened against any Debtor alleging a violation of any such applicable Law pertaining to labor or employment matters, except for any such Proceedings that would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Debtors, taken as a whole.  There is no, and during the past three (3) years there has been no, Order applicable to any Debtor, arising out of any alleged violation of any Law pertaining to labor or employment matters.  No Debtor has any direct or indirect material liability, whether absolute or contingent, with respect to any misclassification of any person as an independent contractor rather than as an employee, or with respect to any employee leased from another employer.

(b)  There are no collective bargaining agreements, labor agreements, work rules or practices, or any other labor-related agreements or arrangements to which any of the Debtors is a party or otherwise subject with respect to any employee.  Within the past three (3) years, no labor union, labor organization or other organization or group has (i) represented or purported to represent any employee, (ii) made a demand to any of the Debtors or, to the Knowledge of the Debtors, to any Governmental Body for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending, threatened in writing or, to the Knowledge of the Debtors, verbally threatened to be brought or filed with the National Labor Relations Board or any other labor relations Governmental Body.  Within the past three (3) years, there has been no actual or, to the Knowledge of the Debtors, threatened, labor arbitrations, grievances, material labor disputes, strikes, lockouts, walkouts, slowdowns or work stoppages, or picketing by any employee of any of the Debtors.  None of the Debtors has committed a material unfair labor practice (as defined in the National Labor Relations Act or any similar Law) within the past three (3) years.

(c)  The Debtors have not, within the past three (3) years, effectuated an event giving rise to a notice obligation, including a "plant closing" or "mass layoff" (as those terms are

18

NY 78156220

defined in the federal Worker Adjustment Retraining Notification Act, or any analogous state or local Law), affecting, in whole or in part, any site of employment, facility or operating unit of any of the Debtors.

(d)     To the Knowledge of the Debtors, no current or former employee of any Debtor is, in any material respect, in violation of any term of any employment contract, nondisclosure agreement, or non-competition agreement with any Debtor. To the Knowledge of the Debtors, no employee of any Debtor is, in any material respect, in violation of the terms of any restrictive covenant with any third party, including any former employer relating to the right of any such employee to be employed by any Debtor or to the use of trade secrets or proprietary information of others and, to the Knowledge of the Debtors, no such claims are threatened.

3.20.    **Related Party Transactions.**  Except as set forth in Section 3.20 of the Debtor Disclosure Schedule, none of the Debtors is party to any transaction, arrangement or Contract with (a) any of the current or former officers, Persons that own or hold (together with their Affiliates) more than 5% of the common stock of the Company, members of the board of directors or board of managers (or comparable governing body) or Affiliates of any of the Debtors (excluding any of the other Debtors), or (b) any immediate family member or Affiliate thereof (the Persons described in clauses (a) and (b) being referred to as, each a "Related Party" and, collectively, the "Related Parties"), in any such case other than (i) in the case of any officer or director, any Benefit Plans and (ii) obligations to pay fees to any director of any Debtor in connection with the performance of his or her service as a director of such Debtor.  None of the Related Parties own any material property or right, tangible or intangible, that is used by any Debtor.

3.21.    **Insurance**.  All insurance policies of the Debtors as of the Execution Date or under which any of the Debtors or any of their respective businesses, employees, assets, liabilities or properties are insured as of the Execution Date (the "Insurance Policies") are in full force and effect, and, except to the extent any such Insurance Policy has been replaced after the Execution Date with comparable substitute insurance coverage that will remain in full force and effect immediately following the Closing, will remain in full force and effect immediately following Closing.  All premiums payable under the material Insurance Policies have been paid to the extent such premiums are due and payable.  The Debtors have otherwise complied with the terms and conditions of, and their obligations under, all of the material Insurance Policies in all material respects, and no event has occurred which, with notice or the lapse of time or both, would constitute such a breach or default, or permit termination, modification, or acceleration, under any of the material Insurance Policies.  To the Knowledge of the Debtors, there is no threatened termination or material alteration of coverage under, any of the Insurance Policies.  During the past three (3) years, no claims have been denied under the Insurance Policies and the Debtors have not (a) had a claim rejected or a payment denied by any insurance provider, (b) had a claim under any Insurance Policy in which there is an outstanding reservation of rights or (c) had the policy limit under any Insurance Policy exhausted or materially reduced, except for any such rejection, denial, reservation, exhaustion or reduction that would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole.  The insurance maintained by or on behalf of the Debtors is adequate to insure against such losses and risks as are prudent and customary in the businesses in which they are engaged.

19

NY 78156220

3.22. **SEC Reports and Bankruptcy Documents.** Since December 31, 2018, the Company has filed all forms, reports, statements, schedules, certifications and other documents (including all exhibits, amendments and supplements thereto) with the SEC as required by the Securities Act or the Exchange Act. The Disclosure Statement, the monthly operating reports and the other pleadings filed with the Bankruptcy Court (collectively, the "Bankruptcy Documents"), when filed with the Bankruptcy Court, the SEC Reports, when they became effective or were filed with the SEC, and the Draft 10-Q, when delivered to counsel to the Backstop Parties on August 13, 2020, as the case may be, (a) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, and (b) complied in all material respects, in the case of the Bankruptcy Documents, with the requirements of the Bankruptcy Code, and in the case of the SEC Reports and the Draft 10-Q, with the requirements of the Securities Act, the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX"), as the case may be, and the applicable rules and regulations of the SEC under the Securities Act, the Exchange Act and SOX, as the case may be. The Company shall file its Form 10-Q quarterly report for the quarter ended June 30, 2020 with the Securities and Exchange Commission on August 17, 2020, and such filing (including the Interim Financial Statements attached thereto) shall be in substantially the form of the Draft 10-Q.

3.23. **Internal Control Over Financial Reporting**. The Company has established and maintains a system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) promulgated under the Exchange Act) that complies with the requirements of the Exchange Act and has been designed to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP and, to the Knowledge of the Debtors, there are no material weaknesses in the Company's internal control over financial reporting as of the Execution Date.

3.24. **Disclosure Controls and Procedures**. The Company (a) maintains disclosure controls and procedures (within the meaning of Rules 13a-15(e) and 15d-15(e) promulgated under the Exchange Act) designed to ensure that information required to be disclosed by the Company in the reports that the Company files and submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, including that information required to be disclosed by the Company in the reports that it files and submits under the Exchange Act is accumulated and communicated to management of the Company as appropriate to allow timely decisions regarding required disclosure, and (b) has disclosed, based upon the most recent evaluation by the Chief Executive Officer and Controller of the Company's internal control over financial reporting, to its auditors and the audit committee of the Company's board of directors (i) all material weaknesses in the design or operation of the Company's internal control over financial reporting which are reasonably likely to adversely affect their ability to record, process, summarize and report financial data and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

3.25. **Investment Company Act**. None of the Debtors is an "investment company" within the meaning of the Investment Company Act of 1940, as amended, and the rules and regulations of the SEC thereunder.

NY 78156220

3.26.  **Oil and Gas Matters**.

(a)     All rentals, royalties and other burdens on production and expenses relating to or arising from the Debtors' ownership or operation of the Oil and Gas Properties, the production of Hydrocarbons or the receipt of proceeds therefrom, have been, and are being, paid (timely and before the same become delinquent) by the Debtors, except where the failure to make such payment would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole.

(b)     The Debtors have incurred no expenses, and have made no commitments to make expenditures in excess of $250,000 in connection with the ownership or operation of the Oil and Gas Properties following the Execution Date, other than routine capital and operating expenditures incurred in the normal operation of existing wells on the Oil and Gas Properties.

(c)     There are no Imbalances arising with respect to the Oil and Gas Properties, except where such Imbalances would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Debtors, taken as a whole.

(d)     Except as otherwise reflected in the Reserve Report attached as Section 3.26(d) of the Debtor Disclosure Schedule, there are no Wells located on the Leases or lands covered thereby that: (i) any Debtor is currently obligated (directly or indirectly) by Law or Contract to incur material costs to plug and abandon; (ii) any Debtor will be obligated (directly or indirectly) by Law or Contract to incur material costs to plug or abandon with the lapse of time or notice or both because the Well is presently not currently capable of producing in commercial quantities; or (iii) have been plugged and abandoned but have not been plugged in material compliance with all applicable requirements of each regulatory authority having jurisdiction over the Oil and Gas Properties. No Debtor is obligated by virtue of any material take-or-pay payment, advance payment or other similar payment (other than gas balancing arrangements) to deliver Hydrocarbons, or proceeds from the sale thereof, attributable to the Oil and Gas Properties at some future time without receiving payment therefor at or after the time of delivery.

(e)     There exists no material agreements or arrangements by or binding upon any of the Debtors for the sale of production from the Oil and Gas Properties (including calls on, or other rights to purchase, production, whether or not the same are currently being exercised) at a fixed price and have a maturity or expiry date of longer than six (6) months from the Execution Date other than agreements or arrangements which are cancelable with 90 days' notice or less without penalty or detriment.  The Debtors are presently receiving payment for all production from (or attributable to) Oil and Gas Properties covered by a production sales contract which is computed in accordance with the terms of such contract, and are not having deliveries of gas from any Oil and Gas Properties subject to a production sales contract curtailed substantially below such property's delivery capacity.  None of the Debtors is taking any of its production from the Oil and Gas Properties in kind and all production is being sold by the operator of the Leases and Wells pursuant to the applicable joint operating agreements.

3.27.  **Takeover Statutes.**  No Takeover Statute is applicable to this Agreement, the Backstop Commitment, the Put Option Premium, or any of the Contemplated Transactions.

21

NY 78156220

4.    **Representations and Warranties of the Backstop Parties**.  Each Backstop Party, severally and not jointly, hereby represents and warrants to the Debtors as set forth in this Section 4.  Each representation and warranty of each Backstop Party is made as of the Execution Date and as of the Effective Date:

4.1.    **Organization of Such Backstop Party.**  Such Backstop Party is duly incorporated, organized or formed (as applicable), validly existing and in good standing under the Laws of its jurisdiction of incorporation, organization or formation (as applicable), with full corporate, partnership or limited liability company (as applicable) power and authority to conduct its business as it is now conducted.

4.2.    **Authority; No Conflict**.

(a)    Such Backstop Party (i) has the requisite corporate, partnership or limited liability company (as applicable) power and authority (A) to enter into, execute and deliver this Agreement and, subject to the entry of the Backstop Order, (B) to perform and consummate the transactions contemplated hereby, and (ii) has taken all necessary corporate, partnership or limited liability company (as applicable) action required for (x) the due authorization, execution and delivery by such Backstop Party of this Agreement and (y) the performance and consummation of the transactions contemplated hereby by such Backstop Party.  This Agreement has been duly executed and delivered by such Backstop Party.  This Agreement constitutes the legal, valid and binding obligation of such Backstop Party, enforceable against such Backstop Party in accordance with its terms, except that such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Laws now or hereafter in effect relating to or affecting the rights and remedies of creditors and general principles of equity (whether considered in a proceeding at Law or in equity).

(b)    Neither the execution and delivery by such Backstop Party of this Agreement nor (subject to the entry of the Backstop Order) the performance or consummation by such Backstop Party of any of the transactions contemplated hereby will, directly or indirectly (with or without notice or lapse of time or both):

(i)    contravene, conflict with, or result in a violation or breach of any provision of the Organizational Documents of such Backstop Party;

(ii)    contravene, conflict with or result in a violation of any Law or Order to which such Backstop Party or any of the properties, assets, rights or interests owned, leased or used by such Backstop Party are bound or may be subject; or

(iii)    contravene, conflict with or result in a violation or breach of any provision of, or give rise to any right of termination, acceleration or cancellation under, any material Contract to which such Backstop Party is a party or which any of the properties, assets, rights or interests owned, leased or used by such Backstop Party are bound or may be subject;

22

except, in the case of clauses (ii) and (iii) above, where such occurrence, event or result would not reasonably be expected to prohibit, materially delay or materially and adversely impact such Backstop Party's performance or consummation of its obligations under this Agreement.

