**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CHAPARRAL ENERGY, INC., *et al.*,[1] | ) Case No. 20-11947 (MFW) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Related to Docket No. 16** |
| | ) |

**OBJECTION OF TGS-NOPEC GEOPHYSICAL COMPANY ASA, TGS-NOPEC GEOPHYSICAL COMPANY, AND A2D TECHNOLOGIES, INC. D/B/A TGS GEOLOGICAL PRODUCTS AND SERVICES TO DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION**

TGS-NOPEC Geophysical Company ASA, TGS-NOPEC Geophysical Company, and A2D Technologies, Inc. d/b/a TGS Geological Products and Services (including as successor in interest to A2D LP) (collectively, "**TGS**"), by and through their undersigned counsel, hereby object (the "**Objection**") to the above-captioned debtors' (the "**Debtors**") Joint Prepackaged Chapter 11 Plan of Reorganization (the "**Plan**").[2] In support of this Objection, TGS states, as follows:

**General Background**

A.   **The Debtors' Bankruptcy Cases**

1.   On August 16, 2020, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). The Debtors continue to manage and

---

[1] The Debtors in these cases, along with the last four digits (or five digits, in cases in which multiple Debtors have the same last four digits) of each Debtor's federal tax identification number, are: CEI Acquisition, L.L.C. (1817); CEI Pipeline, L.L.C. (6877); Chaparral Biofuels, L.L.C. (1066); Chaparral CO2, L.L.C. (1656); Chaparral Energy, Inc. (90941); Chaparral Energy, L.L.C. (20941); Chaparral Exploration, L.L.C. (1968); Chaparral Real Estate, L.L.C. (1655); Chaparral Resources, L.L.C. (1710); Charles Energy, L.L.C. (3750); Chestnut Energy, L.L.C. (9730); Green Country Supply, Inc. (2723); Roadrunner Drilling, L.L.C. (2399); and Trabajo Energy, L.L.C. (9753). The Debtors' address is 701 Cedar Lake Boulevard, Oklahoma City, OK 73114.

[2] Capitalized terms not otherwise defined in this Objection shall have the same meaning as set forth in the Plan.

operate their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been requested in these Chapter 11 Cases.

2. The Debtors are involved in the acquisition, exploration, development, production and operation of oil and natural gas properties primarily in Oklahoma.

3. Based upon the Plan and other documents filed in these Chapter 11 Cases by the Debtors, TGS understands that the proposed Plan is designed to effectuate a comprehensive restructuring of Claims and Interests in the Debtors by deleveraging the Debtors' capital structure and preserving the going-concern value of the Debtors' businesses, maximizing recoveries available to all constituents, and providing for an equitable distribution to the Debtors' stakeholders.

4. Among other provisions, the Plan contemplates a "debt for equity swap," pursuant to which each Holder of an Allowed Senior Notes Claim will receive its pro rata share of 100% of the total issued and outstanding New Common Stock of the parent Reorganized Debtor, subject to dilution as detailed in the Plan. *See* Plan at Art. III, Sec. A., 4.

5. Pursuant to Article V of the Plan, and subject to certain exceptions, all Executory Contracts and Unexpired Leases are to be assumed as of the Effective Date. *See* Plan at Art. V., Sec. A.

B. **The Relationship between the Debtors and TGS**

6. TGS is a geoscientific data and services company that is in the business, *inter alia*, of providing worldwide geoscientific data products and services to the oil and gas industry for the purpose of providing descriptions of subsurface geology for potential oil and gas exploration and/or production and other uses. These products include, but are not limited to, 2D,

3D and other types of seismic surveys and images, and/or well and petroleum data, which are generally offered to licensees on a multi-client basis for a limited term.

7. On March 7, 2006, TGS and debtor Chaparral Energy, LLP ("**Licensee**") entered into a Log Line Plus! Operating Agreement (including all addenda, amendments and supplements thereto, as the "**LLPO Agreement**"), pursuant to which the Licensee was granted a non-exclusive license to use, on a limited and restricted basis, certain proprietary petroleum data (the "**Petroleum Data**").[3] A copy of the LLPO Agreement, redacted to remove sensitive and confidential pricing information, is attached hereto at **Exhibit A**.

