IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CHAPARRAL ENERGY, INC., *et al.*[1] | ) | Case No. 20-11947 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Objection Deadline:** |
| | ) | **September 21, 2020, at 4:00 p.m. (ET)** |
| | ) | |
| | ) | **Hearing Date:** |
| | ) | **October 1, 2020, at 10:30 a.m. (ET)** |
| | ) | |
| | ) | **Re: D.I. 16** |

## CGG LAND (U.S.) INC.'S OBJECTION TO DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION

CGG Land (U.S.) Inc. ("**CGG**"), by and through its undersigned counsel, hereby files its Objection to the confirmation of the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* [D.I. 16] (the "**Plan**") and respectfully states as follows:

### SUMMARY OF OBJECTION

1. The Court should deny confirmation of the Debtors' Plan because it contains material provisions that are contrary to the United States Bankruptcy Code and applicable bankruptcy law rendering the Plan non-confirmable under 11 U.S.C. § 1129(a)(1).

---

[1] The Debtors in these chapter 11 cases, along with the last four digits (or five digits, in cases in which multiple Debtors have the same last four digits) of each Debtor's federal tax identification number, are: CEI Acquisition, L.L.C. (1817); CEI Pipeline, L.L.C. (6877); Chaparral Biofuels, L.L.C. (1066); Chaparral CO2, L.L.C. (1656); Chaparral Energy, Inc. (90941); Chaparral Energy, L.L.C. (20941); Chaparral Exploration, L.L.C. (1968); Chaparral Real Estate, L.L.C. (1655); Chaparral Resources, L.L.C. (1710); Charles Energy, L.L.C. (3750); Chestnut Energy, L.L.C. (9730); Green Country Supply, Inc. (2723); Roadrunner Drilling, L.L.C. (2399); and Trabajo Energy, L.L.C. (9753). The Debtors' address is 701 Cedar Lake Boulevard, Oklahoma City, OK 73114.

1

2. Specifically, the provisions of the Plan that purport to nullify and/or modify change of ownership or control provisions such as those contained in the License, as defined herein, between CGG and Chaparral Energy, L.L.C. ("**Chaparral Energy**") are without legal basis and are contrary to both bankruptcy law and non-bankruptcy law.

3. The License contains an enforceable change of ownership or control provision that will be triggered pursuant to the Restructuring Transactions contemplated by the Debtors' Plan if the License is sought to be assumed or assumed and assigned. Pursuant to Section 365(c)(1)(A) of the Bankruptcy Code, CGG must consent to the assumption of the License because non-bankruptcy law (both federal and Oklahoma law) provide CGG with a protection to the transfer of the data licensed under the License. CGG will not consent to the assumption of the License without strict compliance with the terms of the License, including the change in control provision that requires the payment of a transfer fee of fifty percent (50%) of the purchase price.

4. Furthermore, even if it is determined that the License is assumable without the consent of CGG under Section 365 of the Bankruptcy Code, the Debtors cannot assume the License without first curing any defaults and providing adequate assurance of future performance. The Plan, as currently filed, causes both non-monetary and monetary defaults under the License under the change of control and transfer fee provisions, which must be cured before the License can be assumed.

5. Further, to the extent the License is rejected, the terms of the License provide, among other things, that the licensee must return and/or destroy all Data and Derivatives subject to the License upon termination of the License. Thus, to the extent the License is rejected, CGG objects to the Plan to the extent that the Plan would relieve Chaparral Energy of its obligations upon termination of the License to return and/or destroy the Data and Derivatives that are subject to the License as required by the terms of the License.

6.      In addition, CGG reserves all of its rights to seek rejection damages, if any, arising from the rejection of the License.

## THE LICENSE

7.      CGG and one of the Debtors, Chaparral Energy, are parties to that certain Master Geophysical Data-Use License (Multiple Transaction/U.S. Land) (as amended and/or supplemented from time to time, the "**License**"), dated July 28, 2017, pursuant to which CGG agreed to grant Chaparral Energy a non-exclusive license to use certain geophysical Data and Derivatives, as defined in the License. A true and correct copy of the License is attached hereto as **Exhibit "1."**

8.      The licensed Data and Derivatives constitute valuable and highly confidential intellectual property and a trade secret that are not generally available and are the sole property and proprietary information of CGG.