Except (x) for any required filings under the HSR Act or other applicable competition Laws, (y) for Consents which have been obtained, notices which have been given and filings which have been made, and (z) where the failure to give any notice, obtain any Consent or make any filing would not reasonably be expected to prohibit, materially delay or materially and adversely impact such Backstop Party's performance or consummation of its obligations under this Agreement, such Backstop Party is not and will not be required to give any notice to, make any filing with or obtain any Consent from, any Person in connection with the execution and delivery by such Backstop Party of this Agreement or the consummation or performance by such Backstop Party of any of the transactions contemplated hereby.

4.3.    **Backstop Securities Not Registered.**  Such Backstop Party understands that the Backstop Securities have not been registered under the Securities Act.  Such Backstop Party also understands that the Backstop Securities are being offered and sold pursuant to an exemption from registration provided under Section 4(a)(2) of the Securities Act based in part upon such Backstop Party's representations contained in this Agreement, and such Backstop Party will not sell the Backstop Securities unless subsequently registered under the Securities Act or an exemption from registration is available.

4.4.    **Acquisition for Own Account.**  Such Backstop Party is acquiring the Backstop Securities for its own account (or for the accounts for which it is acting as investment advisor or manager) for investment and not with a present view toward distribution, within the meaning of the Securities Act. Subject to the foregoing, by making the representations herein, such Backstop Party does not agree to hold its Backstop Securities for any minimum or other specific term and reserves the right to dispose of its Backstop Securities at any time in accordance with or pursuant to a registration statement or exemption from the registration requirements under the Securities Act and any applicable state securities Laws.

4.5.    **Qualified Institutional Buyer.**  Such Backstop Party is a Qualified Institutional Buyer and has such knowledge and experience in financial and business matters that such Backstop Party is capable of evaluating the merits and risks of its investment in the Backstop Securities.  Such Backstop Party understands and is able to bear any economic risks of such investment.  Notwithstanding anything to the contrary herein, nothing contained in any of the representations, warranties or acknowledgments made by any Backstop Party in this Section 4.5 will operate to modify or limit in any respect the representations and warranties of the Debtors or to relieve the Debtors from any obligations to the Backstop Parties for breach thereof or the making of misleading statements or the omission of material facts in connection with the transactions contemplated herein.

4.6.    **Proceedings.**  There are no pending, existing, instituted, outstanding or, to the knowledge of such Backstop Party, threatened Proceedings against such Backstop Party which, if adversely determined, would reasonably be expected to prohibit, materially delay or materially and adversely impact such Backstop Party's performance or consummation of its obligations under this Agreement.

23

NY 78156220

4.7.    **Sufficiency of Funds.**  On the Business Day on which the Deposit Deadline occurs, such Backstop Party will have available funds sufficient to pay such Backstop Party's Aggregate Purchase Price.

4.8.    **Access to Information**.  Such Backstop Party acknowledges that it has been afforded the opportunity to ask questions and receive answers concerning the Debtors and to obtain additional information that it has requested to verify the accuracy of the information contained herein.

4.9.    **Party to RSA**. Such Backstop Party has duly and validly executed and delivered the RSA, and the RSA constitutes a valid and binding obligation of such Backstop Party, enforceable against such Backstop Party in accordance with its terms.

4.10.    **No Brokers Fee**.  Such Backstop Party is not a party to any contract, agreement or understanding with any Person that would give rise to a valid claim against the Debtors for a brokerage commission, finder's fee or like payment in connection with the Rights Offering.

4.11.    **Ownership of Claims**. As of the date hereof, such Backstop Party or its Affiliates, as applicable, were, collectively, the beneficial owner (or investment advisor or manager for the beneficial owner) of the aggregate principal amount of Notes Claims indicated in the RSA, and (subject to the signature page limitations set forth in the RSA), has full power to vote and dispose thereof, and has not entered into any agreement to transfer the foregoing where such transfer would prohibit such Backstop Party from complying with its obligations hereunder or under the RSA.

5.    **Covenants of the Debtors.**    Each of the Debtors hereby, jointly and severally, covenants and agrees with the Backstop Parties as set forth in this Section 5.

5.1.    **Approval of this Agreement**.  On the Petition Date, the Debtors shall file a motion and supporting papers (the "Backstop Motion") seeking an order of the Bankruptcy Court (which may be included as part of the Disclosure Statement Order or the Confirmation Order), which order (the "Backstop Order") shall be consistent with the RSA and this Agreement and shall (a) authorize and approve (i) this Agreement and the execution, delivery and performance by the Debtors of this Agreement, (ii) the Debtors' assumption of this Agreement pursuant to Section 365 of the Bankruptcy Code, (iii) the payment of the fees, expenses and other amounts required to be paid by the Debtors hereunder (including the Backstop Expenses and the Put Option Premium (including, if applicable, the Put Option Premium Cash Amount)), which shall constitute allowed administrative claims against the Debtors' estates under sections 503(b) and 507(a)(1) of the Bankruptcy Code, and (iv) the indemnification and contribution provisions set forth herein, (b) release and exculpate the Backstop Parties and their respective Affiliates and Representatives from any liability for participation in the transactions contemplated hereby or any of the other Contemplated Transactions, (c) authorize and approve all documents, instruments, agreements and other materials entered into, delivered, distributed or otherwise used in connection with the Rights Offering (including the Rights Offering Procedures and the accompanying subscription form), and (d) otherwise be in form and substance reasonably satisfactory to the Required Backstop Parties; provided, that the signature pages, exhibits and schedules to any copy of this Agreement that is

24

NY 78156220

filed with the Bankruptcy Court shall be subject to redaction as the Required Backstop Parties determine, including redacting (x) the names of the Backstop Parties, and (y) the Backstop Commitment Percentage of each Backstop Party. The Debtors shall support and use commercially reasonable efforts to (A) obtain Bankruptcy Court approval of the Backstop Order as soon as practicable after the Petition Date, and in no event more than forty-five (45) days thereafter, (B) obtain a waiver of Bankruptcy Rule 6004(h) and request that the Backstop Order be effective immediately upon its entry by the Bankruptcy Court, which Backstop Order shall not be revised, modified, or amended by any other Order of the Bankruptcy Court, and (C) fully support the Backstop Motion and any application seeking Bankruptcy Court approval and authorization to pay the expenses and other amounts required to be paid by the Debtors hereunder (including the Put Option Premium and the Backstop Expenses), as allowed administrative claims against the Debtors' estates.

The Debtors shall provide the Backstop Parties and counsel to the Backstop Parties identified in Section 12(a) hereof with a copy of the proposed Backstop Order together with copies of any briefs, pleadings and motions related thereto, for review and comment by the Backstop Parties and such counsel a reasonable period of time prior to filing such proposed Backstop Order (or any such briefs, pleadings or motions related thereto) with the Bankruptcy Court (but in no event less than three (3) Business Days prior to such filing). Any comments received by the Debtors from the Backstop Parties or such counsel with respect to the Backstop Order (or any briefs, pleadings or motions related thereto) shall be considered by them in good faith and, to the extent the Debtors disagree with, or determine not to incorporate, any such comments, they shall inform the Backstop Parties thereof and discuss the same with the Backstop Parties. Any amendments, modifications, changes or supplements to the Backstop Order sought by the Debtors shall be in form and substance acceptable to the Required Backstop Parties. If the Backstop Order or any other Orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Backstop Order or any such other Order), the Debtors shall diligently defend against any such appeal, petition or motion and shall use their commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion. The Debtors shall keep the Backstop Parties reasonably informed and updated regarding the status of any such appeal, petition or motion.

5.2.    **Exit Facility**. The Debtors shall take all commercially reasonable actions to enter into and consummate, on or prior to the Effective Date the financing contemplated by the Exit Facility Term Sheet, including by using their commercially reasonable efforts to (a) negotiate, execute and deliver the Exit Facility Documents and (b) satisfy all conditions in the Exit Facility Documents. The Debtors shall promptly provide copies of all drafts and final execution copies of all Exit Facility Documents for review and comment by, and the reasonable approval of, the Required Backstop Parties. The Exit Facility Documents shall be consistent in all material respects with the terms set forth in the Exit Facility Term Sheet, except as otherwise agreed by the Required Backstop Parties. Notwithstanding the foregoing, each of the Debtors acknowledges and agrees that neither the Backstop Parties nor any of their respective Affiliates or Representatives shall have any responsibility for the Exit Facility and shall not be liable or otherwise responsible for any statements, assertions, facts, projections, forecasts, data or other information contained or referred to in any materials prepared by or on behalf of the Debtors, the agents or lenders under the Exit

25

Facility, or any of their respective Affiliates or Representatives in connection with the Exit Facility.

5.3.    **Conditions Precedent.**    The Debtors shall use their commercially reasonable efforts to satisfy or cause to be satisfied all the conditions precedent set forth in Section 7.1 hereof and the Plan (including procuring and obtaining all Consents, authorizations and waivers of, making all filings with, and giving all notices to, Persons (including Governmental Bodies) which may be necessary or required on its part in order to consummate or effect the transactions contemplated herein).

5.4.    **Notification**.    The Debtors shall: (a) on reasonable request by any of the Backstop Parties, cause the Rights Offering Subscription Agent to notify each of the Backstop Parties in writing of the aggregate principal amount of Rights Offering Securities that Rights Offering Participants have subscribed for pursuant to the Rights Offering as of the close of business on the Business Day preceding such request or the most recent practicable time before such request, as the case may be, and (b) following the Subscription Instruction and Payment Deadline, (i) cause the Rights Offering Subscription Agent to notify each of the Backstop Parties in writing, within three (3) Business Days after the Subscription Instruction and Payment Deadline, of the aggregate principal amount of Unsubscribed Securities and (ii) timely comply with their obligations under Section 1.1(b) hereof.

5.5.    **Use of Proceeds.**    The Debtors shall use the net cash proceeds from the sale of the Rights Offering Securities from the Rights Offering and the sale of the Backstop Securities pursuant to this Agreement solely for the purposes set forth in the Plan.

5.6.    **HSR Act and Foreign Competition Filings**.    The Debtors shall promptly prepare and file all necessary documentation and effect all applications, if any, that are necessary under the HSR Act or any applicable foreign competition Laws so that all applicable waiting periods shall have expired or been terminated thereunder with respect to the purchase of Backstop Securities hereunder, the issuance and purchase of Rights Offering Securities in connection with the Rights Offering, or any of the other Contemplated Transactions in time for such transactions to be consummated within the timeframes contemplated hereunder and under the RSA, and not take any action, or fail to take any action, that is intended or reasonably likely to materially impede or delay the ability of the parties to obtain any necessary approvals required for the Contemplated Transactions.  Without limiting the provisions of Section 2.2, the Debtors shall bear all costs and expenses of the Debtors and the Backstop Parties in connection with the preparation or the making of any filing under the HSR Act or applicable foreign competition Laws, including any filing fees thereunder.

5.7.    **Royalty Class Action Settlement.**    The Debtors shall, to the extent known by the Debtors, (i) notify counsel for the Backstop Parties as soon as reasonably practicable if the Royalty Class Action Settlement is terminated or if members of the Royalty Class Action Class who have Royalty Class Action Claims which, in the aggregate, exceed ten percent (10%) of the Settlement Cash Proceeds elect to opt-out of the Royalty Class Action Settlement, and (ii) provide counsel for the Backstop Parties, as soon as reasonably practicable upon request, with an update regarding the status of the responses from the members of the Royalty Class Action Class.