8. On September 9, 2015, TGS and Licensee entered into a Master License Agreement (together with all addenda, amendments and supplements thereto, the "**MLA**"), pursuant to which the Licensee was granted a non-exclusive license to use, on a limited and restricted basis, certain proprietary geological information and data, including well data and seismic data (collectively, the "**MLA Data**") as from time to time was ordered by the Licensee in accordance with the terms and conditions of the MLA. A copy of the MLA is attached hereto as **Exhibit B** and incorporated by reference herein.

9. On February 7, 2018, Oklahoma Energy Acquisitions, LP and Licensee entered into a 3D Seismic Data License Agreement (the "**Kingfisher License**"), pursuant to which Licensee was granted a non-exclusive license to use, on a limited and restricted basis, certain 3D seismic data (the "**Kingfisher Data**," and together with the MLA Data and Petroleum Data, the "**Data**") as described therein in accordance with the terms and conditions of the Kingfisher License. The Kingfisher License was assigned to TGS, and title to the 3D seismic data was transferred to TGS, via an Asset Purchase Agreement dated May 29, 2019 between TGS-

---

[3] To be clear, the defined term LLPO Agreement includes and governs the data originally licensed to Edge Petroleum which was transferred to the Debtor pursuant to letter dated October 16, 2008.

3

NOPEC Geophysical Company ASA, Alta Mesa Holdings, LP and Oklahoma Energy Acquisitions LP. A copy of the Kingfisher License is attached hereto as **Exhibit C** and incorporated by reference herein.

10. The Data licensed to the Licensee under the LLPO Agreement, the MLA, and the Kingfisher License (collectively, the "**TGS Agreements**") is extremely valuable, proprietary in nature, and contains sensitive and confidential information belonging to TGS, and, as such, certain of the Data is subject to, and protected by, the copyright laws of the United States, and all of the Data constitutes a "trade secret," all within the scope of section 101(35A) of the Bankruptcy Code. Indeed, the MLA expressly provides and emphasizes that the MLA Data "constitutes valuable and highly confidential trade secrets and intellectual property that are not generally available and are the sole property and proprietary information of TGS . . ." See MLA, at p. 3, §4.1, and the Kingfisher License similarly emphasizes that the data licensed thereunder is "the property of, proprietary to, and a valuable asset and trade secret of LICENSOR…" See Kingfisher License, at p. 3, §5.

11. The MLA further provides, among other things, that:

- The Licensee acquires only the *non-exclusive* right to use the MLA Data in accordance with the MLA. See MLA, at p. 1, §1.1.

- The Licensee shall not Show,[4] allow the Use[5] of or Deliver[6] the MLA Data to any other person, except as specifically provided in the MLA. See id. at p. 3, § 4.2.

---

[4] "Show" is defined in the MLA as "to give passive access to, or permit to be viewed by, a person,. . . " See id. at p. 5, § 6.5.

[5] "Use" is defined in the MLA as "to have, or be permitted access to, [MLA Data] in a manner that allows a person to alter, or generate displays, interpretations or processing of, the [MLA Data]." See id. at p. 3-4, § 6.6.

[6] "Deliver" is defined in the MLA as "permit access, or actual or constructive possession of [MLA Data] to any extent equal to or greater than that contemplated by the definitions of Show and Use in Sections 6.5 and 6.6, respectively, including any physical transfer or electronic or other transmission of [MLA Data] on or through any medial or by any means whatsoever." See id. at p. 6, § 6.7.

- The Licensee may not transfer the MLA or any of its rights and obligations under the MLA except as expressly provided by the MLA. See id. at p. 6, § 7.1.

- Unless the Licensee has obtained the prior written consent of TGS, the MLA and any rights to use the MLA Data "shall automatically terminate at the time an Acquisition occurs." [7] See id. at p. 6, § 7.2.

- TGS shall not withhold its consent unreasonably in the case of an Acquisition if the Licensee and/or Acquiror pay to TGS a fee in an amount equal to 20% of the undiscounted list price of the MLA Data that is licensed from TGS by Licensee as of the date of the Acquisition. See id. at p. 6, § 7.3.

- The MLA is governed by the laws of the State of Texas. See id. at 10, § 13.6.

12. Similarly, the LLPO Agreement provides that the Licensee is receiving a nonexclusive, nontransferable license for access to the Petroleum Data. *See* LLPO Agreement at p. 1, § C.