9.      The License contains, among other things, an enforceable "change in ownership or control" provision that will be triggered pursuant to the Restructuring Transactions contemplated by the Debtors' Plan, which require, among other things, the payment of a transfer fee of fifty percent (50%) of the purchase price. Specifically, with respect to change of ownership or control, the License provides as follows:

> 5.      <u>Transfer of License</u>
>
> Licensee is not permitted to sell, sublicense, assign, or transfer this License to a Third Party, in whole or in part, or transfer its rights or obligations hereunder, except as expressly authorized in this License.
>
> > 5.1    <u>Acquisitions/Mergers</u>. This License will automatically terminate at such time as a Third Party becomes an Acquirer of Licensee unless (i) CGG receives payment from either Licensee or the Acquirer of an amount equal to fifty percent (50%) of the consideration actually paid by or due from Licensee for all Data licensed under this License and (ii) the Acquirer signs CGG's then standard license agreement. In the event that this License

>> terminates, the provision of Section 9 regarding the return of Data and Derivatives will apply.
>
> 5.2   <u>Other Changes in Ownership or Control.</u>  The provisions of this Section 5 will not apply to situations where the voting securities of Licensee (or any of its parents) are publicly traded and the Ownership of such securities changes over time in the normal course of business *unless*, however, Ownership or Control of Licensee (or any of its parents) becomes, *after the date hereof*, concentrated in one unrelated Third Party or more than one such Third Parties acting together.

Ex. 1 at § 5 (emphasis in original).[2]

10.   In addition, the termination provisions of the License provide, among other things, as follows:

> 9.1   <u>Return of Data/Destruction of Derivatives</u>. Upon termination of this License or any Supplement, regardless of the cause, Licensee must, within 30 days, return

---

[2] The License defines a "Third Party" as:

> "[A]ny corporation, individual, partnership, trust, or other entity not a party to the License (including Prospective Acquirers and Prospective Partners) other than a Related Entity."

The License defines "Related Entity" as:

> "[A]ny entity which (i) is Owned by Licensee, or (ii) Owns Licensee.  An entity will be a Related Entity only so long as it (i) is Owned by Licensee or (ii) Owns Licensee.  Notwithstanding the previous two sentences, neither of the following will be a Related Entity at any time: (a) an Acquirer of Licensee; or (b) any entity engaged in the business of licensing geophysical data."

The License defines "Acquirer(s)" as:

> "Third Parties that acquire, either directly or indirectly, Ownership or Control of Licensee, whether accomplished by statutory merger, consolidation or share exchange, stock sale or purchase, or any similar transaction."

The License defines "Ownership" or "Owns" as:

> "[I]n the case of a corporation or other entity that issues voting securities, greater than 50% of the outstanding common stock or other voting securities and, in the case of a partnership, trust or other entity, greater than 50% of the interest in the profits thereof."

The License defines "Control(s)" as:

> "[T]he ability to direct, manage or dictate the actions of or determine the management of the entity in question whether by the election of members of the Board of Directors or other governing body of such entity, or by having a majority number of members of such governing body or by other means."

Ex. 1 at § 1.1, 1.4, 1.10, 1.16, and 1.20.

or destroy all Data previously licensed to Licensee under each terminated Supplement and must, within the same 30-day period, provide written certification to CGG that (i) all copies of all or part of such Data have been returned to CGG or destroyed, (ii) all of such Data have been removed from Licensee's storage and archival systems, workstations, and prospect files, and (iii) Licensee has retained no copies of such Data.  Licensee must also, within 30 days, destroy all Derivatives created from such Data and must, within the same 30-day period, provide written certification to CGG that (i) all copies of all or part of such Derivatives have been destroyed, (ii) all of such Derivatives have been removed from Licensee's storage and archival systems, workstations, and prospect files, and (iii) Licensee has retained no copies of such Derivatives.  To the extent Licensee's computer back-up procedures create a copy of any part of the Data or Derivatives, Licensee is allowed to retain such copy only for the period it normally archives backed up computer records; provided, however, that until the information on such back-up copy is destroyed, Licensee will make no use of such Data or Derivatives, will make no further copies of such Data and Derivatives and will neither disclose nor transfer the Data or Derivatives to any Third Party.  For a period of one year from the termination of any License or Supplement, CGG will have the right to audit Licensee's premises, systems and storage sites to verify that all of the affected Data and Derivatives have been returned or destroyed.  The Parties agree that Licensee Interpretations need not be returned or destroyed and will remain the property of the Licensee.