26

5.8.    **RSA Covenants.**  Each of the covenants and agreements set forth in Section 6 of the RSA (as in effect on the Execution Date) (collectively, the "Debtors RSA Covenants"), are hereby incorporated herein by reference with full force and effect as if fully set forth herein by applying the provisions thereof *mutatis mutandis* (such that all changes and modifications to the defined terms and other terminology used in the Debtors RSA Covenants shall be made so that the Debtors RSA Covenants can be applied in a logical manner in this Agreement), and the Debtors shall perform, abide by and observe, for the benefit of the Backstop Parties, all of the Debtors RSA Covenants as incorporated herein and modified hereby, and without giving effect to any amendment, modification, supplement, forbearance, waiver or termination of or to any of the Debtors RSA Covenants that are made or provided under the terms of the RSA, other than any amendment, modification, supplement, forbearance, waiver or termination of or to any of the Debtors RSA Covenants which (a) the Required Backstop Parties have provided their prior written consent or (b) have the effect of making such RSA Covenant more favorable to the Required Backstop Parties, as determined by the Required Backstop Parties in their sole discretion. The Debtors shall not assert, or support any assertion by any third party, that the Debtors RSA Covenants, as incorporated herein and modified hereby, are not enforceable by the Backstop Parties by reason of the fact that the Debtors RSA Covenants are included in a Contract that was entered into by the Debtors prior to the Petition Date or otherwise, or that the Required Backstop Parties shall be required to obtain relief from the automatic stay from the Bankruptcy Court as a condition to the right of the Required Backstop Parties to terminate this Agreement pursuant to Section 8(b) on account of a breach or violation of any of the Debtors RSA Covenants.  For the avoidance of doubt, for purposes of applying the Debtors RSA Covenants to this Agreement, the term "Required Consenting Creditors" used in the Debtors RSA Covenants shall mean and be a reference to the "Required Backstop Parties".

5.9.    **Access**.  Each of the Debtors shall provide, and direct its employees, officers, advisors, and other representatives to cooperate and work in good faith with and provide, to the Backstop Parties and their respective advisors (i) reasonable access to the Debtors' books and records during normal business hours on reasonable advance notice to the Debtors' representatives and without disruption to the operation of the Debtors' business, (ii) reasonable access to the management and advisors of the Debtors on reasonable advance notice to such Persons and without disruption to the operation of the Debtors' business and (iii) such other information or access as reasonably requested by the Backstop Parties or their respective legal and financial advisors; provided that such Backstop Parties and their respective advisors shall enter into confidentiality agreements or nondisclosure agreements with the Debtors in connection with such access.

6.    **Covenants of the Backstop Parties**.

6.1.    **Conditions Precedent.**  Each Backstop Party shall use its commercially reasonable efforts to satisfy or cause to be satisfied on or prior to the Effective Date all of the conditions precedent applicable to such Backstop Party set forth in Section 7.2 hereof; provided, however, that nothing contained in this Section 6.1 shall obligate the Backstop Parties to waive any right or condition under this Agreement, the RSA, the Plan or any of the other Definitive Documents.

27

NY 78156220

6.2.    **HSR Act and Foreign Competition Filings**.  Each Backstop Party shall promptly prepare and file all necessary documentation and effect all applications, if any, that are necessary under the HSR Act or any applicable foreign competition Laws so that all applicable waiting periods shall have expired or been terminated thereunder with respect to the purchase of Backstop Securities hereunder, the issuance and purchase of Rights Offering Securities in connection with the Rights Offering or any of the other Contemplated Transactions within the timeframes contemplated hereunder and in the RSA, and not take any action that is intended or reasonably likely to materially impede or delay the ability of the parties to obtain any necessary approvals required for the Contemplated Transactions.  Notwithstanding anything to the contrary herein, none of the Backstop Parties (or their respective ultimate parent entities, as such term is used in the HSR Act) shall be required to (a) disclose to any other party hereto any information contained in its HSR Notification and Report Form (if any) or filings under any applicable foreign competition Laws (if any) that such party, in its sole discretion, deems confidential, except as may be required by applicable Laws as a condition to the expiration or termination of all applicable waiting periods under the HSR Act and any applicable foreign competition Laws, (b) agree to any condition, restraint or limitation relating to its or any of its Affiliates' ability to freely own or operate all or a portion of its or any of its Affiliates' businesses or assets, (c) hold separate (including by trust or otherwise) or divest any of its or any of its Affiliates' businesses or assets, or (d) hold separate (including by trust or otherwise) or divest any assets of any of the Debtors.  Without limiting the provisions of Section 2.2, the Debtors shall bear all costs and expenses of the Debtors and the Backstop Parties in connection with the preparation or the making of any filing under the HSR Act or any applicable foreign competition Laws, including any filing fees thereunder.

7.    **Conditions to Closing**.

7.1.    **Conditions Precedent to Obligations of the Backstop Parties.**    The obligations of the Backstop Parties to subscribe for and purchase Backstop Commitment Securities pursuant to their respective Backstop Commitments are subject to the satisfaction (or waiver in writing by the Required Backstop Parties) of each of the following conditions on or prior to the Effective Date:

(a)    RSA.    None of the following shall have occurred:  (i) the RSA shall not have been terminated by any party thereto, (ii) the RSA shall not have been invalidated or deemed unenforceable by the Bankruptcy Court or any other Governmental Body, (iii) no Consenting Creditor Termination Event shall have occurred which was not waived in writing (including by e-mail) by the Required Backstop Parties (disregarding whether any such Consenting Creditor Termination Event was waived in writing by the Required Consenting Creditors), and (iv) there shall not be continuing any cure period with respect to any event, occurrence or condition that would permit the Required Consenting Creditors to terminate the RSA in accordance with its terms (disregarding whether the Required Consenting Creditors waived any Consenting Creditor Termination Event that would arise out of the failure to cure such event, occurrence or condition).

(b)    Plan and Plan Supplement.    The Plan, as confirmed by the Bankruptcy Court, shall be consistent in all material respects with the RSA.  The Plan Supplement (including all schedules, documents and forms of documents contained therein or constituting a part thereof)

28

and the Definitive Documents shall be consistent in all material respects with the terms of this Agreement and the RSA.

(c)    Disclosure Statement.  The Disclosure Statement shall be consistent in all material respects with the terms of this Agreement and the RSA.

(d)    Disclosure Statement Order.  (i) The Bankruptcy Court shall have entered the Order approving the Disclosure Statement (the "Disclosure Statement Order"), (ii) the Disclosure Statement Order shall be consistent in all material respects with the terms of this Agreement and the RSA and (iii) the Disclosure Statement Order shall be a Final Order.

(e)    Confirmation Order.  (i) The Bankruptcy Court shall have entered the Confirmation Order, (ii) the Confirmation Order shall be consistent in all material respects with the terms of this Agreement and the RSA and (iii) the Confirmation Order shall be a Final Order. Without limiting the generality of the foregoing, the Confirmation Order shall contain the following specific findings of fact, conclusions of Law and Orders:  (A) the Specified Issuances described in clause (a) of the definition of "Specified Issuances" are exempt from the registration and prospectus delivery requirements of Section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code; (B) each of the Specified Issuances described in clauses (b) - (d) of the definition of "Specified Issuances" are exempt from the registration and prospectus delivery requirements of Section 5 of the Securities Act pursuant to Section 4(a)(2) of the Securities Act and/or another available exemption from the Securities Act registration requirements; (C) the solicitation of acceptance or rejection of the Plan by the Backstop Parties and/or any of their respective Related Persons (if any such solicitation was made) was done in good faith and in compliance with the applicable provisions of the Bankruptcy Code and applicable non-bankruptcy law and, as such, the Backstop Parties and any of their respective Related Persons are entitled to the benefits and protections of section 1125(e) of the Bankruptcy Code; and (D) the participation by the Backstop Parties and/or any of their respective Related Persons in the offer, issuance, sale or purchase of any security offered, issued, sold or purchased under the Plan (if any such participation was made) was done in good faith and in compliance with the applicable provisions of the Bankruptcy Code and, as such, the Backstop Parties and any of their respective Related Persons are entitled to the benefits and protections of section 1125(e) of the Bankruptcy Code.

(f)    Backstop Order.  The Bankruptcy Court shall have entered the Backstop Order, and the Backstop Order shall be consistent in all material respects with the terms of this Agreement and this Agreement and shall otherwise be in form and substance acceptable to the Required Backstop Parties, and the Backstop Order shall be a Final Order.

(g)    Conditions to Effectiveness of Plan.  The conditions to the Effective Date set forth in the Plan shall have been satisfied (or waived with the prior written consent of the Required Backstop Parties) in accordance with the Plan, and the Effective Date shall have occurred or shall occur simultaneously with the Closing.

(h)    Rights Offering and Backstop.  (i) The Rights Offering shall have been conducted and consummated in accordance with the Plan and this Agreement, (ii) all Rights Offering Securities and Backstop Securities shall have been (or concurrently with the Closing will be) issued and sold in connection with the Rights Offering and/or pursuant to this Agreement, and

29

(iii) the Debtors shall have received (or concurrently with the Closing will receive) net cash proceeds from the issuance and sale of Rights Offering Securities and Backstop Securities in an aggregate amount of not less than the Rights Offering Amount.

(i)     Exit Facility Documents.  (i) Each of the Exit Facility Documents shall (A) have been (or concurrently with the Closing will be) executed and/or delivered by the Debtors and each other Person required to execute and/or deliver the same, (B) be consistent in all material respects with the terms of this Agreement and the RSA, (C) be in full force and effect, and (D) be in form and substance acceptable to the Required Backstop Parties, (ii) all conditions to closing of the transactions contemplated by the Exit Facility (as set forth in the Exit Facility Documents) shall have been satisfied (or waived by the requisite Person(s)).

(j)     Stockholders Agreement.  The Company shall have executed and delivered the Stockholders Agreement, and the Stockholders Agreement shall be (i) consistent in all material respects with the terms of the RSA and this Agreement and otherwise in form and substance acceptable to the Required Backstop Parties and (ii) in full force and effect.

(k)     Registration Rights Agreement.  The Company shall have executed and delivered the Registration Rights Agreement, and the Registration Rights Agreement shall be (i) consistent in all material respects with the terms of the RSA and this Agreement and otherwise in form and substance acceptable to the Required Backstop Parties and (ii) in full force and effect.

(l)     New Convertible Notes Indenture.  The Company and the New Convertible Notes Indenture Trustee shall have executed and delivered the New Convertible Notes Indenture, the New Convertible Notes Indenture shall have been issued, and the New Convertible Notes Indenture shall be (i) consistent in all material respects with the terms of the RSA and this Agreement and otherwise in form and substance acceptable to the Required Backstop Parties and (ii) in full force and effect.

(m)     Warrant Agreements.  The Company and the warrant agent with respect to the New Warrants shall have executed and delivered the Warrant Agreements, and the Warrant Agreements shall be (i) consistent in all material respects with the terms of the RSA and this Agreement and otherwise in form and substance acceptable to the Required Backstop Parties and (ii) in full force and effect.

(n)     No Injunctions or Restraints; Illegality.  No temporary restraining order, preliminary or permanent injunction, judgment or other Order preventing the consummation of any of the transactions contemplated by this Agreement or any of the other Contemplated Transactions shall have been entered, issued, rendered or made, nor shall any Proceeding seeking any of the foregoing be commenced, pending or threatened; nor shall there be any Law promulgated, enacted, entered, enforced or deemed applicable to any of the Backstop Parties or any of the Debtors which makes the consummation of any of the transactions contemplated by this Agreement or any of the other Contemplated Transactions (including each of the Specified Issuances) impossible, illegal or void.

(o)     Notices and Consents.  All Governmental Body and material third party notifications, filings, waivers, authorizations and other Consents, including Bankruptcy Court

30

approval, necessary or required for the consummation of any of the transactions contemplated by this Agreement or any of the other Contemplated Transactions or the effectiveness of the Plan, shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect; and all applicable waiting periods (including the waiting period under the HSR Act or any other applicable competition Laws (and any extensions thereof)) shall have expired without any action being taken or threatened by any Governmental Body that would restrain, prevent or otherwise impose materially adverse conditions on any of the transactions contemplated by this Agreement or any of the other Contemplated Transactions.