13. Section E, 2 of the LLPO Agreement provides that Licensee may not transfer the right to use the data to an acquiror of Licensee's equity interest or assets, whether such acquisition is in the form of a statutory merger, consolidation, stock or asset sale, or otherwise, without the prior written consent of TGS (which consent TGS is prohibited from unreasonably withholding under certain conditions, which include Licensee transferring all of its equity interest or assets or all or substantially all of its petroleum exploration assets to a single Acquiror and Licensee agreeing to pay TGS a stipulated transfer fee). *See* LLPO Agreement, p. 1, § E, 2.

14. Like the MLA, the LLPO Agreement is governed by the law of the state of Texas. *See* LLPO Agreement, at p. 1, § D.

---

[7] "Acquisition" is defined in the MLA to include the event of an Acquiror, directly or indirectly, acquiring Ownership or Control of Licensee. See id. at p. 6, § 7.2. "Acquiror" is defined as "a person (or a group of persons acting in concert)". id. "Ownership" is defined in the MLA to mean "direct or indirect rights in, or legal title to, greater than fifty percent (50%) of (i) outstanding common stock or other voting securities, (ii) equity interest, (iii) voting power, (v) management or (vi) interest in the profits." id. "Control" is defined as "the ability to, directly or indirectly, direct, manage or dictate the actions of, the entity in question,…" id.

5

15. Further, the Kingfisher License provides:

- The Licensee acquires only the *non-exclusive* right to use the Kingfisher Data in accordance with the Kingfisher License terms and conditions. See Kingfisher License, at p. 1, §1.

- The Licensee shall use the data for its own internal use only and the data shall not be given, sold, traded, disposed of, shown, or otherwise divulged to any other person, except as specifically provided in the Kingfisher License. See id. at p. 1, § 3.

- The license shall terminate automatically and immediately in the event of a Change of Control[8] of Licensee, and Licensee shall within ten (10) days of a Change of Control return all Data and destroy all analyses, reformattings and reprocessed versions thereof unless TGS grants its approval for the surviving Person[9] to obtain a license to use the Data by executing a license agreement and paying a negotiated re-license fee. See id at p. 3, § 12.

## OBJECTION

16. TGS hereby objects to the Debtors' proposed assumption of the TGS Agreements pursuant to the Plan.

### A. The TGS Agreements are Executory Contracts

17. As a preliminary matter, the MLA is an "executory contract" within the meaning of section 365 of the Bankruptcy Code since, among other things, the Licensee has continuing confidentiality obligations to TGS under such agreement and remains subject to the restrictions imposed upon its use of the licensed MLA Data. TGS likewise has a continuing obligation to allow the Licensee to use the data and other information, and to defend legal proceedings arising out of the licensing thereof.

---

[8] "Change of Control" is defined as, among other things, a change in the legal, beneficial or equitable ownership, direct or indirect, of not less than a majority of the capital stock or other ownership interest of Licensee having voting rights, where such control is acquired, directly or indirectly, in a single transaction or a series of related transactions, by any Person or group. See Kingfisher License at p. 3, § 12.

[9] "Person" is defined as any individual, firm, corporation, partnership, limited partnership, limited liability company, trust or other entity, and shall include any successor (by merger or otherwise) of such entity. See Kingfisher License at p 4, § 12.

18.     Similarly, the LLPO Agreement is an "executory contract," as each party has continuing obligations under the LLPO Agreement. Specifically, under the LLPO Agreement, TGS is required to provide the Licensee with access to the Petroleum Data. In turn, the Licensee has continuing obligations to TGS concerning the use and confidentiality of the Petroleum Data.

19.     Likewise, the Kingfisher License is an "executory contract," as each party has continuing obligations under the Kingfisher License, including continued confidentiality obligations of Licensee and continued obligations of TGS to allow use of the data and defend legal proceedings arising out of the licensing thereof.

20.     In that each party has continuing obligations under the TGS Agreements, the agreements are "executory contracts." See, e.g., In re Golden Books Family Entm't, Inc., 269 B.R. 300, 308 (Bankr. D. Del. 2001) (explaining that under "Countryman" test, a contract is executory when the obligations of both parties are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other); see also In re Aerobox Composite Structures, LLC, 373 B.R. 135, 139 (Bankr. D.N.M. 2007) (finding that patent license agreement was executory due to the continuing material duties and obligations of both parties, including the duty to maintain confidentiality and defend the patent against challenges of third parties); RCI Tech. Corp. v. Sunterra Corp. (In re Sunterra Corp.), 361 F.3d 257, 264 (4th Cir. 2004) (holding that software licensing agreement was executory because each side possessed an ongoing obligation to maintain confidentiality).