*Id.* at § 9.1.

## THE BANKRUPTCY CASE

11.     On August 16, 2020 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors have continued to operate and manage their businesses as debtors-in-possession pursuant to §§ 1107 and 1108(a) of the Bankruptcy Code.

12.     On August 17, 2020, the Debtors filed their Plan [D.I. 16] and Disclosure Statement [D.I. 17].

13.     On August 18, 2020, the Court entered an *Order (I) Scheduling a Combined Hearing to Consider (A) Approval of Disclosure Statement and (B) Confirmation of Plan, (II) Establishing a Deadline to Object to Disclosure Statement and Plan, (III) Approving the Form and Manner of Notice of the Combined Hearing, Objection Deadline, and Notice of*

*Commencement, (IV) Approving Solicitation Procedures and Forms of Ballots, (V) Approving Opt Out Procedures and Equity Holder Opt Out Form, (VI) Approving the Rights Offering Procedures and Related Materials, (VII) Approving Notice and Objection Procedures For the Assumption of Executory Contracts and Unexpired Leases, and (VIII) Conditionally Waiving Requirements to (A) File Statement of Financial Affairs and Schedules of Assets and Liabilities and (B) Convene Section 341 Meeting of Creditors* [D.I. 87], in which the Court, among other things, scheduled a combined hearing on final approval of the Disclosure Statement and on confirmation of the Debtors' Plan, and established various deadlines relating to same.

14. The Plan is premised upon Restructuring Transactions that provide for a comprehensive restructuring of Claims against and Interests in the Debtors. [D.I. 17] at 15.

15. Specifically, the Plan provides that "[a]ll interests in Chaparral Parent (including, without limitation, the Chaparral Parent Equity Interests and the Other Chaparral Parent Equity Interests) shall be cancelled, released, and extinguished as of the Effective Date."[3] [D.I. 16] at 29. Further, the Plan provides that, "[o]n the Effective Date, the New Common Stock (including the New Common Stock on account of the Backstop Premium) and the New Warrants shall be issued and distributed by the Distribution Agent to the Entities entitled to receive the New Common Stock and New Warrants pursuant to, and in accordance with, the terms of the Plan, the New Corporate Governance Documents, the New Stockholders Agreement, and the New Warrant Agreements." *Id.*

16. The Plan defines "New Common Stock" as the common stock, limited liability company membership units, or functional equivalent thereof of Reorganized Chaparral Parent having the terms set forth in the New Corporate Governance Documents to be issued on the

---

[3] Chaparral Energy, Inc. ("**Chaparral Parent**") is the direct or indirect parent of each of the Debtors. [D.I. 17] at 24.

Effective Date subject to the terms and conditions set forth in the Restructuring Support Agreement and the New Stockholders Agreement. [D.I. 16] at 11.

17. Further, the Plan provides that, "[e]xcept to the extent that any Holder of an Allowed Senior Notes Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Senior Notes Claim, each Holder of an Allowed Senior Notes Claim shall receive its pro rata share (as determined as a percentage of all Senior Notes Claims) of (i) 100% of the total issued and outstanding New Common Stock . . . ." [D.I. 16] at 23-24.

18. Further, the Plan provides that, on the Effective Date, "the terms of the current members of the Chaparral Parent board of directors shall expire, and the Reorganized Chaparral Parent Board will include those directors set forth in the list of directors of the Reorganized Debtors included in the Plan Supplement." [D.I. 16] at 34.