(p)     Representations and Warranties.   Each of (i) the representations and warranties of the Debtors in this Agreement (other than the Fundamental Representations) that are not qualified as to "materiality" or "material adverse effect" shall be true and correct in all material respects, (ii) the representations and warranties of the Debtors in this Agreement (other than the Fundamental Representations) that are qualified as to "materiality" or "material adverse effect" shall be true and correct in all respects, and (iii) the Fundamental Representations shall be true and correct in all respects, in each case of clauses (i), (ii) and (iii), at and as of the Execution Date and at and as of the Effective Date as if made at and as of the Effective Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(q)     Covenants.   Each of the Debtors shall have performed and complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by the Debtors on or prior to the Closing.

(r)     Backstop Expenses.   The Debtors shall have paid all Backstop Expenses that have accrued and remain unpaid as of the Effective Date in accordance with the terms of this Agreement, and no Backstop Expenses shall be required to be repaid or otherwise disgorged to the Debtors or any other Person.

(s)     Material Adverse Effect.   No Material Adverse Effect shall have occurred on or after the Execution Date.

(t)     Put Option Securities.   The Company shall have issued and delivered the Put Option Securities in accordance with Section 1.3(a), or will issue and deliver such securities concurrently with the delivery of the Rights Offering Securities, and no portion of the Put Option Securities shall have been invalidated or avoided.

(u)     Backstop Certificate.   The Backstop Parties shall have received a Backstop Certificate in accordance with Section 1.1(b).

(v)     No Registration; Compliance with Securities Laws.   No Proceeding shall be pending or threatened by any Governmental Body that alleges that any of the Specified Issuances is not exempt from the registration and prospectus delivery requirements of Section 5 of the Securities Act or any applicable securities or "Blue Sky" laws of any state of the United States.

31

NY 78156220

(w)     Officer's Certificate.  The Backstop Parties shall have received on and as of the Effective Date a certificate of an executive officer of the Debtors confirming that the conditions set forth in Sections 7.1(p), 7.01(q), 7.1(s), and 7.1(z) hereof have been satisfied.

(x)     Valid Issuance.  The Rights Offering Securities and the Backstop Securities shall be, upon issuance, validly issued, and free and clear of all issue, stamp, transfer or similar Taxes, Encumbrances, pre-emptive rights, rights of first refusal, subscription rights and similar rights, except for any restrictions on transfer as may be imposed by applicable securities Laws or as may be provided in the New Stockholders Agreement or the New Convertible Notes Indenture, as applicable. The Put Option Securities shall be, upon issuance, fully-paid and non-assessable.

(y)     Securities of the Debtors.  On the Effective Date, after giving effect to the consummation of the transactions contemplated by the Plan and this Agreement, (A) other than (i) the Rights Offering Securities issued and sold to the Rights Offering Participants pursuant to the Rights Offering and to the Backstop Parties pursuant to this Agreement, (ii) the Backstop Securities sold and/or issued to the Backstop Parties pursuant to this Agreement, (iii) the shares of New Common Stock issued pursuant to the Plan, (iv) Equity Interests of a Debtor owned solely by another Debtor (other than the Company) and (v) New Warrants, no Equity Interests of any Debtor will be issued or outstanding and (B) no pre-emptive rights, rights of first refusal, subscription rights and/or similar rights to acquire any Equity Interests of any Debtor, in any such case will be outstanding or in effect, except as may be provided in the New Stockholders Agreement, the New Convertible Notes Indenture, the Warrant Agreements or the New Corporate Governance Documents.

(z)     Royalty Class Action Settlement.  (A) the Bankruptcy Court shall have entered the Royalty Class Action Settlement Conditional Approval Order and such Order is in full force and effect and shall not have been reversed, stayed, modified, or amended, or (B) none of the following shall have occurred, in each case except with the prior written consent of the Required Backstop Parties: (i) the termination of the Royalty Class Action Settlement or the Royalty Class Action 9019 Settlement Agreement, (ii) the waiver, amendment, or any other modification to the terms of the Royalty Class Action Settlement or the Royalty Class Action 9019 Settlement Agreement that is adverse to the Debtors, or (iii) members of the Royalty Class Action Class who have Royalty Class Action Claims which, in the aggregate, exceed ten percent (10%) of the Settlement Cash Proceeds, elect to opt out of the Royalty Class Action Settlement.

7.2.    **Conditions Precedent to Obligations of the Company.**  The obligations of the Company to issue and sell the Backstop Commitment Securities to each of the Backstop Parties pursuant to this Agreement are subject to the satisfaction (or waiver in writing by the Company) of each of the following conditions precedent on or prior to the Effective Date:

(a)     Confirmation Order.  The Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall be a Final Order.

(b)     Backstop Order.  The Bankruptcy Court shall have entered the Backstop Order and the Backstop Order shall be a Final Order.

32

NY 78156220

(c)    Conditions to Effectiveness of Plan.  The conditions to the Effective Date set forth in the Plan shall have been satisfied or waived in accordance with the Plan, and the Effective Date shall have occurred or shall occur simultaneously with the Closing.

(d)    Rights Offering.  The Rights Offering shall have been consummated.

(e)    No Injunctions or Restraints; Illegality.  No temporary restraining order, preliminary or permanent injunction, judgment or other Order preventing the consummation of any of the transactions contemplated by this Agreement or any of the other Contemplated Transactions shall have been entered, issued, rendered or made, nor shall any Proceeding seeking any of the foregoing be commenced, pending or threatened; nor shall there be any Law promulgated, enacted, entered, enforced or deemed applicable to the Backstop Parties or the Debtors which makes the consummation of any of the transactions contemplated by this Agreement or any of the other Contemplated Transactions (including each of the Specified Issuances) impossible, illegal or void.

(f)    Representations and Warranties and Covenants.  (i) Each of (A) the representations and warranties of each Backstop Party in this Agreement that are not qualified as to "materiality" or "material adverse effect" shall be true and correct in all material respects and (B) the representations and warranties of each Backstop Party that are qualified as to "materiality" or "material adverse effect" shall be true and correct, in each case of clauses (A) and (B), at and as of the Execution Date and at and as of the Effective Date as if made at and as of the Effective Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date) and (ii) each Backstop Party shall have complied in all material respects with all covenants in this Agreement applicable to it, except, in any such case of clause (i) or clause (ii) above, to the extent that any such inaccuracy or non-compliance would not reasonably be expected to prohibit, materially delay or materially and adversely impact such Backstop Party's performance or consummation of its obligations under this Agreement.

8.    **Termination**.

(a)    Unless earlier terminated in accordance with the terms of this Agreement, this Agreement (including the Backstop Commitments contemplated hereby) shall terminate automatically and immediately, without a need for any further action on the part of (or notice provided to) any Person, upon the earlier to occur of:

(i)    the Bankruptcy Court's entry of an Order converting any of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, appointing a trustee or custodian for any of the Debtors or dismissing any of the Chapter 11 Cases; and

(ii)    the date of any termination of the RSA with respect to the Consenting Noteholders or all parties thereto or the delivery of notice of termination by any of the parties to the RSA that would have the effect of terminating the RSA with respect to the Consenting Noteholders or all parties thereto if such notice of termination was effective.

33

NY 78156220

(b)    This Agreement (including the Backstop Commitments contemplated hereby) may be terminated and the transactions contemplated hereby may be abandoned at any time by the Backstop Parties effective immediately upon the giving by the Required Backstop Parties of written notice of termination to the Debtors:

(i)    if (A) any of the Debtors shall have breached or failed to perform any of their respective covenants or other obligations contained in this Agreement (including covenants incorporated into this Agreement by reference), and (B) any such breach or failure to perform (x) would result in a failure of a condition set forth in Section 7.1 and (y) is not curable by the Outside Date, or, if curable or able to be performed by the Outside Date, is not cured by the Outside Date;

(ii)    if any of the conditions set forth in Section 7.1 hereof become incapable of fulfillment prior to the Outside Date;

(iii)    if any of the Debtors (including by or through any of their Representatives) (A) enters into, publicly announces its intention to enter into (including by means of any filings made with any Governmental Body), or announces to any of the Backstop Parties or holders of Company Claims/Interests its intention to enter into, an agreement (including any agreement in principle, letter of intent, memorandum of understanding or definitive agreement), whether binding or non-binding, or whether subject to terms and conditions, with respect to any Alternative Transaction, (B) files any pleading or document with the Bankruptcy Court agreeing to, evidencing its intention to support, or otherwise supports, any Alternative Transaction or (C) consummates any Alternative Transaction;

(iv)    if a Consenting Creditor Termination Event shall occur, without giving effect to any waivers of a Consenting Creditor Termination Event provided under the RSA (for purposes of determining the occurrence of a Consenting Creditor Termination Event, the terms "Required Consenting Noteholders" and "Required Consenting Creditors" as used in any of clauses (a)-(m) of Section 10.01 of the RSA shall be replaced with "Required Backstop Parties");

(v)    if any Law or Order has been enacted or entered by any Governmental Body that operates to prevent, restrict or alter, in any material respect, the implementation of the Plan, the Rights Offering or any of the Contemplated Transactions;

(vi)    if the Backstop Order is not entered by the Bankruptcy Court on or before the date that is forty-five (45) days after the Petition Date; or

(vii)    at any time after the date that is one hundred (100) days after the Petition Date (the "Outside Date"), if the Closing shall not have occurred on or prior to the Outside Date.

(c)    This Agreement (including the Backstop Commitments contemplated hereby) may be terminated at any time by the Debtors effective immediately upon the Debtors'

34

giving of written notice of termination to the Backstop Parties if (i) any of the Backstop Parties shall have breached or failed to perform any of their respective covenants or other obligations contained in this Agreement, or any representation or warranty of any of the Backstop Parties in this Agreement shall have become untrue (determined as if the Backstop Parties made their respective representations and warranties at all times on and after the Execution Date and prior to the date this Agreement is terminated), and (ii) any such breach or failure to perform (A) would result in a failure of a condition set forth in Section 7.2 and (B) is not curable by the Outside Date, or, if curable or able to be performed by the Outside Date, is not cured by the Outside Date; provided, however, that if a Funding Default shall occur, the Debtors shall not be permitted to terminate this Agreement and the transactions contemplated hereby pursuant to this Section 8(c) unless Non-Defaulting Backstop Parties do not elect to commit to purchase all of the Default Securities pursuant to the process set forth in Section 1.2(c) or otherwise.

(d)      This Agreement may be terminated by mutual written agreement among each of the Debtors party hereto and the Required Backstop Parties.

(e)      To the extent this Agreement is validly terminated in accordance with Section 8, within ten (10) Business Days following the termination of this Agreement, the Debtors shall pay the Put Option Premium in cash (in lieu of any Put Option Securities), in an aggregate amount equal to the Put Option Premium Cash Amount, to the Backstop Parties on a *pro rata* basis (determined in accordance with the terms of Section 1.3(a) hereof, as applicable) by wire transfer of immediately available funds to an account designated by each Backstop Party; provided, however, that the Put Option Premium shall not be payable in the event of (i) a termination of this Agreement by the Debtors pursuant to Section 8(c) hereof, (ii) a termination of this Agreement pursuant to Section 8(a)(ii) hereof as a result of (A) a termination of the RSA by the Debtors pursuant to clause (1) of Section 10.02(a) of the RSA or (B) a termination by the Backstop Parties pursuant to Section 10.01(i) of the RSA for failure to meet a Milestone (other than a termination thereunder for failure to meet a Milestone related to the Backstop Order, Confirmation Order and the Outside Date).   The terms set forth in this Section 8(e) shall survive termination of this Agreement and shall remain in full force and effect regardless of whether the transactions contemplated by this Agreement or any of the other Contemplated Transactions are consummated. The obligations set forth in this Section 8(e) are in addition to, and do not limit, the Debtors' obligations under Sections 2.2 and 9 hereof

(f)      In the event of a termination of this Agreement in accordance with this Section 8 at a time after all or any portion of the Aggregate Purchase Price for Backstop Commitment Securities has been deposited into the Deposit Account by any of the Backstop Parties and/or all or any portion of the purchase price for Default Securities that any of the Backstop Parties elects to commit to purchase, the Backstop Parties that have deposited such amounts shall be entitled to the return of all such amounts.  In such a case, the Backstop Parties and the Debtors hereby agree to execute and deliver to the Rights Offering Subscription Agent, promptly after the effective date of any such termination (but in any event no later than two (2) Business Days after any such effective date), a letter instructing the Rights Offering Subscription Agent to pay to each applicable Backstop Party, by wire transfer of immediately available funds to an account designated by such Backstop Party, an amount equal to the total amount that such Backstop Party previously deposited into the Deposit Account and is entitled to receive pursuant to this Section 8(f).