**B.      Absent TGS' Consent, the TGS Agreements Cannot Be Assumed
         by Their Own Terms and "Applicable Law"**

21.     Section 365(c)(1) of the Bankruptcy Code limits a debtor's ability to assume and assign any executory contract or unexpired lease. See 11 U.S.C. §§ 365(a), 365(c)(1). Specifically,

section 365(c)(1) provides that a debtor may *not* assume or assign an executory contract or unexpired lease where

> applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties.

11 U.S.C. § 365(c)(1).

22. In interpreting section 365(c)(1), courts within the Third Circuit apply the "hypothetical test," under which "a debtor in possession may not assume an executory contract over the nondebtor's objection if applicable law would bar assignment to a hypothetical third party, *even where the debtor in possession has no intention of assigning the contract in question to any such third party*. In re Trump Entm't Resorts, Inc., 526 B.R. 116, 122 (Bankr. D. Del. 2015) (citing Perlman v. Catapult Entm't, Inc. (In re Catapult Entm't, Inc.), 165 F.3d 747, 750 (9th Cir. 1999)).

23. In the present case, the MLA makes clear that at the time of any Acquisition, the MLA "automatically terminates" unless TGS consents. See MLA, at p. 6, § 7.2. Similarly, the Kingfisher Agreement makes clear that the license terminates "automatically and immediately" upon the occurrence of a Change of Control. See Kingfisher License, at p. 3, § 12. These provisions are geared towards limiting the disclosure of the relevant Data to only those parties of which TGS approves in order to protect TGS' valuable proprietary information.

24. Bankruptcy Code section 365(c)(1) provides, however, that *irrespective* of the terms of the MLA, Kingfisher License, or the LLPO Agreement, if "applicable law" excuses TGS from rendering performance to an entity other than the Licensee, the Licensee may not assume and assign the MLA, Kingfisher License, or LLPO Agreement.

25. Here, applicable law – namely, the U.S. Copyright Act and/or Texas law, and relevant case law – excuses TGS from accepting performance under the MLA, Kingfisher License, and the LLPO Agreement from any party other than the Licensee without TGS' consent. See XMH Corp., 647 F.3d 690, 695 (7th Cir. 2011) (explaining that "applicable law" means "any law applicable to a contract, other than bankruptcy law"). Thus, without TGS' consent (which has not been provided), the TGS Agreements cannot be assumed under Bankruptcy Code section 365(c)(1).

      **(i)**    **TGS' Well and Seismic Data is Protected by the U.S. Copyright Act, which Precludes Assumption of the MLA or Kingfisher Agreement**

26. The well and seismic Data licensed to the Licensee under the MLA and Kingfisher License is covered and protected by the U.S. Copyright Act because it is an "original work of authorship" of TGS that is fixed in a tangible medium of expression from which the data can be perceived, reproduced or otherwise communicated. See 17 U.S.C. § 102 ("Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."). As such, because the MLA and Kingfisher License involve the use of data protected by the U.S. Copyright Act, "applicable law" for purposes of Bankruptcy Code section 365(c)(1) includes the U.S. Copyright Act.

27. The U.S. Copyright Act prohibits the transfer of copyrighted material unless the owner of the copyright consents. Specifically, the U.S. Copyright Act provides that the "transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed[.]" 17 U.S.C. § 204(a).

28. By granting copyright owners the exclusive right to authorize the use of copyrighted material, the U.S. Copyright Act realizes Congress's intention that copyright owners be granted a limited monopoly that provides them with a period of time during which to reap the benefits of their work, and that such owners be protected from persons mistakenly or fraudulently claiming oral licenses or copyright ownership. See Matter of Buildnet, Inc., No. 01-82293, 2002 WL 31103235, at *5 (Bankr. M.D.N.C. Sept. 20, 2002) ("The Copyright Act, 17 U.S.C. § 101 *et seq.* is intended to grant the copyright owner a limited monopoly which provides the owner a period of time during which to reap the benefits of his work."); Imperial Residential Design, Inc. v. Palms Dev. Grp., Inc., 70 F.3d 96, 99 (11th Cir. 1995) (explaining that the chief purpose of section 204(a) of the Copyright Act is to "protect copyright holders from persons mistakenly or fraudulently claiming oral licenses or copyright ownership").