19. Moreover, the Plan provides that "the Restructuring Transactions may include changes to the corporate and/or capital structure of Chaparral Parent and/or any of its subsidiaries to be made on or prior to the Effective Date, in each case, subject to the Creditor Approval Rights and as may be set forth in the Plan Supplement," including, but not limited to, "(i) the conversion of Chaparral Parent and/or one or more of its subsidiaries into corporations, limited liability companies or partnerships, (ii) the creation of one or more newly formed Entities and/or holding companies, (iii) the merger of one or more existing or newly formed entities and/or holding companies, (iv) the issuance of intercompany liabilities and/or intercompany equity, and (v) any 'election' that may be made for United States federal income tax purposes, (vi) the creation of one or more newly formed entities and/or (vi) the restructuring or repositioning of any of the direct or indirect subsidiaries of Chaparral Parent." [D.I. 16] at 28.

20. With respect to executory contracts, the Plan provides that, on the Effective Date, "except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts and Unexpired Leases shall be deemed assumed, including the Restructuring Support Agreement, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under Section 365 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to reject filed on or before the Effective Date; or (4) is identified on the Rejected Executory Contract and Unexpired Lease List." [D.I. 16] at 35.

21. The Plan provides that any monetary defaults under each Executory Contract to be assumed pursuant to the Plan shall be satisfied by Payment of the Cure Amount in Cash on the Effective Date or in the ordinary course of business. [D.I. 16] at 36. Further, the Plan provides that the Debtors shall provide notices of proposed Cure Amounts to counterparties to Executory Contracts, which shall include a description of the procedures for objection to assumption thereof based on the proposed cure Amounts or the Reorganized Debtors' ability to provide "adequate assurance of future performance thereunder." *Id.*

22. In the Plan, the Debtors reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List at any time through and including thirty days after the Effective Date. [D.I. 16] at 35-36.

23. In addition, the Plan provides that "[a]ssumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related

defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption." *Id.* at 37.

24. The Plan also provides that "[t]o the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breach by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor Party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto." [D.I. 16] at 36.

25. On September 9, 2020, the Debtors filed their *Notice of Filing Plan Supplement to the Chapter 11 Joint Prepackaged Plan of Reorganization for Chaparral Energy, Inc. and Its Affiliated Debtors* [D.I. 143], attaching as Exhibit "D" the Rejected Executory Contract and Unexpired Lease List. To date, the Debtors have not identified any contracts they intend to reject. *Id.* at 81.

## LAW AND ARGUMENT

**A. The License is an Executory Contract With a Valid Change in Ownership or Control Provision. The Plan Provisions Purporting to Invalidate the Change in Ownership or Control Provisions are Contrary to Law. In Addition, or Alternatively, the Debtors Cannot Assume or Assign the License Without Curing All Defaults Thereunder.**

26. A debtor may not assume an executory contract unless and until all defaults are cured; i.e. the Debtors' cure obligations include the obligation to cure all existing defaults as of the time of assumption and assignment. 11 U.S.C. § 365(b)(1); *In re Thane International, Inc.*, 586 B.R. 540, 546 (Bankr. D. Del. 2018). Moreover, it is well-settled that an executory contract must generally be assumed in its entirety or not at all. One cannot reject the burdens of an executory

contract and accept only the benefits. *In re E-Z Serv Convenience Stores, Inc.*, 289 B.R. 45, 49 (Bankr. M.D.N.C. 2003); *In re Rovine Corp.*, 6 B.R. 661, 666 (Bankr. W.D. Tenn. 1980).