NY 78156220

(g)     In the event of a termination of this Agreement in accordance with this Section 8, the provisions of this Agreement shall immediately become void and of no further force or effect (other than Sections 2.2, 8, 9, 11, 12 and 13 hereof (and any defined terms used in any such Sections (but solely to the extent used in any such Sections)), and other than in respect of any liability of any party for any breach of this Agreement prior to such termination, which shall in each case expressly survive any such termination).

(h)     Each Debtor hereby acknowledges and agrees and shall not dispute that the giving of notice of termination by the Required Backstop Parties pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and each Debtor hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice).

9.     **Indemnification**.

(a)     Whether or not the transactions contemplated by this Agreement or any of the other Contemplated Transactions are consummated, the Debtors hereby agree, jointly and severally, to indemnify and hold harmless (i) each of the Backstop Parties, (ii) each of the Affiliates of each of the Backstop Parties, and (iii) each of the stockholders, equity holders, members, partners, managers, officers, directors, employees, attorneys, accountants, financial advisors, consultants, agents, advisors and controlling persons of each of the Backstop Parties and each of the Affiliates of each of the Backstop Parties (each, in such capacity, an "Indemnified Party") from and against any and all losses, claims, damages, liabilities, costs and expenses (including reasonable attorneys' fees but excluding Taxes of the Backstop Parties, except to the extent otherwise expressly provided for in this Agreement), Taxes, interest, penalties, judgments and settlements, whether or not related to a third party claim, imposed on, sustained, incurred or suffered by, or asserted against, any Indemnified Party as a result of, arising out of, related to or in connection with, directly or indirectly, this Agreement, the Backstop Commitments, the Backstop Securities, the Rights Offering, any of the Definitive Documents, the Plan (or the solicitation thereof), the Chapter 11 Cases or the transactions contemplated hereby or thereby or any of the other Contemplated Transactions, or any breach by any Debtor of any of its representations, warranties and/or covenants set forth in this Agreement, or any claim, litigation, investigation or other Proceeding relating to or arising out of any of the foregoing, regardless of whether any such Indemnified Party is a party thereto, and to pay and/or reimburse each such Indemnified Party for the reasonable and documented legal or other out-of-pocket costs and expenses as they are incurred in connection with investigating, monitoring, responding to or defending any of the foregoing (collectively, "Losses"); provided, that the foregoing indemnification will not, as to any Indemnified Party, apply to Losses that are determined by a final, non-appealable decision by the Bankruptcy Court to have resulted solely from any act by such Indemnified Party that constitutes fraud, gross negligence or willful misconduct.  If for any reason the foregoing indemnification is unavailable to any Indemnified Party or insufficient to hold it harmless, then the Debtors shall contribute to the amount paid or payable by such Indemnified Party as a result of such Loss in such proportion as is appropriate to reflect not only the relative benefits received by the Debtors on the one hand and such Indemnified Party on the other hand but also the relative fault of the Debtors, on the one hand, and such Indemnified Party, on the other hand, as well as any relevant equitable considerations. It is hereby agreed that the relative benefits to the Debtors on the one hand and all Indemnified

36

Parties on the other hand shall be deemed to be in the same proportion as (i) the total value received or proposed to be received by the Debtors pursuant to the sale of the maximum principal amount of Backstop Securities that the Backstop Parties may be required to purchase pursuant to this Agreement bears to (ii) the Put Option Premium.  The Debtors also agree that no Indemnified Party shall have any liability based on its exclusive or contributory negligence or otherwise to the Debtors, any Person asserting claims on behalf of or in right of the Debtors, or any other Person in connection with or as a result of this Agreement, the Backstop Commitments, the Backstop Securities, the Rights Offering, any of the Definitive Documents, the Plan (or the solicitation thereof), the Chapter 11 Cases or the transactions contemplated hereby or thereby or any of the other Contemplated Transactions, except as to any Indemnified Party to the extent that any Losses incurred by the Debtors resulted solely from the fraud, gross negligence or willful misconduct of such Indemnified Party, as determined by a final, non-appealable decision by the Bankruptcy Court.  The terms set forth in this Section 9 shall survive termination of this Agreement and shall remain in full force and effect regardless of whether the transactions contemplated by this Agreement or any of the other Contemplated Transactions are consummated.  The indemnity, contribution and reimbursement obligations of the Debtors under this Section 9 are in addition to, and do not limit, the Debtors' obligations under Sections 2.2, and 8.

(b)    Promptly after receipt by an Indemnified Party of notice of the commencement of any claim, litigation, investigation or other Proceeding with respect to which such Indemnified Party may be entitled to indemnification hereunder ("Actions"), such Indemnified Party will, if a claim is to be made hereunder against the Debtors in respect thereof, notify the Debtors in writing of the commencement thereof; provided, that (i) the omission to so notify the Debtors will not relieve the Debtors from any liability that they may have hereunder except to the extent (and solely to the extent) they have been actually and materially prejudiced by such failure and (ii) the omission to so notify the Debtors will not relieve the Debtors from any liability that they may have to an Indemnified Party otherwise than on account of this Section 9. In case any such Actions are brought against any Indemnified Party and such Indemnified Party notifies the Debtors of the commencement thereof, if the Debtors commit in writing to fully indemnify and hold harmless the Indemnified Party with respect to such Actions, without regard to whether the Effective Date occurs, the Debtors will be entitled to participate in such Actions, and, to the extent that the Debtors elect by written notice delivered to such Indemnified Party, to assume the defense thereof, with counsel satisfactory to such Indemnified Party, provided, that if the defendants in any such Actions include both such Indemnified Party and the Debtors and such Indemnified Party shall have concluded that there may be legal defenses available to it that are different from or additional to those available to the Debtors, such Indemnified Party shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Actions on behalf of such Indemnified Party.  Following the date of receipt by an Indemnified Party of such indemnification commitment from the Debtors and notice from the Debtors of their election to assume the defense of such Actions and approval by such Indemnified Party of counsel, the Debtors shall not be liable to such Indemnified Party for expenses incurred by such Indemnified Party in connection with the defense thereof after such date (other than reasonable costs of investigation and monitoring) unless (w) such Indemnified Party shall have employed separate counsel in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence, (x) the Debtors shall not have employed counsel satisfactory to such Indemnified Party to represent such Indemnified Party at the Debtors'

37

NY 78156220

expense within a reasonable time after notice of commencement of the Actions, (y) after the Debtors assume the defense of such Actions, such Indemnified Party determines that the Debtors are failing to diligently defend against such Actions in good faith or (z) any of the Debtors shall have authorized in writing the employment of counsel for such Indemnified Party.

(c)    The Debtors shall not, without the prior written consent of an Indemnified Party, effect any settlement, compromise or other resolution of any pending or threatened Actions in respect of which indemnity has been sought hereunder by such Indemnified Party unless such settlement, compromise or other resolution (i) includes an unconditional release of such Indemnified Party in form and substance reasonably satisfactory to such Indemnified Party from all liability on the claims that are the subject matter of such Actions and (ii) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Party.

(d)    All amounts paid to an Indemnified Party under this Section 9 shall, to the extent permitted by applicable law, be treated for all Tax purposes as adjustments to the purchase price for the New Convertible Notes subscribed for or purchased by such Indemnified Person.

10.    **Survival**.    Except as expressly provided otherwise in this Agreement, the representations, warranties, covenants and agreements made in this Agreement shall not survive the Closing except for covenants and agreements made in this Agreement that by their terms are to be satisfied or complied with after the Closing, which covenants and agreements shall survive until fully satisfied or complied with in accordance with their terms.

11.    **Amendments and Waivers**.    Any term of this Agreement may be amended or modified and the compliance with any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only if such amendment, modification or waiver is signed, in the case of an amendment or modification, by the Required Backstop Parties and the Debtors, or in the case of a waiver, by the Required Backstop Parties (if compliance by the Debtors is being waived) or by the Required Backstop Parties and the Debtors (if compliance by any of the Backstop Parties is being waived); provided, however, that (a) the Backstop Commitment Schedule may only be updated in accordance with the terms of Section 13.1 hereof, (b) any amendment or modification to this Agreement that would have the effect of changing the Backstop Commitment Percentage of any Backstop Party shall require the prior written consent of such Backstop Party, (c) any amendment or modification to the definition of "Aggregate Purchase Price" or the allocation of the Put Option Premium among the Backstop Parties as set forth in Section 1.3 shall (in any such case) require the prior written consent of each Backstop Party adversely affected thereby, and (d) any amendment, modification or waiver to this Agreement that would adversely affect any of the rights or obligations (as applicable) of any Backstop Party set forth in this Agreement in a manner that is different or disproportionate in any material respect from the effect on the comparable rights or obligations (as applicable) of the Required Backstop Parties set forth in this Agreement (other than in proportion to the amount of the Backstop Commitments held by each of the Backstop Parties) shall also require the written consent of such affected Backstop Party (it being understood that in determining whether consent of any Backstop Party is required pursuant to this clause (d), no personal circumstances of such Backstop Party shall be considered).    No delay on the part of any party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver

38

on the part of any party of any right, power or privilege pursuant to this Agreement, or any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement.  The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party otherwise may have at Law or in equity.

12.    **Notices**.  Except as otherwise expressly provided in this Agreement, all notices, requests, demands, document deliveries and other communications under this Agreement shall be in writing and shall be deemed to have been duly given, provided, made or received (i) when sent by electronic mail ("e-mail"), (ii) when delivered personally, (iii) one (1) Business Day after deposit with an overnight courier service, or (iv) three (3) Business Days after mailed by certified or registered mail, return receipt requested, with postage prepaid, in any such case to the parties at the following addresses or e-mail addresses (or at such other address or e-mail address for a party as shall be specified by like notice):

(a)    if to a Backstop Party, to the address or e-mail address for such Backstop Party set forth on the Backstop Commitment Schedule, with a copy to:

> Stroock & Stroock & Lavan LLP
> 180 Maiden Lane
> New York, New York 10038
> Attention: Erez Gilad and Brian Kelly
> E-mail address: egilad@stroock.com and
> bkelly@stroock.com

(b)    if to the Debtors, at:

> c/o Chaparral Energy, Inc.
> 701 Cedar Lake Blvd.
> Oklahoma City, OK 73114
> Attention: Charles Duginski, Chief Executive Officer, and
> Justin Byrne, Vice President and General Counsel
> E-mail address: chuck.duginski@chaparralenergy.com and
> justin.byrne@chaparralenergy.com

> with copies to:

> Davis Polk & Wardwell LLP
> 450 Lexington Avenue
> New York, New York 10017
> Attention: Damian S. Schaible and Angela M. Libby
> E-mail address: damian.schaible@davispolk.com and
> angela.libby@davispolk.com

provided; however, that no notice, request, demand, document or other communication delivered pursuant to clause (ii), clause (iii) or clause (iv) above shall be deemed to have been duly given,

39

provided, made or received unless and until the sending party notifies the receiving party by e-mail of such delivery (including a reasonable description thereof).