29. Because the U.S. Copyright Act prohibits the transfer of protected materials without an owner's consent, the statute likewise excuses TGS, for purposes of Bankruptcy Code section 365(c)(1), from accepting performance from an entity other than the Licensee under the MLA or Kingfisher License without its consent.

30. In Golden Books, the United States Court of Appeals for the Third Circuit considered whether copyright law precluded the free assignment of the copyright and trademark licenses at issue. Golden Books, 269 B.R. 300 (Bankr. D. Del. 2001). The Court explained that "the answer to this question turns on whether each particular license is exclusive or nonexclusive." Id. at 309. The Court reasoned that under copyright law, "'a nonexclusive licensee . . . has only a personal and not a property interest in the [intellectual property],' which 'cannot be assigned unless the [intellectual property] owner authorizes the assignment[.]'" Id. (citing In re Patient Educ. Media, Inc.), 210 B.R. 237, 242-43 (Bankr. S.D.N.Y. 1997)). In

contrast, an exclusive licensee does acquire property rights and may freely transfer his rights. Id. Thus, because the licenses at issue were non-exclusive, such licenses could not be assigned without the consent of the licensor. Id. at 310; see also Patient Educ., 210 B.R. at 240, 243 (distinguishing between exclusive and non-exclusive licenses and holding that debtors could not assign non-exclusive license to use licensor's photographs without copyright owner's consent).

31.     As in Golden Books and Patient Educ., the licenses at issue under the MLA and Kingfisher License are non-exclusive licenses. See MLA, at p.3, § 2.1 and Kingfisher License at p.1, § 1. As such, case law dictates that applicable copyright law prohibits the assignment of the MLA or Kingfisher License without TGS' consent.[10]

### (ii) Texas and Oklahoma Law Pertaining to Trade Secrets Precludes Assumption of the TGS Agreements

32.     Texas and Oklahoma state law, which governs and controls the TGS Agreements also precludes the assumption of the TGS Agreements absent TGS' consent.

33.     As a "trade secret," the Data licensed under the MLA and the LLPO Agreement is protected by the Texas Uniform Trade Secrets Act (the "**Texas Act**"). Under the Texas Act, a "trade secret" is defined as

> information, including business, scientific, technical, economic, or engineering information, and any formula, design, prototype, pattern, plan, compilation, program device, program, code, device, method, technique, process, procedures, financial data, or list of actual or potential customers or suppliers, whether tangible or intangible and whether or how stored,

---

[10] *But, see* In re Virgin Offshore USA, Inc., No. 13-79, 2013 WL 485312, at *4 (E.D. La. Sept. 10, 2013) (holding that copyright law was not applicable to seismic data). TGS asserts that the non-binding decision in Virginia Offshore is wrong, for several reasons, including that the court's decision was premised on the assumption that information can be copyrighted or a trade secret, but not both. As copyright law makes clear, this is not necessarily the case. See, e.g., 37 C.F.R. § 202.20(vii) (describing process for obtaining copyright protection of computer programs containing trade secret material). Moreover, the Virgin Offshore court held that even if copyright law *did* apply, it would not prevent the debtor from assuming the license agreement because, unlike the Third Circuit, which applies the "hypothetical test" in interpreting Bankruptcy Code section 365(c)(1), the Fifth Circuit applies the "actual test," under which "a Chapter 11 debtor-in-possession may assume an executory contract provided it has no actual intent to assign the contract to a third party." id. As noted above, courts in this district apply the "hypothetical test."

compiled, or memorialized physically, electronically, graphically, photographically, or in writing if: (A) the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means, by, another person who can obtain economic value from the disclosure or use of the information.

Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(6) (2017).