27.     "An executory contract is a contract under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." In re Columbia Gas Sys. Inc., 50 F.3d 233, 239 (3rd Cir. 1995) citing Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39 (3rd Cir. 1989). The License is an executory contract within the meaning of Section 365 of the Bankruptcy Code because, *inter alia*, Chaparral Energy has continuing confidentiality obligations to CGG under the License and restrictions upon the use of the licensed data, and CGG has continuing obligations to allow Chaparral Energy to use the licensed data. *See In re Kmart Corp.*, 290 B.R. 614, 618 (Bankr. N.D. Ill. 2003) ("Generally speaking, a license agreement is an executory contract as such is contemplated in the Bankruptcy Code."); *RCI Tech. Corp. v. Sunterra Corp. (In re Sunterra Corp.)*, 361 F.3d 257, 264 (4th Cir. 2004) (a software license agreement was executory when at the time of filing, the parties each possessed an ongoing obligation to maintain the confidentiality of the source code of the software developed by the other). "Courts generally found intellectual property licenses to be 'executory' within the meaning of section 365(c) because each party to the license had the material duty of 'refraining from suing the other for infringement of any of the [intellectual property] covered by the license.'" *In re Golden Books Family Entm't*, 269 B.R. 300, 308 (Bankr. D. Del. 2001) (*quoting In re Access Beyond Techs., Inc.*, 237 B.R. 32, 44 (Bankr. D. Del. 1999); *see also Pegasus Imaging Corp. v. Northrop Grumman Corp.*, No. 07-1937, 2010 WL 1528506 (M.D. Fla. April 14, 2010) (holding that duties do not cease when software is delivered pursuant to software license agreement); *In re Chapin Revenue Cycle Mgmt., LLC*, 343 B.R. 728, 730 (Bankr. M.D. Fla. 2006) (holding that an end-user license agreement was an executory contract).

28. The change in control provisions contained in the License prohibit a transfer of the License, except to a Related Entity, and further provide that the License will automatically terminate if a Third Party becomes an Acquirer of the License unless Chaparral Energy or the acquiring entity pay to CGG a "Transfer Fee" representing fifty percent (50%) of the cash consideration actually paid by or due from Chaparral Energy for the licensed data.

29. Change in ownership or control provisions such as those contained in the License are valid and enforceable against a debtor. *See e.g., In re Washington Capital Aviation & Leasing*, 156 B.R. 167, 174 (Bankr. E.D. Va. 1993) (language in a lease that required principal of the debtor to control debtor prevented sale of stock in debtor as a method of transferring the lease as valid, noting that the change in control provision at issue was neither an *ipso facto* clause nor an anti-assignment clause.); *see also Institut Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489, 494 (1st Cir. 1997) (suggesting licensors desiring to prevent the assignment of their material without consent could include provisions either limiting or terminating the licensee's rights in the event of a change in ownership), *cert. den.*, 521 U.S. 1120 (1997), *abrogated on other grounds*, *Hardeman v. City of Boston*, 1998 WL 148382 (1st Cir. 1998).

30. The provisions of the Plan that purport to nullify the change of ownership and control provisions in the License are contrary to Bankruptcy law and non-Bankruptcy law. Moreover, to the extent the Plan provides for a change of ownership or control of the Debtors in violation of the change of ownership or control provisions of the License, and/or the Plan otherwise authorizes or enables the Debtors to assume (or assume and assign to third parties) the License without properly curing all defaults thereunder, including the default under the change of ownership or control provisions, the Plan further violates Bankruptcy law.

31. CGG objects to the assumption or assumption and assignment of the License because the Plan is premised upon a complete change of ownership and/or control as those terms

11

are defined in the License. Bankruptcy law provides that the Debtors are prohibited from assuming or assuming and assigning the License without curing all defaults thereunder, including non-monetary defaults such as under the change of ownership or control provisions.

32. Specifically, the Plan provides that all interest in Chaparral Parent will be extinguished as of the Effective date and the New Common Stock in Reorganized Chaparral Parent will be issued pro rata to Holders of Allowed Senior Note Claims. [D.I. 16] at 19-24. In addition, the Plan provides that the terms of the current members of the Chaparral Parent Board shall expire on the Effective Date and the Reorganized Chaparral Parent Board will include those directors set forth in the Plan Supplement. *Id.* at 34. Moreover, the Plan provides that "the Restructuring Transactions may include changes to the corporate and/or capital structure of Chaparral Parent and/or any of its subsidiaries to be made on or prior to the Effective Date, in each case, subject to the Creditor Approval Rights and as may be set forth in the Plan Supplement," including, but not limited to, "(i) the conversion of Chaparral Parent and/or one or more of its subsidiaries into corporations, limited liability companies or partnerships, (ii) the creation of one or more newly formed Entities and/or holding companies, (iii) the merger of one or more existing or newly formed entities and/or holding companies, (iv) the issuance of intercompany liabilities and/or intercompany equity, and (v) any 'election' that may be made for United States federal income tax purposes, (vi) the creation of one or more newly formed entities and/or (vi) the restructuring or repositioning of any of the direct or indirect subsidiaries of Chaparral Parent." [D.I. 16] at 28.