13.    **Miscellaneous**.

13.1.    **Assignments.**  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and, solely to the extent expressly permitted hereunder, permitted assigns.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned by any of the parties (whether by operation of Law or otherwise) without the prior written consent of the Debtors and the Required Backstop Parties.  Notwithstanding the immediately preceding sentence, any Backstop Party's rights, obligations or interests hereunder may be freely assigned, delegated or transferred, in whole or in part, by such Backstop Party to (a) any other Backstop Party, (b) any Affiliate of a Backstop Party, or (c) any other Person not referred to in clause (a) or clause (b) above so long as such Person is approved in writing by the Required Backstop Parties and the Debtors prior to such assignment, delegation or transfer (for purposes of this clause (c), the Backstop Party proposing to make such assignment, delegation or transfer, and all of its Affiliates, shall be deemed to be Defaulting Backstop Parties for purposes of determining whether the definition of "Required Backstop Parties" has been satisfied); provided, that (x) any such assignee assumes all of the obligations of the assigning Backstop Party hereunder and agrees in writing prior to such assignment to be bound by all of the terms hereof in the same manner as the assigning Backstop Party (which writing shall contain, if the assignee is not already a Backstop Party, a certification from the assignee as to the accuracy of the representations and warranties made by each Backstop Party in Section 4 hereof as applied to such assignee), (y) any assignee of a Backstop Commitment must be a Qualified Institutional Buyer, and (z) the right to purchase Rights Offering Securities are only assignable as set forth in the Rights Offering Procedures.  Following any assignment described in the immediately preceding sentence, the Backstop Commitment Schedule shall be updated by the Debtors (in consultation with the assigning Backstop Party and the assignee) solely to reflect (i)(A) the name and address of the applicable assignee or assignees, and (B) the Backstop Commitment Percentage that shall apply to such assignee or assignees as specified by the assigning Backstop Party and the assignee or assignees, and (ii) any changes to the Backstop Commitment Percentage applicable to the assigning Backstop Party as specified by the assigning Backstop Party and the assignee or assignees (it being understood and agreed that updates to the Backstop Commitment Schedule shall not result in an overall change to the aggregate Backstop Commitment Percentages for all Backstop Parties).  Any update to the Backstop Commitment Schedule described in the immediately preceding sentence shall not be deemed an amendment to this Agreement.  Notwithstanding the foregoing or any other provisions herein, unless otherwise agreed in any instance by the Debtors and the Required Backstop Parties (for purposes of this sentence, the Backstop Party making such assignment, and all of its Affiliates, shall be deemed to be Defaulting Backstop Parties for purposes of determining whether the definition of "Required Backstop Parties" has been satisfied), no assignment of obligations by a Backstop Party to an Affiliate of such Backstop Party will relieve the assigning Backstop Party of its obligations hereunder if any such Affiliate assignee fails to perform such obligations.

13.2.    **Severability.**  If any provision of this Agreement, or the application of any such provision to any Person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and

40

the remaining part of such provision and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party hereto.  Upon any such determination of invalidity, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

13.3.    **Entire Agreement.**  Except as expressly set forth herein, this Agreement and the RSA constitute the entire understanding among the parties hereto with respect to the subject matter hereof and replace and supersede all prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof.

13.4.    **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which will be an original, and all of which, when taken together, will constitute one agreement.  Delivery of an executed counterpart of this Agreement by facsimile or portable document format (PDF) will be effective as delivery of a manually executed counterpart of this Agreement.

13.5.    **Governing Law.  THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS OF THE PARTIES HERETO SHALL BE GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAW PRINCIPLES THEREOF EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK.**

13.6.    **Submission to Jurisdiction.**  Each party to this Agreement hereby (a) consents to submit itself to the personal jurisdiction of the federal court of the Southern District of New York or any state court located in New York County, State of New York in the event any dispute arises out of or relates to this Agreement or any of the transactions contemplated by this Agreement, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, including a motion to dismiss on the grounds of forum non conveniens, and (c) agrees that it will not bring any action arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than the federal court of the Southern District of New York or any state court located in New York County, State of New York; provided, however, that during the pendency of the Chapter 11 Cases, all such actions and disputes shall be brought in the Bankruptcy Court.

13.7.    **Waiver of Trial by Jury; Waiver of Certain Damages.**  EACH PARTY HERETO HEREBY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THE PERFORMANCE OF ANY SUCH RIGHTS OR OBLIGATIONS.  Except as prohibited by Law, the Debtors hereby waive any right which they may have to claim or recover in any action or claim referred to in the immediately preceding sentence any special, exemplary, punitive or consequential damages or any damages other than, or in addition to, actual damages.  Each of the Debtors (a) certifies that none of the Backstop Parties nor any Representative of any of the Backstop Parties has represented,

41

NY 78156220

expressly or otherwise, that the Backstop Parties would not, in the event of litigation, seek to enforce the foregoing waivers and (b) acknowledges that, in entering into this Agreement, the Backstop Parties are relying upon, among other things, the waivers and certifications contained in this Section 13.7. Each of the Backstop Parties (i) certifies that none of the Debtors nor any Representative of any of the Debtors has represented, expressly or otherwise, that the Debtors would not, in the event of litigation, seek to enforce the foregoing waivers and (ii) acknowledges that, in entering into this Agreement, the Debtors are relying upon, among other things, the waivers and certifications contained in this Section 13.7.

13.8.    **Further Assurances.**    From time to time after the Execution Date, the parties hereto will execute, acknowledge and deliver to the other parties hereto such other documents, instruments and certificates, and will take such other actions, as any other party hereto may reasonably request in order to consummate the transactions contemplated by this Agreement.

13.9.    **Specific Performance.**    The Debtors and the Backstop Parties acknowledge and agree that (a) irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached, and (b) remedies at Law would not be adequate to compensate the non-breaching party. Accordingly, the Debtors and the Backstop Parties agree that each of them shall have the right, in addition to any other rights and remedies existing in its favor, to seek an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce its rights and obligations hereunder not only by an action or actions for damages but also by an action or actions for specific performance, injunctive and/or other equitable relief. The right to equitable relief, including specific performance or injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Agreement. Each of the Debtors and each of the Backstop Parties hereby waives any defense that a remedy at Law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance or other equitable remedies.

13.10.    **Headings.**    The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

13.11.    **Interpretation; Rules of Construction.**    When a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or Exhibit or Schedule to, this Agreement unless otherwise indicated. Unless the context of this Agreement otherwise requires, (a) words of any gender include each other gender; (b) words using the singular or plural number also include the plural or singular number, respectively; (c) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement; and (d) the words "include", "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation". The parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any regulation, holding, rule of construction or Law providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document. Prior drafts of this Agreement or the fact that any terms or provisions have been added, deleted or otherwise modified from any prior drafts of this Agreement shall not be construed in favor of or against any party on account of its participation in any negotiations and/or drafting of this Agreement or be used as an aid of construction or otherwise constitute

42

evidence of the intent of the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of such prior drafts.

13.12. **Several, Not Joint, Obligations**.    The representations, warranties, covenants and other obligations of the Backstop Parties under this Agreement are, in all respects, several and not joint or joint and several, such that no Backstop Party shall be liable or otherwise responsible for any representations, warranties, covenants or other obligations of any other Backstop Party, or any breach or violation thereof.

13.13. **Disclosure**.  Unless otherwise required by applicable Law, the Debtors will not disclose to any Person (including by filing a copy of this Agreement with the Bankruptcy Court) any of the information set forth on the Backstop Commitment Schedule or on any of the Backstop Parties' signature pages to this Agreement (including (x) the identities and notice information of any of the Backstop Parties, and (y) the Backstop Commitment Percentage of and/or percentage of Company Claims/Interests held by any Backstop Party), it being understood and agreed that the Backstop Commitment Schedule and each Backstop Party's signature page to this Agreement shall be redacted to remove all such information, except for (a) disclosures made with the prior written consent of each Backstop Party whose information will be disclosed (in each case in the sole discretion of such Backstop Party), (b) disclosures to the Debtors' Representatives who reasonably need to know such information in connection with the transactions contemplated hereby and subject to their agreement to be bound by the confidentiality provisions hereof and (c) disclosures to parties to this Agreement solely to the extent required for purposes of calculating the Adjusted Commitment Percentage of a Non-Defaulting Backstop Party; provided, however, that if such disclosure is required by Law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Backstop Party a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure to the greatest extent possible.

13.14. **No Recourse Party**.  This Agreement may only be enforced against the named parties hereto (and then only to the extent of the specific obligations undertaken by such parties in this Agreement).  All claims or causes of action (whether in contract, tort, equity or any other theory) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement, may be made only against the Persons that are expressly identified as Parties hereto (and then only to the extent of the specific obligations undertaken by such Parties).  Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Backstop Parties may be partnerships or limited liability companies, the Debtors and the Backstop Parties covenant, agree and acknowledge that no recourse under this Agreement shall be had against any former, current or future directors, officers, agents, Affiliates, general or limited partners, members, managers, employees, stockholders or equity holders of any Backstop Party, or any former, current or future directors, officers, agents, Affiliates, employees, general or limited partners, members, managers, employees, stockholders, equity holders or controlling persons of any of the foregoing, as such (any such Person, a "No Recourse Party"), whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable Law (whether in contract, tort, equity or any other theory that seeks to "pierce the corporate veil" or impose liability of an entity against its owners or affiliates or otherwise), it being expressly agreed and acknowledged that no liability whatsoever shall attach to, be imposed on or otherwise be

43

incurred by any No Recourse Party for any obligation of any Backstop Party under this Agreement or for any claim or proceeding based upon, in respect of or by reason of any such obligations or their creation.

13.15. **Settlement Discussions**. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any Proceeding other than a Proceeding to enforce the terms of this Agreement.

13.16. **No Third Party Beneficiaries**. This Agreement is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any Person other than the parties hereto and other than (a) the Indemnified Parties with respect to Section 9 hereof and (b) each No Recourse Party with respect to Section 13.14 hereof.

13.17. **Arm's Length.** Each Debtor acknowledges and agrees that the Backstop Parties are acting solely in the capacity of arm's length contractual counterparties to the Debtors with respect to the transactions contemplated hereby and the other Contemplated Transactions (including in connection with determining the terms of the Rights Offering) and not as financial advisors or fiduciaries to, or agents of, the Debtors or any other Person. Additionally, the Backstop Parties are not advising the Debtors or any other Person as to any legal, Tax, investment, accounting or regulatory matters in any jurisdiction. Each Debtor shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby and the other Contemplated Transactions, and the Backstop Parties shall have no responsibility or liability to any Debtor with respect thereto. Any review by the Backstop Parties of the Debtors, the Contemplated Transactions or other matters relating to the Contemplated Transactions will be performed solely for the benefit of the Backstop Parties and shall not be on behalf of the Debtors.

14. **Definitions**.

14.1. **Definitions in the RSA**. Capitalized terms used in this Agreement and not otherwise defined in this Agreement shall have the meanings given to such terms in the RSA (as in effect on the Execution Date).

14.2. **Certain Defined Terms.** As used in this Agreement the following terms have the following respective meanings:

"Accredited Investor" means an "accredited investor" as such term is defined in Rule 501 under the Securities Act.

"Actions" has the meaning given to such term in Section 9(b) hereof.

"Adjusted Commitment Percentage" means, with respect to any Non-Defaulting Backstop Party, in the case of a Funding Default committed by a Backstop Party with respect to the deposit of its Aggregate Purchase Price attributable to its Backstop Commitment Securities, a fraction, expressed as a percentage, the numerator of which is the Backstop Commitment Percentage of such Non-Defaulting Backstop Party and the denominator of which is the sum of the Backstop Commitment Percentages of all Non-Defaulting Backstop Parties.