34. The Texas Act provides that a "misappropriation" of a trade secret occurs when, among other things, a trade secret is disclosed "without express or implied consent," and permits injunctive relief and damages for such misappropriation. See Tex. Civ. Prac. & Rem. Code Ann. §§ 134A.002(3)(B), 134A.003, 134A.004 (2017). Texas law also imposes criminal liability in connection with the disclosure of trade secrets. Under Texas law, a person who, *without the owner's consent*, knowingly (a) steals a trade secret; (b) makes a copy of an article representing a trade secret; or (3) communicates or transmits a trade secret, is guilty of committing a felony. See Tex. Penal Code Ann. § 31.05.

35. Similarly, as a "trade secret," the Data licensed under the Kingfisher License is protected by the Oklahoma Uniform Trade Secrets Act (the "**Texas Act**"). Under the Oklahoma Act, a "trade secret" means

> a formula, patter, compilation, program, device, method, technique or process, that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

See 78 Okl. St. § 86, 4 (2014).

36. The Oklahoma Act provides that a "misappropriation" of a trade secret occurs when, among other things, a trade secret is disclosed "without express or implied consent," and permits injunctive relief and damages for such misappropriation. See 78 Okl. St. §§ 86, 2 and 87

and 88 (2014). Oklahoma law also imposes criminal liability in connection with the disclosure of trade secrets. Under Oklahoma law, a person, who, with the intent to appropriate a trade secret to his or her own use or to the use of another, (a) steals a trade secret; or (b) makes a copy of an article representing a trade secret, is guilty of committing larceny. See 21 Okl. St. § 21-1732 (2014).

37. In short, Texas and Oklahoma law makes clear that a trade secret may not be disclosed without consent. Accordingly, applicable state law excuses TGS from accepting performance from any entity other than the licensee under the TGS Agreements for purposes of Bankruptcy Code section 365(c)(1), absent the consent of TGS.

C. **If the TGS Agreements Can Be Assumed, the Debtors Must Cure All Defaults Thereunder and Provide Adequate Assurance of Future Performance**

38. Notwithstanding Bankruptcy Code section 365(c)(1) and the "applicable law" demonstrating that TGS' consent is required for any assumption of the TGS Agreements, to the extent this Court determines that the TGS Agreements can be assumed, TGS respectfully requests that the Court condition the proposed assumption upon (i) the cure of all defaults thereunder, as required by law, and (ii) the Debtors providing TGS adequate assurance of future performance of the provisions of the agreements.

39. As of the date of this Objection, the Licensee owes TGS $2,550 related to Supplement H-012 to the MLA, as set forth on the invoice attached hereto as **Exhibit D** and incorporated by reference herein.

40. Pursuant to Supplement H-011 of the MLA, additional annual License Fees are due TGS on each of March 1, 2021 and March 1, 2022, each in the amount of $60,000. See Supplement H-011, p. 3, § 4.1.1. The Debtor must provide adequate assurance that such amounts will be timely paid.

13
37484329.2 09/21/2020

41. In addition, and as noted above, the TGS Agreements provide that, under the circumstances contemplated by the Plan, TGS is entitled to (a) payment of an additional license fee equal to 20% of the undiscounted list price of the MLA Data that is licensed from TGS to the Licensee under the MLA, (b) payment of a re-license fee for Kingfisher Data licensed from TGS to Licensee under the Kingfisher License, and (c) payment of an additional license fee equal to 20% of the Standard level rates for the Petroleum Data previously licensed by the Licensee under the LLPO Agreement or the Reorganized Debtor's commitment to license additional Petroleum Data in an amount equal to 50% of the Standard level rates for the previously licensed Petroleum Data on terms satisfactory to TGS and the Reorganized Debtor.

42. Any cure provided in connection with the assumption of the TGS Agreements must therefore include these fees.

WHEREFORE, TGS respectfully requests that the Court enter an order (i) denying the assumption of the TGS Agreements under the Plan and (ii) granting TGS such other and further relief as is just and proper.

| | |
|---|---|
| Dated: September 21, 2020 | SAUL EWING ARNSTEIN & LEHR LLP |
| | */s/ Mark Minuti* |
| | Mark Minuti (DE Bar No. 2659) |
| | Monique B. DiSabatino (DE Bar No. 6027) |
| | 1201 N. Market Street, Suite 2300 |
| | P.O. Box 1266 |
| | Wilmington, DE 19899 |
| | Telephone: (302) 421-6840 |
| | Facsimile: (302) 421-5873 |
| | mark.minuti@saul.com |
| | monique.disabatino@saul.com |
| | |
| | *Counsel to TGS* |