33. The Restructuring Transactions contemplated by the Plan would result in a change of ownership and control, triggering the Section 5.1 of the License. Pursuant to Section 5.1 of the License, the License will automatically terminate due to the Restructuring Transactions unless CGG receives payment of an amount equal to fifty percent (50%) of the consideration actually paid by or due from Licensee for all Data licensed under the License.

**B.     The Assumption of the License is Prohibited by 11 U.S.C. § 365(c)(1)(A) Absent the Consent of CGG.**

34.     The Court should reject any proposed assumption of the License as prohibited by Section 365(c)(1)(A) of the Bankruptcy Code, which provides that a trustee may <u>not</u> assume or assign an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if:

> (a) "applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession . . .," and (b) "such party does not consent to such assumption or assignment . . .".

35.     "Applicable law" as used in Section 365(c)(1)(A) means "any law applicable to a contract, other than bankruptcy law". *In re Trump Entertainment Resorts, Inc.*, 526 B.R. 116, 123 (Bankr. D. Del. 2015) citing *In re XMH Corp.,* 647 F.3d 690, 695 (7th Cir. 2011).

> ***i.     Oklahoma and Federal Trade Secret Law is "Applicable Law" under Section 365(c)(1)(A) Preventing Assumption and Assignment as Proposed in the Plan.***

36.     Oklahoma and U.S. trade secrets laws constitute "applicable law" under Section 365(c)(1)(A) and excuse CGG from accepting performance from or rendering performance to an unrelated acquiring entity absent strict compliance with the terms of the License, including payment of the Transfer Fee to CGG.

37.     Although the Bankruptcy Code does not define "applicable law" for the purposes of Section 365(c)(1)(A), it has been interpreted to include non-bankruptcy federal law governing patent, trademark and copyright licenses. See, e.g., *Trump Entertainment Resorts,* 526 B.R. at 123 (applying federal trademark law); *Permian v. Catapult Entm't. Inc., (In re Catapult Entm't Inc.)*, 165 F.3d 747, 750 (9th Cir. 1999) (finding that federal patent law constitutes "applicable law" for the purposes of Section 365(c)(1)); *Everex Sys., Inc. v. Cadtrak Corp. (In re CFLC, Inc.)*, 89 F.3d 673, 679 (9th Cir. 1996) (holding that federal law governs the assignability of a patent license and

13

finding that the application of federal law was supported by the federal patent policy of encouraging innovation); *In re Alltech Plastics, Inc.*, 71 B.R. 686, 689 (Bankr. W.D. Tenn. 1987) (finding federal law governs the assignability of patent licenses); *In re Sunterra Corp*, 361 F.3d at 257 (finding that federal law constitutes applicable law in the case of copyright licenses); *In re Patient Educ Media, Inc.*, 210 B.R. 237 (Bankr. S.D.N.Y. 1997) (applying federal law to non-exclusive copyright license); *Harris v Emus Records Corp*, 734 F.2d 1329 (9th Cir 1984) (applying federal law to copyright license); *NCP Mktg Group, Inc. v. Blanks (In re NCP Mktg Group, Inc.)*, 337 B.R. 230 (D. Nev. 2005) (applying federal law to trademark license).

38. While the case law does not address whether "applicable law" includes trade secret laws, it should apply equally to trade secret laws as it does for copyright, trademark and patent laws as they all serve similar purposes.