44

"Affiliate" means, with respect to any Person, any other Person controlled by, controlling or under common control with such Person; provided, that, for purposes of this Agreement, none of the Debtors shall be deemed to be Affiliates of any Backstop Party. As used in this definition, "control" (including, with its correlative meanings, "controlling," "controlled by" and "under common control with") shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies of a Person (whether through ownership of securities, by contract or otherwise). A Related Fund of any Person shall be deemed to be an Affiliate of such Person.

"Aggregate Purchase Price" has the meaning given to such term in Section 1.2(b) hereof.

"Agreement" has the meaning given to such term in the preamble hereof.

"Alternative Transaction" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, financing, joint venture, partnership, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that in each case is an alternative to, or is materially inconsistent with, one or more of the Contemplated Transactions.

"Approvals" means all approvals and authorizations that are required under the Bankruptcy Code for the Debtors to take corporate or limited liability company (as applicable) action.

"Audited Balance Sheet" has the meaning given to such term in Section 3.16 hereof.

"Audited Financial Statements" has the meaning given to such term in Section 3.16 hereof.

"Backstop Certificate" has the meaning given to such term in Section 1.1(b).

"Backstop Commitment" means, with respect to any Backstop Party, the commitment of such Backstop Party, subject to the terms and conditions set forth in this Agreement, to purchase Unsubscribed Securities pursuant to, and on the terms set forth in, Section 1.2(a) hereof; and "Backstop Commitments" means the Backstop Commitments of all of the Backstop Parties collectively.

"Backstop Commitment Percentage" means, for each Backstop Party, the percentage set forth on the Backstop Commitment Schedule opposite such Backstop Party's name.

"Backstop Commitment Schedule" has the meaning given to such term in the preamble hereof.

"Backstop Commitment Securities" has the meaning given to such term in Section 1.2(a).

45

NY 78156220

"Backstop Expenses" means (a) all Consenting Creditor Fees and Expenses of each of the Backstop Parties payable pursuant to the terms of the RSA, (b) to the extent not included among such Consenting Creditor Fes and Expenses, all accrued but unpaid reasonable and documented fees and expenses (whether incurred prior to or after the commencement of the Chapter 11 Cases) related to the formulation, development, negotiation, documentation, and implementation of this Agreement and the transactions contemplated hereby, the Definitive Documents, and/or any amendments, waivers, consents, supplements, or other modifications to any of the foregoing, in each case, of: (i) Stroock & Stroock & Lavan LLP, as counsel to the Backstop Parties, (ii) Young Conaway Stargatt & Taylor, LLP, as local counsel to the Backstop Parties, (iii) Perella Weinberg Partners LP, as financial advisor to Stroock & Stroock & Lavan LLP and (iv) such other advisors retained by the Required Backstop Parties with the consent of the Company (such consent not to be unreasonably withheld) in connection with its representation of the Backstop Parties, in the case of a financial advisor, in accordance with the engagement letters and/or fee letters among such consultant or professional and any of the Debtors, including, without limitation, any success fees contemplated therein, and in each case, without further order of, or application to, the Bankruptcy Court by such consultant or professionals or the Debtors, and (c) all filing fees (if any) required by the HSR Act or any other competition Laws and any expenses related thereto.

"Backstop Motion" has the meaning given to such term in Section 5.1 hereof.

"Backstop Order" has the meaning given to such term in Section 5.1 hereof.

"Backstop Party" and "Backstop Parties" have the meanings given to such terms in the preamble hereof.

"Backstop Securities" means, with respect to any Backstop Party, the Default Securities that such Backstop Party elects to purchase pursuant to Section 1.2(c), if any, together with such Backstop Party's Backstop Commitment Securities and Put Option Securities.

"Bankruptcy Code" has the meaning given to such term in the recitals hereof.

"Bankruptcy Court" has the meaning given to such term in the recitals hereof.

"Bankruptcy Documents" has the meaning given to such term in Section 3.22 hereof.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases and/or the transactions contemplated by this Agreement, and any Local Rules of the Bankruptcy Court.

"Benefit Plan(s)" has the meaning given to such term in Section 3.12(a) hereof.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by Law to be closed.

"Chapter 11 Cases" has the meaning given to such term in the recitals hereof.

46

NY 78156220

"Closing" has the meaning given to such term in Section 2.1(a) hereof.

"COBRA" has the meaning given to such term in Section 3.12(c) hereof.

"Code" has the meaning given to such term in Section 3.12(a) hereof.

"Company" has the meaning given to such term in the preamble hereof.

"Confirmation Order" means the Order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall conform to the requirements set forth in Section 7.1(e) hereto, and shall otherwise be reasonably satisfactory to the Required Backstop Parties.

"Consent" means any consent, waiver, approval, Order or authorization of, or registration, declaration or filing with or notice to, any Governmental Body or other Person.

"Consenting Creditors RSA Covenants" has the meaning given to such term in Section 6.3 hereof.

"Contemplated Transactions" means, collectively, all of the transactions contemplated by this Agreement, the RSA and the Proposed Plan.

"Contract" means any written agreement, contract, obligation, promise, undertaking or understanding.

"Debtor Disclosure Schedule" has the meaning given to such term in Section 3 hereof.

"Debtor IP Rights" has the meaning given to such term in Section 3.9(a) hereof.

"Debtor IT Systems" has the meaning given to such term in Section 3.9(b) hereof.

"Debtor" and "Debtors" have the meanings given to such terms in the preamble hereof.

"Debtors RSA Covenants" has the meaning given to such term in Section 5.7 hereof.

"Default Purchase Right" has the meaning given to such term in Section 1.2(c) hereof.

"Default Securities" has the meaning given to such term in Section 1.2(c) hereof.

"Defaulting Backstop Party" has the meaning given to such term in Section 1.2(c) hereof.

"Defense Article" has the meaning given to such term in Section 3.13(c) hereof.

47

NY 78156220

"Definitive Documents" means all of the definitive documents implementing the this Agreement, the Plan and the Contemplated Transactions, including, without limitation, the documents set forth in Section 3 of the RSA.

"Deposit Account" has the meaning given to such term in Section 1.2(b) hereof.

"Deposit Deadline" has the meaning given to such term in Section 1.2(b) hereof.

"Disclosure Statement Order" has the meaning given to such term in Section 7.1(d) hereof.

"Draft 10-Q" has the meaning given to such term in Section 3 hereof.

"Effective Date" means the effective date of the Plan.

"e-mail" has the meaning given to such term in Section 12 hereof.

"Encumbrance" means any charge, claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, mortgage, right of first refusal or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"Environmental Laws" means all applicable Laws and Orders relating to pollution or the regulation and protection of human health or safety as it pertains to the exposure to hazardous or toxic substances, the environment or natural resources, including without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. § 9601 et seq.); the Hazardous Materials Transportation Uniform Safety Act, as amended (49 U.S.C. § 5101 et seq.); the Resource Conservation and Recovery Act, as amended (42 U.S.C. § 6901 et seq.); the Toxic Substances Control Act, as amended (15 U.S.C. § 2601 et seq.); the Clean Air Act, as amended (42 U.S.C. § 7401 et seq.); the Clean Water Act, as amended (33 U.S.C. § 1251 et seq.); the Occupational Safety and Health Act, as amended (29 U.S.C. § 651 et seq.); the Atomic Energy Act, as amended (42 U.S.C. §§ 2011 et seq., 2022 et seq., 2296 et seq.); any transfer of ownership notification or approval statutes; and all counterparts or equivalents adopted, enacted, ordered, promulgated, or otherwise approved by any Governmental Body.

"Equity Interests" means, with respect to any Person, the shares (or any class thereof) of capital stock (including common stock and preferred stock), limited liability company interests, partnership interests and any other equity, ownership, or profits interests of such Person, and options, warrants, rights, stock appreciation rights, phantom units, incentives, commitments, calls, redemption rights, repurchase rights or other securities or agreements to acquire or subscribe for, or which are convertible into, or exercisable or exchangeable for, the shares (or any class thereof) of capital stock (including common stock and preferred stock), limited liability company interests, partnership interests and any other equity, ownership, or profits interests of such Person (in each case whether or not arising under or in connection with any employment agreement).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

48

"ERISA Affiliate(s)" means any entity which is a member of any Debtor's controlled group, treated as a single employer, or under common control with any Debtor, within the meaning of Section 414 of the Code or ERISA.

"Escrow Agent" has the meaning given to such term in Section 1.2(b) hereof.

"Execution Date" has the meaning given to such term in the preamble hereof.

"Export Regulations" has the meaning given to such term in Section 3.13(c) hereof.

"Final Order" has the meaning given to such term in the Proposed Plan.

"Financial Statements" has the meaning given to such term in Section 3.16 hereof.

"Fundamental Representations" means the representations and warranties of the Debtors set forth in Sections 3.1, 3.2, 3.3(a), 3.5, 3.6 and 3.7.

"Funding Default" has the meaning given to such term in Section 1.2(c) hereof.

"GAAP" means generally accepted accounting principles in the United States, as in effect from time to time, consistently applied.

"Governance Term Sheet" means the Governance Term Sheet attached as Exhibit E to the RSA.

"Governmental Authorization" means any authorization, approval, consent, license, registration, lease, ruling, permit, tariff, certification, Order, privilege, franchise, membership, entitlement, exemption, filing or registration by, with, or issued by, any Governmental Body.

"Governmental Body" means any federal, national, supranational, foreign, state, provincial, local, county, municipal or other government, any governmental, regulatory or administrative authority, agency, department, bureau, board, commission or official or any quasi-governmental or private body exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority, or any court, tribunal, judicial or arbitral body.

"Hazardous Materials" means hazardous or toxic substances or wastes, solid wastes, petroleum or any fraction thereof, petroleum products or wastes, asbestos, asbestos-containing material, radioactive materials or wastes, medical wastes, or any other wastes, pollutants or contaminants regulated under any Environmental Law.

"Holder Questionnaire" has the meaning given to such term in the Rights Offering Procedures.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the related regulations and published interpretations.

49

"Hydrocarbons" means oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"Imbalance(s)" means any over-production, under-production, over-delivery, under-delivery or similar imbalance of Hydrocarbons produced from or allocated to the Oil and Gas Properties, regardless of whether such over-production, under-production, over-delivery, under-delivery or similar imbalance arises at the wellhead, pipeline, gathering system, transportation system, processing plant or other location.

"Indemnified Party" has the meaning given to such term in Section 9(a) hereof.

"Insurance Policies" has the meaning given to such term in Section 3.21 hereof.

"Interim Financial Statements" has the meaning given to such term in Section 3.16 hereof.

"IP Rights" has the meaning given to such term in Section 3.9(a) hereof.

"IRS" means the Internal Revenue Service and any Governmental Body succeeding to the functions thereof.

"IT Systems" has the meaning given to such term in Section 3.9(b) hereof.

"ITAR" has the meaning given to such term in Section 3.13(c) hereof.

"Knowledge of the Debtors" means the collective knowledge, after reasonable and due inquiry, of the executive officers of any of the Debtors or any other officers of any of the Debtors with responsibility for the applicable subject matter. A reference to the word "knowledge" (whether or not capitalized) or words of a similar nature with respect to the Debtors means the Knowledge of the Debtors as defined in this definition.

"Law" means any federal, national, supranational, foreign, state, provincial, local, county, municipal or similar statute, law, common law, writ, injunction, decree, guideline, policy, ordinance, regulation, rule, code, Order, Governmental Authorization, constitution, treaty, requirement, judgment or judicial or administrative doctrines enacted, promulgated, issued, enforced or entered by any Governmental Body.

"Leases" means all of the Debtors' respective rights, titles and interests in oil, gas, oil and gas or mineral leases, subleases and other leasehold estates created thereby, including carried interests, rights of recoupment, options, reversionary interests, convertible interests and rights to reassignment.

"Licenses and Permits" has the meaning given to such term in Section 3.10 hereof.

"Losses" has the meaning given to such term in Section 9(a) hereof.