39. The Oklahoma Uniform Trade Secrets Act sets forth the definition of a trade secret in Oklahoma; in addition, the Oklahoma Supreme Court has adopted six factors from the Restatement of Torts, § 757, Comment b (1939), to help determine whether information is a trade secret. *MTG Guarnieri Mfg., Inc. v. Clouatre*, 239 P.3d 202, 209 (Okla. Civ. App. 2010) (citation omitted). The Oklahoma Uniform Trade Secrets Act, § 86, defines a trade secret as: "information, including a formula, pattern, compilation, program, device, method, technique or process, that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." OKLA. STAT. tit. 78, § 86(4). The Restatement factors are: (1) the extent to which the information is known outside of the business, (2) the extent to which the information is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of information; (4) the value of the information

to the business and to competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *MTG Guarnieri Mfg.,* 239 P.3d at 210 (citations omitted).

    40.    The data licensed under the License is a protected trade secret under Oklahoma law.[4] Cases in other states that have adopted the Uniform Trade Secrets Act have recognized the industry wide practice of treating seismic data as trade secrets *See, e.g., In re Bass*, 113 S.W.3d 735, 742 (Tex. 2003) (It is undisputed that the oil and gas industry typically treats seismic data and other methods for obtaining subsurface geological information as trade secrets under Texas law); s*ee also LexMac Energy, L.P. v. Macquarie Bank Limited*, 4:08–cv–048, 2014 WL 12669718, at *34 (D. N.D. Feb. 19, 2014) (seismic data is trade secret); *MAR Oil Co. v. Korpan*, 3:11-cv-1261, 2014 WL 2986907 at *5 (N.D. Ohio April 18, 2014); *Musser David Land Co. v. Union Pac. Res.*, 201 F.3d 561, 569 (5th Cir. 2000); *Anadarko Petroleum Corp. v. Davis,* 06-2849, 2006 WL 3837518 at *15 (S.D. Tex. Dec. 28, 2006); *In re TXCO Res., Inc.*, 475 B.R. 781 (Bankr. W.D. Tex. 2012).

    41.    Under the Oklahoma Uniform Trade Secrets Act, disclosure or use of a trade secret results in a misappropriation action if it occurs without the express or implied consent of the owner. OKLA. STAT. tit. 78, § 86(2). In addition, a person who, without the owner's consent, knowingly copies or transmits a trade secret is guilty of larceny under Oklahoma law. OKLA. STAT. tit. 21, § 1732.

---

[4] The License provides that it is governed by Oklahoma law. *See* Ex. 1 at Section 14.

42. Furthermore, federal trade secret law mirrors the Oklahoma Uniform Trade Secrets Act providing for a federal action for misappropriation of a trade secret if consent of the owner is not obtained. *See* 18 U.S.C. § 1836 *et seq*.

43. The Oklahoma Uniform Trade Secrets Act and federal trade secrets law constitute "applicable law" under Section 365(c)(1)(A) of the Bankruptcy Code. The trade secrets laws serve similar purposes to other laws considered "applicable law" under § 365(c)(1)(A), such as federal trademark, patent and copyright law, which prohibit nonconsensual assignments in order to provide protection of owners of information or materials that derive their value from being difficult to develop, unique and/or not publicly available by limiting who can use the information or materials without the owner's consent. *See, e.g., In re Trump Entertainment Resorts,* 526 B.R. at 124; *In re CFLC, Inc.*, 89 F.3d 673, 679 (9th Cir. 1996); *In re Patient Educ. Media, Inc.*, 210 B.R. 237, 242 (Bankr. S.D.N.Y. 1997).

44. For the above reasons, CGG is excused from accepting performance from or rendering performance to an unrelated acquiring entity absent strict compliance with the terms of the License, including payment of the Transfer Fee to CGG. Accordingly, the License cannot be assumed under the Debtors' Plan without the consent of CGG.

    *ii.*    **Federal Copyright Law is "Applicable Law" under Section 365(c)(1)(A).**

45. In addition, the U.S. Copyright Act further constitutes "applicable law" under Section 365(c)(1)(A) and precludes assumption of the License absent strict compliance with the terms of the License, including payment of the Transfer Fee to CGG.