50

NY 78156220

"Material Adverse Effect" means any event, change, effect, occurrence, development, circumstance, condition, result, state of fact, or change of fact or the worsening of any of the foregoing (each, an "Event") that, individually or together with all other Events, has had, or would reasonably be expected to have a material adverse effect on either (a) the business, operations, finances, properties, interests, reserves, condition (financial or otherwise), assets or liabilities of the Debtors, taken as a whole, or (b) the ability of the Debtors, taken as a whole, to perform their respective obligations under, or to consummate the Contemplated Transactions or the transactions contemplated by this Agreement; provided in the case of clause (a) only, except to the extent such Event results from, arises out of, or is attributable to, the following (either alone or in combination): (i) any Event after the date hereof in global, national or regional political conditions (including hostilities, acts of war, sabotage, terrorism or military actions, or any escalation or material worsening of any such hostilities, acts of war, sabotage, terrorism or military actions existing or underway) or in the general business, market, financial or economic conditions affecting the industries, regions and markets in which the Debtors operate, including any change in the United States or applicable foreign economies or in securities, commodities or financial markets, including price movements in any such markets, or force majeure events or "acts of God"; (ii) any changes after the date hereof in applicable Law or GAAP, or in the interpretation or enforcement thereof; (iii) the filing or pendency of the Chapter 11 Cases or any reasonably anticipated effects thereof in each case consistent with and in accordance with the terms of the RSA and this Agreement; (iv) declarations of national emergencies or natural disasters; (v) any epidemic, pandemic or disease outbreak (including the COVID-19 pandemic), or any Law, regulation, statute, directive, pronouncement or guideline issued by a Governmental Unit, the Centers for Disease Control and Prevention, the World Health Organization or industry group providing for business closures, "sheltering-in-place" or other restrictions that relate to, or arise out of, an epidemic, pandemic or disease outbreak (including the COVID-19 pandemic) or any change in such Law, regulation, statute, directive, pronouncement or guideline or interpretation thereof following the date of this Agreement; or (vi) changes resulting from the taking of any action by the Debtors after the date hereof with the prior consent of the Required Backstop Parties; provided, however, that the exceptions set forth in clauses (i), (ii), (iv) and (v) shall not apply to the extent such Event is disproportionately adverse to the Debtors and their Subsidiaries, taken as a whole, as compared to other companies in the industries in which the Debtors operate.

"Material Contract" means any of the following contracts or agreements (or group of related contracts or agreements) to which any of the Debtors is a party or by which any of the Debtors or any of their respective assets or properties are bound: (a) any contract or agreement that is a "material contract," or "plans of acquisition, reorganization, arrangement, liquidation or succession" (as each such term is defined in Item 601(b)(2) or Item 601(b)(10) of Regulation S-K under the Exchange Act) or (b) any Swap Agreement (as defined in the RBL Credit Agreement).

"Money Laundering Laws" has the meaning given to such term in Section 3.13(b) hereof.

"New Common Stock" means the common stock, limited liability company membership units, or functional equivalent thereof of Reorganized Chaparral Parent (as defined in the Plan) having the terms set forth in the New Corporate Governance Documents to be issued on the Effective Date subject to the terms and conditions set forth in the RSA and the Stockholders Agreement.

51

"New Convertible Notes" means the 9%/13% second-lien convertible payment-in-kind notes issued pursuant to the New Convertible Notes Indenture, in an original aggregate principal amount, as of the Effective Date, of $35,000,000.

"New Warrants" means the New Warrants-A (as defined in the Plan) and the New Warrants-B (as defined in the Plan).

"No Recourse Party" has the meaning given to such term in Section 13.14 hereof.

"Non-Defaulting Backstop Party" means, in the case of a Funding Default committed by a Backstop Party with respect to the deposit of its Aggregate Purchase Price attributable to its Backstop Commitment Securities, each Backstop Party that is not a Defaulting Backstop Party and then only to the extent of such Backstop Commitment Securities.

"OFAC" has the meaning given to such term in Section 3.13(c) hereof.

"Oil and Gas Properties" means all rights, titles, interests and estates in and to Leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature and including any interests acquired pursuant to unit agreements, pooling agreements and declarations of pooled units of the Debtors.

"Order" means any order, writ, judgment, injunction, decree, rule, ruling, directive, stipulation, determination or award made, issued or entered by the Bankruptcy Court or any other Governmental Body, whether preliminary, interlocutory or final.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Debtors, consistent with past practices of the Debtors, including as to timing and amount, and in compliance with all applicable Laws.

"Organizational Documents" means, with respect to any Person other than a natural person, the documents by which such Person was organized or formed (such as a certificate of incorporation, certificate of formation, certificate of limited partnership or articles of organization, and including, without limitation, any certificates of designation for preferred stock or other forms of preferred equity) or which relate to the internal governance of such Person (such as by-laws, a partnership agreement or an operating, limited liability company or members agreement).

"Outside Date" has the meaning given to such term in Section 8(b)(vii) hereof.

"Permitted Encumbrances" means (a) Encumbrances for utilities and current Taxes not yet due and payable or that are due but may not be paid as a result of the commencement of the Chapter 11 Cases, (b) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the assets of the Debtors which do not, individually or in the aggregate, adversely affect the operation of the business of the Debtors thereon, (c) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law (but not restrictions arising from a violation of any such Laws) which are not violated by the current use of the assets and properties of the Debtors, (d) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law

52

or statutory liens incurred in the Ordinary Course of Business for sums not yet due and payable or that are due but may not be paid as a result of the commencement of the Chapter 11 Cases and do not result from a breach, default or violation by a Debtor of any Contract or Law, and (e) any obligations, liabilities or duties created by this Agreement or any of the Definitive Documents.

"Person" means an individual, a partnership, a joint venture, a corporation, a limited liability company, a trust, an unincorporated organization or a Governmental Body.

"Petition Date" means the date on which the Chapter 11 Cases were commenced in the Bankruptcy Court.

"Plan" has the meaning given to such term in the recitals hereof.

"Plan Supplement" means compilation of certain documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court prior to the hearing held by the Bankruptcy Court to consider confirmation of the Plan, each of which shall be consistent in all material respects with (to the extent applicable) the RSA and this Agreement.

"Proceeding" means any action, claim, complaint, petition, suit, arbitration, mediation, alternative dispute resolution procedure, hearing, audit, examination, investigation or other proceeding of any nature, whether civil, criminal, administrative or otherwise, direct or derivative, in Law or in equity.

"Put Option Premium" has the meaning given to such term in Section 1.3(a).

"Put Option Premium Cash Amount" means cash in an aggregate amount equal to $2,625,000.

"Put Option Securities" has the meaning given to such term in Section 1.3(a).

"Qualified Institutional Buyer" means a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act.

"Registration Rights Agreement" has the meaning given to such term in the Governance Term Sheet.

"Related Fund" means, with respect to any Person, any fund, account, or investment vehicle that is controlled or managed by (a) such Person, (b) an Affiliate of such Person, or (c) the same investment manager, advisor or subadvisor as such Person or an Affiliate of such investment manager, advisor or subadvisor.

"Related Party" and "Related Parties" have the meanings given to such terms in Section 3.20 hereof.

"Related Person" means, with respect to any Person, such Person's current and former Affiliates, members, partners, controlling persons, subsidiaries, officers, directors, managers, principals, employees, agents, managed funds, advisors, attorneys, accountants,

53

NY 78156220

investment bankers, consultants, representatives and other professionals, together with their respective successors and assigns.

"Release" means any spilling, leaking, migrating, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other receptacles containing any Hazardous Materials).

"Representatives" means, with respect to any Person, the employees, officers, directors, managers, general partners, accountants, attorneys and other advisors of such Person.

"Required Backstop Parties" means, as of any time of determination, one or more Non-Defaulting Backstop Parties as of such time whose aggregate Backstop Commitment Percentages constitute more than 66-2/3% of the aggregate Backstop Commitment Percentages of all Non-Defaulting Backstop Parties as of such time.

"Rights Offering" has the meaning given to such term in the recitals hereof.

"Rights Offering Amount" means thirty-five million dollars ($35,000,000).

"Rights Offering Participant" means an Eligible Holder (as defined in the Rights Offering Procedures) has the meaning given to such term in the recitals hereof.

"Rights Offering Procedures" means the rights offering procedures for the Rights Offering, which shall be in substantially the form attached as Exhibit A hereto.

"Rights Offering Securities" New Convertible Notes in an aggregate principal amount equal to the Rights Offering Amount.

"Rights Offering Subscription Agent" means Kurtzman Carson Consultants LLC as the "Subscription Agent" under the Rights Offering Procedures.

"RSA" has the meaning given to such term in the recitals hereof.

"SEC" means the United States Securities and Exchange Commission.

"SEC Reports" means all forms, reports, statements, schedules, certifications and other documents (including all exhibits, amendments and supplements thereto) filed by the Company with the SEC.

"SOX" has the meaning given to such term in Section 3.22 hereof.

"Specified Issuances" means, collectively, (a) the issuance of New Common Stock to the holders of Notes Claims and New Warrants to holders of existing Equity Interests in Chaparral pursuant to the Plan, (b) the distribution by the Debtors of the Subscription Rights pursuant to the Plan, (c) the issuance and sale by the Company of Rights Offering Securities to the Rights Offering Participants (or their respective designees) upon exercise of such Subscription

54

Rights in the Rights Offering, and (d) the issuance and sale by the Company of the Backstop Securities to the Backstop Parties (or their respective designees) pursuant to this Agreement.

"Stockholders Agreement" has the meaning given to such term in the Governance Term Sheet.

"Subsidiary" means, with respect to any Person, any corporation or other Person of which securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred), are held by the Person or one or more of its Subsidiaries.

"Subscription Instruction and Payment Deadline" has the meaning given to such term in the Rights Offering Procedures.

"Subscription Rights" has the meaning given to such term in the Rights Offering Procedures.

"Takeover Statute" means any restrictions contained in any "fair price," "moratorium," "control share acquisition," "business combination" or other similar anti-takeover statute or regulation.

"Tax" means any and all taxes of any kind whatsoever, including all foreign, federal, state, county, or local income, sales and use, excise, franchise, ad valorem, value added, real and personal property, unclaimed property, gross income, gross receipt, capital stock, production, license, estimated, environmental, excise, business and occupation, disability, employment, payroll, severance, withholding or all other taxes or assessments, fees, duties, levies, customs, tariffs, imposts, obligations and charges in the nature of tax, including all interest, additions, surcharges, fees or penalties related thereto.

"Tax Return" means a report, return, claim for refund, amended return, combined, consolidated, unitary or similar return or other information filed or required to be filed with a Taxing Authority with respect to Taxes, including any schedule or attachment thereto or amendment thereof.

"Taxing Authority" means the IRS and any other Governmental Body responsible for the administration or collection of any Tax.

"Total New Equity Interests" means the total number of shares of New Common Stock to be issued by the Debtors on or about the Effective Date as distributions under the Plan and as Put Option Securities, but excluding, for the avoidance of doubt, the New Common Stock issuable upon conversion of the Convertible Notes and any New Common Stock issued or issuable under management compensation arrangements.

"Unsubscribed Securities" has the meaning given to such term in the recitals hereof.

55

"Wells" means all oil, gas, water, monitoring, disposal or injection wells located on the lands covered by the Leases, whether producing, shut-in, or temporarily or permanently abandoned.

14.3.    **Interpretation**.  For purposes of this Agreement:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neutral gender shall include the masculine, feminine, and the neutral gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference in this Agreement to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    unless otherwise specified, any reference in this Agreement to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; notwithstanding the foregoing, any capitalized terms in this Agreement that are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date of this Agreement;

(e)    unless otherwise specified, all references in this Agreement to "Sections" are references to Sections of this Agreement;

(f)    the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)    captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)    references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)    the use of "include" or "including" is without limitation, whether stated or not; and

(j)    the word "or" shall not be exclusive.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

56