46. The Copyright Act, 17 U.S.C. §102, *et. seq.*, provides protection to the authors of "original works of authorship" fixed in "any tangible medium of expression . . . from which they can be perceived, reproduced, or otherwise communicated," including but not limited to both published and non-published literary, pictorial, graphic, artistic, audiovisual, sound recording,

architectural, and certain other intellectual works. It also applies to and protects compilations and derivative works.

47.    A work need only have been independently created and possess "at least some minimal degree of creativity" to be sufficiently original for copyrightability. *Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 141 (5th Cir. 1992). The Supreme Court has held that the level of creativity required under the Copyright Act "is extremely low; even a slight amount will suffice." *Fiest Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S 340, 111 S.Ct. 1282, 1287 (1991). For example, photographs and maps have been held to be copyrightable. *See SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301, 308-311 (S.D.N.Y. 2000); *Mason*, 967 F.2d at 139-141; *City of New York v. Geodata Plus, LLC*, 537 F. Supp. 2d 443, 450-52 (E.D.N.Y. 2007); *Newton v. Voris*, 364 F. Supp. 562, 563-64 (D. Or. 1973).

48.    It is well-settled that federal copyright law makes non-exclusive licenses such as the License are non-assignable absent consent of the licensor. *See, e.g.*, *In re Patient Education Media, Inc.*, 210 B.R. 237, 241 (Bankr. S.D.N.Y. 1997); *In re Buildnet, Inc.*, 2002 WL 31103235, at *5 (Bankr. M.D.N.C. Sept. 20, 2002); *In re Sunterra Corp.*, 361 F.3d at 262, n.7; *In re Trump Entertainment Resorts,* 526 B.R. at 126.

49.    Pursuant to the License, CGG provides the Debtors with a non-exclusive license to use sensitive, highly confidential, and copyrighted seismic data. The data licensed to Chaparral Energy under the License is an "original work of authorship" of CGG fixed in a tangible medium of expression from which they can be perceived, reproduced, or otherwise communicated. Because the License is protected under copyright laws, Section 365(c)(1)(A) of the Bankruptcy Code prohibits the assumption or assumption and assignment of the License without the CGG's consent. As such, the Plan provisions purporting to authorize the Debtors to assume and assign the License if not identified on the Debtor's Rejected Executory Contracts and Unexpired Leases List, and

purporting to authorize the Debtors to assume and assign the License, violates Bankruptcy law. CGG does not consent to the assumption of the License absent strict compliance with the terms of the License, including payment of the Transfer Fee to CGG.

**C.     If the License is Rejected, CGG Objects to the Plan to the Extent it Would Relieve Chaparral Energy of its Obligations Upon Termination of the License.**

50.     If the License is rejected, CGG objects to the Plan to the extent that the Plan would relieve Chaparral Energy of its obligations upon termination of the License to, among other things, return and/or destroy the Data and Derivatives that are subject to the License as required by the terms of the License.

## RESERVATION OF RIGHTS

51.     CGG reserves the right to supplement, amend, and/or modify its objection and raise other objections they may have to confirmation of the Debtors' proposed Plan, as well as all other rights including, without limitation, the right to file any such further and additional objections to any filings in this proceeding that they deem appropriate.

52.     In addition, CGG reserves all of its rights to seek rejection damages, if any, arising from the rejection of the License if it is rejected.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, CGG Land (U.S.) Inc. respectfully requests that the Court deny confirmation of the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization unless and until CGG's objections are resolved, and grant CGG Land (U.S.) Inc. such other and further relief to which it may be entitled in law and equity.

Dated: September 21, 2020
Wilmington, Delaware

BAYARD, P.A.

*/s/ Evan T. Miller*
Evan T. Miller (No. 5364)
600 N. King Street, Suite 400
Wilmington, DE 19801
Tel. (302) 655-5000
Email: emiller@bayardlaw.com

-and-

ADAMS AND REESE LLP
Scott R. Cheatham (admitted *pro hac vice*)
George Robert Parrott II (admitted *pro hac vice*)
701 Pydras Street, Suite 4500
New Orleans, LA 70139
Telephone: (504) 581-3234
Email: scott.cheatham@arlaw.com
       Robert.parrott@arlaw.com

*Attorneys for CGG Land (U.S.) Inc.*